UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 18-CV-0361 (JBW) |
| PATRICK K. MCDONNELL, and CABBAGETECH, CORP. d/b/a COIN DROP MARKETS, | ECF Case |
| Defendants. | |

**BRIEF OF COMMODITY FUTURES TRADING COMMISSION IN SUPPORT OF
<u>PRELIMINARY INJUNCTION AND OTHER RELIEF</u>**

**Table of Contents**

I.      SUMMARY ..................................................................................................... 1

II.     THE PARTIES ................................................................................................ 2

III.    FACTS ............................................................................................................ 3

        A.      Virtual Currency .................................................................................. 3

        B.      The Commission's Oversight of Virtual Currency-Related Markets and Virtual
                Currency Trading ................................................................................ 4

        C.      McDonnell's Solicitation and Trading Background ............................. 8

        D.      Defendants Fraudulently Solicited Customers To Purchase RedliteGreenLite and
                Turnkey Services ................................................................................. 9

        E.      Defendants Fraudulently Solicited Customers To Provide Virtual Currencies for
                Managed Trading ............................................................................... 10

IV.     ARGUMENT ................................................................................................ 11

        A.      The Court's Jurisdiction and the Commission's Authority To Bring This Action 11

        B.      Defendants Violated the Antifraud Provisions of Section 6(c)(1) of the Act and
                Regulation 180.1(a) ........................................................................... 12

                1.      Defendants Committed Fraud Through Misappropriation and Material
                        Misrepresentations and Omissions ......................................... 15

                2.      The Defendants' Fraud Was in Connection with a Contract of Sale of a
                        Commodity in Interstate Commerce ........................................ 17

                        a.      The Virtual Currencies Bitcoin and Litecoin Are "Commodities" 17

                        b.      Defendants' Fraudulent Acts Were in Connection with Contracts
                                of Sale of Commodities in Interstate Commerce ........................ 21

                3.      Defendants Acted with Scienter ............................................... 23

        C.      McDonnell Is Liable as a Controlling Person ..................................... 24

        D.      CDM Is Liable for the Acts of Its Agent McDonnell ......................... 25

        E.      Entry of a Preliminary Injunction Is Appropriate in this Matter ......... 26

V.      CONCLUSION ............................................................................................. 27

**TABLE OF AUTHORITIES**

**CASES**

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) .................................................13

*CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir. 1986) ....................................27

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) .........................................................24

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977) ....................26, 27

*CFTC v. Byrnes*, 58 F. Supp. 3d 319 (S.D.N.Y. 2014)...................................................25

*CFTC v. Commodity Inv. Grp., Inc.*, 2006 WL 353466 (S.D.N.Y. Feb. 11, 2006) ....................26

*CFTC v. Creagh*, 15-CV-6140 (JPO), 2017 WL 1929624 (S.D.N.Y. May 10, 2017) .................27

*CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21708,
    2013 WL 5212237 (S.D. Fla. Sept. 12, 2013) .........................................................15

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) .................14. 16

*CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014) ..................................26

*CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004). ........................16, 24

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ........................................23

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321 (11th Cir. 2002)........................................23

*CFTC v. S. Trust Metals, Inc.*, 2018 WL 493116 (11th Cir. 2018) ................................ 14-15, 16

*CFTC v. S. Trust Metals, Inc.*, No. 1:14-CV-22739-KING,
    2016 WL 4523851 (S.D. Fla. Aug. 29, 2016)........................................................16

*CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245 (S.D. Fla. 2009) .............................27

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29 (D.D.C. 2015).....................................18

*CFTC v. Van Beuningen*, No. 1:16-cv-978, 2016 WL 9454431 (N.D. Ga. Mar. 29, 2016).........15

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003)....................................................16

*Corley v. United States*, 556 U.S. 303 (2009)...........................................................................20

*Dunn v. CFTC*, 519 U.S. 465 (1997) ...............................................................................17, 19

*Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999)...................................................................25

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................21

*Lenroot v. W. Union Tel. Co.*, 141 F.2d 400 (2d Cir. 1944)
    *rev'd on other grounds by*, 323 U.S. 490 (1945) ..................................................19

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993)...........................................................24

*R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ............................. 13-14

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ..............................................................26

*SEC v. Lawbaugh*, 359 F. Supp. 2d 418 (D. Md. 2005) .................................................15

*SEC v. Zandford*, 535 U.S. 813 (2002) ......................................................................13, 21

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .......................................................26

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)......................................................................26

*Stotler & Co. v. CFTC*, 855 F.2d 1288 (7th Cir. 1988) ...................................................25

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .........................................................21

*Wax v. Aventis Pasteur Inc.*, 240 F. Supp. 2d 191, 192 (E.D.N.Y. 2002) .....................21

*First Commodity Corp. v. CFTC*, 676 F.2d 1 (1st Cir. 1982).........................................23

## STATUTES

7 U.S.C. § 1a(9) (2012).................................................................................................18, 19

7 U.S.C. § 1a(13) (2012) ...................................................................................................22

7 U.S.C. § 1a(19) (2012)....................................................................................................18

7 U.S.C. § 1a(30) (2012)...............................................................................................22, 23

7 U.S.C. § 1a(40) (2012).................................................................................................... 13

7 U.S.C. § 2(a)(1)(A) (2012) ...............................................................................................4

7 U.S.C. § 2(a)(1)(B) (2012)........................................................................................25, 26

7 U.S.C. § 2(b) (2012) ..................................................................................................22, 23

7 U.S.C. § 6(a) (2012).........................................................................................................19

7 U.S.C. § 6(b)(2)(A) (2012) ..................................................................................19

7 U.S.C. § 9(1) (2012) ................................................................................... *passim*

7 U.S.C. § 13-1 (2012) ............................................................................................17

7 U.S.C. § 13a-1 (2012) ...............................................................................1, 12, 26

7 U.S.C. § 13c(b) (2012) .........................................................................................24

18 U.S.C. § 1341 (2012) ............................................................................................8

28 U.S.C. § 1331 (2012) ..........................................................................................11

28 U.S.C. § 1345 (2012) ..........................................................................................12

## ADMINISTRATIVE DECISIONS

*In re Barclays PLC*, CFTC No. 15-25, 2015 WL 2445060  (May 20, 2015) ...............................18

*In re BFXNA Inc. d/b/a Bitfinex*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016) ..........6, 20

*In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) ..........................6, 20

*In re Commodities Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543 (Jan. 14, 1997) ..................16

*In re Spiegel*, CFTC No. 85-19, 1988 WL 232212 (Jan. 12, 1988) ...............................................24

*In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015) .................6, 20

## ADMINISTRATIVE REGULATIONS AND INTERPRETATIONS

17 C.F.R. § 1.2 (2017) ..........................................................................................25

17 C.F.R. § 37.4 (2017) ..........................................................................................5

17 C.F.R. § 40.2 (2017) ..........................................................................................5

17 C.F.R. § 180.1(a) (2017) ............................................................................. *passim*

17 C.F.R. § 240.10b-5 (2017) ................................................................14, 15, 22

Prohibition on the Employment, or Attempted Employment, of Manipulative and
     Deceptive Devices and Prohibition on Price Manipulation,
     76 Fed. Reg. 41,398 (July 14, 2011) ................................................................ *passim*

Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60335
    (proposed Dec. 15, 2017) ................................................................................3, 6, 20

I.R.S. Notice 2014-21 (Apr. 14, 2014) ...............................................................3, 19

Department of Treasury Financial Crimes Enforcement Network ("FinCEN") Guidance
    FIN-2013-G001 (Mar. 18, 2013) ...............................................................................3

## OTHER SOURCES

Black's Law Dictionary (10th ed. 2014) ...................................................................19

Oxford English Dictionary (3d ed. 2010) ................................................................19

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") respectfully submits this Memorandum in Support of Preliminary Injunction and Other Relief against defendants Patrick K. McDonnell ("McDonnell") and the company CabbageTech, Corp. d/b/a Coin Drop Markets ("CDM") (collectively, "Defendants") pursuant to Section 6c of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 13a-1 (2012).  Among other relief, Plaintiff seeks an order (1) prohibiting Defendants from further violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2017); (2) preserving the books and records of Defendants, and providing the Commission with access thereto; and (3) ordering Defendants to submit to an interim accounting on an expedited basis within five (5) days.  The application is supported by this memorandum of law, the Complaint, and the February 26, 2018 Declaration of Christopher Giglio ("Giglio Decl.").

## I.     SUMMARY

Since at least in or around January 2017 to the present, Defendants operated a deceptive and fraudulent virtual currency scheme to induce customers ("CDM Customers") to send money and virtual currencies to Defendants in exchange for particularized advice as to the trading of virtual currencies such as Bitcoin (BTC) and Litecoin (LTC), and for virtual currency purchases and trading on customers' behalf under McDonnell's direction.  Then, to conceal the scheme, Defendants removed website and social media materials from the internet, and ceased communicating with CDM Customers, who lost most if not all of their invested funds due to Defendants' fraud and misappropriation.

The Complaint in this matter was filed on January 18, 2018.  ECF No. 1.  Defendants were served with process on January 22, 2018.  ECF No. 7 (as to Patrick K. McDonnell), ECF No. 8 (as to CabbageTech, Corp.).  On January 30, 2018, the Court issued an Order (the "January

30 Order") that directed the parties to appear on February 12, 2018, at 11:00 AM for an evidentiary hearing, set a schedule for preliminary briefs and responses, and stated that the Court "will consider temporary relief and the further administration of the litigation." ECF No. 9. The next day, the Court issued another Order (the "January 31 Order") that directed the parties in their briefs "to address the jurisdictional question: the authority of the plaintiff to bring this action." ECF No. 10. On February 9, 2018, at the parties' request, the Court adjourned the evidentiary hearing and related deadlines, including Defendants' obligation to answer and briefing, to March 6, 2018, at 10:30 AM. ECF No. 14.

Defendant McDonnell entered by letter a notice of appearance pro se dated February 12, 2018, ECF No. 16, and a motion to dismiss dated February 14, 2018, ECF No. 18. By Order dated February 14, 2018, the Court indicated it would hear the parties on jurisdictional, standing, and other issues at the March 6 hearing, and that all briefs would be due February 26, 2018. In this regard, this memorandum supports the Commission's request for a preliminary injunction and other relief, and in particular addresses the Commission's authority to bring this action in Parts IV.A and B, *infra*. The Commission also is filing a separate memorandum that opposes Defendant McDonnell's meritless motion to dismiss.

## II.      THE PARTIES

Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-27(f) (2012), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2017).

Defendant **Patrick K. McDonnell** is a resident of Staten Island, New York. Giglio Decl. ¶ 10. McDonnell formed, owned, and controlled CabbageTech, Corp. *Id.* at ¶ 12. Defendant **CabbageTech, Corp.** is a New York corporation based in Staten Island, New York, that was

2

incorporated on May 6, 2016.  *Id.*, Ex. 16 .  CabbageTech, Corp.'s last known address is 20

Rawson Place, Suite B, Staten Island, New York, 10314.  At times, CabbageTech, Corp. did

business as **Coin Drop Markets**.  *Id.* at ¶ 13.  Neither Defendant has ever been registered with

the Commission.  McDonnell was previously licensed as a securities broker by the Financial

Industry Regulatory Authority, Inc. ("FINRA").  *Id.* at ¶ 10, Ex. 11.

### III.   FACTS

#### A.   Virtual Currency

Defendants engaged in the business of offering trading services related to virtual

currency.  A virtual currency is defined here as a digital representation of value that functions as

a medium of exchange, a unit of account, and/or a store of value.  *Id.* ¶ 3; *see also* Retail

Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60335, 60337-38 (proposed

Dec. 15, 2017); Internal Revenue Bulletin 2014-16, Notice 2014-21 (Apr. 14, 2014),

https://www.irs.gov/pub/irs-drop/n-14-21.pdf; Department of Treasury Financial Crimes

Enforcement Network ("FinCEN") Guidance FIN-2013-G001 (Mar. 18, 2013),

https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf.  In contrast to real or

traditional currency (i.e., the coin and paper money of a country), virtual currency does not have

legal tender status in any jurisdiction.  *See* I.R.S. Notice 2014-21, at 1 ("[Bitcoin] operates like

'real' currency . . . but it does not have legal tender status in any jurisdiction."); FinCEN

Guidance FIN-2013-G001, at 1 ("In contrast to real currency, 'virtual' currency is a medium of

exchange that operates like a currency . . . but does not have all the attributes of real currency.  In

particular, virtual currency does not have legal tender status in any jurisdiction.").

Virtual currencies are often described as "cryptocurrencies" by purchasers and sellers

because typically the virtual currency in question uses cryptographic protocols to secure

transactions in that asset despite being recorded on publicly available decentralized ledgers,

usually described in this context as "blockchains."  Giglio Decl. ¶ 4.  Many virtual currencies

(like Bitcoin and Litecoin, two virtual currencies involved in the contracts of sale identified in

the Complaint) use such decentralized networks to track transactions between persons who are

denominated only by publicly visible strings of characters called keys, rather than individual

names, and who are otherwise anonymous to each other.  *Id.*  The transactions are captured in

single blocks at a time, which independent operators (called "miners," a virtual analogy to actual

miners whose efforts unearth gold, silver, and other precious metals) confirm by performing

algorithmic proofs of work and for which they are usually awarded a sum of the virtual currency

in question.  *Id.*  The public nature of the decentralized ledger allows people to recognize the

transfer of virtual currency from one user to another without requiring any central intermediary

in which both users need to trust.  *Id.*

> **B.    The Commission's Oversight of Virtual Currency-Related Markets and
> Virtual Currency Trading**

With certain exceptions not relevant here, Congress has granted the Commission

exclusive jurisdiction over commodity futures, commodity options, and all other commodity

derivatives that fall within the definition of a swap.  7 U.S.C. § 2(a)(1)(A) (2012).  Commodity

futures and options products are generally traded through designated contract markets

("DCMs"), such as the Chicago Mercantile Exchange, Inc. ("CME"), Cboe Futures Exchange,

LLC ("CFE"), or North American Derivatives Exchange, Inc. ("NADEX").  Swaps are generally

traded on DCMs or Swap Execution Facilities ("SEFs") such as LedgerX LLC and

TeraExchange, LLC.

In recent years, the CFTC has exercised its exclusive jurisdiction over virtual currency

derivatives in a variety of ways.  For example, the CFTC allowed the DCMs and SEFs it

regulates to list derivatives products for which the underlying commodity consisted of a virtual

4

currency, namely the most well-known:  Bitcoin.[1]  *See, e.g.*, TeraExchange, LLC, *TeraExchange Submission 2014-25* (Sept. 11, 2014), https://www.teraexchange.com/style/ images/rnd/instr/Tera%2040.2%20Filing%20-%202014-25%20Listing%20of%20USD-Bitcoin%20Non-Deliverable%20Forward.pdf (noting listing of Bitcoin swaps in 2014); NADEX, *Self-Certification of Rule Amendments* as to NADEX Bitcoin Binary Options (Nov. 26, 2014), https://www.nadex.com/notices/2014/nadex-adds-new-bitcoin-binary-contracts-product-listing (noting listing of Bitcoin binary options); CFTC Order of Registration as a SEF, *In re LedgerX LLC* (July 6, 2017), http://www.cftc.gov/idc/groups/public/@otherif/documents/ifdocs /orgledgerxord170706.pdf (granting registration and authority to list digital currency swaps); CFTC Order of Registration as a Designated Clearing Organization, *In re LedgerX LLC* (July 24, 2017), http://www.cftc.gov/idc/groups/public/@otherif/documents/ifdocs/ledgerxdco regorder72417.pdf (granting authority and registration to clear digital currency swaps); CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE, and Cantor Exchange (Dec. 1, 2017), http://www.cftc.gov/PressRoom/PressReleases/pr7654-17 (noting listing of Bitcoin futures contracts and binary options by three major exchanges); NADEX, *Self-Certification of Rule Amendments* as to NADEX Bitcoin Variable Payout Contract ("Bitcoin Spread Contracts") (Dec. 14, 2017), https://www.nadex.com/notices/2017/nadex-self-certification-list-new-bitcoin-spread-contracts.  Many of these Bitcoin-derivatives products are actively traded with increasing volume each month.  As of February 23, 2018, for example, open interest in CFE and CME contracts for future delivery of Bitcoin alone exceeded 14,000 Bitcoin, or approximately $140

---

[1] In general, before listing new contracts, the Act provides DCMs or SEFs with the option to either self-certify that the contract applies with applicable Commission regulations or submit the contract to review by the Commission. 17 C.F.R. §§ 37.4, 40.2 (2017).

million using end-of-day prices, with more than $150 million in daily trading volume.[2]  Giglio Decl. ¶ 7.

The Commission also has actively policed the virtual currency derivatives markets it regulates.  The Commission brought an enforcement action against a SEF for violating core principles by failing to enforce its prohibitions against unlawful wash trading and prearranged trades.  *See In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015).  Similarly, while allowing registered exchanges that meet their obligations to list virtual currency derivatives, the Commission has brought actions against exchanges that offered Bitcoin options, certain retail spot virtual currency trading, or other derivative products without registering as a DCM or SEF.  *See In re BFXNA Inc. d/b/a Bitfinex*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016) (taking action against an unregistered exchange that offered financed, retail spot commodity transactions in Bitcoin and other cryptocurrencies); *In re Coinflip, Inc.,* CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) (offering Bitcoin options without registration).

The Commission has also issued proposed guidance concerning the interpretation of the term "actual delivery" involving certain retail commodity transactions in virtual currency.  Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60,335 (proposed Dec. 15, 2017).  Under the Act and the Regulations, an exchange generally must register with the Commission if it offers to enter into, execute, or confirm the execution of financed retail commodity transactions.  Certain exceptions apply, such as for contracts of sale resulting in actual delivery within twenty-eight days.  This interpretation will provide additional guidance regarding what constitutes "actual delivery" in the context of virtual currency, and thus which

---

[2] Virtual currency futures trading has also occurred on various boards of trade outside the United States since at least 2015.  For example, BitMEX, a foreign board of trade with offices in Hong Kong (and owned by a Seychelles company), offers futures contracts on Bitcoin and Litecoin, among others.  Giglio Decl. ¶ 6.

exchanges must register with the Commission (i.e., those that do not actually deliver the virtual currency within twenty-eight days of sale).

The Commission has engaged in public outreach as well.  For example, the Commission maintains a publicly available webpage of virtual currency resources, http://www.cftc.gov/bitcoin/index.htm.  The Commission also has issued advisories to inform the public about virtual currency topics, such as the Commission's oversight of virtual currency futures markets[3] and the certification of Bitcoin futures and options products.[4]

Each of these regulatory actions reflects the determination by the Commission (and in some cases, such as self-certification, the relevant market participant) that Bitcoin and other virtual currencies are "commodities" under the Act.  *See* 7 U.S.C. § 1a(9).

In addition to virtual currency derivative products, spot[5] contracts involving virtual currencies such Bitcoin and Litecoin are actively traded throughout the United States and worldwide.  Although persons and entities dealing in spot virtual currency transactions generally are not subject to the CFTC's DCM, SEF, or other registration requirements, Congress provided the CFTC with enforcement authority to prosecute fraud and manipulation in these spot markets—that is, in addition to the Commission's plenary authority over most derivatives markets, Congress granted the Commission authority, and the Commission has exercised that authority, generally to prohibit (and bring enforcement actions for) fraudulent or manipulative acts in connection with a contract of sale of any commodity in interstate commerce.  *See* 7

---

[3] CFTC, *Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets* (Jan. 4, 2018), http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/backgrounder_virtualcurrency01.pdf.

[4] CFTC, *Backgrounder on Self-Certified Contracts for Bitcoin Products* (Dec. 1, 2017), http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/bitcoin_factsheet120117.pdf.

[5] The "spot" market involves immediate delivery of and payment for a product, as distinct from a contract for future delivery.  *E.g.*, "Spot," CFTC Glossary, http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#S.

U.S.C. § 9(1) (2012); 17 C.F.R. § 180.1 (2017).  Notably, this enforcement authority over the

spot market does not require that the fraud or manipulation in the spot market have a connection

to the derivatives market.  *See* Prohibition on the Employment, or Attempted Employment, of

Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg.

41,398 (July 14, 2011).

The Commission has exercised its authority in the virtual currency spot markets in a

number of ways, including issuing advisories to market participants about virtual currency

valuations and volatility in spot virtual currency markets[6] and about virtual currency pump-and-

dump schemes,[7] and filing anti-fraud civil enforcement actions in federal courts against virtual

currency Ponzi schemes.[8]

### C.      McDonnell's Solicitation and Trading Background

McDonnell is very familiar with the use of deceptive and fraudulent techniques in selling

trading advice and services to customers.  From 1993 to 2000, McDonnell held a Series 7 and a

Series 63 license as a securities representative, and was employed at Stratton Oakmont, Biltmore

Securities, Duke & Co., I.A. Rabinowitz & Co., and Barron Chase Securities.  Giglio Decl. ¶ 10,

Ex. 11.  Notably, four of these five brokerage firms were expelled by FINRA because of fraud

and similar misconduct.  *Id.* ¶ 10.

In 2003, McDonnell pleaded guilty to mail fraud pursuant to 18 U.S.C. § 1341 in

connection with a scheme whereby he fraudulently solicited customers through investment

---

[6] CFTC, *Customer Advisory: Understand the Risks of Virtual Currency Trading* (Dec. 15, 2017),
http://www.cftc.gov/idc/groups/public/@customerprotection/documents/file/customeradvisory_urvct121517.pdf.

[7] CFTC, *Customer Advisory: Beware Virtual Currency Pump-and-Dump Schemes* (Feb. 15, 2018),
http://www.cftc.gov/idc/groups/public/@customerprotection/documents/file/customeradvisory_pumpdump0218.pdf.

[8] *E.g.*, *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181 (S.D.N.Y. Sept. 21, 2017); *CFTC v. My Big Coin Pay, Inc.*, No. 1:18-cv-10077 (D. Mass. Jan. 16, 2018); *CFTC v. Dean*, No. 2:18-cv-00345-SJF-AYS (E.D.N.Y. Jan. 18, 2018).

companies he controlled to trade foreign currency contracts, and, once he obtained the funds, converted the money to his personal use.  *Id.* ¶ 11, Exs. 13-15.  McDonnell was sentenced to thirty months' imprisonment for this conduct.  *Id.*, Ex. 15.

### D.  Defendants Fraudulently Solicited Customers To Purchase RedliteGreenLite and Turnkey Services

Defendants solicited customers in several of the United States as well as foreign countries (*see* Giglio Decl. ¶ 14) to become members of groups supposedly receiving Defendants' virtual currency consulting services and trading advice.  In April 2017, Defendants advertised membership in trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to Bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to Litecoin.  *Id.* ¶ 17.  These groups purported to provide trading advice and guidance, such as entry and exit prices for day trading of certain virtual currencies.  *Id.* ¶ 17, Exs. 18-20.  Defendants also solicited membership or subscription to other groups and services, such as a "Turn-Key Annual Membership" providing access, for instance, to McDonnell's and CDM's supposed virtual currency trading expertise, mentorship, and guidance.  *Id.* ¶ 19.

For example, in or around April and May 2017, CDM's promotional materials made claims such as that a CDM membership in RLGLLTC would provide "real-time . . . reports [of] critical $LTC entry/exit points via @RLGLLTC 24/7 including holidays/weekends."  *Id.* ¶ 18, Exs. 18-20.  These promotional materials further made claims that this continuous, ongoing monitoring and trading signals "afford[ed] 'minute-to-minute' price arbitrage, exploitation, and opportunities for swing trading profits."  *Id.*  These promotional materials also made claims that the service consisted of  "a dedicated team of digital asset trading specialists trend spotting."  *Id.*

These materials promised to provide the membership services on an annual basis in exchange for the up-front subscription fee.  *Id.*, Ex. 21.  Defendants further solicited "lifetime"

memberships, at a higher price, in a more exclusive trading sector that would provide greater opportunities to profit from virtual currency trading. For example, one such opportunity purported to offer profits as much as 300% return on an investment in less than a week. *Id.* ¶ 20, Ex. 22. In or around May 2017, Defendants created one or more social media chatrooms, purportedly to provide the agreed-upon trading advice and services. *Id.*

In fact, however, after receiving subscription payments from multiple CDM Customers, Defendants never provided to such customers continuous, real-time trading signals, advice, or trading expertise through its social media chatrooms, through online communications such as via Twitter, or through its website. For example, Defendants never provided "real-time . . . reports [of] critical $LTC entry/exit points via @RLGLLTC 24/7 including holidays/weekends." Similarly, Defendants' RLGLLTC never provided signals that "afford[ed] 'minute-to-minute' price arbitrage, exploitation, and opportunities for swing trading profits." *Id.* ¶ 27.

Instead, Defendants misappropriated the CDM Customers' funds. By July 2017, within three months after Defendants had solicited and obtained payments from numerous CDM Customers for the purchase of annual and "lifetime" subscriptions to various membership services, Defendants shut down the website and chatroom, deleted social media accounts, ceased communicating with customers, and kept the customers' funds. *Id.* ¶ 27-28.

### E. Defendants Fraudulently Solicited Customers To Provide Virtual Currencies for Managed Trading

McDonnell also solicited persons to provide funds to Defendants, which Defendants would employ to purchase virtual currencies and/or engage in trading on the customers' behalf.

Defendants' solicitations involved exaggerations of McDonnell's trading track record in order to suggest his ability to achieve similar gains for CDM Customers. For example, McDonnell described himself in solicitations as a "professional trader," and CDM's website

10

included a purported example of a single virtual currency trade that had generated more than an approximately 1,000% return.  Giglio Decl. ¶ 24.

 In fact, rather than achieving enormous gains on behalf of CDM Customers, once Defendants had solicited and obtained CDM Customer funds for trading by Defendants on behalf of customers, Defendants ceased communicating with the customers and misappropriated the customers' funds.  *Id.* ¶ 26.  For example, one CDM customer sent the Defendants the equivalent of 5 Bitcoins in preparation for trading on behalf of McDonnell's large customer. *Id*. ¶¶ 22, 31.  This CDM customer never did any trading for this large customer and the Defendants never returned the funds that were transferred by Investor 2.  *Id.*

 For another example, in or around May 2017, after being solicited by McDonnell, another CDM Customer provided Litecoin to Defendants for trading by McDonnell on the customer's behalf.  McDonnell told this customer that he would use the customer's funds to trade the "volatility" of Litecoin.  *Id. ¶* 22.  In fact, however, Defendants misappropriated this customer's funds and ultimately ceased communicating with the customer.  *Id.* ¶ 30.

## IV.   ARGUMENT

 As set forth below, the Commission seeks an order (1) prohibiting Defendants from further violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017); (2) preserving the books and records of Defendants, and providing the Commission with access thereto; and (3) ordering Defendants to submit to an interim accounting on an expedited basis.

### A.   The Court's Jurisdiction and the Commission's Authority To Bring This Action

 This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of

the United States) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over

civil actions commenced by the United States or by any agency expressly authorized to sue by

Act of Congress).

By statute, the Commission has the express authority to bring this action pursuant to

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012).  That section authorizes the Commission to

seek injunctive and other relief from a United States District Court against any person whenever

it appears to the Commission that such person has engaged, is engaging, or is about to engage in

any act or practice constituting a violation of any provision of the Act or any rule, regulation, or

order thereunder.

Here, as discussed below, it appears that Defendants have engaged, are engaging, or are

about to engage in acts and practices that constituted using a deceptive device in connection with

the contract of sale of a commodity in interstate commerce in violation of Section 6(c)(1) of the

Act and Regulation 180.1(a).

### B.  Defendants Violated the Antifraud Provisions of Section 6(c)(1) of the Act and Regulation 180.1(a)

Section 6(c)(1) of the Act makes it unlawful for any person, directly or indirectly, to "use

or employ, or attempt to use or employ, in connection with . . . a contract of sale of any

commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in

contravention of such rules and regulations as the Commission shall promulgate."  7 U.S.C.

§ 9(1).  The Commission, in turn, has promulgated Regulation 180.1(a), which makes it:

> unlawful for any person, directly or indirectly, in connection with any . . . contract
> of sale of any commodity in interstate commerce[9] . . . to intentionally or
> recklessly:

---

[9] Section 6(c)(1) and Regulation 180.1(a) prohibit fraud or manipulation in connection with "any swap, or contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a).  As noted above, a contract "for future delivery" is the statutory term for what is commonly known as a futures contract.  A "registered entity" refers to certain entities, which include,

>      (1) Use or employ, or attempt to use or employ, any manipulative
>      device, scheme, or artifice to defraud;
>
>      (2) Make, or attempt to make, any untrue or misleading statement
>      of a material fact or to omit to state a material fact necessary in
>      order to make the statements made not untrue or misleading;
>
>      (3) Engage, or attempt to engage, in any act, practice, or course of
>      business, which operates or would operate as a fraud or deceit
>      upon any person . . . .

17 C.F.R. § 180.1(a).

In promulgating Regulation 180.1, the Commission stated that Section 6(c)(1) of the Act

and Regulation 180.1 "give the Commission broad enforcement authority to prohibit fraud and

manipulation."[10]  76 Fed. Reg. 41,398, at 41,401.  Moreover, the Commission announced that it

"intends to interpret and apply CEA section 6(c)(1) and final Rule 180.1 'not technically and

restrictively, but flexibly to effectuate its remedial purposes.'"[11]  *Id.* at 41,399 (quoting *SEC v.*

*Zandford*, 535 U.S. 813, 818–26 (2002) (where a statute has a remedial purpose such as the

prevention of fraud, the statute should be construed "not technically and restrictively, but

flexibly to effectuate its remedial purposes") (internal citations omitted)).  This statement of

purpose accords with the principle that remedial statutes generally, and the Act specifically, "are

to be construed liberally."  *R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000)

---

broadly speaking, an exchange on which futures contracts are traded.  *See* 7 U.S.C. § 1a(40) (2012).  Thus, Section 6(c)(1) and implementing Regulation 180.1(a) apply to fraud and manipulation in connection with three separate types of contracts:  (1) swaps, (2) contracts of sale of commodities in interstate commerce, and (3) futures contracts traded on or subject to the rules of an exchange.  The Complaint here alleges fraud in connection with contracts of sale of commodities in interstate commerce, not swaps or futures contracts, so only the former are discussed.

[10] Even if Section 6(c)(1) were ambiguous, the CFTC's administrative implementation of Section 6(c)(1) through the promulgation of Regulation 180.1 pursuant to its delegated authority qualifies for *Chevron* deference, including determinations of the scope of the agency's authority.  *See, e.g.*, *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013).

[11] For instance, the Commission explicitly stated that it may exercise its authority under Section 6(c)(1) and Regulation 180.1 against an entity that employed a deceptive device to sell commodities in interstate commerce to customers as a way for the customers to speculate on the value of such commodities.  *See* 76 Fed. Reg. at 41,400-01 & n.37.

("In 1974, Congress gave the Commission even greater enforcement powers in part because of

the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities

markets through fraudulent advertising.  Remedial statutes are to be construed liberally, and in an

era of increasing individual participation in commodities markets, the need for such protection

has not lessened.").

Given the similarities of Section 6(c)(1) of the Act and Section 10(b) of the Securities

Exchange Act of 1934, the Commission modeled Regulation 180.1 on Securities and Exchange

Commission ("SEC") Rule 10b-5, stating that it "will be guided, but not controlled, by the

substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."

76 Fed. Reg. at 41,399.  Federal courts thus have found case law developed under Section 10(b)

and Rule 10b-5 to be instructive in construing Section 6(c)(1) of the Act and

Regulation 180.1(a).  *See, e.g.*, *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008-09

(N.D. Ill. 2015); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1346–47

(S.D. Fla. 2014).[12]

To prove a violation of Section 6(c)(1) of the Act and Regulation 180.1(a), the

Commission must show that Defendants (1) engaged in prohibited conduct (i.e., employed a

fraudulent scheme, made material misrepresentations, or engaged in a fraudulent business

practice); (2) in connection with a contract of sale of a commodity in interstate commerce; (3)

with scienter.  *See, e.g.*, *Hunter Wise*, 21 F. Supp. 3d at 1347; *see also CFTC v. S. Trust Metals,

Inc.*, 2018 WL 493116, at *6 (11th Cir. 2018) (affirming judgment of district court that, *inter*

---

[12] Following the effective date of Regulation 180.1, the Commission has exercised its authority under Section 6(c)(1) and Regulation 180.1 in various anti-fraud enforcement actions involving spot commodity transactions, i.e., contracts of sale of commodities in interstate commerce.  *E.g.*, Complaint, *CFTC v. Atlantic Bullion & Coin, Inc.*, No. 12-CV-1503-JMC (D.S.C. June 6, 2012), ECF No. 1 (consent order Feb. 27, 2013, ECF No. 17); Complaint, *CFTC v. Gold Chasers, Inc.*, No. 6:17-CV-0256 (M.D. Fla. Feb. 13, 2017), ECF No. 1; Complaint, *CFTC v. Gelfman Blueprint*, No. 1:17-cv-07181 (S.D.N.Y. Sept. 21, 2017), ECF No. 1; Complaint, *CFTC v. My Big Coin Pay, Inc.*, No: 1:18-cv-10077 (D. Mass. Jan. 16, 2018), ECF No. 1.

14

*alia*, defendants had committed commodities fraud in violation of Regulation 180.1, and discussing elements of such fraud claims).

As shown below, Defendants repeatedly violated Section 6(c)(1) of the Act and Regulation 180.1 by intentionally or recklessly engaging in a scheme to defraud customers in connection with contracts of sale of virtual currencies such as Bitcoin and Litecoin, each a commodity in interstate commerce. Defendants made false and misleading representations and omissions to solicit customers to purchase CDM's trading advice, and then misappropriated almost all of the money they received from customers. Defendants also made false and misleading representations and omissions to solicit customers to provide Bitcoin and Litecoin to Defendants for Defendants to trade on customers' behalf, and then misappropriated almost all of the money they received from customers.

## 1. Defendants Committed Fraud Through Misappropriation and Material Misrepresentations and Omissions

Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the Act and Regulation 180.1(a). *See CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (default judgment) (defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1) by misappropriating funds and making misrepresentations and omissions); *cf., e.g.*, *CFTC v. Van Beuningen*, No. 1:16-cv-978, 2016 WL 9454431, at *4 (N.D. Ga. Mar. 29, 2016) (noting that, as with Rule 10b-5, misappropriation of funds violates Regulation 180.1); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005) (defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 by misappropriating investor funds for his personal benefit). Here, Defendants misappropriated virtually all of the CDM Customer funds obtained from customers under the pretense that they would be used to purchase the promised CDM services and to trade in virtual currencies (Giglio

Decl. at ¶¶ 25-32) in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).  *See, e.g.*, *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (misappropriation of funds earmarked for trading constituted "willful and blatant fraudulent activity that clearly violates" the Act (quotation marks and citations omitted)).

Making material misrepresentations or omissions in connection with a contract of sale of a commodity in interstate commerce violates Regulation 180.1(a).  *See CFTC v. S. Trust Metals, Inc.*, 2018 WL 493116, at *6 (11th Cir. 2018)*; Hunter Wise*, 21 F. Supp. 3d at 1347; *CFTC v. S. Trust Metals, Inc.*, No. 1:14-CV-22739-KING, 2016 WL 4523851, at *5–6 (S.D. Fla. Aug. 29, 2016) (material misrepresentations and omissions in connection with contracts of sale of commodities violated Regulation 180.1(a)), *aff'd*, 2018 WL 493116, at *6–7.  A statement of fact is material "if a reasonable investor would consider it important in deciding whether to make an investment."  *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328–29 (11th Cir. 2002); *S. Trust Metals, Inc.*, 2018 WL 493116, at *7–8 (citing *R.J. Fitzgerald*).  Any fact that enables investors to assess the risk inherent in their investment and the likelihood of profit is material.  *See, e.g., In re Commodities Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543, at *8–9 (Jan. 14, 1997).  Misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law.  *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2004).

Here, as shown above, Defendants' communications with CDM Customers were rife with material misrepresentations and omissions in violation of Regulation 180.1(a).  Defendants repeatedly misrepresented the existence, potential uses, duration, and effectiveness of CDM's trading advice and services.  In addition, Defendants omitted to state material facts concerning

CDM and CDM Customer funds, including omitting that Defendants were misappropriating or would not on demand return the funds.

### 2. The Defendants' Fraud Was in Connection with a Contract of Sale of a Commodity in Interstate Commerce

#### a. The Virtual Currencies Bitcoin and Litecoin Are "Commodities"

The Commodity Exchange Act defines "commodity" to include:

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by the first section of Public Law 85-839 [7 U.S.C. 13-1]) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

7 U.S.C. § 1a(9) (2012).

Thus, the Act includes three broad categories of commodities: (1) the listed agricultural goods and articles; (2) "all other goods and articles," with exceptions for "onions (as provided by [7 U.S.C. § 13–1]) and motion picture box office receipts (or any index, measure, value, or data related to such receipts)"; and (3) "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in," with the same exception for "motion picture box office receipts, or any index, measure, value or data related to such receipts." *Id.*

This statutory definition of commodity is expansive in scope (with two narrow, explicit exceptions), broadly covering many asset classes from agricultural commodities, to natural resources such as oil, gas, and metals, to services, rights, and interests, and more. *See, e.g.*, *Dunn v. CFTC*, 519 U.S. 465, 469 (1997) (stating that Congress "dramatically expanded the coverage"

of the CEA by broadening the definition of "commodity" in the 1974 CFTC Act); *see also* Section 1a(19) of the Act, 7 U.S.C. § 1a(19) (2012) (as part of since-largely repealed amendments to the Act in 2000, applying the category "excluded commodity" to a subset of commodities that included, *inter alia*, any "rate, differential, index, or *measure of economic or commercial . . . value*" (emphasis added)); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 37–38 (D.D.C. 2015) (explaining that the "span of the Act's definition of 'commodity' is further demonstrated by the definition of 'excluded commodity,'" and holding that contracts tied to events and statistics falling within the definition of excluded commodity, but not otherwise meeting requirements for exclusion from certain provisions of the Act, were commodity options).

Indeed, over the course of its existence, the Commission has continuously recognized intangible commodities such as renewable energy credits and emission allowances, certain indices, interest rate benchmarks, and certain debt instruments, among others.  *See, e.g.*, *id.* (option contracts on climate and weather events and option contracts regarding U.S. economic numbers are options on commodities); *In re Barclays PLC,* CFTC No. 15-25 (May 20, 2015) (interest rate benchmark USD ISDAFIX is a commodity in interstate commerce) (Settlement Order); *see also* 7 U.S.C § 1a(19) (including within the definition of certain class of commodities the category "any . . . measure of economic or commercial . . . value").

Bitcoin and Litecoin—the two virtual currencies identified in the Complaint—are "commodities" within the meaning of the Act because they fall within two of the categories of commodities delineated by the Act's definition.  First, the rights and interests that inhere to each unit of virtual currency constitute "rights [or] interests . . . in which contracts for future delivery are presently . . . dealt in."  7 U.S.C. § 1a(9).  As discussed above, "contracts for future delivery"

of Bitcoin have been dealt in since 2017 at boards of trade in the United States, including CME and CFE, and "contracts for future delivery" of Bitcoin, Litecoin, and various other virtual currencies have been dealt in on foreign boards of trade since at least 2015.[13]   Giglio Decl. ¶ 6.

Second, virtual currencies like Bitcoin and Litecoin also fall within the category of "all other goods and articles."  The Act does not define "goods and articles," but the plain meaning encompass the virtual currencies Bitcoin and Litecoin.  *See Goods*, Black's Law Dictionary (10th ed. 2014) ( "[t]angible or movable personal property other than money; esp., articles of trade or items of merchandise <goods and services> . . . .[t]hings that have value, whether tangible or not"); *cf.* I.R.S. Notice 2014-21 (Apr. 14, 2014) (virtual currency treated as property for U.S. federal tax purposes); *cf. Lenroot v. W. Union Tel. Co.*, 141 F.2d 400, 402 (2d Cir. 1944) (determining that the definition of "goods" in Fair Labor Standards Act including "articles of commerce of any character" and "subjects of commerce" manifests Congress's intention to include intangibles), *rev'd on other grounds by*, 323 U.S. 490 (1945); *Article*, Black's Law Dictionary (10th ed. 2014) ( "a particular item or thing"); *see also Article, Oxford English Dictionary* (3d ed. 2010) ( "[a] particular material thing, esp. one belonging to a specified class; a commodity; an item of goods or property.  Also occasionally used of an immaterial thing").  Indeed, prior to the development of virtual currencies like Bitcoin, traditional foreign currencies were similarly recognized as "goods."  *Dunn,* 519 U.S. at 470.  Bitcoin or Litecoin fall within this category. Each unit is a particular item for which each transaction is separately identifiable

---

[13] Any futures contract, domestic or foreign, would be sufficient to bring virtual currencies within the category of right or interest underlying "contracts for future delivery" because the Act uses the "contracts for future delivery" formulation to describe both domestic and foreign futures.  *Cf., e.g.*, 7 U.S.C. § 6(a) (requiring exchange trading of "a contract for the purchase or sale of a commodity for future delivery"); *with id.* § 6(b)(2)(A) (granting the Commission certain authority regarding a "contract of sale of a commodity for future delivery" dealt "*outside the United States*") (emphasis added).  For purposes of the CEA, the critical point is that both virtual currencies are traded in interstate commerce.  7 U.S.C. § 9(1).  Moreover, a virtual currency is a commodity even if no futures contract currently is traded; all the statute requires is that such a contract could "in the future" be dealt in.  *Id.* § 1a(9).

by unique identification recorded on the blockchain, stored in a wallet, and moveable from one wallet to another, and thus from one owner to another.  Giglio Decl., ¶¶ 3-5.

The structure of the Act's definition of "commodity" also plainly contemplates that the phrase "goods and articles" includes intangible goods and articles.  Otherwise, for example, the exception for any "index, measure, value, or data" related to motion picture box office receipts would be superfluous.  *See* 7 U.S.C. § 1(a)(9) (excepting "motion picture box office receipts [and] any index, measure, value, or data related to such receipts" from both the category of "all other goods and articles," and the category of "services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in"); *e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that "[a] statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotations omitted).

Given the definition's breadth, the Commission has consistently found that virtual currencies such as Bitcoin and Litecoin are "commodities" within the meaning of Section 1(a)(9) of the Act.  *See, e.g.*, *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order); *In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, at *3, n.3 (Sept. 24, 2015) (consent order); *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5 (June 2, 2016) (consent order); *see also, e.g.*, Complaint at 1, *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181 (S.D.N.Y. Sept. 21, 2017), ECF No. 1 (alleging that Bitcoin and other virtual currencies are encompassed within the definition of "commodity" under Section 1a(9) of the Act); Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60,335 (proposed Dec. 15, 2017) (providing guidance on retail commodity transactions involving virtual currency under the Act); CFTC, *Customer Advisory: Understand the Risks of Virtual Currency*

*Trading* (Dec. 15, 2017); Complaint at 1-3, 6, *CFTC v. My Big Coin Pay, Inc.*, No: 1:18-cv-

10077 (D. Mass. Jan. 16, 2018), ECF No. 1 (virtual currencies are encompassed within the

definition of "commodity" under Section 1a(9) of the Act).  In this regard, even if the statutory

definition of "commodity" were ambiguous with respect to virtual currency (and the

Commission believes it is not), the Commission's informed, consistent, and reasonable

interpretation of the Act, whose administration is entrusted to the Commission, would be entitled

to deference.  *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Wax v.*

*Aventis Pasteur Inc.*, 240 F. Supp. 2d 191, 192-94 (E.D.N.Y. 2002) (noting statements of policy

and other non-regulatory pronouncements may be entitled to weight, to the extent they are

persuasive).

      Moreover, market participants have relied on the Commission's considered determination

that Bitcoin is a commodity, and have invested hundreds of millions of dollars in the listed

Bitcoin derivatives products that are regulated by the Commission.

      Finally, with regard to any argument McDonnell would make concerning a lack of

sufficient notice that the Commission determined Bitcoin and Litecoin to fall within the

definition of commodity, McDonnell himself has publicly acknowledged the Commission's

determination.  In an interview dated October 5, 2015, with Irish Tech News, an online

technology news site, Defendant McDonnell is quoted as stating: "Bitcoin [is] defined as a

commodity by the CFTC just like crude oil or wheat."  Giglio Decl. ¶ 9, Ex. 10.

               **b.**     **Defendants' Fraudulent Acts Were in Connection with**
                            **Contracts of Sale of Commodities in Interstate Commerce**

      The "in connection with" requirement of Section 6(c)(1) of the Act and

Regulation 180.1(a) is construed broadly and satisfied where the contract of sale of a commodity

in interstate commerce and the fraud are not independent events.  *See Zandford*, 535 U.S. at 819

(holding that Section 10(b) of the Exchange Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal citation omitted)); 76 Fed. Reg. at 41,405 (consistent with *Zandford*, "[t]he Commission interprets the words 'in connection with' broadly, not technically or restrictively"); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (concluding that the "in connection with" requirement, broadly read pursuant to *Zandford*, can be met even in cases involving "completely fictitious" securities transactions).

Regulation 180.1 governs, among other transactions, any "contract of sale," which the Act defines broadly as including "sales, agreements of sale, and agreements to sell."  7 U.S.C. § 1a(13) (2012).  In this regard, the language of Regulation 180.1 is broader than the comparable SEC Rule 10b-5 on which it was modeled.  *Compare* Regulation 180.1 (prohibiting specified conduct "in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery"), *with* SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2017) (prohibiting specified conduct "in connection with the *purchase or sale* of any security" (emphasis added)); *see also* 76 Fed. Reg. at 41,399 & n.6 (noting ways in which language of Regulation 180.1 is broader than that of Rule 10b-5).

Finally, the Act defines "interstate commerce" very broadly.  *See* 7 U.S.C. § 1a(30); 7 U.S.C. § 2(b) (2012) (a "transaction in interstate commerce" includes, without limitation, a transaction involving an article that is normally part of the "current of commerce usual in the commodity trade").

Here, the "in connection with," "contract of sale," and "in interstate commerce" prongs are easily satisfied, as Defendants' fraudulent scheme was in connection with contracts of sale of virtual currencies such as Bitcoin and Litecoin, each a commodity in interstate commerce.

22

Defendants fraudulently solicited customers for the purchase of trading advice services throughout the United States and in foreign countries. Giglio Decl. ¶ 14. The material misrepresentations and omissions alleged in the Complaint and described above concerned the use, value, and duration of CDM's services. *Id*. at ¶¶ 17-24. Defendants made the misrepresentations and omissions about CDM through sources available to the public worldwide, including the CDM website and various social media platforms. *Id*. at ¶¶ 15-16. In addition, Defendants actually obtained and then misappropriated funds from members of the public for the purpose of entering into contracts of sale of virtual currencies such as Bitcoin and Litecoin. *Id*. at ¶¶ 25-32. Finally, virtual currency as such is a commodity "in interstate commerce" because virtual currencies are traded via electronic platforms nation- and worldwide. *Id*. at ¶ 5. *See* 7 U.S.C. §§ 1a(30), 2(b).

### 3.    Defendants Acted with Scienter

Under Regulation 180.1, the Commission must show that Defendants' conduct was intentional or reckless. 17 C.F.R. § 180.1; *Kraft*, 153 F. Supp. 3d at 1015. This standard is met if a defendant "intended to defraud, manipulate, or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328; *see also Kraft*, 153 F. Supp. 3d at 1015. The Commission can establish recklessness by showing that the conduct "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. v. CFTC*, 676 F.2d 1, 6-7 (1st Cir. 1982); *see also R.J. Fitzgerald*, 310 F.3d at 1328 (holding that scienter is met when a defendant's conduct "involves highly unreasonable omissions or misrepresentations that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it" (internal citation omitted)).

23

Here, Defendants' conduct in misappropriating CDM Customer funds and making material misrepresentations and omissions about CDM was intentional or, at a minimum, reckless. For example, when Defendants solicited customers, they knew or should have known that their representations concerning the trading signals and advice involved with, for example, RLGLLTC and Turn-Key, were false. Giglio Decl. at ¶ 24. Additionally, when Defendants solicited customers to provide funds for virtual currency trading on the customers' behalf, they knew or should have known that the exaggerated representations and promises of profits were false. *Id.* at ¶ 24. Moreover, the evidence suggests that Defendants *never* intended to provide the promised trading signals and advice, or to trade on behalf of customers, and that the entire enterprise was fraudulent from the start. Accordingly, Defendants acted with the requisite scienter.

### C.    McDonnell Is Liable as a Controlling Person

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), an individual who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity, provided that the individual either knowingly induces, directly or indirectly, the violative acts, or fails to act in good faith. To establish controlling person liability under Section 13(b) of the Act, the Commission must show (1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation. *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504-05 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002)). The statute is construed liberally, and even indirect means of discipline or influence, short of actual direction, is sufficient to find liability as a controlling person. *Monieson v. CFTC*, 996 F.2d 852, 859-60 (7th Cir. 1993). Proof of recklessness will demonstrate that the controlling person acted in bad faith. *Id*. at 860. To establish "knowing inducement," the Commission must show that "the controlling person had actual or constructive

knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (Jan. 12, 1988).

Here, McDonnell is liable as a controlling person. First, McDonnell has general control over CabbageTech, Corp. d/b/a Coin Drop Markets. McDonnell founded the company, created CDM, and controlled the content on the CDM website and related social media. Giglio Decl. ¶ 12. In addition, McDonnell either directly or indirectly controlled virtual currency accounts to which he directed CDM Customers to send money for the purchase of CDM services and for Defendants-managed trading. *Id*. ¶¶ 33-34. McDonnell also was responsible for developing and disseminating the false and misleading information about CDM to CDM Customers through CDM's solicitation materials. *Id*. ¶ 18, Ex. 22. Second, McDonnell knowingly induced, directly or indirectly, the conduct constituting the violations set forth in the Complaint, or failed to act in good faith. In fact, McDonnell was personally involved in and committed many of the fraudulent acts alleged in the Complaint. Accordingly, McDonnell is liable for CDM's violations of Section 6(c)(1) of the Act and Regulation 180.1(a) to the same extent as CDM itself.

### D.    CDM Is Liable for the Acts of Its Agent McDonnell

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), impose strict liability on an association for acts and omissions by agents of the association who act within the scope of their employment or office. Pursuant to these provisions, "it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197 F.3d 33, 39-40 (2d Cir. 1999). Additionally, that an agent's actions are illegal does not automatically place those acts outside of his scope of employment. *See, e.g.*, *Guttman*, 197 F.3d at 39-40 (upholding Commission's finding of principal-agent

25

liability under Section 2(a)(1)(B) of the Act, where agent engaged in trading that was both within

scope of employment, and illegal); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-30 (S.D.N.Y. 2014)

(company may be liable under Section 2(a)(1)(A) of the Act for agents' violations of the Act

within scope of employment, including any acts intended to serve any purpose of the employer).

McDonnell committed the fraudulent acts described above and in the Complaint as agent

of CDM.  In fact, CDM's operations are primarily if not entirely comprised of McDonnell's

conduct.  McDonnell fraudulently solicited customers on behalf of CDM.  Giglio Decl. ¶ 17, Ex.

21.  Because the fraudulent acts that McDonnell committed occurred within the course and scope

of his work for CDM, the company is liable for his conduct under Section 2(a)(1)(B) of the Act.

### E.      Entry of a Preliminary Injunction Is Appropriate in this Matter

Pursuant to Section 6c(a) and (b) of the Act, 7 U.S.C. § 13a-1(a), (b) (2012), the

Commission seeks a preliminary injunction (1) prohibiting Defendants from further violating

Section 6(c)(1) of the Act and Regulation 180.1(a); (2) preserving the books and records of

Defendants, and providing the Commission with access thereto; and (3) ordering Defendants to

submit to an interim accounting on an expedited basis.

The Commission is entitled to preliminary injunctive relief under Section 6c of the Act

upon a *prima facie* showing that (1) defendants have violated the Act and (2) "there is a

reasonable likelihood that the wrong will be repeated."  *CFTC v. Commodity Inv. Grp., Inc.*, No.

05 Civ. 5741, 2006 WL 353466, at *1 (S.D.N.Y. Feb. 11, 2006) (citing *CFTC v. British Am.*

*Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977)); *see also CFTC v. Hunter Wise*

*Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) (same); *cf. Smith v. SEC*, 653 F.3d 121,

127–28 (2d Cir. 2011) (applying a similar standard to injunctions sought by the SEC under the

securities laws).  Unlike private litigants seeking preliminary injunctions, the Commission does

not need to show irreparable injury or the inadequacy of other remedies when seeking a

26

preliminary injunction. *British Am.*, 560 F.2d at 141-42; *cf. SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (noting same exception applies in actions by SEC); *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990) (explaining that the public interest inherent in SEC actions justifies this reduced burden).  Furthermore, the Court may infer a reasonable likelihood of future violations based on Defendants' past unlawful conduct.  *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1251 (2d Cir. 1986); *CFTC v. Creagh*, 15-CV-6140 (JPO), 2017 WL 1929624, at *2 (S.D.N.Y. May 10, 2017) (same); *see also British Am.*, 560 F.2d at 142 (finding likelihood of future violations was clear where defendant maintained that its activities were legitimate and persisted in its allegedly violative conduct up to day of hearing); *CFTC v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1291 (S.D. Fla. 2009) (relevant considerations in "reasonable likelihood" analysis include nature of past violation, defendant's present attitude, and objective constraints on or opportunities for future violations).

As discussed above, the Division expects to show that Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a) by misappropriating CDM Customer funds and by making materially false representations and omissions in soliciting CDM Customers; that Defendants engaged in these illegal acts and omissions repeatedly, and with scienter; that McDonnell has previously engaged and been imprisoned for similar fraudulent conduct,  and that the Defendants' illegal conduct appears likely to continue today.  Accordingly, injunctive relief is necessary and appropriate.

## V.    CONCLUSION

For the foregoing reasons, the Commission requests that the Court issue an order (1) prohibiting Defendants from further violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017); (2) preserving the books and records of Defendants, and providing the Commission with access thereto; and (3) ordering Defendants to

submit to an interim accounting on an expedited basis within five (5) days; and certain other

relief.


Dated:  February 26, 2018

                                     **COMMODITY FUTURES TRADING COMMISSION**

                                     By:  /s/ Gates S. Hurand
Gates S. Hurand
Senior Trial Attorney
ghurand@cftc.gov
Phone: (646) 746-9700

David Oakland
Senior Trial Attorney
doakland@cftc.gov
Phone: (646) 746-9700

K. Brent Tomer
Chief Trial Attorney
ktomer@cftc.gov
Phone: (646) 746-9700

Manal M. Sultan
Deputy Director
msultan@cftc.gov
Phone: (646) 746-9700

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION