UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                    Plaintiff,

          v.

PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

                    Defendants.

Case No. 18-CV-361 (JBW)

ECF Case

## DECLARATION OF CHRISTOPHER GIGLIO
## PURSUANT TO 28 U.S.C. §1746

I, Christopher Giglio, do hereby declare under penalty of perjury as follows:

1.        I am employed as a Senior Futures Trading Investigator in the Division of

Enforcement of the Commodity Futures Trading Commission ("Commission"). I have been

employed by the Commission since June 2008 and assigned to the Division of Enforcement as a

Futures Trading Investigator since March 2011. I was promoted to the role of a Senior Futures

Trading Investigator in September 2015. My responsibilities as a Senior Futures Trading

Investigator include investigating registered and unregistered commodity firms and individuals

located throughout the United States in order to ensure compliance with and enforcement of the

Commodity Exchange Act and the rules and regulations promulgated thereunder. I make this

declaration in support of the Commission's Preliminary Brief in Support of Temporary Relief

and Recommendations for Further Administration of the Litigation against Patrick K. McDonnell

and Cabbagetech, Corp. d/b/a Coin Drop Markets ("CDM") (together with McDonnell, "the Defendants").

2.      I have been assigned to the Commission's investigation of the Defendants.  I am fully familiar with the facts related to and documents obtained in the Commission's investigation of the Defendants discussed in this declaration.

**VIRTUAL CURRENCY BACKGROUND**

3.      In the context of this investigation and declaration, I use the term virtual currency to refer to a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  This is consistent with the definitions that were published in Internal Revenue Service's Notice 2014-21, the Commission's Proposed Interpretation of Retail Commodity Transaction Involving Virtual Currency, and the Department of Treasury Financial Crimes Enforcement Network Guidance FIN-2013-G001.  These documents are attached to this declaration as EXHIBIT 1, EXHIBIT 2, and EXHIBIT 3 respectively.   In contrast to real or traditional currency (i.e., the coin and paper money of a country), virtual currency does not have legal tender status in any jurisdiction. *See Exhibit 1.*

4.      Virtual currencies are often described as "cryptocurrencies" by purchasers and sellers because typically the virtual currency in question uses cryptographic protocols to secure transactions in that asset despite being recorded on publicly available decentralized ledgers. Many virtual currencies, like Bitcoin and Litecoin, use such decentralized networks to track transactions between persons who are denominated only by publicly visible strings of characters called keys, rather than individual names, and who are otherwise anonymous to each other. The transactions are captured in single blocks at a time, which independent operators ("miners") confirm by performing algorithmic proofs of work and for which they are usually rewarded a

2

sum of the virtual currency in question.  The public nature of the decentralized ledger allows people to recognize the transfer of virtual currency from the account of one user, called a "wallet", to another without needing any central intermediary in which both users need to trust.

5.     The most commonly described type of virtual currency is called Bitcoin (BTC), but many other virtual currencies are actively traded on electronic platforms in the United States and worldwide.  Examples include Litecoin (LTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), Ripple (RTC), Monero (XMR), and more.

6.     Virtual currency trading includes the trading of virtual currency futures contracts, swaps, and other derivatives.  Currently, for example, the CBOE Futures Exchange ("CFE") and the Chicago Mercantile Exchange Inc. ("CME"), both of which are registered with the Commission as "designated contract markets", offer Bitcoin futures.  Since at least 2015, exchanges outside of the United States, such as Bitmex, which is located in Hong Kong and owned by a Seychelles company, have offered futures contracts on Bitcoin and other virtual currencies, including Ether (ETH), Ethereum Classic (ETC) and Litecoin (LTC).

7.     As of February 23, 2018, open interest in CFE and CME contracts for future delivery of Bitcoin alone exceeded 14,000 Bitcoin, or approximately $140 million using end-of-day prices, with more than $150 million in daily trading volume.

8.     As virtual currency markets have developed over time, the CFTC has exercised its regulatory, anti-manipulation, and anti-fraud authority over virtual currency and related markets in numerous ways.  Examples include:

- taking action against an unregistered Bitcoin spot exchange, *In re BXFNA Inc. d/b/a Bitfinex*, Dkt. No. 16-19 (CFTC June 2, 2016) (EXHIBIT 4);

- enforcing the laws prohibiting wash trading and prearranged trades on a derivatives platform for virtual currency swaps, *In re TeraExchange LLC*, Dkt. No. 15-33 (CFTC Sept. 24, 2015) (EXHIBIT 5);

3

- issuing proposed guidance on what constitutes a derivative market and what constitutes a spot market in the virtual currency context, CFTC, *Retail Commodity Transactions Involving Virtual Currency*, 82 Fed. Reg. 60,335 (Dec. 20, 2017) (proposed Dec. 15, 2017) *See Exhibit 2*;

- issuing warnings to market participants about virtual currency valuations and volatility in spot virtual currency markets, CFTC, *A CFTC Primer on Virtual Currencies* (Oct. 17, 2017) (EXHIBIT 6);

- issuing a customer protection advisory about virtual currency pump-and-dump schemes, CFTC, *Customer Advisory: Beware Virtual Currency Pump-and-Dump Schemes* (Feb. 15, 2018) (EXHIBIT 7);

- filing anti-fraud civil enforcement actions in federal courts against virtual currency Ponzi schemes, *e.g.*, *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181 (S.D.N.Y. Sept. 21, 2017); *CFTC v. My Big Coin Pay, Inc.*, No. 1:18-cv-10077 (D. Mass. Jan. 16, 2018); *CFTC v. Dean*, No. 2:18-cv-00345-SJF-AYS (E.D.N.Y. Jan. 18, 2018) (EXHIBIT 8); and

- working closely with derivatives contract merchants ("DCMs") and swap execution facilities ("SEFs") registered with the Commission in connection with certifying contracts for a variety of virtual currency derivatives, including Bitcoin futures, Bitcoin swaps, and Bitcoin spread and binary options, *e.g.*, CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE and Cantor Exchange (December 1, 2017); CFTC Order of Registration as a SEF, *In re LedgerX LLC* (July 6, 2017) (EXHIBIT 9).

9.      As part of my investigatory responsibilities in this matter, I have participated in the interviews of individuals who transferred money and virtual currencies to the Defendants ("CDM Customers"). I have also analyzed the following:

a.  Materials produced by CDM Customers, including receipts of Paypal transactions, cryptocurrency transaction data, screenshots from the Defendants' websites,  and communications with the Defendants;

b.  An online video interview with a masked figure that was identified as being McDonnell relating to McDonnell and CabbageTech, Corp.;

c.  An interview that McDonnell gave to Irish Tech News (EXHIBIT 10);

d.  Materials produced by the digital currency exchange Bittrex;

4

e.   Information made available through, and documents obtained from, the Financial Industry Regulatory Authority ("FINRA");

f.   Information made available through, and documents obtained from, the New York Secretary of State Division of Corporations;

g.   Information made available through, and documents obtained from, U.S. District Court for the Eastern District of New York;

h.   Information made available through, and documents obtained from, CLEAR, online investigation software operated by Thomson Reuters.

## THE DEFENDANTS

10.   Patrick K. McDonnell resides in Staten Island, New York. From 1993 to 1999, he held a Series 7 and Series 63 license with FINRA and was employed at five registered brokerage firms. Four of the five firms at which McDonnell was employed have been expelled by FINRA. McDonnell's FINRA BrokerCheck Report is attached to this declaration as EXHIBIT 11. McDonnell was last registered with FINRA in 1999. He has never been registered with the Commission in any capacity.

11.   In 2003, McDonnell entered a guilty plea to mail fraud under 18 U.S.C. § 1341 in connection with a fraudulent solicitation scheme relating to foreign exchange. *See United States v. McDonnell*, 03-cr-0166 (E.D.N.Y.) (Korman, C.J.). Attached are copies of the docket in that matter (EXHIBIT 12), the information to which McDonnell pleaded guilty (EXHIBIT 13), the transcript of the plea hearing (EXHIBIT 14), and the judgment entered by the court sentencing McDonnell to 30 months' imprisonment (EXHIBIT 15).

12.   CabbageTech, Corp. is a New York Corporation that was established on May 6, 2016. The Certificate of Incorporation for CabbageTech, Corp. is attached to this declaration as

5

EXHIBIT 16. According to Exhibit 16, McDonnell filed the Certificate of Incorporation for CabbageTech, Corp. with the state of New York. Exhibit 16 provides a business address for CabbageTech, Corp., which is the same as the personal address listed for McDonnell in CLEAR.

13.    CabbageTech, Corp. did business as Coin Drop Markets. A screenshot from one of the Coin Drop Markets websites, www.coindrops.club, is attached to this declaration as EXHIBIT 17. This website stated that Coin Drop Markets was a division of CabbageTech, Corp. and contains a report that is listed as a "CabbageTech, Corp. Publication".

**THE SOLICITATION OF INVESTORS**

14.    During the relevant period, the Defendants began soliciting and accepting funds from at least seven investors in the United States and foreign countries for various cryptocurrency-related programs and investments.

15.    The Defendants promoted these investments through the social media platform, Twitter. Defendants also advertised these investments through at least two websites, www.coindropmarkets.com and www.coindrops.club. Attached as EXHIBIT 18 is a screenshot from the website, www.coindropmarkets.com, which was produced to the Commission by one CDM customer. This screenshots shows advertisements for multiple programs and services offered by the Defendants.

16.    Defendants also promoted these investments through the third-party website, bitcointalk.org, which is an online Bitcoin forum. Attached as EXHIBIT 19 and EXHIBIT 20 are screenshots of postings from bitcointalk.org. These postings both quote the Coin Drop Markets website, as shown in Exhibit 18, and site www.coindropmarkets.com/services as the source of their information.

6

17.    One of the services marketed by the Defendants was called RedLiteGreenLite

LTC ("RLGLLTC"). *See Exhibit 18, Exhibit 19, and Exhibit 20*. Through RLGLLTC, Coin

Drop Markets was supposed to provide trading advice and entry and exit prices for the

cryptocurrency Litecoin to subscribers through the social media platform Twitter. *See Exhibit 18,*

*Exhibit 19, and Exhibit 20*. Advertisements for RLGLLTC stated, "RLGLLTC is a 'real-time'

CDM trading membership that reports critical $LTC entry/exit points via @RLGLLTC 24/7

including holidays/weekends". *See Exhibit 18, Exhibit 19, and Exhibit 20*. At least one customer

("Investor 1") purchased a subscription to RLGLLTC. Investor 1 received an email on April 27,

2017, confirming his purchase of RLGLLTC. This email is attached to this declaration as

EXHIBIT 21. According to Exhibit 21, a yearly subscription to RLGLLTC cost approximately

$99 and the program was supposed to begin operating on May 1, 2017. Exhibit 21 was sent from

the email address, coindropmarkets@gmail.com, and it was signed by McDonnell, who is

referred to as the "CTO" of Coin Drop Markets.

18.    Defendants marketed a similar program for Bitcoin called RedLiteGreenLite BTC

("RLGLBTC"). In an email chain with Investor 1, Defendants made several claims about

RLGLBTC, including that investors would receive direct 1-on-1 trading alongside the

Defendants and all members in real time, that the members of RLGLBTC traded "24/7", and that

an investor could make several Bitcoin through the program. This email chain is attached to this

declaration as EXHIBIT 22. Defendants instructed Investor 1 pay for RLGLBTC by transferring

Bitcoin to Coin Drop Market's Bitcoin acceptance wallet,

1KirsN7GAXdWkwVgt1gd6AxN8yKbkiPx8h. *See Exhibit 22*.

19.    According to interviews with CDM Customers and related materials, *see para.* 9

*supra*, Defendants marketed and sold memberships to another program called Turn-Key Annual

7

Membership ("Turn-Key"). Through Turn-Key, Defendants offered to provide advice on the cryptocurrency markets directly to CDM Customers through the social media platform, Slack. There were approximately 100 members in this Turn-Key Slack group, which was bitcoinxbttradegroup.slack.

20.     According to interviews with CDM Customers and related materials, *see para.* 9 *supra*, Defendants marketed and sold memberships to another program, which was sometimes referred to as the "elite group." The cost to join the elite group was 1 Bitcoin for a lifetime membership. In an email chain with Investor 1, McDonnell claimed that, through this elite group, an investment of 1 Bitcoin should generate a return of 3 Bitcoin, that he had a trade on the exchange Yobit that should generate 300% by the following Sunday, and that 1 Bitcoin could earn 1 to 1.5 Bitcoin through one night of trading. *See Exhibit 22.*

21.     Defendants offered to trade cryptocurrencies on behalf of some investors. According to interviews with CDM Customers and related materials, *see para.* 9 *supra*, McDonnell offered to trade the "volatility" of Litecoin on behalf of Investor 1. In an email chain with Investor 1, McDonnell agreed to trade Litecoin on behalf of Investor 1 and instructed this individual to transfer 76 Litecoin to a Litecoin address controlled by defendants, LQxwfiKLW4ozywLsh3BHMJ7pQeiprVNUE1, on or around April 28, 2017. This email chain is attached to this declaration as EXHIBIT 23. McDonnell claimed that he could generate profits of 2 to 300 % each day for Investor 1 and that $1,000 in Litecoin should be earning $200 to $250 per day through trading. *See Exhibit 23.*

22.     According to interviews with CDM Customers and related materials, *see para.* 9 *supra*, Defendants claimed to be trading Bitcoins on behalf of customers. McDonnell told one CDM customer ("Investor 2") that he was personally trading Bitcoins on behalf of a large

customer. McDonnell asked Investor 2 to trade this large customer's funds in exchange for a percentage of the trading profits. However, before he would allow Investor 2 to trade for this large customer, McDonnell insisted that he deposit his own cryptocurrency to ensure that he had "skin in the game". Investor 2 sent McDonnell 5 Bitcoin worth of Bitcoins, Etherium Classic, and Verge (a similar virtual currency) in May and June of 2017.

23. According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, McDonnell claimed that he was involved in the creation and/or initial coin offering for a new cryptocurrency, called Tigr Token. McDonnell said that these Tigr Tokens would soon be listed for trading on cryptocurrency exchanges and that he expected Tigr Tokens to rise in value. Investor 2 sent McDonnell 5 Bitcoin and one other customer ("Investor 3") sent McDonnell 0.5 Bitcoin for the purchase of Tigr Tokens. Investor 3 sent these tokens to a Bitcoin address that had been provided by McDonnell, 1KirsN7GAXdWkwVgt1gd6AxN8yKbkiPx8h, which is the same address that McDonnell provided to Investor 1.

24. During the solicitation of investors and the marketing of these services and products, the Defendants made a series of incredible statements. According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, McDonnell described himself as a professional trader. The CDM website contained several trade reports, which purported to show profitable cryptocurrency trades that had been executed by Coin Drop Markets. At least one of these reports showed a profit of more than 1000%. In one email chain with Investor 1, McDonnell claimed that he had a retail business with more than 8,000 investors, that he had traded over $50 million in Bitcoin for this group since 2010, and that he had built a bot-like trading platform that was "close to 100% accurate". This email chain is attached to this declaration as EXHIBIT 24. McDonnell also claimed that he was involved in the creation of

9

several alternative cryptocurrencies, such as Titcoin, PotCoin and MPRO.  In a May 14, 2017 Twitter message to Investor 1, McDonnell claimed that he had "80+ blockchains in R&D all launching in the next 12-36 months".  This Twitter message is attached to this declaration as EXHIBIT 25.

## THE DEFENDANTS' MISAPPROPRIATION OF INVESTOR FUNDS

25.   The Defendants did not adequately provide any of the services that they advertised and sold to CDM Customers and often directly misappropriated and/or refused to refund the CDM Customers' funds.

26.   According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, after receiving investments from multiple CDM customers, McDonnell deleted his social media accounts and the CDM websites and ceased communicating with CDM customers in or around July 2017.

27.   Advertisements for RLGLLTC claimed that the service consisted of, "a dedicated team of digital asset trading specialists trend spotting", and that it provided Litecoin reports and entry/exit points "24/7".  *See Exhibit 18, Exhibit 19, and Exhibit 20*.  However, the Defendants never provided trading advice or entry/exit prices to RLGLLTC subscribers.  Investor 1 purchased a one-year subscription to RLGLLTC on or around April 27, 2017.  *See Exhibit 21*. RLGLLTC was supposed to being operating on May 1, 2017.  *See Exhibit 21*.  According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, RLGLLTC never began operating and the Defendants never provided trading advice or entry/exit prices to RLGLLTC subscribers.  When several investors became disgruntled about the Defendants' failure to provide the service, McDonnell shut down the twitter handle that he had been using,

10

@BitcoinXBTradeGRP, and established a new handle, @MrPatMcDonnell. A text message in which McDonnell notifies Investor 1 of this change is attached to this declaration as EXHIBIT 26. Despite this failure, the Defendants never offered to refund the money that Investor 1 had paid for the RLGLLTC service.

28.     According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, the Defendants failed to provide the type of service that was promised to the Turn-Key customers. McDonnell did not regularly provide advice to the members of the Slack group and, when he did provide advice, he simply instructed the group to keep purchasing Litecoin. Investor 1 did not see any indication that McDonnell was performing any sort of technical analysis in connection with this Turn-Key service. When members of the Turn-Key Slack group became disgruntled and began questioning McDonnell about this failure in summer of 2017, McDonnell shut down the Slack group. Even though Investor 1 had purchased a one-year membership to the Turn-Key group in April 2017 and the Defendants closed the Slack group approximately three months later, the Defendants did not offer to refund the money that Investor 1 had paid for the Turn-Key service.

29.     According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, the Defendants failed to provide the type of service that was promised to CDM Customers in the elite group. Investor 1, Investor 2 and Investor 3 paid 1 Bitcoin, or the equivalent quantity of Litecoin, for a lifetime membership in this elite group. This membership was supposed to include, amongst other things, market reviews on different virtual currencies and the potential to earn as much as 300% return on an investment in less than one week. *See Exhibit 22.* However, investors did not achieve the types of returns that were advertised and did not receive any reports

11

or communications from the Defendants since July 2017, despite their purchases of a lifetime membership.

30.     Defendants misappropriated and failed to return the funds that they traded on behalf of investors. Investor 1 transferred 76 Litecoin to the Defendants on or around April 28, 2017. In a May 10, 2017 email, McDonnell told Investor 1 that he was "up big on amount of $LTC traded". *See Exhibit 24*. In June or July of 2017, after McDonnell ceased communicating with CDM Customers and deleted several websites and Twitter handles, Investor 1 contacted McDonnell on his Twitter handle, @MrPatMcdonnell, and requested that McDonnell return his Litecoin. This Twitter exchange is attached to this declaration as EXHIBIT 27.  In response to this request, McDonnell became hostile and wrote, "fuck you... i thought you were my man" and "i would like a true friend not a scumbag". *See Exhibit 27.*

31.     According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, Investor 2 sent the Defendants the equivalent of 5 Bitcoins in preparation for trading on behalf of Defendants' large customer. Investor 2 never did any trading for this large customer and the Defendants never returned the funds that were transferred by Investor 2.

32.     According to interviews with CDM Customers and related materials, *see* para. 9 *supra*, Defendants never provided any of the Tigr Tokens that were purchased by investors. Investors 2 and 3 sent cryptocurrencies to the Defendants in exchange for Tigr Tokens.  Neither Investor 2 nor Investor 3 ever received any Tigr Tokens from the Defendants. On June 10, 2017, McDonnell sent Investor 1 a message using the Twitter handle, @BitcoinX฿TradeGRP, in which he says that he is, "backing out of $TIGR" and that he, "will refund btc to those who joined". This message is attached to this declaration as EXHIBIT 28. Despite the claims made

in Exhibit 28, the Defendants did not refund the Bitcoins that customers sent for the purchase of Tigr Tokens.

## DEFENDANTS' CRYPTOCURRENCY WALLETS AT ONE EXCHANGE

33.   Some CDM Customers were instructed to send Bitcoins to the Defendants at the Bitcoin address, 1KirsN7GAXdWkwVgt1gd6AxN8yKbkiPx8h. *See Exhibit 22.* I determined that this address was likely associated with the virtual currency exchange, Bittrex.

34.   The Commission sent an information request to Bittrex, in which it asked for account opening documentation, communications, and all transfer records for all accounts associated with McDonnell. The information provided by Bittrex shows that the Bitcoin address identified above is in a wallet that belongs to McDonnell.

35.   Information provided by Bittrex shows that approximately 662 Litecoin were withdrawn from this account between June 17, 2017 and June 19, 2017.

36.   The last transaction of any kind in McDonnell's account at Bittrex took place on June 19, 2017 and the remaining balance of the account is 0.00000004 Bitcoin. At the current values at which Bitcoin is trading today, this remaining balance is less than one-tenth of one penny.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.
Executed at New York, New York on February 26, 2018.

Christopher Giglio

13

# EXHIBIT
# 1

Notice 2014-21

SECTION 1. PURPOSE

This notice describes how existing general tax principles apply to transactions using virtual currency.  The notice provides this guidance in the form of answers to frequently asked questions.

SECTION 2. BACKGROUND

The Internal Revenue Service (IRS) is aware that "virtual currency" may be used to pay for goods or services, or held for investment.  Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  In some environments, it operates like "real" currency -- i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance -- but it does not have legal tender status in any jurisdiction.

Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency.  Bitcoin is one example of a convertible virtual currency.  Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies.  For a more comprehensive description of convertible virtual currencies to date, see Financial Crimes Enforcement Network (FinCEN) *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (FIN-2013-G001, March 18, 2013).

SECTION 3. SCOPE

In general, the sale or exchange of convertible virtual currency, or the use of convertible virtual currency to pay for goods or services in a real-world economy transaction, has tax consequences that may result in a tax liability.  This notice addresses only the U.S. federal tax consequences of transactions in, or transactions that use, convertible virtual currency, and the term "virtual currency" as used in Section 4 refers only to convertible virtual currency.  No inference should be drawn with respect to virtual currencies not described in this notice.

The Treasury Department and the IRS recognize that there may be other questions regarding the tax consequences of virtual currency not addressed in this notice that warrant consideration.  Therefore, the Treasury Department and the IRS request comments from the public regarding other types or aspects of virtual currency transactions that should be addressed in future guidance.

Comments should be addressed to:

Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

or hand delivered Monday through Friday between the hours of 8 A.M. and 4 P.M. to:

Courier's Desk
Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Alternatively, taxpayers may submit comments electronically via e-mail to the following
address: Notice.Comments@irscounsel.treas.gov.  Taxpayers should include "Notice
2014-21" in the subject line.  All comments submitted by the public will be available for
public inspection and copying in their entirety.

For purposes of the FAQs in this notice, the taxpayer's functional currency is assumed
to be the U.S. dollar, the taxpayer is assumed to use the cash receipts and
disbursements method of accounting and the taxpayer is assumed not to be under
common control with any other party to a transaction.

SECTION 4. FREQUENTLY ASKED QUESTIONS

**Q-1:  How is virtual currency treated for federal tax purposes?**

**A-1:**  For federal tax purposes, virtual currency is treated as property.  General tax
principles applicable to property transactions apply to transactions using virtual
currency.

**Q-2:  Is virtual currency treated as currency for purposes of determining whether
a transaction results in foreign currency gain or loss under U.S. federal tax laws?**

**A-2:**  No.  Under currently applicable law, virtual currency is not treated as currency that
could generate foreign currency gain or loss for U.S. federal tax purposes.

**Q-3:  Must a taxpayer who receives virtual currency as payment for goods or
services include in computing gross income the fair market value of the virtual
currency?**

**A-3:**  Yes.  A taxpayer who receives virtual currency as payment for goods or services
must, in computing gross income, include the fair market value of the virtual currency,

measured in U.S. dollars, as of the date that the virtual currency was received.  See Publication 525, *Taxable and Nontaxable Income,* for more information on miscellaneous income from exchanges involving property or services.

**Q-4:  What is the basis of virtual currency received as payment for goods or services in Q&A-3?**

**A-4:**  The basis of virtual currency that a taxpayer receives as payment for goods or services in Q&A-3 is the fair market value of the virtual currency in U.S. dollars as of the date of receipt.  See Publication 551, *Basis of Assets,* for more information on the computation of basis when property is received for goods or services.

**Q-5:  How is the fair market value of virtual currency determined?**

**A-5:**  For U.S. tax purposes, transactions using virtual currency must be reported in U.S. dollars.  Therefore, taxpayers will be required to determine the fair market value of virtual currency in U.S. dollars as of the date of payment or receipt.  If a virtual currency is listed on an exchange and the exchange rate is established by market supply and demand, the fair market value of the virtual currency is determined by converting the virtual currency into U.S. dollars (or into another real currency which in turn can be converted into U.S. dollars) at the exchange rate, in a reasonable manner that is consistently applied.

**Q-6:  Does a taxpayer have gain or loss upon an exchange of virtual currency for other property?**

**A-6:**  Yes.  If the fair market value of property received in exchange for virtual currency exceeds the taxpayer's adjusted basis of the virtual currency, the taxpayer has taxable gain.  The taxpayer has a loss if the fair market value of the property received is less than the adjusted basis of the virtual currency.  See Publication 544, *Sales and Other Dispositions of Assets*, for information about the tax treatment of sales and exchanges, such as whether a loss is deductible.

**Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?**

**A-7:**  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.   A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or

business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.

**Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?**

**A-8:**  Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, *Taxable and Nontaxable Income*, for more information on taxable income.

**Q-9:  Is an individual who "mines" virtual currency as a trade or business subject to self-employment tax on the income derived from those activities?**

**A-9:** If a taxpayer's "mining" of virtual currency constitutes a trade or business, and the "mining" activity is not undertaken by the taxpayer as an employee, the net earnings from self-employment (generally, gross income derived from carrying on a trade or business less allowable deductions) resulting from those activities constitute self-employment income and are subject to the self-employment tax.  See Chapter 10 of Publication 334, *Tax Guide for Small Business*, for more information on self-employment tax and Publication 535, *Business Expenses,* for more information on determining whether expenses are from a business activity carried on to make a profit.

**Q-10:  Does virtual currency received by an independent contractor for performing services constitute self-employment income?**

**A-10:**  Yes.  Generally, self-employment income includes all gross income derived by an individual from any trade or business carried on by the individual as other than an employee.  Consequently, the fair market value of virtual currency received for services performed as an independent contractor, measured in U.S. dollars as of the date of receipt, constitutes self-employment income and is subject to the self-employment tax. See FS-2007-18, April 2007, *Business or Hobby? Answer Has Implications for Deductions,* for information on determining whether an activity is a business or a hobby.

**Q-11:  Does virtual currency paid by an employer as remuneration for services constitute wages for employment tax purposes?**

**A-11:**  Yes.  Generally, the medium in which remuneration for services is paid is immaterial to the determination of whether the remuneration constitutes wages for employment tax purposes.  Consequently, the fair market value of virtual currency paid as wages is subject to federal income tax withholding, Federal Insurance Contributions

Act (FICA) tax, and Federal Unemployment Tax Act (FUTA) tax and must be reported on Form W-2, *Wage and Tax Statement*.  See Publication 15 (Circular E), *Employer's Tax Guide*, for information on the withholding, depositing, reporting, and paying of employment taxes.

**Q-12:  Is a payment made using virtual currency subject to information reporting?**

**A-12:**  A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property.  For example, a person who in the course of a trade or business makes a payment of fixed and determinable income using virtual currency with a value of $600 or more to a U.S. non-exempt recipient in a taxable year is required to report the payment to the IRS and to the payee.  Examples of payments of fixed and determinable income include rent, salaries, wages, premiums, annuities, and compensation.

**Q-13:  Is a person who in the course of a trade or business makes a payment using virtual currency worth $600 or more to an independent contractor for performing services required to file an information return with the IRS?**

**A-13:**  Generally, a person who in the course of a trade or business makes a payment of $600 or more in a taxable year to an independent contractor for the performance of services is required to report that payment to the IRS and to the payee on Form 1099-MISC, *Miscellaneous Income*.  Payments of virtual currency required to be reported on Form 1099-MISC should be reported using the fair market value of the virtual currency in U.S. dollars as of the date of payment.  The payment recipient may have income even if the recipient does not receive a Form 1099-MISC.  See the Instructions to Form 1099-MISC and the General Instructions for Certain Information Returns for more information.  For payments to non-U.S. persons, see Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Q-14:  Are payments made using virtual currency subject to backup withholding?**

**A-14:**  Payments made using virtual currency are subject to backup withholding to the same extent as other payments made in property.  Therefore, payors making reportable payments using virtual currency must solicit a taxpayer identification number (TIN) from the payee.  The payor must backup withhold from the payment if a TIN is not obtained prior to payment or if the payor receives notification from the IRS that backup withholding is required.  See Publication 1281, *Backup Withholding for Missing and Incorrect Name/TINs,* for more information*.*

**Q-15:  Are there IRS information reporting requirements for a person who settles payments made in virtual currency on behalf of merchants that accept virtual currency from their customers?**

**A-15:**  Yes, if certain requirements are met.  In general, a third party that contracts with a substantial number of unrelated merchants to settle payments between the merchants and their customers is a third party settlement organization (TPSO).  A TPSO is required to report payments made to a merchant on a Form 1099-K, *Payment Card and Third Party Network Transactions*, if, for the calendar year, both (1) the number of transactions settled for the merchant exceeds 200, and (2) the gross amount of payments made to the merchant exceeds $20,000.  When completing Boxes 1, 3, and 5a-1 on the Form 1099-K, transactions where  the TPSO settles payments made with virtual currency are aggregated with transactions where the TPSO settles payments made with real currency to determine the total amounts to be reported in those boxes.  When determining whether the transactions are reportable, the value of the virtual currency is the fair market value of the virtual currency in U.S. dollars on the date of payment.

See The Third Party Information Reporting Center, http://www.irs.gov/Tax-Professionals/Third-Party-Reporting-Information-Center, for more information on reporting transactions on Form 1099-K.

**Q-16:  Will taxpayers be subject to penalties for having treated a virtual currency transaction in a manner that is inconsistent with this notice prior to March 25, 2014?**

**A-16:**  Taxpayers may be subject to penalties for failure to comply with tax laws.  For example, underpayments attributable to virtual currency transactions may be subject to penalties, such as accuracy-related penalties under section 6662.  In addition, failure to timely or correctly report virtual currency transactions when required to do so may be subject to information reporting penalties under section 6721 and 6722.  However, penalty relief may be available to taxpayers and persons required to file an information return who are able to establish that the underpayment or failure to properly file information returns is due to reasonable cause.

SECTION 5. DRAFTING INFORMATION

The principal author of this notice is Keith A. Aqui of the Office of Associate Chief Counsel (Income Tax & Accounting).  For further information about income tax issues addressed in this notice, please contact Mr. Aqui at (202) 317-4718; for further information about employment tax issues addressed in this notice, please contact Mr. Neil D. Shepherd at (202) 317- 4774; for further information about information reporting issues addressed in this notice, please contact Ms. Adrienne E. Griffin at (202) 317-6845; and for further information regarding foreign currency issues addressed in this notice, please contact Mr. Raymond J. Stahl at (202) 317- 6938.  These are not toll-free calls.

# EXHIBIT 2

technology or economic conditions? How would these modifications affect the costs and benefits of the Rule for consumers and businesses, particularly small businesses?

(9) *Conflicts With Other Requirements:* Does the Rule overlap or conflict with other federal, state, or local laws or regulations? If so, how? Provide any evidence that supports your position. With reference to the asserted conflicts, should the Rule be modified? If so, why, and how? If not, why not? Are there any Rule changes necessary to help state law enforcement agencies combat deceptive practices in the recycled engine oil market? Provide any evidence concerning whether the Rule has assisted in promoting national consistency with respect to the advertising of recycled engine oil.

(10) *Update Rule Reference to API Document:* Should the Commission update the Rule to incorporate by reference the current version (*i.e.,* the Seventeenth Edition) of the API Publication 1509?[5] If so, should the incorporation include a specific date or other information to identify the seventeenth edition of API Publication 1509?

## IV. Comment Submissions

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before February 12, 2018. Write "16 CFR part 311—Recycled Oil, Matter No. R811006" on your comment. Your comment—including your name and your state—will be placed on the public record of this proceeding, including, to the extent practicable, on the public Commission website, at *http:// www.ftc.gov/os/publiccomments.shtm.* Postal mail addressed to the Commission is subject to delay due to heightened security screening. As a result, we encourage you to submit your comments online, or to send them to the Commission by courier or overnight service. To make sure that the Commission considers your online comment, you must file it at *https:// ftcpublic.commentworks.com/ftc/ RecycledOilReview,* by following the instructions on the web-based form. When this Notice appears at *https:// www.regulations.gov,* you also may file a comment through that website.

If you prefer to file your comment on paper, write "16 CFR part 311—Recycled Oil, Matter No. R811006" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission,

Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex A), Washington, DC 20580, or deliver your comment to the following address: Federal Trade Commission, Office of the Secretary, Constitution Center, 400 7th Street SW, 5th Floor, Suite 5610 (Annex A), Washington, DC 20024. If possible, submit your paper comment to the Commission by courier or overnight service.

Because your comment will be placed on the publicly accessible FTC website at *https://www.ftc.gov,* you are solely responsible for making sure that your comment does not include any sensitive or confidential information. In particular, your comment should not include any sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number, or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure that your comment does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any "trade secret or any commercial or financial information which . . . is privileged or confidential"—as provided by Section 6(f) of the FTC Act, 15 U.S.C. 46(f), and FTC Rule 4.10(a)(2), 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with FTC Rule 4.9(c), 16 CFR 4.9(c). In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. *See* FTC Rule 4.9(c). Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted on the public FTC website—as legally required by FTC Rule 4.9(b)—we cannot redact or remove your comment from the FTC website, unless you submit a confidentiality request that meets the requirements for such treatment under FTC Rule 4.9(c), and the General Counsel grants that request.

Visit the FTC website to read this Notice and the news release describing it. The FTC Act and other laws that the Commission administers permit the collection of public comments to consider and use in this proceeding, as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before February 12, 2018. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/site-information/ privacy-policy.*

By direction of the Commission.

Donald S. Clark,
*Secretary.*

[FR Doc. 2017–27374 Filed 12–19–17; 8:45 am]

**BILLING CODE 6750–01–P**

## COMMODITY FUTURES TRADING COMMISSION

### 17 CFR Part 1

**RIN 3038–AE62**

### Retail Commodity Transactions Involving Virtual Currency

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Proposed interpretation; request for comment.

**SUMMARY:** The Commodity Futures Trading Commission (the "Commission" or "CFTC") is issuing this proposed interpretation of the term "actual delivery" as set forth in a certain provision of the Commodity Exchange Act ("CEA") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). Specifically, this proposed interpretation is being issued to inform the public of the Commission's views as to the meaning of actual delivery within the specific context of retail commodity transactions in virtual currency. The Commission requests comment on this proposed interpretation and further invites comment on specific questions related to the Commission's treatment of virtual currency transactions.

**DATES:** Comments must be received on or before March 20, 2018.

**ADDRESSES:** You may submit comments, identified by RIN 3038–AE62, by any of the following methods:

• *CFTC website: http:// comments.cftc.gov.* Follow the instructions for submitting comments through the Comments Online process on the website.

• *Mail:* Christopher Kirkpatrick, Secretary of the Commission,

---

[5] The current Rule (Section 311.4) references the Fifteenth Edition of API Publication 1509.

Commodity Futures Trading Commission, Three Lafayette Center, 1155 21st Street NW, Washington, DC 20581.

• *Hand Delivery/Courier:* Same as Mail, above.

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments. Please submit your comments using only one method.

All comments must be submitted in English or, if not, accompanied by an English translation. Comments will be posted as received to *http://www.cftc.gov.* You should submit only information that you wish to make available publicly. If you wish the Commission to consider information that you believe is exempt from disclosure under the Freedom of Information Act ("FOIA"),[1] a petition for confidential treatment of the exempt information may be submitted according to the procedures established in Commission Regulation 145.9.[2]

The Commission reserves the right, but shall have no obligation, to review, pre-screen, filter, redact, refuse or remove any or all of your submission from *http://www.cftc.gov* that it may deem to be inappropriate for publication, such as obscene language. All submissions that have been redacted or removed that contain comments on the merits of the interpretation will be retained in the public comment file and will be considered as required under the Administrative Procedure Act and other applicable laws, and may be accessible under FOIA.

**FOR FURTHER INFORMATION CONTACT:**
Philip W. Raimondi, Special Counsel, (202) 418–5717, *praimondi@cftc.gov;* or David P. Van Wagner, Chief Counsel, (202) 418–5481, *dvanwagner@cftc.gov;* Office of the Chief Counsel, Division of Market Oversight, Commodity Futures Trading Commission, 1155 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

## I. Background

With certain exceptions, the CFTC has been granted exclusive jurisdiction over commodity futures, options, and all other derivatives that fall within the definition of a swap.[3] Further, the Commission has been granted general anti-fraud and anti-manipulation authority over "any swap, or a contract

of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."[4] The Commission's mission is to foster open, transparent, competitive and financially sound markets; and protect the American public from fraudulent schemes and abusive practices in those markets and products over which it has been granted jurisdiction.

Pursuant to CEA section 2(c)(2)(D),[5] the marketplace for "retail commodity transactions" is one such area over which the Commission has been granted explicit oversight authority.[6] CEA section 2(c)(2)(D) applies to any agreement, contract or transaction in any commodity that is entered into with, or offered to (even if not entered into with), a person that is neither an eligible contract participant[7] nor an eligible commercial entity[8] ("retail") on a leveraged or margined basis, or financed by the offeror, the counterparty or a person acting in concert with the offeror or counterparty on a similar basis.[9] CEA section 2(c)(2)(D) further provides that such an agreement, contract or transaction is subject to CEA sections 4(a),[10] 4(b),[11] and 4b[12] "as if the agreement, contract or transaction was a contract of sale of a commodity for future delivery."[13] The statute, however, excepts certain transactions from its application. In particular, CEA section 2(c)(2)(D)(ii)(III)(aa)[14] excepts a contract of sale that "results in actual delivery within 28 days or such other

longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved."[15] If no exception is applicable, these retail transactions are "commodity interests" subject to Commission regulations together with futures, options, and swaps.[16] Under this authority, the Commission regulates retail commodity transactions, with the exception of contracts of sale that result in actual delivery within 28 days.[17]

The Dodd-Frank Act added CEA section 2(c)(2)(D) to address certain judicial uncertainty involving the Commission's regulatory oversight capabilities. The Commission has long held that certain speculative commodity transactions involving leverage or margin may have indicia of futures contracts, subjecting them to Commission oversight.[18] However, judicial decisions emerged that called into question the Commission's oversight over certain leveraged retail transactions in currencies and other commodities.[19] In 2008, Congress addressed this judicial uncertainty by providing the Commission with more explicit authority over retail foreign currency transactions in CEA section 2(c)(2)(C).[20] These new statutory provisions established a two-day actual delivery exception for such transactions.[21] Two years later, Congress provided the Commission with explicit oversight authority over all other "retail commodity transactions" in CEA section 2(c)(2)(D).[22] As noted,

---

[1] 5 U.S.C. 552.

[2] 17 CFR 145.9. Commission regulations referred to herein are found at 17 CFR chapter I.

[3] 7 U.S.C. 2(a)(1)(A). The CFTC shares its swap jurisdiction in certain aspects with the Securities and Exchange Commission ("SEC"). *See* 7 U.S.C. 2(a)(1)(C).

[4] 7 U.S.C. 9(1).

[5] 7 U.S.C. 2(c)(2)(D).

[6] The authority provided to the Commission by CEA section 2(c)(2)(D) is in addition to, and independent from, the jurisdiction over contracts of sale of a commodity for future delivery and transactions subject to regulation pursuant to CEA section 19 that the CEA has historically granted to the Commission. It is also in addition to, and independent from, the jurisdiction over swaps granted to the Commission by the Dodd-Frank Act. Further, the authority granted under CEA section 2(c)(2)(D) is in addition to, and independent of, the Commission's ability to bring enforcement actions for fraud or manipulation in connection with swaps, contracts of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity. 7 U.S.C. 9(1), 9(3), 13(a)(2); 17 CFR 180.1, 180.2.

[7] 7 U.S.C. 1a(18).

[8] 7 U.S.C. 1a(17); *see also* 7 U.S.C. 2(c)(2)(D)(iv).

[9] 7 U.S.C. 2(c)(2)(D)(i).

[10] 7 U.S.C. 6(a) (prohibiting the off-exchange trading of futures transactions by U.S. persons unless that transaction is conducted on or subject to the rules of a designated contract market).

[11] 7 U.S.C. 6(b) (permitting foreign boards of trade registered with the Commission with the ability to provide direct access to U.S. persons).

[12] 7 U.S.C. 6b (prohibiting fraudulent conduct in connection with any contract of sale of any commodity in interstate commerce, among other things).

[13] 7 U.S.C. 2(c)(2)(D)(iii).

[14] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[15] The Commission has not adopted any regulations permitting a longer actual delivery period for any commodity pursuant to this statute. Accordingly, the 28-day actual delivery period remains applicable to all commodities, while retail foreign currency transactions remain subject to a 2-day actual delivery period pursuant to CEA section 2(c)(2)(C).

[16] 17 CFR 1.3(yy).

[17] In addition, certain commercial transactions and securities are excepted pursuant to CEA section 2(c)(2)(D)(ii).

[18] *See In re Stovall,* CFTC Docket No. 75–7 [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777 (CFTC Dec. 6, 1979) (applying traditional elements of a futures contract to a purported cash transaction).

[19] *See, e.g., CFTC v. Zelener,* 373 F.3d 861 (7th Cir. 2004); *CFTC v. Erskine,* 512 F.3d 309 (6th Cir. 2008).

[20] *See* Food, Conservation and Energy Act of 2008, Public Law 110–246, 122 Stat. 1651 (2008).

[21] 7 U.S.C. 2(c)(2)(C)(i)(II)(bb)(AA).

[22] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Public Law 111–203, 124 Stat. 1376 (2010); *see also Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture,* 111th Cong. 52–664 (2009) (statement of Rep. Marshall, Member, H. Comm. on Agriculture) ("If in substance it is a futures contract, it is going to be regulated. It doesn't matter how

these new statutory provisions established an exception for instances when actual delivery of the commodity occurs within 28 days.[23]

In connection with its retail commodity transaction oversight, the Commission previously issued a proposed interpretation of the term "actual delivery" in the context of CEA section 2(c)(2)(D), accompanied by a request for comment.[24] In that interpretation, the Commission provided several examples of what may and may not satisfy the actual delivery exception. After reviewing public comments, the Commission issued a final interpretation in 2013 (the "2013 Guidance").[25]

The 2013 Guidance explained that the Commission will consider evidence "beyond the four corners of contract documents" to assess whether actual delivery of the commodity occurred.[26] The Commission further noted that it will "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction."[27] The 2013 Guidance also included a list of relevant factors the Commission will consider in an actual delivery determination[28] and again provided examples[29] of what may and may not constitute actual delivery. As per the 2013 Guidance, the only satisfactory examples of actual delivery involve transfer of title and possession of the commodity to the purchaser or a

depository acting on the purchaser's behalf.[30] Among other things, mere book entries and certain instances where a purchase is "rolled, offset, or otherwise netted with another transaction" do not constitute actual delivery.[31]

Within a year after the 2013 Guidance was released, the Eleventh Circuit issued an opinion affirming a preliminary injunction obtained by the Commission in *CFTC v. Hunter Wise Commodities, LLC.*[32] *Hunter Wise* further reinforced the Commission's interpretation of actual delivery in the 2013 Guidance. Specifically, the Eleventh Circuit recognized that delivery "denotes a transfer of possession and control."[33] Indeed, "[i]f 'actual delivery' means anything, it means something other than simply 'delivery,' for we must attach meaning to Congress's use of the modifier 'actual.'"[34] Accordingly, the Court stated that actual delivery "denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent' and constructive delivery does not suffice.[35] Notably, the Eleventh Circuit found that its own holding harmonized with the 2013 Guidance and recognized that the legislative history behind CEA section 2(c)(2)(D) also "complements" its decision.[36]

Soon after the *Hunter Wise* decision, the Commission established that virtual currency is a commodity as that term is defined by CEA section 1a(9).[37] Subsequently, the Commission brought its first enforcement action against a platform that offered virtual currency transactions to retail customers on a leveraged, margined, or financed basis without registering with the Commission.[38] In the *Bitfinex* settlement order, the Commission found that the virtual currency platform violated CEA sections 4(a) and 4d because the unregistered entity "did not actually deliver bitcoins purchased from

them" as prescribed within the actual delivery exception.[39] Rather, the entity "hold the purchased bitcoins in bitcoin deposit wallets that it owned and controlled."[40]

After *Bitfinex*, the Commission received requests for guidance with regard to the meaning of the actual delivery exception in the specific context of virtual currency transactions. Accordingly, the Commission has decided to issue this proposed interpretation and seek public comment. The Commission is issuing this proposed interpretation to inform the public of the Commission's views as to the meaning of the term "actual delivery" in the context of virtual currency and to provide the public with guidance on how the Commission intends to assess whether any given retail commodity transaction in virtual currency (whereby an entity or platform offers margin trading or otherwise facilitates[41] the use of margin, leverage, or financing arrangements for their retail market participants) results in actual delivery, as the term is used in CEA section 2(c)(2)(D)(ii)(III)(aa).[42] The Commission requests comment generally on this proposed interpretation and further invites comment on specific questions, as outlined within this release.

## II. Commission Interpretation of Actual Delivery for Virtual Currency

### A. Virtual Currency as a Commodity

As noted previously, the Commission considers virtual currency to be a commodity,[43] like many other intangible commodities that the Commission has recognized over the course of its existence (*e.g.*, renewable energy credits and emission allowances, certain indices, and certain debt instruments, among others).[44] Indeed, since their inception, virtual currency

clever your draftsmanship is."); 156 Cong. Rec. S5,924 (daily ed. July 15, 2010) (statement of Sen. Lincoln) ("Section 742 corrects [any regulatory uncertainty] by extending the Farm Bill's "*Zelener* fraud fix" to retail off-exchange transactions in *all* commodities.") (emphasis added).

[23] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[24] Retail Commodity Transactions Under Commodity Exchange Act, 76 FR 77670 (Dec. 14, 2011).

[25] Retail Commodity Transactions Under Commodity Exchange Act, 78 FR 52426 (Aug. 23, 2013).

[26] *Id.* at 52,428.

[27] *Id.*

[28] "Relevant factors in this determination include the following: Ownership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction, including all related documentation; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed." 78 FR at 52428.

[29] In the 2013 Guidance, Examples 1 and 2 illustrate circumstances where actual delivery is made, while Examples 3, 4 and 5 illustrate circumstances where actual delivery is not made. In setting forth the examples, the Commission made clear that they are non-exclusive and were intended to provide the public with guidance on how the Commission would apply the interpretation. 78 FR at 52427–28.

[30] *Id.*

[31] *Id.*

[32] *CFTC v. Hunter Wise Commodities, LLC, et al.,* 749 F.3d 967 (11th Cir. 2014) (hereinafter, *Hunter Wise*).

[33] 749 F.3d at 978–79, (citing *Black's Law Dictionary* 494 (9th ed. 2009)).

[34] 749 F.3d at 979.

[35] *Id.*

[36] 749 F.3d at 977.

[37] *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan,* CFTC Docket No. 15–29, 2015 WL 5535736, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,538 (CFTC Sept. 17, 2015) (consent order); *In re TeraExchange LLC,* CFTC Docket No. 15–33, 2015 WL 5658082, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,546 (CFTC Sept. 24, 2015) (consent order).

[38] *In re BFXNA INC. d/b/a BITFINEX,* CFTC Docket No. 16–19 (June 2, 2016) (consent order) (hereinafter, *Bitfinex*).

[39] *Id.*

[40] *Id.*

[41] Specifically, CEA section 2(c)(2)(D)(i) captures any such retail commodity transaction "entered into, or offered . . . on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."

[42] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[43] *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan,* CFTC Docket No. 15–29, 2015 WL 5535736, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,538 (CFTC Sept. 17, 2015) (consent order); *In re TeraExchange LLC,* CFTC Docket No. 15–33, 2015 WL 5658082, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,546 (CFTC Sept. 24, 2015) (consent order).

[44] *See generally* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 FR 48208 at 48233 (Aug. 13, 2012) (discussing application of the swap forward exclusion to intangible commodities).

**60338** **Federal Register** / Vol. 82, No. 243 / Wednesday, December 20, 2017 / Proposed Rules

structures were proposed as digital alternatives to gold and other precious metals.[45] As a commodity, virtual currency is subject to applicable provisions of the CEA and Commission regulations.

The Commission interprets the term virtual currency broadly. In the context of this interpretation, virtual or digital currency:[46] Encompasses any digital representation of value (a "digital asset") that functions as a medium of exchange, and any other digital unit of account that is used as a form of a currency (i.e., transferred from one party to another as a medium of exchange); may be manifested through units, tokens, or coins, among other things; and may be distributed by way of digital "smart contracts," among other structuros.[47] However, the Commission notes that it does not intend to create a bright line definition at this time given the evolving nature of the commodity and, in some instances, its underlying public distributed ledger technology ("DLT" or "blockchain").

*B. The Commission's Interest in Virtual Currency*

The Commission recognizes that certain virtual currencies and their underlying blockchain technologies have the potential to yield notable advancements in applications of financial technology ("FinTech").

Indeed, as part of its efforts to facilitate beneficial FinTech innovation and help ensure market integrity, the Commission launched the LabCFTC initiative.[48] This initiative provides the Commission with a platform to engage the FinTech community and promote market-enhancing innovation in furtherance of improving the quality, resiliency, and competitiveness of the markets overseen by the Commission. As such, the Commission is closely following the development and continuing evolution of blockchain technologies and virtual currencies.

Moreover, since virtual currency can serve as an underlying component of derivatives transactions, the Commission maintains a close interest in the development of the virtual currency marketplace generally. As a practical matter, virtual currency, by virtue of its name, represents a digital medium of exchange for goods and services, similar to fiat currency.[49] Over time, numerous centralized platforms have emerged as markets to convert virtual currency to fiat currency or other virtual currencies. These platforms provide a place to immediately exchange one commodity for another "on the spot."

Some of these centralized platforms also attempt to cater to those that wish to speculate on the price movements of a virtual currency against other currencies. For example, a speculator may purchase virtual currency using borrowed money in the hopes of covering any outstanding balance owed through profits from favorable price movements in the future. This interpretation is specifically focused on such "retail commodity transactions," whereby an entity or platform: (i) Offers margin trading or otherwise facilitates[50] the use of margin, leverage, or financing arrangements for their retail market participants; (ii) typically to enable such participants to speculate or capitalize on

price movements of the commodity—two hallmarks of a regulated futures marketplace.[51]

Beyond their practical and speculative functions, the emergence of these nascent markets has also been negatively marked by a variety of retail customer harm that warrants the Commission's attention, including, among other things, flash crashes and other market disruptions,[52] delayed settlements,[53] alleged spoofing,[54] hacks,[55] alleged internal theft,[56] alleged manipulation,[57] smart contract coding vulnerabilities,[58] bucket shop

---

[45] Nick Szabo, *Bit gold*, Unenumerated (Dec. 27, 2008), *http://unenumerated.blogspot.com/2005/12/bit-gold.html.*

[46] The Commission uses the term "virtual currency" and "digital currency" interchangeably for purposes of this proposed interpretation. However, the Commission acknowledges that the two terms may have certain practical differences in other contexts. For example, one view is that "digital currency" includes fiat currencies, while "virtual currency" does not. *See* The Financial Action Task Force (FATF), *Virtual Currencies: Key Definitions and Potential AML/CFT Risks*, at 4 (June 27, 2014), *http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.* Further, this interpretation is not intended to encompass transactions otherwise covered by CEA section 2(c)(2)(C) and related Commission regulations.

[47] One prominent type of virtual currency is cryptocurrency. Cryptocurrency is described as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party." Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008), *https://bitcoin.org/bitcoin.pdf.* Transactions are represented by a hash or "chain of digital signatures," which takes into account the previous owner and the next owner. Given the lack of a centralized authority, transaction verification is "publicly announced" in a transparent ledger "system for participants to agree on a single history" of transactions. *Id.* Each transaction moves from one digital wallet to another, recognized as "nodes" on a distributed ledger network. This structure represents one form of DLT or blockchain technology, which underlies bitcoin—a widely traded virtual currency.

[48] *See* Press Release, Commodity Futures Trading Commission, CFTC Launches LabCFTC as Major FinTech Initiative (May 17, 2017), *http://www.cftc.gov/PressRoom/PressReleases/pr7558-17.*

[49] Michael J. Casey and Paul Vigna, *Bitcoin and the Digital-Currency Revolution*, The Wall Street Journal (Jan. 23, 2015), *https://www.wsj.com/articles/the-revolutionary-power-of-digital-currency-1422035061* ("Once inside the coffee shop, you will open your wallet's smartphone app and hold its QR code reader up to the coffee shop's device" to buy a cup of coffee).

[50] As noted earlier, CEA section 2(c)(2)(D)(i) captures any such retail transaction "entered into, or offered . . . on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." The Commission views any financing arrangements facilitated, arranged, or otherwise endorsed by the offeror or counterparty to satisfy this statutory definition for purposes of this interpretation.

[51] *See, e.g., CFTC v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004) (listing elements typically found in a futures contract); *In re Stovall*, CFTC Docket No. 75–7 [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777 (CFTC Dec. 6, 1979) (describing how futures contracts, being traded on margin, "are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for determining ownership of the actual commodities."); David J. Gilberg, *Regulation of New Financial Instruments Under the Federal Securities and Commodities Laws*, 39 Vand. L. Rev. 1599, 1603–04, n.14 (1986) (typically, futures "traders are interested only in obtaining cash payments of price differentials, not actual commodities").

[52] *See, e.g.,* Paul Vigna, *Virtual Currencies Bitcoin and Ether Wrap Up a Wild Quarter*, The Wall Street Journal, Jul. 3, 2017, at B6 (describing a recent flash crash affecting the price of virtual currency Ether, caused by "a multimillion-dollar sell order" that subsequently "sparked a cascade of stop-loss orders"); Paul Vigna, *BitBeat: Bitcoin Price Drops on Block-Size Debate, 'Flash Crash*,' The Wall Street Journal (Aug. 20, 2015), *http://blogs.wsj.com/moneybeat/2015/08/20/bitbeat-bitcoin-price-drops-on-block-size-debate-flash-crash/* (describing a bitcoin's speculative traders love this kind of stuff [margin trading]; these guys could easily give Wall Street's casino hotshots a run for their money").

[53] Paul Vigna, *Virtual Currencies Bitcoin and Ether Wrap Up a Wild Quarter*, The Wall Street Journal, Jul. 3, 2017, at B6 ("[t]here were delays of hours and even days.").

[54] Lionel Laurent, *Bitcoin Wrestles With Spoofy the Trader*, Bloomberg Gadfly (Aug. 7, 2017), *https://www.bloomberg.com/gadfly/articles/2017-08-07/bitcoin-has-a-spoofy-problem.*

[55] *See, e.g.,* Paul Vigna and Gregor Stuart Hunter, *Bitcoin Sinks After Exchange Reports Hack*, The Wall Street Journal (Aug. 3. 2016), *http://www.wsj.com/articles/bitcoin-sinks-after-exchange-reports-hack-1470195727;* Nathaniel Popper and Rachul Abrams, *Apparent Theft Rattles the Bitcoin World*, N.Y. Times, Feb. 25, 2014, at B1; Alex Hern, *A History of Bitcoin Hacks*, The Guardian (Mar. 18, 2014), *http://www.theguardian.com/technology/2014/mar/18/history-of-bitcoin-hacks-alternative-currency.*

[56] Jessica Lipscomb, *Cryptsy Founder Paul Vernon Disappeared, Along With Millions of His Customers' Cash*, Miami New Times (Jun. 28, 2016), *http://www.miaminewtimes.com/news/cryptsy-founder-paul-vernon-disappeared-along-with-millions-of-his-customers-cash-8557571.*

[57] Izabella Kaminska, *When OTC markets backfire, bitcoin edition*, Financial Times—Alphaville (Mar. 6, 2017), *https://ftalphaville.ft.com/2017/03/06/2185731/when-otc-markets-backfire-bitcoin-edition.*

[58] Matthew Leising, *The Ether Thief*, Bloomberg Markets Magazine (Jun. 13, 2017), *https://www.bloomberg.com/features/2017-the-ether-thief/* (while not technically an event specific to any one

arrangements and other conflicts of interest.[59] These types of activities perpetrated by bad actors can inhibit market-enhancing innovation, undermine market integrity, and stunt further market development.

## C. Actual Delivery of Virtual Currency

As underscored by its efforts to engage the FinTech community, the Commission emphasizes that it does not intend to impede market-enhancing innovation or otherwise harm the evolving virtual currency marketplace with this interpretation. To the contrary, the Commission believes this interpretation can help advance a healthy ecosystem and support further market-enhancing innovation. Additionally, the Commission takes seriously its goal of protecting U.S. retail market participants engaged in the virtual currency marketplace that falls within the Commission's jurisdiction— as it would with respect to retail market participants trading in any other retail commodity marketplace that falls within its jurisdiction. The Commission drafted this interpretation with such a balance in mind.

As discussed above, a retail commodity transaction may be excepted from CEA section 2(c)(2)(D) (and thus not subject to CEA sections 4(a), 4(b), and 4b) if actual delivery of the commodity occurs within 28 days of the transaction.[60] The longstanding Model State Commodity Code also contains an exception from its "commodity contract" regulation when physical settlement occurs within 28 days.[61] However, the Model State Commodity Code provides for the ability to lengthen *or shorten* its 28-day physical delivery exception time period, while CEA section 2(c)(2)(D) only provides the Commission with the ability to lengthen its actual delivery exception time period.[62] Therefore, absent

Congressional action, the Commission is unable to reduce the actual delivery exception period for speculative, leverage-based retail commodity transactions in virtual currency. The one-size-fits-all 28 day delivery period in CEA section 2(c)(2)(D) may not properly account for innovation or customary practice in certain cash markets, such as virtual currency transactions that would presumably take much less than 28 days to deliver to a purchaser in a typical spot transaction.[63] Without the application of CEA section 2(c)(2)(D), retail market participants that transact on platforms offering speculative transactions in virtual currency (involving margin, leverage, or other financing) will not be afforded many of the protections that flow from registration under the CEA. Despite the statutory limitations, the Commission will utilize its current statutory authority as best it can to prevent fraud in retail commodity transactions involving virtual currency.

The Commission, in interpreting the term actual delivery for the purposes of CEA section 2(c)(2)(D)(ii)(III)(aa), will continue to follow the 2013 Guidance and "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction."[64] Further, the Commission will continue to assess all relevant factors[65] to aid in such an actual delivery determination. More specifically, the Commission's view of when "actual delivery" has occurred within the context of virtual currency requires:

(1) A customer having the ability to: (i) Take possession and control of the entire quantity of the commodity, whether it was purchased on margin, or using leverage, or any other financing arrangement, and (ii) use it freely in commerce (both within and away from any particular platform) no later than 28 days from the date of the transaction; and

(2) The offeror and counterparty seller (including any of their respective affiliates or other persons acting in

concert with the offeror or counterparty seller on a similar basis)[66] not retaining any interest in or control over any of the commodity purchased on margin, leverage, or other financing arrangement at the expiration of 28 days from the date of the transaction.[67]

Consistent with the 2013 Guidance, a sham delivery does not constitute actual delivery for purposes of this interpretation. The offeror and counterparty seller, including their agents, must retain no interest or control whatsoever in the virtual currency acquired by the purchaser at the expiration of 28 days from the date of entering into the transaction. Indeed, in its simplest form, actual delivery of virtual currency connotes the ability of a purchaser to utilize the virtual currency purchased "on the spot" to immediately purchase goods or services with the currency elsewhere.

In the context of an "actual delivery" determination in virtual currency, physical settlement of the commodity must occur. A cash settlement or offset mechanism, as described in Example 4 below, will not satisfy the actual delivery exception of CEA section 2(c)(2)(D). The distinction between physical settlement and cash settlement in this context is akin to settlement of a spot foreign currency transaction at a commercial bank or hotel in a foreign nation—the customer receives physical foreign currency, not U.S. dollars. As mentioned, such physical settlement must occur within 28 days from the date on which the "agreement, contract, or transaction is entered into" to constitute "actual delivery."[68]

Consistent with the interpretation above, the Commission provides the following non-exclusive examples to further clarify the meaning of actual delivery in the virtual currency context:

---

platform, this hack illustrates an event that dramatically affected the price and status of a virtual currency traded on such platforms.

[59] *See, e.g.,* Vitalik Buterin, *Bitfinex: Bitcoinica Rises From The Grave,* Bitcoin Magazine (Nov. 22, 2012), *http://bitcoinmagazine.com/articles/bitfinex-bitcoinica-rises-from-the-grave-1353641122;* Matt Levine, *How A Bank Should Be?,* Bloomberg View (Mar. 11, 2015), *https://www.bloomberg.com/view/articles/2015-03-11/how-should-a-bank-be-* ("Just because you mumble the word 'blockchain' doesn't make otherwise illegal things legal"); Matt Levine, *Bitcoin Bucket Shop Kicks Bucket,* Bloomberg View (Jun. 19, 2015), *https://www.bloomberg.com/view/articles/2015-06-19/bitcoin-bucket-shop-kicks-bucket.*

[60] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[61] *See* Model State Commodity Code section 1.01(o), [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,568 (Apr. 5, 1985).

[62] To date, the Commission has not chosen to extend the 28-day actual delivery period in any instance.

[63] Notably, Congress provided a 2-day actual delivery exception for retail foreign currency transactions. *See* 7 U.S.C. 2(c)(2)(C)(i)(II)(bb)(AA).

[64] 78 FR at 52428.

[65] This list includes, but is not limited to "[o]wnership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction, including all related documentation; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed." *Id.*

[66] The Commission recognizes that the offeror of the transaction and the ultimate counterparty may be two separate entities or may be the same. For example, the Commission would consider as the offeror of the transaction a virtual currency platform that makes the transaction available to the retail customer or otherwise facilitates the transaction. That virtual currency platform could also be considered a counterparty to the transaction if, for example, the platform itself took the opposite side of the transaction or the purchaser of the virtual currency enjoyed privity of contract solely with the platform rather than the seller. Additionally, the Commission recognizes that some virtual currency platforms may provide a purchaser with the ability to source financing or leverage from other users or third parties. The Commission would consider such third parties or other users to be acting in concert with the offeror or counterparty seller on a similar basis.

[67] Among other things, the Commission may look at whether the offeror or seller retain any ability to access or withdraw any quantity of the commodity purchased from the purchaser's account or wallet.

[68] 78 FR at 52427.

*Example 1:* Actual delivery of virtual currency will have occurred if, within 28 days of entering into an agreement, contract, or transaction, there is a record on the relevant public distributed ledger network or blockchain of the transfer of virtual currency, whereby the entire quantity of the purchased virtual currency, including any portion of the purchase made using leverage, margin, or other financing, is transferred from the counterparty seller's blockchain wallet [69] to the purchaser's blockchain wallet, the counterparty seller retains no interest in or control over the transferred commodity, and the counterparty seller has transferred title [70] of the commodity to the purchaser. When a matching platform or other third party offeror acts as an intermediary, the virtual currency's public distributed ledger must reflect the purchased virtual currency transferring from the counterparty seller's blockchain wallet to the third party offeror's blockchain wallet and, separately, from the third party offeror's blockchain wallet to the purchaser's blockchain wallet, provided that the purchaser's wallet is not affiliated with or controlled by the counterparty seller or third party offeror in any manner.

*Example 2:* Actual delivery will have occurred if, within 28 days of entering into a transaction: (1) The counterparty seller has delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, into the possession of a depository (*i.e.*, wallet or other relevant storage system) other than one owned, controlled, or operated by the counterparty seller (including any parent companies, partners, agents, affiliates, and others acting in concert with the counterparty seller) [71] that has entered into an agreement with the purchaser to hold virtual currency as agent for the purchaser without regard to any asserted interest of the offeror, the counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis; (2) the counterparty seller has

transferred title of the commodity to the purchaser; (3) the purchaser has secured full control over the virtual currency (*i.e.*, the ability to immediately remove the full amount of purchased commodity from the depository); and (4) no liens (or other interests of the offeror, counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis) resulting from the use of margin, leverage, or financing used to obtain the entire quantity of the commodity purchased will continue forward at the expiration of 28 days from the date of the transaction.

*Example 3:* Actual delivery will *not* have occurred if, within 28 days of entering into a transaction, a book entry is made by the offeror or counterparty seller purporting to show that delivery of the virtual currency has been made to the purchaser, but the counterparty seller or offeror has *not*, in accordance with the methods described in Example 1 or Example 2, actually delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, and transferred title to that quantity of the virtual currency to the purchaser, regardless of whether the agreement, contract, or transaction between the purchaser and offeror or counterparty seller purports to create an enforceable obligation [72] to deliver the commodity to the purchaser.

*Example 4:* Actual delivery will *not* have occurred if, within 28 days of entering into a transaction, the agreement, contract, or transaction for the purchase or sale of virtual currency is rolled, offset against, netted out, or settled in cash or virtual currency (other than the purchased virtual currency) between the purchaser and the offeror or counterparty seller (or persons acting in concert with the offeror or counterparty seller).

### III. Request for Comment

The Commission requests comment from the public regarding the Commission's proposed interpretation of "actual delivery" in the context of virtual currency and further invites comments on specific questions related to the Commission's treatment of virtual currency transactions. The Commission encourages all comments including background information, actual market examples, best practice principles,

expectations for the possible impact on further innovation, and estimates of any asserted costs and expenses. Specifically, the Commission requests comment on the following questions:

*Question 1:* As noted in this proposed interpretation, the Commission is limited in its ability to shorten the length of the actual delivery exception period for retail commodity transactions in virtual currency—which presumably take much less than 28 days to deliver to a purchaser. Would a 2-day actual delivery period, such as the actual delivery exception in CEA section 2(c)(2)(C), more accurately apply to such transactions in virtual currency? Would another actual delivery period be more appropriate? What additional information should the Commission consider in determining an appropriate actual delivery exception period for retail commodity transactions in virtual currency? If the Commission were to decide that a shorter actual delivery exception period would be more appropriate in the context of virtual currency, should the Commission engage Congress to consider an adjustment to CEA section 2(c)(2)(D)'s the actual delivery exception? For example, should the Commission seek that Congress amend CEA section 2(c)(2)(D)'s actual delivery exception to be more aligned with the broader delivery period adjustment language in the Model State Commodity Code?

*Question 2:* With respect to the Commission's proposed interpretation, are there additional examples the Commission should consider in satisfaction of the "actual delivery" exception to CEA section 2(c)(2)(D)?

*Question 3:* The Commission is concerned about offerors of virtual currency retail commodity transactions that may be subject to conflicts of interest, including situations such as an offeror or its principals taking the opposite side of a customer transaction, either directly or through an affiliated liquidity provider or market maker. These arrangements may, in certain circumstances, resemble bucket shops. [73] How should the Commission evaluate such circumstances if a platform seeks to avail itself of the actual delivery exception? Are there any additional factors that the Commission should consider in its determination of whether

---

[69] The source of the virtual currency is provided for purposes of this example. However, the focus of this analysis remains on the actions that would constitute actual delivery of the virtual currency to the purchaser.

[70] For purposes of this interpretation, title may be reflected by linking an individual purchaser with proof of ownership of the particular wallet or wallets that contain the purchased virtual currency.

[71] The Commission recognizes that an offeror could act in concert with both the purchaser and the counterparty seller in the ordinary course of business if it intermediates a transaction. It is not intended that such activity would prevent an offeror from associating with a depository, as otherwise allowed by this example.

[72] This "enforceable obligation" language is provided in reference to an exception to CEA section 2(c)(2)(D) that is limited by its terms to a commercial transaction involving two commercial entities with a pre-existing line of business in the commodity at issue that is separate and distinct from the business of engaging in a retail commodity transaction. *See* 7 U.S.C. 2(c)(2)(D)(ii)(III)(bb).

[73] Vitalik Buterin, *Bitfinex: Bitcoinica Rises From The Grave, Bitcoin Magazine* (Nov. 22, 2012), *http://bitcoinmagazine.com/articles/bitfinex-bitcoinica-rises-from-the-grave-1353644122* (describing a bucket shop arrangement whereby a platform "steps in and acts as the counterparty to some of its users," creating "perverse incentives").

the "actual delivery" exception is available?

*Question 4:* As noted above, CEA sections 4(a), 4(b), and 4b apply to retail commodity transactions "as if" the transaction was a futures contract.[74] Therefore, absent an exception, a retail commodity transaction must be offered on or subject to the rules of a designated contract market ("DCM").[75] Separately, an entity soliciting or accepting orders for retail commodity transactions and accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure such transactions must register with the Commission as a futures commission merchant ("FCM").[76] As a result of these requirements, the Commission recognizes that certain entities or platforms will choose not to offer virtual currency retail commodity transactions. This business decision is not unique to any particular commodity. However, as noted earlier, the Commission does not intend to stifle innovation. Rather, it is acting to protect U.S. retail customers regarding transactions that fall within its jurisdiction. Therefore, the Commission requests comments as to what factors may be relevant to consider regarding the Commission's potential use of its exemptive authority under CEA section 4(c)[77] in this regard. For example, please note any advantages and disadvantages regarding the potential to establish a distinct registration and compliance regime for entities that seek to offer retail commodity transactions in virtual currency. Why would such treatment be uniquely warranted[78] in the context of virtual currency? Please also note any other issues that the Commission should consider regarding such an analysis. What other alternatives should the Commission consider instead of establishing a distinct registration and compliance regime?

*Question 5:* In Example 2, the Commission sets forth a proposed set of facts that permits actual delivery to a depository instead of the purchaser. What should the Commission consider in further clarifying the meaning of "depository" for purposes of this interpretation? For example, could the depository maintain certain licenses or registrations in order to qualify for this example? In addition, should the

Commission further prohibit the depository from being owned or operated by the offeror (including any offeror parent company, partner, agent, and other affiliates)? Please note any factors the Commission should consider in making this determination (such as the effect of contractual agreements between the depository and the offeror).

*Question 6:* Example 2 also requires the purchaser to secure full control over the virtual currency once it is deposited in a depository in order for the fact pattern to constitute actual delivery. The Commission requests comment regarding what types of circumstances would ensure a purchaser has obtained "full control" of the commodity. For example, is possession of a unique key or other credentials that allow full access and ability to transfer virtual currency sufficient to provide full control? Similarly, how should the Commission view full control by a user in light of commonly used cybersecurity techniques and money transmitter procedures otherwise required by law?

*Question 7:* Example 2 also requires that no liens resulting from the use of margin, leverage, or financing used to obtain the entire quantity of the commodity purchased by the buyer continue forward at the expiration of 28 days from the date of the transaction. The Commission requests comment regarding circumstances under which a lien would be considered terminated for purposes of this interpretation. For example, are there circumstances where the Commission should consider allowing "forced sale" scenarios, whereby the purchased virtual currency is used to satisfy any resulting liens from the retail commodity transaction, while still interpreting the transaction as having resulted in actual delivery to the purchaser? Should the Commission consider other types of lien scenarios or interests, such as those liens that would not provide a right to repossession of the commodity?

*Question 8:* As noted above, the status of "title" is one of the factors the Commission considers in an actual delivery determination for retail commodity transactions.[79] In Examples 1 and 2, this interpretation notes that "title" may be reflected by linking an individual purchaser with proof of ownership of the particular wallet or wallets that contain the purchased virtual currency. What additional examples, if any, should the Commission consider to address the status of "title" for the purposes of an actual delivery determination?

*Question 9:* While this interpretation is solely focused on the actual delivery exception to CEA section 2(c)(2)(D), the Commission recognizes other exceptions may be available.[80] Specifically, the Commission recognizes that the SEC recently issued a statement regarding the application of federal securities laws to certain initial coin offerings ("ICOs").[81] Depending on their use, the tokens or units issued in an ICO may be commodities, commodity options, derivatives, or otherwise fall within the Commission's virtual currency definition described in this interpretation. However, any such tokens that are deemed securities (and trade in a manner that qualifies as a retail commodity transaction) would be excepted from the retail commodity transaction definition pursuant to section 2(c)(2)(D)(ii)(II) of the Act. Are there concerns with the scope of this exception with regard to retail commodity transactions? What factors should the Commission consider if it were to issue further guidance regarding this exception?

Issued in Washington, DC, on December 15, 2017 by the Commission.

**Christopher J. Kirkpatrick,**
*Secretary of the Commission.*

**Appendix to Retail Commodity Transactions Involving Virtual Currency—Commission Voting Summary**

On this matter, Chairman Giancarlo and Commissioners Quintenz and Behnam voted in the affirmative. No Commissioner voted in the negative.

[FR Doc. 2017–27421 Filed 12–19–17; 8:45 am]

**BILLING CODE 6351–01–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 165**

**[Docket Number USCG–2017–0234]**

**RIN 1625–AA00**

**Safety Zone; Pacific Ocean, Kilauea Lava Flow Ocean Entry on Southeast Side of Island of Hawaii, HI**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Supplemental notice of proposed rulemaking.

---

[74] 7 U.S.C. 2(c)(2)(D)(iii).

[75] 7 U.S.C. 6(a).

[76] 7 U.S.C. 1a(28); 7 U.S.C. 6d(a).

[77] 7 U.S.C. 6(c).

[78] Arguably, beyond the distributed ledger technologies, entities offering virtual currency retail commodity transactions operate in a similar manner to any other entity offering retail commodity transactions online.

[79] *See* 78 FR at 52428.

[80] *See generally* 7 U.S.C. 2(c)(2)(D)(ii).

[81] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207 (Jul. 25, 2017).

# EXHIBIT
# 3

# Department of the Treasury
# Financial Crimes Enforcement Network

## Guidance

**FIN-2013-G001**

**Issued:**      **March 18, 2013**

**Subject:**     **Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies**

The Financial Crimes Enforcement Network ("FinCEN") is issuing this interpretive guidance to clarify the applicability of the regulations implementing the Bank Secrecy Act ("BSA") to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies.[1]  Such persons are referred to in this guidance as "users," "administrators," and "exchangers," all as defined below.[2]  A user of virtual currency is ***not*** an MSB under FinCEN's regulations and therefore is not subject to MSB registration, reporting, and recordkeeping regulations.  However, an administrator or exchanger ***is*** an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person.  An administrator or exchanger is not a provider or seller of prepaid access, or a dealer in foreign exchange, under FinCEN's regulations.

### Currency vs. Virtual Currency

FinCEN's regulations define currency (also referred to as "real" currency) as "the coin and paper money of the United States or of any other country that [i] is designated as legal tender and that [ii] circulates and [iii] is customarily used and accepted as a medium of exchange in the country of issuance."[3]  In contrast to real currency, "virtual" currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency.  In particular, virtual currency does not have legal tender status in any jurisdiction. This guidance addresses "convertible" virtual currency.  This type of virtual currency either has an equivalent value in real currency, or acts as a substitute for real currency.

---

[1] FinCEN is issuing this guidance under its authority to administer the Bank Secrecy Act.  *See* Treasury Order 180-01 (March 24, 2003).  This guidance explains only how FinCEN characterizes certain activities involving virtual currencies under the Bank Secrecy Act and FinCEN regulations.  It should not be interpreted as a statement by FinCEN about the extent to which those activities comport with other federal or state statutes, rules, regulations, or orders.

[2] FinCEN's regulations define "person" as "an individual, a corporation, a partnership, a trust or estate, a joint stock company, an association, a syndicate, joint venture, or other unincorporated organization or group, an Indian Tribe (as that term is defined in the Indian Gaming Regulatory Act), and all entities cognizable as legal personalities."  31 CFR § 1010.100(mm).

[3] 31 CFR § 1010.100(m).

## Background

On July 21, 2011, FinCEN published a Final Rule amending definitions and other regulations relating to money services businesses ("MSBs").[4]  Among other things, the MSB Rule amends the definitions of dealers in foreign exchange (formerly referred to as "currency dealers and exchangers") and money transmitters.  On July 29, 2011, FinCEN published a Final Rule on Definitions and Other Regulations Relating to Prepaid Access (the "Prepaid Access Rule").[5]  This guidance explains the regulatory treatment under these definitions of persons engaged in virtual currency transactions.

## Definitions of User, Exchanger, and Administrator

This guidance refers to the participants in generic virtual currency arrangements, using the terms "user," "exchanger," and "administrator."[6]  A *user* is a person that obtains virtual currency to purchase goods or services.[7]  An *exchanger* is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency.  An *administrator* is a person engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency.

## Users of Virtual Currency

A user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is ***not*** an MSB under FinCEN's regulations.[8]  Such activity, in and of itself, does not fit within the definition of "money transmission services" and therefore is not subject to FinCEN's registration, reporting, and recordkeeping regulations for MSBs.[9]

---

[4] *Bank Secrecy Act Regulations – Definitions and Other Regulations Relating to Money Services Businesses*, 76 FR 43585 (July 21, 2011) (the "MSB Rule").  This defines an MSB as "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(7) of this section.  This includes but is not limited to maintenance of any agent, agency, branch, or office within the United States."  31 CFR § 1010.100(ff).

[5] *Final Rule – Definitions and Other Regulations Relating to Prepaid Access*, 76 FR 45403 (July 29, 2011),

[6] These terms are used for the exclusive purpose of this regulatory guidance.  Depending on the type and combination of a person's activities, one person may be acting in more than one of these capacities.

[7] How a person engages in "obtaining" a virtual currency may be described using any number of other terms, such as "earning," "harvesting," "mining," "creating," "auto-generating," "manufacturing," or "purchasing," depending on the details of the specific virtual currency model involved.  For purposes of this guidance, the label applied to a particular process of obtaining a virtual currency is not material to the legal characterization under the BSA of the process or of the person engaging in the process.

[8] As noted above, this should not be interpreted as a statement about the extent to which the user's activities comport with other federal or state statutes, rules, regulations, or orders.  For example, the activity may still be subject to abuse in the form of trade-based money laundering or terrorist financing. The activity may follow the same patterns of behavior observed in the "real" economy with respect to the purchase of "real" goods and services, such as systematic over- or under-invoicing or inflated transaction fees or commissions.

[9] 31 CFR § 1010.100(ff)(1-7).

## Administrators and Exchangers of Virtual Currency

An administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person.[10]  FinCEN's regulations define the term "money transmitter" as a person that provides money transmission services, or any other person engaged in the transfer of funds.  The term "money transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."[11]

The definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies.  Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the BSA.[12]  FinCEN has reviewed different activities involving virtual currency and has made determinations regarding the appropriate regulatory treatment of administrators and exchangers under three scenarios: brokers and dealers of e-currencies and e-precious metals; centralized convertible virtual currencies; and de-centralized convertible virtual currencies.

### a.        *E-Currencies and E-Precious Metals*

The first type of activity involves electronic trading in e-currencies or e-precious metals.[13]  In 2008, FinCEN issued guidance stating that as long as a broker or dealer in real currency or other commodities accepts and transmits funds solely for the purpose of effecting a *bona fide* purchase or sale of the real currency or other commodities for or with a customer, such person is not acting as a money transmitter under the regulations.[14]

However, if the broker or dealer transfers funds between a customer and a third party that is not part of the currency or commodity transaction, such transmission of funds is no longer a fundamental element of the actual transaction necessary to execute the contract for the purchase or sale of the currency or the other commodity.  This scenario is, therefore, money

---

[10]  FinCEN's regulations provide that whether a person is a money transmitter is a matter of facts and circumstances. The regulations identify six circumstances under which a person is not a money transmitter, despite accepting and transmitting currency, funds, or value that substitutes for currency.  31 CFR § 1010.100(ff)(5)(ii)(A)–(F).

[11]  31 CFR § 1010.100(ff)(5)(i)(A).

[12]  Ibid.

[13]  Typically, this involves the broker or dealer electronically distributing digital certificates of ownership of real currencies or precious metals, with the digital certificate being the virtual currency.  However, the same conclusions would apply in the case of the broker or dealer issuing paper ownership certificates or manifesting customer ownership or control of real currencies or commodities in an account statement or any other form.  These conclusions would also apply in the case of a broker or dealer in commodities other than real currencies or precious metals.  A broker or dealer of e-currencies or e-precious metals that engages in money transmission could be either an administrator or exchanger depending on its business model.

[14]  *Application of the Definition of Money Transmitter to Brokers and Dealers in Currency and other Commodities*, FIN-2008-G008, Sept. 10, 2008.  The guidance also notes that the definition of money transmitter excludes any person, such as a futures commission merchant, that is "registered with, and regulated or examined by…the Commodity Futures Trading Commission."

transmission.[15]  Examples include, in part, (1) the transfer of funds between a customer and a third party by permitting a third party to fund a customer's account; (2) the transfer of value from a customer's currency or commodity position to the account of another customer; or (3) the closing out of a customer's currency or commodity position, with a transfer of proceeds to a third party.  Since the definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies, the same rules apply to brokers and dealers of e-currency and e-precious metals.

### b.    Centralized Virtual Currencies

The second type of activity involves a convertible virtual currency that has a centralized repository.  The administrator of that repository will be a money transmitter to the extent that it allows transfers of value between persons or from one location to another.  This conclusion applies, whether the value is denominated in a real currency or a convertible virtual currency.  In addition, any exchanger that uses its access to the convertible virtual currency services provided by the administrator to accept and transmit the convertible virtual currency on behalf of others, including transfers intended to pay a third party for virtual goods and services, is also a money transmitter.

FinCEN understands that the exchanger's activities may take one of two forms.  The first form involves an exchanger (acting as a "seller" of the convertible virtual currency) that accepts real currency or its equivalent from a user (the "purchaser") and transmits the value of that real currency to fund the user's convertible virtual currency account with the administrator.  Under FinCEN's regulations, sending "value that substitutes for currency" to another person or to another location constitutes money transmission, unless a limitation to or exemption from the definition applies.[16]  This circumstance constitutes transmission *to another location*, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator.  It might be argued that the exchanger is entitled to the exemption from the definition of "money transmitter" for persons involved in the sale of goods or the provision of services.  Under such an argument, one might assert that the exchanger is merely providing the service of connecting the user to the administrator and that the transmission of value is integral to this service.  However, this exemption does not apply when the only services being provided are money transmission services.[17]

The second form involves a *de facto* sale of convertible virtual currency that is not completely transparent.  The exchanger accepts currency or its equivalent from a user and privately credits the user with an appropriate portion of the exchanger's own convertible virtual currency held with the administrator of the repository.  The exchanger then transmits that

---

[15] In 2011, FinCEN amended the definition of money transmitter.  The 2008 guidance, however, was primarily concerned with the core elements of the definition – accepting and transmitting currency or value – and the exemption for acceptance and transmission integral to another transaction not involving money transmission.  The 2011 amendments have not materially changed these aspects of the definition.

[16] See footnote 11 and adjacent text.

[17] 31 CFR § 1010.100(ff)(5)(ii)(F).

internally credited value to third parties at the user's direction.  This constitutes transmission ***to another person***, namely each third party to which transmissions are made at the user's direction. To the extent that the convertible virtual currency is generally understood as a substitute for real currencies, transmitting the convertible virtual currency at the direction and for the benefit of the user constitutes money transmission on the part of the exchanger.

### c.    De-Centralized Virtual Currencies

A final type of convertible virtual currency activity involves a de-centralized convertible virtual currency (1) that has no central repository and no single administrator, and (2) that persons may obtain by their own computing or manufacturing effort.

A person that creates units of this convertible virtual currency and uses it to purchase real or virtual goods and services is a user of the convertible virtual currency and not subject to regulation as a money transmitter.  By contrast, a person that creates units of convertible virtual currency and sells those units to another person for real currency or its equivalent is engaged in transmission to another location and is a money transmitter.  In addition, a person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency.

## Providers and Sellers of Prepaid Access

A person's acceptance and/or transmission of convertible virtual currency cannot be characterized as providing or selling prepaid access because prepaid access is limited to real currencies.[18]

## Dealers in Foreign Exchange

A person must exchange the currency of two or more countries to be considered a dealer in foreign exchange.[19]  Virtual currency does not meet the criteria to be considered "currency" under the BSA, because it is not legal tender.  Therefore, a person who accepts real currency in

---

[18] This is true even if the person holds the value accepted for a period of time before transmitting some or all of that value at the direction of the person from whom the value was originally accepted.  FinCEN's regulations define "prepaid access" as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number."  31 CFR § 1010.100(ww).  Thus, "prepaid access" under FinCEN's regulations is limited to "access to funds or the value of funds."  If FinCEN had intended prepaid access to cover funds denominated in a virtual currency or something else that substitutes for real currency, it would have used language in the definition of prepaid access like that in the definition of money transmission, which expressly includes the acceptance and transmission of "other value that substitutes for currency."  31 CFR § 1010.100(ff)(5)(i) .

[19] FinCEN defines a "dealer in foreign exchange" as a "person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more countries in exchange for the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery."  31 CFR § 1010.100(ff)(1).

exchange for virtual currency, or *vice versa*, is not a dealer in foreign exchange under FinCEN's regulations.

* * * * *

Financial institutions with questions about this guidance or other matters related to compliance with the implementing regulations of the BSA may contact FinCEN's Regulatory Helpline at (800) 949-2732.

# EXHIBIT
# 4

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**1:30 pm, Jun 02, 2016**

|  |  |
|---|---|
| In the Matter of: | ) |
| | ) |
| BFXNA INC. d/b/a BITFINEX, | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

CFTC Docket No. 16 – 19

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, AS AMENDED,
MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that from in or about April 2013 to at least February 2016 (the "Relevant Period"), BFXNA Inc. d/b/a Bitfinex ("Bitfinex" or "Respondent") and, prior to January 2015, Bitfinex's predecessor in interest, iFinex Inc., violated Sections 4(a) and 4d of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(a) and 6d (2012). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Bitfinex engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Bitfinex has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Bitfinex consents to the entry of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions ("Order") and acknowledges service of this Order.[1]

---

[1] Bitfinex consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Bitfinex does not consent to the use of the Offer, or the findings or conclusions in this Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Bitfinex consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

# III.

The Commission finds the following:

## A.  SUMMARY

During the Relevant Period, Bitfinex operated an online platform for exchanging and trading cryptocurrencies, mainly bitcoins.  Bitfinex's platform permitted users, including individuals and entities that did not meet the definition of an eligible contract participant or eligible commercial entity, to borrow funds from other users on the platform in order to trade bitcoins on a leveraged, margined, or financed basis.  Bitfinex was not registered with the Commission.  During the Relevant Period, Bitfinex did not actually deliver bitcoins purchased on a leveraged, margined, or financed basis to the traders who purchased them within the meaning of Section 2(c)(2)(D)(ii)(III)(aa) of the Act.  Instead, Bitfinex held the purchased bitcoins in bitcoin deposit wallets that it owned and controlled.  Therefore, Bitfinex engaged in illegal, off-exchange commodity transactions and failed to register as a futures commission merchant, in violation of Sections 4(a) and 4d of the Act, 7 U.S.C. §§ 6(a) and 6d.

## B.  RESPONDENT

**BFXNA Inc. d/b/a Bitfinex** is a corporation formed and existing under the laws of the British Virgin Islands, and has its principal place of business at suite 13/F, 1308 Bank of America Tower, 12 Harcourt Road, Central, Hong Kong, China.  Bitfinex has never been registered with the Commission in any capacity.[2]

## C.  FACTS

Bitfinex operates an online platform for exchanging and trading cryptocurrencies, mainly bitcoins.  Bitfinex's "Exchange Trading" feature permits users to exchange dollars for bitcoins and litecoins, and vice-versa, as well as to trade cryptocurrencies for other cryptocurrencies.[3] Bitfinex states that it operates the "most liquid exchange in the world" for trading between bitcoins and dollars, and offers traders multiple different order types through which to place trades.  Users access Bitfinex's platform and place orders through its website, www.bitfinex.com.

Another of Bitfinex's services is its "Margin Trading" feature.  Through this feature, Bitfinex permits traders to borrow dollars and bitcoins from other users on the platform in order to open leveraged positions on Bitfinex's exchange.  Bitfinex refers to the participants on the platform who act as lenders as "Margin Funding Providers."  In order to initiate a loan, Margin

---

[2]  As of January 30, 2015, Bitfinex has been registered with the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury as a Money Services Business.  Prior to January 2015, iFinex Inc. carried on business with U.S. customers.  BFXNA Inc. is a wholly-owned subsidiary of iFinex Inc. and iFinex Inc.'s successor-in-interest with respect to the U.S.-facing business.

[3]  Nearly all of the trading volume on Bitfinex's platform during the Relevant Period was in bitcoin. Litecoin made up a small portion of volume.  This order will use the shorthand "bitcoin" to describe all cryptocurrencies traded on Bitfinex during the Relevant Period.

2

Funding Providers enter offers in Bitfinex's online tool to lend funds with their own chosen terms (daily rate of return, duration, and amount), or they can lend at the "Flash Return Rate" set by the market. When an offer to borrow is accepted by a trader ("Financing Recipient"), the Financing Recipient can use the borrowed funds to buy or sell bitcoins on Bitfinex's exchange. In addition to repaying the borrowed funds, Financing Recipient are responsible for paying fees and interest to the Margin Funding Providers.

Bitfinex is not a principal, counterparty, or market-maker in any bitcoin trade. Rather, Bitfinex administers and enforces the contracts established between Margin Funding Providers and Financing Recipients.

The Bitfinex platform allows maximum leverage of 3.33-to-1 (i.e., a 30% initial margin requirement). Traders may close out positions at any time without penalty for closing it. This will reimburse the Margin Funding Provider, and the position will be settled at a profit or loss. Financing Recipients can also "claim" their positions, by paying off the outstanding loan, or they can trade out of positions. If a Financing Recipient's equity in a position falls below 15%, the position is forcibly liquidated in order to ensure repayment of the loan.

From April 2013 to August 2015, when a customer purchased bitcoins on Bitfinex, the purchased bitcoins were held for the benefit of the buyer in Bitfinex's omnibus settlement wallet. The individual customer interests in the omnibus settlement wallet were accounted for in real time on Bitfinex's database. However, the omnibus settlement wallet was owned and controlled by Bitfinex and Bitfinex held all "private keys" associated with its omnibus settlement wallet.[4] Financing Recipients had no rights to access or use the bitcoins that they had purchased until Bitfinex released them, following satisfaction of the Financing Recipient's outstanding loan. Bitfinex considered bitcoins held in the omnibus wallet to belong to the Financing Recipients, but subject to a lien in the amount of any outstanding loan plus fees owed to the Margin Funding Provider.

In August 2015, Bitfinex changed its model so that bitcoins purchased using the Exchange Trading feature were held in multi-signature wallets established by a third party firm that were individually enumerated for each trader. Bitcoins purchased using the Exchange Trading feature were settled to the Blockchain on an intra-day basis. However, Bitfinex retained control over the private keys to these wallets as well.

In January 2016 and for the remainder of the Relevant Period, during the course of the Division of Enforcement's investigation, Bitfinex changed its model again so that bitcoins purchased using both the Exchange Trading and Margin Trading features were held in individually enumerated, multi-signature wallets. However, Bitfinex continued to retain control over the private keys to those wallets.

During the Relevant Period, Bitfinex's Margin Trading services were available to retail customers, and are not limited to eligible contract participants ("ECPs") or eligible commercial entities ("ECEs"). However, corporate users comprised a significant portion of Bitfinex's

---

[4]   In the context of cryptocurrencies, a "private key" is a secret number (usually a 256-bit number) associated with a deposit wallet that allows bitcoins in that wallet to be spent.

trading volume during the Relevant Period.   In 2015, 88% of the dollars deposited to and withdrawn from Bitfinex were by corporate users.

Bitfinex's cooperation with the Commission's investigation was significant.   After learning that the Commission was potentially investigating Bitfinex, on September 17, 2015 – which was before the Commission had announced any enforcement action involving bitcoin – Bitfinex affirmatively contacted staff of the Division of Enforcement to offer its cooperation. During the course of the investigation conducted by the Division of Enforcement, Bitfinex consistently responded to requests for information fully and quickly, both in writing and via oral presentations.

In response to the Division of Enforcement's investigation, Bitfinex represents that it has made a number of changes to its business practices in order to attempt to come into compliance with the Act and Regulations.

## IV.

## LEGAL DISCUSSION

### A.   Relevant Statutory Background

Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Public Law 111-203, 124 Stat. 1376 (2010) ("the Dodd-Frank Act") amended the Commodity Exchange Act to add, among other things, new authority over certain leveraged, margined, or financed retail commodity transactions.

Section 742(a) of the Dodd-Frank Act added Section 2(c)(2)(D) to the Act.[5]   That jurisdictional provision broadly applies to any agreement, contract, or transaction in any commodity that is entered into with, or offered to (even if not entered into with), a non-eligible contract participant ("non-ECP") or non-eligible commercial entity ("non-ECE")[6] on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.   7 U.S.C. § 2(c)(2)(D)(i).   Section 2(c)(2)(D) further provides that such an agreement, contract, or transaction shall be subject to Sections 4(a), 4(b), and 4b of the Act "as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery."   7 U.S.C. § 2(c)(2)(D)(iii).

Section 2(c)(2)(D)(ii) of the Act excepts certain transactions from Commission jurisdiction.   Section 2(c)(2)(D)(ii)(III)(aa) excepts a contract of sale that results in "actual

---

[5]   Section 2(c)(2)(D) of the Act became effective July 16, 2011.

[6]   As is relevant to this matter, Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi), defines an eligible contract participant as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or which is in excess of $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.   The term eligible commercial entity is defined at Section 1a(17) of the Act, 7 U.S.C. § 1a(17).

delivery" within 28 days ...."[7]  As found by the Eleventh Circuit, the term "actual delivery" is unambiguous, and is therefore given its ordinary meaning.  "Delivery" is "[t]he formal act of transferring something"; it denotes a transfer of possession and control." *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 978-9 (11th Cir. 2014) (*citing Black's Law Dictionary* 494 (9th ed. 2009).  As such, "'[a]ctual delivery" denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent.'"  *Id.*  "Actual delivery" is distinct from "constructive delivery."  *See id.* (holding that "the electronic transfer of documents indicating control or possession" without physical transfer of the commodity "is by any definition constructive, rather than actual."); *see also Black's Law Dictionary* 494 (9th ed. 2009) (defining "constructive delivery" as "[a]n act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible").  "Actual" is that which "exist[s] in fact" and is "real," rather than constructive.  *Id.* at 40.

The Commission's interpretation is consistent with the Eleventh Circuit's definition.  The determination of whether "actual delivery" has occurred within the meaning of Section 2(c)(2)(D)(ii)(III)(aa) requires consideration of evidence beyond the four corners of the contract documents.  In determining whether actual delivery has occurred, the Commission employs a functional approach to assess whether there has been a "real and immediate" transfer of "possession and control" to the "buyer or the buyer's agent" of the commodity.  The Commission examines how the agreement, contract, or transaction is marketed, managed, and performed.  Ownership, possession, title, and physical location, as well as the relationships between the buyer, seller, and possessor of the commodity, and the manner in which the sale is recorded and completed are all relevant considerations in determining whether there has been actual delivery.  Thus, physical delivery of the entire quantity of the commodity, including the portion purchased using leverage, margin or financing, into the possession of the buyer, or a depository other than the seller, the seller's parent company, partners, agents and affiliates will satisfy the actual delivery exception, provided that the purported delivery is not a sham.[8]  By contrast, actual delivery will not have occurred if only a "book entry" is made by the seller purporting to show that delivery of the commodity has been made.

Congress did not express any intent to limit the reach of Section 2(c)(2)(D).  Rather, in enacting the statute Congress expressed its intent that Section 2(c)(2)(D) should be applicable to a broad range of agreements, contracts, and transactions.

## B.      The Commission's Jurisdiction

Section 1a(9) of the Act defines "commodity" to include, among other things, "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).  The definition of a "commodity" is broad.  *See, e.g., Board of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982).  Bitcoin and other virtual

---

[7] The Commission has not adopted any regulations permitting a longer actual delivery period for any commodity pursuant to Section 2(c)(2)(D)(ii)(III)(aa) of the Act.  Accordingly, the 28 day actual delivery period set forth in this provision remains applicable to all commodities.

[8] *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426 (Aug. 23, 2013) (CFTC interpretation regarding the meaning of the term "actual delivery" as set forth in the Act).

currencies are encompassed in the definition and properly defined as commodities, and are therefore subject as a commodity to applicable provisions of the Act and Regulations. *See In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, 2015 WL 5535736, [Current Transfer Binder] (CCH) ¶ 33,538 (CFTC Sept. 17, 2015); *In re TeraExchange LLC*, CFTC Docket No. 15-33, 2015 WL 5658082, [Current Transfer Binder] (CCH) ¶ 33,546 (CFTC Sept. 24, 2015).

Many of the customers who entered into financed transactions in bitcoin on Bitfinex were not eligible contract participants or eligible commercial entities. Indeed, many were individual investors who did not meet the $10 million discretionary investment threshold to be considered ECPs. Moreover, Bitfinex offered such transactions on a margined or leveraged basis, and/or such transactions were financed by Margin Funding Providers through Bitfinex's financing order book. Bitfinex's retail financed transactions in bitcoin therefore fell squarely within the Commission's jurisdiction under Section 2(c)(2)(D) of the Act.

Bitfinex's retail-financed commodity transactions in bitcoin did not result in actual delivery to the Financing Recipients who traded on Bitfinex's platform. Bitfinex did not transfer possession and control of any bitcoin to the Financing Recipients, unless and until all liens on the bitcoin were satisfied. Prior to satisfaction of the liens, the Financing Recipients' bitcoins were held in an omnibus settlement wallet owned and controlled by Bitfinex, and to which Bitfinex held the private keys needed to access the wallet. Bitfinex's accounting for individual customer interests in the bitcoin held in the omnibus settlement wallet in its own database was insufficient to constitute "actual delivery." *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426, 52,428 (Aug. 23, 2013) ("book entry" purporting to show delivery insufficient). Similarly, when Bitfinex changed its model in August 2015 and January 2016, it retained control over the private keys to those wallets, and the Financing Recipients had no contractual relationship with the third party firm that established the wallets. *See id.*

Therefore, Bitfinex's transactions are not excepted from the Commission's jurisdiction under Section 2(c)(2)(D)(ii)(III)(aa) of the Act. Also, Bitfinex had the authority to force liquidate customers' positions without the customers' prior consent if their equity fell beneath a preset level, which further evidenced Bitfinex's possession and control over the bitcoins.

## C.   Bitfinex Violated Section 4(a) of the Act: Illegal, Off-Exchange Transactions

As stated above, retail commodity transactions within the scope of Section 2(c)(2)(D) of the Act are subject to enforcement under Section 4(a) of the Act, among other provisions, as if such transactions are commodity futures contracts. Section 4(a) of the Act makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a commodity futures contract, unless such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility for the specific commodity.

Bitfinex offered to enter into, executed, and/or confirmed the execution of financed retail commodity transactions. None of the financed retail commodity transactions were conducted on

6

or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility. Bitfinex therefore violated Section 4(a) of the Act.

**D.    Bitfinex Violated Section 4d(a) of the Act by Failing to Register as a Futures Commission Merchant**

Section 4d(a) of the Act requires all persons acting as futures commission merchants ("FCMs") to register with the Commission. Section 1a(28) of the Act defines a FCM, in relevant part, as an individual, partnership, corporation or trust, that is engaged in soliciting or accepting orders for retail commodity transactions, or that accepts money in connection with such transactions. *See* 7 U.S.C. §1a(28)(i)(I)(aa)(DD). *See also CFTC v. Hunter Wise Commodities, et al.*, 1 F.Supp.3d 1311 (S.D. Fla. 2014) (entering summary judgment against purported precious metals wholesaler for failing to register as an FCM).

Bitfinex accepted orders for retail commodity transactions and received funds from those customers in connection with retail commodity transactions. Bitfinex was not, however, registered with the Commission in any capacity. Therefore, Bitfinex violated Section 4d(a) of the Act.

## V.

## FINDINGS OF VIOLATION

Based on the foregoing, the Commission finds that, during the Relevant Period, Bitfinex violated Sections 4(a) and 4d of the Act.

## VI.

## OFFER OF SETTLEMENT

Bitfinex has submitted the Offer in which it, without admitting or denying the findings and conclusions herein:

A.    Acknowledges receipt of service of this Order;

B.    Admits the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.    Waives:

    1.    the filing and service of a complaint and notice of hearing;

    2.    a hearing;

    3.    all post-hearing procedures;

4.      judicial review by any court;

5.      any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6.      any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30, relating to, or arising from, this proceeding;

7.      any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

8.      any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.      Stipulates that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Bitfinex has consented in the Offer;

E.      Consents, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.      makes findings by the Commission that Bitfinex violated Sections 4(a) and 4d of the Act;

2.      orders Bitfinex to cease and desist from violating Sections 4(a) and 4d of the Act;

3.      orders Bitfinex to pay a civil monetary penalty in the amount of seventy-five thousand dollars $75,000, plus post-judgment interest;

4.      orders Bitfinex and its successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

## Accordingly, IT IS HEREBY ORDERED THAT:

A.      Bitfinex shall cease and desist from violating Sections 4(a) and 4d of the Act, 7 U.S.C. §§ 6(a) and 6d (2012).

C.      Bitfinex shall pay a civil monetary penalty in the amount of seventy-five thousand dollars ($75,000) (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on

the CMP Obligation beginning on the date of entry of this Order, and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Bitfinex shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC/AMZ-341
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644
> Fax: (405) 954-1620
> Nikki.gibson@faa.gov

If payment is to be made by electronic funds transfer, Bitfinex shall contact Nikki Gibson or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Bitfinex shall accompany payment of the CMP Obligation with a cover letter that identifies Respondent and the name and docket number of this proceeding. Bitfinex shall simultaneously transmit copies of the cover letter and the form of payment to: (1) Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and (2) Deputy Director, Commodity Futures Trading Commission, Chicago Regional Office, 525 West Monroe, Suite 1100, Chicago, IL 60661.

D.   <u>Public Statements</u>: Bitfinex agrees that neither it nor any of its successors and assigns, agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Bitfinex's: (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Bitfinex and its successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

E.   <u>Cooperation with the Commission</u>: Bitfinex shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto.

F.   <u>Partial Satisfaction</u>: Bitfinex understands and agrees that any acceptance by the Commission of partial payment of Bitfinex's CMP Obligation shall not be deemed a

waiver of Bitfinex's obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

G.    Change of Address/Phone:   Until such time as Bitfinex satisfies in full its CMP Obligation as set forth in this Order, Bitfinex shall provide written notice to the Commission by certified mail of any change to its telephone numbers and mailing addresses within ten (10) calendar days of the change.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:  June 2, 2016

# EXHIBIT 5



RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**11:37 am, Sep 24, 2015**

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

|  |  |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| TeraExchange LLC, | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

CFTC Docket No. 15-33

**ORDER INSTITUTING
PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE
COMMODITY EXCHANGE ACT
MAKING FINDINGS AND
IMPOSING REMEDIAL
SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that TeraExchange, LLC ("Tera"), a provisionally registered swap execution facility ("SEF"), has violated Section 5h(f)(2) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 7b-3(f)(2) (2012), and Commission Regulation ("Regulation") 37.203, 17 C.F.R. § 37.203 (2014). The Commission, therefore, deems it appropriate and in the public interest that a public administrative proceeding be, and hereby is, instituted to determine whether Tera engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Tera has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Tera acknowledges service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Tera consents to the entry of this Order, the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Tera does not consent to the use of the Offer, or the findings in this Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Tera consent to the use of the Offer or this Order, or the findings consented to in the Offer or this Order, by any other party in any other proceeding.

## III.

The Commission finds the following:

**A.**   **Summary**

On October 8, 2014, two traders executed a transaction in a non-deliverable forward contract based on the relative value of the U.S. Dollar and Bitcoin, a virtual currency (the "Bitcoin swap"). Six minutes later, the two traders executed a fully offsetting transaction in the Bitcoin swap for the same price and notional amount. As a result, the two transactions (the "October 8 transactions") constitute both wash trading and prearranged trading in violation of Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2012).

Tera arranged the two transactions with the understanding that the parties, who did not know of each other's identities, would execute "a round-trip trade with the same price in, same price out (i.e. no P/L [profit/loss] consequences)[.]" Tera employees were on Skype calls with the two traders as they executed the transactions. The two traders involved were the only market participants on Tera's SEF who had completed the membership process and had received trading privileges on the SEF.

On October 9, 2014, Tera issued a press release, stating that "TeraExchange announced today the first bitcoin derivative transaction to be executed on a regulated exchange." Tera intended for its press release and a related statement by its then-president to create the impression of actual trading interest in the Bitcoin swap.

Section 5h(f)(2)(B) of the Act, 7 U.S.C. § 7b-3(f)(1) (2012) and Regulation 37.203(a), 17 C.F.R. § 37.203(a) (2014), obligate Tera to establish and enforce rules prohibiting wash trading and prearranged trading on the SEF. Instead, Tera actively arranged for the two traders to enter into prearranged wash trades.

**B.**   **Respondent**

**TeraExchange, LLC** is a Delaware limited liability company, with its principal place of business in Summit, New Jersey. Tera has been registered provisionally with the Commission as a SEF since September 19, 2013, with its application for permanent SEF registration pending.

**C.**   **Facts**

Tera is operating a SEF pursuant to a grant of temporary registration by the Commission's Division of Market Oversight ("DMO") effective September 19, 2013.

Tera compiled a rulebook governing the operation of the SEF and trading on the SEF by market participants. Tera requires all participants on its SEF to comply with the SEF's rulebook. Tera's rulebook states, in relevant part, that

"[n]o Participant shall create fictitious transactions or wash transactions or execute any such Order with knowledge of its nature. No Participant shall place or accept Orders in the same Instrument where the Participant knows or

2

reasonably should know that the purpose of the Orders is to avoid taking a bona fide market position exposed to market risk (transactions commonly known or referred to as wash sales)."

On September 11, 2014, Tera filed with DMO a submission self-certifying the Bitcoin swap for trading on its SEF. Tera began offering the Bitcoin swap for trading on September 12, 2014. Valuations of the Bitcoin swap are determined by reference to an index of bids, offers, and executed transactions on a number of Bitcoin exchanges (the "Tera Bitcoin index").

Tera's rulebook requires a market participant to complete an onboarding process, including the completion of an exchange user license agreement ("EULA"), before being granted membership and being allowed to trade any product on the Tera SEF. As of October 8, 2014, only two market participants ("Firm A" and "Firm B") had completed the onboarding processes to trade on the Tera SEF.

On October 7, 2014, an employee of Tera sent an email to an authorized trader for Firm B ("Trader B"), which had recently completed the onboarding process. The Tera employee stated that Tera had "a counterparty [Firm A] who would like to do a trade." The Tera employee said "we would like to test the pipes by doing a round-trip trade with the same price in, same price out, (i.e. no P/L [profit/loss] consequences) no custodian required." On a call that afternoon with the Tera employee, Trader B agreed to the trade, scheduled for the following day.

On the morning of October 8, 2014, Tera employees initiated Skype calls with both Trader A and Trader B to walk them through the trade. At 9:22 a.m., Trader A initiated a transaction to buy a Bitcoin swap with a notional amount of $500,000 at a defined price, which Trader B accepted. Six minutes later, Trader A initiated a transaction to sell a Bitcoin swap with a notional amount of $500,000 and at the same defined price, which Trader B also accepted.

The two transactions on October 8 canceled each other out. The transactions were offsetting, were intended to negate, and did negate, any market risk and achieved a "wash" result. The transactions did not create any bona fide position in the Bitcoin swap. Further, Tera did not charge a transaction fee or commission to either party, meaning that there were no transaction costs associated with the two transactions.

On October 8, 2014, the National Futures Association ("NFA") (which provides regulatory services for Tera) and the CFTC's Division of Market Oversight ("DMO") separately contacted Tera regarding the two offsetting transactions. Tera told DMO and the NFA that the purpose of the transactions was to "test the pipes."

Nevertheless, on October 9, 2014, Tera issued a press release, stating that "TeraExchange announced today the first bitcoin derivative transaction to be executed on a regulated exchange." Tera employees forwarded drafts of the press release to Trader A and made some edits at his

request.[2]  Also on October 9, 2014, Tera's then-president appeared at a meeting of the Commission's Global Markets Advisory Committee ("GMAC"), where he stated that trades had occurred in the Bitcoin swap the day before.

The October 8 transactions were the only transactions in the Bitcoin swap executed on the Tera SEF as of the date of this Order and provided an opportunity for Tera to state publicly that trading in the Bitcoin swap had occurred.  Tera intended for its press release and statements at the GMAC to create the impression of actual trading interest in the Bitcoin swap.  As a result, neither Tera's press release nor the statements at the GMAC indicated that the October 8 transactions were pre-arranged wash sales executed solely for the purpose of testing Tera's systems.

These facts should be distinguished from a situation where a SEF or other designated contract market runs pre-operational test trades to confirm that its systems are technically capable of executing transactions and, to the extent that these simulated transactions become publicly known, makes it clear to the public that the trades do not represent actual liquidity in the subject market.

**D.**   **Legal Discussion**

**1.**   **Compliance with SEF Core Principles**

As a condition of registration, SEFs are obligated to comply with the SEF Core Principles under the Act.  Section 5h(f)(1) of the Act, 7 U.S.C. § 7b-3(f)(1) (2012).  SEF Core Principle 2 requires that a SEF shall "establish and enforce trading, trade processing, and participation rules that will deter abuses and have the capacity to detect, investigate, and enforce those rules[.]"  Section 5h(f)(2)(B) of the Act, 7 U.S.C. § 7b-3(f)(2)(B) (2012).

A Commission regulation providing additional guidance on compliance with SEF Core Principle 2 requires SEFs to "prohibit abusive trading practices on its markets... Specific trading practices that shall be prohibited include...wash trading [and] pre-arranged trading[.]"  Regulation 37.203(a), 17 C.F.R. § 37.203(a) (2014).

**2.**   **Prohibition on Wash Trading and Prearranged Trading**

Market participants are prohibited from engaging in "wash trading" and "prearranged trading" in swaps under Section 4c(a) of the Act, which makes it unlawful to enter a transaction that "is, is of the character of, or is commonly known to the trade as, a 'wash sale' or 'accommodation trade'...or is a fictitious sale or is used to cause any price to be reported, registered, or recorded that is not a true and *bona fide* price."  7 U.S.C. § 6c(a)(2).[3]  Congress

---

[2]   Following conversations with counsel for the Commission, Tera voluntarily removed the October 9 press release from its website.

[3]   As relevant here, pursuant to Section 2(a)(1)(A) of the Act, 7 U.S.C. § 2(a)(1)(A) (2012) the Commission has exclusive jurisdiction over "transactions involving swaps...traded or executed on a... swap execution facility pursuant to section 5h".  In addition, the swap offered by Tera is not subject to any exceptions to the CFTC's jurisdiction.  Regardless, Tera's submission

enacted Section 4c(a) of the Act to prevent collusive trades conducted away from the market. *See, generally, Merrill Lynch Futures, Inc. v. Kelly,* 585 F.Supp. 1245, 1251 n.3 (S.D.N.Y. 1984). As a result of wash trading and fictitious sales, "perceived market volume [is] distorted, and the market's price discovery function hindered." *In the Matter of Thomas Collins,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,743 (CFTC December 10, 1997) (citing *In the Matter of Citadel Trading Co. of Chicago, Ltd.,* [1986-1987 Transfer Binder] Comm. Fut. L. rep. (CCH) ¶ 24,085 at 32,191 (CFTC May 12, 1986).

A wash trade "is a transaction made without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position." *Reddy v. CFTC,* 191 F.3d 109, 115 (2d Cir. 1999). "In order to establish that a wash sale has occurred, the [Commission] must initially demonstrate that the transaction at issue achieved a wash result. The factors that show a wash result are (1) the purchase and sale (2) of the same delivery month of the same futures contract (3) at the same (or a similar) price." *In re Piasio,* [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,276 at 50,685 (CFTC Sept. 29, 2000) (citing *In re Gilchrist,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,993 at 37,653 (CFTC Jan. 25, 1991)), *aff'd, Piasio v. CFTC,* 54 F. App'x 702 (2d Cir. 2002); *see also Wilson v. CFTC,* 322 F.3d 555, 559 (8th Cir. 2003) (same).

In addition, the Commission "must demonstrate that the [defendant] intended to negate risk or price competition," and "that at the time [the defendant] chose to participate in the transaction he knew that the transaction was designed to achieve a wash result in a manner that negated risk." *In re Piasio,* Comm. Fut. L. Rep. (CCH) ¶ 28,276 at 50,685 (citing *In re Gimbel,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,213 at 35,003 (CFTC Apr. 14, 1988), *aff'd as to liability, Gimbel v. CFTC,* 872 F.2d 196 (7th Cir. 1989), and *In re Bear Stearns & Co.,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,994 at 37,665 (CFTC Jan. 25, 1991)); *see also Reddy,* 191 F.3d at 119 ("[T]he [Commission] must prove intent to establish a violation of . . . Section 4c of the" Act). The Commission need not, however, prove *both* intent to negate risk *and* intent to negate price competition; one or the other is sufficient to sustain a

---

self-certifying the Bitcoin swap for trading stated that "[a]s with all products listed for trading on TeraExchange, trading in the USD/Bitcoin Swap will be subject to compliance with the Act, Regulations and the TeraExchange Rulebook[.]" Therefore, Tera consented to the application of the Act, including the prohibitions on wash trading and pre-arranged trading under Section 4c(a) of the Act, to trading in the Bitcoin swap.

Section 4c(a) of the Act applies to transactions involving the purchase or sale of any commodity for future delivery or swap that, *inter alia,* may be used to "hedge any transaction in interstate commerce in the commodity[.]" As a non-deliverable forward contract, the Bitcoin swap may be used to hedge transactions in interstate commerce in Bitcoin. Further, Bitcoin is a commodity under Section 1a of the Act, 7 U.S.C. § 1a (2012), and is therefore subject as a commodity to applicable provisions of the Act and Regulations.

claim under Section 4c(a), 7 U.S.C. § 6c(a) (2012). *See, e.g., In re Gimbel,* Comm. Fut. L. Rep. (CCH) ¶ 24,213 at 35,003 n.7.

Prearranged trading is also a form of fictitious sales. *In the Matter of Gilchrist,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,933 at 37,653 n26 (C.F.T.C. Jan. 25, 1991). Prearranged trading involves "the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk of price competition incident to such a market." *Harold Collins,* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 at 31,902 (CFTC April 4, 1986), *rev'd on other grounds sub nom. Stoller v. CFTC,* 834 F.2d 262 (2d Cir. 1987). A series of transactions may constitute prearranged trading where "[e]ach individual trade was initiated with the understanding that it would be matched such that, when the prearranged transaction was complete, the...traders would have no market position and the net financial position of the group would be zero." *In re Gimbel,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,213 at 35,004 (CFTC Apr. 14, 1988). The two accounts involved in a trade do not need to be owned by the same individual or entity for the trade to constitute a fictitious sale. *See, e.g., Thomas Collins,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,743 (CFTC December 10, 1997).

### 3.   The October 8 Transactions Constitute Wash Trading and Prearranged Trading

The October 8 transactions in the Bitcoin swap constitute wash trading. Trader A and Trader B effected a wash result by the purchase and sale of the same product with the same tenor and notional amount for the same price.[4] Trader A and Trader B entered into the transaction with the knowledge that the transactions were designed to achieve a wash result in a manner that negated risk, as demonstrated in the Tera employee's October 7 email to Trader B that the trades would have "no P/L consequences." Because Trader A and Trader B were the only participants in the Bitcoin swap market at the time of the transactions, neither bore any price risk as their transactions would set the only prices in the market.

Further, Trader A and Trader B, as facilitated by Tera employees, prearranged the two October 8 transactions. Trader A and Trader B initiated the transactions "with the understanding that it would be matched such that" the net financial result would be a nullity. While Trader A and Trader B did not communicate directly with each other regarding the two transactions, Tera's involvement allowed Trader A and Trader B to prearrange the transactions while negating any market risk.

As a result, the October 8 transactions constitute both wash trading and prearranged trading in violation of Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2012).

---

[4]     The tenor of a swap is the period of time that the swap is in effect. As such, tenor is equivalent to the contract month of a futures contract.

4.      **Tera Failed to Deter, and in Fact Facilitated, Wash Trading and Prearranged Trading in the Bitcoin Swap**

Tera was obligated under Core Principle 2 to establish and enforce rules to prohibit wash trading and prearranged trading on the SEF.  Instead, Tera actively facilitated wash trading and prearranged trading by bringing together two market participants with the express purpose of entering into two offsetting transactions.  Tera told Trader B that the transactions would be "a round-trip trade with the same price in, same price out, (i.e. no P/L [profit/loss] consequences)[.]"  Further, Tera employees were on the telephone with both Trader A and Trader B during the October 8 transactions to help walk the traders through the transactions.

Tera also ensured that the two transactions would have no transaction costs by not charging any fees to Trader A or Trader B.  Tera assured Trader B that no custodian would be required, meaning that neither party would be required to post collateral for the trades.

By failing to enforce its rules against wash trading, and in fact actively arranging a wash trade, Tera failed to comply with its obligations under SEF Core Principle 2 and Regulation 37.203(a), 17 C.F.R § 37.203(a) (2014).  Further, as a result of the wash trading and prearranged trading, Tera's trading platform submitted reports of the two transactions to a swap data repository which made the reports public.  The reports of the two transactions created a misleading impression of trading volume in the Bitcoin swap.[5]

## IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Tera violated Section 5h(f)(2) of the Act, 7 U.S.C. § 7b-3(f)(2) (2012), and Regulation 37.203, 17 C.F.R. § 37.203 (2014), on October 8, 2014.

## V.

## OFFER OF SETTLEMENT

Tera has submitted the Offer in which it, without admitting or denying the findings and conclusions herein:

A.      Acknowledges receipt of service of this Order;

B.      Admit(s) the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

---

[5]      As set forth above, at p. 4, these facts distinguish Tera's actions from a situation where a SEF runs pre-operational test trades which it makes clear are not *bona fide* transactions.

C.     Waives: the filing and service of a complaint and notice of hearing; a hearing; all
post-hearing procedures; judicial review by any court; any and all objections to
the participation by any member of the Commission's staff in the Commission's
consideration of the Offer; any and all claims that it may possess under the Equal
Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or
the rules promulgated by the Commission in conformity therewith, Part 148 of the
Regulations, 17 C.F.R. §§ 148.1-30 (2014), relating to, or arising from, this
proceeding; any and all claims that it may possess under the Small Business
Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253,
110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121
Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and any
claim of Double Jeopardy based upon the institution of this proceeding or the
entry in this proceeding of any order imposing a civil monetary penalty or any
other relief.

D.   ·  Stipulates that the record upon which this Order is entered shall consist solely of
the findings contained in this Order, to which Tera has consented; and

E.     Consents, solely on the basis of the Offer, to entry of this Order that:

1.     Makes findings by the Commission that Tera violated Section 5h(f)(2) of
the Act, 7 U.S.C. § 7b-3(f)(2) (2012), and Regulation 37.203, 17 C.F.R.
§ 37.203 (2014);

2.     Orders Tera to cease and desist from violating Section 5h(f)(2) of the Act,
7 U.S.C. § 7b-3(f)(2) (2012), and Regulation 37.203, 17 C.F.R. § 37.203
(2014);

3.     Orders Tera and its successors and assigns to comply with the
undertakings consented to in the Offer and set forth below in Part VI of
this Order.

Upon consideration, the Commission has determined to accept Tera's Offer.

## VI.

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.     Tera shall cease and desist from violating Section 5h(f)(2) of the Act, 7 U.S.C.
§ 7b-3(f)(2) (2012), and Regulation 37.203, 17 C.F.R. § 37.203 (2014);

B.     Tera and its successors and assigns shall comply with the following conditions
and undertakings set forth in the Offer:

Public Statements: Respondent agrees that neither it nor any of its successors and
assigns, agents or employees under its  authority or control shall take any action
or make any public statement denying, directly or indirectly, any findings or

8

conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondent's: (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondent's successors and assigns shall undertake all steps necessary to ensure that all of its agents and/or employees under its authority or control understand and comply with this agreement.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: September 24 , 2015

9

# EXHIBIT
# 6



**October 17, 2017**

# A CFTC Primer on Virtual Currencies



**CFTC**

*Please note that LabCFTC cannot and will not provide legal advice. If you have specific questions regarding your activities and whether they conform to legal or regulatory requirements, you should consult with a qualified lawyer or appropriate expert. LabCFTC has no independent authority or decision-making power, and cannot independently provide, or create an expectation for, legal or regulatory relief. Communications from LabCFTC shall not create estoppel against CFTC or other enforcement actions. Any formal requests for relief must be addressed by relevant CFTC staff or, as necessary, by the Commission. LabCFTC will work with entities on such requests with the appropriate offices through established processes.*

1



# Contents

*This primer format is intended to be an educational tool regarding emerging FinTech innovations. It is not intended to describe the official policy or position of the CFTC, or to limit the CFTC's current or future positions or actions. The CFTC does not endorse the use or effectiveness of any of the financial products in this presentation. It is organized as follows:*

- **Overview**
  - What is a Virtual Currency?
  - Bitcoin and Related Technologies
  - Potential Uses of Virtual Currencies and Blockchain Technologies

- **The Role of the CFTC**
  - The CFTC's Mission
  - Sample Permitted and Prohibited Activities
  - ICOs, Virtual Tokens, and CFTC Oversight

- **Risks of Virtual Currencies**
  - Operational Risks
  - Speculative Risks
  - Cybersecurity Risks
  - Fraud and Manipulation Risks

3



# OVERVIEW OF VIRTUAL CURRENCIES

 **LabCFTC** **What is a Virtual Currency?**

- Although precise definitions offered by others are varied, an IRS definition provides us with a general idea:

  - "Virtual currency is a digital representation of value that functions as **a medium of exchange, a unit of account, and/or a store of value.**

  - In some environments, it operates like 'real' currency . . . but it **does not have legal tender status** [in the U.S.].

  - Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as 'convertible' virtual currency. **Bitcoin is one example of a convertible virtual currency.**

  - Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies."†

†IRS Notice 2014-21, available at https://www.irs.gov/businesses/small-businesses-self-employed/virtual-currencies (emphasis added). Please note that this definition is not a statement of the Commission's view, and is instead offered as an aid to enhance public understanding of virtual currencies. We further note that one prominent type of virtual currency is cryptocurrency. Cryptocurrency has been described as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party." Satoshi Nakamoto, Bitcoin: A Peer-to-Peer Electronic Cash System (Oct. 31, 2008), available at https://bitcoin.org/bitcoin.pdf.

4

 LabCFTC   **What is Bitcoin?**

- Bitcoin is currently the largest convertible virtual currency by market capitalization (close to $72 billion in August 2017)†

- Bitcoin was created in 2008 by a person or group that used the name "Satoshi Nakamoto," with the belief that:

  *"[w]hat is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party."*

- Bitcoin:

  - Is "pseudonymous" (or partially anonymous) in that an individual is identified by an alpha-numeric public key/address;

  - Relies on cryptography (and unique digital signatures) for security based on public and private keys and complex mathematical algorithms;

  - Runs on a decentralized peer-to-peer network of computers and "miners" that operate on open-source software and do "work" to validate and irrevocably log transactions on a permanent public distributed ledger visible to the entire network;

  - Solves the lack of trust between participants who may be strangers to each other on a public ledger through the transaction validation work noted in the sub-bullet above; and

  - Enables the transfer of ownership without the need for a trusted, central intermediary.

† Paul Vigna, *Bitcoin, Valued Like a Cool Blue Chip. Trading Like a Hot Small Cap,* Wall Street Journal (Aug. 29, 2017), available at https://blogs.wsj.com/moneybeat/2017/08/28/bitcoin-valued-like-a-blue-chip-trading-like-a-small-cap/.  It is important to note that there are many other virtual currencies with sizeable market capitalizations  that are built upon various Blockchain technologies, but may have different characteristics or functionalities than Bitcoin, including Ethereum (or Ether), Litecoin, and Ripple.

# What is the Difference between Public and Private Ledger Systems?

- Certain virtual currencies operate on public distributed ledger systems that capture "blocks" of transactions – there is no inherent trust in this decentralized system.

  – Virtual currencies create an economic incentive for dispersed, independent, computers, or groups of computers, around the world to confirm transactions and perform verifiable "work" (that creates consensus) to publish a new block of transactions on the public ledger in exchange for a payment of the applicable virtual currency.

- Private / permissioned distributed ledger networks typically have some degree of trust between participants.

  – Private ledger systems allow a network of known participants to share transaction information between themselves more efficiently.

  – While cryptography and consensus may still be involved in private ledger systems, these systems do not necessarily involve a virtual currency that may serve as the economic incentive for miner or validator participation in public networks.

# Sample Potential Use Cases of Virtual Currencies

LabCFTC

- Store of Value
  - Like precious metals, many virtual currencies are a "non-yielding" asset (meaning they do not pay dividends or interest), but they may be more fungible, divisible, and portable
  - Limited or finite supply of virtual currencies may contrast with 'real' (fiat) currencies

- Trading
  - Trading in virtual currencies may result in capital gains or losses
  - Note that trading in virtual currencies may involve significant speculation and volatility risk (see Virtual Currency Risks section below)

- Payments and Transactions
  - Some merchants and online stores are accepting virtual currencies in exchange for physical and digital goods (i.e., payments)
  - Some public Blockchain systems rely on the payment of fees in virtual currency form in order to power the network and underlying transactions

- Transfer / Move Money
  - Domestic and international money transfer (e.g., remittances) in order to increase efficiencies and potentially reduce related fees

## Sample Potential Use Cases of Blockchain/DLT Technology

LabCFTC

Blockchain, or distributed ledger technology,* underpins many virtual currencies, but can also be used within private, permissioned ledger systems – versions of public and private systems may be used by:

■ Financial Institutions
  – Trading & Payment Platforms / Clearing and Settlement
  – Regulatory Reporting, Compliance & Audit
  – Know Your Customer (KYC) / Anti-Money Laundering (AML)
  – Repurchase Agreement Transactions ("Repos," i.e., short-term borrowing of securities)

■ Governments
  – General Records Management
  – Title & Ownership Records Management (e.g., real property deeds and title transfer)
  – Regulatory Reporting and Oversight

■ Cross-Industry
  – Smart Contracts (i.e., self executing agreements)
  – Resource / Asset Sharing Agreements (e.g., allowing rental of a personal car left behind during a vacation or allowing rental of excess computer or data storage)
  – Digital Identity (e.g., proof of identity when entering into a contract)

* See generally Marco Iansiti and Karim R. Lakhani, *The Truth About Blockchain*, Harvard Business Review (Jan-Feb 2017), available at https://hbr.org/2017/01/the-truth-about-blockchain (for a general overview of how a public Blockchain works).

8

5



# THE ROLE OF THE CFTC

## The CFTC's Mission

- The mission of the CFTC is to foster open, transparent, competitive, and financially sound markets. By working to avoid systemic risk, the Commission aims to protect market users and their funds, consumers, and the public from fraud, manipulation, and abusive practices related to derivatives and other products that are subject to the Commodity Exchange Act (CEA).

- To foster the public interest and fulfill its mission, the CFTC will act:

  – To deter and prevent price manipulation or any other disruptions to market integrity;

  – To ensure the financial integrity of all transactions subject to the CEA and the avoidance of systemic risk;

  – To protect all market participants from fraudulent or other abusive sales practices and misuse of customer assets; and

  – To promote responsible innovation and fair competition among boards of trade, other markets, and market participants.

- Responsible innovation is market-enhancing.

10

LabCFTC   **Virtual Currencies are Commodities**

- The definition of "commodity" in the CEA is broad.
  – It can mean a physical commodity, such as an agricultural product (e.g., wheat, cotton) or natural resource (e.g., gold, oil).
  – It can mean a currency or interest rate.
  – The CEA definition of "commodity" also includes "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."

- The CFTC first found that Bitcoin and other virtual currencies are properly defined as commodities in 2015.‡

- The CFTC has oversight over futures, options, and derivatives contracts.

- The CFTC's jurisdiction is implicated when a virtual currency is used in a derivatives contract, or if there is fraud or manipulation involving a virtual currency traded in interstate commerce.
  – Beyond instances of fraud or manipulation, the CFTC generally does not oversee "spot" or cash market exchanges and transactions involving virtual currencies that do not utilize margin, leverage, or financing.

‡ See, In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan, CFTC Docket No. 15-29, available at http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf.

11

# Examples of Permitted Activities

- TeraExchange, LLC, a Swap Execution Facility ("SEF") registered with the CFTC, entered in to the virtual currency market in 2014 by listing a Bitcoin swap for trading. Trading on a SEF platform is limited to "eligible contract participants," a type of sophisticated trader, which includes various financial institutions and persons, with assets above specified statutory minimums.

- North American Derivatives Exchange Inc. ("NADEX"), a designated contract market ("DCM"), listed binary options based on the Tera Bitcoin Price Index from November 2014 to December 2016. Retail customers may trade on NADEX.

- LedgerX, LLC ("LedgerX") registered with the CFTC as a SEF and Derivative Clearing Organization ("DCO") in July 2017. It plans to list digital currency options.

12

# Examples of Prohibited Activities‡

LabCFTC

- Price manipulation of a virtual currency traded in interstate commerce.

- Pre-arranged or wash trading in an exchange-traded virtual currency swap or futures contract.

- A virtual currency futures or option contract or swap traded on a domestic platform or facility that has not registered with the CFTC as a SEF or DCM.

- Certain schemes involving virtual currency marketed to retail customers, such as off-exchange financed commodity transactions with persons who fail to register with the CFTC.

‡Please note that this is not an exhaustive list of prohibited activities.

13

## LabCFTC  ICOs, Virtual Tokens, and CFTC Oversight

- The Securities and Exchange Commission ("SEC") recently released a report about an Initial Coin Offering or "ICO" (the "DAO Report").‡

- The DAO Report explains that "The DAO" is an example of a "Decentralized Autonomous Organization," which is a "virtual" organization embodied in computer code and executed on a distributed ledger or blockchain.

- Investors exchanged Ether, a virtual currency, for virtual DAO "Tokens" to fund projects in which the investors would share in anticipated earnings. DAO Tokens could be resold on web-based platforms.

- Based on the facts and circumstances, the SEC determined that DAO Tokens are "securities" under the federal securities laws.

- There is no inconsistency between the SEC's analysis and the CFTC's determination that virtual currencies are commodities and that virtual tokens may be commodities or derivatives contracts depending on the particular facts and circumstances.

  – The CFTC looks beyond form and considers the actual substance and purpose of an activity when applying the federal commodities laws and CFTC regulations

‡ See Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, available at https://www.sec.gov/litigation/investreport/34-81207.pdf.

14

15



# RISKS OF VIRTUAL CURRENCIES



## Virtual Currencies Have Risks

- While virtual currencies have potential benefits, this emerging space also involves various risks, including:

    - Operational Risks

    - Cybersecurity Risks

    - Speculative Risks

    - Fraud and Manipulation Risks

- Virtual currencies are relatively unproven and may not perform as expected (for example, some have questioned whether public distributed ledgers are in fact immutable).

- Investors and users of virtual currencies should educate themselves about these and other risks before getting involved.

16

## LabCFTC   Virtual Currency: Operational Risk

- *Conduct extensive research before giving any money or personal information to a virtual currency platform.*

- The virtual currency marketplace is comprised of many different platforms where you can convert one type of virtual currency into another or into real currency, if offered.

- Many of these platforms are not subject to the supervision which applies to regulated exchanges.  For example, if they engage in only certain spot or cash market transactions and do not utilize margin, leverage, or financing, they may be subject to federal and state money transmission and anti-money laundering laws, but they do not have to follow all the rules that regulated exchanges operate under.

- Some virtual currency platforms may be missing critical system safeguards and customer protection related systems; without adequate safeguards, customers may lose some or all of their virtual assets.

17

# LabCFTC Virtual Currency: Cybersecurity Risk

- *Keep your property in safe accounts and carefully verify digital wallet addresses.*

- Some platforms may "commingle" (mix) customer assets in shared accounts (at a bank for real currency or a digital wallet for virtual currency).  This may affect whether or how you can withdraw your currency.

- Depending on the structure and security of the digital wallet, some may be vulnerable to hacks, resulting in the theft of virtual currency or loss of customer assets.

  - If a bad actor gains access to your private key, it can take your virtual currency with limited or no recourse

- When transferring virtual currency, be sure to confirm the destination wallet address, even when using "copy and paste."  It is possible for hackers to change digital wallet addresses on your computer.

18



# Virtual Currency: Speculative Risk

- *Only invest what you are willing and able to lose.*

- The virtual currency marketplace has been subject to substantial volatility and price swings.

- An individual or coordinated group trading a large amount of virtual currency at once could affect the price, depending on the overall amount of trading in the marketplace.

- Periods of high volatility with inadequate trade volume may create adverse market conditions, leading to harmful effects such as customer orders being filled at undesirable prices.

- Some advertisements promise guaranteed returns – this can be a common tactic with fraudulent schemes.

19

# Virtual Currency: Fraud & Manipulation Risk

LabCFTC

- *Carefully research the platform you want to use, and pay close attention to the fee structure and systems safeguards.*

- Unregistered virtual currency platforms may not be able to adequately protect against market abuses by other traders.

  - For example, recent news articles discuss potential "spoofing" activity and other manipulative behavior that can negatively affect prices

- Some virtual currency platforms may be selling you virtual currency directly from their own account – these types of transactions may give the platform unfair advantages and sometimes resemble fraudulent "bucket shop" schemes.

- There is also a risk of Ponzi schemers and fraudsters seeking to capitalize on the current attention focused on virtual currencies.

# EXHIBIT
# 7



## Customer Advisory: Beware Virtual Currency Pump-and-Dump Schemes

**The U.S. Commodity Futures Trading Commission (CFTC) is advising customers to avoid pump-and-dump schemes that can occur in thinly traded or new "alternative" virtual currencies and digital coins or tokens.  Customers should not purchase virtual currencies, digital coins, or tokens based on social media tips or sudden price spikes. Thoroughly research virtual currencies, digital coins, tokens, and the companies or entities behind them in order to separate hype from facts.**

Pump-and-dump schemes have been around long before virtual currencies and digital tokens. Historically, they were the domain of "boiler room" frauds that aggressively peddled penny stocks by falsely promising the companies were on the verge of major breakthroughs, releasing groundbreaking products, or merging with blue chip competitors.  As demand in the thinly traded companies grew, the share prices would rise. When the prices reached a certain point, the boiler rooms would dump their remaining shares on the open market, the prices would crash, and investors were left holding nearly worthless stock.

### Old Scam, New Technology

The same basic fraud is now occurring using little known virtual currencies and digital coins or tokens, but thanks to mobile messaging apps or Internet message boards, today's pump-and-dumpers don't need a boiler room, they organize anonymously and hype the currencies and tokens using social media.

Some of these pump-and-dump groups and chat rooms contain thousands of members.  The members subscribe to the group and follow the conversations as they indicate when the next pump-and-dump will occur. On the day of the scam, the organizer counts down the buy signal:

> *"15 mins left before the pump! Get ready to buy"*

> *"5 minutes till pump, next message will be the coin! Tweet about us and send everyone the link to telegram (sic) for outsiders to see what we are pumping so they can get in on the action too!! lets (sic) take it to the MOON!!!!!"*

---

> ### Blow the whistle on pump-and-dump schemers
>
> Virtual currency and digital token pump-and-dump schemes continue because they are mostly anonymous.
>
> If you have original information that leads to a successful enforcement action that leads to monetary sanctions of $1 million or more, you could be eligible for a monetary award of between 10 percent and 30 percent.
>
> For more information, or to submit a tip, visit the CFTC's **whistleblower.gov** website.

This article was prepared by the Commodity Futures Trading Commission's Office of Customer Education and Outreach. The article is provided for general informational purposes only and does not provide legal or investment advice to any individual or entity. Please consult with your own legal adviser before taking any action based on this information.



The next post announces the coin that will be bid up, followed by the exchange platform where the pump will take place.

Some pump and dumps use false news reports, typically about a famous high-tech business leader or investor who plans to pour millions of dollars into a small, lesser known virtual currency or coin. Other fake news stories have featured major retailers, banks, or credit card companies, announcing plans to partner with one virtual currency or another. Links to the phony stories are also accompanied by posts that create false urgency and tell readers to buy now.

Once the pump begins, it can be over in a matter of minutes.  In the example above, the buy and sell cycle was over in less than eight minutes.  Commonly, it is the people pulling the strings who get out first making the most in the scheme, and leaving everyone else scrambling to sell before losing their investment.

These pump and dumps occur in the largely unregulated cash market for virtual currencies and digital tokens, and typically on platforms that offer a wide array of coin pairings for traders to buy and sell.  While the scams have been around as long as the virtual currency markets themselves, the number of new virtual currency and digital coin traders has grown substantially, increasing the number of potential victims or unwitting perpetrators.

The CFTC has received complaints from customers who have lost money to pump-and-dump schemes.  While its regulatory oversight authority over commodity cash markets is limited, the CFTC maintains general anti-fraud and manipulation enforcement authority over virtual currency cash markets as a commodity in interstate commerce.  In addition, some of the coin exchanges are taking measures to identify and block accounts that participate in pump-and-dump activities.

**Protect Yourself**

The best protection for customers is to only purchase alternative virtual currencies, digital coins, or tokens that have been thoroughly researched.  Remember:

- Don't purchase digital coins or tokens because of a single tip, especially if it comes over social media.
- Don't believe ads or websites that promise quick wealth by investing in certain digital coins or tokens.
- Do not participate in pump-and-dump trades; market manipulation is against the law and many participants end up losing money.
- There is no such thing as a guaranteed investment or trading strategy. If someone tells you there is no risk of losing money, do not invest.

If you believe you may have been the victim of fraud, or to report suspicious activity, contact us at 866.366.2382 or visit **CFTC.gov/TipOrComplaint**.

This article was prepared by the Commodity Futures Trading Commission's Office of Customer Education and Outreach. The article is provided for general informational purposes only and does not provide legal or investment advice to any individual or entity. Please consult with your own legal adviser before taking any action based on this information.

# EXHIBIT
# 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 17-7181 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| GELFMAN BLUEPRINT, INC., and NICHOLAS GELFMAN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.    Since at least January 2014 through at least January 2016 (the "Relevant Period"), the company Gelfman Blueprint, Inc. ("GBI") and its Chief Executive Officer ("CEO") and Head Trader, Nicholas Gelfman ("Gelfman") (collectively, "Defendants"), operated a Bitcoin Ponzi scheme in which they fraudulently solicited participation in a pooled fund that purportedly employed a high-frequency, algorithmic trading strategy, executed by Defendants' computer program called "Jigsaw," to trade the virtual currency Bitcoin, a commodity in interstate commerce. During the Relevant Period, Defendants obtained more than approximately $600,000 from at least eighty customers ("GBI Customers") through these fraudulent solicitations. In fact, the strategy was fake, the purported performance reports were false, and—as in all Ponzi schemes—payouts of supposed profits to GBI Customers in actuality consisted of other customers' misappropriated funds.

2.    Defendants fraudulently solicited potential GBI Customers by making false and misleading claims and omissions about the performance and reliability of Jigsaw. Then, once GBI Customers invested in the fraudulent scheme, Defendants attempted to conceal their

fraudulent solicitations and misappropriation of funds through issuing false reports to GBI Customers.  In this regard, Defendants prepared and conveyed to potential and actual GBI Customers numerous solicitation materials, asset and performance reports, and other materials (1) misrepresenting that GBI Customers averaged a 7-9% *monthly* increase in their Bitcoin balances net of all fees through Defendants' risk-protected strategy, when in fact they did not; (2) misrepresenting in individualized performance and balance reports that GBI Customers owned specific amounts of Bitcoin, when in fact those customers did not; and (3) misrepresenting that GBI's assets and performance were audited by a certified public accountant ("CPA"), when in fact they were not.  In reality, the strategy was fake, the supposed trading results were illusory, and any payouts of supposed profits to investors in fact were derived from funds fraudulently obtained from other investors.

3.     In an attempt to conceal the scheme, Gelfman staged a fake computer "hack" that supposedly caused the loss of nearly all GBI Customer funds.  This was a lie.  Later, again trying to conceal the full extent of the fraud, Gelfman claimed he had stolen only $25,000.  But this too was a lie.  In fact, Defendants misappropriated virtually all of the approximately $600,000 solicited from GBI Customers.  As a result, GBI Customers have lost most if not all of their invested funds due to Defendants' fraud and misappropriation.

4.     Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt. 1–190 (2017), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

5.      Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

6.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     <u>JURISDICTION AND VENUE</u>

7.      <u>Jurisdiction</u>.  This Court has jurisdiction of this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

8.      <u>Venue</u>.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.   THE PARTIES

**9.**     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

**10.**     Defendant **Gelfman Blueprint, Inc.** is a New York corporation based in Staten Island, New York.  GBI was incorporated on August 7, 2014.  GBI's last known address is 533 Wilson Avenue, Staten Island, NY 10312.  GBI has never been registered with the Commission.

**11.**     Defendant **Nicholas Gelfman** is a resident of Brooklyn, New York.  Gelfman was the CEO and Head Trader of GBI.  Gelfman has never been registered with the Commission.

### IV.   STATUTORY BACKGROUND

**12.**     Bitcoin and other virtual currencies are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).[1]

### V.   FACTS

**13.**     During the Relevant Period, Defendants solicited and received more than approximately $600,000 from at least eighty GBI Customers, who invested amounts ranging from a few hundred dollars to tens of thousands of dollars, for the purpose of entering into contracts of sale of Bitcoin, a virtual currency, through electronic web-based Bitcoin trading platforms based in various states and countries.

---

[1] For purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.  Bitcoin and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

**Defendants Made False and Misleading Representations, and**
**Omitted Material Facts, to Solicit GBI Customers**

14.　　During the Relevant Period, Defendants solicited customers in Manhattan, Staten Island, and elsewhere to invest in GBI's fund.

15.　　Gelfman solicited customers, and received and directed deposits, withdrawals, and transfers of GBI Customer funds on behalf of GBI.

16.　　Defendants' solicitations to potential GBI Customers to participate in GBI's pooled fund included false and misleading representations and omissions of material facts—in short, lies and deceit—about the profitability and safety of investing in GBI.

17.　　Defendants made these false and misleading representations and omissions of material facts to potential customers during the Relevant Period through the GBI website.

18.　　For example, during the Relevant Period, GBI's website touted the high investment performance of Defendants' high-frequency, algorithmic trading computer program (or "bot") named Jigsaw.  In particular, GBI's website claimed that GBI's Jigsaw trading strategy both generated monthly profits and protected against risk (such as the volatility of Bitcoin prices, and the risk that the value of Bitcoin could drop) for customers invested in the fund, with statements such as:

> INCREASED BITCOIN BALANCE Customers average a 7-9% monthly increase in ฿.  [฿ is a symbol used for Bitcoin]
>
> PROTECTING AGAINST VOLATILITY Trading results are maximized during price drops.

19.　　These statements were false and misleading representations and omissions of material facts.  In fact, GBI Customers did not average the 7-9% monthly increase in Bitcoin, and in reality the purported strategy did not "maximize" trading results—i.e., achieve even higher than 7-9% monthly returns—during price drops.

20.     During the Relevant Period, Defendants' primary Bitcoin trading account for its supposed Jigsaw trading strategy was at an international virtual currency exchange, under the name of TMJigsaw ("Defendants' Jigsaw trading account").

21.     The account records of Defendants' Jigsaw trading account reveal only infrequent and unprofitable trading.  In particular, during 2015, Defendants' Jigsaw trading account records reveal trading on only 17 calendar days that incurred approximately 185 Bitcoin in losses.

22.     Gelfman exclusively controlled and had access to Defendants' Jigsaw trading account.

23.     During the Relevant Period, GBI's website also touted GBI Customers' access to their current balances, deposits, and withdrawals though the GBI website's "interactive customer dashboard."

24.     These statements constituted false and misleading representations and omissions of material facts.  In fact, GBI Customers could not access their true current balances, deposits, and withdrawals through the website's "interactive customer dashboard."  As described below, the figures reflecting large gains provided through the dashboard were false.

25.     During the Relevant Period, these pages on GBI's website touting GBI's high investment performance, strategy, and account transparency were publicly available.

26.     Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through GBI marketing materials.

27.     For example, Defendants' marketing materials used for soliciting customers touted the high investment performance of Jigsaw through statements such as the following:

- Our fund earns customers a 7-11% monthly return on their bitcoins.

6

- Our customers on average are and have been averaging 7-9% profit a month on their Bitcoin Investments.

- As of August 1st, 2015 we had 85 customers, 2,367 bitcoins under management and 717 in revenue.

**28.** Using the then-prevailing exchange rate, 2,367 Bitcoin was equivalent to approximately $660,000, and 717 Bitcoin was equivalent to approximately $200,000.

**29.** These and similar statements about Defendants' trading performance and Bitcoin under management were false and misleading representations and omissions of material facts.

**30.** In fact, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in trading losses.

**31.** In fact, Defendants' Bitcoin under management was far, far less. Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (equivalent to approximately $73,000 using the then-prevailing exchange rate), no Bitcoin trading activity at all after early July 2015, and a Bitcoin balance of zero beginning in early August 2015.

**32.** Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through various internet social media websites, such as Instagram and Facebook, with statements such as:

We are a software development firm, currently offering customers access to a high frequency BTC [Bitcoin] trading program called "Jigsaw" (2% weekly BTC [Bitcoin] return).

**33.** These and similar statements that Jigsaw offered a 2% weekly Bitcoin return were false and misleading representations and omissions of material facts. In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

34.     During the Relevant Period, these social media solicitations touting GBI's high investment performance, strategy, and account transparency were publicly available.

35.     Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period through internet chat room posts, with statements such as:

> The current return is advertised at 7-9% monthly over an extended time period, and is based on the return you receive after we take our commission.

36.     These and similar statements that Defendants provided customers with a 7-9% monthly return, after commission, over an extended time period, were false and misleading representations and omissions of material facts. In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

37.     During the Relevant Period, such internet chat room solicitations touting GBI's high investment performance and strategy were publicly available.

38.     Defendants also made false and misleading representations and omissions of material facts to potential customers during the Relevant Period in person.

39.     Typically, these false and misleading representations and omissions concerned GBI's net monthly returns, the safety of investments with GBI (such as the claim that Jigsaw consistently generated profits regardless of whether Bitcoin prices went up or down), and GBI Customers' ability to monitor their investments online through the GBI website.

40.     For example, in or around December 2014, in Manhattan, Gelfman and another GBI officer made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person. This person then became a GBI Customer, over time investing more than $50,000, all of which was misappropriated by Defendants.

41.     Similarly, in or around April 2015, in Brooklyn, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $60,000, all of which was misappropriated by Defendants.

42.     Similarly, in or around June 2015, in Staten Island, agents of GBI using information provided by Gelfman made such false and misleading statements about GBI's performance, the safety of the investment, and GBI Customers' ability to monitor their investments, while soliciting a potential customer in person.  This person then became a GBI Customer, over time investing more than $40,000, all of which was misappropriated by Defendants.

43.     Such statements in person by Defendants to these and numerous other potential customers were false and misleading representations and omissions of material facts.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading that resulted in substantial Bitcoin losses, and GBI Customers could not verify and monitor their investments online, such as through logging into GBI website's customer "dashboard," since the information Defendants provided therein was falsified by Defendants.

44.     Defendants made these false and misleading representations and omissions of material facts to potential customers as well as existing GBI Customers on the GBI website, in marketing materials, in internet social media and chatroom websites, and in person knowingly or with reckless disregard for the truth.

**Defendants Provided False Account Statements and Made Other Misrepresentations to GBI Customers**

45.     Defendants were fiduciaries of GBI Customers.

46.     Despite this, during the Relevant Period Defendants perpetuated their fraudulent scheme by providing GBI Customers false reports, by obtaining false and misleading documents from an accountant through deceit, and through other false and misleading representations and omissions of material facts.

47.     Once GBI Customers had invested in GBI, Defendants provided GBI Customers with password-protected access to restricted areas of Defendants' website where GBI Customers could access and view account statements and reports purporting to show their account balances and trading profits or losses.

48.     During the Relevant Period, these statements and reports to GBI Customers were false and misleading because the reported trading conducted on behalf of customers did not occur.  In reality, the account and performance statements misrepresented, and provided false and misleading descriptions of, trading activity and account balances.

49.     For example, on or around August 1, 2015, one GBI Customer logged into the GBI website and received from the GBI "dashboard" an account statement that the customer's investment balance was 197.719 Bitcoin, worth $58,297.45 (purportedly using the then-prevailing exchange rate).  This reported balance reflected customer profits (net of fees to GBI and a subsequent deposit) of more than 38%, achieved in less than two months, based on the customer's initial investment of approximately $40,000.

50.     In fact, this statement and report to the GBI Customer were false and misleading.  The reported balance did not exist, and the reported profits were illusory.  During that two-month

10

period, Defendants' Jigsaw trading account records reveal trading on only four calendar days that resulted in thousands of dollars in losses.

51.     During the Relevant Period, Defendants also provided account balance and profitability information by telephone to GBI Customers.

52.     The GBI Customer account balance and profitability information provided by Defendants to GBI Customers by telephone was false and misleading because the supposed trading conducted on behalf of investors did not occur, the balances did not exist, and the reported profits were illusory.  In reality, as stated above, Defendants' Jigsaw trading account records reveal only infrequent trading and substantial Bitcoin losses.

53.     In or around July to October 2015, Defendants obtained a series of one-page documents from an accountant stating GBI's assets under management, specifically, the amount of GBI's balance at a particular Bitcoin exchange as of a particular date.

54.     These documents obtained from the accountant reflected that GBI's assets under management held at the specific exchange, an international platform advertised as the "world's largest and most advanced cryptocurrencies exchange," were increasing in value each month and, as of October 2015, were in excess of $840,000.

55.     These statements were false and misleading representations and omissions of material facts.

56.     In reality, Defendants' account balance was far, far less: Defendants' Jigsaw trading account records show a Bitcoin balance of less than 270 Bitcoin as of early July 2015 (then equivalent to approximately $73,000), and a Bitcoin balance of zero beginning in early August 2015.

11

57.     Defendants fraudulently obtained the one-page account-balance documents from the accountant by providing the accountant with information Defendants knew to be misleading and false, such as false account or balance statements that Gelfman had generated with the intent to deceive.

58.     Referring to this accountant and these documents, Defendants represented to potential and actual GBI Customers that GBI had monthly CPA audited results and asserted balances under management according to the last CPA audit.

59.     These statements were false and misleading representations and omissions of material facts.

60.     In reality, this accountant was not a CPA.

61.     In reality, this accountant never performed an audit of GBI.

62.     In reality, the account balance documents stated false balances because the information that Defendants provided to the accountant was false and intended to mislead.

63.     Defendants made these and other false and misleading representations and omissions of material facts to potential and actual GBI Customers concerning trading activity and results, account balances, and CPA audits knowingly or with reckless disregard for the truth.

**Defendants Misappropriated GBI Customers' Funds**

64.     Between approximately January 2014 and December 2015, Defendants received in excess of approximately $600,000 from more than 80 GBI Customers.

65.     During the Relevant Period, Defendants misappropriated almost all of these GBI Customers' funds for improper and unauthorized uses, such as to pay GBI business expenses and to wrongfully enrich Gelfman.

66.     For example, during the Relevant Period, GBI charged GBI Customers fees in the form of large percentages of supposed Bitcoin trading profits.

67.     Nearly all GBI Customers were charged fees of approximately 50- 65% of those purported trading profits.

68.     Defendants' representations of trading results and profits for or on behalf of GBI Customers were false. Consequently, all "fees" deducted by Defendants from GBI Customers' funds based on these false profits in fact were GBI Customer funds that Defendants misappropriated from GBI Customers.

69.     In or around October 2015, Gelfman told other GBI officers that a computer "hack" had caused GBI to lose all or nearly all of GBI Customers' investments. Defendants then conveyed this story to GBI Customers to explain the loss of their investments.

70.     For instance, Defendants notified a GBI Customer, who had invested more than $50,000 beginning in December 2014, and whose investment in GBI's fund had purportedly generated tens of thousands of dollars of profits through Jigsaw, of the supposed hack and that all of the GBI Customer's investments were gone. This GBI Customer was never repaid any of the investment.

71.     In fact, Defendants' statements about the supposed computer "hack" causing the loss of all or nearly all GBI's Bitcoin were false.

72.     In fact, there was no "hack" in October 2015 causing massive losses. In fact, Defendants' Jigsaw trading account records reveal that the account had had a Bitcoin balance of zero since early August 2015.

73.     In fact, Defendants had misappropriated nearly all of the GBI Customers' funds for Defendants' own financial benefit and to transfer the funds illegally to other customers of the Ponzi scheme, and had invented the falsehood of the "hack" to conceal this misappropriation.

74.     To the extent any GBI Customers received any purported profits from GBI, those profits in fact consisted of funds that Defendants misappropriated from other GBI Customers, in the nature of a Ponzi scheme.

75.     In or around January 2016, Gelfman confessed to other GBI officers, such as the Chief Operating Officer and the Chief Compliance Officer, that he had stolen approximately $25,000 from GBI.

76.     In fact, Gelfman had misappropriated far in excess of $25,000 in GBI Customer funds.  In reality, Defendants misappropriated nearly all GBI Customer funds.

**Nicholas Gelfman's Invocation of Fifth Amendment Privilege Against Self-Incrimination**

77.     On April 22, 2016, pursuant to an investigatory subpoena, Gelfman appeared before the Commission for testimony concerning GBI.

78.     In response to Division staff's questions at this testimony, Gelfman invoked his Fifth Amendment privilege against compelled self-incrimination.

**Gelfman Was a Controlling Person of GBI**

79.     Defendants' website and marketing materials identified Gelfman as CEO and Head Trader of GBI.  Gelfman solicited investors on behalf of GBI, created and controlled the performance and investment information in solicitation materials, created and controlled the content of GBI's website, oversaw and controlled GBI's trading of Bitcoin, was a signatory to GBI bank accounts, and generated account information on behalf of GBI.

**Gelfman Acted as Agent for GBI**

80.     Through his actions as CEO and head trader overseeing Bitcoin trading by GBI, managing the purported Jigsaw bot, and calculating GBI purported performance results, and thus profits and fees, as well as through his additional actions of marketing GBI to potential investors, soliciting investors, providing information to the accountant during reviews of GBI's assets under management, and providing account information to GBI Customers, Gelfman acted in the scope of his employment and on behalf of GBI.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance

**Violations of Section 6(c)(1) of the Act and
Regulation 180.1(a) by Gelfman and GBI**

81.     Paragraphs 1 through 80 are re-alleged and incorporated herein by reference.

82.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

83.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

84. During the Relevant Period, as described above, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce, making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading, such as the following:

A. Issuing performance statements and updates misrepresenting the supposed amount of bitcoins and profits in GBI Customers' purported accounts;

B. Issuing written statements misrepresenting the amount of GBI's assets under management;

C. Issuing written statements misrepresenting the profitability of Defendants' Bitcoin trading;

D. Failing to disclose, and omitting, that GBI never achieved the advertised performance and returns—such as a 7-9% monthly increase in bitcoins—for its customers;

E. Failing to disclose, and omitting, that GBI never was audited by a CPA; and

F. Failing to disclose, and omitting, that Defendants were misappropriating GBI Customer funds.

85. As described above, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, in connection with contracts of sale of a commodity in interstate commerce, soliciting investors with false and misleading performance statements; providing GBI Customers false account and performance statements that misrepresented GBI Customers' investment performance; misrepresenting and omitting material facts on Defendants' website and in other communications with investors regarding GBI's strategy, performance, and

16

CPA audits, as well as other material facts regarding GBI and GBI Customers' interest in the fund; and misappropriating GBI Customers' funds.

86.     Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

87.     By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a).

88.     The acts, omissions, and failures of Gelfman described in this Complaint occurred within the scope of his agency, employment, and office at GBI.  Accordingly, GBI is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as principal for its agent's acts, omissions, or failures in violation of the Section 6(c)(1) of the Act and Regulation 180.1(a).

89.     At all times relevant to this Complaint, Gelfman controlled GBI, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, GBI's conduct constituting the violations of GBI described in this Count.  Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Gelfman is liable for GBI's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

90.     Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1.

17

## VII.  **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

**A.** An order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

**B.** An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with any Defendant, including any successor thereof, from:

    **i.** Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act, or Regulation 180.1(a);

    **ii.** Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    **iii.** Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

    **iv.** Having any commodity interests traded on Defendants' behalf;

    **v.** Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests; and/or

    **vi.** Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

**C.** An order requiring Defendants to pay civil monetary penalties, plus post-judgment interest thereon, in the amount of the greater of (1) $170,472 for each violation of the Act and Regulations, or (2) triple the monetary gain from violations of the Act and Regulations;

**D.** An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**E.** An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds any Defendant received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

**F.** An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

**G.** An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least January 2014 to the date of such accounting;

**H.** An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

**I.** An order providing such other and further relief as the Court deems proper.

<p style="text-align:center">*     *     *</p>

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Dated:  September 21, 2017

<div style="margin-left:50%">

**COMMODITY FUTURES TRADING COMMISSION**

By: s/ Gates S. Hurand
Gates S. Hurand
Senior Trial Attorney
ghurand@cftc.gov
Phone: (646) 746-9700

K. Brent Tomer
Chief Trial Attorney
ktomer@cftc.gov
Phone: (646) 746-9700

Manal M. Sultan
Deputy Director
msultan@cftc.gov
Phone: (646) 746-9700

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>My Big Coin Pay, Inc., Randall Crater, and Mark Gillespie,<br><br>Defendants,<br><br>Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC, Greyshore Technology, LLC,<br><br>Relief Defendants. | Case No. [_____]<br><br>ECF Case<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

## I.   INTRODUCTION

1.      Since at least January 2014 through the present, the company My Big Coin Pay, Inc. ("MBCP"), Randall Crater ("Crater"), and Mark Gillespie ("Gillespie") (collectively, "Defendants"), operated a virtual currency scheme in which they fraudulently offered the sale of a fully-functioning virtual currency, My Big Coin ("MBC"), a commodity in interstate commerce. From at least January 2014 through at least June 2017, Defendants obtained more than approximately $6 million from at least twenty-eight customers ("MBC Customers") through fraudulent solicitations.

2.      Defendants fraudulently solicited potential and existing MBC Customers throughout the United States by making false and misleading claims and omissions about MBC's value, usage, and trade status, and that MBC was backed by gold. In this regard, the MBC

website, maintained and operated by Defendants, conveyed to potential and actual MBC Customers numerous solicitation materials, MBC trade data, and other materials (1) misrepresenting that MBC was actively being traded on several currency exchanges, including the MBC Exchange website (https://mybigcoinexchange.com), when in fact it was not; (2) misrepresenting in reports the daily trading price, when in fact no price existed because MBC was not trading; and (3) misrepresenting that MBC was backed by gold, when in fact it was not. In reality, the supposed trading results were illusory, and any payouts of funds to MBC customers were derived from funds fraudulently obtained from other MBC Customers in the manner of a Ponzi scheme.

3.     As MBC Customers began to raise questions about their MBC accounts, Defendants attempted to conceal their fraud by providing additional coins to them and falsely representing that they had secured a deal with another exchange to trade MBC. Defendants encouraged MBC Customers to refrain from redeeming their MBC holdings until MBC was active on this "new" exchange.

4.     Defendants misappropriated virtually all of the approximately $6 million they solicited from MBC Customers. Defendants used these misappropriated funds to purchase a home, antiques, fine art, jewelry, luxury goods, furniture, interior decorating and other home improvement services, travel, and entertainment. As a result, MBC Customers have lost most, if not all, of their funds due to Defendants' fraud and misappropriation.

5.     Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-27f (2012), and the Commission's Regulations ("Regulations"), 17 C.F.R. pt. 1-190

2

(2017), specifically, Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

6.    Defendants funneled customer funds or arranged for customers to send their funds to the accounts of Kimberly Renee Benge, Kimberly Renee Benge d/b/a Greyshore Advertisement a/k/a Greyshore Advertiset, Barbara Crater Meeks, Erica Crater, Greyshore, LLC, and Greyshore Technology, LLC (collectively "Relief Defendants"). The Relief Defendants have no legitimate claim to the customer funds they hold, or they have collected, all of which were obtained as a result of the Defendants' fraudulent conduct.

7.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

8.    Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

9.    **Jurisdiction**. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), provides that district courts have jurisdiction to hear actions

3

brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in, an act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.     The Commission has anti-fraud authority over the conduct and transactions at issue in this case pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

11.     Venue.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants are found in, inhabit, or transact business in the District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.  As alleged in this complaint, Defendants fraudulently solicited numerous customers in the District of Massachusetts, receiving in excess of $5 million from those customers.

## III.     THE PARTIES

12.     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

13.     Defendant **My Big Coin Pay, Inc.** is a corporation based in Las Vegas, Nevada. MBCP was incorporated on October 9, 2014.  MBCP's last known address is 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169.  MBCP has never been registered with the Commission.

4

14. Defendant **Randall Crater** is a resident of East Hampton, New York. Crater is a founder of MBCP. Crater has never been registered with the Commission.

15. Defendant **Mark Gillespie** is a resident of Hartland, Michigan. Gillespie solicited MBC Customers on behalf of MBCP and Crater. Gillespie has never been registered with the Commission.

## IV. RELIEF DEFENDANTS

16. Relief Defendant **Kimberly Renee Benge** ("Relief Defendant Kimberly Benge") is a resident of State Road, North Carolina. Benge is Crater's sister. Benge has never been registered with the Commission.

17. Relief Defendant **Kimberly Renee Benge d/b/a Greysbore Advertisement a/k/a Greyshore Advertiset** ("Relief Defendant Greyshore Advertisement") maintained its business address at 1643 Old Highway 21, State Road, North Carolina and is operated by Benge. It also used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. It has never been registered with the Commission.

18. Relief Defendant **Barbara Crater Meeks** is a resident of Elkin, North Carolina. She is Randall Crater's mother. Meeks has never been registered with the Commission.

19. Relief Defendant **Erica Crater** is a resident of East Hampton, New York. She is Crater's wife. Crater has never been registered with the Commission.

20. Relief Defendant **Greyshore, LLC** ("Greyshore") is a limited liability company based in Longwood, Florida. It was formed on May 17, 2010. Greyshore's last known address is 280 South Ronald Reagan Boulevard, Suite 203, Longwood, Florida but previously it used the address of 81 Newtown Lane, Suite 328, East Hampton, New York. Crater is the CEO of Greyshore. Greyshore has never been registered with the Commission.

5

21.     Relief Defendant **Greyshore Technology, LLC** ("Greyshore Technology") is a limited liability company based in East Hampton, New York. It was operational from at least January 2014 through at least June 2017 and its last known address is 81 Newtown Lane, Suite 328, East Hampton, New York. Crater is the CEO of Greyshore Technology. Greyshore Technology has never been registered with the Commission.

## V.     STATUTORY BACKGROUND

22.     Virtual currencies are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012). For the purposes of this Complaint, a virtual currency means a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

## VI.     FACTS

### A.     Defendants Made False and Misleading Representations, and Omitted Material Facts, To Solicit MBC Customers

23.     From at least January 2014 to present, in an effort to capitalize upon the public's heightened awareness of, and interest in purchasing, virtual currencies, Defendants solicited potential MBC Customers to purchase MBC, a virtual currency with a similar sounding name to a more commonly known virtual currency, "Bitcoin." Defendants also solicited MBC Customers to invest in MBCP by purchasing both stock in a company which had merged with MBCP and alleged licenses related to the medical marijuana business and marijuana derivative products such as Trokie, a marijuana-based lozenge.

6

**24.**     Defendants solicited potential MBC Customers and, along with the Relief Defendants, received and directed deposits, withdrawals, and transfers of MBC Customer funds.

**25.**     In their promotion of MBC, Defendants claimed that "merchants and consumers [could] process transaction with our new digital currency [MBC]" on the MBC website. Defendants further claimed that "any person with a valid email account [could] receive my big coins (MBC)," and "MBC is quoted, at the current value of the coin that day." Defendants provided MBC Customers with access, via the MBC website, to their individual accounts which reported their MBC balances, transactions, and the current value of MBC.

**26.**     Defendants' solicitations to potential MBC Customers to purchase MBC included false and misleading representations and omissions of material facts—in short, lies and deceit— about MBC's active trading status, rising prices, and the currency's merits.

**27.**     Defendants made these false and misleading representations and omissions of material facts to potential MBC Customers from at least January 2014 through at least June 2017 via the MBC website, YouTube videos, press releases, and posting on various social media platforms, such as Facebook and chatroom websites.

**28.**     For example, Defendants posted a YouTube video in which Defendants claimed that MBC was a fully-functioning virtual currency that could be used to buy goods and services, and that was actively trading on "several currency exchanges . . . for dollars, euros, and more" and stated that MBC was the only virtual currency backed by gold to give prospective customers the illusion that MBC was safe to purchase. The video directed potential MBC Customers to visit the MBC website, www.MyBig Coin.com, for more information. The MBC website later claimed that MBC could be traded through the MBC Exchange. Further, in the same YouTube video, Defendants claimed that MBC could be purchased, sold, traded, donated, and used to

7

make purchases, and that MBC was "a global currency that lets you send money anywhere, anytime in any currency." The YouTube video also contained the representation that MBC had partnered with MasterCard with the promise that MBC could be used anywhere MasterCard was accepted. These representations were false. The MBC website reiterated the MasterCard association. In addition to promoting an alleged agreement with MasterCard on the MBC website, the logos of the credit card companies American Express, Visa, and Discover also appeared in order to promote a pretense of legitimacy. On November 4, 2014, Defendants issued the following press release on CISION, which advertises itself as a "PR Newswire" (https://www.prnewswire.com/news-releases/mybigcoinpay-incs-co-founder-randall-crater-announces-the-crypto-currency-exchange-companys-agreement-to-have-its-own-branded-master-card-attached-to-its-e-wallet-281455731.html) which contained a link to other CISION MBCP press releases and read in part:

> *MyBigCoinPay Inc.'s Co-Founder Randall Crater Announces the Crypto-Currency Exchange Company's Agreement to have its own Branded Master-Card* [sic] *attached to its e-Wallet . . .* MyBigCoinPay Inc., a Nevada Corporation and a worldwide exchange portal for Crypto-Currency transfers, trades and buy [sic] and [sic] sell services announces today that it has reached an agreement with TRUCASH aka DCR Strategies Inc, a Canadian Corporation, for the implementation of a customized branded pre-paid master card [sic] program. Whereby [sic] cardholders will have access to their e-Wallet funds 24/7 enabling them to purchase MyBigCoin, the exchanges [sic] branded Crypto-Currency, along with buying products, goods and services worldwide in real time.

These statements were false because at the time of the statement and afterwards, MBCP did not have such an agreement with TRUCASH.

29.    The MBC website also contained a link to "the MBC Mall," a website which advertised that "you can purchase any of the products we have using your MBC." Products purportedly offered for sale included Apple and Sony electronics. The contact page on the MBC

8

Mall shows that it shares the same mailing address of Relief Defendants Greyshore and Greyshore Technology, entities operated by Crater.

30.     Furthering the illusion of MBC's value, MBC Customers could monitor their purchases and sales of MBC through their account on the MBC website.  MBC Customers could also view the purported current price of MBC on the MBC website and could view or participate in MBC trading on the MBC Exchange website.  For example, on September 21, 2015, the MBC Exchange website reported the last exchange trade of MBC at $410 USD; a high trade at $500 USD and a low trade at $60 USD.  The website also additionally reported the latest trade volumes and prices.

31.     These statements by Defendants were false and misleading representations and omissions of material facts.  In fact, MBC was not actively traded on any currency or other exchange, was not backed by gold, was not associated with MasterCard or any other credit card company, and could not be used "to send money anywhere, anytime in any currency."

32.     Further, while the MBC website reflected that MBC Customers owned a certain number of MBCs, these account statements were false and misleading representations and omissions of material facts.  For example, MBC Customers could not exercise any ownership rights in relation to their MBC because they could not trade their MBC or withdraw funds from their individual accounts.

33.     Defendants' statements about the daily price or value of MBC were also false and misleading and omitted material facts.  From at least January 2014 through at least June 2017, Defendants arbitrarily changed the "price" or value of MBC to make it appear as though it fluctuated in an effort by Defendants to replicate price changes that might be observed in any other actively traded commodity.  For example, on September 23, 2015, the reported price of

9

MBC on the MBC website was $389.86 USD and on November 9, 2015, the reported price of MBC on the MBC website was $547.34 USD. When one MBC Customer questioned Gillespie about the fluctuation in MBC's price, Gillespie admitted that Crater would arbitrarily change the price, indicating the price was not based on actual trading. The increasing prices for MBC on the website and the MBC Exchange website were illusory and false.

34.    From at least January 2014 through at least June 2017, Defendants echoed the false and misleading representations and omissions of material facts contained on the MBC and MBC Exchange websites regarding the rising value or price, usage, and gold-backing of MBC, on social media accounts they controlled. For example, on the MBC Facebook page, Defendants solicited potential MBC Customers by touting the rising trading value of MBC in U.S. Dollars through statements such as the following false and/or misleading postings related to supposed MBC value or price, usage and relationship with MasterCard, and backing by gold:

A.    **Value or price**

  i.    January 27, 2014: "Today current value is $28.87 USD." Gillespie posted a comment to this post on February 10, 2014 at 2:26 p.m. "$32.26 ....and going VERTICAL!!!"

  ii.   February 28, 2014: "Today #MYBIGCOIN (MBC) Current value is $47.56 USD."

  iii.  March 15, 2014: "...Current value is $57.99 USD"

  iv.   April 19, 2014: "...Current value is $76.57 USD"

  v.    May 21, 2014: "...Current value is $102.13 USD"

  vi.   September 7, 2014: "...Current value is $111.66 USD"

  vii.  November 8, 2014: "...Current value is $121.38 USD"

B.    **Usage**

  i.    March 7, 2014: "...Sign up today to receive your My Big Coin Visa/MasterCard."

10

ii.      September 3, 2015: "The First Crypto-Currency Mastercard easy access to your money use at any atm's and anywhere Mastercard is accepted."

C.    **Gold Backing**

i.      March 6, 2014: "The Wait is Over !! Officially… My Big Coin has Entered into a Contract where All My Big Coins will be Backed 100% by Gold. My Big Coin. www.MyBigCoin.com."

ii.      March 7, 2014: "The only crypto currency to back your money with gold."

iii.      August 6, 2015: "The first Crypto Currency to be backed by Gold."

35.      These and similar statements about MBC's value or price, usage, and backing by gold were false and misleading representations and omitted material facts.

36.      Defendants also made false and misleading representations and omitted material facts to potential and existing MBC Customers from at least January 2014 through at least June 2017 through Internet chat room posts, with false statements regarding the rising trading price such as the following on the Internet chatroom, Raging Bull, http://ragingbull.com:

> February 10, 2014: "my friends and family are all in 'My Big Coin'– we all got in around 20.00 – its now at 32.26 . . . this will go through the roof – I encourage all to give it a look!"

This Internet chat room post was made on the same day and quoted the same price that Gillespie also posted on the MBC Facebook page.

37.      From at least January 2014 through at least June 2017, such Internet chat room solicitations touting MBC's supposed rising trading value or price, usage, and gold backing were publicly available.

38.      Defendants also made false and misleading representations and omitted material facts directly to MBC Customers from at least January 2014 through at least June 2017 in person and via email messages.

11

39.     Typically, these false and misleading representations and omissions also related to actions which could cause an increase in the trading value of MBC, how a customer could use MBC, and the safety of purchasing MBC because it was backed by gold.

40.     For example, in or around March 2016, Gillespie sent an email to a customer who was dissatisfied with his MBC purchase that included several material false statements regarding MBCP and MBC. Gillespie wrote:

> Our funding (in the hundreds of millions) I'm told should hit this week...by the end of the week MBC[P] will buy up any and all coin you want to sell on the Exchange..."
>
> Things could not possibly be better—Randall [Crater] is in an unnamed South American country since yesterday, at their request, striking a deal to use our gold-backed coin to stabilize their economy.
>
> We have signed deal, 50/50 partnership with one of the largest companies in the world on their phone payment system.

These statements were false.

41.     Gillespie told another MBC customer "that all good with MBC... VERY good in fact. Each coin is now backed with gold! So, our currency and accounts are backed better than the FDIC backs your money in the bank!" These statements were false.

42.     Like Gillespie, from at least January 2014 through at least June 2017 Defendant Crater also made false representations to an MBC Customer about MBC being backed by hundreds of millions of dollars of gold.

43.     On January 28, 2015, Crater sent an email to the same MBC Customer which read "...we have 300 million in gold backing us they have nothing show [sic] you how strong we are going to be [.]" This statement was false.

44. Defendants made these false and misleading representations and omitted material facts to potential as well as existing MBC Customers on the MBC and MBC Exchange websites, on Internet social media and chatroom websites, in email communications, and in person, and did so knowingly or with reckless disregard for the truth. Over the course of this scheme, Defendants have revised their fraudulent statements on the MBC website.

**B.** **Defendants Misappropriated MBC Customers' Funds**

45. From at least January 2014 through at least June 2017, Defendants received in excess of approximately $6 million from at least twenty-eight MBC Customers.

46. From at least January 2014 through at least June 2017, Defendants misappropriated almost all of these MBC Customers' funds for improper and unauthorized uses, such as to wrongfully enrich themselves and the Relief Defendants.

47. From at least January 2014 through at least June 2017, Defendants directed MBC Customers to transfer funds into bank accounts controlled by or operated for the benefit of Defendants and Relief Defendants.

48. For instance, Defendants instructed MBC Customers to transfer funds by wire or through written checks into bank accounts held in the names of Relief Defendants Greyshore Advertisement, Greyshore LLC, Greyshore Technology, Barbara Crater Meeks, and Defendant Gillespie.

49. Upon receipt or very soon after receipt of MBC Customers' funds, the MBC Customer funds were transferred to other accounts controlled by Defendants or Relief Defendant Erica Crater, or withdrawn to make purchases for Defendants' or Relief Defendants' own financial benefit. On occasion, MBC Customer funds were transferred illegally to other MBC Customers to cover up Defendants' fraud.

13

50.     For example, MBC Customer funds for the purchase of MBC were transferred to a bank account in the name of "Kimberly Renee Benge d/b/a Greyshore Advertisemet a/k/a Greyshore Advertiset." On September 12, 2014, Relief Defendant Kimberly Benge withdrew funds from this account and purchased a cashier's check made out to "Kimberly Benges Greyshore Advertisment" in the amount of $1,849,370.38. The next business day, September 15, 2014, this cashier's check was deposited into a bank account held in the name of Greyshore LLC. On September 19, 2014, Defendants and/or Relief Defendants wired $631,523.79 from the Greyshore LLC bank account to a real estate settlement company in Florida with the notation "Other Home Purchase." On or about September 26, 2014, Relief Defendant Erica Crater purchased a home for the price of approximately $645,000 using the funds transferred to the real estate settlement company. A similar pattern repeated itself throughout the period from at least January 2014 through at least June 2017 with MBC customer funds being wired to Crater's or Erica Crater's personal bank accounts from Relief Defendants' bank accounts or used to make purchases in the amount of at least $339,689 at a jewelry store in Southampton, New York; at least $209,000 at an East Coast based marina; and at least $517,719.27 at an auction house that specialized in fine art and antiques in Southhampton, New York. Defendants and/or Relief Defendants withdrew via ATM transactions over $56,000 of MBC Customer funds from the Relief Defendant Greyshore Advertisement's bank account, and Relief Defendant Kimberly Benge personally withdrew at least $489,000 from this account at bank branch offices. None of the funds obtained from MBC Customers were used to buy MBC for MBC Customers.

51.     To the extent any MBC customers received any funds from the Defendants, those funds in fact consisted of funds that Defendants misappropriated from other MBC Customers, in the nature of a Ponzi scheme.

### C.   Crater Was a Controlling Person of MBCP

52.   Crater was a controlling person of MBCP.  Crater was a founder of MBCP and the creator/developer of MBC.  Crater controlled the content on the MBC, MBC Exchange, and the MBC Mall websites, including setting the purported trading price of MBC.  Crater either directly or indirectly controlled the operation of the bank accounts to which MBC Customers transferred funds under the belief that they were purchasing MBC.

### D.   Crater Acted as an Agent for MBCP

53.   Through his solicitation of potential and existing MBC Customers and active marketing of MBC including, without limitation, providing information regarding the merits of owning MBC to potential and existing MBC Customers and providing existing customers with additional MBC after they raised concerns about their inability to trade MBC, Crater acted as an agent of MBCP.

### E.   Gillespie Acted as an Agent for MBCP

54.   Through his actions in marketing and soliciting customers, through direct communications and posting on social media, and directing MBC Customers to transfer funds which they believed were for the purchase of MBC to bank accounts controlled by Defendants, Gillespie acted as an agent of MBCP.

### F.   Relief Defendants Received Funds to Which They Have No Legitimate Claim

55.   As described above, on multiple occasions, Relief Defendants have received MBC Customer funds that were obtained as a result of Defendants' fraudulent conduct.  Relief Defendants have no legitimate interest in the MBC Customer funds that they obtained or received.  The funds funneled to the Relief Defendants exceeded $6 million.

15

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I—Fraud by Deceptive Device or Contrivance

#### Violations of Section 6(c)(1) of the Act and
#### Regulation 180.1(a) by MBCP, Crater, and Gillespie

56.     Paragraphs 1 through 55 are re-alleged and incorporated herein by reference.

57.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), makes it unlawful for any

person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

58.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

59.     Virtual currencies are encompassed in the definition of "commodity" under

Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012).

60.     As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities

in interstate commerce, making or attempting to make untrue or misleading statements of

16

material fact or omitting to state or attempting to omit material facts necessary in order to make

statements made not untrue or misleading, including without limitation, the following:

      A.    Issuing written statements misrepresenting that MBC was actively being traded on several currency exchanges, including the MBC Exchange;

      B.    Verbally telling MBC Customers that MBC would be listed on a new exchange when trading on the MBC Exchange was unsuccessful;

      C.    Issuing written statements misrepresenting the daily trading price of MBC;

      D.    Issuing written statements misrepresenting that MBC was backed by gold;

      E.    Issuing written statements misrepresenting that MBC could be purchased, sold, traded, donated, and used to make purchases;

      F.    Issuing written statements misrepresenting that MBC was a global currency that allowed customers to send money anywhere at any time in any currency;

      G.    Issuing written statements misrepresenting that MBC could be used anywhere that MasterCard was accepted;

      H.    Issuing written statements misrepresenting that MBCP was affiliated or had a relationship with the credit card companies Visa, MasterCard, American Express, and/or Discover;

      I.    Issuing written statements misrepresenting that MBC could be used at the "MBC Mall" to purchase products;

      J.    Issuing written statements mispresenting that customers owned a certain number of MBC and that MBC could be sold or customers could withdraw their funds; and

      K.    Failing to disclose, and omitting, that Defendants were misappropriating MBC customer funds.

      61.    As described above, Defendants violated Section 6(c)(1) of the Act and

Regulation 180.1(a) by, among other things, in connection with contracts of sale of a commodity

in interstate commerce, soliciting customers with false and misleading statements about MBC's

trading activity, usage, value, affiliation with credit card companies, and backing by gold;

providing MBC Customers with false statements misrepresenting that customers owned a certain

number of MBC and that MBC could be sold or customers could withdraw their funds; and misappropriating MBC Customers' funds.

62.     Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

63.     By this conduct, Defendants violated Section 6(c)(1) of the Act and Regulation 180.1(a).

64.     The acts, omissions, and failures of Crater described in this Complaint occurred within the scope of his agency, employment, or office at MBCP. Accordingly, MBCP is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017), as a principal for its agent's acts, omissions, or failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

65.     At all times relevant to this Complaint, Crater controlled MBCP, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, MBCP's conduct constituting the violations of MBCP described in this Count. Accordingly, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Crater is liable for MBCP's violations of Section 6(c)(1) of the Act and Regulation 180.1(a).

66.     The acts, omissions, and failures of Gillespie described in this Complaint occurred within the scope of his agency, employment, or office at MBCP. Accordingly, MBCP is liable under Section 2(a)(1)(B) of the Act and Regulation 1.2 as principal for its agent's acts, omissions, or failures in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

67.     Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the

18

statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

### Count II – Disgorgement of Funds from Relief Defendants

68.     The allegations set forth in paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

69.     Defendants have engaged in a fraudulent investment scheme that defrauded Defendants' customers.

70.     Relief Defendants have received funds that were obtained as a result of Defendants' fraudulent conduct.

71.     Relief Defendants have no legitimate entitlement to, or interest in, the funds received from Defendants' fraudulent conduct.

72.     Relief Defendants should be required to disgorge the funds they received from Defendants' fraudulent conduct, or the value of those funds that Relief Defendants may have subsequently transferred to third parties.

72.     By reason of the foregoing, Relief Defendants hold funds in constructive trust for the benefit of customers who were victimized by Defendants' fraudulent scheme.

### VIII.   RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

A.     An order finding that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2012);

**B.**      An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with any Defendant, including any successor thereof, from:

      **i.**      Engaging, directly or indirectly, in conduct in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), or Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017);

      **ii.**      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

      **iii.**      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for their own personal account(s) or for any account in which Defendants have a direct or indirect interest;

      **iv.**      Having any commodity interests traded on Defendants' behalf;

      **v.**      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      **vi.**      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

      **vii.**      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except

as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

viii.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration, or required to be registered with the Commission (except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017));

C.    An order directing each Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act and Regulations, as described herein;

D.    An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.    An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer and investor whose funds any Defendant received, or caused another person or entity to receive, as a result of

21

the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

      **F.**    An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedure as the Court may order, all contracts and agreements, whether express or implied, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants as a result of the acts and practices which constituted violations of the Act and the Regulations, as described herein;

      **G.**    An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least January 2014 to the date of such accounting;

      **H.**    An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012);

      **I.**    An order requiring Relief Defendants, as well as any of their successors or assigns, to disgorge to any officer appointed or directed by the Court, all ill-gotten gains and other benefits received from Defendants, including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from Defendants as a result of Defendants' acts or practices that constitute violations of the Act and the Regulations, including post-judgment interest; and

      **J.**    An order providing such other and further relief as the Court deems proper.

<p style="text-align:center">*    *    *</p>

Dated: January 16, 2018

COMMODITY FUTURES TRADING
COMMISSION

By: _____

Traci L. Rodriguez
Chief Trial Attorney
trodriguez@cftc.gov

Jonah E. McCarthy
Trial Attorney
jmccarthy@cftc.gov

John Einstman
Chief Trial Attorney
jeinstman@cftc.gov

Paul G. Hayeck
Deputy Director (Mass. Bar. No. 554815)
phayeck@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
Phone: (202) 418-5980
Fax: (202) 418-5428

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                              Plaintiff,<br><br>v.<br><br>DILLON MICHAEL DEAN and THE ENTREPRENEURS HEADQUARTERS LIMITED,<br><br>                              Defendants. | Case Number 18-cv-00345<br><br>Judge _____<br><br>ECF Case |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, RESTITUTION, AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

### I.     SUMMARY

1.      From approximately April 2017 through the present (the "Relevant Period"), Defendant Dillon Michael Dean ("Dean"), through his company, Defendant The Entrepreneurs Headquarters Limited ("TEH") (together, "Defendants"), has engaged in a fraudulent scheme to solicit at least $1.1 million worth of Bitcoin from more than 600 members of the public to participate in a pooled investment vehicle for trading commodity interests.  Rather than convert customer funds, security, or property ("funds") from Bitcoin to fiat currency to invest in binary options contracts, as promised, Defendants misappropriated their customers' funds (including by using them to pay other customers, in the manner of a Ponzi scheme), and then lied to customers about their account balances in order to conceal Defendants' misappropriation.

2.     In furtherance of the fraudulent scheme, Defendants made material misstatements and omissions in solicitations to pool participants, including misrepresenting Dean's experience and track record, and misrepresenting that forty percent of the customers' funds would be pooled and invested in, among other things, binary options for the customers' benefit, with all or substantially all of the remainder kept in reserve in Bitcoins to fund customer withdrawals.

3.     Upon information and belief, in reality, Defendants did not trade any of the funds contributed by customers for the benefit of the pool.

4.     In order to perpetuate the fraud and conceal their misappropriation, Defendants made misrepresentations to their customers, such as by issuing them electronic account statements (available through TEH's website), which purported to reflect that customers' account balances were being credited with the exorbitant daily returns promised by Defendants and which indicated that such amounts were available for withdrawal by customers.

5.     Defendants also attempted to perpetuate the fraud and conceal their misappropriation of customer funds by lying to customers, beginning in August 2017, about a purported hack of Defendants' website.

6.     During the Relevant Period, TEH also failed to register with the Commission as a commodity pool operator ("CPO"), and Dean failed to register with the Commission as an associated person ("AP") of a CPO.

7.     By virtue of this conduct and the conduct further described herein, Defendants, either directly or as controlling persons, have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4c(b), 4k(2), 4m(1), and 4$o$(1)(A)-(B) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6c(b), 6k(2), 6m(1), 6$o$(1)(A)-(B) (2012),

and Commission Regulations ("Regulations") 3.12(a) and 32.4, 17 C.F.R. §§ 3.12(a), 32.4 (2017).

8.    The acts and omissions described herein all have been done during the Relevant Period by Dean and other officers, employees or agents of TEH in the scope of their employment or office at TEH.  Therefore, TEH is liable for all acts and omissions described herein, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

9.    Dean was a controlling person of TEH throughout the Relevant Period and did not act in good faith or knowingly induced TEH's violations of the Act and Regulations described herein.  Therefore, Dean is liable for TEH's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

10.    The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

11.    Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

12.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other relief in United States district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that district courts "shall have jurisdiction to entertain such actions."  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2012) (Federal Question) and 28 U.S.C. § 1345 (United States as Plaintiff) (2012).

13.     Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

## III.     THE PARTIES

14.     Plaintiff **Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1–190 (2017).

15.     Defendant **TEH** is an England and Wales company, incorporated on or about April 24, 2017.  TEH has never been registered with the Commission in any capacity.

16.     Defendant **Dean** is the sole founder, principal, director, and officer of TEH. Dean's last known residence is in Longmont, Colorado.  Dean has never been registered with the Commission in any capacity.

4

## IV.    FACTS

**A.    Defendants' Purported Commodity Pool**

17.    In or around April 2017, Dean began soliciting investments in a multi-level marketing scheme, which he referred to on his website as "The Entrepreneurs Headquarters," or "TEH" for short.

18.    On his website, www.theentrepreneurheadquarters.com, Dean stated that he was the owner of TEH, claiming that he had "traded options" for seven years, and had "[s]trong skills in options trading," among other areas.

19.    The website offered the opportunity to invest in a pooled investment vehicle referred to as "Option #1":  "Option #1 is a [sic] automated investment where you invest and get a [sic] automatic return in your back office on our set return rate.  Our current set return rate is 11%-17.5%/week depending on how much you invest."  (Options #2 and #3 offered customers assistance in trading through their own personal accounts on the North American Derivatives Exchange ("Nadex"), an online exchange that is designated by the Commission as a contract market for binary options.)

20.    The website represented that Option #1 "investments are unit, or private shares inside The Entrepreneurs Headquarters LTD, you are given a set amount of earning [sic] based on the companies [sic] increase in profits and value."

21.    Specifically, the website stated that customers choosing Option #1 "will make money off of the profits we make on the investment via trading options and paid ad promotion. You will be paid weekly and can withdraw profits instantly."

22.     According to the website, the scheme was "extremely sustainable," because Dean had "developed a formula based around a foundation of 3 years of proven trading and paid marketing profit results."

23.     The website promised that participants could earn commissions for referring new customers, stating that the firm's "three-tier referral program" enabled participants to "earn extra money in the amount of 6%-3%-1% of the deposits of your referrals," that participants could make "up to 9% in referral commissions EACH time your referral makes a deposit," that participants need not invest their own funds to earn commissions for referring others, and that participants could solicit new participants with "whatever marketing material" they wished.

24.     Dean marketed the TEH commodity pool by, among other things, uploading a video of himself to YouTube on April 17, 2017.  In the video, Dean identified himself as the CEO and owner of "The Entrepreneur Headquarters," and provided www.theenterpreneurheadquarters.com as the company's website.  Dean stated in the video that he had "launched the business" and that as of "April 15, 2017, our automated [i.e., Option #1] and interactive investments are fully functional and ready to go."

25.     Dean stated in the video that he had already received $6,000 in investments and claimed that he had already achieved over ten percent in returns on that principal.  Dean predicted:  "People are gonna start coming in once they see these results happen, which, they're happening."

26.     Dean also stated in the video:  "Basically what I do is I leave in at least sixty percent of the money for reserve and for people to withdraw, etc., etc., and I use forty percent of the money to profit off of.  And we're doing well.  Basically we do—like I said, we're trading."

27.     In some cases, Dean solicited investments through personal contact with potential investors.  One individual who ultimately invested more than $50,000 with Defendants ("Customer 1") spoke on the telephone with Dean before investing.

28.     Dean told Customer 1 on this phone call that returns for customers would be generated by Dean trading commodity options on Nadex.

29.     Nadex is designated by the CFTC as a contract market, and offers customers the ability to trade binary options.  A binary option is a type of options contract in which the payout depends entirely on the outcome of a yes/no proposition, typically relating to whether the price of a particular asset that underlies the binary option will rise above or fall below a specified amount.  Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset.  When the binary option expires, the option holder will receive either a pre-determined amount of cash or nothing at all.

30.     Dean also solicited investments in TEH through a closed Facebook group, called "The Entrepreneurs Headquarters," which he created on or about March 31, 2017 (the "Facebook Group").

31.     Dean, through Facebook profiles with the names "Dean Dillon" and "Dillon M. Dean," used the Facebook Group, as well as a smaller Facebook group for a "VIP plan" called "TEH Managed Accounts," to solicit investments in the TEH commodity pool and communicate with participants.  Over 2,000 Facebook users ultimately became members of the Facebook Group.

32.     Dean added other "administrators" to the Facebook Group, beginning with a Kentucky resident who had worked with Dean on a previous multi-level marketing scheme in or around 2014 ("Administrator 1"), and who was identified as the "Marketing Director" for TEH.

7

33.     Administrator 1 had no trading experience or understanding of commodity options trading, and did not invest any of his own funds in TEH, but solicited over forty customers who did invest.

34.     Dean told Administrator 1 that returns for customers would be generated by Dean trading commodity options on Nadex on behalf of customers, and Administrator 1 conveyed this message to potential customers when soliciting them to invest.

35.     Additional administrators of the Facebook Group were added by Administrator 1 and others.

36.     Administrators posted messages to the Facebook Group, controlled membership in the group, and participated in online streaming videoconferences accessible from the group page.

37.     During these videoconferences, administrators told customers that returns would be generated by Dean trading commodity options on Nadex on behalf of customers.

38.     Dean and other administrators also told customers that, in addition to Dean himself, a person using the name Propht Taurai Moyo on Facebook ("Moyo") was also trading on behalf of TEH customers.

39.     Upon information and belief, all of these representations by Defendants about their trading expertise and intention to generate profits for customers by trading binary options were knowingly false when made.

40.     Defendants were not trading commodity options on Nadex at all during the Relevant Period.

41.     Neither TEH nor Moyo ever had a trading account at Nadex.

42.     Dean had a personal trading account at Nadex that he opened in 2013.  Other than a period of 10 days in February 2017 (i.e., prior to the Relevant Period)—in which Dean *lost* $637.50 trading binary options on forex contracts—there was never any trading activity in the account.

**B.     Defendants' Purported Trading Profits**

43.     Defendants also made numerous representations to customers about their supposed trading profits.

44.     For instance, on July 9, 2017, Dean posted a Facebook message to TEH Managed Accounts purporting to disclose trading "results [for] the last few weeks" of that program, boasting of "a few awesome weeks" and promising to "get even better."  Included in the post was an image promoting weekly profits of 28.50%, 15.25%, and 19.50% for the first three weeks of the "TEH Managed Account" program, respectively; instructing customers to "Email for withdraw @ stockgains9@gmail.com"; and stating, "All money month withdrawn [sic] is compounded weekly."

45.     On July 15, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "17.6% this week. (for members) Was a good week but was really busy and was not able to trade as much as usual.  Next week I got my sights set on 30%."  Included in the post was a purported "screenshot" showing trading from "last week," consisting of an image showing certain details (mostly illegible)—including order number, time, type (buy/sell), product (e.g., "BrentCrude")—of twenty-five purported trades.

46.     On July 23, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating:  "15% last week.  Also waiting to close more trades from last week that will be added to this %.  $$$$$."

47.     On July 29, 2017, Dean posted a Facebook message to TEH Managed Accounts, stating: "Waiting on a huge trade on OIL.  This week will be recorded next week after oil and a few other trades are closed.  This week will be just like the previous time we had to wait on trades to close.  Thanks!  Patience = money."  The post included an image containing an unlabeled graphic that was illegible except for the handwritten phrase "massive profit."

48.     On August 8, Dean posted to the Facebook Group an image showing purported profitable results trading forex and crude oil derivatives on that date, along with the message "Just keep pumping away . . . with Propht Taurai Moyo."

49.     On August 13, Dean posted a Facebook message to TEH Managed Accounts, purporting to provide "the managed account weekly results for the past 8 weeks."  Dean's message reiterated the percentages provided in his July 9, 15, and 23 messages for Week 1 through Week 5, and represented that total profits for "Week 6-8 (3 weeks)" were "41.25%."

50.     On August 20, Dean posted a Facebook message to TEH Managed Accounts, stating: "11% this week… slow week trying to get our site back up and running."

51.     Upon information and belief, all of these purported trading profits were entirely fictitious, as Defendants were not actually engaged in trading on behalf of their customers during the Relevant Period.

**C.     Solicitation and Transfer of Customer Funds in Bitcoin**

52.     As explained on Defendants' website, Defendants only accepted investor deposits in Bitcoin.

53.     Defendants instructed customers to set up personal account pages at the TEH website (referred to by Defendants and customers as their "back office") and follow the instructions there to transfer Bitcoin to TEH from the customers' own cryptocurrency wallets.

54.     For instance, one customer who began investing with TEH in June 2017 ("Customer 2") was prompted by the TEH website to select one of three investment options (which varied by amount required to be invested, length of time of the investment, and promised rate of return).

55.     After Customer 2 selected the "Weekly VIP Plan," the TEH website provided him with an alphanumeric string to which to direct his payment of Bitcoin.

56.     Customer 2 then logged into his own Bitcoin wallet at Coinbase and directed Bitcoin to be paid from his wallet to the alphanumeric string provided by the TEH website.

57.     Customer 2 later received a confirmation email from CoinPayments.net, a cryptocurrency payment processor used by TEH, stating that he had successfully directed payment of Bitcoins to "The Entrepreneurs Headquarters."

58.     After customers such as Customer 2 transferred Bitcoin to TEH through CoinPayments.net and the payments were confirmed, they could log into their back office and see their account balance with TEH, denominated in U.S. dollars.

59.     For a period of time, Defendants made upwards adjustments to customers' back office U.S. dollar account balances on a regular basis, reflecting the high rates of return ("11%-17.5%" per week, or comparable daily rates) promised on Defendants' website.

60.     As promised on the TEH website ("Profits can be withdrawn at anytime [sic]"), customers were initially able to withdraw the interest on their principal investments by logging into their back office and requesting the transfer of Bitcoin (corresponding to the U.S. dollar amounts shown in their back office) from TEH to the customers' Bitcoin wallets.

61.     Between approximately April 2017 and August 2017, many customers made successful withdrawals of Bitcoin from their accounts.

**D.** **Defendants' Invention of a Hacking Incident in Order To Perpetuate Their Fraud**

62.     On August 9, 2017, a TEH customer whom Dean had added as an administrator of the Facebook Group on or about June 6, 2017 ("Administrator 2"), posted, while located in this District, a message to the Facebook Group that stated:

> URGENT MESSAGE..IT HAS BEEN BROUGHT TO OUR
> ATTENTION THAT SOME HAVE HAD THERE [sic]
> ACCOUNT HACKED AND WALLET CHANGED…ASAP GO
> CHANGE YOUR WALLET ADDRESS AND SAVE PLUS
> ENABLE ALL SECURITY[.]  IF YOU HAVE A PENDING
> WITHDRAW [sic] DOUBLE CHECK THE ADDRESS IT'S
> GOING TOO!!! [sic]  AND CHANGE YOUR EXSISTING [sic]
> PASSWORD AS WELL!!!!!"

63.     Later on August 9, Dean posted a message to the Facebook Group, stating: "CRAZY I detected a hacker, but everything is ok, and I have stopped who ever it was.  I have hared [sic] that some accounts got hacked, if they did, message me and I can fix the issue.  If you need to send me a message, send a fried [sic] request first if your [sic] not friends so the message goes to my primary inbox."

64.     Upon information and belief, there had been no hack of the TEH website, and Defendants knew, or recklessly disregarded the fact, that at the time they made each of these statements about the supposed hack the statements were false.

65.     Upon information and belief, the statements about the supposed hack were made by Defendants with the intent to deceive customers and conceal and perpetuate Defendants' fraud.

66.     On August 11, Dean posted a message to the Facebook Group identifying a "[s]uspicious email address" and stating:  "Do not respond to any emails from this guy . . . got to say the hacker is really trying his hardest lol."

67.     Later on August 11, Dean posted another message to the Facebook Group, stating: "Hacker is holding site for ransom LOL Do not touch the site I got an email titled 'i hacked you' and requesting reply and most likly [sic] funds for him to release back to me."

68.     Upon information and belief, Dean knew that the person with the supposedly suspicious email address had not hacked the TEH website, and that no one was holding the site "for ransom."

69.     Dean's message continued:  "Good thing I already have new site made!  Just am finishing the back end and with programmers now to speed up the process."  Dean provided a website address—http://dutysquad.com/demo/teh/index.php (the "preview website")—which, he wrote, "is what the new site will look like!"  In fact, this "new" preview website had been online since at least May 2017, and it contained substantially the same material as the purportedly hacked TEH website.

70.     Dean's message concluded by promising to provide "further instructions on how we will transfer to this site" and instructing customers to email him at stockgains9@gmail.com if they wished to make "any emergency withdraws [sic]" of funds.

71.     On August 13, Dean posted another message to the Facebook Group, stating: "Soon I will be collecting everyone's deposit amount and adding it to the new site when the programmer has it ready.  Just finishing the new back end."

72.     Later on August 13, Dean posted another message, stating that Defendants were "[w]orking hard on finishing the back end" of TEH's new website "so we can start the transfer."

73.     Dean's message continued:  "Money is safe and there are no problems."  He concluded:  "Apologize if I have not got to your message yet as I have 100s to go through."

74.    On August 14, Dean posted a message to the Facebook Group, claiming to have "processed over 100 emergency withdraws now," and asking customers to "please only do one if you really need it . . . the new site will be out soon."

75.    On August 17, Dean posted a message to the Facebook Group, stating: "All the data has been lost because of the hacker," and providing the following instructions to customers: "1) Send screenshots of your initial deposits into TEH from your wallet.  2) Send screenshots of all your withdraws made.  3) Send all screenshots here; -------→ transfertonewsite@gmail.com."

76.    Defendants then proceeded to post a series of "Updates" to the preview website, which updates were, upon information and belief, merely an attempt to continue to conceal their fraud by fabricating purported reasons for customers to delay taking action with respect to their investments.

77.    Defendants claimed on the preview website that as of August 19, 2017, they were "currently in the process of building the new site," and that, as of August 21, the "completion of the TEH back end will be 8/22/2017 (tomorrow)," stating: "The time estimation of creating each account accordingly is 2-3 days.  After that the site will be ready and open for business."

78.    On August 21, Defendants posted a message to the preview website claiming that they were "[c]ompleting the payment software needed to do the payments."

79.    On August 23, Defendants posted a message to the preview website claiming that they were "[w]orking as fast has [sic] we can so we can start the adding everyone accounts [sic]" as well as "working on editing and re-doing the content of the site."  The message stated that the "re-opening of the site will be between 8/26/2017-8/28/2017," i.e., within the next three to five days, "if everything goes according to plan."

80.     On September 2, Dean posted a message to the Facebook Group, stating that Defendants "will first find out what your active balance was before the site sent [sic] down." Dean promised that "[t]o cover the loss" from the time the original TEH website was down (and Defendants "were not able to trade as much"), "we will send you 18% of you active deposit PLUS adding the active deposit back onto a fresh new plan which will extend your earning days of the time we were down [sic]."

81.     In or around early September 2017, customers who had provided their information pursuant to Dean's August 17 instructions received emails from TEH using the address transfertonewsite@gmail.com, which purported to have credited the customers with their "active balance" plus eighteen percent because "[d]uring our down period, we were only trading about half the time due to site maintenance."  The emails stated that TEH's new website "is not fully active" but promised to provide a link to the website "soon."

**E.     Defendants' Misappropriation and Refusal To Return Customers' Funds**

82.     As Defendants attempted to delay, customers began to post messages to the Facebook Group that were critical of TEH and Dean, questioning the validity of their representations and promises.

83.     In response, Dean and other administrators removed such customers from the group, and ultimately Defendants moved their activity to a new closed Facebook group, called "Official Entrepreneurs Headquarters Group" (the "Official' Facebook Group").

84.     Ultimately, when Defendants provided the URL to TEH's new website, located at entrepreneursheadquarter.com, it contained substantially the same information as had already existed for months both on the original TEH website (theentrepreneurheadquarters.com) and the preview website.

15

85.     However, the extravagant daily and weekly returns promised to customers were reduced to almost zero.  Defendants offered no justification why their purported trading lost profitability so precipitously.

86.     In response to customers' requests for the return of their principal investments or purported earnings or fees that Defendants had represented to have been credited to their accounts, Defendants continued to make up excuses for their failure to pay redemptions.

87.     For instance, on December 9, 2017, Dean posted a message on the "Official" Facebook Group, stating:  "Withdraws; SLOWWW blockchain…btc was losing it there for a while lol I am waiting on a few large transactions to be moved over into our BTC wallet for the mass payment for everyone's withdraws."

88.     In recent weeks, when customers asked Defendants for the return of their funds, their requests were ignored.

89.     Dean has stopped responding to emails and other communications from customers who have previously asked for the return of their funds.

90.     Upon information and belief, Defendants have stopped making payments to customers of TEH, and have misappropriated over $1 million total in principal investments by customers.

91.     Meanwhile, Dean and other representatives of TEH have launched another purported trading venture, Real Trade Profits ("RTP"), which solicits new customers in a manner very similar to TEH—seeking investments in Bitcoin for a pooled investment, professing expertise and consistent results in binary options trading, and promising high rates of return—using the website realtradeprofits.com.

16

92.     According to its website, RTP is a "small group of self-taught traders who have developed two successful and unique trading techniques," who are "Experts on the Binary Options and Forex Platforms."

93.     The RTP website states:  "We have a [sic] automated payment platform that will automatically pay interest on all of your deposits into RTP.  Simply deposit and earn 20%-50% of all the profits we make that day which averages 1-10% return on your money everyday [sic] of the week . . . .  Your principal is returned to you at the end of the pay period, and you are able to withdraw all profits as well."  The website offers 14-day, 30-day, and 45-day "Interest Plans."

94.     As of December 4, 2017, RTP purported to have 65 members.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 4c(b) and Regulation 32.4
### (Options Fraud)

95.     Paragraphs 1 through 94 are realleged and incorporated herein by reference.

96.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

97.     Regulation 32.4, 17 C.F.R. § 32.4 (2017), provides that, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:  (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any

17

other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever.

98.     Defendants violated Section 4c(b) of the Act and Regulation 32.4, by, as alleged above, cheating and defrauding, or attempting to cheat and defraud, customers, in connection with Defendants' offers to enter into commodity option contracts.  Defendants misrepresented that they would trade binary options on Nadex and that customers would achieve returns of 11%-17.5% per week.  Defendants also misappropriated customer funds and never traded options with TEH customer funds.  Moreover, Defendants failed to disclose the high degree of risk associated with options trading and that it was possible to sustain a total loss of investment.  Defendants also concealed and perpetuated their fraud by falsely stating that their website was hacked.

99.     The foregoing acts, omissions, and failures by Dean and other officers, employees, and agents of TEH occurred within the scope of their employment or office with TEH.  Therefore, TEH is liable for its officers, employees, and agents' acts, omissions, and failures in violation of Section 4c(b) of the Act and Regulation 32.4, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

100.     Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4c(b) of the Act and Regulation 32.4.  As a controlling person of TEH, Dean is liable for TEH's violations of Section 4c(b) of the Act and Regulation 32.4, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

101.    Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act and Regulation 32.4.

## COUNT TWO

### Violations of Section 4*o*(1)(A)-(B)
### (CPO Fraud)

102.    Paragraphs 1 through 101 are realleged and incorporated herein by reference.

103.    During the Relevant Period, TEH acted as a CPO, as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, operated for the purpose of trading in commodity interests and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property (in the form of Bitcoins), either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including, in relevant part, commodity options authorized under Section 4c of the Act.

104.    An AP of a CPO is defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2017), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.  During the Relevant Period, Dean acted as an AP of TEH, in that he solicited funds, securities, or property (in the form of Bitcoins) for TEH's pool and supervised other officers, employees, and agents of TEH who solicited funds, securities, or property for TEH's pool.

105.     Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2012), prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes, or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

106.     While acting in its capacity as a CPO, TEH, by and through its officers, employees, and agents, knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) misrepresented to customers that the hacking of TEH's website and related issues were preventing Defendants from making customer funds available to customers; and (6) misappropriated pool participants' funds for unauthorized purposes rather than investing for the benefit of participants, and failed to disclose that pool participants' funds had been misappropriated.  Therefore, TEH violated Section 4*o*(1) of the Act.

107.     Dean directly violated Section 4*o*(1) of the Act while acting in his capacity as an AP of TEH, because he knowingly or recklessly:  (1) misrepresented to customers that approximately forty percent of their funds would be pooled and used to invest in, among other things, commodity options contracts for the benefit of customers; (2) misrepresented to

customers that Defendants had prior experience and success trading commodity options on Nadex; (3) misrepresented to customers that Defendants were using their funds to trade commodity options on Nadex and were doing so profitably; (4) mispresented to customers that Defendants were holding approximately sixty percent of their funds in reserve in order to facilitate withdrawals; (5) misrepresented to customers that the hacking of TEH's website and related issues were preventing Defendants from making customer funds available to customers; and (6) misappropriated pool participants' funds for unauthorized purposes rather than investing for the benefit of participants, and failed to disclose that pool participants' funds had been misappropriated.

108.    The foregoing acts, omissions, and failures by Dean and other officers, employees, and agents of TEH occurred within the scope of their employment or office with TEH.  Therefore, TEH is liable for its officers, employees, and agents' acts, omissions, and failures in violation of Section 4o(1) of the Act, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2.

109.    Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4o(1) of the Act.  As a controlling person of TEH, Dean is liable for TEH's violations of Section 4o(1) of the Act, pursuant to Section 13(b) of the Act.

110.    Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act.

## COUNT THREE

### Violations of Section 4m(1) and 4k(2) of the Act and Regulation 3.12(a)
### (Failure to Register as a CPO and as an AP of the CPO)

111.    Paragraphs 1 through 110 are realleged and incorporated herein by reference.

112.    During the Relevant Period, TEH, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO and was not exempt from registration as a CPO.  Thus, TEH acted as an unregistered CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012).

113.    During the Relevant Period, Dean, while acting as an AP of TEH, was never registered as an AP of TEH.  Thus, Dean violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2012), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2017), by acting as an unregistered AP of a CPO.

114.    Dean held and exercised direct and indirect control over TEH and either did not act in good faith or knowingly induced TEH's violations of Section 4m(1) of the Act.  As a controlling person of TEH, Dean is liable for TEH's violations of Section 4m(1) of the Act, pursuant to Section 13(b) of the Act.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Enter an order finding that Defendants violated Sections 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 6c(b), 6k(2), 6m(1), 6o(1)(A)-(B) (2012), and Regulations 3.12(a) and 32.4, 17 C.F.R. §§ 3.12(a), 32.4 (2017);

B.    Enter an order of permanent injunction restraining, enjoining, and prohibiting Defendants and any other person or entity in active concert with them from engaging in conduct

22

in violation of Sections 4c(b), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, and Regulations 3.12(a) and 32.4;

      C.      Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

      1)    Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

      2)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

      3)    Having any commodity interests traded on any Defendant's behalf;

      4)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      5)    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

      6)    Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

      7)    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person

registered, exempted from registration, or required to be registered with the

CFTC except as provided for in Regulation 4.14(a)(9);

D.      Enter an order requiring Defendants, as well as any of their successors, to

disgorge to any officer appointed by the Court all benefits received from acts or practices that

constitute violations of the Act and Regulations as described herein, including, but not limited to,

salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly,

plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

E.      Enter an order requiring Defendants, as well as any of their successors, to make

full restitution, pursuant to such procedure as the Court may order, to every person or entity who

sustained losses proximately caused by Defendants' violations (in the amount of such losses), as

described herein, plus pre-judgment interest thereon from the date of such violations, plus post-

judgment interest;

F.      Enter an order directing Defendants, as well as any of their successors, to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between them and any of the customers whose funds were

received by them as a result of the acts and practices which constituted violations of the Act and

Regulations, as described herein;

G.      Enter an order directing each Defendant to pay a civil monetary penalty, to be

assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of

the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584

(2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation

of the Act and Regulations, as described herein;

H.      Enter an order directing that Defendants, as well as any of their successors, make

an accounting to the Court of all of their assets and liabilities, together with all funds they

received from and paid to investors and other persons in connection with commodity interests

and all disbursements for any purpose whatsoever of funds received from commodity interests,

including salaries, commissions, interest, fees, loans, and other disbursement of money or

property of any kind from at least April 2017 to the date of such accounting;

I.      Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

J.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


January 18, 2018                                    Respectfully submitted,

                                                   COMMODITY FUTURES TRADING
                                                   COMMISSION

                                           By: s/ David C. Newman
                                                   David C. Newman
                                                   Senior Trial Attorney
                                                   dnewman@cftc.gov
                                                   (646) 746-9740

                                                   W. Derek Shakabpa, *pro hac vice pending*
                                                   Senior Trial Attorney
                                                   wshakabpa@cftc.gov

                                                   David W. MacGregor, *pro hac vice pending*
                                                   Chief Trial Attorney
                                                   dmacgregor@cftc.gov

                                                   Manal M. Sultan
                                                   Deputy Director
                                                   msultan@cftc.gov

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th floor
New York, NY 10005
Phone: (646) 746-9700
Fax: (646) 746-9940

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

# EXHIBIT 9

UNITED STATES OF AMERICA

Before the

COMMODITY FUTURES TRADING COMMISSION

_____

In the Matter of the Application of
LedgerX LLC for
Registration as a Swap Execution Facility

_____

### ORDER OF REGISTRATION

LedgerX LLC ("LedgerX") has submitted to the Commodity Futures Trading Commission ("Commission" or "CFTC"), pursuant to Section 5h of the Commodity Exchange Act ("Act"), 7 U.S.C. § 7b-3, and Commission Regulation 37.3(b), 17 C.F.R. § 37.3(b), an application for registration as a swap execution facility, which includes submissions dated January 13, 2017 through June 28, 2017.  Having reviewed LedgerX's application, the Commission makes the following findings and rulings:

WHEREAS in addition to its application for registration as a swap execution facility, LedgerX has applied for a registration to be a derivatives clearing organization; and

WHEREAS LedgerX has represented that it will not list an intended to be cleared swap until it has a clearing agreement with a registered derivatives clearing organization and it will not list a swap that is not intended to be cleared unless it revises its rulebook and other pertinent registration materials to provide for the execution of uncleared swaps;

The Commission FINDS that LedgerX has demonstrated, as required by Section 5h of the Act, 7 U.S.C. § 7b-3, that it complies with the provisions set forth in the Act, and the Commission's regulations thereunder applicable to it, for registration as a swap execution

1

facility, and LedgerX has provided sufficient assurance that it will continue to comply with the requirements of the Act and the Commission's regulations.

Therefore:

IT IS HEREBY ORDERED, pursuant to Section 5h of the Act and Commission Regulation 37.3(b)(6)(i), that LedgerX is granted registration as a swap execution facility, subject to the terms and conditions specified herein:

(1)     LedgerX shall comply with all representations and submissions made by LedgerX in support of its application for registration as a swap execution facility, as shown in the application record; including, but not limited to, its representations that it will not list an intended to be cleared swap until it has a clearing agreement with a derivatives clearing organization registered under Section 5b of the Act and it will not list a swap that is not intended to be cleared until it submits to the Commission revisions of its rulebook and other pertinent registration materials, pursuant to the provisions of Part 40 of the Commission's regulations, to provide for the execution of uncleared swaps; and

(2)     LedgerX shall comply with all provisions of the Act and all requirements set forth in the Commission's regulations, as may be amended or adopted from time to time, that are applicable to swap execution facilities.

Issued in Washington, D.C. on this 6th day of July, 2017.

By the Commission

Christopher J. Kirkpatrick
Secretary of the Commission

2

# EXHIBIT 10

IRISH TECH NEWS
(https://irishtechnews.ie)



(https://goo.gl/HUDpPc)



**BITCOIN, CRYPTO CURRENCIES, PATRICK PK MCDONNELL, THE COYOTE OF WALLSTREET, EXCLUSIVE IRISH TECH NEWS INTERVIEW**

SIMON COCKING (HTTPS://IRISHTECHNEWS.IE/AUTHOR/ADMIN/)   ×   OCTOBER 5, 2015

This website uses cookies to improve your experience.

Got It

Irish Tech News
Simon Cocking
Bitcoin, crypto currencies, Patrick PK McDonnell, the Coyote of Wallstreet, exclusive Irish Tech News in...

0m 0s                                                                                              6m 22s

1 x    ⟲        ▶        ⟳        Rate SpeechKit

By @SimonCocking (https://twitter.com/SimonCocking)

Patrick PK McDonnell *Crypto Dev, Dreamer, Enthusiast, Miner, Trader, Trickster, VC, Paid mind of 700+ Devs, Ex $TIT (https://twitter.com/search?q=%24TIT&src=ctag) Director of Biz Dev. My children are my wealth. #CryptosGOD (https://twitter.com/hashtag/CryptosGOD?src=hash)*

## What lead you into what you do now?

I entered Wall Street back in 1992 where I trained under Jordan Belfort founder of Stratton Oakmont, Inc. [The Wolf Of Wall St (https://sarahpaddleswim.wordpress.com/category/wolf-of-wallstreet/)]. I mastered the art of small cap market making at the age of 19 giving me a strategic advantage over NASDAQ traders where I implemented short selling techniques bankrupting many low capitalized broker-dealers including Biltmore Securities, Inc. a sister outfit of Stratton.

In 2013, I recognized that Bitcoin possessed many trading characteristics of NASDAQ investment vehicles yet unlike traditional security exchanges, cryptocurrency platforms reported both sides of the market [BID/ASK] with live inventory positions 100% visible due to blockchain transparency. This was a huge advantage in my trading success which led to me participate in 700+ R&D promotions that helped build many of the Altcoins we use today. My position in the cryptosphere is voluntary like all involved it's not about the money to me, but it is… if that makes any sense to you?

— My latest articles involving #Bitcoin (https://twitter.com/hashtag/Bitcoin?src=hash), #Blockchain (https://twitter.com/hashtag/Blockchain?src=hash), #Cryptocurrency (https://twitter.com/hashtag/Cryptocurrency?src=hash), #FinTech (https://twitter.com/hashtag/FinTech?src=hash) & More> https://t.co/ejGsILbzJA (https://t.co/ejGsILbzJA) #BTC (https://twitter.com/hashtag/BTC?src=hash) pic.twitter.com/Cs4tBulj9k (https://t.co/Cs4tBulj9k)

— ?atrick ?K McÐonnell (@CoyoteOfWallSt) September 27, 2015 (https://twitter.com/CoyoteOfWallSt/status/648243705938374656)

## What led you to developing and launching FINTECHinc?

I recently wrote an article on Bitcoin.com (https://bitcoin.com/) titled, Financial Giants Flock To Blockchain Technology, While Employees Left Clueless? (https://news.bitcoin.com/fintechedu-financial-giants-flock-blockchain-technology-employees-left-clueless/) which is where the idea grew legs. I preach awareness of Bitcoin/Blockchain/Cryptocurrency like no other outside of Bitcoin Jesus aka Roger Ver who I respect. FACT: To build a true eco-system with a solid infrastructure we need to educate the masses in-depth. The biggest problem with Bitcoin adoption is a lack of user knowledge & FINTECHinc. is my answer to FinTechEDU [FinTech Education].

## What's your role with www.Bitcoin.com?

My primary role at Bitcoin.com (https://bitcoin.com/) is commentary & writing. I volunteer my time although our writers are generally paid in BTC for their efforts. 10/31/15 we launch 'Bitsy' a comic strip [FinTech Funnies] something I hope our community enjoys as much as I do creating it. My core focus is helping Roger Ver build the Bitcoin Forum which is a place where community members can speak openly with **'no censorship'** unlike other biased venues in our sphere.

## There have been massive rises and falls in the value of Bitcoin – do you think it will continue to fluctuate in the future too?

Yes, there will always be fluctuation in the value of Bitcoin it's defined as a commodity by the CFTC just like crude oil or wheat. In time as more coins are mined we will stabilize above $10,000 USD per coin I believe.

> Ironically @AdamConover (https://twitter.com/adamconover) has done a #Bitcoin (https://twitter.com/hashtag/Bitcoin?src=hash) video? Should We Do a Bitcoin Sketch? (Hardly Working) https://t.co/lAHrqjvYhx (https://t.co/lAHrqjvYhx) @BTCTN (https://twitter.com/BTCTN) @RogerKVer (https://twitter.com/rogerkver)
>
> — ?atrick ?K McDonnell (@CoyoteOfWallSt) October 3, 2015 (https://twitter.com/CoyoteOfWallSt/status/650355071092424705)

## Who is Satoshi Nakamoto, some say he was one of my lecturers, (Micheal Clear) what do you think?  (and does it matter any longer?!)

Possibly the CIA, FBI or NSA? My reasoning is my own through endless hours of research, it's a very simple conclusion when you step out of Bitcoin & look at the full picture. Anyhow, Satoshi Nakamoto is not a person, he or it's a movement. Understanding the history of finance & the world's changing views of financial institutions & governments, ie: [Occupy WallStreet] is to understand Satoshi Nakamoto's true identity. We are 'all' Satoshi Nakamoto so it does not matter to me, what does matter most is 'proof on concept' that we can evolve into a society of trust without third party interference & biased regulation.

## Will we see a number of crypto currencies in the future or do you think there will be 'one bitcoin to unite them all' ?

We have 634 listed on www.CoinMarketCap.com (https://www.coinmarketcap.com/) already & hundreds of unreported private blockchains so it really depends on which cryptocurrency users choose to adopt. This is the beginning of CryptoNASDAQ (https://www.youtube.com/watch?v=nilWAgH2CFQ). We will see sector based cryptocurrencies fill niche

oriented markets & lead the way, ie: Titcoin ([http://www.titcoins.biz/](http://www.titcoins.biz/)) [Adult industry] reported on how it could have prevented the [Ashley Madison (https://news.bitcoin.com/titcoin-co-founder-warned-ashley-madison-user-privacy-issues/)](https://news.bitcoin.com/titcoin-co-founder-warned-ashley-madison-user-privacy-issues/) security breach recently. We have seen many cryptocurrencies fork & hybrid into one unit of value which basically is our form of merger. So all options are open… cryptocurrency is the clay, we await the hands of the world to mold it.

## How was the last 12 months?

Great! No complaints.

## Anything you'd do differently?

Sleep need more sleep! Working harder these days than ever.

## What trends are you excited about for the future of blockchain / crypto currencies?

I'm interested in seeing how the music industry utilizes blockchain technology it's a perfect fit. Overstock's CEO Patrick Byrne has some amazing things in the pipeline with Medici [NMS (http://cointelegraph.com/news/113281/patrick-byrne-medici-will-be-a-national-market-system-compliant-and-able-to-trade-everything)](http://cointelegraph.com/news/113281/patrick-byrne-medici-will-be-a-national-market-system-compliant-and-able-to-trade-everything) which is very exciting to me personally. Everything, just everything…


Wolf of Wall Street & Cryptocurrency w/ Patrick "PK" McDonnell

**Your twitter bio says you're a dreamer – how / where do you create space for this?**

I live my dreams through my children & blockchain R&D may it be a concept, idea or thought becoming a reality in tangible form. I've always had a knack for predictions that prove true. I was called an idiot for preaching DOW 10K by my peers in the 90's. It's all in my head…

**Life / work / online / offline how do you navigate a balance between these demands?**

Ask me I'll tell you easy, ask my wife she will tell you different. It's been a tough balance to be honest, but my youngest is about to turn 21 years old so we are not talking babies. I'm real tired but usually that is when I figure things out.

**What's your take on the Irish tech scene from where you're sitting?**

Ireland in general has done amazing in business over the past decade & contributions in the tech sector have expanded significantly. I've received a lot of support from many Irish Bitcoiner's the last couple years & greatly appreciate the love.

> It is true… we did meet with representatives of @AshleyMadison (https://twitter.com/ashleymadison) to talk about anonymous payment methods. #bitcoin (https://twitter.com/hashtag/bitcoin?src=hash) pic.twitter.com/pLfaMbIIJO (https://t.co/pLfaMbIIJO)
>
> — Titcoin eCurrency (@OfficialTitcoin) October 1, 2015 (https://twitter.com/OfficialTitcoin/status/649392545039024128)

**Why the *'Coyote of WallStreet'*?**

When Playboy ran their article (http://www.playboy.com/articles/titcoin-bitcoin-for-adult-industries)on Titcoin it just stuck. I think AVN & XBIZ put it out there first for article ratings due to Jordan's exposure at about the same time. I like Pat better though, I'm not proud of my time at Stratton. I address it because it comes up regularly.

(https://twitter.com/share?

(https://www.facebook.com/sharer.php?u=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&t=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

(https://www.linkedin.com/shareArticle?mini=true&url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&title=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

(https://buffer.app/add?url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&text=Bitcoin%2C%20crypto%20currencies)

(https://plus.google.com/share?url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F)

(https://www.evernote.com/clip.action?url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&title=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

(https://mail.google.com/mail/u/0/?

(https://www.reddit.com/submit?url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&title=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

(http://www.stumbleupon.com/badge?url=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&title=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

(https://www.tumblr.com/share/v=3&u=https%3A%2F%2Firishtechnews.ie%2Fbitcoin-crypto-currencies-patrick-pk-mcdonnell-the-coyote-of-wallstreet-exclusive-irish-tech-news-interview%2F&t=Bitcoin%2C%20crypto%20currencies%2C%20Patrick%20PK%20McDonnell%2C%20the%20Coyote%20of%20Wallstreet%2C%20exclusive%20Irish%20Tech%20News)

## You May Also Like:

?ATRICK ?K MCDONNELL (HTTPS://IRISHTECHNEWS.IE/TAG/%E1%B5%BDATRICK-%E1%B5%BDK-MCDONNELL/)

BITCOIN (HTTPS://IRISHTECHNEWS.IE/TAG/BITCOIN/)

COYOTE OF WALLSTREET (HTTPS://IRISHTECHNEWS.IE/TAG/COYOTE-OF-WALLSTREET/)

CRYPTO CURRENCIES (HTTPS://IRISHTECHNEWS.IE/TAG/CRYPTO-CURRENCIES/)

JORDAN BELFORT (HTTPS://IRISHTECHNEWS.IE/TAG/JORDAN-BELFORT/)

SATOSHI NAKAMOTO (HTTPS://IRISHTECHNEWS.IE/TAG/SATOSHI-NAKAMOTO/)

〈  PREVIOUS ARTICLE (HTTPS://IRISHTECHNEWS.IE/12-GREAT-BUSINESSES-TO-WATCH-IRISH-TECH-NEWS-BUSINESS-SHOWCASE-SEPTEMBER-HIGHLIGHTS/)
12 GREAT BUSINESSES TO WATCH. IRISH TECH NEWS BUSINESS SHOWCASE SEPTEMBER HIGHLIGHTS (HTTPS://IRISHTECHNEWS.IE/12-GREAT-BUSINESSES-TO-WATCH-IRISH-TECH-NEWS-BUSINESS-SHOWCASE-SEPTEMBER-HIGHLIGHTS/)

NEXT ARTICLE (HTTPS://IRISHTECHNEWS.IE/WHY-DATA-IS-SO-IMPORTANT-10-EXPERTS-TELL-US-THE-IRISH-TECH-NEWS-SEPTEMBER-DATA-DIGEST/)
WHY DATA IS SO IMPORTANT, 10 EXPERTS TELL US. THE IRISH TECH NEWS SEPTEMBER DATA DIGEST (HTTPS://IRISHTECHNEWS.IE/WHY-DATA-IS-SO-IMPORTANT-10-EXPERTS-TELL-US-THE-IRISH-TECH-NEWS-SEPTEMBER-DATA-DIGEST/)  〉



(https://goo.gl/79Yx5p)

**Subscribe to our Newsletter**

email address

Subscribe

  

(https://www.facebook.com/irishtechnews) (https://twitter.com/Irish_TechNews) (https://plus.google.com/+IrishtechnewsNet)

   

(https://www.linkedin.com/company/irish-tech-news) (https://www.pinterest.com/IrishTechNews/) (https://soundcloud.com/irish-tech-news) (mailto:info@irishtechnews.ie)



(https://feeds.feedburner.com/IrishTechNews)

**Follow Irish Tech News**

## PODCAST

Irish Tech News
Krystian Fikert The Founder Of MyMind

Cookie policy



## IRISH TECH NEWS – JOBS (https://irishtechnews.ie/jobs/)

Check out all the latest vacancies in our **Jobs** (https://irishtechnews.ie/jobs/) section

 (https://go.nordvpn.net/aff_c?offer_id=15&aff_id=10648&file_id=164)

COPYRIGHT © 2018 IRISH TECH NEWS - IRELAND'S LEADING TECHNOLOGY NEWS SITE. PART OF THE INFUSED MEDIA GROUP.

# EXHIBIT 11


FINRA

**BrokerCheck Report**

## PATRICK KERRY MCDONNELL SR

CRD# 2300028

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure Events | 5 |



**FINRA**

## About BrokerCheck®

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

· **What is included in a BrokerCheck report?**

  BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

· Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

· **Where did this information come from?**

  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:

  o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

· **How current is this information?**

  Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

· **What if I want to check the background of an investment adviser firm or investment adviser representative?**

  To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

· **Are there other resources I can use to check the background of investment professionals?**

  FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

·

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck

User Guidance



# PATRICK K. MCDONNELL SR

CRD# 2300028

This broker is not currently registered.

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

This broker is not currently registered.

### This broker has passed:

- 0 Principal/Supervisory Exams
- 1 General Industry/Product Exam
- 1 State Securities Law Exam

## Registration History

This broker was previously registered with the following securities firm(s):

**BARRON CHASE SECURITIES, INC.**
CRD# 18969
BOCA RATON, FL
07/1998 - 03/1999

**I. A. RABINOWITZ & CO.**
CRD# 5155
NEW YORK, NY
02/1997 - 04/1997

**DUKE & CO., INC.**
CRD# 8035
NEW YORK, NY
04/1996 - 07/1996

## Disclosure Events

This broker has been involved in one or more disclosure events involving certain final criminal matters, regulatory actions, civil judicial proceedings, or arbitrations or civil litigations.

Are there events disclosed about this broker?  **Yes**

The following types of disclosures have been reported:

| Type | Count |
|------|-------|
| Regulatory Event | 3 |

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.



www.finra.org/brokercheck

User Guidance

## Broker Qualifications

### Registrations

This section provides the self-regulatory organizations (SROs), states and U.S. territories the broker is currently registered and licensed with, the category of each registration, and the date on which the registration became effective. This section also provides, for each firm with which the broker is currently employed, the address of each branch where the broker works.

This broker is not currently registered.

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.



User Guidance

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 1 general industry/product exam, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Representative Examination | Series 7 | 06/10/1993 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 06/25/1993 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

www.finra.org/brokercheck

User Guidance



FINra

# Registration and Employment History

## Registration History

The broker previously was registered with the following securities firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 07/1998 - 03/1999 | BARRON CHASE SECURITIES, INC. | 18969 | BOCA RATON, FL |
| 02/1997 - 04/1997 | I. A. RABINOWITZ & CO. | 5155 | NEW YORK, NY |
| 04/1996 - 07/1996 | DUKE & CO., INC. | 8035 | NEW YORK, NY |
| 08/1995 - 02/1996 | BILTMORE SECURITIES, INC | 25023 | FT. LAUDERDALE, FL |
| 06/1993 - 03/1995 | STRATTON OAKMONT INC. | 18692 | LAKE SUCCESS, NY |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|

No information reported.

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

www.finra.org/brokercheck

User Guidance

# Disclosure Events

What you should know about reported disclosure events:

1. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, their employing firms, and regulators. When more than one source reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions are separated by a solid line with the reporting source labeled.

For your convenience, below is a matrix of the number and status of regulatory disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.

|  | Final | On Appeal |
|---|---|---|
| Regulatory Event | 3 | 0 |

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

www.finra.org/brokercheck

User Guidance

FINra

## Disclosure Event Details

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Regulatory - Final

This type of disclosure event involves a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, self-regulatory organization, federal regulator such as the Securities and Exchange Commission, foreign financial regulatory body) for a violation of investment-related rules or regulations.

### Disclosure 1 of 3

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Regulatory Action Initiated By:** | State of Michigan, Corporation, Securities & Land D*See FAQ #1* |
| **Sanction(s) Sought:** | |
| **Other Sanction(s) Sought:** | |
| **Date Initiated:** | 01/26/1999 |
| **Docket/Case Number:** | BD 8719 |
| **Employing firm when activity occurred which led to the regulatory action:** | |
| **Product Type:** | |
| **Other Product Type(s):** | |
| **Allegations:** | Not Provided |
| **Current Status:** | Final |
| **Resolution:** | Order |
| **Resolution Date:** | 01/26/1999 |
| **Sanctions Ordered:** | Cease and Desist/Injunction Revocation/Expulsion/Denial |
| **Other Sanctions Ordered:** | |
| **Sanction Details:** | Final Order to Revoke agent registration and to Cease and Desist pursuant to the Michigan Uniform Securities Act issued on 1/26/99 for being the subject of an Order from another state. The Order of Refusal of Applicant Registration, issued by the State of Georgia, stated "McDonnell is not of good business reputation". |

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

www.finra.org/brokercheck

User Guidance

FINRA

**Regulator Statement**    See above CONTACT: MATTHEW A. CURTIS
517-334-6209

**Disclosure 2 of 3**

**Reporting Source:**    Regulator

**Regulatory Action Initiated By:**    Maryland Division of Securities

**Sanction(s) Sought:**

**Other Sanction(s) Sought:**

**Date Initiated:**    07/16/1998

**Docket/Case Number:**    98-0886

**Employing firm when activity occurred which led to the regulatory action:**

**Product Type:**

**Other Product Type(s):**

**Allegations:**    Notice of Intent to Deny was issued 7/16/98 with the opportunity to either request a hearing or to withdraw the application. The Order to Show Cause was entered due to McDonnell's disciplinary history.

**Current Status:**    Final

**Resolution:**    Order

**Resolution Date:**    08/18/1998

**Sanctions Ordered:**    Revocation/Expulsion/Denial

**Other Sanctions Ordered:**

**Sanction Details:**    No response was received by the Division and the Order of Denial was issued 8/18/1998.

**Regulator Statement**    Application denied 8/18/98. CONTACT: ELLEN E. CHERRY, (410) 576-6494.

**Reporting Source:**    Broker

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

7

www.finra.org/brokercheck

User Guidance

FINJa

**Regulatory Action Initiated By:** STATE OF MARYLAND DIVISON OF SECURITIES

**Sanction(s) Sought:**

**Other Sanction(s) Sought:**

**Date Initiated:** 07/16/1998

**Docket/Case Number:** 98-0886

**Employing firm when activity occurred which led to the regulatory action:**

**Product Type:**

**Other Product Type(s):**

**Allegations:** COMMISSIONER OF STATE OF MARYLAND ISSUED AN ORDER TO SHOW CAUSE AND AN ORDER OF SUMMARY POSTPONEMENT. FAILURE TO REQUEST A HEARING WITHIN 15 DAYS OF RECEIPT OF ORDERS RESULTED IN AN ORDER OF DENIAL OF AGENT REGISTRATION.

**Current Status:** Final

**Resolution:** Order

**Resolution Date:** 08/18/1998

**Sanctions Ordered:** Revocation/Expulsion/Denial

**Other Sanctions Ordered:**

**Sanction Details:** ORDER OF DENIAL OF AGENT REGISTRATION ISSUED BY STATE OF MARYLAND

**Broker Statement** BROKER REFUSES TO SIGN

**Disclosure 3 of 3**

**Reporting Source:** Regulator

**Regulatory Action Initiated By:** ROBERT D. TERRY, GEORGIA ASSISTANT SECURITIES ASSISTANT

**Sanction(s) Sought:**

**Other Sanction(s) Sought:**

**Date Initiated:** 09/04/1998

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

8

www.finra.org/brokercheck

User Guidance

FINIa

**Docket/Case Number:** 50-98-001182

**Employing firm when activity occurred which led to the regulatory action:**

**Product Type:**

**Other Product Type(s):**

**Allegations:** MCDONNELL'S DISCIPLINARY HISTORY INDICATES A PATTERN OF ACTIONS WHICH CONSTITUTE DISHONEST AND UNETHICAL BUSINESS PRACTICES. CONSEQUENTLY HE IS "NOT OF GOOD BUSINESS REPUTATION."

**Current Status:** Final

**Resolution:** Other

**Resolution Date:** 09/04/1998

**Sanctions Ordered:** Revocation/Expulsion/Denial

**Other Sanctions Ordered:**

**Sanction Details:** IT IS HERBY ORDERED THAT MCDONNELL'S APPLICATION FOR REGISTRATION AS A SECURITIES SALESMAN IN GEORGIA BE REFUSED.

**Regulator Statement** CONTACT: GEORGIA SECURITIES ENFORCEMENT, 404/656-6409.

--------------------------------------------------

**Reporting Source:** Broker

**Regulatory Action Initiated By:** ROBERT D TERRY GEORGIA ASSISTANT SECURITIES

**Sanction(s) Sought:**

**Other Sanction(s) Sought:**

**Date Initiated:** 09/04/1998

**Docket/Case Number:** 50-98-001182

**Employing firm when activity occurred which led to the regulatory action:**

**Product Type:**

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

9

www.finra.org/brokercheck



**Other Product Type(s):**

**Allegations:** MCDONNELL'S DISCIPLINARY HISTORY INDICATES A PATTERN OF ACTIONS WHICH CONSTITUTE DISHONEST AND UNETHICAL BUSINESS PRACTICES.

**Current Status:** Final

**Resolution:** Other

**Resolution Date:** 09/04/1998

**Sanctions Ordered:** Revocation/Expulsion/Denial

**Other Sanctions Ordered:**

**Sanction Details:** MCDONNELL'S APPLICATION FOR REGISTRATION AS A SECURITIES SALESMAN IN GEORGIA BE REFUSED.

**Broker Statement** BROKER REFUSES TO SIGN

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.



User Guidance

End of Report

This page is intentionally left blank.

©2018 FINRA. All rights reserved. Report about PATRICK K. MCDONNELL SR.

# EXHIBIT 12

Case 1:18-cv-00361-JBW-RLM Document 21-2 Filed 02/23/18 Page 179 of 262 PageID #: 298

CLOSED,MJSELECT

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:03-cr-00166-ERK All Defendants

Case title: USA v. McDonnell

Date Filed: 02/21/2003

Assigned to: Judge Edward R. Korman

### Defendant (1)

**Patrick McDonnell**
*TERMINATED: 08/28/2003*

represented by **Andrew L. Carter , Jr.**
Federal Defenders of New York, Inc.
16 Court Street
Brooklyn, NY 11241
718-330-1253
Fax: 718-855-0760
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

### Pending Counts

18:1341 and 3551 et seq - FRAUDS AND SWINDLES.
(1)

### Disposition

Imprisoned for 30 months. 3 years supervised release with conditions. Special Assessment: $100.00. MODIFICATION OF SUPERVISION - Deft. shall submit his person, residence, vehicle, and any other premises under his control to a search upon reasonable suspicion that contraband or evidence of a violation of the conditions of supervision release/probation may be found. The search must be conducted in a reasonable manner and at a reasonable time. Failure to submit to a search may be grounds for revocation. Furthermore the deft. shall inform any other residents that the premises may be subject to a search pursuant to this condition

### Highest Offense Level (Opening)

Felony

### Terminated Counts

None

### Disposition

### Highest Offense Level (Terminated)

None

## Complaints

None

## Disposition

---

**Plaintiff**

**USA**        represented by **Eric Ross Komitee**
United States Attorney's Office
156 Pierrepont Street, 6th Floor
Brooklyn, NY 11201
718- 254-6240
Fax: 718- 254-7499
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2003 | 1 | Notice of intent to proceed under FRCrP 7(b) as to Patrick McDonnell. (Noh, Kenneth) (Ferdinand, Chellsa). (Entered: 02/21/2003) |
| 02/19/2003 | | Magistrate Mann has been selected by random selection to handle any matters that may be referred in this case. (Noh, Kenneth) (Entered: 02/21/2003) |
| 02/21/2003 | 2 | CALENDAR ENTRY as to Patrick McDonnell; Case called before Magistrate A. S. Chrein on date of 2/21/03. AUSA Eric Komittee present; dft present with counsel Andrew Carter. Tape #3/49. Speedy trial start 2/21 stop 3/14/03. (Noh, Kenneth) (Entered: 02/26/2003) |
| 02/21/2003 | 3 | ORDER of Excludable Delay by Patrick McDonnell (Signed by Magistrate A. S. Chrein Dated 2/21/03). (Noh, Kenneth) (Entered: 02/26/2003) |
| 03/07/2003 | 4 | CALENDAR ENTRY as to Patrick McDonnell; Case called before Magistrate Marilyn D. Go on date of 3/7/03. AUSA Deborah Mayer for Eric Komitee; dft present with counsel Andrew Carter. Tape 3/61(3252-3637). Waiver of indictment filed. (Noh, Kenneth) (Entered: 03/10/2003) |
| 03/07/2003 | 5 | WAIVER OF INDICTMENT by Patrick McDonnell. (Noh, Kenneth) (Entered: 03/10/2003) |
| 03/18/2003 | 6 | ORDER as to Patrick McDonnell, referring plea to USMJ Mann. (Signed by Chief Judge Edward R. Korman on 3/18/03). (Noh, Kenneth) (Entered: 03/19/2003) |
| 03/18/2003 | 7 | WAIVER OF INDICTMENT by Patrick McDonnell. (Noh, Kenneth) (Entered: 03/19/2003) |
| 03/18/2003 | 8 | FELONY INFORMATION as to Patrick McDonnell (1) count(s) 1. (Noh, Kenneth) (Entered: 03/19/2003) |
| 03/18/2003 | 9 | CALENDAR ENTRY as to Patrick McDonnell; Case called before Magistrate Roanne L. Mann on date of 3/18/03 for pleading. AUSA Sean Haran for Eric Komittee, dft present with counsel Andrew Carter. Tape 3/36 0-1723. Dft pleads Guilty: Patrick McDonnell (1) count(s) 1 . (Noh, Kenneth) (Entered: 03/19/2003) |
| 04/18/2003 | 10 | TRANSCRIPT filed in case as to Patrick McDonnell for pleading before USMJ Roanne L. Mann on 3/18/03. For the govt: AUSA Sean Haran. For the dft: Andrew Carter. (Noh, |

| | | Kenneth) (Entered: 04/21/2003) |
|---|---|---|
| 08/01/2003 | 12 | Minute Entry for proceedings held before Edward R. Korman :Sentencing held on 8/1/2003 for Patrick McDonnell (1), Count(s) 1. AUSA Eric Komitee for Sean Haran, Justine Harris for Drew Carter for dft. Statements of dft and counsel heard. Dft sentenced on count 1. Imprisoned for 30 months. 3 years supervised release with conditions that the dft pay restitution in the amount of $197,337.50 at the rate of 10% of net monthly income; dft to comply with the restitution order; dft to make full financial disclosure and dft to undergo mental health treatment. Dft waived right to appeal in plea agreement. Dft remanded. Court finds factual basis for, and accepts, rule 11 plea. Dft to pay a Special Assessment: $100.00. Dft to be incarcerated at the Fort Dix Facility. (Court Reporter Carasello.) (Nieves, Adrian) (Entered: 08/28/2003) |
| 08/05/2003 | 11 | Letter dated 8/1/03 from Justine A. Harris to USDJ Edward R. Korman requesting that the court sentence dft McDonnell to the bottom of the guidelines - 30 months. (Noh, Kenneth) (Entered: 08/05/2003) |
| 08/28/2003 | 13 | JUDGMENT as to Patrick McDonnell (1), Count(s) 1. Dft imprisoned for 30 months. The court recommends that the dft be incarcerated at the Fort Dix Facility. Upon release from imprisonment the dft shall be on 3 years supervised release. Special conditions of supervised release: that the dft pay restitution in the amount of $197,337.50 at the rate of 10% of net monthly income; dft to comply with the restitution order; dft to make full financial disclosure and dft to undergo mental health treatment as directed by the Probation Department. Special Assessment: $100.00. Copies distributed. Signed by Judge Edward R. Korman on 8/1/03. (Nieves, Adrian) (Entered: 08/28/2003) |
| 06/16/2009 | 14 | ORDER Modifying Conditions or Term of Supervision as to Patrick McDonnell. Deft. shall submit his person, residence, vehicle, and any other premises under his control to a search upon reasonable suspicion that contraband or evidence of a violation of the conditions of supervision release/probation may be found. The search must be conducted in a reasonable manner and at a reasonable time. Failure to submit to a search may be grounds for revocation. Furthermore the deft. shall inform any other residents that the premises may be subject to a search pursuant to this condition. Ordered by Senior Judge Edward R. Korman on 5/26/2009. (Greene, Donna) (Entered: 06/17/2009) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/07/2018 10:36:13 | | |
| **PACER Login:** | Cf016456:2523335:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:03-cr-00166-ERK |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT 13

LR:ERK
F. #2000R01027

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

PATRICK McDONNELL,

           Defendant.

- - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. 03-CR-166 (ERK)
(T. 18, U.S.C., §§ 1341
and 3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

        1.  In or about and between September 1999 and March 2002, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PATRICK McDONNELL did knowingly and intentionally devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did receive matter sent and delivered by a private and commercial interstate carrier.

        2.  It was a part of the scheme and artifice that the defendant PATRICK McDONNELL solicited customers to invest in foreign currency instruments through various investment companies that he controlled, each of which was located within the Eastern District of New York.  These companies included Rutherford Clearing Corporation, doing business as "U.S. Currency Traders";

2

J.P. Davenport & Co., Inc.; Momentum Currency Group, Ltd.; Greenway Consulting Group Ltd.; E.P.O. Corporation; F.A.M. Group Ltd.; and M.W. Group Ltd.

3.   It was a further part of the scheme and artifice that the defendant PATRICK McDONNELL advised the customers of such companies that he would purchase and sell foreign currency investments on their behalf through the investment companies if they provided such funds.

4.   It was a further part of the scheme and artifice that, once the defendant PATRICK McDONNELL received the funds for the purported foreign currency investments, he did not use the funds to purchase or sell foreign currency, but rather converted the money to his own use and the use of others, without the permission of rightful owners of the funds.

5.   It was a further part of the scheme and artifice that, on or about December 27, 1999, the defendant PATRICK McDONNELL caused a victim ("Victim #1") to send an account application and a check in the amount of $8,007.50 via Federal

3

Express to the Rutherford Clearing Corporation in Forest Hills, New York.

     (Title 18, United States Code, Sections 1341 and 3551 et seq.)

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

# EXHIBIT 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA        *       Case No.   03-CR-166(ERK)
                                *
                                *       Brooklyn, New York
                                *       March 18, 2003
        v.                      *
                                *
PATRICK McDONNELL,              *
                                *
            Defendant.          *
                                *
* * * * * * * * * * * * * * * * *

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:             SEAN HARAN, ESQ.
                                Asst. United States Attorney
                                United States Attorneys' Office
                                One Pierrepont Plaza
                                Brooklyn, NY 11201


For the Defendant:              ANDREW CARTER, ESQ.
                                The Legal Aid Society
                                Federal Defender Division
                                16 Court Street
                                Brooklyn, NY 11241


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

Christine Fiore
Fiore Transcription Service
67 Elaine Drive
Shelton, Connecticut 06484 (203)929-9992

2

1          (Proceedings commenced at 4:50 p.m.)

2          THE CLERK:   Criminal cause for guilty pleading,

3     United States against Patrick McDonnell, docket number 03-CR-

4     166.

5          Please step forward and state your appearances for

6     the record.

7          MR. HARAN:   Sean Haran for the United States.

8          Good afternoon, Judge.

9          THE COURT:   Good afternoon.

10         MR. CARTER:   Andrew Carter, Federal Defenders, for

11    Patrick McDonnell.   Good afternoon.

12         THE COURT:   Good afternoon.

13         Mr. McDonnell, I have before me an order of referral

14    from Judge Korman, the district court judge assigned to this

15    case.   This order refers the guilty plea proceeding to me to

16    hear. There's a consent portion at the bottom. Is that your

17    signature?

18         THE DEFENDANT:   Yes, it is.

19         THE COURT:   I'm going to ask you to keep your voice

20    up, because this proceeding is being tape recorded.  And if any

21    of your responses are not recorded, we're going to have to redo

22    the proceeding.   So please make sure you keep your voice up.

23         Did you read this order of referral, and have you

24    discussed it with Mr. Carter?

25         THE DEFENDANT:   Yes, I have.

3

1       THE COURT:  Do you understand what it is that you've

2   agreed to by signing this agreement?

3       THE DEFENDANT:  Yes, I do.

4       THE COURT:  I'm going to ask the defendant and Mr.

5   Carter to stand by the podium so the defendant will be speaking

6   into the microphone.

7       All right.  I want to make sure that you do

8   understand what you consented to.

9       This is Judge Korman's case.  He's a United States

10  District Court Judge, and he's the judge who will sentence you

11  and make the ultimate decision as to whether to accept your

12  guilty plea.

13      If you wish, you have the absolute right to have

14  Judge Korman listen to your plea.  And if you choose to do

15  that, there will be no prejudice to you.

16      Do you understand that?

17      THE DEFENDANT:  Yes, I do.

18      THE COURT:  On the other hand, if you wish, I will

19  listen to your plea.  I'm a United States magistrate judge.

20      A transcript will be made of the proceeding, and

21  Judge Korman will review the transcript to decide whether to

22  accept your plea.  He'll also review it in connection with your

23  sentence.

24      Do you understand that?

25      THE DEFENDANT:  Yes, I do.

4

1          THE COURT:  Again, please keep your voice up.

2          Do you wish to give up your right to have Judge

3      Korman listen to your plea and proceed instead before me at

4      this time?

5          THE DEFENDANT:  No.

6          THE COURT:  You don't want to proceed before me?

7          THE DEFENDANT:  Yes.  I want to plead in front of

8      Korman, yes.  I want to plead in front of Judge Korman.

9          Right?

10         MR. CARTER:  You don't want her to hear your guilty

11     plea?

12         THE DEFENDANT:  Yes.  I'll plead in front of you.

13         MR. CARTER:  Judge Korman will sentence you.

14         THE COURT:  Well, I want to make sure that --

15         THE DEFENDANT:  Okay.  Yes, that's what it is.

16         No.  I'll plead in front of you and be sentenced by

17     Judge Korman.

18         THE COURT:  All right.  Since you initially said you

19     wanted to go before Judge Korman, you consulted with your

20     attorney; I want to make sure that this is what you want to do.

21         Again, Judge Korman will be the judge who will

22     sentence you.

23         Do you wish to give up your right to have him listen

24     to the plea, and are you prepared to proceed before me at this

25     time?

5

1          THE DEFENDANT:  Yes, I'm prepared to proceed before

2     you.

3          THE COURT:  Do you make this decision voluntarily and

4     of your own free will?

5          THE DEFENDANT:  Yes, I do.

6          THE COURT:  Have any threats or promises been made to

7     you to induce you to have me hear your plea?

8          THE DEFENDANT:  No.

9          THE COURT:  All right.  I find that the defendant's

10    consent is knowing, intelligent and voluntary.

11          Mr. McDonnell, before accepting your guilty plea,

12    there are a number of questions that I have to ask you to make

13    sure that it's a valid plea.

14          If you don't understand any of my questions, please

15    say so and I'll reword the question.

16          Mr. Marco, would you swear the defendant?

17        (The defendant is sworn.)

18          THE CLERK:  Please state your name for the record.

19          THE DEFENDANT:  My name is Patrick McDonnell.

20          THE CLERK:  Thank you.

21          THE COURT:  Mr. McDonnell, you should understand that

22    having been sworn your answers to my questions will be subject

23    to the penalties of perjury if you do not answer truthfully.

24          Do you understand that?

25          THE DEFENDANT:  Yes, I do.

6

1          THE COURT:  Mr. McDonnell, how old are you?

2          THE DEFENDANT:  30.

3          THE COURT:  How far did you go in school?

4          THE DEFENDANT:  I have a GED.

5          THE COURT:  Are you now or have you recently been

6 under the care of a doctor or psychiatrist?

7          THE DEFENDANT:  No.

8          THE COURT:  In the past 24 hours, have you taken any

9 narcotic drugs, medicine, or pills, or drunk any alcoholic

10 beverages?

11         THE DEFENDANT:  No, I haven't.

12         THE COURT:  Have you ever been hospitalized or

13 treated for narcotic addiction or for any mental or emotional

14 problem?

15         THE DEFENDANT:  No.

16         THE COURT:  Is your mind clear now?

17         THE DEFENDANT:  Yes, it is.

18         THE COURT:  Do you understand what's going on here

19 now?

20         THE DEFENDANT:  Yes, I do.

21         THE COURT:  Have you seen a copy of the criminal

22 information that's been filed against you?

23         THE DEFENDANT:  Yes, I have.

24         THE COURT:  Have you discussed this information, this

25 document, with your attorney?

7

1          THE DEFENDANT:  Yes, I have.

2          THE COURT:  And you understand that this document

3    contains a felony charge?

4          Do you understand that?

5          THE DEFENDANT:  Yes, I do.

6          THE COURT:  Specifically, it alleges that you

7    participated in a mail fraud scheme.  And more specifically, it

8    alleges that between approximately September of 1999 and March

9    of 2002, you knowingly and intentionally devised a scheme and

10   artifice to defraud and to obtain money and property by means

11   of materially false and fraudulent representations, and that in

12   executing this scheme to defraud, you received matter sent and

13   delivered by a private and commercial interstate carrier.

14         And it further alleges that it was part of the scheme

15   that you solicited customers to invest in foreign currency

16   instruments through various investment companies that you

17   controlled, and further that you advised the customers that you

18   would purchase and sell foreign currency investments on their

19   behalf through these investment companies if they provided such

20   funds.

21         However, according to the charge, once you received

22   the funds, you did not use the funds to purchase or sell

23   currency, but rather you converted the money to your own use

24   and the use of others without the owners' permission.

25         In order to prove you guilty of the charge, the

8

1    government would have to prove the following beyond a

2    reasonable doubt.

3            First, that there was, in fact, a scheme or artifice

4    to defraud, or to obtain money or property by materially false

5    and fraudulent representations as alleged in the indictment.

6            Second, that you knowingingly and willfully

7    participated in the scheme to defraud with knowledge of its

8    fraudulent nature and with the specific intent to defraud.

9            Additionally, the government would have to prove that

10   in executing that scheme you used or caused the use of a

11   private or commercial interstate carrier as specified in the

12   indictment.

13           And, finally, the government would have to prove that

14   you acted knowingingly and willfully and not because of some

15   mistake or innocent reason.

16           And, by the way, a scheme to defraud is merely a plan

17   to deprive another of money or property by trick, deceit,

18   deception, or swindle.

19           Do you understand that charge?

20           THE DEFENDANT:  Yes, I do.

21           THE COURT:  I have before me a waiver of indictment

22   form.

23           Is that your signature on it?

24           THE DEFENDANT:  Yes, it is.

25           THE COURT:  Have you read this document and discussed

9

1        it with Mr. Carter?

2                    THE DEFENDANT:  Yes, I have.

3                    THE COURT:  Do you understand what you're giving up

4        by waiving indictment?

5                    THE DEFENDANT:  Yes, I do.

6                    THE COURT:  Let me just check something.

7               (Pause.)

8                    THE COURT:  I want to make sure that you do

9        understand what you're giving up by waiving indictment.

10                   You have a constitutional right to be charged by an

11       indictment of a grand jury.  You can, however, waive or give up

12       that right and consent to being charged by what's known as an

13       information of the United States attorney.

14                   Rather than an indictment, the felony charge that I

15       described to you earlier has been brought by the United States

16       attorney by filing an information.

17                   Unless you waive indictment, you may not be charged

18       with a felony unless a grand jury finds by returning an

19       indictment that there's probable cause to believe that a crime

20       has been committed and that you committed it.

21                   Do you understand that?

22                   THE DEFENDANT:  Yes, I do.

23                   THE COURT:  If you do not waive indictment, the

24       government could present this case to the grand jury and

25       request that the grand jury indict you.

10

1      A grand jury is composed of at least 16 and not more

2      than 23 persons, and at least 12 grand jurors must find that

3      there's probable cause to believe that you committed the crime

4      with which you are charged before you may be indicted.

5           Do you understand that?

6           THE DEFENDANT:  Yes, I do.

7           THE COURT:  If this case were presented to the grand

8      jury, the grand jury might or might not indict you.

9           Do you understand that?

10          THE DEFENDANT:  Yes, I do.

11          THE COURT:  If you waive indictment by the grand

12     jury, the case will proceed against you on the basis of the

13     U.S. attorney's information just as though you had been

14     indicted.

15          Do you understand that?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  Have you discussed the matter of waiving

18     your right to indictment by the grand jury with Mr. Carter?

19          THE DEFENDANT:  Yes, I have.

20          THE COURT:  Do you understand your right to

21     indictment by a grand jury?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  Have any threats or promises been made to

24     you to induce you to waive or give up your right to

25     indictment?

11

1          THE DEFENDANT:  No.

2          THE COURT:  Do you wish to waive your right to

3     indictment by a grand jury?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Mr. Carter, do you know any reason why

6     Mr. McDonnell should not waive indictment?

7          MR. CARTER:  No.

8          THE COURT:  All right.  I find that his waiver is

9     knowing, intelligent, and voluntary.

10          And if I neglected to say so earlier, I also find

11     that his consent to proceed before me is knowing, intelligent

12     and voluntary.

13          Mr. Carter, have you discussed the matter of pleading

14     guilty with your client?

15          MR. CARTER:  Yes.

16          THE COURT:  In your view, does he understand the

17     rights he'll be waiving by pleading guilty?

18          MR. CARTER:  Yes.

19          THE COURT:  Is he capable of understanding the nature

20     of these proceedings?

21          MR. CARTER:  Yes.

22          THE COURT:  Do you have any doubt as to his

23     competence to plead at this time?

24          MR. CARTER:  No.

25          THE COURT:  Have you advised him of the maximum

12

1    sentence and fine that can be imposed, and have you discussed

2    with him the effect of the sentencing guidelines?

3              MR. CARTER:  Yes.

4              THE COURT:  Mr. McDonnell, have you discussed your

5    case with Mr. Carter, and are you satisfied to have him

6    represent you?

7              THE DEFENDANT:  Yes, I am.

8              THE COURT:  You indicated earlier that you'd seen a

9    copy of the information, and you'd consulted with Mr. Carter

10   about that document.

11             Is that correct?

12             THE DEFENDANT:  That's correct.

13             THE COURT:  And you do understand that charge?

14             THE DEFENDANT:  Yes, I do.

15             THE COURT:  I now want to talk with you about the

16   rights that you'll be giving up by pleading guilty.

17             But the first and most important thing you have to

18   understand is that you do not have to plead guilty even if you

19   are guilty.

20             Under our system of law, the prosecutor has the

21   burden of proving the guilt of a defendant beyond a reasonable

22   doubt.

23             And if the prosecutor is unable to meet his burden of

24   proof, the jury has the duty to find the defendant not guilty

25   even if he is guilty.

13

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  If you plead not guilty, then under the

4   Constitution and the laws of the United States, you're entitled

5   to a speedy and public trial by jury with the assistance of

6   counsel on the charges contained in the indictment against you.

7          Do you understand that?

8          THE DEFENDANT:  Yes, I do.

9          THE COURT:  At the trial, you would be presumed to be

10  innocent, and the government would have to overcome that

11  presumption and prove you guilty by competent evidence and

12  beyond a reasonable doubt.

13         You would not have to prove that you were innocent.

14  And if the government were to fail in its burden of proof, the

15  jury would have the duty to find you not guilty.

16         Do you understand that?

17         THE DEFENDANT:  Yes, I do.

18         THE COURT:  In the course of a trial, the witnesses

19  for the government would have to come to court and testify in

20  your presence.

21         And your attorney would have the right to cross

22  examine the witnesses for the government, to object to evidence

23  offered by the government, and to offer evidence on your

24  behalf.

25         Do you understand that?

14

1         THE DEFENDANT:  Yes, I do.

2         THE COURT:  At a trial, while you would have the

3    right to testify if you chose to do so, you could not be

4    required to testify.

5         Under the Constitution of the United States, a

6    defendant in a criminal case cannot be forced to take the

7    witness stand at his trial and say anything that could be used

8    to show that he is guilty of the crime with which he is

9    charged.

10        If you decided not to testify, the Court would, at

11    your lawyer's request, instruct the jurors that they could not

12    hold that against you.

13        Do you understand that?

14        THE DEFENDANT:  Yes.

15        THE COURT:  If you plead guilty, I'll have to ask you

16    questions about what you did in order to satisfy myself and

17    Judge Korman that you are, in fact, guilty of the charge to

18    which you seek to plead guilty.

19        And you'll have to answer my questions and

20    acknowledge your guilt.  In that way, you'll be giving up the

21    right that I just described, that is, the right not to say

22    anything that would show that you're guilty of the crime with

23    which you are charged.

24        Do you understand that?

25        THE DEFENDANT:  Yes.

15

1          THE COURT:  If you plead guilty and the Court accepts

2     your plea, you'll be giving up your constitutional right to a

3     trial and the other rights that I've just described.

4          There will be no further trial of any kind and no

5     right to appeal the judgment of guilty.  The Court will simply

6     enter a judgment of guilty on the basis of your guilty plea.

7          Do you understand that?

8          THE DEFENDANT:  Yes, I do.

9          THE COURT:  Are you willing to give up your right to

10    a trial and the other rights that I've just discussed?

11         THE DEFENDANT:  Yes, I am.

12         THE COURT:  I have before me a plea agreement that's

13    been marked Court Exhibit 1.

14         Turning to the sixth and final page of that document,

15    is that your signature on the defendant's signature line?

16         THE DEFENDANT:  Yes, it is.

17         THE COURT:  Have you read this entire document and

18    discussed it with your lawyer?

19         THE DEFENDANT:  Yes, I have.

20         THE COURT:  Do you understand all of the terms and

21    conditions of this agreement?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Does this document fully and accurately

24    reflect your understanding of the agreement you've reached with

25    the government concerning your guilty plea?

16

1    THE DEFENDANT:  Yes.

2    THE COURT:  Other than the promises contained in this

3    document, has anyone made any promises that have caused you to

4    plead guilty?

5    THE DEFENDANT:  No.

6    THE COURT:  Has anyone made any promises to you as to

7    what your sentence will be?

8    THE DEFENDANT:  No.

9    THE COURT:  I now want to talk with you about the

10   sentencing scheme that's applicable here.

11   The statute that you're accused of violating carries

12   a prison term of up to five years.

13   Do you understand that?

14   THE DEFENDANT:  Yes, I do.

15   THE COURT:  The Court does not have complete

16   discretion as to what sentence to impose within that five-year

17   range.

18   There are presently in effect sentencing guidelines.

19   They're really rules of law that limit the Court's discretion

20   in imposing a sentence within the five-year range provided by

21   statute.   The guidelines limit how high a sentence can be

22   imposed and how low a sentence can be imposed.

23   In addition, there may be factors present that would

24   allow the Court to depart from the guidelines either upwardly

25   or downwardly.

17

1          Until sentencing, when everyone receives the pre-

2     sentence report and Judge Korman hears from you, your lawyer,

3     and the government, you cannot know with certainty what the

4     guidelines will be or whether there will be grounds to depart

5     from them.

6          Do you understand that?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  I nevertheless do ask the attorneys to

9     give their best estimate of what the guidelines are likely to

10    say, keeping in mind that it's simply a guess on their part and

11    that it could be wrong.

12         Do you understand that?

13         THE DEFENDANT:  Yes, I do.

14         THE COURT:  Mr. Haran, I take it the government's

15    calculations are set forth in paragraph 2 of the agreement.

16         MR. HARAN:  That's correct, Judge.

17         THE COURT:  And you've calculated an adjusted offense

18    level of 19, which carries a range of imprisonment of 33 to 41

19    months, assuming the defendant falls within Criminal History

20    Category 2; is that right?

21         MR. HARAN:  That's right.

22         THE COURT:  And, Mr. Carter, have you done your own

23    calculation under the guideline?

24         MR. CARTER:  Yes.

25         THE COURT:  And what is the result of your

18

1  calculation?

2          MR. CARTER:  I estimate that my client would be in

3  Criminal History Category 1, therefore the range would be 30 to

4  37 months.

5          We also would preserve the right to challenge some of

6  the enhancements in the plea agreement, particularly the

7  obstruction of justice.

8          If we were to prevail on that, the guideline range

9  would be 24 to 30 months.

10         THE COURT:  All right.  Mr. McDonnell, you heard what

11  your lawyer said.  Any issues about how the guidelines should

12  be calculated are for Judge Dearie to decide.

13         Do you understand that?

14         THE CLERK:  It's Judge Korman.

15         THE COURT:  I'm sorry.  Judge Korman to decide.

16         In other words, he's not bound by the position of one

17  party or the other.  And, indeed, on those issues on which

18  they're both in agreement, he's still not bound by their views.

19         Do you understand that?

20         THE DEFENDANT:  Yes, I do.

21         THE COURT:  Now, I want to point out a particular

22  provision of this agreement.

23         Paragraph 4 provides in substance and in part that

24  you will not file an appeal or otherwise challenge your

25  conviction or sentence in the event the Court imposes a term of

19

1    imprisonment of 41 months or below.

2           And, again, 41 months is the upper end of the range

3    that's been estimated by the government.

4           Now, Mr. Carter has indicated that he takes issue

5    with the government's calculation.  For example, he said he

6    believes you fall within Criminal History Category 1 rather

7    than Category 2 as calculated by the government.

8           He additionally has indicated that he may challenge

9    the obstruction of justice two-point enhancement.

10          This agreement does not preclude him or you from

11   making these arguments prior to the time Judge Korman imposes

12   sentence.  And, indeed, you and he are free to make any and all

13   good faith arguments that you can before sentence is imposed as

14   to why you should be sentenced to something less than 41

15   months.

16          For example, you're free to argue that you should be

17   sentenced at the low end of the guidelines range, whatever that

18   range might be.

19          However, because of the language in paragraph 4, once

20   Judge Korman imposes sentence, as long as he does not impose a

21   prison term of more than 41 months, that's the end of it.

22          You've agreed that you will not file an appeal or

23   otherwise challenge your conviction or sentence in that event.

24          Do you understand that?

25          THE DEFENDANT:  Yes, I do.

20

1         THE COURT:  In addition to the prison term, the

2        sentencing Court can also impose a supervised release term of

3        up to three years.

4         The supervised release term will follow any term of

5        imprisonment.  And if you violate a condition of your release,

6        you could then be sent back to prison for up to an additional

7        two years.

8         If that happened, you would not receive credit for

9        time already spent in prison, nor would you receive credit for

10       time already spent on post-release supervision.

11         Do you understand that?

12       THE DEFENDANT:  Yes, I do.

13         THE COURT:  In other words, if you violate a

14       condition of supervised release, you could end up spending up

15       to an additional two years in jail regardless of how much time

16       you may have already spent in jail or on supervised release.

17         Do you understand that?

18       THE DEFENDANT:  Yes, I do.

19         THE COURT:  In addition to the prison term and

20       supervised release term, the sentencing Court can also impose

21       a fine of up to the greater amount of either $250,000 or twice

22       the gross gain or loss from the offense.

23         And I gather, Mr. Haran, that the government's

24       estimate of the gain or loss in this case is 150,000?

25         MR. HARAN:  That's correct.

21

1       THE COURT:   So, if that estimate is correct, the

2   maximum fine would then be as high as 300,000; correct?

3       MR. HARAN:   That sounds right, Judge, yes.

4       THE COURT:   All right.   And, Mr. McDonnell, to the

5   extent that there is an issue about gain or loss, again, that

6   would be up to Judge Dearie to determine.

7       Do you understand that?

8       Judge Korman, I'm sorry. I just had another case that

9   involved Judge Dearie.

10      It would be up to Judge Korman to determine what the

11  amount is.

12      Do you understand that?

13      THE DEFENDANT:   Yes, I do.

14      THE COURT:   But you do understand that the maximum

15  fine could be greater than 250,000 and could be as high as

16  twice what the gain or loss is?   Do you understand that?

17      THE DEFENDANT:   Yes, I do.

18      THE COURT:   In addition to the prison term and

19  supervised release term and fine, the sentencing Court can also

20  require that you make restitution to the victim or victims of

21  your offense.   The government has estimated that the

22  restitution would be $150,000.

23      Again, it would be for Judge Korman to make the

24  determination.

25      Do you understand that?

22

1          THE DEFENDANT:  Yes, I do.

2          THE   COURT:   And  I  do  want  to  point  out  the

3    distinction between a fine and restitution.

4          A fine is a penalty that the defendant is required to

5    pay  to  the  United  States  Treasury  as  punishment  for  his

6    misconduct.

7          Restitution, on the other hand, is an amount that the

8    defendant  is  ordered  to  pay  to  make  his  victim  or  victims

9    whole, as a remedy to them.

10         And even though in this case the fine could be keyed

11   to  the  loss  to  the  victims,  nevertheless,  a  fine  and

12   restitution are separate elements of a sentence.  And the Court

13   could both require that you make restitution and also that you

14   pay a fine in the amount of twice your victims' losses.

15         Do you understand that?

16         THE DEFENDANT:  Yes, I do.

17         THE  COURT:   And that would be  in  addition  to  the

18   other   penalties   that   I've   already   described,   including

19   imprisonment and a supervised release term.

20         Do you understand that?

21         THE DEFENDANT:  Yes, I do.

22         THE  COURT:   And  in  addition  to  all  of  the  other

23   consequences that I've already described, the sentencing Court

24   will impose a mandatory $100 special assessment.

25         Do you understand that?

23

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you have any questions you'd like to

3     ask me about the charge, your rights, or anything else relating

4     to this matter?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Are you ready to plead?

7          THE DEFENDANT:  Yes, I am.

8          THE COURT:  Mr. Carter, do you know any reason why

9     the defendant should not plead guilty?

10         MR. CARTER:  No, Your Honor.

11         THE COURT:  Are you aware of any viable legal defense

12    to the charge?

13         MR. CARTER:  No, I am not.

14         THE COURT:  Mr. McDonnell, what is your plea to the

15    count in the information, guilty or not guilty?

16         THE DEFENDANT:  Guilty, Your Honor.

17         THE COURT:  Are you making this plea of guilty

18    voluntarily and of your own free will?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Has anyone threatened or forced you to

21    plead guilty?

22         THE DEFENDANT:  No.

23         THE COURT:  Has anyone made any promise to you as to

24    what your sentence will be?

25         THE DEFENDANT:  No.

24

1      THE COURT:  Again, the information charges that

2  between approximately September of 1999 and March of 2002 you

3  engaged in mail fraud in connection with your soliciting

4  customers to invest in foreign currency instruments through

5  various investment companies that you controlled.

6      And that in connection with that scheme, you

7  solicited and received funds for such investments; but rather

8  than using the funds to purchase or sell foreign currency, you

9  converted the money to your own use and for the use of others

10  without the owners' permission.

11      Did you, in fact, do that?

12      THE DEFENDANT:  Yes, I did.

13      THE COURT:  Would you tell me in your own words

14  exactly what you did and what you knew at the time?

15      THE DEFENDANT:  What I did was set up a bunch of

16  companies and telemarket investors to purchase foreign currency

17  investments, and utilized the funds to my own benefit.

18      THE COURT:  And when you set them up and solicited

19  and received monies from investors, was it your intention to

20  keep the funds for your own use or for the use of others

21  without the permission of the investors you had solicited?

22      THE DEFENDANT:  To be honest with you, initially, no.

23  But eventually I did.

24      THE COURT:  And when you say "eventually," tell me

25  when that was and what you did at that point.

1    THE DEFENDANT:  Well, there just came a point where

2    I wasn't used to having that much money in my hands and, you

3    know, I had outstanding bills and things, and just things I

4    wanted.  And I used their assets to purchase things and to live

5    the lifestyle I wanted.

6        THE COURT:  And did you continue to solicit other

7    investors after you started doing that; after you started

8    diverting and converting the funds to your own use?

9        THE DEFENDANT:  Absolutely.

10       THE COURT:  And at that point, did you continue to

11   represent to investors that you were going to be using the

12   money to make foreign currency investments?

13       THE DEFENDANT:  Yes, I did.

14       THE COURT:  And at that point, were those

15   representations knowingly false?

16       THE DEFENDANT:  Yes, they were.

17       THE COURT:  And can you tell me just generally when

18   that conduct occurred, the fraudulent conduct?

19       THE DEFENDANT:  I would say between what the

20   government has, September 1999 is when they started initially.

21       THE COURT:  And March of 2002?

22       THE DEFENDANT:  Actually, up until May 2002.

23       THE COURT:  And at what point -- you said initially

24   you went into this without intending to convert the funds.  At

25   approximately what point did you start using the money for your

26

1  own purpose and defrauding subsequent investors?

2        THE   DEFENDANT:   I   would   say   somewhere   in   the

3  beginning of October.

4        THE COURT:  Of 1999?

5        THE DEFENDANT:  1999.

6        THE COURT:  And on approximately December 27th, 1999,

7  did  you  cause  one  of  the  investors  to  send  an  account

8  application and a check in the amount of more than $8,000 by

9  Federal  Express  to  the  Rutherford  Clearing  Corporation  in

10  Forest Hills, New York?

11        THE DEFENDANT:  I'm sure.

12        THE COURT:  And was that an application and a check

13  to make an investment that, in fact, you did not intend to

14  invest but to convert to your own use?

15        THE DEFENDANT:  That's correct.

16        THE COURT:  And you knew it was wrong to do that?

17        THE DEFENDANT:  Yes, I did.

18        THE COURT:  Mr. Haran, is there any further inquiry

19  you'd like me to make of the defendant?

20        MR. HARAN:  No, Judge.

21        THE COURT:  All right.  Based on the information

22  provided  to  me,  I  find  that  the  defendant  is  acting

23  voluntarily,  that  he  fully  understands  his  rights  and  the

24  consequences of his plea, and that there is a factual basis for

25  the plea.

27

1          I, therefore, recommend acceptance of the plea of

2     guilty for the one count in the information.

3          I take it Probation is going to be setting the

4     sentence?

5          THE CLERK:  That's right, Judge.

6          THE COURT:  All right.  The Probation Department will

7     set a date for your sentencing before Judge Korman.

8          The Probation Department will also be preparing a

9     pre-sentence report.  I urge you to cooperate with the

10    probation officer.

11         Is there anything further?

12         MR. HARAN:  Nothing further.

13         THE COURT:  Thank you very much.

14         THE DEFENDANT:  Thank you.

15      (Proceedings concluded at 5:30 p.m.)

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, Christine Fiore, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of proceedings in the matter of:

UNITED STATES OF AMERICA

V.

PATRICK McDONNELL

Date:    March 18, 2003

Place:   Brooklyn, New York

where had as therein appears, and that this is the original transcript thereof for the files of the United States District Court.

_____        Date: April 15, 2003
        Christine Fiore
        Transcriber

# EXHIBIT 15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
—vs—

JUDGMENT IN A CRIMINAL CASE
(FOR OFFENSES COMMITTED ON OR AFTER NOVEMBER 1, 1987)

_____ PATRICK MCDONNELL _____

CASE NO.: CR-03-166
COUNSEL: ANDREW CARTER

THE DEFENDANT:

X    pleaded guilty to count(s)____SINGLE COUNT INFORMATION_____
____ was found guilty on count(s)_____
     after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s),
which involve the following offenses:

| Title/Section | Nature of Offense | Date concluded | Count # |
|---|---|---|---|
| 18:1341 | FRAUD AND SWINDLING | 3/2002 | 1 |

     The deft is sentenced as provided in pgs. 2 through    4
of this judgment.  The sentence is imposed pursuant to the
Sentencing Reform Act of 1984.

____ The deft has been found not guilty on cts.  _____ and
     is discharged as to such cts.
____ Count(s)_____is/are dismissed on motion of A.U.S.A.
X    It is ordered that the deft shall pay a special assessment of
     $  100.00    for count(s)    ONE_____.

IT IS FURTHER ORDERED that the deft shall notify the U.S. attorney
for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special
assessments imposed by this judgment are fully paid.

Defts S.S. No. ███████████

AUGUST 1, 2003_____
Date of imposition of sentence

Defts D.O.B. ███████████

Defts USM No: ███████████

Signature of Judicial Officer

Defts residence address:

___ EDWARD R. KORMAN,U.S.D.J.___
Name/Title of Judicial Officer

CUSTODY_____
_____

A TRUE COPY ATTEST
DATED_____
ROBERT C. HEINEMANN
        CLERK
BY_____
      Deputy Clerk

Deft:       PATRICK MCDONNELL       Judgment -Page 2 of 4

Case Number:    CR-03-166 _____

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of:
THIRTY (30) MONTHS.

__X__       The Court makes the following recommendations to the Bureau of Prisons:

THAT THE DEFT. BE INCARCERATED AT THE FORT DIX FACILITY.

__X__       The defendant is remanded to the custody of the U.S.Marshal.

____       The defendant shall surrender to the U.S.Marshal for this district.
     ___ at _____ on _____.
     ___ as notified by the U.S. Marshal.

_____       The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
     ___ by _____.
     ___ as notified by the U.S.Marshal.
     ___ as notified by the Probation Office.

## RETURN

I have executed this judgment as follows:_____

_____
_____
_____

Defendant delivered on _____ to _____
at _____ with a certified copy of
this judgment.

_____
United States Marshal

_____
By            Deputy Marshal

Deft: PATRICK MCDONNELL      Judgment –Page 3 of 4

Case Number:   CR-03-166

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of   THREE (3) YEARS.

## ADDITIONAL CONDITIONS:

THAT THE DEFT. PAY RESTITUTION IN THE AMOUNT OF $197,337.50 AT THE RATE OF 10% OF NET MONTHLY INCOME; THAT THE DEFT. COMPLY WITH THE RESTITUTION ORDER; THAT DEFT MAKE FULL FINANCIAL DISCLOSURE. THAT DEFT UNDERGO SUCH MENTAL HEALTH TREATMENT AS DIRECTED BY PROBATION;

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state , or local crime.

The defendant shall not illegally possess a controlled substance.

For offenses committed on or after September 13, 1994:

    The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

\_\_\_ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

x \_\_\_ The defendant shall not possess a firearm as defined in 18 U.S.C. Section 921.

    If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth above.
    The defendant shall comply with the standard conditions that have been adopted by this court(set forth below). The defendant shall also comply with the additional conditions set forth above.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instruction of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol;

8) the defendant shall not frequent places where controlled substance are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement

# EXHIBIT
# 16

# *STATE OF NEW YORK*

# *DEPARTMENT OF STATE*

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on January 11, 2018.

Brendan Fitzgerald
Executive Deputy Secretary of State

Rev. 09/16

# CERTIFICATE OF INCORPORATION
## OF
## CabbageTech, Corp.
Under Section 402 of the Business Corporation Law

**FIRST:** The name of the corporation is:

**CabbageTech, Corp.**

**SECOND:** This corporation is formed to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law, provided that it is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

**THIRD:** The county, within this state, in which the office of the corporation is to be located is NEW YORK.

**FOURTH:** The total number and value of shares of common stock which the corporation shall have authority to issue is: 200 SHARES WITH NO PAR VALUE.

**FIFTH:** The Secretary of State is designated as agent of the corporation upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process against the corporation served upon him or her is:

CabbageTech, Corp.
20 Rawson Place
Suite B
Staten Island, NY 10314

I certify that I have read the above statements, I am authorized to sign this Certificate of Incorporation, that the above statements are true and correct to the best of my knowledge and belief and that my signature typed below constitutes my signature.

Shawn Scott  (signature)
_____

Shawn  Scott, INCORPORATOR

**Filed by:**
Patrick McDonnell

**FILED WITH THE NYS DEPARTMENT OF STATE ON: 05/06/2016**
**FILE NUMBER: 160506010070; DOS ID: 4942494**

# EXHIBIT 17

Ethereum [BLOCKCHAIN: ETH]

**BUY ALERT [Initiated Coverage Report] – ACTION: ACCUMULATE**

Coin Drop Markets "A Division of CabbageTech, Corp." -- Published: February 20, 2017

IPO's & IPO's ARE LAUNCHING ON THE BLOCKC
Got a question in regards to this report? Give us a call! Toll Free: 1:888.614.6445



**ENTRY POINT:** $12.77
**52-Week:** $4.64-$14.97
**Market Cap:** 1.1B
**Projected ROI:** 300%+
**Coins Outstanding:** 89,051,215M
**Target Price:** $49.00-$50.00
**Time Horizon:** 36 Month Hold

### Live Ethereum Trading



### Securely Buy/Sell Ethereum



# DIGITAL CURRENCY OVERVIEW

*Ethereum – BLOCKCHAIN: ETH is a decentralized platform that runs smart contracts: applications that run exactly as programmed without any possibility of downtime, censorship, fraud or third party interference. Apps run on a custom built blockchain, an enormously powerful shared global infrastructure that can move value around and represent the ownership of property. ETH is a world computer that can't be shut down.* **We are entering Ethereum, BLOCKCHAIN Ticker Symbol: ETH for the following reasons;**

Ethereum digital currency is -0.30% in Monday trading as the core development and research teams build upon progress made within the past 12 months. Ethereum has become the premier blockchain of choice for tech industry giants exploring application and usage for seamless integration. IBM's early exploration into ETH and Microsoft Azure's Blockchain-as-a-Service (BaaS) marketplace certification of Ethereum Blockchain Software for Enterprises is monumental. Azure's 'first-in' adoption strategy of Ethereum brings confidence and credibility with Microsoft pioneering internet infrastructure via Windows P2P software distribution. Ethereum has the second largest MCAP in digital currency with over 100 liquid trading markets.

Ethereum is an inflationary play meaning there is no limit to the amount of ETH that can be created with a total 89,051,215M coin supply currently in circulation. Historically, most digital currencies are designed as deflationary, ETH technology favors an inflationary supply. Uncapped supplies encourage users to digitally transact using ETH rather than participating on pure price speculation of global exchange rates leading to more active and useful blockchain applications. Ethereum is the only digital asset outside of Bitcoin traded on both Coinbase and Gemini US regulated exchanges affording deep liquidity to market participants. *Winklevoss ETF SEC approval naturally would bring Ethereum integration attracting institutional capital.

*NOTE: Ethereum enables developers to create markets, store registries of debts or promises, move funds in accordance with instructions given long in the past (like a will or a futures contract) and many other things that have not been invented yet, all without a middle man or counterparty risk.*

Ethereum takes the concept of blockchain distributed ledger systems one step further adding to the technology a capacity for what are known as "smart contracts" aka "smart property" which are encrypted digital contracts automatically honored by the distributed ledger system itself at a predetermined forward date and/or value once struck between executing parties. Ethereum blockchain-based application and project growth is rapid with a highly respected team of professionals steadfast in building the ETH eco-system, in turn, creating a viable storage of wealth for early stakeholders. We view Ethereum as an undervalued asset whose revolutionary smart contract technology will rewrite contractual agreements world-wide.

### We are establishing an initial target price of $49.00-$50.00 per coin.

COIN DROP MARKETS
Toll Free: +1.888.614.6445 • Website: www.coindrops.club
A CabbageTech, Corp. Publication -- All Rights Reserved

# EXHIBIT 18

# EXHIBIT 19

1/10/2018
ANN: Coin Drop Markets launches the world's 1st #Litecoin Analyst Rating System!
Case 1:18-cv-00361-JBW-RLM Document 21-2 Filed 02/20/18 Page 228 of 262 PageID #: 347



**Bitcoin Forum** — simple machines forum

January 10, 2018, 07:21:34 PM

Welcome, **Guest**. Please login or register.

**News:** ◆ Electrum users must upgrade to 3.0.5 if they haven't already. More info.

[Search]

HOME | HELP | SEARCH | DONATE | LOGIN | REGISTER

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderator: mprep) > **ANN: Coin Drop Markets launches the world's 1st #Litecoin Analyst Rating System!**

« previous topic next topic »

Pages: [1]   print

| Author | Topic: ANN: Coin Drop Markets launches the world's 1st #Litecoin Analyst Rating System! (Read 361 times) |

This is a self-moderated topic. If you do not want to be moderated by the person who started this topic, create a new topic.

**LitecoinLouie**
Newbie

Activity: 1

**ANN: Coin Drop Markets launches the world's 1st #Litecoin Analyst Rating System!**
May 08, 2017, 08:22:35 PM                                  #1

**Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System!**

The **Coin Drop Markets** development team has launched the world's 1st **Litecoin Analyst Rating System** in an effort to help $LTC traders profit in what we believe to be a trending market. **RedliteGreenLite, LTC** aka **'RLGL₺TC'** like Litecoin is a community born to Bitcoin via @RLGL₿TC a Coin Drop Markets private BTC trade group. RLGL₺TC is a 'real-time' CDM trading membership that reports critical $LTC **entry/exit points** via @RLGL₺TC 24/7 including holidays/weekends. Unlike conventional markets digital currency **does not sleep** affording 'minute-to-minute' price arbitrage, exploitation, and opportunities for swing trading profits. RLGL₺TC is a dedicated team of digital asset trading specialists trend spotting.

**SOURCE:** https://www.coindropmarkets.com/services

Pages: [1]   print

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderator: mprep) > **ANN: Coin Drop Markets launches the world's 1st #Litecoin Analyst Rating System!**

« previous topic next topic »

Jump to: => Announcements (Altcoins) ▼ [go]

Powered by SMF 1.1.19 | SMF © 2006-2009, Simple Machines

# EXHIBIT 20

Case 1:18-cv-00361-JBW-RLM   Document 21-2   Filed 02/20/18   Page 230 of 262 PageID #: 349



# Bitcoin Forum

simple machines forum

January 10, 2018, 07:18:00 PM

Welcome, **Guest**. Please login or register.

**News:** ◆ Electrum users must upgrade to 3.0.5 if they haven't already. More info.

HOME   HELP   SEARCH   DONATE   LOGIN   REGISTER

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderator: mprep) > **Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System! $LTC**

« previous topic next topic »

Pages: [**1**]

print

| | |
|---|---|
| **Author** | Topic: Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System! $LTC (Read 2356 times) |

This is a self-moderated topic. If you do not want to be moderated by the person who started this topic, create a new topic.

**CoinDropMark**
Newbie

Activity: 1

**Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System! $LTC**
April 27, 2017, 07:14:55 PM

#1

**Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System!**

The **Coin Drop Markets** development team has launched the world's 1st **Litecoin Analyst Rating System** in an effort to help $LTC traders profit in what we believe to be a trending market. **RedliteGreenLite, LTC** *aka* **'RLGLŁTC'** like Litecoin is a community born to Bitcoin *via* @RLGLŁTC a Coin Drop Markets private BTC trade group. RLGLŁTC is a *'real-time'* CDM trading membership that reports critical $LTC **entry/exit points** *via* @RLGLŁTC 24/7 including holidays/weekends. Unlike conventional markets digital currency **does not sleep** affording *'minute-to-minute'* price *arbitrage*, *exploitation*, and *opportunities* for swing trading profits. RLGLŁTC is a dedicated team of digital asset trading specialists trend spotting.

**SOURCE:** https://www.coindropmarkets.com/services

Pages: [**1**]

print

Bitcoin Forum > Alternate cryptocurrencies > Announcements (Altcoins) (Moderator: mprep) > **Coin Drop Markets launches the world's 1st Litecoin Analyst Rating System! $LTC**

« previous topic next topic »

Jump to: => Announcements (Altcoins)  ▼   go

Powered by SMF 1.1.19 | SMF © 2006-2009, Simple Machines

W3C XHTML 1.0

W3C CSS

# EXHIBIT 21

**To:** ███████████

**From:** ~~Coin Drop Markets~~

**Sent:** Thur 4/27/2017 2:01:32 PM

**Subject:** Coin Drop Markets -- 24 Month RLGLŁTC Membership Offer Receipt/Terms [Activation]

**RE:** Coin Drop Markets -- 24 Month RLGLŁTC Membership Offer Receipt/Terms [Activation]

*Greetings Mr.* ███████████ *,*

*As per your recent online membership subscription*, we have established a **24 Month Membership** for agreed upon terms listed below. Your membership includes all **RLGLŁTC MEMBERSHIP PRIVILEGES** listed on our website <u>services</u> page.

Please **whitelist us** by adding <u>coindropmarkets@gmail.com</u> to your email contact list to avoid our information landing in junk/spam folder.

*Your 'Membership' Terms go as follows;*

**Member:** ███████████

**Member ID:** ████████

**Member Address:** N/A

**Member Email:** ████████████████████

**Member Phone:** N/A

**Membership Dues:** $99.98 [1X Fee]

**Membership Term:** [2 Year] *04/27/17-04/27/19*

*Your credit/debit card statement should reflect a recent charge from: **CDM**

**OPEN RESEARCH REPORTS / TRADE ALERTS**

DryShips Inc. -- $DRYS **Report Password:** DRYS Review Report: <u>http://www.coindropmarkets.com/drys2</u>
Gevo, Inc. -- $GEVO **Report Password:** GEVO Review Report: <u>http://www.coindropmarkets.com/gevo</u>
Bitcoin -- $BTC Review Report:**Report Password:** BTC Review Report: <u>http://www.coindropmarkets.com/btc</u>
Litecoin -- $LTC **Report Password: BITCOINKILLER** Review Report: <u>https://www.coindropmarkets.com/ltc</u>
Potcoin -- $POT **Report Password:** POT Review Report: <u>https://www.coindropmarkets.com/pot</u>

Upon publishing each research report/trade alert members receive an email notifying them of our market price point with a uniquely generated password to access information for review.

*Each email notification stipulates alert/report access and will have an attached hard copy for those members on the go unable to login to our website throughout the day.

**We are currently uploading all of our archived reports for menu *vs* member single publication review. RLGLŁTC MEMBERSHIP is scheduled to start crowing May 01, 2017 as we round up all members globally throughout the week.**

**\*IF YOU HAVE NOT ALREADY DONE SO, PLEASE FOLLOW THIS MEMBERSHIPS <u>PRIVATIZED</u> TWITTER FOR LITECOIN ALERTS ONCE WE GO LIVE. NOTHING MUCH THERE CURRENTLY YET YOU WILL BE SET-UP READY
FOR CHIKUN CROWS TO POSSIBLY PROFIT FROM MARKET VOLATILITY. \*FOR CLARIFICATION, PLEASE EMAUL US BACK YOUR TWITTER HANDLE IF NOT DONE YET TO SIMPLIFY THE PROCESS FOR US ON THIS END.**

*If you have any questions upon receipt please contact me. I have been assigned your personal research specialist and look forward to servicing you as a Coin Drop Markets member!*

**Pat McDonnell/CTO**
Coin Drop Markets
<u>www.coindropmarkets.com</u>
**Toll Free:** <u>+1.888.614.6445</u>
M-Sat 8am-8pm, Sun 12pm-3pm EST

*Sincerest Regards,*

Pat McDonnell

# EXHIBIT 22

**To:** █████████████████████████

**From:** Coin Drop Markets

**Sent:** Sat 4/29/2017 9:38:07 PM

**Subject:** Re: New message via your website, from ██████████████████

Real good your message said you are worried?

On Sat, Apr 29, 2017 at 9:37 P███████████████████████████ wrote:

> Yes mate, up and around kids sport but have my laptop.

How are things going.?

Cheers.

████████

Sent from my iPhone

On 30 Apr 2017, at 9:35 am, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

> Hi ████████ you around today?

On Fri, Apr 28, 2017 at 10:49 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

> My goal would be recoup your fees quick move onto BTC profits. I think by morn. with ton. trade depending on your BTC level of involvement each 1 BTC can earn 1-1.5 BTC gonna be a big move I believe. ;) Also, if your game set-up free wallet and fund with BTC for ton. trading at net

On Fri, Apr 28, 2017 at 10:45 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

> If you choose this route you can pay via new CDM BTC acceptance wallet. TY
> https://blockchain.info/address/1KirsN7GAXdWkwVgt1gd6AxN8yKbkiPx8h

On Fri, Apr 28, 2017 at 10:44 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

> Hi ████████
> Don't know if you check your twitter messages? Sent you a few somewhat time sensitive with ton. trade.

Regards,

Pat McDonnell

> Hi ████████ Glad you joined us bud. Hey TY for new membership your receipt will be there in a few. You may wanna consider joining RLGLBTC it's direct 1-on-1 trading alongside me and all members involved real-time. We trade 24/7 and you can make a couple BTC depending on your BTC power.
>
> 2h Sent

> The program is 1 BTC for it's lifetime been running since 2010 so there is a lot of BTC buying power we when move because there are a few early adopters who have some real coin. Let me know it's a better option vs relying on reports we all trade on same exchange talk via @Slack RT.

> *couple BTC per trade more if your a BTC whale.

2h Sent

Hi again ████, Also if you decide to join RLGLBTC we will credit all your membership payments to 1 BTC to save $ and you get all sub perks even new to launch. We have our own IPO coming in 2 weeks only 500K tokens gonna fly.

Today we have a trade on yobit that will run tonight until sunday should produce 300%.

1 BTC in should produce 3 BTC out.

On Thu, Apr 27, 2017 at 7:46 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

YW!

On Thu, Apr 27, 2017 at 6:52 P████████████████████████ wrote:

Hi Patrick,

Much appreciated thanks for the extra 12 months, looking forward to May 1st

Regards.

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Friday, 28 April 2017 1:29 AM

**To:** ████████████
**Subject:** Re: New message via your website, f████████████████████

She's working on your activation curren █████████ sorry for delay I extended it to 24 months vs 12.

On Thu, Apr 27, 2017 at 10:14 AM, Coin Drop Markets coindropmarkets@gmail.com wrote:

Hi ██████, You should be receiving everything within the next hour or so. I really want to thank you for your business and am looking forward to servicing your membership. Regards, Patrick

On Wed, Apr 26, 2017 at 11:41 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:

TY ██████ will approve you on twitter now. Just give us a bit to get all onboard there so they all get alerts. Patrick

On Wed, Apr 26, 2017 at 11:39 P █████████████████████████████ wrote:

Hi Mr McDonnell

Thanks for your swift reply, my new Twitter handle is ████████████

And I have also sent a follow request to @RLGLLTC

Thanks again.

████

████████

██████████

██████████████████
██████████████████
██████████████████
██████████████████

██████████████

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Thursday, 27 April 2017 11:18 AM
**To:** ███████████
**Subject:** Re: New message via your website, from ████████████

Hi Mr. ██████,

Sorry for delay in response first thing in the morning your membership will be activated. We are gathering all members currently getting them over to new @RLGLLTC twitter. If you could email me back your twitter handle & follow I'll approve so your ready for LTC picks when initiated. Your receipt/terms will be in your inbox once secretary gets in tom. morning around 9-9:30AM.

Regards,

Pat McDonnell

On Wed, Apr 26, 2017 at 10:03 PM no-reply@parastorage.com wrote:

- **You have a new message:**

- Via: https://www.coindropmarkets.com/

- **Message Details:**

  - 
  - **Name** ██████

  - **Subject** RLGLLTC

  - **Message** Hi, I just purchased this product, what happens now? I have not received any email or instructions on what happens next. Many Tha██████ .

  - **Phone** ████████████

  - **Email** ██████████████████

- **Sent on:** 27 April, 2017

- Thank you!

  .

# EXHIBIT 23

**From:**
**Sent:** Fri 4/28/2017 11:54:00 PM
**Subject:** RE: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Ok thanks.....No I'm just an employee of ATCO...they own a lot of in ground infrastructure and power stations..

It's a big Canadian company, its only been in Australia for 5 years or so.



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:52 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Will do once LTC clears I'll set all up. Do you trade oil & gas? I see your co. why I ask?

On Fri, Apr 28, 2017 at 11:50 P                                  wrote:
Ok...last 76 LTC just sent...

In your hands now, can you send me the link so I can monitor.

Cheers.



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:44 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Yes that is correct. T            over time money will be made but a good biz relationship is important as well.

On Fri, Apr 28, 2017 at 11:42 P                                       wrote:
OK...trust it is..

Do I send it still to this one

http://explorer.litecoin.net/address/LQxwfiKLW4ozywLsh3BHMJ7pQeiprVNUE1



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:41 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

I give you my word as a man I will protect & trade with you as my own.

On Fri, Apr 28, 2017 at 11:39 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
*LTC address to monitor

On Fri, Apr 28, 2017 at 11:39 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
It's honestly a trust fact          your control is our relationship. You'll have an LTC to monitor daily trading balan and if you need it get in touch I'll send.

On Fri, Apr 28, 2017 at 11:33 P                                    > wrote:
Ok, so when I send you my last LTC do I have any control left? How will it end up coming back to me

Just need to clarify before I send

Cheers

.



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:32 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Then we have no time zone issues I up 18-20 hrs a day so we are good.

On Fri, Apr 28, 2017 at 11:30 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
You paid all your fees ever needed for lifetime of our service.

On Fri, Apr 28, 2017 at 11:29 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
Actually just send it here I'll set one up & send you link to monitor
value.http://explorer.litecoin.net/address/LQxwfiKLW4ozywLsh3BHMJ7pQeiprVNUE1

On Fri, Apr 28, 2017 at 11:28 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
Gonna give you a diff LTC address to keep it segregated for trading one minute.

On Fri, Apr 28, 2017 at 11:27 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
Dont sell MPRO at all . You want me to trade the LTC send it now I'll produce 2-300 profit on the 76 each day with
volatility until coinbase.

On Fri, Apr 28, 2017 at 11:24 P███████████████████████████████ wrote:
Yes my timing is a bit off and im still learning probably best if I go on your instuctions.

Do I set a sell for my existing MPRO.

Do I need to send you any more LTC.....76 left



From: Coin Drop Markets [mailto:coindropmarkets@gmail.com]
Sent: Saturday, 29 April 2017 11:22 AM
To: █████████████
Subject: Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN &
FUND A WALLET - IN & OUT VERY QUICK!

Somehow we need to get in sync to make things profitable.

On Fri, Apr 28, 2017 at 11:20 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
OK once we exit MPRO back to LTC. I help you trade that too daily. $1,000 in LTC should be earning you $200-$
day trading until coinbase.

On Fri, Apr 28, 2017 at 11:17 P███████████████████████████████ wrote:
I have 76 left on POLO and sent you 70.5

Plus what I alredy used to buy MPRO this morning on yobit

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:16 AM
**To:** ████████████
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Was that all your LTC or did you buy a stake I mean?

On Fri, Apr 28, 2017 at 11:14 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
No I meant how much LTC do you hold total for coinbase?

On Fri, Apr 28, 2017 at 11:11 P████████████████████████ wrote:
That was kind of it, plus what I already bought on yobit.....m

My work bonus

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:10 AM
**To:** ████████████
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

How much LTC do you hold?

On Fri, Apr 28, 2017 at 11:07 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
On $MPRO

On Fri, Apr 28, 2017 at 11:07 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
OK put an order to buy what you can at 0.00000799 satoshis. It will knock down and in a by noon tom. back over 0.00009000 with liquid bid ok?

On Fri, Apr 28, 2017 at 11:04 P████████████████████████ wrote:
About 5113 MPRO

████████████ .

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 11:03 AM
**To:** ███████████
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

How much did you buy?

On Fri, Apr 28, 2017 at 11:02 PM ████████████████████████████ wrote:
Ok, just sent 70.5 LTC to LQxwfiKLW4ozywLsh3BHMJ7pQeiprVNUE1

I already have some MPRO....shall I send that also?

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 10:59 AM
**To:** ███████
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

Hey ███████ once I see payment hit I'll get to work. Just need 1 BTC to make 3 strategically w/ MPRO if you have to play with the better. Then we go back to LTC on Monday 72 vehicle play to build BTC w/ Yobit wallet base mon

On Fri, Apr 28, 2017 at 10:57 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
http://explorer.litecoin.net/address/LQxwfiKLW4ozywLsh3BHMJ7pQeiprVNUE1

On Fri, Apr 28, 2017 at 10:55 P ████████████████████████████ wrote:
OK, what address shall I send the LTC?

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 10:54 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

I'll get to work tonight with you & SAT/SUN we will make some good BTC on MPRO.

On Fri, Apr 28, 2017 at 10:53 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
This is new the new CDM LTC addy for memb's posted yest. If you do would be breaking her cherry. lol

On Fri, Apr 28, 2017 at 10:52 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
Just posted this calculator https://twitter.com/BTCXBTDEV/status/858147009441746944

On Fri, Apr 28, 2017 at 10:51 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
Send me 1 BTC worth of LTC. If we profit like I think I'll sell it back straight swap.

On Fri, Apr 28, 2017 at 10:50 P wrote:
So should I sell some LTC and send you 1 BTC?



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 10:48 AM
**To:**
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

https://blockchain.info/address/1KirsN7GAXdWkwVgt1gd6AxN8yKbkiP x8h

On Fri, Apr 28, 2017 at 10:48 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
If you are ready to get busy send us 1 BTC I'll get busy tonight. By Sunday I'll have made you a few back in $MPR believe.

On Fri, Apr 28, 2017 at 10:47 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:
My goal is for traders to think its weak sell the $MPRO they bought at 9000 sats at these levels.

On Fri, Apr 28, 2017 at 10:46 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:

Right now just got a bot on $MPRO gonna slowly move it up to catch dumps cheap

On Fri, Apr 28, 2017 at 10:45 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:
Honestly, If you would of joined earlier you would of made $ back already. $MPRO hit a tad under 10K sats.

On Fri, Apr 28, 2017 at 10:44 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:
It will but let me tell you when. Did you consider joining RLGLBTC private? I could of had access to your yobit wal
while you have w/d email control. In case like $MPRO I could set your limits for you with no withdrawal control jus
access to trading.

On Fri, Apr 28, 2017 at 10:40 P▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ wrote:
Any chance its going up again over the weekend?



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 10:40 AM
**To:** ▇▇▇▇▇▇▇
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN &
OUT VERY QUICK!

I think 1600% was highest dumpers killed it for the moment.

On Fri, Apr 28, 2017 at 10:39 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:
It went up & down real quick. lol

On Fri, Apr 28, 2017 at 8:32 P▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ wrote:
Think I missed the boat on this one....damn time difference....LOL



**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Saturday, 29 April 2017 12:16 AM
**Subject:** Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT
VERY QUICK!

April 28, 2017

**RE: TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!**

*Greetings Members & Non-Members [Mailing List],*

Tonight we will be participating in a trade that looks to produce 300% in profits Friday thru Sunday.
WE RECOMMEND THAT YOU OPEN/FUND A WWW.YOBIT.NET WALLET W/ BTC BY 5:00PM EST. TO AVOID ANY DELAYS.

WE CANNOT ANNOUNCE WHICH PARTICULAR COIN(S) PRIOR TO 7PM EST. TO AVOID FRONT RUNNING OF TRADE(S)
CDM DOES NOT BUY PRIOR TO ANNOUNCING COIN IN PLAY WE ENTER 30-60 MINUTES AFTER MEMBERS POSITION

300% IS A VERY LOW EXPECTATION AND WE BELIEVE ALL CDM PARTICIPANTS DOUBLE/TRIPLE UP THEIR BTC COINS.

We will be attaching & forwarding another email to this with all trade instructions needed to profit.

Follow our lead on twitter once announced entry/exit wise by midnight our team is celebrating yet another win!!!

I look forward to profiting for you all this evening!

*Sincerest Regards,*

Pat McDonnell
CDM/GuardianOfSomeCode
www.CoinDropMarkets.com





# EXHIBIT 24

**To:** ██████████
**From:** CoinDrop Markets
**Sent:** Wed 5/10/2017 1:19:26 AM
**Subject:** Re: Catch up

Hey ████, I sent this through twitter then realized email was better. Time sensitive do to $LTC pricing IK some thing cannot speak them bud. Pat

Hey ██ I'm going over trading blotter your up big on amount of $LTC traded will discuss tom. Hey listen IDK how big an investor you are but there is real $ to be made just w/ $LTC.

I'm not nuts why I post I cracked 177 code me and another smart member caught it 2 weeks ago or more. I believe ██ that I can make members millions in $LTC alone.

19mSent

I love $BTC & $ETH too but $LTC provides the leverage needed to generate massive BTC. Gotta be honest with ya I built a trading program that attaches to Bitfinex/Bittrex/Poloniex that automatically filters and executes my $LTC trades it's bot like.

17mSent

However, I programmed this according to a specific group of indicators that instantly act on market movements honestly it is close too 100% accurate. Exchange API's offer an inside track to trading crypto properly with trade programs, etc.

15mSent

Outside of twitter I have a very big retail business with over 8,000+ active investors who trade my stock rec's this honestly is just building the crypto side. I trade over $50M in BTC for this group gathered since 2010. $LTC was a joke KEY: There is no supply on Bittrex/Polo roughly 420K on polo and 50K on Bittrex for sale.

10mSent

It's the same pump groups trading same coins, same BTC. $LTC whales DO NOT trade I am very cool with TechShare biggest holder of Litecoin paid me $12K in it for fun honestly I helped his bud build Infinitecoin $IFC.

I say all that to say this ████ I comb through new memberships most are crazy crypto kids, from guam, and guys like you NORMAL.

8mSent

I don't feel I am giving you the attention you deserve although I'm rockin' with trading. If I communicated better we could have possibly made triple by making some moves on your end.

6mSent

I would like you to join blockchain crypto fund of mine. Each fund is 100 partners issued each a crypto-based token as ownership rights in fund profits. We do top-line revenue growth all monies generated from trading profits above all traders initial investment is divided evenly monthly and distributed to each member in BTC.

3mSent

IK at times I feel weird on twitter and you seem more traditional like myself. You would go from email/twitter to a real client where it's all phone like real investors.

2mSent

If this is something that you might find interesting let me know. Also, you have member login to view your balance/stake daily. Think it over let me know there is more to crypto than pumps bud.

GN

On Tue, May 9, 2017 at 10:40 PM, Coin Drop Markets coindropmarkets@gmail.com wrote:

OK cool ███ got it definitely need to speak man you'll be happy that fucking trade killed tonight are these traders stupid? If this continues I'm coming out by you to retire NEXT WEEK. lol My pers████████████ call me anytime but tonight my wife is giving me that where are you look? lol Luv ya as a bud good night, Pat

On Tue, May 9, 2017 at 10:28 P ████████████████████████ wrote:

Hey Pat,

Im free 7:30-10am Perth time and from 11am onwards.

Look forward to catching up.

Big respect.

███

████████

████████





81 Prinsep Road, Jandakot, Western Australia, 6164

# EXHIBIT 25

**To:**

**From:** Bitcoin XBTrade GRP™ (via Twitter)

**Sent:** Sun 5/14/2017 8:24:58 PM

**Subject:** Bitcoin XBTrade GRP™ (@BTCXBTDEV) has sent you a Direct Message on Twitter!

Case X:XX-xx-XXXXX-JBW-RLM   Document 21-2   Filed 02/26/18   Page 256 of 262 PageID #: 375

███ this is how your gonna build wealth without cash outlay also $TIGR I have 80+ blockchains in R&D all launching in next 12-36 months.

Reply

Settings | Help | Opt-out | Download app

Twitter, Inc. 1355 Market Street, Suite 900 San Francisco, CA 94103

# EXHIBIT 26

Case 1:18-cv-00361-JBW-RLM Document 21-2 Filed 02/26/18 Page 258 of 262 PageID #: 377

should be hand picked...only the best qualify...regardless of BTC worth.....gold standard trade club....not for your average troll fuckwit.....don't let em get you down pat

6:17 am ✓

good idea

i wont ▮▮▮▮Im just going through enough

Im gonna shut this twitter down now and use @MrPatMcDonnell only to many.

Lets connect there in a few.

6:23 am

Ok 👉

Start a new message

Home     Explore     Notifications     Messages     Me

# EXHIBIT 27

# Pat

@MrPatMcDonnell



tough with my kid right

im not your dad ill twist you

7:46 pm

I would like my ltc back....

7:46 pm ✓

fuck you █

i thought you were my man

good for you

i would like a true friend

not a scumbag

peace

ill donate your ltc back to ltc

  Start a message 

   

# EXHIBIT 28

**To:**
**From:** Bitcoin XBTRADE GRP™ (via Twitter)
**Sent:** Sat 6/10/2017 8:53:00 PM
**Subject:** Bitcoin XBTRADE GRP™ (@BTCXBTTRADING) has sent you a Direct Message on Twitter!



I am backing out of $TIGR will refund btc to those who joined

Reply

Settings  |  Help |  Opt-out  |  Download app

Twitter, Inc. 1355 Market Street, Suite 900 San Francisco, CA 94103