UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>    – against –<br><br>PATRICK K. MCDONNELL,<br>and CABBAGETECH, CORP. d/b/a COIN DROP MARKETS,<br><br>           Defendants. | **MEMORANDUM & ORDER**<br><br>18-CV-361 |

**Parties**

Commodity Futures Trading Commission

Patrick McDonnell
CabbageTech Corp.,
d/b/a/ Coin Drop Markets

**Appearances**

David William Oakland
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005
Email: doakland@cftc.gov

Kenneth B. Tomer
Commodity Futures Trading Commission
140 Broadway
19th Floor
New York, NY 10005
Email: ktomer@cftc.gov

Gates Salyers Hurand
Commodity Futures Trading Commission
140 Broadway, 19th Floor
Ny, NY 10005
646-746-9700
Fax: 646-746-3903
Email: ghurand@cftc.gov

Pro se

1

Jᴀᴄᴋ B. Wᴇɪɴsᴛᴇɪɴ, Senior United States District Judge:

## Table of Contents

I.      Introduction ........................................................................................................ 3

   A.   Commodity Futures Trading Commission ("CFTC") Standing ......................... 3

   B.   Injunctive Relief ............................................................................................ 4

II.     Facts .................................................................................................................. 4

III.   Background of Bitcoin and Virtual Currencies ................................................... 5

   A.   Description of Virtual Currencies ................................................................... 5

   B.   Expansion and Value .................................................................................... 6

   C.   Fraud and Crime ........................................................................................... 8

   D.   Regulation and Oversight of Virtual Currency ................................................ 9

      1.   Potential Virtual Currency Regulation ..................................................... 10

      2.   Oversight by CFTC ............................................................................... 12

      3.   Concurrent Oversight from Other Agencies ............................................. 14

IV.   Law .................................................................................................................. 14

   A.   Jurisdiction ................................................................................................. 15

   B.   Standing ..................................................................................................... 15

      1.   Enforcement Power of CFTC .................................................................. 15

          a.   Virtual Currencies are Commodities ................................................ 17

          b.   Commodity Exchange Act's Definition of "Commodity" ................... 18

          c.   CFTC's Interpretation of "Commodity" ........................................... 19

          d.   Derivative Contracts and Futures ..................................................... 20

          e.   Regulation of Spot Market Fraud ..................................................... 21

      2.   Concurrent Jurisdiction ......................................................................... 23

   C.   Preliminary Injunction Standard ................................................................. 23

V.     Application of Law ........................................................................................... 24

   A.   CFTC Standing .......................................................................................... 24

      1.   Virtual Currencies as Commodities ........................................................ 24

      2.   CFTC Jurisdiction Over Virtual Currency Fraud ..................................... 25

   B.   Prima Facie Showing of Fraud Committed by Defendants ............................. 26

   C.   Preliminary Injunction ............................................................................... 26

   D.   Appropriate Research by Court .................................................................... 27

VI.   Conclusion ...................................................................................................... 28

VII.  Appendix A Preliminary Injunction ................................................................. 28

VIII. Appendix B CFTC Primer .............................................................................. 40

IX.   Appendix C Congressional Testimony of CFTC Chairman ............................... 60

I.   Introduction

The Commodity Futures Trading Commission ("CFTC") sues Patrick McDonnell and his company Coin Drop Markets.  CFTC alleges defendants "operated a deceptive and fraudulent virtual currency scheme . . . for purported virtual currency trading advice" and "for virtual currency purchases and trading . . . and simply misappropriated [investor] funds."  *See* CFTC Complaint, ECF No. 1, Jan. 18, 2018, at 1 ("CFTC Compl.").

CFTC seeks injunctive relief, monetary penalties, and restitution of funds received in violation of the Commodity Exchange Act ("CEA").  *Id.* at 11.

Until Congress clarifies the matter, the CFTC has concurrent authority, along with other state and federal administrative agencies, and civil and criminal courts, over dealings in virtual currency.  An important nationally and internationally traded commodity, virtual currency is tendered for payment for debts, although, unlike United States currency, it is not legal tender that must be accepted.  Title 31 U.S.C. § 5103 ("United States coins and currency . . . are legal tender for all debts . . .").

A.   Commodity Futures Trading Commission ("CFTC") Standing

The primary issue raised at the outset of this litigation is whether CFTC has standing to sue defendants on the theory that they have violated the CEA.  Title 7 U.S.C. § 1.  Presented are two questions that determine the plaintiff's standing: (1) whether virtual currency may be regulated by the CFTC as a commodity; and (2) whether the amendments to the CEA under the Dodd-Frank Act permit the CFTC to exercise its jurisdiction over fraud that does not directly involve the sale of futures or derivative contracts.

Both questions are answered in the affirmative.  A "commodity" encompasses virtual currency both in economic function and in the language of the statute.  Title 7 U.S.C. § 1(a)(9)

3

(The CEA defines "commodity" as agricultural products and "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in.").

CFTC's broad authority extends to fraud or manipulation in derivatives markets and underlying spot markets. *See* Title 7 U.S.C. § 9(1). CFTC may exercise its enforcement power over fraud related to virtual currencies sold in interstate commerce. *See* Title 17 C.F.R. § 180.1.

### B. Injunctive Relief

After hearing testimony from an Investigator in the Division of Enforcement for the CFTC, the court finds the plaintiff has made a preliminary prima facie showing that the defendants committed fraud by misappropriation of investors' funds and misrepresentation through false trading advice and promised future profits.

A preliminary injunction is granted in favor of the CFTC. The court finds a reasonable likelihood that without an injunction the defendants will continue to violate the CEA. An order outlining the terms of relief is issued and attached. *See* Appendix A, Order of Preliminary Injunction and Other Relief ("App. A, Prelim. Injunction").

## II.   Facts

Patrick McDonnell and his company CabbageTech, Corp., doing business as Coin Drop Markets ("defendants"), offered fraudulent trading and investment services related to virtual currency, *see* Description of "Virtual Currencies" *infra* Part III, in the spring and summer of 2017. Christopher Giglio Declaration, ECF No. 21, Feb. 26, 2018, Ex. 2 ("Giglio Decl.") ¶¶ 13,14.

Customers from the United States and abroad paid defendants for "membership" in virtual currency trading groups purported to provide exit prices and profits of up to "300%" per

4

week.  *Id.* ¶¶ 17-20.  Defendants advertised their services through "at least two websites, www.coindropmarkets.com and www.coindrops.club," as well as on the social media platform Twitter.  *Id.* ¶¶ 15-17.

 "Investors" transferred virtual currency to the defendants for "day" trading.  *Id.* ¶ 21 ("McDonnell claimed that he could generate profits of 2 to 300% each day for [an] Investor . . . and that $1,000 in Litecoin [a type of virtual currency] should be earning $200 to $250 per day through trading.").

After receiving membership payment or virtual currency investments, defendants deleted their "social media accounts" and "websites and ceased communicating with . . . customers around July, 2017."  *Id.* ¶ 26.  Defendants provided minimal, if any, virtual currency trading advice and never achieved the promised return on investment.  *Id.* ¶ 27.  When customers asked for a return of their membership fee, or virtual currency investment, the defendants refused and misappropriated the funds.  *Id.* ¶¶ 27-32.

III.    Background of Bitcoin and Virtual Currencies

    A.  Description of Virtual Currencies

Virtual currencies are generally defined as "digital assets used as a medium of exchange." Skadden's Insights, *Bitcoins and Blockchain: The CFTC Takes Notice of Virtual Currencies*, Jan., 2016.  They are stored electronically in "digital wallets," and exchanged over the internet through a direct peer-to-peer system.  *Id.*  They are often described as "cryptocurrencies" because they use "cryptographic protocols to secure transactions . . . recorded on publicly available decentralized ledgers," called "blockchains."  Brief of CFTC In Support of Preliminary Injunction and Other Relief, ECF No. 21, Feb. 26, 2018, at 4 ("CFTC Brief").

The "blockchain" serves as a digital signature to verify the exchange.  *See* Appendix B, *A CFTC Primer on Virtual Currencies*, Oct. 17, 2017, at 5 ("App. B, *CFTC Primer*").  "The public nature of the decentralized ledger allows people to recognize the transfer of virtual currency from one user to another without requiring any central intermediary in which both users need to trust." CFTC Brief, at 4.  Some experts believe blockchain technology underlying virtual currencies will serve to "enhance [future] economic efficiency" and have a "broad and lasting impact on global financial markets in payments, banking, securities settlement, title recording, cyber security and trade reporting and analysis."  Appendix C, United States Senate Banking Committee, *Hearing on Virtual Currency,* Feb. 6, 2018 (written testimony of Christopher Giancarlo, Chairman, CFTC) ("App. C, CFTC Chair, Congressional Testimony").  Virtual currencies are not backed by any government, fiat currency, or commodity.  Robert J. Anello, *New-Wave Legal Challenges for Bitcoin and Other CryptoCurrencies*, Law Journal Newsletters, Nov. 2017.

They have some characteristics of government paper currency, commodities, and securities.  Allison Nathan, *Interview with Eric Posner*, Goldman Sachs Global Investment Research, Mar. 11, 2014 ("It is a lot like gold, in fact. The difference [] is that it is digital rather than a heavy, unwieldy object. That means that it could serve the same purposes as gold in terms of a currency, but much more efficiently because it does not have any mass and can be sent easily from place to place."); *cf. Power of the Executive to Change the Gold Value of the Dollar*, Columbia Law Review, Vol. 48, No. 3 (Apr. 1948) ("[T]he United States is committed to a policy of international cooperation, and in particular, to a program of international stability of [currency] exchange rates . . .").

B.  Expansion and Value

The price of Bitcoin, and other virtual currencies, has risen, and then fallen, at extreme rates.  Olga Kharif, *All you Need to Know About Bitcoin's Rise, From $0.01 to $15,000*, Bloomberg Businessweek, Dec. 1, 2017 ("The initial price of bitcoin, set in 2010, was less than 1 cent. Now it's crossed $16,000. Once seen as the province of nerds, libertarians and drug dealers, bitcoin today is drawing millions of dollars from hedge funds.").

As their value has increased, online exchanges have become more accessible allowing more members of the public to trade and invest in virtual currencies.

> While there are many Bitcoin exchanges around the world, Coinbase has been the dominant place that ordinary Americans go to buy and sell virtual currency. No company had made it simpler to sign up, link a bank account or debit card, and begin buying Bitcoin.
>
> The number of people with Coinbase accounts has gone from 5.5 million in January [2017] to 13.3 million at the end of November, according to data from the Altana Digital Currency Fund. In late November, Coinbase was sometimes getting 100,000 new customers a day — leaving the company with more customers than Charles Schwab and E-Trade.

Nathaniel Popper, *Coinbase: The Heart of the Bitcoin Frenzy*, N.Y. Times, Dec. 6, 2017; Ian Parker, *A Bitcoin A.T.M. Comes To A New York Deli*, New Yorker, Sept. 18, 2017 ("A Coinsource A.T.M. accepts dollars and in return adds the bitcoin equivalent (less Coinsource's seven per cent) to a customer's digital wallet.").

According to coinmarketcap.com (viewed Feb. 6, 2018, at approximately 9:10 a.m. EST), there were over 1500 virtual currencies.  Bitcoin had the largest market capitalization, valued at $121,264,863,386.  *Id.*  A single Bitcoin was valued at $7,196.92.  *Id.*  The cheapest virtual currency, Strong Hands, was valued at $0.000001.  *Id.*

The combined market capitalization of all virtual currencies as of January 6, 2018, was roughly $795 billion; by Feb. 6, 2018, the total value had dropped to $329 billion.  Coin Market Cap, https://coinmarketcap.com/charts/ (last visited Feb. 6, 2018); Arjun Kharpal, *Over $60*

*Billion Wiped off Value of Cryptocurrencies as Bitcoin Drops Below $8,000 again*, CNBC, Feb. 5, 2018 ("It was not only bitcoin that fell either. Other major virtual currencies, including ethereum and ripple, fell sharply in the last 24 hours.").

     C.  Fraud and Crime

The rise in users and value of virtual currencies has been accompanied by increased fraud and criminal activity.  Edgar G. Sánchez, *Crypto-Currencies: The 21st Century's Money Laundering and Tax Havens*, 28 U. Fla. J.L. & Pub. Pol'y 167, 169 (2017) ("[T]he newest growing concern with Bitcoin, and crypto-currencies in general, are their ability to wash money and conceal taxable income.").

Silk Road, an online drug market that allowed for purchase through Bitcoin, was one of the earliest and most audacious examples of crime enabled by virtual currencies.

> The largest case involving Bitcoin and illegal activity was the Silk Road case, which included billions of dollars in black market drug sales, two federal agents caught (and convicted for) stealing, and murder-for-hire attempts. While the U.S. government claimed a victory in curbing illegal activity facilitated with Bitcoin by shutting down the Silk Road's massive black market for drugs, Bitcoin is still available, and other online black markets have tripled the industry since Silk Road's closure.

Christopher Burks, *Bitcoin: Breaking Bad or Breaking Barriers?*, 18 N.C.J.L. & Tech. On. 244, 251–52 (2017) (internal citations omitted); *see also* U.S. Attorney's Office EDNY, *Long Island Woman Indicted for Bank Fraud and Money Laundering to Support Terrorists*, Dec. 14, 2017 (The defendant allegedly "laundered and transferred the funds [using virtual currencies] out of the country to support the Islamic State . . .").

Virtual currency exchanges have been victims of hacking and theft.  Reuters Staff, *The Coincheck Hack and the Issue With Crypto Assets on Centralized Exchanges*, Jan. 29, 2018 ("Hackers have stolen roughly 58 billion yen ($532.6 million) from Tokyo-based cryptocurrency

exchange Coincheck Inc, raising questions about security and regulatory protection in the emerging market of digital assets."); Alex Hern, *A History of Bitcoin Hacks*, The Guardian, Mar. 18, 2014 ("25,000 bitcoins were stolen from their wallet after hackers compromised the Windows computer they were using. Even at the time, that sum was worth more than $500,000; it would now be worth a little less than £10m.").

These and other criminal acts have led some to call for increased governmental oversight and regulation of virtual currency.

> Having delved into the prevalence of money laundering and tax evasion both globally and in the United States, and the rise of crypto-currencies and their use in disguising real money, the question remains as to what steps can be taken to legitimize crypto-currencies, or at the very least, put an end to their use for illegal purposes.

Sánchez, *supra* at 188.

### D.  Regulation and Oversight of Virtual Currency

Congress has yet to authorize a system to regulate virtual currency.  T. Gorman, *Blockchain, Virtual Currencies and the Regulators*, Dorsey & Whitney LLP, Jan. 11, 2018 ("As the CFTC recently admitted, U.S. law does not provide for 'direct comprehensive U.S. regulation of virtual currencies. To the contrary a multi-regulatory approach is being used.'").

 The CFTC, and other agencies, claim concurrent regulatory power over virtual currency in certain settings, but concede their jurisdiction is incomplete.  *See* App. C, CFTC Chair, Congressional Testimony ("[C]urrent law does not provide any U.S. Federal regulator with such regulatory oversight authority over spot virtual currency platforms [not involving fraud] operating in the United States or abroad."); *cf.* Doris Kearns Goodwin, *The Bully Pulpit*, (2013) at 443 ("Roosevelt . . . continued to regard the judicial system as an ineffective arena for controlling giant corporations . . . Regulation, he believed, promised a far better remedy. 'The

design should be to prevent the abuses incident to the creation of unhealthy and improper combinations [] instead of waiting until they are in existence and then attempting to destroy them by civil or criminal proceedings.'"); *cf.* Balleisen, Bennear, Kraweic, and Weiner, *Policy Shock*, (2017) at 543-44 ("[T]ypes of regulatory responses to a crisis may vary along many dimensions. These responses may be robust or cosmetic. They may be structural (reorganizing government or instrumental (changing policy tools).").

### 1.   Potential Virtual Currency Regulation

Until Congress acts to regulate virtual currency the following alternatives appear to be available:

1.      No regulation.  *See, e.g.,* Nikolei M. Kaplanov, *Nerdy Money: Bitcoin, the Private Digital Currency, and the Case Against Its Regulation*, 25 Loy. Consumer L. Rev. 111, 113 (2012) ("This Comment will show that the federal government has no legal basis to prohibit bitcoin users from engaging in traditional consumer purchases and transfers. This Comment further argues that the federal government should refrain from passing any laws or regulations limiting the use of bitcoins . . . applying any sort of regulation to bitcoin use, [] would be ineffective and contrary to the interest of the United States consumers.").

2.      Partial regulation through criminal law prosecutions of Ponzi-like schemes by the Department of Justice, or state criminal agencies, or civil substantive suits based on allegations of fraud.  *See, e.g., United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Defendants in this case are charged in connection with their operation of an underground market in the virtual currency 'Bitcoin' via the website 'Silk Road.'"); *United States v. Lord*, No. CR 15-00240-01/02, 2017 WL 1424806, at *2 (W.D. La. Apr.

10

20, 2017) ("Counts 2-14 charged Defendants with various other crimes associated with operating their bitcoin exchange business.").

3.      Regulation by the Commodity Futures Trading Commission ("CFTC").  *See infra* Part III.D.2.

4.      Regulation by the Securities and Exchange Commission ("SEC") as securities. *See, e.g., SEC v. Plexcorps,* 17-CV-7007 (E.D.N.Y. Filed Dec. 1, 2017) SEC Compl., ECF No. 1 ("This is an emergency action to stop Lacroix, a recidivist securities law violator in Canada, and his partner Paradis-Royer, from further misappropriating investor funds illegally raised through the fraudulent and unregistered offer and sale of securities called 'PlexCoin' or 'PlexCoin Tokens' in a purported 'Initial Coin Offering.'"); *see also* Jon Hill, *Accused Fraudster Says Cryptocurrencies Aren't Securities*, Feb. 27, 2018 ("According to the government, those blockchain based tokens were securities . . .").

5.      Regulation by the Treasury Department's Financial Enforcement Network ("FinCEN").  *See, e.g.,* FinCEN, *Treasury's First Action Against a Foreign-Located Money Services Business*, U.S. Department of the Treasury, Jul. 27, 2017 ("The Financial Crimes Enforcement Network (FinCEN), working in coordination with the U.S. Attorney's Office for the Northern District of California, assessed a $110,003,314 civil money penalty today against BTC-e [a virtual currency exchange] for willfully violating U.S. anti-money laundering laws.").

6.      Regulation by the Internal Revenue Service ("IRS").  *See, e.g., United States v. Coinbase, Inc*., No. 17-CV-01431-JSC, 2017 WL 3035164, at *1 (N.D. Cal. July 18, 2017) ("In March 2014, the IRS issued Notice 2014-21, which describes how the IRS applies U.S. tax principles to transactions involving virtual currency. (Case No.

3:16-cv-06658-JSC, Dkt. No. 2-4 at 3 ¶ 6.) In Notice 2014-21, the IRS stated its

position: virtual currencies that can be converted into traditional currency are property for

tax purposes, and a taxpayer can have a gain or loss on the sale or exchange of

a virtual currency, depending on the taxpayer's cost to purchase the virtual currency.").

7.      Regulation by private exchanges.  *See, e.g.,* Asian Review, *Japan Tries Light*

*Touch in Bringing Cryptocurrencies out of Regulatory Limbo*, NIKKEI, Sept. 30, 2017

("[T]here is a growing need for exchange operators to self-police to protect investors

from taking on too much risk and other dangers.").

8.      State regulations.  *See, e.g.,* Press Release, *DFS Grants Virtual Currency License*

*to Coinbase, Inc.,* N.Y. Department of Financial Services, Jan. 17, 2017 ("DFS has

approved six firms for virtual currency charters or licenses, while denying those

applications that did not meet DFS's standards. In addition to bitFlyer USA, DFS has

granted licenses to Coinbase Inc., XRP II and Circle Internet Financial, and charters to

Gemini Trust Company and itBit Trust Company.").

9.      A combination of any of the above.

## 2.   Oversight by CFTC

The CFTC is one of the federal administrative bodies currently exercising partial

supervision of virtual currencies.  Christopher Giancarlo, *Chairman Giancarlo Statement on*

*Virtual Currencies*, CFTC, Jan. 4, 2018 ("One thing is certain: ignoring virtual currency trading

will not make it go away. Nor is it a responsible regulatory strategy. The CFTC has an important

role to play.").

Administrative and civil action has been utilized by the CFTC to expand its control:

On September 17, 2015, the [CFTC] issued an [administrative] order (the Coinflip
Order) filing and simultaneously settling charges against Coinflip, Inc. (Coinflip)

and its chief executive officer. In the Coinflip Order, the CFTC took the view for
the first time that bitcoin and other virtual currencies are commodities subject to
the Commodity Exchange Act (CEA) and CFTC regulations.

Conrad Bahlke, *Recent Developments in the Regulatory Treatment of Bitcoin,* 28 No. 1 Intell.

Prop. & Tech. L.J. 6 (2016) (internal citations omitted); *see also* Reuters, *U.S. CFTC Sues Three*

*Virtual Currency Operators for Fraud*, N.Y. Times, Jan. 19, 2018 ("The U.S. derivatives

watchdog said on Friday that it has filed charges against three separate virtual currency operators

alleging the defendants had defrauded customers and broken other commodity trading rules, in a

further sign regulators globally are cracking down on the emerging asset class."); *CFTC Charges*

*Randall Crater, Mark Gillespie and My Big Coin Pay Inc. with Fraud and Misappropriation in*

*Ongoing Virtual Currency Scam*, Jan. 24, 2018 ("The [CFTC] today announced the filing of a

federal court enforcement action under seal on January 16, 2018, charging commodity fraud and

misappropriation related to the ongoing solicitation of customers for a virtual currency known

as My Big Coin . . .").

Legitimization and regulation of virtual currencies has followed from the CFTC's

allowance of futures trading on certified exchanges.  Akin Oyedele, *Bitcoin Futures Trading gets*

*Green Light from [U.S.] Regulators*, Business Insider, Dec. 1, 2017 ("In a statement, the CFTC

said the Chicago Mercantile Exchange and the CBOE Futures Exchange self-certified new

contracts for bitcoin futures products. The Cantor Exchange self-certified a new contract for

bitcoin binary options. The futures contracts will make it possible to bet on bitcoin prices without

buying the cryptocurrency.").  Two futures exchanges, Chicago Mercantile Exchange and the

CBOE Futures Exchange, as of February 23, 2018, exceeded "$150 million in daily trading

volume."  CFTC Brief, at 6.  The CFTC has "actively policed" futures exchanges for "violating

core principles" such as "failing to enforce its prohibitions against unlawful wash trading and

prearranged trades." *Id.; see In Re TeraExchange LLC,* CFTC No.15-33, 2015 WL 5658082 (Sept. 24, 2015).

### 3. Concurrent Oversight from Other Agencies

The SEC, IRS, DOJ, Treasury Department, and state agencies have increased their regulatory action in the field of virtual currencies without displacing CFTC's concurrent authority. Most current regulatory action takes the form of pursuing criminal and fraudulent conduct after it occurs.

> A new division of the Securities and Exchange Commission dedicated to so-called "initial coin offerings" (ICOs) filed its first charges on Friday, targeting a scam that reportedly raised $15 million from thousands of investors by promising a 13-fold profit in less than a month.
>
> In a criminal complaint filed in Brooklyn federal court, the new SEC division, known as the Cyber Unit, describes how Dominic Lacroix sold digital tokens known as "PlexCoins" as part of a purported plan "to increase access to cryptocurrency services" across the world.

Jeff John Roberts, *The SEC's New Cyber Unit Just Filed Its First Charges Over an ICO Scam*, Dec. 4, 2017; Robert J. Anello, *New-Wave Legal Challenges for Bitcoin and Other CryptoCurrencies*, Law Journal Newsletters, Nov. 2017 ("Over the last few months the SEC has demonstrated that it intends to pursue enforcement of securities law on certain cryptocurrency transactions, especially increasingly popular [Initial Coin Offerings], in response to concerns about fraud and manipulation."); Tara Siegel Bernard, *When Trading in Bitcoin, Keep the Tax Man in Mind*, N.Y. Times, Jan. 18, 2018 ("In late 2016, the I.R.S. made it clear that it was searching for cryptocurrency tax evaders: The agency sent a broad request to Coinbase, the largest Bitcoin exchange in the United States, requesting records for all customers who bought digital currency from the company from 2013 to 2015.").

### IV. Law

A.  Jurisdiction

District courts have jurisdiction over any action in which the United States is a plaintiff. U.S. Const. Art. III § 2 ("The judicial Power shall extend to all Cases . . . [or] Controversies to which the United States shall be a Party."); 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.").

Under 28 U.S.C. § 1331 district courts also "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  *See U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd*., 110 F.3d 861, 864 (2d Cir. 1997) ("[T]he subject matter jurisdiction provisions of Title 28 having broadest application are those granting the district courts power to entertain cases based on federal questions.").

B.  Standing

Pursuant to Title 7 U.S.C. § 13a-1(a) the CFTC may seek injunctive or other relief when it believes that a person or entity is in violation of the CEA.  ("[T]he Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions."); *see also U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 241 (S.D.N.Y. 2012) ("The Commission may [] bring claims alleging violations of the CEA.").  Relief may be sought in the "district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur." Title 7 U.S.C. § 13a-1(e).

1.  Enforcement Power of CFTC

15

Exclusive jurisdiction over "accounts, agreements . . . and *transactions involving swaps or contracts of sale of a commodity for future delivery*" has been granted to the CFTC.  Title 7 U.S.C. § 2 (emphasis added).  Any commodity traded as a future must be traded on a commodity exchange approved by the CFTC.  Title 7 U.S.C. § 6.

The CEA and its "remedial statutes" are to be "construed liberally" to allow for broad market protection.  *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n,* 205 F.3d 165, 173 (5th Cir. 2000) ("In 1974, Congress gave the Commission even greater enforcement powers, in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising. Remedial statutes are to be construed liberally, and in an era of increasing individual participation in commodities markets, the need for such protection has not lessened.").

The court generally defers to an agency's interpretation of a statute "that the agency is responsible for administering."  *Sierra Club, Inc. v. Leavitt,* 488 F.3d 904, 911–12 (11th Cir. 2007) (citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837 (1984)); *Commodity Futures Trading Comm'n v. Am. Precious Metals, LLC*, 845 F. Supp. 2d 1279, 1282–83 (S.D. Fla. 2011) ("*Chevron* applies to the instant case because the CFTC is construing a jurisdictional provision of the CEA—a statute it is responsible for administering.") (emphasis in original).

Full deference is dependent on whether the agency's interpretation followed a formal rulemaking process.  *Commodity Futures Trading Comm'n v. Sterling Trading Grp., Inc.*, 605 F. Supp. 2d 1245, 1265–66 (S.D. Fla. 2009) (citing *TVA v. Whitman*, 336 F.3d 1236, 1250 (11th Cir. 2003)) ("*Chevron* deference is confined to those instances in which the agency renders its interpretation in the course of a rulemaking proceeding or adjudication. [E]ven if an agency's interpretation of its own statute is advanced in the course of litigation rather than through a

rulemaking or agency adjudication, courts will still pay some deference to the agency's

interpretation.").

a.   Virtual Currencies are Commodities

Black's Law Dictionary defines a commodity as "an article of trade or commerce."

Bryan Garner, *Black's Law Dictionary*, (10th ed. 2014).  Merriam Webster defines it as "[a]n

economic good . . . [or] an article of commerce . . ."  Merriam Webster, https://www.merriam-

webster.com/ dictionary/commodity (last visited Feb. 5, 2018).

Commentators have argued that based on common usage, virtual currency should be

interpreted as a commodity.

> It would make sense for regulators to treat Bitcoin as a commodity. Commodities
> are generally defined as "goods sold in the market with a quality and value
> uniform throughout the world." This categorization would be appropriate because
> it realistically reflects the economic behavior of Bitcoin users and squares with
> traditional economic conceptions of exchange.

Mitchell Prentis, *Digital Metal: Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev.

609, 626 (2015).

Some propose that because virtual currencies provide a "store of value" they

function as commodities:

> A commodity is any item that "accommodates" our physical wants and needs.
> And one of these physical wants is the need for a store of value. Throughout
> history humans have used different commodities as a store of value – even cocoa
> beans – but, more persistently, gold. In contrast, a security is any instrument that
> is "secured" against something else. As a currency is usually secured by a
> commodity or a government's ability to tax and defend, it is considered to be a
> security. By these definitions, bitcoin with a lower case "b," is a commodity, and
> not a currency, while Bitcoin with a capital "B" is the technology, or network,
> that bitcoin moves across. The analogy would be Shale technology versus shale
> oil.

Jeff Currie, *Bullion Bests bitcoin, Not Bitcoin*, Goldman Sachs Global Investment Research,

Mar. 11, 2014.

Others argue virtual currencies are commodities because they serve as a type of monetary exchange:

> Bitcoin should primarily be considered a commodity because it serves the function of money in its community of users. Users exchange Bitcoins to obtain property that they desire. In his seminal work, *Man, Economy, and State,* Murray Rothbard argues that all monetary exchanges are actually indirect commodity exchanges. Rothbard supports his proposition by tracing the development of money and exchange. Before the widespread adoption of a common form of money, people had to engage in bartering, or "direct exchange," in order to complete transactions . . .
>
> Furthermore, while Bitcoin acts as a money commodity in its community of users, from a pricing standpoint, it is valued like other commodities. The price of traditional commodities, like gold, silver, and agricultural products, vary in accordance with their demand and scarcity. When more people want a commodity that has a fixed supply, the price rises.
>
> Similarly, the price of Bitcoin fluctuates according to the same fixed supply model. Bitcoins are scarce because the algorithm controlling how many Bitcoins are released into the market through mining [] is designed to taper the supply of bitcoins, until no more are created. Bitcoins are considered rare because there is a fixed supply of them, leading users to be willing to pay increasing prices to control them. The value of a Bitcoin is ultimately driven by supply and demand— a coin is worth whatever someone is willing to pay for it.

Prentis, at 628–29 (internal citations omitted).

### b.   Commodity Exchange Act's Definition of "Commodity"

CEA defines "commodities" as "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, *and all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in*." Title 7 U.S.C. § 1(a)(9) (emphasis added).

The original grant of power to the CEA was designed to control trading in agricultural commodities.  Other goods, as well as services, rights and interests, are now covered by the statute.  *See, e.g., United States v. Brooks*, 681 F.3d 678, 694 (5th Cir. 2012) ("Natural gas is plainly a 'good' or 'article.' The questions thus turns on whether it is a good 'in which contracts for future delivery are presently or in the future dealt with.'").

The CEA covers intangible commodities.  *See, e.g.*, *In re Barclays PLC,* CFTC No. 15-25 (May 20, 2015) (regulating fixed interest rate benchmarks as commodities); *cf. Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395–96 (E.D.N.Y. 2017) (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)) ("That the meteoric rise of virtual reality through the Internet and its impact on communal and commercial affairs could not have been anticipated by Congress does not mean the law's application to the Internet and website is ambiguous; 'the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'").

c.   CFTC's Interpretation of "Commodity"

After an administrative proceeding in 2015, the CFTC issued an order finding, for the first time, that virtual currencies can be classified as commodities.  *In the Matter of: Coinflip, Inc.,* CFTC Docket No. 15-29 ("Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.").

Multiple statements defining virtual currency as a commodity have been issued by the CFTC.  *See* App. B, *CFTC Primer*, at 11 ("The definition of 'commodity' in the CEA is broad . . . It can mean physical commodity, such as an agricultural product . . . It can mean currency or interest rate."); *CFTC Launches Virtual Currency Resource Web Page*, Press Release, Dec. 15, 2017 ("Bitcoin and other virtual currencies have been determined to be commodities under the

Commodity Exchange Act (CEA). The [CFTC] primarily regulates commodity derivatives contracts that are based on underlying commodities. While its regulatory oversight authority over commodity cash markets is limited, the CFTC maintains general anti-fraud and manipulation enforcement authority over virtual currency cash markets as a commodity in interstate commerce.").

d.   Derivative Contracts and Futures

Regulatory authority over commodities traded as futures and derivatives has been granted to CFTC. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 372 (D.C. Cir. 2013) ("The Commodity Exchange Act (CEA), Title 7, United States Code, Chapter 1, establishes and defines the jurisdiction of the Commodity Futures Trading Commission. Under this Act, the Commission has regulatory jurisdiction over a wide variety of markets in futures and derivatives, that is, contracts deriving their value from underlying assets.").

Title 7 U.S.C. § 9(1) of the CEA makes it unlawful for any person to:

use or employ, in connection with any swap, *or a contract of sale of any commodity in interstate commerce*, or for future delivery on or subject to the rules of any registered entity, *any manipulative or deceptive device or contrivance*, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010 . . . (emphasis added).

17 C.F.R. § 180.1 further defines the regulatory power of the CFTC:

(a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit . . .

20

Liability, under the CEA, for commodity fraud, is shown by: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *Commodity Futures Trading Comm'n, v. Commodity Inv. Grp., Inc.,* No. 05 CIV 5741(HB), 2006 WL 353466, at *1 (S.D.N.Y. Feb. 11, 2006) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1328 (11th Cir. 2002)).

### e.   Regulation of Spot Market Fraud

The CFTC has recently expanded its enforcement to fraud related to spot markets underlying the (already regulated) derivative markets. *See, e.g.,* App. B, *CFTC Primer* (finding the CFTC has jurisdiction "if there is fraud or manipulation involving a virtual currency traded in interstate commerce"); *CFTC v. Gelfman Blueprint, Inc.,* Case No. 17-7181 (S.D.N.Y. Filed Sept. 21, 2017) (suit brought by the CFTC alleging a Bitcoin Ponzi scheme, not involving future contracts).

In *Gelfman*, as in the instant case, the CFTC relied on the broad statutory authority in Section 9(1) of the CEA, and regulatory authority under 17 C.F.R. § 180.1.  Specifically, the language in § 180.1 prohibiting "any person, directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce" from using a "manipulative device, scheme, or artifice to defraud," or making "any untrue or misleading statement of a material fact."

The portion of the statute delegating oversight authority over "*contract of sale of any commodity in interstate commerce*" allows CFTC to enforce its mandate in cases not directly involving future trades.  17 C.F.R. § 180.1 (emphasis added); *see* Gary DeWaal, *CFTC Files Charges Alleging Bitcoin Ponzi Scheme Not Involving Derivatives*, Sept. 24, 2017 ("The CFTC brought its current action [*Gelfman*] under a relatively new provision of law (enacted as part of

the Dodd-Frank Wall Street Reform and Consumer Protection Act) and Commission regulation that prohibits any person from using a manipulative or deceptive device or contrivance in connection with any 'contract for sale of any commodity in interstate commerce' – not solely in connection with swaps or a commodity for future delivery.").

Where a futures market exists for a good, service, right, or interest, it may be regulated by CFTC, as a commodity, without regard to whether the dispute involves futures contracts. *See, e.g., Brooks*, 681 F.3d at 694-95 ("[F]utures contracts for natural gas are traded on NYMEX, and those futures are derivative of natural gas traded at Henry Hub. Nonetheless, the record shows that natural gas may be moved from any location to Henry Hub through the national pipeline system. Thus, it would be peculiar that natural gas at another hub is not a commodity, but suddenly becomes a commodity solely on the basis that it passes through Henry Hub, and ceases to be a commodity once it moves onto some other locale. While the price of that commodity may fluctuate with its location, and the forces of supply and demand at that location, the actual nature of the 'good' does not change.").

CFTC does not have regulatory authority over simple quick cash or spot transactions that do not involve fraud or manipulation. Title 7 U.S.C. § 2(c)(2)(C)(i)(II)(bb)(AA) (The CFTC does not have jurisdiction over "spot" transactions that "[result] in actual delivery within 2 days."). This boundary has been recognized by the CFTC. It has not attempted to regulate spot trades, unless there is evidence of manipulation or fraud. *See* App. C, CFTC Chair, Congressional Testimony ("[T]he CFTC does not have authority to conduct regulatory oversight over spot virtual currency platforms or other cash commodities, including imposing registration requirements, surveillance and monitoring, transaction reporting, compliance with personnel

conduct standards, customer education, capital adequacy, trading system safeguards, cyber

security examinations or other requirements.").

2. Concurrent Jurisdiction

Federal agencies may have concurrent or overlapping jurisdiction over a particular issue

or area.  *See, e.g.,* Todd S. Aagaard, *Regulatory Overlap, Overlapping Legal Fields, and*

*Statutory Discontinuities*, 29 Va. Envtl. L.J. 237, 240 (2011)) ("[T]he Environmental Protection

Agency (EPA) and the Occupational Safety and Health Administration (OSHA) manage

overlapping statutory authorities. Both the EPA and OSHA regulate certain risks in the

workplace arising from exposures to hazardous and toxic substances.").

> Agencies often cooperate to enforce their overlapping powers.
>
> [Agencies] have explored joint rulemaking, such as the Environmental Protection
> Agency (EPA) and the Department of Transportation (DOT) collaboration on fuel
> standards. They have discussed coordination in individual-level adjudication, such
> as the Department of Justice (DOJ) and the Department of Homeland Security
> (DHS) partnering in cases involving persons without proper documentation. And
> they have analyzed agency collaboration in shaping policy in complex and novel
> areas, such as work by DHS and the National Security Agency (NSA) to combat
> cyber threats.

Daniel A. Farber & Anne Joseph O'Connell, *Agencies As Adversaries*, 105 Cal. L. Rev. 1375,

1384 (2017); *but see Hunter v. F.E.R.C.*, 711 F.3d 155, 157 (D.C. Cir. 2013) ("Stated simply,

Congress crafted CEA section 2(a)(1)(A) to give the CFTC exclusive jurisdiction over

transactions conducted on futures markets.").

C. Preliminary Injunction Standard

Under Title 7 U.S.C. § 13a-1(a) the CFTC may seek injunctive or other relief when it

concludes that a person or entity is in violation of the CEA.  "The CFTC is entitled to a

preliminary injunction upon a *prima facie* showing that defendants have violated the Act and

'that there is a reasonable likelihood that the wrong will be repeated.'"  *Commodity Futures*

23

*Trading Comm'n, v. Commodity Inv. Grp., Inc*., No. 05 CIV 5741(HB), 2006 WL 353466, at *1

(S.D.N.Y. Feb. 11, 2006) (quoting *CFTC v. British Am. Commodity Options Corp.,* 560 F.2d

135, 141 (2d Cir.1977)).  When enforcing a statutorily prescribed injunction, the CFTC "need

not prove irreparable injury or the inadequacy of other remedies as required in private injunctive

suits." *British Am.,* 560 F.2d at 141.  Likelihood of future violations may be inferred from a

"defendant's past conduct." *CFTC v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242, 1251 (2d Cir.

1986).

V.    Application of Law

A.  CFTC Standing

The CFTC has standing pursuant to Title 7 U.S.C. § 13a-1(a) to seek injunctive and other

relief related to misleading advice, and the fraudulent scheme and misappropriation of virtual

currencies by defendants.

1.  Virtual Currencies as Commodities

Virtual currencies can be regulated by CFTC as a commodity.  Virtual currencies are

"goods" exchanged in a market for a uniform quality and value.  Mitchell Prentis, *Digital Metal:*

*Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev. 609, 626 (2015).  They fall well-

within the common definition of "commodity" as well as the CEA's definition of "commodities"

as "all other goods and articles . . . in which contracts for future delivery are presently or in the

future dealt in."  Title 7 U.S.C. § 1(a)(9).

The jurisdictional authority of CFTC to regulate virtual currencies as commodities does

not preclude other agencies from exercising their regulatory power when virtual currencies

function differently than derivative commodities.  *See, e.g.,* Jay Clayton [SEC Chair] and

Christopher Giancarlo [CFTC Chair], *Regulators are Looking at Cryptocurrency,* Wall Street

Journal, Jan. 24, 2018 ("The SEC does not have direct oversight of transactions in currencies or commodities. Yet some products that are labeled cryptocurrencies have characteristics that make them securities. The offer, sale and trading of such products must be carried out in compliance with securities law. The SEC will vigorously pursue those who seek to evade the registration, disclosure and antifraud requirements of our securities laws.").

The Chicago Mercantile Exchange Inc. ("CME") has filed an *amicus* brief.  *See* ECF No. 27, Mar. 6, 2018.  It claims to operate the "world's leading derivatives marketplace."  *Id.* at 1.  It supports the view that virtual currencies are commodities subject to the CFTC's regulatory protections.  It writes:

> CME offers for the Court's consideration an explanation of the possible consequences of a determination that a virtual currency such as bitcoin is not a commodity. Such a determination would put in jeopardy CME's and its market participants' expectation to rely on . . . the CFTC's regulatory protections for commodity derivatives contracts based on virtual currencies. This legal uncertainty would substantially disrupt the settled expectations of CME and numerous market participants who are trading bitcoin futures for purposes of hedging cash market exposures or making a market in bitcoin futures by offering liquidity, in addition to market professionals that clear, broker or manage virtual currency futures trading activity.

*Id.* at 2.

## 2.   CFTC Jurisdiction Over Virtual Currency Fraud

CFTC has jurisdictional authority to bring suit against defendants utilizing a scheme to defraud investors through a "contract [for] sale of [a] commodity in interstate commerce."  Title 7 U.S.C. § 9(1).  Although the CFTC has traditionally limited its jurisdiction primarily to "future" contracts for commodities, its expansion into spot trade commodity fraud is justified by statutory and regulatory guidelines.  *See CFTC v. Gelfman Blueprint, Inc.,* Case No. 17-7181 (S.D.N.Y. Filed Sept. 21, 2017); *see also* Gary DeWaal, *CFTC Files Charges Alleging Bitcoin Ponzi Scheme Not Involving Derivatives*, Sept. 24, 2017 ("This CFTC complaint [*CFTC v.*

*Gelfman Blueprint, Inc.*] has significant ramifications beyond its four corners. It represents a powerful statement by the Commission that it will exercise jurisdiction over cryptocurrencies when there is potential fraud – even if the fraud does not involve derivatives based on cryptocurrencies.").

Language in 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1, establish the CFTC's regulatory authority over the manipulative schemes, fraud, and misleading statements alleged in the complaint.  17 C.F.R. § 180.1 ("It shall be unlawful for any person, directly or indirectly, in connection . . . [with any] contract of sale of any commodity in interstate commerce . . . to [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit . . .").

B.  Prima Facie Showing of Fraud Committed by Defendants

CFTC has made a prima facie showing that the defendants committed fraud by misappropriation of investors' funds and misrepresentation of trading advice and future profits promised to customers.  CFTC Brief, at 11 (citing Giglio Decl. ¶ 26) ("[O]nce Defendants had solicited and obtained [] Customer funds for trading by Defendants on behalf of customers, Defendants ceased communicating with the customers and misappropriated the customers' funds.").  The intentional nature of the defendants' conduct, as required by 17 C.F.R. § 180.1, is evidenced by the blatant disregard of customers' complaints and their refusal to return investors' funds.  *See* Giglio Decl. ¶¶ 29-32; *see also* Hr'g Tr., Mar. 6, 2018.

C.  Preliminary Injunction

26

A preliminary injunction is granted in favor of the CFTC.  The court concludes that without an injunction there is a reasonable likelihood that defendants will continue to violate the CEA.  A separate order outlining the terms of the relief is issued.  *See* App. A, Prelim. Injunction.

### D.  Appropriate Research by Court

In deciding jurisdictional, standing and other issues fundamental to the present litigation, the court has engaged in extensive background research, but not on the specific frauds charged. This is appropriate.

The ABA has issued the following opinion related to individual research by the court:

> Easy access to a vast amount of information available on the Internet exposes judges to potential ethical problems. Judges risk violating the Model Code of Judicial Conduct by searching the *Internet for information related to participants or facts in a proceeding. Independent investigation of adjudicative facts generally is prohibited* unless the information is properly subject to judicial notice. The restriction on independent investigation includes individuals subject to the judge's direction and control.

Committee on Ethics and Responsibility, *Independent Factual Research by Judges Via Internet*, Formal Opinion 478, Dec. 8, 2017 (ABA) (emphasis added).

It is appropriate and necessary for the judge to do research required by a case in order to understand the context and background of the issues involved so long as the judge indicates to the parties the research and conclusions, by opinions and otherwise, so they may contest and clarify.  *See* Abrams, Brewer, Medwed, et al., *Evidence Cases and Materials* (10th Ed. 2017) (Ch. 9 "Judicial Notice").  It would be a misapprehension of the ABA rule to conclude otherwise.

Adjudicative facts involving defendants' alleged activities have not been the subject of investigation by the court, except at an evidentiary hearing.  *See* Hr'g Tr., Mar. 6, 2018.

VI.   Conclusion

CFTC has standing to exercise its enforcement power over fraud related to virtual currencies sold in interstate commerce.  A preliminary injunction is granted in favor of the CFTC.  *See* App. A, Prelim. Injunction.

The individual defendant's pro se motion to "Dismiss for Lack of Jurisdiction" is denied. ECF No. 18, Feb. 15, 2018.  This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.  The CFTC has adequately pled and for purpose of a preliminary injunction proved its claim of fraud in violation of the CEA.

Any person claiming improper application of the injunctive power of the court may seek relief by motion.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: March 6, 2018
       Brooklyn, New York

28

Appendix A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

    v.                                           18-CV-0361

PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

                Defendants.

## ORDER OF PRELIMINARY INJUNCTION
## AND OTHER RELIEF

### I.      INTRODUCTION

On January 18, 2018, Plaintiff Commodity Futures Trading Commission ("Plaintiff" or

"Commission") filed a Complaint for Injunctive and Other Equitable Relief and for Civil

Monetary Penalties Under the Commodity Exchange Act and Commission Regulations

("Complaint") against Defendants Patrick K. McDonnell ("McDonnell") and CabbageTech,

Corp. d/b/a Coin Drop Markets ("CDM") (collectively, "Defendants") pursuant to Section 6c(a)

of the Commodity Exchange Act ("Act"), 7 U.S.C. § 13a-1 (2012).

On January 30, 2018, the court directed the parties to appear for an evidentiary hearing at

which the court would consider temporary relief and further administration of the action.  ECF

No. 9.  Subsequent Orders directed the parties to address the Commission's authority to bring

this action and notified the parties that the court would hear the parties on jurisdictional,

standing, and other issues at the hearing, set for March 6, 2018.  ECF No. 10, ECF  No. 17.

On February 26, 2018, the Commission filed its briefs and supporting documents, including the Brief of Commodity Futures Trading Commission in Support of a Preliminary Injunction and Other Relief, the Declaration of Christopher Giglio, that set forth its arguments, including advocating for the issuance of an order (1) prohibiting Defendants from further violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a) (2017); (2) preserving the books and records of Defendants, and providing the Commission with access thereto; and (3) ordering Defendants to submit to an interim accounting on an expedited basis.

On March 6, 2018, the court, with advance notice, *see* ECF No. 23, Feb. 27, 2018, held an evidentiary hearing on the request for preliminary injunction.

The court has considered the Brief of Commodity Futures Trading Commission in Support of a Preliminary Injunction and Other Relief, the Complaint, the Declaration of Christopher Giglio, all filings by Defendant McDonnell to date, and testimony and evidence introduced at the March 6, 2018 hearing.  It finds that there is good cause for the entry of this Order and that there is no just reason for delay. The court therefore directs the entry of the following findings of fact, conclusions of law, and preliminary injunction and other equitable relief pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1.

## II.     FINDINGS AND CONCLUSIONS THE COURT FINDS
##         AND CONCLUDES AS FOLLOWS:

### A.     FINDINGS OF FACT

**The Parties**

1.     Plaintiff **Commodity Futures Trading Commission** ("Commission" or "CFTC") is an independent federal regulatory agency that is charged by Congress with the

administration and enforcement of the Act, 7 U.S.C. §§ 1-27(f) (2012), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2017).

2.      Defendant **CabbageTech, Corp.** is a New York corporation based on Staten Island, New York.  It was incorporated on May 6, 2016.  CabbageTech, Corp.'s last known address is 20 Rawson Place, Suite B, Staten Island, New York, 10314.  At times, CabbageTech, Corp. did business as **Coin Drop Markets** (together with CabbageTech, Corp, "CDM").  CDM has never registered with the Commission.

3.      Defendant **Patrick K. McDonnell** ("McDonnell") is a resident of Staten Island, New York.  McDonnell formed, owned, and controlled CabbageTech, Corp.  McDonnell has never registered with the Commission

**Defendants' Fraud Involving Advice About Trading Virtual Currencies**

4.      Defendants solicited customers in several of the United States as well as foreign countries to become members of groups supposedly to receive Defendants' virtual currency consulting services and trading advice.

5.      In April 2017, Defendants advertised membership in trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to Bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to Litecoin.  These groups purported to provide trading advice and guidance, such as entry and exit prices for day trading of virtual currencies.  Defendants  also solicited membership or subscription to other groups and services, such as a "Turn-Key Annual Membership" providing access, for instance, to McDonnell's and CDM's supposed virtual currency trading expertise, mentorship, and guidance.

6.      CDM's promotional materials made claims that a CDM membership in RLGLLTC would provide "real-time . . . reports [of] critical $LTC entry/exit points via

@RLGLLTC 24/7 including holidays/weekends." These promotional materials further made claims that this continuous, ongoing monitoring and trading signals "afford[ed] 'minute-to-minute' price arbitrage, exploitation, and opportunities for swing trading profits." These promotional materials also made claims such as a trading group was "a dedicated team of digital asset trading specialists trend spotting."

7.      These materials promised to provide the membership services on an annual basis in exchange for an up-front subscription fee. Defendants further solicited "lifetime" memberships, at a higher price, in a more exclusive trading sector that would provide greater opportunities to profit from virtual currency trading. One such opportunity purported to offer profits as much as a 300% return on an investment in less than a week. In or around May 2017, Defendants created one or more social media chatrooms, purportedly to provide agreed-upon trading advice and services.

8.      After receiving subscription payments from multiple CDM Customers, Defendants did not provide to such customers continuous, real-time trading signals, advice, or trading expertise through its social media chatrooms, through online communications such as via Twitter, or through its website. For example, Defendants never provided "real-time . . . reports [of] critical $LTC entry/exit points via @RLGLLTC 24/7 including holidays/weekends." Defendants' RLGLLTC never provided signals that "afford[ed] 'minute-to-minute' price arbitrage, exploitation, and opportunities for swing trading profits."

9.      Defendants misappropriated CDM Customers' funds. By July 2017, Defendants shut down the website and chatroom, deleted social media accounts, ceased communicating with customers, and kept the customers' funds.

**Defendant's Fraud Involving Management of Customer Investments in Virtual Currency**

10.      McDonnell described himself in solicitations as a "professional trader," and CDM's website included a purported example of a single virtual currency trade that had generated more than an approximately 1,000% return.

11.      Instead of achieving enormous gains on behalf of CDM Customers, once Defendants had solicited and obtained CDM Customer funds for trading by Defendants on behalf of customers, Defendants ceased communicating with the customers and misappropriated the customers' funds.

12.      In or around May 2017, after being solicited by McDonnell, one CDM Customer  provided Litecoin to Defendants for trading by McDonnell on the customer's behalf.  McDonnell  told this customer that he would use the customer's funds to trade the "volatility" of Litecoin.  In  fact, Defendants misappropriated this customer's funds and ultimately ceased communicating with the customer.

**CDM's Controlling Person**

13.      McDonnell founded and created CDM, and controlled content on the CDM website and related social media.  McDonnell controlled bank and virtual currency accounts to which he directed CDM Customers to send money for the purchase of CDM services and for Defendants-managed trading.  McDonnell was responsible for developing and disseminating the false and misleading information about CDM to CDM Customers through CDM's solicitation materials.

**B.     CONCLUSIONS OF LAW**

**Jurisdiction and Venue**

14.     The Court has jurisdiction over the subject matter of this action under 28  U.S.C. § 1331 (2012) and 28 U.S.C. § 1345 (2012).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2012), authorizes the Commission to seek injunctive and other relief against any person  whenever it shall appear to the Commission that such person has engaged, is engaging in, or is  about to engage in any act or practice constituting a violation of any provision of the Act, or any  rule, regulation, or order thereunder.

15.     Venue properly lies in this District, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the Act occurred within this District, among other places.

**Injunctive Relief is Appropriate**

16.     The Commission has presented a prima facie case for the purpose of obtaining a preliminary injunction based on the fact that Defendants have engaged  or are engaging in violations the Act and Commission Regulations as set forth in the Complaint.

17.     The Commission has demonstrated a reasonable likelihood of future violations by the Defendants.

18.     A preliminary injunction and other relief are warranted in light of the allegations set forth in the Complaint, evidence submitted at a hearing held by the court, the Commission's likelihood of success on the merits of its claims  against the Defendants, and the reasonable likelihood of future violations by the Defendants.

### III.    RELIEF GRANTED

**A.    PRELIMINARY INJUNCTIVE RELIEF**

**IT IS HEREBY ORDERED** that:

19.    Defendants, their officers, agents, servants, employees, successors, assigns, and attorneys, and all persons in active concert or participation with Defendants who receive notice of this Order by personal service or otherwise, are hereby restrained, enjoined, and  prohibited until further order of the court, from directly or indirectly, in connection with any  swap, or contract of sale of any commodity in interstate commerce, or contract for future  delivery on or subject to the rules of any registered entity, intentionally or recklessly:

A.    using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud;

B.    making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make statements made not untrue or misleading; and

C.    engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person;

in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), or Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017).

20.    Defendants, their officers, agents, servants, employees, successors, assigns, or attorneys, and all persons in active concert or participation with Defendants who receive notice of this Order by personal service or otherwise, are hereby restrained, enjoined, and  prohibited until further order of the court, from directly or indirectly:

A.    Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012);

7

B.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for their own personal account or for any account in which they have a direct or indirect interest;

C.      Having any commodity interests traded on their behalf;

D.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

E.      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity;

F.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and

G.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017).

B.      **MAINTENANCE OF AND ACCESS TO BUSINESS RECORDS**

**IT IS FURTHER ORDERED** that:

21.     Defendants are restrained from directly or indirectly destroying, mutilating, erasing, altering, concealing or disposing of, in any manner, directly or indirectly, any documents that relate to the business practices or business or personal finances of any Defendant.

8

22.     Any financial or brokerage institution, business entity, or person that receives notice of this Order by personal service or otherwise, shall not:

A.     directly or indirectly destroy, alter or dispose of, in any manner, any records relating to the business activities and business and personal finances of any Defendant; and

B.     deny a request by the Commission to inspect any records pertaining to  any account or asset owned, controlled, managed or held by Defendants, or managed or held  on behalf of, or for the benefit of, any Defendants, including, but not limited to, originals or copies of  account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers   to and from the accounts, debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.  As an alternative to allowing inspection of records, a financial or brokerage institution, business entity or other person may provide full un-redacted copies  of records requested by the Commission.

## C.     ACCOUNTING AND PRODUCTION OF DOCUMENTS

**IT IS FURTHER ORDERED** that:

23.     Within five (5) business days following the service of this Order, Defendants shall submit in writing and serve upon the Commission an accounting identifying:

A.     all transfers or payments of funds to them or any other entity controlled by them from any individual or entity in connection with the misconduct described in the Complaint. The identification shall include the amount of each such transfer or payment, the date of the transfer or payment, and the name, address, account number and financial institution of the party making and the party receiving the transfer or payment;

B.      in detail, the precise disposition of each such transfer or payment and any assets derived therefrom;

C.      by name and address, all persons, entities and accounts currently holding funds or assets derived from such transfers or payments and the reason each received the funds or assets.  The identification shall include the amount each received, the date received, the reason received, the institution and account number or location in which the funds or other assets are held and the name, address, account number and financial institution of the person or entity who provided each with the funds or other assets;

D.      assets of every type and description presently owned by or held for the direct or indirect benefit, or subject to the direct or indirect control, of any Defendant, whether in the United States or elsewhere; and

E.      the identification number of each account or other asset controlled, managed, or held by, on behalf of, or for the benefit of a Defendant, either individually or jointly; the balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and the identification of any safe deposit box that is owned controlled, managed, or held by, on behalf of, or for the benefit of a Defendant, either individually or jointly, or is otherwise subject to access by Defendants.

24.     Upon request by the Commission, each Defendant shall promptly provide the Commission with copies of all records or other documentation pertaining to any account or asset identified in response to Paragraph 23 above, including, but not limited to, originals or copies of

account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers

to and from the accounts, all other debit and credit instruments or slips, currency transaction

reports, Internal Revenue Service Forms 1099, and safe deposit box logs.

### IV.   **MISCELLANEOUS PROVISIONS**

25.   *Definitions*.  For the purposes of this Order, the following definitions apply:

A.   "Assets" means any legal or equitable interest in, right to, or claim to, any

real or personal property, whether individually or jointly, directly or indirectly controlled, and

wherever located, including, but not limited to:  chattels, goods, instruments, equipment, fixtures,

general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes,

accounts (including, but not limited to, bank accounts and accounts at other financial

institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or

swaps contracts), insurance policies, and all cash, wherever located, within or outside   the United

States.

B.   The term "document" is synonymous in meaning and equal in scope to the

broad usage of the term in Federal Rule of Civil Procedure 34(a).

26.   *Service of this Order*.  Copies of this Order may be served by any means,

including mail, electronic mail, facsimile transmission, Fedex, and United Parcel Service, upon

any financial   institution or other entity or person that may have possession, custody, or control

of any  document or asset of Defendants, or that may be subject to any provision of this Order.

27.   *Bond Not Required of Plaintiff*. Plaintiff is an agency of the United States, and

therefore, pursuant to Section 6c(b) of the Act, 7 U.S.C. §13a-1(b) (2012), no bond is required

prior to entry of this Order.

28.    *Continuing Jurisdiction of this Court*.  This Order shall remain in effect until further order of the court.  The court shall retain jurisdiction over this action to ensure compliance with this Order and for all other purposes related to this action.

29.    Any person claiming improper application of the injunctive power of the court may seek relief by motion.

**SO ORDERED.**

/s/ Jack B. Weinstein
_____
Jack B. Weinstein
Senior United States District Judge

Dated: March 6, 2018
        Brooklyn, New York

Appendix B

**October 17, 2017**



# A CFTC Primer on Virtual Currencies



**CFTC**

*Please note that LabCFTC cannot and will not provide legal advice.  If you have specific questions regarding your activities and whether they conform to legal or regulatory requirements,  you should consult with a qualified lawyer or appropriate expert.  LabCFTC has no independent authority or decision-making power, and cannot independently provide, or create an expectation for, legal or regulatory relief.   Communications from LabCFTC shall not create estoppel against CFTC or other enforcement actions.  Any formal requests for relief must be addressed by relevant CFTC staff or, as necessary, by the Commission.  LabCFTC will work with entities on such requests with the appropriate offices through established processes.*

# Contents

*This primer format is intended to be an educational tool regarding emerging FinTech innovations. It is not intended to describe the official policy or position of the CFTC, or to limit the CFTC's current or future positions or actions. The CFTC does not endorse the use or effectiveness of any of the financial products in this presentation. It is organized as follows:*

- Overview
    - What is a Virtual Currency?
    - Bitcoin and Related Technologies
    - Potential Uses of Virtual Currencies and Blockchain Technologies

- The Role of the CFTC
    - The CFTC's Mission
    - Sample Permitted and Prohibited Activities
    - ICOs, Virtual Tokens, and CFTC Oversight

- Risks of Virtual Currencies
    - Operational Risks
    - Speculative Risks
    - Cybersecurity Risks
    - Fraud and Manipulation Risks



# OVERVIEW OF VIRTUAL CURRENCIES

# What is a Virtual Currency?

- Although precise definitions offered by others are varied, an IRS definition provides us with a general idea:

  − "Virtual currency is a digital representation of value that functions as **a medium of exchange, a unit of account, and/or a store of value.**

  − In some environments, it operates like 'real' currency . . . but it **does not have legal tender status** [in the U.S.].

  − Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as 'convertible' virtual currency. **Bitcoin is one example of a convertible virtual currency**.

  − Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies."[†]

[†]IRS Notice 2014-21, available at https://www.irs.gov/businesses/small-businesses-self-employed/virtual-currencies (emphasis added).  Please note that this definition is not a statement of the Commission's view, and is instead offered as an aid to enhance public understanding of virtual currencies. We further note that one prominent type of virtual currency is cryptocurrency.  Cryptocurrency has been described as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party."  Satoshi Nakamoto, Bitcoin: A Peer-to-Peer Electronic Cash System (Oct. 31, 2008), available at https://bitcoin.org/bitcoin.pdf.

4

# What is Bitcoin?

- Bitcoin is currently the largest convertible virtual currency by market capitalization (close to $72 billion in August 2017)[†]

- Bitcoin was created in 2008 by a person or group that used the name "Satoshi Nakamoto," with the belief that:

  *"[w]hat is needed is an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party."*

- Bitcoin:
  - Is "pseudonymous" (or partially anonymous) in that an individual is identified by an alpha-numeric public key/address;
  - Relies on cryptography (and unique digital signatures) for security based on public and private keys and complex mathematical algorithms;
  - Runs on a decentralized peer-to-peer network of computers and "miners" that operate on open-source software and do "work" to validate and irrevocably log transactions on a permanent public distributed ledger visible to the entire network;
  - Solves the lack of trust between participants who may be strangers to each other on a public ledger through the transaction validation work noted in the sub-bullet above; and
  - Enables the transfer of ownership without the need for a trusted, central intermediary.

[†] Paul Vigna, *Bitcoin, Valued Like a Cool Blue Chip, Trading Like a Hot Small Cap*, Wall Street Journal (Aug. 29, 2017), available at https://blogs.wsj.com/moneybeat/2017/08/28/bitcoin-valued-like-a-blue-chip-trading-like-a-small-cap/.  It is important to note that  there are many other virtual currencies with sizeable market capitalizations  that are built upon various Blockchain technologies, but may have different characteristics or functionalities than Bitcoin, including Ethereum (or Ether), Litecoin, and Ripple.

5

# What is the Difference between Public and Private Ledger Systems?

- Certain virtual currencies operate on public distributed ledger systems that capture "blocks" of transactions – there is no inherent trust in this decentralized system.

  - Virtual currencies create an economic incentive for dispersed, independent, computers, or groups of computers, around the world to confirm transactions and perform verifiable "work" (that creates consensus) to publish a new block of transactions on the public ledger in exchange for a payment of the applicable virtual currency.

- Private / permissioned distributed ledger networks typically have some degree of trust between participants.

  - Private ledger systems allow a network of known participants to share transaction information between themselves more efficiently.

  - While cryptography and consensus may still be involved in private ledger systems, these systems do not necessarily involve a virtual currency that may serve as the economic incentive for miner or validator participation in public networks.

Case 1:18-cv-00361-JBW-RLM   Document 29   Filed 03/05/18   Page 5 of 79 PageID #: 451

# Sample Potential Use Cases of Virtual Currencies

- **Store of Value**
  - Like precious metals, many virtual currencies are a "non-yielding" asset (meaning they do not pay dividends or interest), but they may be more fungible, divisible, and portable
  - Limited or finite supply of virtual currencies may contrast with 'real' (fiat) currencies

- **Trading**
  - Trading in virtual currencies may result in capital gains or losses
  - Note that trading in virtual currencies may involve significant speculation and volatility risk (see Virtual Currency Risks section below)

- **Payments and Transactions**
  - Some merchants and online stores are accepting virtual currencies in exchange for physical and digital goods (i.e., payments)
  - Some public Blockchain systems rely on the payment of fees in virtual currency form in order to power the network and underlying transactions

- **Transfer / Move Money**
  - Domestic and international money transfer (e.g., remittances) in order to increase efficiencies and potentially reduce related fees

7

# Sample Potential Use Cases of Blockchain/DLT Technology

Blockchain, or distributed ledger technology,* underpins many virtual currencies, but can also be used within private, permissioned ledger systems – versions of public and private systems may be used by:

- Financial Institutions
  - Trading & Payment Platforms / Clearing and Settlement
  - Regulatory Reporting, Compliance & Audit
  - Know Your Customer (KYC) / Anti-Money Laundering (AML)
  - Repurchase Agreement Transactions ("Repos," i.e., short-term borrowing of securities)

- Governments
  - General Records Management
  - Title & Ownership Records Management (e.g., real property deeds and title transfer)
  - Regulatory Reporting and Oversight

- Cross-Industry
  - Smart Contracts (i.e., self executing agreements)
  - Resource / Asset Sharing Agreements (e.g., allowing rental of a personal car left behind during a vacation or allowing rental of excess computer or data storage)
  - Digital Identity (e.g., proof of identity when entering into a contract)

\* *See generally* Marco Iansiti and Karim R. Lakhani, *The Truth About Blockchain*, Harvard Business Review (Jan-Feb 2017), available at https://hbr.org/2017/01/the-truth-about-blockchain (for a general overview of how a public Blockchain works).

8



# THE ROLE OF THE CFTC

# The CFTC's Mission

- The mission of the CFTC is to foster open, transparent, competitive, and financially sound markets. By working to avoid systemic risk, the Commission aims to protect market users and their funds, consumers, and the public from fraud, manipulation, and abusive practices related to derivatives and other products that are subject to the Commodity Exchange Act (CEA).

- To foster the public interest and fulfill its mission, the CFTC will act:

  - To deter and prevent price manipulation or any other disruptions to market integrity;

  - To ensure the financial integrity of all transactions subject to the CEA and the avoidance of systemic risk;

  - To protect all market participants from fraudulent or other abusive sales practices and misuse of customer assets; and

  - To promote responsible innovation and fair competition among boards of trade, other markets, and market participants.

- Responsible innovation is market-enhancing.

# Virtual Currencies are Commodities

- The definition of "commodity" in the CEA is broad.
  - It can mean a physical commodity, such as an agricultural product (e.g., wheat, cotton) or natural resource (e.g., gold, oil).
  - It can mean a currency or interest rate.
  - The CEA definition of "commodity" also includes "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."

- The CFTC first found that Bitcoin and other virtual currencies are properly defined as commodities in 2015.[‡]

- The CFTC has oversight over futures, options, and derivatives contracts.

- The CFTC's jurisdiction is implicated when a virtual currency is used in a derivatives contract, or if there is fraud or manipulation involving a virtual currency traded in interstate commerce.
  - Beyond instances of fraud or manipulation, the CFTC generally does not oversee "spot" or cash market exchanges and transactions involving virtual currencies that do not utilize margin, leverage, or financing.

‡ See, In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan, CFTC Docket No. 15-29, available at http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf.

# Examples of Permitted Activities

- TeraExchange, LLC, a Swap Execution Facility ("SEF") registered with the CFTC, entered in to the virtual currency market in 2014 by listing a Bitcoin swap for trading. Trading on a SEF platform is limited to "eligible contract participants," a type of sophisticated trader, which includes various financial institutions and persons, with assets above specified statutory minimums.

- North American Derivatives Exchange Inc. ("NADEX"), a designated contract market ("DCM"), listed binary options based on the Tera Bitcoin Price Index from November 2014 to December 2016.  Retail customers may trade on NADEX.

- LedgerX, LLC ("LedgerX") registered with the CFTC as a SEF and Derivative Clearing Organization ("DCO") in July 2017.  It plans to list digital currency options.

Case 1:18-cv-00361-JBW-RLM   Document 29   Filed 03/06/18   Page 53 of 79 PageID #: 457

# Examples of Prohibited Activities‡

- Price manipulation of a virtual currency traded in interstate commerce.

- Pre-arranged or wash trading in an exchange-traded virtual currency swap or futures contract.

- A virtual currency futures or option contract or swap traded on a domestic platform or facility that has not registered with the CFTC as a SEF or DCM.

- Certain schemes involving virtual currency marketed to retail customers, such as off-exchange financed commodity transactions with persons who fail to register with the CFTC.

‡Please note that this is not an exhaustive list of prohibited activities.

# ICOs, Virtual Tokens, and CFTC Oversight

- The Securities and Exchange Commission ("SEC") recently released a report about an Initial Coin Offering or "ICO" (the "DAO Report").[‡]

- The DAO Report explains that "The DAO" is an example of a "Decentralized Autonomous Organization," which is a "virtual" organization embodied in computer code and executed on a distributed ledger or blockchain.

- Investors exchanged Ether, a virtual currency, for virtual DAO "Tokens" to fund projects in which the investors would share in anticipated earnings. DAO Tokens could be resold on web-based platforms.

- Based on the facts and circumstances, the SEC determined that DAO Tokens are "securities" under the federal securities laws.

- There is no inconsistency between the SEC's analysis and the CFTC's determination that virtual currencies are commodities and that virtual tokens may be commodities or derivatives contracts depending on the particular facts and circumstances.

  - The CFTC looks beyond form and considers the actual substance and purpose of an activity when applying the federal commodities laws and CFTC regulations

[‡] See Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, available at https://www.sec.gov/litigation/investreport/34-81207.pdf.

14



# RISKS OF VIRTUAL CURRENCIES

# Virtual Currencies Have Risks

- While virtual currencies have potential benefits, this emerging space also involves various risks, including:

  – Operational Risks

  – Cybersecurity Risks

  – Speculative Risks

  – Fraud and Manipulation Risks

- Virtual currencies are relatively unproven and may not perform as expected (for example, some have questioned whether public distributed ledgers are in fact immutable).

- Investors and users of virtual currencies should educate themselves about these and other risks before getting involved.

# Virtual Currency: Operational Risk

- *Conduct extensive research before giving any money or personal information to a virtual currency platform.*

- The virtual currency marketplace is comprised of many different platforms where you can convert one type of virtual currency into another or into real currency, if offered.

- Many of these platforms are not subject to the supervision which applies to regulated exchanges.  For example, if they engage in only certain spot or cash market transactions and do not utilize margin, leverage, or financing, they may be subject to federal and state money transmission and anti-money laundering laws, but they do not have to follow all the rules that regulated exchanges operate under.

- Some virtual currency platforms may be missing critical system safeguards and customer protection related systems; without adequate safeguards, customers may lose some or all of their virtual assets.

# Virtual Currency: Cybersecurity Risk

- *Keep your property in safe accounts and carefully verify digital wallet addresses.*

- Some platforms may "commingle" (mix) customer assets in shared accounts (at a bank for real currency or a digital wallet for virtual currency).  This may affect whether or how you can withdraw your currency.

- Depending on the structure and security of the digital wallet, some may be vulnerable to hacks, resulting in the theft of virtual currency or loss of customer assets.

  - If a bad actor gains access to your private key, it can take your virtual currency with limited or no recourse

- When transferring virtual currency, be sure to confirm the destination wallet address, even when using "copy and paste."  It is possible for hackers to change digital wallet addresses on your computer.

# Virtual Currency: Speculative Risk

- *Only invest what you are willing and able to lose.*

- The virtual currency marketplace has been subject to substantial volatility and price swings.

- An individual or coordinated group trading a large amount of virtual currency at once could affect the price, depending on the overall amount of trading in the marketplace.

- Periods of high volatility with inadequate trade volume may create adverse market conditions, leading to harmful effects such as customer orders being filled at undesirable prices.

- Some advertisements promise guaranteed returns – this can be a common tactic with fraudulent schemes.

# LabCFTC Virtual Currency: Fraud & Manipulation Risk

- *Carefully research the platform you want to use, and pay close attention to the fee structure and systems safeguards.*

- Unregistered virtual currency platforms may not be able to adequately protect against market abuses by other traders.

  - For example, recent news articles discuss potential "spoofing" activity and other manipulative behavior that can negatively affect prices

- Some virtual currency platforms may be selling you virtual currency directly from their own account – these types of transactions may give the platform unfair advantages and sometimes resemble fraudulent "bucket shop" schemes.

- There is also a risk of Ponzi schemers and fraudsters seeking to capitalize on the current attention focused on virtual currencies.

# Appendix C

**WRITTEN TESTIMONY OF**
**J. CHRISTOPHER GIANCARLO**
**CHAIRMAN, COMMODITY FUTURES TRADING COMMISSION**
**BEFORE THE**
**SENATE BANKING COMMITTEE**
**WASHINGTON, D.C.**
**FEBRUARY 6, 2018**

## Introduction: Virtual Currency

Thank you, Chairman Crapo, for the invitation to testify before the Committee.  Thank you, Ranking Member Brown, and all the members of the Committee for this opportunity to discuss virtual currencies.

At the outset, I would like to note that this hearing is timely, even fortuitous.  Emerging financial technologies broadly are taking us into a new chapter of economic history.  They are impacting trading, markets and the entire financial landscape with far ranging implications for capital formation and risk transfer.  They include machine learning and artificial intelligence, algorithm-based trading, data analytics, "smart" contracts valuing themselves and calculating payments in real-time, and distributed ledger technologies, which over time may come to challenge traditional market infrastructure. They are transforming the world around us, and it is no surprise that these technologies are having an equally transformative impact on US capital and derivatives markets.

The more specific topic for today's hearing, however, is virtual currency.  Broadly speaking, virtual currencies are a digital representation of value that may function as a medium of exchange, a unit of account, and/or a store of value.  Virtual currencies generally run on a decentralized peer-to-peer network of computers, which rely on certain network participants to validate and log transactions on a permanent, public distributed ledger, commonly known as the blockchain.

Supporters of virtual currencies see a technological solution to the age-old "double spend" problem – that has always driven the need for a trusted, central authority to ensure that an entity is capable of, and does, engage in a valid transaction.  Traditionally, there has been a need for a trusted intermediary – for example a bank or other financial institution – to serve as a gatekeeper for transactions and many economic activities. Virtual currencies seek to replace the need for a central authority or intermediary with a decentralized, rules-based and open consensus mechanism.[1]  An array of thoughtful business, technology, academic, and policy leaders have

---

[1] *See generally*, CFTC Talks, Episode 24, Dec. 29, 2017, Interview with Coincenter.org Director of Research, Peter Van Valkenburgh, at http://www.cftc.gov/Media/Podcast/index.htm.

extrapolated some of the possible impacts that derive from such an innovation, including how market participants conduct transactions, transfer ownership, and power peer-to-peer applications and economic systems.[2]

Others, however, argue that this is all hype or technological alchemy and that the current interest in virtual currencies is overblown and resembles wishful thinking, a fever, even a mania. They have declared the 2017 heightened valuation of Bitcoin to be a bubble similar to the famous "Tulip Bubble" of the seventeenth century.  They say that virtual currencies perform no socially useful function and, worse, can be used to evade laws or support illicit activity.[3] Indeed, history has demonstrated to us time-and-again that bad actors will try to invoke the concept of innovation in order to perpetrate age-old fraudulent schemes on the public. Accordingly, some assert that virtual currencies should be banned, as some nations have done.[4]

There is clearly no shortage of opinions on virtual currencies such as Bitcoin. In fact, virtual currencies may be all things to all people: for some, potential riches, the next big thing, a technological revolution, and an exorable value proposition; for others, a fraud, a new form of temptation and allure, and a way to separate the unsuspecting from their money.

Perspective is critically important.  As of the morning of February 5, the total value of all outstanding Bitcoin was about $130 billion based on a Bitcoin price of $7,700.  The Bitcoin "market capitalization" is less than the stock market capitalization of a single "large cap" business, such as McDonalds (around $130 billion). The total value of all outstanding virtual currencies was about $365 billion. Because virtual currencies like Bitcoin are sometimes considered to be comparable to gold as an investment vehicle, it is important to recognize that the total value of all the gold in the world is estimated by the World Gold Council to be about $8 trillion which continues to dwarf the virtual currency market size. Clearly, the column inches of press attention to virtual currency far surpass its size and magnitude in today's global economy.

---

[2] *See* Marc Andreessen, *Why Bitcoin Matters*, New York Times DealBook (Jan. 21, 2014), https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/; Jerry Brito and Andrea O'Sullivan, *Bitcoin: A Primer for Policymakers*, George Mason University Mercatus Center (May 3, 2016),https://www.mercatus.org/publication/bitcoin-primer-policymakers; Christian Catalini and Joshua S. Gans, *Some Simple Economics of the Blockchain*, Rotman School of Management Working Paper No. 2874598, MIT Sloan Research Paper No. 5191-16 (last updated Sept. 21, 2017),https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2874598; Arjun Kharpal, *People are 'underestimating' the 'great potential' of bitcoin, billionaire Peter Thiel says*, CNBC (Oct. 26, 2017), https://www.cnbc.com/2017/10/26/bitcoin-underestimated-peter-thiel-says.html; Hugh Son, *Bitcoin 'More Than Just a Fad,' Morgan Stanley CEO Says*, Bloomberg (Sept. 27, 2017), https://www.bloomberg.com/news/articles/2017-09-27/bitcoin-more-than-just-a-fad-morgan-stanley-ceo-gorman-says; Chris Brummer and Daniel Gorfine, *FinTech: Building a 21st-Century Regulator's Toolkit*, Milken Institute (Oct. 21, 2014), available at http://www.milkeninstitute.org/publications/view/665.
[3] Virtual currencies are not unique in their utility in illicit activity.  National currencies, like the US Dollar, and commodities, like gold and diamonds, have long been used to support criminal enterprises.
[4] Countries that have banned Bitcoin include Bangladesh, Bolivia, Ecuador, Kyrgyzstan, Morocco, Nepal, and Vietnam.  China has banned Bitcoin for banking institutions.

Yet, despite being a relatively small asset class, virtual currency presents novel challenges for regulators. SEC Chairman Clayton and I recently wrote:

> *The CFTC and SEC, along with other federal and state regulators and criminal authorities, will continue to work together to bring transparency and integrity to these markets and, importantly, to deter and prosecute fraud and abuse. These markets are new, evolving and international. As such they require us to be nimble and forward-looking; coordinated with our state, federal and international colleagues; and engaged with important stakeholders, including Congress[5].*

It is this perspective that has guided our work at the CFTC on virtual currencies.

## Introduction: The Mission of the CFTC:

The mission of the CFTC is to foster open, transparent, competitive, and financially sound derivatives markets.[6] By working to avoid systemic risk, the Commission aims to protect market users and their funds, consumers, and the public from fraud, manipulation, and abusive practices related to derivatives and other products that are subject to the **Commodity Exchange Act (CEA)**.

The CFTC was established as an independent agency in 1974, assuming responsibilities that had previously belonged to the Department of Agriculture since the 1920s. The Commission historically has been charged by the CEA with regulatory authority over the commodity futures markets. These markets have existed since the 1860s, beginning with agricultural commodities such as wheat, corn, and cotton.

Over time, these organized commodity futures markets, known as **designated contract markets (DCMs)** regulated by the CFTC, have grown to include those for energy and metals commodities, collectively including crude oil, heating oil, gasoline, copper, gold, and silver. The agency now also oversees these commodity futures markets for financial products such as interest rates, stock indexes, and foreign currency. The definition of "commodity" in the CEA is broad. It can mean a physical commodity, such as an agricultural product (e.g., wheat, cotton) or natural resource (e.g., gold, oil). It can mean a currency or interest rate. The CEA definition of "commodity" also includes "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."

In the aftermath of the 2008 financial crisis, President Obama and Congress enhanced the CFTC's regulatory authority. With passage of the **Dodd-Frank Wall Street Reform and**

---

[5] Jay Clayton and J. Christopher Giancarlo, *Regulators Are Looking at Cryptocurrency: At the SEC and CFTC We Take Our Responsibility Seriously,* Wall Street Journal, Jan. 24, 2018, https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363.
[6] *See* CFTC, *Mission and Responsibilities*, http://www.cftc.gov/About/MissionResponsibilities/index.htm.

**Consumer Protection Act (Dodd-Frank Act)**, the agency now also oversees most of the U.S. swaps market in addition to exchange traded futures markets.

Futures, swaps and other derivatives markets are essential means for commercial and financial risk mitigation and transfer. These markets allow the risks of variable production costs, such as the price of raw materials, energy, foreign currency and interest rates, to be transferred from those who cannot afford them to those who can.  They are the reason why American consumers enjoy stable prices in the grocery store, whatever the conditions out on the farm.

But derivatives markets are not just useful for agricultural producers.  They impact the price and availability of heating in American homes, the energy used in factories, the interest rates borrowers pay on home mortgages and the returns workers earn on their retirement savings. More than 90 percent of *Fortune 500* companies use derivatives to manage commercial or market risk in their worldwide business operations.  In short, derivatives serve the needs of society to help moderate price, supply and other commercial risks to free up capital for economic growth, job creation and prosperity.

To ensure the integrity of US derivatives markets, the CFTC regulates derivatives market participants and activities. The agency oversees a variety of individuals and organizations. These include swap execution facilities, derivatives clearing organizations, designated contract markets, swap data repositories, swap dealers, futures commission merchants, commodity pool operators, and other entities.  The CFTC also prosecutes derivative market fraud and manipulation, including misconduct in underlying spot markets for commodities.

## I.      CFTC Authority and Oversight over Virtual Currencies

In 2015, the CFTC determined that virtual currencies, such as Bitcoin, met the definition of "commodity" under the CEA.  Nevertheless, the CFTC does NOT have regulatory jurisdiction under the CEA over markets or platforms conducting cash or "spot" transactions in virtual currencies or other commodities or over participants on such platforms.  More specifically, the CFTC does not have authority to conduct regulatory oversight over spot virtual currency platforms or other cash commodities, including imposing registration requirements, surveillance and monitoring, transaction reporting, compliance with personnel conduct standards, customer education, capital adequacy, trading system safeguards, cyber security examinations or other requirements.  In fact, current law does not provide any U.S. Federal regulator with such regulatory oversight authority over spot virtual currency platforms operating in the United States or abroad. However, the CFTC DOES have enforcement jurisdiction to investigate through subpoena and other investigative powers and, as appropriate, conduct civil enforcement action against fraud and manipulation in virtual currency derivatives markets and in underlying virtual currency spot markets.

In contrast to the spot markets, the CFTC does have both regulatory and enforcement jurisdiction under the CEA over derivatives on virtual currencies traded in the United States. This means that for derivatives on virtual currencies traded in U.S. markets, the CFTC conducts

4

comprehensive regulatory oversight, including imposing registration requirements and compliance with a full range of requirements for trade practice and market surveillance, reporting and monitoring and standards for conduct, capital requirements and platform and system safeguards.

## II.     Assertion of CFTC Authority

The CFTC has been straightforward in asserting its area of statutory jurisdiction concerning virtual currencies derivatives.  As early as 2014, former CFTC Chairman Timothy Massad discussed virtual currencies and potential CFTC oversight under the Commodity Exchange Act (CEA).[7]   And as noted above, in 2015, the CFTC found virtual currencies to be a commodity.[8] In that year, the agency took enforcement action to prohibit wash trading and prearranged trades on a virtual currency derivatives platform.[9]  In 2016, the CFTC took action against a Bitcoin futures exchange operating in the U.S. that failed to register with the agency.[10] Last year, the CFTC issued proposed guidance on what is a derivative market and what is a spot market in the virtual currency context.[11]  The agency also issued warnings about valuations and volatility in spot virtual currency markets[12] and launched an unprecedented consumer education effort (detailed in Section IV herein).

### a.   Enforcement

The CFTC Division of Enforcement is a premier Federal civil enforcement agency dedicated to deterring and preventing price manipulation and other disruptions of market integrity, ensuring the financial integrity of all transactions subject to the CEA, and protecting market participants from fraudulent or other abusive sales practices and misuse of customer assets.  **Appendix A hereto** summarizes recent CFTC enforcement activities.

The CFTC has been particularly assertive of its enforcement jurisdiction over virtual currencies.  It has formed an internal virtual currency enforcement task force to garner and deploy relevant expertise in this evolving asset class.  The task force shares information and works cooperatively with counterparts at the SEC with similar virtual currency expertise.

---

[7] Testimony of CFTC Chairman Timothy Massad before the U.S. Senate Committee on Agriculture, Nutrition and Forestry (Dec. 10, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-6.

[8]  *In re* Coinflip, Inc., Dkt. No. 15-29 (CFTC Sept. 17, 2015), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf.

[9] *In re* TeraExchange LLC, Dkt. No. 15-33 (CFTC Sept. 24, 2015), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfteraexchangeorder92415.pdf.

[10] *In re* BXFNA Inc. d/b/a Bitfinex, Dkt. No. 16-19 (CFTC June 2, 2016), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfbfxnaorder060216.pdf.

[11] CFTC, Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60335 (Dec. 20, 2017), www.gpo.gov/fdsys/pkg/FR-2017-12-20/pdf/2017-27421.pdf.

[12] CFTC, A CFTC Primer on Virtual Currencies (Oct. 17, 2017), http://www.cftc.gov/idc/groups/public/documents/file/labcftc_primercurrencies100417.pdf.

In September 2017, the CFTC took enforcement action against a virtual currency Ponzi scheme.[13]  Over the past few weeks, the CFTC filed a series of civil enforcement actions against perpetrators of fraud, market manipulation and disruptive trading involving virtual currency. These include:

(i)   ***My Big Coin Pay Inc.***, which charged the defendants with commodity fraud and misappropriation related to the ongoing solicitation of customers for a virtual currency known as My Big Coin;

(ii)   ***The Entrepreneurs Headquarters Limited***, which charged the defendants with a fraudulent scheme to solicit Bitcoin from members of the public, misrepresenting that customers' funds would be pooled and invested in products including binary options, and instead misappropriated the funds and failed to register as a Commodity Pool Operator; and

(iii)   ***Coin Drop Markets***, which charged the defendants with fraud and misappropriation in connection with purchases and trading of Bitcoin and Litecoin.

These recent enforcement actions confirm that the CFTC, working closely with the SEC and other fellow financial enforcement agencies, will aggressively prosecute bad actors that engage in fraud and manipulation regarding virtual currencies.

### b.  Bitcoin Futures

It is important to put the new Bitcoin futures market in perspective.  It is quite small with open interest at the CME of 6,695 bitcoin[14] and at Cboe Futures Exchange (Cboe) of 6,695 bitcoin (as of Feb. 2, 2018).  At a price of approximately $7,700 per Bitcoin,[15] this represents a notional amount of about $94 million.  In comparison, the notional amount of the open interest in CME's WTI crude oil futures was more than one thousand times greater, about $170 billion (2,600,000 contracts) as of Feb 2, 2018 and the notional amount represented by the open interest of Comex gold futures was about $74 billion (549,000 contracts).

Prior to the launch of Bitcoin futures, the CFTC closely observed the evolution of virtual currencies over the past several years.  One exchange, CME Group, launched a Bitcoin Reference Rate in November 2016.  And, another exchange, CBOE Futures Exchange (Cboe), first approached the CFTC in July 2017.  The CFTC anticipated receiving proposals for the launch of Bitcoin futures products in late 2017.

---

[13] On September 21, 2017, the CFTC filed a complaint in federal court in the Southern District of New York against Nicholas Gelfman and Gelfman Blueprint, Inc., *see* http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfgelfmancomplaint09212017.pdf.

[14] Each CME contract represents 5 Bitcoin.

[15] The price changes day to day.

Under CEA and Commission regulations and related guidance, futures exchanges may self-certify new products on twenty-four hour notice prior to trading. In the past decade and a half, over 12,000 new futures products have been self-certified.[16] It is clear that Congress and prior Commissions deliberately designed the product self-certification framework to give futures exchanges, in their role as self-regulatory organizations, the ability to quickly bring new products to the marketplace. The CFTC's current product self-certification framework has long been considered to function well and be consistent with public policy that encourages market-driven innovation that has made America's listed futures markets the envy of the world.

Practically, both CME and Cboe had numerous discussions and exchanged numerous draft product terms and conditions with CFTC staff over a course of months prior to their certifying and launching Bitcoin futures in December 2017. This type of lengthy engagement is not unusual during the self-certification process for products that may raise certain issues. The CFTC staff undertook its review of CME's and Cboe's Bitcoin futures products with considered attention. Given the emerging nature and heightened attention of these products, staff conducted a "heightened review" of CME's and Cboe's responsibilities under the CEA and Commission regulations to ensure that their Bitcoin futures products and their cash-settlement processes were not readily susceptible to manipulation,[17] and the risk management of the associated Derivatives Clearing Organizations (DCOs) to ensure that the products were sufficiently margined.[18]

Staff obtained the voluntary cooperation of CME and Cboe with a set of enhanced monitoring and risk management steps.

1. Designated contract markets (DCMs) setting exchange large trader reporting thresholds at five bitcoins or less;
2. DCMs entering direct or indirect information sharing agreements with spot market platforms to allow access to trade and trader data making up the underlying index that the futures contracts settle to;
3. DCMs agreeing to engage in monitoring of underlying index data from cash markets and identifying anomalies and disproportionate moves;
4. DCMs agreeing to conduct inquiries, as appropriate, including at the trade settlement and trader level when anomalies or disproportionate moves are identified;
5. DCMs agreeing to regular communication with CFTC surveillance staff on trade activities, including providing trade settlement and trader data upon request;

---

[16] Prior to the changes made in the Commodity Futures Modernization Act of 2000 (CFMA) and the Commission's subsequent addition of Part 40, exchanges submitted products to the CFTC for approval. From 1922 until the CFMA was signed into law, less than 800 products were approved. Since then, exchanges have certified over 12,000 products. For financial instrument products specifically, the numbers are 494 products approved and 1,938 self-certified. *See* http://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.
[17] *See* CEA Section 5(d)(3), 7 U.S.C. 7(d)(3); Section 5(d)4), 7 U.S.C. 7(d)(4); 17 C.F.R. 38.253 and 38.254(a), and Appendices B and C to Part 38 of the CFTC's regulations.
[18] CEA Section 5b(c)(2)(D)(iv), 7 U.S.C. 7a-1(c)(2)(D)(iv) ("The margin from each member and participant of a derivatives clearing organization shall be sufficient to cover potential exposures in normal market conditions.").

6. DCMs agreeing to coordinate product launches to enable the CFTC's market surveillance branch to monitor developments; and

7. DCOs setting substantially high initial[19] and maintenance margin for cash-settled instruments.

The first six of these elements were used to ensure that the new product offerings complied with the DCM's obligations under the CEA core principles and CFTC regulations and related guidance. The seventh element, setting high initial and maintenance margins, was designed to ensure adequate collateral coverage in reaction to the underlying volatility of Bitcoin.

In crafting its process of "heightened review" for compliance, CFTC staff prioritized visibility, data, and monitoring of markets for Bitcoin derivatives and underlying settlement reference rates. CFTC staff felt that in gaining such visibility, the CFTC could best look out for Bitcoin market participants and consumers, as well as the public interest in Federal surveillance and enforcement. This visibility greatly enhances the agency's ability to prosecute fraud and manipulation in both the new Bitcoin futures markets and in its related underlying cash markets.

As for the interests of clearing members, the CFTC recognized that large global banks and brokerages that are DCO clearing members are able to look after their own commercial interests by choosing not to trade Bitcoin futures, as some have done, requiring substantially higher initial margins from their customers, as many have done, and through their active participation in DCO risk committees.

After the launch of Bitcoin futures, some criticism was directed at the self-certification process from a few market participants. Some questioned why the Commission did not hold public hearings prior to launch. However, it is the function of the futures exchanges and futures clearinghouses - and not CFTC staff[20] - to solicit and address stakeholder concerns in new product self-certifications. The CFTC staff's focus was on how the futures contracts and cash settlement indices are designed to bar manipulation and the appropriate level of contract margining to meet CEA and Commission regulations.

Interested parties, especially clearing members, should *indeed* have an opportunity to raise appropriate concerns for consideration by regulated platforms proposing virtual currency derivatives and DCOs considering clearing new virtual currency products. That is why CFTC staff has added an additional element to the Review and Compliance Checklist for virtual

---

[19] In the case of CME and Cboe Bitcoin futures, the initial and maintenance margins were ultimately set at 47% and 44% by the respective DCOs. By way of comparison that is more than ten times the margin required for CME corn futures products.

[20] Unlike provisions in the CEA and Commission regulations that provide for public comment on *rule* self-certifications, there is no provision in statute or regulation for public input into CFTC staff review of *product* self-certifications. It is hard to believe that Congress was not deliberate in making that distinction.

currency product self-certifications.  That is, requesting DCMs and SEFs to disclose to CFTC staff what steps they have taken in their capacity as self-regulatory organizations to gather and accommodate appropriate input from concerned parties, including trading firms and FCMs. Further, CFTC staff will take a close look at DCO governance around the clearing of new virtual currency products and formulate recommendations for possible further action.

The CFTC's response to the self-certification of Bitcoin futures has been a balanced one. It has resulted in the world's first federally regulated Bitcoin futures market.   Had it even been possible, blocking self-certification would not have stopped the rise of Bitcoin or other virtual currencies.  Instead, it would have ensured that virtual currency spot markets continue to operate without effective and data-enabled federal regulatory surveillance for fraud and manipulation.  It would have prevented the development of a regulated derivatives market that allowed participants to take "short" positions that challenged the 2017 rise of Bitcoin prices.

### III.    Adequacy of CFTC Authority

The CFTC has sufficient authority under the CEA to protect investors in virtual currency derivatives over which the CFTC has regulatory jurisdiction under the CEA.  As noted above, the CFTC does NOT have regulatory jurisdiction over markets or platforms conducting cash or "spot" transactions in virtual currencies or over participants on those platforms.  For such virtual currency spot markets, CFTC only has enforcement jurisdiction to investigate and, as appropriate, conduct civil enforcement action against fraud and manipulation.

Any extension of the CFTC's regulatory authority to virtual currency spot markets would require statutory amendment of the CEA.[21]  The CFTC is an experienced regulator of derivatives markets that mostly serve professional and eligible contract participants.  Such extension of regulatory authority would be a dramatic expansion of the CFTC's regulatory mission, which currently does not give the CFTC regulatory authority (distinct from enforcement authority) over cash commodity markets.

### IV.    Educating Investors and Market Participants

The CFTC believes that the responsible regulatory response to virtual currencies must start with consumer education.  Amidst the wild assertions, bold headlines, and shocking hyperbole about virtual currencies, there is a need for much greater understanding and clarity.

---

[21] The CFTC has jurisdiction over retail foreign currency markets and retail commodity transactions that use leverage, margin or financing with some exceptions.  Congress responded to concerns in the regulation of leveraged retail FX by providing the CFTC oversight responsibilities for Retail Foreign Exchange Dealers (RFEDs).  The CFTC Re-authorization Act of 2008 amended the CEA to create a new registration category for RFEDs that include disclosure requirements and leverage limitations to customers.

Over the past six months, the CFTC has produced an unprecedented amount of consumer information concerning virtual currencies (listed in **Appendix B hereto**). These consumer materials include an information "primer" on virtual currencies (**Appendix C hereto**), consumer and market advisories on investing in Bitcoin and other virtual currencies (**Appendix D hereto**), a dedicated CFTC "Bitcoin" webpage, several podcasts (available on the Commission's website and from various streaming services) concerning virtual currencies and underlying technology, weekly publication of Bitcoin futures "Commitment of Traders" data and an analysis of Bitcoin spot market data.

In addition, the CFTC's **Office of Consumer Education and Outreach (OCEO)** is actively engaging with responsible outside partners to better educate consumers on Bitcoin and other virtual currencies. The OCEO is currently partnering with:

- The **Consumer Finance Protection Bureau (CFPB)** to train US public library staff to identify and report consumer in virtual currencies;
- the **American Association of Retired Persons (AARP)** to distribute a virtual currency "Watchdog Alert" to 120,000 AARP members;
- **North American Securities Administrators Association (NASAA)** Investor Educators, who are responsible for conducting outreach to the public on avoiding investment fraud, including in virtual currencies;
- the **National Attorneys General Training and Research Institute (NAGTRI)**, which is the research and training arm of the National Association of Attorneys General (NAAG), to inform State AGs about the availability of CFTC's virtual currency resources; and
- The **Federal Reserve Bank of Chicago** to help consumers manage their finances better, OCEO will again coordinate with NFA, FINRA and SEC to hold a webinar on fraud prevention in virtual currencies.

## V.  <u>Interagency Coordination</u>

As noted, the CFTC's enforcement jurisdiction over virtual currencies is not exclusive. As a result, the U.S. approach to oversight of virtual currencies has evolved into a multifaceted, multi-regulatory approach that includes:

- The **Securities and Exchange Commission (SEC)** taking increasingly strong action against unregistered securities offerings, whether they are called a virtual currency or initial coin offering in name.
- **State Banking** regulators overseeing certain US and foreign virtual currency spot exchanges largely through state money transfer laws.
- The **Internal Revenue Service (IRS)** treating virtual currencies as property subject to capital gains tax.

10

- The **Treasury's Financial Crimes Enforcement Network (FinCEN)** monitoring Bitcoin and other virtual currency transfers for anti-money laundering purposes.

The CFTC actively communicates its approach to virtual currencies with other Federal regulators, including the **Federal Bureau of Investigation (FBI)** and the **Justice Department** and through the **Financial Stability Oversight Council (FSOC),** chaired by the Treasury Department.  The CFTC has been in close communication with the SEC with respect to policy and jurisdictional considerations, especially in connection with recent virtual currency enforcement cases.  In addition, we have been in communication with overseas regulatory counterparts through bilateral discussions and in meetings of the **Financial Stability Board (FSB)** and the **International Organization of Securities Commissions (IOSCO)**.

## VI.    Potential Benefits

I have spoken publicly about the potential benefits of the technology underlying Bitcoin, namely **Blockchain** or **distributed ledger technology (DLT)**.[22]  Distributed ledgers – in various open system or private network applications – have the potential to enhance economic efficiency, mitigate centralized systemic risk, defend against fraudulent activity and improve data quality and governance.[23]

DLT is likely to have a broad and lasting impact on global financial markets in payments, banking, securities settlement, title recording, cyber security and trade reporting and analysis.[24]  When tied to virtual currencies, this technology aims to serve as a new store of value, facilitate secure payments, enable asset transfers, and power new applications.

Additionally, DLT will likely develop hand-in-hand with new "smart" contracts that can value themselves in real-time, report themselves to data repositories, automatically calculate and perform margin payments and even terminate themselves in the event of counterparty default.[25]

DLT may enable financial market participants to manage the significant operational,

---

[22] J. Christopher Giancarlo, *Keynote Address of Commissioner J. Christopher Giancarlo before the Markit Group, 2016 Annual Customer Conference New York*, May 10, 2016, http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo-15.
[23] *Id.*
[24] *See, e.g.*, Larry Greenemeier, *Can't Touch This: New Encryption Scheme Targets Transaction Tampering*, Scientific American, May 22, 2015, http://www.scientificamerican.com/article/can-t-touch-this-new-encryption-scheme-targets-transaction-tampering/.
[25] *See* Massimo Morini & Robert Sams, *Smart Derivatives Can Cure XVA Headaches*, Risk Magazine, Aug. 27, 2015, http://www.risk.net/risk-magazine/opinion/2422606/-smart-derivatives-can-cure-xva-headaches; *see also* Jeffrey Maxim, *UBS Bank Is Experimenting with "Smart-Bonds" Using the Bitcoin Blockchain*, Bitcoin Magazine, June 12, 2015, https://bitcoinmagazine.com/articles/ubs-bank-experimenting-smart-bonds-using-bitcoin-blockchain-1434140571; *see also* Pete Harris, *UBS Exploring Smart Bonds on Block Chain*, Block Chain Inside Out, June 15, 2015, http://harris-on.typepad.com/block_chain_io/2015/06/ubs-exploring-smart-bonds-on-block-chain.html; *See generally* Galen Stops, *Blockchain: Getting Beyond the Buzz*, Profit & Loss, Aug.–Sept. 2015, at 20, http://www.profit-loss.com/articles/analysis/technology-analysis/blockchain-getting-beyond-the-buzz.

transactional and capital complexities brought about by the many mandates, regulations and capital requirements promulgated by regulators here and abroad in the wake of the financial crisis.[26]  In fact, one study estimates that DLT could eventually allow financial institutions to save as much as $20 billion in infrastructure and operational costs each year.[27]  Another study reportedly estimates that blockchain could cut trading settlement costs by a third, or $16 billion a year, and cut capital requirements by $120 billion.[28]  Moving from systems-of-record at the level of a firm to an authoritative system-of-record at the level of a market is an enormous opportunity to improve existing market infrastructure.[29]

Outside of the financial services industry, many use cases for DLT are being posited from international trade to charitable endeavors and social services. International agricultural commodities merchant, Louis Dreyfus, and a group of financing banks have just completed the first agricultural deal using distributed ledger technology for the sale of 60,000 tons of US soybeans to China.[30]  Other DLT use cases include: legal records management, inventory control and logistics, charitable donation tracking and confirmation; voting security and human refugee identification and relocation.[31]

Yet, while DLT promises enormous benefits to commercial firms and charities, it also promises assistance to financial market regulators in meeting their mission to oversee healthy markets and mitigate financial risk.  What a difference it would have made on the eve of the financial crisis in 2008 if regulators had access to the real-time trading ledgers of large Wall Street banks, rather than trying to assemble piecemeal data to recreate complex, individual trading portfolios.  I have previously speculated[32] that, if regulators in 2008 could have viewed a real-time distributed ledger (or a series of aggregated ledgers across asset classes) and, perhaps, been able to utilize modern cognitive computing capabilities, they may have been able to recognize anomalies in market-wide trading activity and diverging counterparty exposures indicating heightened risk of bank failure.  Such transparency may not, by itself, have saved Lehman Brothers from bankruptcy, but it certainly would have allowed for far prompter, better-informed, and more calibrated regulatory intervention instead of the disorganized response that unfortunately ensued.

---

[26] *See, e.g.*, *Oversight of Dodd-Frank Act Implementation*, U.S. House Financial Services Committee, http://financialservices.house.gov/dodd-frank/ (last visited Mar. 2, 2016).

[27] Santander InnoVentures, Oliver Wyman & Anthemis Group, The Fintech Paper 2.0: Rebooting Financial Services 15 (2015), http://santanderinnoventures.com/wp-content/uploads/2015/06/The-Fintech-2-0-Paper.pdf.

[28] Telis Demos, *Bitcoin's Blockchain Technology Proves Itself in Wall Street Test*, Apr. 7, 2016, The Wall Street Journal, http://www.wsj.com/articles/bitcoins-blockchain-technology-proves-itself-in-wall-street-test-1460021421.

[29] Based on conversations with R3 CEV, http://r3cev.com/.

[30] Emiko Terazono, *Commodities trader Louis Dreyfus turns to blockchainhttps*, Financial Times, Jan. 22, 2018, www.ft.com/content/22b2ac1e-fd1a-11e7-a492-2c9be7f3120a.

[31] Frisco d'Anconia, *IOTA Blockchain to Help Trace Families of Refugees During and After Conflicts*, Cointelegraph.com, Aug. 8, 2017, https://cointelegraph.com/news/iota-blockchain-to-help-trace-families-of-refugees-during-and-after-conflicts.

[32] *See supra* note 22.

## VII.   Policy Considerations

Two decades ago, as the Internet was entering a phase of rapid growth and expansion, a Republican Congress and the Clinton administration established a set of enlightened foundational principles: the Internet was to progress through human social interaction; voluntary contractual relations and free markets; and governments and regulators were to act in a thoughtful manner not to harm the Internet's continuing evolution.[33]

This simple approach is well-recognized as the enlightened regulatory underpinning of the Internet that brought about such profound changes to human society. During the almost 20 years of "do no harm" regulation, a massive amount of investment was made in the Internet's infrastructure. It yielded a rapid expansion in access that supported swift deployment and mass adoption of Internet-based technologies. Internet-based innovations have revolutionized nearly every aspect of American life, from telecommunications to commerce, transportation and research and development. This robust Internet economy has created jobs, increased productivity and fostered innovation and consumer choice.

"Do no harm" was unquestionably the right approach to development of the Internet. Similarly, I believe that "do no harm" is the right overarching approach for distributed ledger technology.

Virtual currencies, however, likely require more attentive regulatory oversight in key areas, especially to the extent that retail investors are attracted to this space.  SEC Chairman Clayton and I recently stated in a joint op-ed, that:

> ***"Our task, as market regulators, is to set and enforce rules that foster innovation while promoting market integrity and confidence. In recent months, we have seen a wide range of market participants, including retail investors, seeking to invest in DLT initiatives, including through cryptocurrencies and so-called ICOs—initial coin offerings. Experience tells us that while some market participants may make fortunes, the risks to all investors are high. Caution is merited.***

> ***"A key issue before market regulators is whether our historic approach to the regulation of currency transactions is appropriate for the cryptocurrency markets. Check-cashing and money-transmission services that operate in the U.S. are primarily state-regulated. Many of the internet-based cryptocurrency trading platforms have registered as payment services and are not subject to***

---

[33] The Telecommunications Act of 1996 (*See* Telecommunications Act of 1996 (Pub. L. No. 104-104, 110 Stat. 56 (1996))) and the ensuing Clinton administration "Framework for Global Electronic Commerce" (*See* Clinton administration, Framework for Global Electronic Commerce, http://clinton4.nara.gov/WH/New/Commerce/) established a simple and sensible framework: a) the private sector should play the leading role in innovation, development and financing; and b) governments and regulators should "do no harm" by avoiding undue restrictions, supporting a predictable, consistent and simple legal environment and respecting the "bottom-up" nature of the technology and its deployment in a global marketplace.

> ***direct oversight by the SEC or the CFTC. We would support policy efforts to revisit these frameworks and ensure they are effective and efficient for the digital era."[34]***

As the Senate Banking Committee, the Senate Agriculture Committee and other Congressional policy makers consider the current state of regulatory oversight of cash or "spot" transactions in virtual currencies and trading platforms, consideration should be given to shortcomings of the current approach of state-by-state money transmitter licensure that leaves gaps in protection for virtual currency traders and investors. Any proposed Federal regulation of virtual currency platforms should be carefully tailored to the risks posed by relevant trading activity and enhancing efforts to prosecute fraud and manipulation.  Appropriate Federal oversight may include: data reporting, capital requirements, cyber security standards, measures to prevent fraud and price manipulation and anti-money laundering and "know your customer" protections.  Overall, a rationalized federal framework may be more effective and efficient in ensuring the integrity of the underlying market.

### Conclusion

We are entering a new digital era in world financial markets.  As we saw with the development of the Internet, we cannot put the technology genie back in the bottle. Virtual currencies mark a paradigm shift in how we think about payments, traditional financial processes, and engaging in economic activity.  Ignoring these developments will not make them go away, nor is it a responsible regulatory response.  The evolution of these assets, their volatility, and the interest they attract from a rising global millennial population demand serious examination.

 With the proper balance of sound policy, regulatory oversight and private sector innovation, new technologies will allow American markets to evolve in responsible ways and continue to grow our economy and increase prosperity. This hearing is an important part of finding that balance**.**

Thank you for inviting me to participate.


#### ####

---

[34] *See supra* note 5.

**Appendix A**

**CFTC Enforcement Activities: Fiscal Year (FY) 2017 Year Through the Present**

Overview of FY 2017

In the fiscal year that ended September 30, 2017, the CFTC brought 49 enforcement-related actions, which included significant actions to root out manipulation and spoofing and to protect retail investors from fraud.  The CFTC also pursued significant and complex litigation, including cases charging manipulation, spoofing, and unlawful use of customer funds.  The CFTC obtained orders totaling $412,726,307 in restitution, disgorgement and penalties.   Specifically, in the fiscal year, the CFTC obtained $333,830,145 in civil monetary penalties and $78,896,162 million in restitution and disgorgement orders.  Of the civil monetary penalties imposed, the CFTC collected and deposited at the U.S. Treasury more than $265 million.

Retail Fraud

The CFTC brought a significant number of retail fraud actions in FY 2017 (20 out of the 49).  For example, in February 2017, the CFTC filed and settled charges against Forex Capital Markets LLC for $7 million for defrauding retail foreign exchange customers over a five year time period by concealing its relationship with its most important market maker and misrepresenting that its platform had no conflicts of interests with its customers.  That month the CFTC also brought an action charging Carlos Javier Ramirez, Gold Chasers, Inc., and Royal Leisure International, Inc. with misappropriating millions in customer funds and engaging in fraudulent sales solicitations in connection with a Ponzi scheme involving the purported purchase of physical gold.

In May 2017, the CFTC filed charges against an individual and his company with defrauding 40 investors out of at least $13 million in connection with a commodity pool they operated; investors included family members and members of his church.  In June 2017, the CFTC filed charges against two individuals and their company with fraudulently soliciting customers, including at a church gathering, and defrauding them out of more than $11 million.  The pair was also arrested by the Federal Bureau of Investigation (FBI) on related criminal charges.

In September 2017, the CFTC filed one of the largest precious metals fraud cases in the history of the Commission.  As alleged, the Defendants defrauded thousands of retail customers—many of whom are elderly—out of hundreds of millions of dollars as part of a multi-year scheme in connection with illegal, off-exchange leveraged precious metal transactions.

Market Manipulation

In February 2017, the CFTC settled with RBS for $85 million for attempted manipulation of ISDAFIX, a leading global benchmark for interest rate swaps and related derivatives.  The CFTC

15

also brought actions against The Royal Bank of Scotland plc and Goldman Sachs Group, Inc. and Goldman, Sachs & Co. for attempted manipulation of the ISDAFIX, resulting in $85 million and $120 million in penalties, respectively.  In February 2018, the CFTC settled with Deutsche Bank Securities Inc. for $70 million for attempted manipulation of ISDAFIX.

Since 2012, the CFTC has imposed over $5 billion in penalties against banks and brokers with respect to benchmark manipulation settlements.

Disruptive Trading

In November 2016, the CFTC entered into a consent order with Navinder Singh Sarao and Nav Sarao Futures Limited PLC to settle allegations related to the 2010 flash crash for $25.7 million in monetary sanctions, $12.9 million in disgorgement, and a permanent trading and registration ban.  In December 2016, the CFTC settled with trading company 3Red and trader Igor Oystacher imposing a $2.5 million penalty, a monitor for three years, and requiring the use of certain trading compliance tools for intentionally and repeatedly engaging in a manipulative and deceptive spoofing scheme while placing orders for and trading futures contracts on multiple registered entities.

In January 2017, the CFTC fined Citigroup $25 million for failing to diligently supervise the activities of its employees and agents in conjunction with spoofing orders in the U.S. Treasury futures markets.  Later that year, in July 2017, the CFTC entered into its first non-prosecution agreements (NPA) with three former Citigroup traders who admitted to spoofing in the U.S. Treasury futures markets in 2011 and 2012.  The NPAs emphasize the traders' timely and substantial cooperation, immediate willingness to accept responsibility for their misconduct, material assistance provided to the CFTC's investigation of Citigroup, and the absence of a history of prior misconduct.

In January 2018, in conjunction with the Department of Justice (DOJ) and FBI, the CFTC announced criminal and civil enforcement actions against three banks and six individuals involved in commodities fraud and spoofing schemes.  The banks were fined $45.6 million in penalties.

Virtual Currency

In September 2017, as part of its work to identify and root out bad actors in the virtual currency markets, the CFTC brought its first virtual currency anti-fraud enforcement action in Gelfman Blueprint, Inc., which charged an individual and his corporation with fraud, misappropriation, and issuing false account statements in connection with operating a Bitcoin Ponzi scheme.

In January 2018, the CFTC brought three virtual currency enforcement actions:  (i) My Big Coin Pay Inc., which charged the defendants with commodity fraud and misappropriation  related to

the ongoing solicitation of customers for a virtual currency known as My Big Coin; (ii) The Entrepreneurs Headquarters Limited, which charged the defendants with a fraudulent scheme to solicit Bitcoin from members of the public, misrepresenting that customers' funds would be pooled and invested in products including binary options, making Ponzi-style payments to commodity pool participants from other participants' funds, misappropriating pool participants' funds, and failing to register as a Commodity Pool Operator; and (iii) CabbageTech, Corp., which charged the defendants with fraud and misappropriation in connection with purchases and trading of Bitcoin and Litecoin.

# APPENDIX B

## Virtual Currency Educational Materials and Outreach Activities

CFTC's Bitcoin web page Resources
Launched on December 15, 2017, the CFTC now has a dedicated web page,
www.cftc.gov/bitcoin, where the public can access educational materials on the CFTC's
regulatory oversight authority of virtual currencies and ways to avoid fraud in the virtual
currency space.
Current resources available on www.cftc.gov/bitcoin :

- "CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures
  Markets"
- LabCFTC's Virtual Currency Primer
- *CFTC Talks* Virtual Currency Podcast, "Roundtable with CFTC leaders on Bitcoin";
- Self-Certification Fact Sheet
- Customer Advisories on "Understand the Risks of Virtual Currency Trading" and
  "Beware 'IRS Approved' Virtual Currency IRAs"

Forthcoming resources to be featured on www.cftc.gov/bitcoin:
- Customer Advisories (under development; issuance expected in February 2018)
  - Bitcoin pump-and-dump schemes
  - Avoiding fraud in Bitcoin-to-gold trades
- Brochures (available digitally and printed in mid-February 2018):
  - "Virtual Currency"
    - 6-paneled brochure on the definition of virtual currencies, the risks
      associated with them, and ways to avoid fraud
  - "Bitcoin Basics"
    - 2-sided Bitcoin brochure that speaks about the currency's distinct traits,
      that fact that it is a commodity, and recommendations for spotting fraud

Virtual Currency Outreach Activities by Audience
- Reaching retail investors and industry professionals via in-person presentations at
  industry events, conferences and trade shows
- Targeting seniors, vulnerable populations and those who serve them:
  - Connecting national non-profits who serve seniors and vulnerable populations to
    relevant CFTC virtual currency materials to use for their constituent outreach and
    communications
  - Distribution of both digital and print virtual currency materials to state regulators
    for their fraud prevention outreach
  - Participation in trainings for intermediaries, such as library staff, to educate them
    on the CFTC's fraud prevention resources to protect and assist their
    constituencies

- Outreach to key virtual currency demographics, such as Millennials, through digital communications designed to engage these demographics through channels and in forums they are predisposed to engage
- Engaging the general public through institutional partnerships and direct communication:
  - Working with other federal financial regulators and self-regulatory organizations to hold joint outreach activities, such as webinars, educational campaigns and community-level outreach, to build public awareness of the CFTC's virtual currency resources
  - Utilizing print and radio features to reach the public through media placements