1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

2

3  --------------------------------------X
                             :

4  COMMODITY FUTURES TRADING COMMISSION, :
                             :

5              Plaintiff,     :
                           :  18-CV-00361 (JBW)

6         v.              :
                           :  April 9, 2018

7  PATRICK MCDONNELL, et al.,      :  Brooklyn, New York
                           :

8             Defendants.    :
                           :

9  --------------------------------------X

10

11      TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
          BEFORE THE HONORABLE ROANNE L. MANN
         UNITED STATES CHIEF MAGISTRATE JUDGE

12

13  APPEARANCES:

14

15  For the Plaintiff:      ALEJANDRA DE URIOSTE, ESQ.
                     GATES S. HURAND, ESQ.
                     BRENT TOMER, ESQ.

16                   DAVID W. OAKLAND, ESQ.
                     Commodity Futures Trading Commission

17                   140 Broadway, 19th Floor
                     New York, New York 10005

18

19  For the Defendant:      PATRICK MCDONNELL, Pro Se

20

21  Court Transcriber:      MARY GRECO
                     TypeWrite Word Processing Service

22                   211 N. Milton Road
                     Saratoga Springs, New York 12866

23

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1   (Proceedings began at 12:05 p.m.)

2           THE COURT:  This is Judge Mann on the line.  I'm

3   conducting a telephone conference in CFTC v. McDonnell.  Do I

4   have plaintiff's counsel on the line?

5           MS. DE URIOSTE:  Yes, Your Honor, you do.

6           THE COURT:  Please state your appearances.

7           MS. DE URIOSTE:  My name is Alejandra de Urioste for

8   the CFTC.  I'm joined by my colleagues Gates Hurand, David

9   Oakland, and Brent Tomer.

10          THE COURT:  And Mr. McDonnell, do I have you on the

11  line?

12          MR. McDONNELL:  Yes, Your Honor.

13          THE COURT:  Please state your full name for the

14  record.

15          MR. McDONNELL:  My name is Patrick McDonnell,

16  defendant.

17          THE COURT:  Mr. McDonnell, the Court is distressed

18  that you have not been participating as you should in these

19  proceedings.  I scheduled a telephone conference for Friday,

20  Friday morning, to address the CFTC's motion to compel which

21  in turn alleged that you had not been cooperating in

22  discovery.  My chambers was advised that you were available on

23  Friday morning and then we waited and you did not make

24  yourself --

25          MR. McDONNELL:  Me?

3

1          THE COURT:  Yes.  Mr. McDonnell, you did not make

2    yourself available for Friday morning's telephone conference.

3    Why not?

4          MR. McDONNELL:  I recently started a new job about

5    two weeks ago and I was unable to be where I was supposed to

6    be for you guys.

7          MALE SPEAKER:  Hello?

8          THE COURT:  Yes.  I can hear Mr. McDonnell.  He says

9    he started a new job and he was unable to be where he was

10   supposed to be.  Well, if that was going to be a problem, then

11   you should have reached out to the Court or plaintiff's

12   counsel to explain rather than have us stand on hold for quite

13   some time.  I believe it was about an hour and a half that we

14   were on standby waiting for you.

15         Now, Mr. McDonnell, the CFTC sent a letter on April

16   3rd complaining that you had not properly responded to the

17   CFTC's letter or requests to confer regarding discovery

18   related issues.  They claim that you failed to produce

19   materials that you had been ordered to produce and that you

20   were not responsive when the CFTC reached out by letter or by

21   phone to discuss these matters with you.  What do you have to

22   say for yourself?

23         MR. McDONNELL:  I provided the CFTC with everything

24   possible that I could on my end.  The only thing that I

25   haven't provided to them is the PayPal account which I don't

4

1  have access to because it's in collections and it has,

2  according to the collection agency, what's called an account

3  lock on it.  It's like a 300 and something dollar debit in the

4  account and I don't have this money, Your Honor.  I don't have

5  money.  I'm working two jobs trying to pay my bills.  I'm not

6  trying to be disrespectful to the Court not showing up but I'm

7  just starting a new job with my name littered online as I'm

8  looking for jobs.  So as to my job, I'm sorry to say I don't

9  mean to be rude but I have to work.  You know, I'm trying to

10 obtain attorneys.  I can't do everything that I need to do

11 right now because I don't have the money to hire an attorney.

12 I'm getting battered by all these filings and stuff and I

13 can't even represent myself.  Plus I have to live my life and

14 I have to pay my bills and feed myself and keep a roof over my

15 head.  I'm trying to keep a job.  And I have no excuse for not

16 contacting you in relation to Friday, but in relation to the

17 information that was requested, I provided them with that.

18 They are requesting transactions on something and those

19 transactions, the only record of those transactions are listed

20 on the block chain which I gave them all live links to.

21 They're misconstruing information that I'm providing to them

22 because they're not willing to do the research into it because

23 I don't think they understand it.  And there's no

24 documentation to a [indiscernible] address.  It's just a

25 public and a private key and all the information is listed on

5

1    the block chain which I provided them live addresses that they

2    can go on there and they can see it live for themselves.

3    Block chains [inaudible] nothing like a bank.  There are -- if

4    you're not dealing with a centralized and a third party

5    exchange, there is no documentation.  The only thing is is the

6    information that you see live on the block chain and that's

7    why the block chain is the block chain.  I haven't disagreed

8    with that.  I haven't withheld anything from them.  I provided

9    them with everything that I was able to provide them the same

10   exact way that I explained to Judge Weinstein.  And it's not

11   up to what they want, but I just think they're looking at

12   things they don't understand like from the initiation of

13   filing this entire case.

14          THE COURT:  Well, among other things, they're

15   seeking emails.  Is it your representation to the Court that

16   you have no emails that are responsive to the discovery

17   demands and the Court's order?

18          MR. McDONNELL:  To my knowledge, I have no emails

19   and to my knowledge account that I was using for business, I'm

20   locked out because of a 2FA Google security feature that I'm

21   unable to get into the account.  I'm not trying to withhold

22   anything from them at all.  I want this resolved as quickly as

23   possible and they're making it out like I'm not cooperating,

24   that I'm trying to withhold.  I gave them everything that I

25   could.  If someone on this telephone call could lend me $386

6

1   to pay the fee at PayPal to get the collection lock off of it

2   so I can get access to the account, I'm willing to do that.  I

3   don't have $380 to throw out.  I can't afford an attorney.  I

4   can't afford the bills for my house.  And they're asking for

5   something that I can't afford to do.  That particular instance

6   with PayPal, I can't afford to do it.  But everything else

7   I've given them what they're asking for.  They assume there's

8   a whole bunch of stuff that there isn't.  Everything in this

9   whole case has been an assumption.  They're sending subpoenas

10  to exchanges overseas that I wouldn't possibly be able to

11  access from a US computer.  They're just mauling me with

12  everything.  And I've given them exactly what they've asked

13  for.  Because it's not what they want, that's one thing.  But

14  I've given everything that they've asked for and I've complied

15  with the order, Judge.

16        THE COURT:  Well, you have not complied with the

17  order that you file your answer by March 16th.  You want to

18  wrap up this case quickly, that's one way to do it.  They'll

19  move for a default judgment against you and it'll be very

20  quick.

21        MR. McDONNELL:  I don't understand where I'm

22  supposed to be in the case right now.  I don't understand.

23  And every day that goes by, Judge Mann, I get overwhelmed.

24  Another court order or another file on their end.  I wish

25  somebody could just put themselves in my shoes and realize

1    that it's just Patrick McDonnell fighting.  There's four

2    attorneys on the other end of this phone call.  I'm not

3    legally sound.  I don't understand this.  I'm learning

4    everything as I'm going and I'm expected to really keep up to

5    the pace that these four people -- I'm being attacked by four

6    attorneys.  I can't do this on my own.  And I can show you

7    tons of emails.  I reached out to attorneys begging for people

8    just to please take my case, review my case.  I can't even get

9    representation because I believe the word fraud, I believe

10   they just -- they're like who represent a fraud?

11              THE COURT:  Well, believe me, there are plenty of

12   attorneys who represent people who are accused of fraud.  The

13   fact remains that you were in court both before Judge

14   Weinstein, before this magistrate judge.  An order was entered

15   directing you to respond to the complaint.  It's no answer to

16   say that there are four attorneys on the other side.  I

17   believe I also encouraged you to consult with the pro se

18   clinic.  There are, believe me, there are many, many parties

19   who proceed pro se in this courthouse and they're able to --

20   and many of them who probably don't have the sophistication

21   that you do and they manage to figure out how to respond to a

22   complaint.  They get assistance even if they can't afford

23   counsel.  They go to the pro se clinic, the pro bono clinic,

24   and they put in a response.  You are now in default in this

25   case.  And if you -- you did not even seek leave of the Court

1  for additional time.  You just blew off that deadline.

2          MR. McDONNELL:  I have answered.  I thought that if

3  you look on the docket you'll see that I sent a response which

4  is my notice of appearance to the Court.  I assumed that that

5  was my answer to the Court.  I answered the Court that I'm

6  going to be representing myself.  That's my answer.

7          THE COURT:  That's not an answer.  An answer is a

8  document that responds paragraph by paragraph, line by line to

9  the complaint,

10          MR. McDONNELL:  I don't even know how the case got

11  this far then if you people are saying I didn't answer the

12  complaint.  I thought I answered it with that.  I thought even

13  -- and I also read something online that said that my answer

14  could be my motion to dismiss.  So that was also another

15  answer.  I'm just --

16          THE COURT:  Is there a pending motion to dismiss?

17          MR. McDONNELL:  I filed a motion to dismiss which

18  was denied.

19          THE COURT:  Well, it was denied.  That means you

20  have to file an answer.  There's no pending dispositive

21  motion.

22          MR. McDONNELL:  I [inaudible].

23          THE COURT:  So now you must respond by way of an

24  answer which is a paragraph by paragraph, sentence by sentence

25  response to the allegations in the complaint.

9

1          MR. McDONNELL:  I'll do whatever you say, Your

2    Honor.

3          THE COURT:  Well, I had sua sponte on my own

4    extended the time for you to answer by tomorrow.  It sounds

5    like you're not even prepared to do that.

6          MR. McDONNELL:  Your Honor, I wasn't prepared.  I'm

7    sorry, I wasn't prepared for any of this.  I'm out of my

8    league.  I don't know what I'm doing.  There's nothing more I

9    can say outside of that.

10          THE COURT:  Did you reach out to the pro bono

11    clinic?

12          MR. McDONNELL:  Honestly I'm scared because it seems

13    everybody that I've called in the Brooklyn area wants nothing

14    to do with this case.

15          THE COURT:  This is not a private attorney.

16          MR. McDONNELL:  [Inaudible] --

17          THE COURT:  This is not a private attorney.  It's a

18    not for profit group that's established by the City Bar and

19    they have a -- they operate out of a suite of rooms in the

20    courthouse but they are not affiliated with the court or with

21    the CFTC.  They are pro bono attorneys who assist people on a

22    limited basis.  They don't put in full representation but they

23    help guide you in responding to developments in the litigation

24    including, but not limited to, how to draft an answer, how to

25    respond to discovery dispute demands, and how to request an

1    extension of time when it's needed.

2            MR. McDONNELL:  That's the counsel that you had

3    given me when I appeared last time?

4            THE COURT:  I'm sorry, I couldn't hear you.

5            MR. McDONNELL:  Is that the counsel that your clerk

6    had given me in reference to the pro se?

7            THE COURT:  I believe so.

8            MR. McDONNELL:  Okay.

9            THE COURT:  They're different than the pro se

10   clerk's office in the courthouse which is they basically

11   handle the papers that are filed in pro se cases.  This is a

12   separate office that, as I said, is not affiliated with the

13   Court and that assists parties on a limited basis where the

14   parties are proceeding pro se.

15           MR. McDONNELL:  Okay.

16           THE COURT:  I'll give you until the end of the to

17   file your answer but Judge Weinstein has already set a

18   schedule in this case and the schedule, the subsidiary

19   schedule that I set was in order to have the parties comply

20   with the larger schedule set by Judge Weinstein.  So we're

21   going to just keep -- I cannot keep expending this deadline.

22           MR. McDONNELL:  I honestly didn't know that my

23   answer [inaudible].  I thought that this call was for the

24   discovery and, you know, [inaudible] --

25           THE COURT:  Well, you saw in the same letter that

1  the CFTC was taking the position that you hadn't filed an

2  answer and that they had been trying to communicate with you

3  and you were unresponsive.  So perhaps if you had communicated

4  with them, picked up the phone or emailed them --

5          MR. McDONNELL:  I communicated --

6          THE COURT:  -- they would have explained to you that

7  you had not answered the complaint.

8          MR. McDONNELL:  I communicated fully with them

9  throughout this whole thing.  They're the ones who are being

10 sneaky.  It's very hard to communicate with people that are

11 trying to hurt you.  It's so hard to communicate with them

12 although -- and Alejandra will tell you and David will tell

13 you I have cooperated with them.  I've been in communication

14 [inaudible].  I'm not --

15         THE COURT:  Did we just lose Mr. McDonnell?

16 (Off the record at 12:19 p.m.)

17 (Back on the record at 12:24 p.m.)

18         THE COURT:  All right.  This is Judge Mann back on

19 the line.  Do I have all four CFTC attorneys on the line?

20         MS. DE URIOSTE:  Yes, we're here, Your Honor.

21         THE COURT:  And Mr. McDonnell, are you on the line?

22         MR. McDONNELL:  Yes, Your Honor.

23         THE COURT:  All right.  Mr. McDonnell, do you have

24 dish I want to give you the phone number of the Federal Pro Se

25 Legal Assistance Project, a free service offered by the City

12

1 Bar Justice Center for the New York City Bar Association.  The

2 phone number is 212-382-4729.  Did you get that?

3     MR. McDONNELL:  382-4729?

4     THE COURT:  Yes.  And although it's a 212 number,

5 the office is located here in Brooklyn but the number goes

6 through the City Bar Justice Center.

7     MR. McDONNELL:  Okay.  Thank you very much.

8     THE COURT:  All right.  So let's get back to the

9 issues before the Court.  Let me ask plaintiff's counsel, Mr.

10 McDonnell indicated that he provided the live links to the

11 block chains and that was reflected in the email exchange that

12 was attached to the CFTC's letter to the Court.  This Court

13 obviously can't access that information.  Was the CFTC able to

14 access the information through the links?

15     MS. DE URIOSTE:  Yes, Your Honor, we were.

16     THE COURT:  And Mr. McDonnell further said that he's

17 been locked out of his PayPal account, he needs $386 in order

18 to get access to it.  If he provides the CFTC with an

19 authorization for disclosure, can the CFTC serve a subpoena

20 and if need be pay the $386 in order to access that

21 information?

22     MS. DE URIOSTE:  Yes, Your Honor, we can send the

23 subpoena.  I would have to -- we can't promise the fund

24 payment but we'd have to look into it and certainly would.

25     THE COURT:  All right.  So Mr. McDonnell, I'm going

13

1   to direct you to provide an authorization for the CFTC to

2   access the PayPal account.  They will promptly sent you an

3   authorization.  You need to execute it and send it back so

4   they can subpoena the information from PayPal.

5          MR. McDONNELL:  Okay.  Thank you, Your Honor.

6          THE COURT:  All right.  And is there -- Mr.

7   McDonnell says he has no other documentation so does this

8   resolve the open discovery issues?

9          MS. DE URIOSTE:  Your Honor, from the CFTC's

10  perspective, no.  With respect to Item 1E of the scheduling

11  order, it calls for the production of all business records

12  concerning the customers including communications with

13  customers.  We know for a fact that he communicated with

14  customers through email address, through Twitter and

15  [inaudible].  He even indicated in his email to us that he

16  communicated with customers through his website and through

17  social outlets but he has not produced any of those documents,

18  nor has he identified the social outlets he used.

19         THE COURT:  Mr. McDonnell?

20         MR. McDONNELL:  Yes.  They have identified all the

21  social outlets in their complaint.  And since they've all been

22  deleted from the internet.  They're gone.  In their own words

23  they said it.  And this is what I tried to tell them but they

24  keep pressing for something that doesn't exist.

25         THE COURT:  So you're saying you no longer have

14

1   access to those communications?

2          MR. McDONNELL:  No, ma'am, I have no access to any

3   of it.

4          THE COURT:  Well, you stated earlier that you've

5   been locked out of your email account which is a little

6   peculiar because I don't know why one would get locked out of

7   an email account.

8          MR. McDONNELL:  Well they have, on Gmail they have -

9   - it's an application that you would put on either an iPad or

10  a phone and it's called Google Authenticator where every time

11  you log into your email the outside of your password, another

12  box pops up and it's a randomly generated code.  Like every

13  like minute it changes so nobody can hack into your email.

14  And I had deleted that.  Actually, the phone is gone that I

15  had.  It was a broken phone that I was using that wasn't

16  hooked up and I had just download applications.  And the phone

17  is since gone.  That application is gone.  There's no way to

18  access the actual account.

19         MR. HURAND:  Your Honor, this is Gates Hurand for

20  the CFTC.

21         THE COURT:  Yes.

22         MR. HURAND:  In the same way that the Court has

23  directed defendant to provide an authorization for PayPal

24  account, it may facilitate this to similarly direct for

25  authorization for other such accounts.  You know, perhaps

1  through the subpoena process combined with authorization, we

2  may be able to get access to the Gmail account or perhaps

3  other accounts that the defendant can identify for us.

4       THE COURT:  Well, there's a big difference between

5  requiring the plaintiff to provide authorizations for his

6  PayPal account which he used in connection with the activities

7  alleged in the complaint.  It's another thing to require him

8  to provide authorizations for all his communications

9  presumably much broader than simply transactions related to

10 the business that is the subject of this litigation.  So if

11 there is a way to draft authorizations that would limit the

12 responses to communications with identified individuals, I

13 would consider that.  But I'm not going to require him to turn

14 over authorizations for all communications whether or not they

15 bear any relationship to the CFTC's allocations.

16      MS. DE URIOSTE:  Your Honor, if I may, this is

17 Alejandra from the CFTC.  The email address that we are

18 interested in is Coindropmarkets@gmail.com which is presumably

19 the business's email address.

20      MR. McDONNELL:  The email address is cdm@gmx.us.

21 It's the main company address.

22      THE COURT:  Is that Mr. McDonnell?

23      MR. McDONNELL:  Yes, ma'am.

24      THE COURT:  All right.  So for the business, I am

25 going to require Mr. McDonnell to provide authorizations for

1  disclosure of the contents of the email account or accounts.

2  I'm just not going to order that he provide authorizations for

3  any personal email accounts.

4        MS. DE URIOSTE:  Your Honor, this is Alejandra again

5  from the CFTC.  I just want to note that the cdm@us.gmx email

6  address that he just mentioned is an email address that he has

7  been emailing with us to this morning, this past week.

8        MR. McDONNELL:  It's also the email address of the

9  PayPal account that you want.  It's been around since --

10       MS. DE URIOSTE:  But with respect to communications

11 that were done under -- communications with customers that

12 were done under the cdm@us.gmx account, he presumably has

13 access to those.

14       MR. McDONNELL:  No, I don't.

15       MS. DE URIOSTE:  But this is an email address that

16 you are currently using.

17       MR. McDONNELL:  CDM, I have access to that email

18 address, yes.  That's the PayPal email address like I told

19 you.

20       THE COURT:  Well, I'm not following what the two

21 different accounts are.  What is one account?

22       MR. McDONNELL:  The one account was just for the --

23 you know, you have to have an email address to open up a

24 PayPal account.  The account that I correspond with them

25 happens to be that email.

1          THE COURT:  What is that email address?

2          MR. McDONNELL:  It's cdm@gmx.us.

3          THE COURT:  I'm sorry, cbm@gmx?

4          MR. McDONNELL:  Yeah, it's Charlie David Michael at

5     George Michael X-ray dot US.

6          THE COURT:  And that's your -- that was a business

7     email address and you're currently using it?

8          MR. McDONNELL:  Yeah.  That's what I use to

9     correspond with them.  Yes.  That was the official email

10    address of the company.

11         THE COURT:  And have you been communicating with

12    attorneys on that account?

13         MR. McDONNELL:  Yeah, actually on that, yes, I have.

14    Outside of them, yes.

15         THE COURT:  How does the CFTC propose to deal with

16    the fact that there are communications with attorneys on that,

17    through that address?

18         MS. DE URIOSTE:  Your Honor, with respect to that

19    email address, we would ask that the defendant produce the

20    communications with customers from that email address which he

21    still has access to.

22         THE COURT:  All right.  So you do have access to

23    that address, Mr. McDonnell, and you communicated with

24    customers on that email address?

25         MR. McDONNELL:  No, that address was just

1  communication with PayPal.  That was the official business

2  email address.  The communication address was the address that

3  they're stating with the Gmail address that they're talking

4  about, the coindropmarkets.

5       THE COURT:  So the only communications that you have

6  on using that email address that relate to the charges in this

7  case are communications with PayPal?

8       MR. McDONNELL:  Just with lawyers at this point.

9  There's no communication coming through because the account is

10  blocked.

11       THE COURT:  I'm not -- how can the account be

12  blocked but you're still using it?

13       MR. McDONNELL:  The PayPal account is blocked.  They

14  no longer send communications to the cdm@gmx --

15       THE COURT:  All right.  Well, I'm not asking for

16  current communications, I'm asking for communications during

17  the time period at issue in this case.  You were using that as

18  a business account.  You need to search through your emails

19  and produce responsive emails.

20       MR. McDONNELL:  I delete by the day when I was in

21  business.  There's no information in that account outside of

22  what's recent, and it hasn't been deleted in the period of

23  time from when this case was initiated.  It was way before.

24       THE COURT:  All right.  Does the CFTC have anything

25  else to say about the CBM [sic] email account?

1          MS. DE URIOSTE:  No, as long as defendant has done

2     an adequate search to see if he can collect historical emails

3     that were sent under that account.

4          THE COURT:  Mr. McDonnell, you should search that

5     account.  Don't just rely on your usual practices.  Search the

6     account and see if you have any responsive emails and if so,

7     you're to produce them by this Friday.

8          MR. McDONNELL:  Okay.  Your Honor, can I say this to

9     you?  If we can get that subpoena for PayPal through, it will

10    give them every transaction that would have came through to

11    that email too.

12         THE COURT:  Well, it may well but that may take some

13    time so --

14         MR. McDONNELL:  No, I know.  I'm just saying just so

15    that they will get that information is what I'm saying, you

16    know, because I know because I'm on my email every day there's

17    no files there.  So the best bet to solidify this would be to

18    go through PayPal.  I'm just being [indiscernible].  I've

19    already set the course to try to gather the information and

20    that seems to be the most logical avenue [inaudible].

21         THE COURT:  All right.  And there was another

22    reference business account.  What was that account?

23         MR. McDONNELL:  Are you talking to me or are you

24    talking to them?

25         THE COURT:  To anyone who can respond to that

1  question.  There was the CBM [sic] and then there was

2  reference to another business account.

3          MS. DE URIOSTE:  Your Honor, that's

4  coindropmarkets@gmail.com.

5          THE COURT:  I'm sorry, what markets?  Coin Drop?

6          MS. DE URIOSTE:  Coin Drop, yes.

7          THE COURT:  Coindropmarkets@gmail?

8          MS. DE URIOSTE:  Yes.

9          THE COURT:  All right.  Mr. McDonnell, have you

10  searched that email account?

11          MR. McDONNELL:  That's the email account that I have

12  the problem with accessing that I'm locked out of because of

13  the Google Authenticator that I mentioned.

14          THE COURT:  All right.  But that was strictly a

15  business email account, correct?

16          MR. McDONNELL:  No, I used it for personal.  If I

17  use an email, I use it for everything.

18          THE COURT:  Well, it is a business Gmail address and

19  if you can't access those communications, the CFTC has a right

20  to access them and I'm going to -- when were you barred from

21  accessing?

22          MR. McDONNELL:  I wasn't barred.  I would say around

23  July, August is when the phone went, so that would be when I

24  was locked out.  It's not like I'm barred from Google.

25          THE COURT:  You're locked out.

21

1          MR. McDONNELL:  Yeah, locked out.  It's like a third

2   party application that's keeping me from accessing Google

3   service.

4          THE COURT:  And did you have the CBM [sic] account

5   at the same time as the coindropmarkets account?

6          MR. McDONNELL:  You mean did I have both emails at

7   the same time?

8          THE COURT:  Yes.

9          MR. McDONNELL:  Yes, ma'am.

10          THE COURT:  All right.  Mr. McDonnell, all your

11   business communications would have been, until you were locked

12   out, they would have been through the coindropmarkets Gmail

13   account?

14          MR. McDONNELL:  That and mainly Twitter, the Twitter

15   that they -- the Coin Drop Markets Twitter.  I used to talk to

16   everybody mainly through direct messages because that's where

17   everybody kind of met up and we'd talk live.

18          THE COURT:  And I assume that at the time -- before

19   you were blocked out of the coindropmarkets account you were

20   not communicating with attorneys so there's no reason to

21   believe that there would be any attorney potential client

22   communications in that email account, is that correct?

23          MR. McDONNELL:  Not that I know of.

24          THE COURT:  All right.  So I'm going to direct that

25   Mr. McDonnell provide an authorization for the coindropmarkets

1    account, so the CFTC should draft such an authorization and

2    send it to Mr. McDonnell.

3              MS. DE URIOSTE:  Yes, Your Honor, we will.  If I

4    may, there is one more social media account we believe was

5    used by the business which was an account at Flack.

6              THE COURT:  Account at what?

7              MS. DE URIOSTE:  We believe Flack is a messaging

8    platform that Mr. McDonnell and the Coin Drop Markets business

9    were using.

10             MR. McDONNELL:  We never used Black.  I've never

11   even heard of it.  But you can subpoena whatever you want.

12   It's another one of your stories.  I never heard of a platform

13   called Black in my life.

14             MS. DE URIOSTE:  I'm saying Flack with an F, F-L-A-

15   C-K.

16             MR. McDONNELL:  Oh, Flack.  You have that.  That's

17   the -- your witness is the one that deleted it.

18             THE COURT:  So --

19             MS. DE URIOSTE:  Then, Your Honor, we would like the

20   same authorization to send a subpoena to Flack for potentially

21   responsive communications for the business.

22             THE COURT:  So --

23             MR. McDONNELL:  Yeah, please do that.

24             THE COURT:  Mr. McDonnell, Flack with an F, you did

25   use that messaging platform?

1          MR. McDONNELL:  Well, their witness actually ran it

2  for the company but it was somewhat out there with the company

3  but it was their witness.  I would be curious to see what's

4  written in that too.

5          THE COURT:  All right.  Well, if you provide an

6  authorization and CFTC will be required to provide you with

7  copies of all of the materials that they get in response to

8  the authorizations and subpoenas.

9          MR. McDONNELL:  Your Honor, may I ask you this?  I

10  was not in control of that.  Do I have the right to give them

11  that?

12          THE COURT:  Well, you have the right to give it to

13  them.  I don't know whether the messaging -- whether the

14  entity will -- if you weren't a signatory, they may not

15  provide the information.

16          MR. McDONNELL:  Okay.  I just wanted to -- I was

17  just curious.

18          MR. HURAND:  Mr. McDonnell, this is Gates Hurand of

19  the CFTC.  Just to facilitate things, who do you think

20  controlled that account if you didn't?

21          MR. McDONNELL:  That's for you to figure out.  You

22  have witnesses that are lying to you.  Maybe you want to call

23  them and ask them to be honest, Mr. Gates, with all due

24  respect.  I like you but your witness is a liar.

25          THE COURT:  All right.  Is there anything else with

24

1  respect to the discovery disputes?

2          MS. DE URIOSTE:  Yes, Your Honor.  In our March 23rd

3  letter to Mr. McDonnell, we had a series of questions that

4  were outlined for each discovery request.  In order to

5  understand his response, and we would like him to respond to

6  each of those questions --

7          MR. McDONNELL:  I have no comment.  I have no

8  paperwork in front of me to even address this.

9          THE COURT:  That was --

10          MR. McDONNELL:  They know what I wrote.  It's

11  written.  I don't have to say it again.

12          THE COURT:  That was in your email you said from

13  March 23rd?

14          MS. DE URIOSTE:  The CFTC sent Mr. McDonnell an

15  email on March 23rd in response to his March 16th email.  The

16  March 23rd letter we sent has particular questions for each of

17  the five discovery items that were required to be produced by

18  scheduling order.

19          THE COURT:  I do not have that email in front of me

20  but I would suggest that if those were not part of any formal

21  discovery demands, if you want to take Mr. McDonnell's

22  deposition and if you have questions you can put them to him

23  in deposition.

24          MS. DE URIOSTE:  Thank you, Your Honor.  One more

25  item that we have raised with Mr. McDonnell in correspondence

25

1   is related to the initial disclosures which he never

2   submitted.

3           THE COURT:  Well, I understand that his position was

4   that he provided what he has and I think we're just going over

5   the same materials now, the same issues.

6           MS. DE URIOSTE:  Your Honor, if I may, we are doing

7   our best to identify accounts that he used, thinks that he's

8   used, social media outlets where his website was.  But we are

9   at a disadvantage here because he has not participated in

10  discovery and made required disclosures to us.

11          THE COURT:  Well, his position is that he doesn't

12  have access to them and I am trying to get that information to

13  the CFTC.  You're now asking questions that's beyond document

14  demands and there are other methods for seeking to obtain that

15  information.  I'm not going to turn this telephone conference

16  into a deposition.

17          MS. DE URIOSTE:  Understood, Your Honor.  We will

18  then follow up with the defendant with interrogatories and

19  document requests that ask him to identify the accounts that

20  he used.  And if he does not respond to those promptly, we

21  would like to reserve the right to raise it with you again at

22  a later date.

23          THE COURT:  Well, you're certainly not waiving any

24  right to the extent that discovery disputes arise in the

25  future.

1          Now, I would like to ask a question about the

2     proposed stipulated protective order that's been so ordered by

3     the parties.  There are two provisions in this agreement which

4     seem to be in tension with one another and I wanted to hear

5     the CFTC's explanation and reconciliation of these provisions.

6     Paragraph 2 on Page 2 provides that all discovery material

7     produced in the action shall be used only for the purposes of

8     prosecuting or defending the action and shall not be disclosed

9     to any person except in accordance with the terms hereof or as

10    otherwise authorized by law.  And it then goes on, there's

11    another couple of sentences.  And then there is a provision on

12    Page 12, Section H, which talks about the use of discovery

13    material by the CFTC.  So what, if any, limits are there on

14    the CFTC's use of the discovery material?

15          MS. DE URIOSTE:  Your Honor, I apologize.  I don't

16    have the paragraphs in front of me that you're referring to,

17    but we'd be happy to follow up with the Court regarding that.

18          THE COURT:  All right.  Well, it does say

19    notwithstanding the foregoing, nothing in this protective

20    order shall limit, and it talks about the CFTC's retention or

21    use of any designated information under the Federal Records

22    Act, Freedom of Information Act, or the authority of the

23    commission to conduct such investigations as it deems

24    necessary to ascertain the facts regarding the operations of

25    boards of trustees and other persons subject to the provisions

27

1   of the act, and it goes on.

2          All right.  So you're going to send a letter to the

3   Court?

4          MS. DE URIOSTE:  Yes, Your Honor.

5          THE COURT:  All right.  And can you do that by

6   Friday?

7          MS. DE URIOSTE:  Yes, Your Honor.

8          THE COURT:  All right.  Is there anything else?

9          MS. DE URIOSTE:  Your Honor, we had a couple of

10  issues to raise.  One is just with respect to the scheduling

11  order.  We are scheduled to have a mediation next Tuesday,

12  April 17th.  Given where we are with respect to discovery and

13  the fact that we haven't made much progress, we're not sure

14  that the mediation at this time will be productive.  We would

15  suggest rescheduling the mediation to a later date once we've

16  made more progress in discovery.

17         THE COURT:  What are the dates that Judge Weinstein

18  has in place?

19         MS. DE URIOSTE:  Judge Weinstein's order calls for

20  the parties to exchange summaries of documents May 25th and for

21  the hearing to be held June 5th.

22         THE COURT:  So when are you proposing to have the

23  mediation?

24         MS. DE URIOSTE:  We would propose to push it back by

25  two weeks provided that we've made progress in discovery.

28

1          THE COURT:  I'm sorry, did you say two weeks?

2          MS. DE URIOSTE:  Yes, Your Honor.

3          THE COURT:  Well, assuming -- and have the parties

4    selected a mediator?

5          MS. DE URIOSTE:  Your Honor, the mediation was

6    scheduled before you.

7          THE COURT:  Well, I set aside a substantial amount

8    of time for the settlement conference.  I call it a settlement

9    conference.

10         MS. DE URIOSTE:  Oh, I apologize, Your Honor.

11   That's what I was referring to.

12         THE COURT:  All right.  I can put this off until May

13   2nd.  Mr. McDonnell, is that agreeable to you?

14         MR. McDONNELL:  Your Honor, I was kind of intending

15   on the April 17th date.  You know, with all due respect,

16   because they're having a problem putting together the

17   discovery I don't think that that should intervene in our

18   mediation.

19         THE COURT:  Well, I think --

20         MR. McDONNELL:  [Inaudible].

21         THE COURT:  -- I think unless and until the CFTC can

22   get this information I don't think we're going to have

23   meaningful settlement discussions.  So while I can appreciate

24   that you would like to do it sooner rather than later to avoid

25   further discovery, if we go forward on April 17th the case is

1   not going to be resolved at that point.

2        MR. McDONNELL:  Your Honor, I totally understand

3   that but it seems that the only way the case is going to get

4   resolved is on my back and on their terms.  I [inaudible], you

5   know, working hard to work with them and I don't really think

6   that the date should be switched up because they're having a

7   problem finding things that truly never or don't exist.

8   They're coming at myself and with all due respect to the

9   Court, using the Court as a vehicle and using me as a vehicle

10  for whatever reason that they have.  But I believe that we

11  should sit down on the 17th and see where they're at and if

12  they even have a case in general because I don't believe they

13  have a case.

14       THE COURT:  Well, whether that they have a case or

15  not on the 17th, if they're awaiting the production of

16  documents from third parties, it's not -- when I say

17  documents, I include electronic media.  It's not that they

18  don't exist, it's that you can't access them.  And until the

19  CFTC can access them, it would be meaningless to go forward on

20  April 17th.  Now, I can simply cancel the settlement conference

21  altogether, but I'm not going to go forward with a futile --

22  put aside half a day to accomplish nothing.

23       MR. McDONNELL:  Your Honor, I trust your judgment.

24       THE COURT:  All right.  I'm going to put this down

25  for May 2nd at 10 o'clock.

30

1          All right.  Anything else?

2          MS. DE URIOSTE:  No, Your Honor.  We would close

3   just by noting that given the delays that we've had in getting

4   discovery going, we've lost almost a month or more than a

5   month of the very short time that Judge Weinstein allowed

6   before the June 5th hearing.  And given where we are now, we

7   anticipate potentially having to apply to Judge Weinstein to

8   adjourn the June 5th hearing at a later date.  And we just want

9   to note that for you.

10         THE COURT:  Well, as I said at the outset, I have no

11  control over Judge Weinstein's calendar or over the schedule

12  that he set.

13         All right.  Thank you all very much.  Goodbye.

14         MS. DE URIOSTE:  Thank you, Your Honor.

15         THE COURT:  Goodbye.

16  (Proceedings concluded at 12:54 p.m.)

17                    *  *  *  *  *  *

18

19

20

21

22

23

24

25

31

1          I certify that the foregoing is a court transcript from

2     an electronic sound recording of the proceedings in the above-

3     entitled matter.

4

5                              _____
                                        *Mary Greco*

6                                       Mary Greco

7     Dated:   April 11, 2018