1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2

3  -------------------------------------X
                             :
4  COMMODITY FUTURES TRADING COMMISSION, :
                             :
5               Plaintiff,    :
                           :  18-CV-00361 (JBW)
6         v.              :
                           :  April 12, 2018
7  PATRICK MCDONNELL, et al.,      :  Brooklyn, New York
                           :
8               Defendants.   :
                           :
9  -------------------------------------X

10
      TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
11        BEFORE THE HONORABLE ROANNE L. MANN
         UNITED STATES CHIEF MAGISTRATE JUDGE
12

13  APPEARANCES:

14
  For the Plaintiff:        DAVID WILLIAM OAKLAND, ESQ.
15                      BRENT TOMER, ESQ.
                      Commodity Futures Trading Commission
16                      140 Broadway, 19th Floor
                      New York, New York 10005
17

18  For the Defendant:        PATRICK MCDONNELL, Pro Se

19

20  Court Transcriber:        SARA WINKELJOHN, CET-808
                      TypeWrite Word Processing Service
21                      211 N. Milton Road
                      Saratoga Springs, New York 12866
22

23

24

25

  Proceedings recorded by electronic sound recording,
  transcript produced by transcription service

2

1    (Proceedings began at 5:29 p.m.)

2          THE COURT:  This is Judge Mann on the line.  I'm

3    conducting a telephone conference in <u>CFTC v. McDonnell</u>,

4    18-CV-00361.

5          Do I have plaintiff's counsel on the line?

6          MR. OAKLAND:  Yes, Your Honor; David Oakland and

7    Brent Tomer for the Commodity Futures Trading Commission.

8          THE COURT:  And do I have Mr. McDonnell on the line?

9          MR. McDONNELL:  Yes, ma'am.

10         THE COURT:  All right.  I set up this telephone

11   conference in response to Mr. McDonnell's letter of yesterday

12   which was -- which was docketed into the ECF system by

13   plaintiff's counsel.  In that letter, Mr. McDonnell says that

14   he is prepared to be placed into default.  I want to make

15   sure, Mr. McDonnell, that you understand the consequences of

16   that and also to see if there's a way that we can get this

17   matter resolved.

18         Now first let me ask you, Mr. McDonnell, and I don't

19   want to get into specifics, but did you in fact have an

20   opportunity to speak with anyone from the pro bono clinic?

21         MR. McDONNELL:  Yes, I did.

22         THE COURT:  You did?

23         MR. McDONNELL:  Yes.

24         THE COURT:  And you made this decision after

25   speaking with someone --

1          MR. McDONNELL:  Yes.

2          THE COURT:  -- from the clinic?

3          MR. McDONNELL:  After speaking to them but not on

4    their advice.  On my own.

5          THE COURT: All right.  Well, again, I don't -- any

6    advice that they gave you is privileged so I don't want to get

7    into the specifics.

8          MR. McDONNELL:  Okay.

9          THE COURT:  You understand that if you do default

10   that is -- although you say you're not admitting liability if

11   you fail to respond to the complaint the factual allegations

12   in the complaint will be taken as -- will be taken as admitted

13   since they're undisputed.  Do you understand that?

14         MR. McDONNELL:  Yes, I understand that.

15         THE COURT:  And that would not resolve the case

16   because there would then still be the issue of damages or

17   other remedy that the CFTC might be seeking.  And a defendant

18   who defaults, while he is deemed not to have contested the

19   allegations in the complaint, it is not an admission of the

20   damages or the remedy sought, and there still could be

21   litigation over that.  The CFTC would still be entitled to

22   discovery in order to establish its damages or its entitlement

23   to other relief.  So not filing the answer does not end the

24   case for all purposes.  Do you understand that?

25         MR. McDONNELL:  Yes.

4

1          THE COURT:  And understanding that it's still your

2   decision not to put in an answer to the complaint?

3          MR. McDONNELL:  I don't know.  I really -- I don't

4   have an answer for that right now because I just -- I just

5   want this over with.  And it's already taken everything from

6   me, my wife, everything, and I'm just done with it.  I'd

7   rather go to jail at this point then to go into court for

8   this.  I'm just tired of this.

9          THE COURT:  Well --

10         MR. McDONNELL:  I'm at the point -- they've driven

11  me to -- I'm having panic attacks, anxiety.  I mentally

12  couldn't do this if I chose to.  This has -- this has gotten

13  to a point where -- yeah, okay, I understand what you're

14  saying in terms of the default and everything.  But they have

15  not even produced a number to default on from day one.  The

16  only number that they're counting on is they're hoping that

17  the information that they keep hammering me in the head for

18  for discovery is going to show something.

19         And the authorizations that you had granted an order

20  on the other day, they lied under your name in the cover

21  letter.  They said -- they specifically said that you -- that

22  you said that I was to provide information from Gmail,

23  Twitter, Slack, and Paypal.  We never discussed Twitter.  You

24  never in your order did that, but as per their letter they say

25  your order that I have to sign this.  They're pulling tricks.

1   They're slipping in -- and the actual Twitter accounts were

2   dismissed as evidence in Judge B. Weinstein's evidentiary

3   hearing.

4           I can't go against this.  I've already lost because

5   if we could even -- if we get past this where they're lying in

6   court under your name and saying that an order -- that I'm

7   ordered to send in information for Twitter when that was never

8   even discussed, I mean where do they get in trouble?  Because

9   I just feel like all the pressure's on me.  I have to perform.

10  I have to be here.  I have to answer this.  When I shouldn't

11  even be on this complaint in the first place.  They have no

12  evidence, and they have no case.  And they're persisting with

13  no case and they're wasting the Court's time and they're

14  wasting my time.  And in turn, they took -- my wife of 26

15  years is gone, my kids don't look at me no more.  I've lost

16  everything.

17          So at this point, I want -- I don't want this in my

18  life, and whatever it takes to get this out of my life I want

19  it out of my life immediately.  And I'm not trying to be

20  disrespectful, but this has become my life.  I -- I've been --

21  you know, I was unemployed when this happened, and I was in

22  the job market.  There's over 1.4 million links on Yahoo

23  related to my name and related to this case saying I'm a

24  fraud.  Every employer that I went to to look for a job asked

25  me a question about this.

1          If people can't see what they're doing to me,

2   they're beating me.  They're beating me in the head.  And they

3   have no evidence.  They have no proof.  And I don't even know

4   how it's gotten this far.  I've brought all my evidence to

5   prove my case when I -- when I -- when I showed up the first

6   time.  Nobody wanted to see it.  And it's getting to the point

7   -- they want a deposition on Tuesday where I have to show up

8   at the Commodities Futures Exchange and sit in their room with

9   all their people with a camera in front of me while they grill

10  me with no representation when I shouldn't even be here in the

11  first place.  I think this case should be dismissed on the

12  grounds that they lied and they -- and they continue to lie.

13          They're lying under your name.  I can send you a

14  copy of this.  They should send you a copy also.  But nobody

15  ever -- you never -- we never even discussed Twitter.  And we

16  never even -- you never even ordered that, and they're -- and

17  they're -- they're trying to use -- they're trying to get --

18  they brought these accounts and they were kicked out of

19  evidence.  And they're trying -- they thought like I was just

20  going to sign this because I'm busy.  And this ain't fair.

21  This isn't a fair playing field, and I don't feel comfortable.

22          THE COURT:  Well --

23          MR. McDONNELL:  At all.

24          THE COURT:  I will -- I will ask counsel for the

25  CFTC to respond in a moment.  But getting back to what I had

7

1  been addressing with you, I understand that you want this to

2  be over immediately, but that isn't going to happen simply

3  because you decide not to put in an answer to the complaint.

4  As I said at the outset, that is not going to put an end to

5  it.  If we could resolve this case that would -- that would

6  put an end to it, but simply throwing up your hands and saying

7  I've lost everything, I'm just not going to put in in an

8  answer because I don't have the time, that is not going to

9  wrap up the matter.  And I will simply -- again, I don't want

10  to get into what the attorneys at the pro bono --

11          MR. McDONNELL:  Well, may I ask this of you?  May I

12  ask this of you?  When I --

13          THE COURT:  Well, let me just say I don't want to

14  get into what the attorneys at the pro bono clinic said to you

15  except that I did hear you say you're going against their

16  advice.  I presume -- and I don't want you to say yes or no,

17  but I presume that if you had wanted to put in an answer they

18  would have assisted you with -- in doing that.

19          MR. McDONNELL:  Yes, they did.

20          THE COURT:  Now what is it you wanted to ask me?

21          MR. McDONNELL:  They did do that, but I would like

22  to have -- like, you know, it was just a quick phone call.

23  They gave me a case number.  Like, they opened up, like, a

24  file on me, and they gave me an appointment for April 23rd.

25  Your Honor, I would feel a lot more comfortable if you could

1   extend my answer to the -- to some point -- you know, it could

2   be the 24th just so I could sit down with them and I could let

3   them look at it, you know, and have -- and I just want someone

4   to look at my case.  I'm running blindly into this, and if I

5   do something -- that they're just destroying me from a -- from

6   a legal point of view.  And I really would appreciate if I

7   could get an extension for the filing of the answer to the

8   complaint, you know, a day or two or whatever after the -- you

9   can -- I'll give you the number -- you have the number.  You

10   can contact them.  [Inaudible]

11           THE COURT:  No, I'm not going to -- I have no reason

12   to --

13           MR. McDONNELL:  [Inaudible]

14           THE COURT:  I have no reason to dispute that you

15   said you'd met with them and that they're going to -- they are

16   prepared to meet with you on the 23rd.  Let me see if

17   plaintiff's counsel have any objection to putting off the

18   answer and the deposition.

19           MR. OAKLAND:  Your Honor, this is David Oakland.

20   You know, we don't have a problem with a reasonable request

21   for an extension of time in order to consult with counsel.  I

22   will say this is the first that we've heard of, you know, the

23   date of meeting with pro bono counsel.  We had no, you know,

24   knowledge about that, and, you know, we don't want to know

25   when he's meeting with them or how -- or, you know, what

9

1  happens at the meeting, you know, other than what he's -- what

2  he's willing to actually do in court.

3        I do want to address the bandied-about accusation

4  that we were somehow being false or misleading with him

5  regarding the authorizations.  It was Mr. McDonnell at the

6  conference on Monday who explicitly stated, and I'm reading

7  from the transcript that was just provided from the court

8  reporter's office, where he said that -- you asked

9  communications, "They would have been through the

10  coindropmarkets Gmail account?"  And Mr. McDonnell replied:

11  "That and mainly Twitter, the Twitter that they -- the Coin

12  Drop Markets Twitter.  I used to talk to everybody mainly

13  through direct messages."

14        And, Your Honor, I mean your order was clearly

15  designed to provide access to the books and records of the

16  Coin Drop Markets company through which Mr. McDonnell was

17  communicating with customers regarding the cryptocurrencies in

18  question here.  And the -- so we asked for authorizations for

19  three social media networks.  Well, one email account, the

20  Gmail account that we discussed on Monday; the Twitter was

21  that was explicitly identified by Mr. McDonnell as the -- as

22  the primary method that he communicated; as well as the Slack

23  message group that we identified that he says that actually

24  one of the customers created, but at the very least we'll get

25  to the bottom of that; and then we also sent the authorization

1  for the Paypal account.  And, you know, Your Honor, obviously

2  we take it very seriously, you know, following the contours

3  of --

4          MR. McDONNELL:  I object.  If you took it so

5  seriously you would have had it stipulated in the court order.

6  Okay.  I was [inaudible] --

7          THE COURT:  Excuse me, Mr. McDonnell.

8          MR. McDONNELL:  -- stating that -- yes.

9          THE COURT:  If you have anything to say you can

10  address it to the Court.  I'm not going to just sit here while

11  the --

12          MR. McDONNELL:  I'm sorry.

13          THE COURT:  -- two of you go back and forth.

14          I actually had a question for Mr. Oakland.  There

15  was no reason you could not have asked Mr. McDonnell for an

16  authorization for his Twitter account based on the comments he

17  made during that call.  But since you have the transcript, did

18  the Court either during that call or in the order, the minute

19  entry that issued subsequent to that, did the Court at any

20  point order him to provide an authorization for the Twitter

21  account?

22          MR. OAKLAND:  I'm checking right now the language.

23  It said:  "In the same way that the Court has directed

24  defendant to provide an authorization for PayPal account, it

25  may facilitate this to similarly direct for authorization for

1   other such accounts.  You know, perhaps through the subpoena

2   process combined with authorization, we may be able to get

3   access to the Gmail account or perhaps other accounts that the

4   defendant can identify."  And you said I'm going to -- if

5   there is a way to draft authorizations that would limit it to

6   the customers.  And Ms. de Urioste pointed out that this is

7   the Coin Drop Markets.  I am going to require that he provide

8   authorizations for disclosure of those email account or

9   accounts but not any personal email accounts that he has.

10          THE COURT:  Well, I was -- we were talking about

11   email accounts.

12          MR. OAKLAND:  Right.  I'm -- let me look for the

13   social media part of the --

14          THE COURT:  I don't -- I don't believe that I ever

15   expressly authorized the -- or ordered that he produce an

16   authorization for the -- for the -- for the Twitter account.

17          MR. OAKLAND:  Well, Your Honor, I -- if that was not

18   the intent of the discussion on Monday, you know, I apologize

19   if we misunderstood the extension of the -- of the social

20   media accounts that were the subject of it.  The -- it is

21   correct that the minutes that were put on the docket do not

22   explicitly identify the Twitter account.  We thought they were

23   subsumed within the social media discovery.  Your Honor, we

24   would request that the -- to the extent that the order was not

25   explicitly including the Twitter account that it be deemed to

12

1  do so.

2        MR. McDONNELL:  Objection [inaudible].

3        MR. OAKLAND:  You know, Mr. McDonnell admitted --

4        MR. McDONNELL:  You just [inaudible].

5        MR. OAKLAND:  -- that that was a primary method of

6  communication.

7        THE COURT:  I can't --

8        MR. McDONNELL:  [Inaudible]

9        THE COURT:  I can't have two of you talking

10  simultaneously.

11        MR. McDONNELL:  I'm sorry.

12        THE COURT:  All right.  Mr. Oakland.

13        MR. OAKLAND:  So to the extent -- to the extent that

14  the order was not covering the Twitter account, you know, we

15  would request that the authorization for the Twitter account

16  also be deemed to be a -- you know, a useful tool for

17  discovery in that Mr. McDonnell authorized Twitter to produce

18  those records.

19        THE COURT:  I will -- I will consider this as a new

20  request, but that was not within the scope of my order.  And

21  to the extent that the cover letter from the CFTC suggested in

22  any way that the Court had ordered it, that was inaccurate.

23        Mr. McDonnell, there's now a request for -- that you

24  produce -- that you provide an authorization for the Twitter

25  account.  You object to that, so let me -- I'll hear from you

1  now.

2        MR. McDONNELL:  Okay.  I object to it because he

3  just lied in his statement.  He stated initially that the

4  minutes stipulated me saying something about Coin Drop Markets

5  and then he comes back with his claim why he would want

6  authorization for these Twitters saying that we never

7  specifically discussed the Twitter.  He also was using

8  evidence that has been dismissed by Judge Jack B. Weinstein

9  that he tried to present, and it's been dismissed from

10  evidence, from the case already.  The first -- the top four I

11  recognize just from memory from the case.  I don't know where

12  the other ones come from, but I don't believe that he should

13  have that because I don't -- those aren't my Twitters.  And

14  they were dismissed for that reason.  [Inaudible].

15        THE COURT:  I don't know what you mean when you say

16  that evidence was dismissed by the district court.

17        MR. McDONNELL:  It was -- it was omitted from the

18  case, omitted.  I -- maybe I'm using the word wrong, but it

19  was omitted when it was presented through their investigator's

20  evidence package that he presented at the hearing that we went

21  to.  And Judge Weinstein would question him piece-by-piece

22  with the evidence, and the particular -- the particular

23  Twitter accounts that he's talking about have been omitted

24  from the case by Judge Jack B. Weinstein.  And I don't know

25  why they're trying to bring them back in when that has been

14

1    omitted in the first place.

2              THE COURT:  Well, when you say it was omitted by

3    Judge Weinstein, you mean the CFTC did not present it?  As

4    part of their presentation to Judge Weinstein they didn't rely

5    on evidence from Twitter?

6              MR. McDONNELL:  He --

7              THE COURT:  Or are you saying Judge Weinstein

8    expressly rejected evidence from Twitter that was presented?

9              MR. McDONNELL:  He expressly rejected -- he

10   expressly rejected it.  He rejected it.  And he -- and he told

11   them, he said that you have limited evidence at most, and he

12   called it flimsy, what evidence they did have left after that

13   hearing.

14             THE COURT:  And the purpose of the hearing, is that

15   a motion for a preliminary injunction or --

16             MR. OAKLAND:  Yes, Your Honor.

17             MR. McDONNELL:  That the preliminary -- that was the

18   -- that was for my notice of -- to dismiss and there was a

19   couple things kind of bundled into that one date.

20             THE COURT:  Well, let me just say --

21             MR. McDONNELL:  I mean --

22             THE COURT:  -- that the fact that a judge may at a

23   very early stage of the proceeding say that the plaintiff has

24   a weak case does not mean that the -- that the plaintiff is

25   then barred from obtaining more evidence through discovery to

1   try and strengthen its case.  Let me hear from --

2            MR. McDONNELL:  But I'm saying that it was found in

3   that hearing that I was -- those weren't my accounts, and

4   that's why they were excluded.  I can't possibly give

5   authorization to the CFTC to access accounts at Twitter that

6   aren't mine.  And what they also did in that [inaudible] order

7   on everything else, like, in reference to Paypal, for

8   instance, your order specifically -- the wording in the

9   minutes and everything allowed them -- you know, I agreed to

10  authorization of the cdm@gmx.us Paypal account.  They do

11  things like this in all their consents to release.  It's with

12  the email addresses, and then they put Coin Drop Markets

13  and/or CDM -- or cdm@gmx.us.  And then on the subpoena that

14  they're using for Slack Technologies, I'm telling them that I

15  didn't authorize this account, and you gave them authorization

16  for the URL that they presented, which was

17  bitcoinxbttradegroup.slack.com.  And then they have and/or

18  accounts associated with email addresses

19  coindropmarkets@gmail.com or cdm@gmx.us.

20            I don't have accounts I believe under those, but

21  let's say I did.  That would be giving them access to three

22  accounts versus the account that they were authorized under

23  court order to get.  And they do this on every one of their

24  consents.  I don't object to signing these consents, but I

25  object to signing them and protest some of the wording that

16

1   they have in this -- how they're adding on and/or this email

2   address.  They were specifically -- I was specifically ordered

3   with your order in this court to provide the information for

4   the CDM Paypal account, the information for Gmail Coin Drop

5   Markets, and the Slack [inaudible] Trade Group, not Twitter,

6   nothing.

7          In my case, I've probably made the mistake of, you

8   know, not addressing things.  This is a case of them not

9   addressing something, and, you know, you just can't reverse

10  something because you didn't address it in the first place.

11  That's why I want to drop from this case because if they can

12  just reversing and reversing this is going to go on for the

13  rest of my life.  We had a hearing that was in relation to

14  everything that I was going to agree to in reference to

15  authorization, and you know I didn't give too much of a fight.

16  I actually was willing and open to them to do the Paypal

17  issue.  I willing and open for them to do the Gmail issue

18  because of the 2FA Google Authenticator problem.

19         And I'm not willing to sign anything with Twitters

20  that I don't recognize, and I'm not willing to give consent to

21  accounts.  Like even the Slack group, I have a problem when I

22  hear Patrick K. McDonnell is a subscriber of the electronic

23  communication service.  I believe Patrick McDonnell is not a

24  subscriber, but yet I have to sign this authorization for them

25  to access this account when I don't believe I've ever been the

1    owner of the account.

2              THE COURT:  Well, and we discussed that --

3              MR. McDONNELL:  Or an account --

4              THE COURT:  -- and I said to the extent that you --

5              MR. McDONNELL:  You know, I know and [inaudible].

6              THE COURT:  -- give an authorization and the service

7    provider says, well, this guy isn't the authorized

8    representative they won't honor it.

9              MR. McDONNELL:  Yes.  Yes.  But it's kind of me

10   lying when I'm saying I am a service -- I am a -- you know,

11   like I'm lying to help these people screw me.  I -- that's the

12   only way I could say it.  I'm going to sign a document that

13   says that I am a subscriber of the electronic communications

14   and request that they release information under court-ordered

15   subpoena to their -- to Slack, and I don't believe it's true.

16   I'm not being threatened or nothing, but I don't believe it's

17   true.

18             So in that case that's how I feel about that, and

19   I've expressed that with you.  And I -- I've agreed to move

20   forward with it, but I don't think that's legal.  Then when

21   you look at them just adding on all these and/or accounts

22   associated with email addresses.  That wasn't the agreement,

23   and that wasn't the order.  The order was specifically

24   written, and it was written by this Court.  And I'm asking,

25   Judge, and I object to any further discussion or topic of this

18

1   social media or email stuff.  We covered that, and it should

2   have been covered in that meeting.  And it's their bad if they

3   didn't cover it.

4        THE COURT:  Well, I don't know that it's -- that if

5   it didn't come up during that meeting that means that they're

6   barred from seeking additional discovery.  I am concerned that

7   the cover sheet and the authorizations that were provided to

8   you do exceed what the Court ordered.

9        MR. McDONNELL:  They definitely do.

10        THE COURT:  It's not -- it's not that they can't ask

11   for more, but I think they should be upfront about what was --

12        MR. McDONNELL:  Yes.

13        THE COURT:  -- ordered by the Court and what

14   additional accounts they're demanding.  Now let me talk to

15   plaintiff's counsel because I am very concerned about the

16   breadth of these authorizations.  When we had our discussion

17   -- and I'm at a disadvantage because I didn't know you were

18   going to be discussing this today and I haven't gone back and

19   re-read and read the transcript.  But I remember specifically

20   that I was concerned that to provide an authorization would

21   produce -- could produce a broad array of information that's

22   beyond what is relevant to the case.  For example, we talked

23   about the cdm@gmx account.  And Mr. McDonnell, if I recall

24   correctly, noted that he communicated with attorneys who he

25   was reaching out to using that account.  That's the account he

1    uses as his general account.  And you can correct me if I'm

2    wrong but I believe --

3              MR. McDONNELL:  No, that's correct.

4              THE COURT:  I believe I didn't -- I specifically did

5    not authorize the disclosure -- the -- I did not require him

6    to provide an authorization for that account because the

7    information sought would be -- the information that would be

8    produced would relate to other matters, confidential matters,

9    privileged matters, that the CFTC had no right to.  So we

10   talked very specifically about certain accounts, and I ordered

11   those produced.  And the CFTC had no business under the guise

12   of my order of submitting authorizations that exceeded the

13   scope of my order.

14             MR. OAKLAND:  Your Honor, this is David Oakland

15   again.  The request to Mr. McDonnell would not -- certainly

16   was not intended to exceed the scope of the order, and I'm

17   prepared to go through it right now.  And it might take a

18   couple minutes because I'm going to have to go through each of

19   the different networks and read to you essentially what the

20   authorization is requesting.  First of all, the cover letter

21   that Mr. McDonnell is referring to, I have the email in front

22   of me that Ms. de Urioste sent to him on Tuesday evening.  And

23   it says:

24             "Mr. McDonnell, for your reference I have attached

25             copies of the authorizations that we discussed

1        during Monday's conference call with the Court.  I'm

2        sending you hard copies of these forms via UPS for

3        you to sign and return along with a second UPS

4        envelope for return overnight delivery paid by the

5        Commission so you can get them back to us by April

6        13th per Judge Mann's order."

7        And that reference of course is to the fact that you

8  had ordered him to get them to us by Friday, and so we

9  provided a UPS overnight delivery so that it could be turned

10  around as quickly as possible and there would be no delay.

11  You know, and so then the authorization's really to four

12  different entities.  I'll start with --

13        MR. McDONNELL:  What about the cover letter?  What

14  about the cover letter that came with that email that you're

15  skipping over as you go to the authorizations that mentions

16  Twitter, Slack, Gmail, and everything else?

17        THE COURT:  Again, Mr. McDonnell --

18        MR. McDONNELL:  [Inaudible]

19        THE COURT:  -- I said -- you know, I'm happy --

20        MR. McDONNELL:  I'm sorry, Judge Mann.  I'm sorry.

21        THE COURT:  -- to get off this phone and have you

22  negotiate the scope of these authorizations.  I don't have

23  them in front of me.

24        MR. McDONNELL:  I'm sorry.  I'm very sorry.

25        THE COURT:  You all do.  I'm at a disadvantage.  But

1   even just based on that cover letter, while that cover letter

2   was -- there was nothing literally inaccurate it was certainly

3   misleading because it referred to authorizations that the --

4   that the Court had discussed and ordered and then it includes

5   authorizations that go beyond what the Court had ordered.

6          MR. McDONNELL:  I'm sorry.

7          THE COURT:  So whether it was intentional or not

8   intentional it did exceed the scope of the Court's order, and

9   there was a reason why the Court limited its orders.  Because

10  we're not simply talking about information coming from Mr.

11  McDonnell which he can go through and cull out what's relevant

12  and what relates to the claims and what doesn't.  You're

13  talking about getting it from a third-party provider, and this

14  is social media.  There are privacy interests at stake.  So I

15  am not going to require that he sign broad authorizations that

16  not only list the email address that we specifically discussed

17  but that say and/or any other email addresses.  That was

18  not --

19         MR. TOMER:  Your Honor, this is --

20         THE COURT:  -- part of the order.

21         MR. TOMER:  Your Honor, this is Brent Tomer from the

22  Commission.  Our consents to release do list

23  coindropmarkets@gmail.com and cdm@gmx.us email addresses

24  merely as an identification standpoint for the consent.  In

25  many cases, particularly with regard to Slack or Twitter, Mr.

1   McDonnell likely did not even include his name when he signed

2   up for an account.  You don't need to.  So we need to identify

3   the email addresses that he used in order to identify and sign

4   up for his account.  Otherwise, the social media networks

5   would be unable to identify the account at issue.

6              THE COURT:  But as I --

7              MR. TOMER:  And we've [inaudible] --

8              THE COURT:  As I understand it the language that Mr.

9   McDonnell is objecting to is not simply that this account that

10  we're seeking is believed to be identified with the following

11  individual and the following email address.  But rather,

12  you're asking for all other accounts associated with that name

13  and/or that email address, so that is broader.  That's not

14  simply --

15             MR. TOMER:  Your Honor, let me --

16             THE COURT:  That's not simply identification.  That

17  is broadening what's being sought.

18             MR. TOMER:  Your Honor, if I may I'm going to read

19  to you the language of the -- of the authorization that we

20  were requesting for the Slack, and this will give you an idea

21  of what the language says.  And this language comes from our

22  standard template whenever we deal with consent forms

23  involving documents that may be held and are covered by the

24  Electronics Communications Privacy Act or such or similar or

25  remote computing services.  So we say: "Patrick McDonnell is

23

 1  a subscriber of the electronic communication service or remote
 2  computing service Slack Technologies." Now I understand
 3  earlier he said that he doesn't know if that's true, and, you
 4  know, this is again the first that he's objecting to that
 5  language in the authorization to us.
 6          But setting that aside, this is what the
 7  authorization says:  "Pursuant to 18 U.S.C. 2702(b)(3), I do
 8  hereby consent individually and as an authorized agent of
 9  CabbageTech, Corp. doing business as Coin Drop Markets."  And
10  then we point -- we describe that as Coin Drop Markets.  "To
11  the disclosure of the contents of all electronic
12  communications in the Slack Team URL," which is uniform
13  resource locator address, "bitcoinxbttradegroup.Slack.com
14  and/or accounts associated with the email addresses
15  coindropmarkets@gmail.com or cdm@gmx.us."  And then we coin
16  that as the Coin Drop Markets account.
17          And what that is intended to do is to give Slack a
18  specific Slack group name as well as identifiers, two email
19  addresses that Slack can use to identify the Slack team's
20  groups that Slack maintained -- or may have maintained that
21  would have been associated with either of those two email
22  addresses.  So this is not intended to get at communications
23  that are held at the cdm@gmx.us account.  That was the
24  discussion of that he may have used that for communications
25  with potential attorneys in the matter.  Instead, this is an

24

1  -- again, an identifier, simply a email address by which Slack

2  can then use to locate the appropriate trade groups that might

3  be responsive to a subpoena that is being authorized.

4  THE COURT:  Well, what you read to --

5  MR. McDONNELL:  [Inaudible]

6  THE COURT:  -- me, it may be your standard language,

7  but the way I heard it -- and I don't have the language in

8  front of me, but the way I heard it is whatever your intent

9  might be that it has the potential to authorize the release of

10  more than just the email address we were discussing.  And I

11  thought we were discussing one email address.  You mentioned

12  two email addresses.

13  MR. TOMER:  Your Honor, we did mention one email

14  address and that was the request that was going to go to

15  Google, which is the Gmail account that's the

16  coindropmarkets@gmail.com account.  And explicitly there we

17  limit the communications from that Gmail account to that one

18  email address.  And that was the email address that we

19  discussed during the conference on Monday that had nothing to

20  do -- that was -- that he doesn't use currently that he can't

21  even get into because of the problems that he has encountered

22  with the two-factor authorization that he says.  So, Your

23  Honor, what the -- so the actual email that's associated with

24  -- it was only to that one email address.  For Slack, we've

25  given both email addresses in order so that Slack can identify

1   the right Slack social media group.  To --

2          MR. McDONNELL:  I can just give him the Slack URL.

3   That's the identity right there,

4   bitcoinxbttradegroup.Slack.com.  That's the identifier to the

5   account.  You don't need an email to identify a Slack-based

6   identifier.  That's why it's a URL.

7          MR. TOMER:  Your Honor, though, they won't agree to

8   the consent without actually having the linked email address.

9   So, for example, Mr. McDonnell had said he doesn't even know

10  if he's a subscriber for this.  So if they -- if Slack looks

11  and says, oh, that bitcoinxbttradegroup team URL is not

12  associated with either coindropmarkets@gmail.com or cdm@gmx.us

13  they won't produce it to us.  Or they'll -- or they'll --

14         THE COURT:  Well, what if -- what if you simply

15  reworded the authorization to give the Slack URL and to say

16  which is associated with and then you can put down the email

17  accounts so you're not saying and any and all other accounts

18  associated with those email accounts.  If you --

19         MR. TOMER:  Your Honor --

20         THE COURT:  If you have the URL and it's just an

21  identifier why can't it explicitly be made an identifier as

22  opposed to a term of expansion?

23         MR. TOMER:  Your Honor, we have no problem with that

24  change and would have been happy to make that change upon

25  discussion with Patrick McDonnell.  But that sort of brings us

26

1    to the larger point of this conference call which is that we

2    -- you know, we received an order from Judge Weinstein well

3    over a month ago requiring him to turn him over books and

4    records of the company within 10 days.  He argued at that

5    court hearing for an order that would protect the names of the

6    customers that he would provide to us and subsequently failed

7    to provide anything to us whatsoever.  Now more than a month

8    later, we've sent these consents to him and he, you know,

9    doesn't respond to our request to confer.  He refuses to show

10   up for a deposition and then ultimately says he's going to

11   default for the answer.  We're less than two months away from

12   our hearing, and we've received not one piece of disclosure

13   from him.

14          THE COURT:  Well, you've received an email from him

15   with links, and he did respond to your demands.  And he

16   explained that he did not have access to much of the

17   information that you were seeking.  I set up the telephone

18   conference.  It was the Court that proposed authorizations.  I

19   had suggested that the -- that the CFTC pay the $384 for

20   whichever account -- I guess it was the Paypal account, and

21   the CFTC said, well, we don't know that we're going to pay the

22   384.  You would rather spend hours on the phone with the Court

23   with multiple attorneys to -- you know, to debate these

24   issues.  In any event, the Court --

25          MR. TOMER:  Your Honor, that's an incorrect

1  characterization of what we said.  And we do take some offense

2  to that.

3          THE COURT:  Please let -- please let me finish.  The

4  Court was -- it was the Court that proposed authorizations and

5  very specific authorizations.  And so it really is unfair for

6  you to say that Mr. McDonnell provided nothing to you.  Yes,

7  it's frustrating at how long this is taking.  It's going to

8  take even longer with authorizations because I'm sure that --

9  you know, that Slack or Slack Team, this is not going to be a

10 top priority for them.  The Court is trying to find a way that

11 accommodates everyone's interest in this case, both the CFTC's

12 and Mr. McDonnell's.

13         MR. TOMER:  We appreciate that, Your Honor.

14         THE COURT:  All right.  So the CFTC has agreed to

15 rewrite the Slack Team authorization so that the identifier is

16 clearly denominated or limited as an identifier as opposed to

17 an expansion of what they're seeking.

18         Now let's talk about the request for an

19 authorization for Twitter which was not specifically ordered

20 by the Court but which Mr. McDonnell did, in fact, reference

21 during our last telephone call.  The Twitter account is -- as

22 I understand it, Mr. McDonnell, you did use the Twitter

23 account to communicate with your investors?

24         MR. McDONNELL:  The funny thing is -- the funny

25 thing is is that the Twitter account that I mentioned that he

28

1   said wasn't mentioned in the statement was Coin Drop Markets.

2   That's the handle at Twitter, Coin Drop Markets.  There's --

3   I'm looking at seven Twitter handles, and not one of them is

4   Coin Drop Markets.  I only attested to the fact that I dealt

5   with the customers on that call under the Coin Drop Markets

6   Twitter.  I have no relation to these other ones, and again

7   four of them were expelled at that hearing in front of

8   [inaudible].

9               MR. TOMER:  Your Honor -- Your Honor, we have

10  [inaudible].

11              THE COURT:  Again, I don't -- I don't know what that

12  -- I don't know what that means.  Perhaps the CFTC can

13  enlighten the Court about what Twitter evidence was presented

14  at the hearing and what Judge Weinstein's response or ruling

15  was with respect to the Twitter information.

16              MR. TOMER:  Sure, Your Honor.  We presented Twitter

17  information to the Court.  Mr. McDonnell denied that those

18  accounts were his.  Likely for the purposes of the preliminary

19  injunction hearing the Court declined to introduce those

20  accounts into evidence at that time, and that's the short

21  story of it.  The accounts themselves are all associated with

22  screenshots that we received through customers of Mr.

23  McDonnell that show Mr. McDonnell's face attached to those

24  Twitter handles.

25              THE COURT:  And what would have --

1          MR. TOMER:  That's why we've included them, and the

2    customers that he worked with that he has acknowledged through

3    showing [inaudible] transfers have provided that evidence to

4    us.  He claims that they aren't his.  That's fine.  Then

5    Twitter won't produce them to us because he's -- he doesn't

6    have the authorization for it.

7          THE COURT:  What if -- what if you subpoenaed

8    Twitter?

9          MR. TOMER:  That's what we intend to do, Your Honor.

10          THE COURT:  I mean did they --

11          MR. TOMER:  But because this is an electronic

12    communications and private electronic communications without

13    the consent --

14          MR. OAKLAND:  It will be more time-consuming.

15          MR. TOMER:  It will be very time-consuming.  And

16    again, we have a June 5th hearing on the calendar.

17          THE COURT:  Well, I'm not sure that even if you got

18    authorizations this week, which it looks like is not -- is not

19    going to happen, that you would get responses in time for the

20    hearing.  So it may well be that you're going to have to go

21    back to Judge Weinstein and request an adjournment.  I have no

22    control --

23          MR. TOMER:  I think that's likely, Your Honor.

24          THE COURT:  I have no control over his calendar.

25    I'm frankly confused about the Twitter information.  On the

1  one hand, it apparently is undisputed that Judge Weinstein

2  refused to consider it because of Mr. McDonnell's claim that

3  it was not associated with him.  The CFTC says that the

4  screenshots showed Mr. McDonnell's face.  Was that presented

5  to Judge Weinstein?

6           MR. TOMER:  At least -- at least one of the

7  communications I believe was in the evidence binders that were

8  given, but I don't know whether we attempted to introduce that

9  or not offhand.

10          THE COURT:  And the CFTC's information is that the

11 Twitter account was in whose name?

12          MR. TOMER:  Mr. McDonnell's or Coin Drop Markets'.

13          THE COURT:  Well, when you say his individual name

14 or Coin Drop Market, is it that you don't which it was or it

15 was in both?

16          MR. OAKLAND:  Your Honor, we do not know which it

17 was because all we know is that customers believed that they

18 were communicating with Mr. McDonnell through Twitter -- or

19 through direct messages that were being sent through Twitter,

20 and the -- and the group would simply just given an identity

21 of the group name.  So whether the -- you know, obviously the

22 customers wouldn't know necessarily who the nominal owner of

23 that Twitter handle would be.  You know, we would have -- that

24 -- I mean that's why we're going to go to Twitter and find

25 these things out.

1            MR. TOMER:  But they certainly discussed transfers

2    that went into Mr. McDonnell's account at --

3            MR. OAKLAND:  [Inaudible]

4            MR. McDONNELL:  Your Honor, may I speak?

5            THE COURT:  Yes.

6            MR. McDONNELL:  I find -- what I find concerning is

7    that there's a consent to release electronic communications

8    from my company, Coin Drop Markets.  Like -- in the words of

9    the plaintiff, the only Twitter account that I referenced on

10   our previous call was Coin Drop Markets on Twitter.  If you

11   look at the consent that they sent to me, they don't even ask

12   for consent to Coin Drop Markets.  They ask for seven

13   alias-looking Twitters that I don't recognize, and they don't

14   ask for my company's Twitter which was Coin Drop Markets --

15   Twitter/coindropmarkets.  I find that very odd when we're

16   talking about my business and my business was Coin Drop

17   Markets and the Twitter for that account was Coin Drop

18   Markets.  And they're fully aware of that.

19           THE COURT:  Well, do you have any objection -- well,

20   I know -- I know you're upset about the fact that they sent

21   you these authorizations --

22           MR. McDONNELL:  I think they sent them -- like you

23   mentioned they -- initially they [inaudible].

24           THE COURT:  I understand that.

25           MR. McDONNELL:  So we can see [inaudible] --

1           THE COURT:  I'm now asking you --

2           MR. McDONNELL:  -- [inaudible] this coming from.

3           THE COURT:  I'm now asking you if this issue had

4   come up during the initial conference that we had several days

5   ago and you were talking -- you yourself said you communicated

6   with customers through Twitter through the Coin Drop Markets

7   account, so if it had come up at that time and they said we

8   want that Twitter account, would you have had any objection to

9   the Court ordering that you provide an authorization for the

10  Twitter records for Coin Drop, the Coin Drop Markets account?

11          MR. McDONNELL:  In the conversation that we had

12  initially?  Absolutely not.  I would have authorized it along

13  with Paypal, Gmail, and everything else.  But being that

14  they're just trying -- being that they pulled this with trying

15  to get seven accounts that aren't related to me and they

16  didn't address it, I object to them receiving anything in

17  relations to Twitter.  They had the opportunity to present it

18  to the Court, and instead they wanted to present this to me.

19  And I wanted to address this with the Court because I wanted

20  the Court to see this for what it really is.  And --

21          THE COURT:  All right.  Well, as I said, the fact

22  that they didn't address it at first does not mean that

23  they're forever barred from making that demand.  I've heard

24  your objections.  I've certainly taken them into account.  As

25  I said, I've tried to accommodate everyone's interests.  I'm

33

1  going to require the CFTC to redo the authorizations so that

2  they are not as broad as the initials -- initial ones were,

3  but I am going to grant their request and order the defendant

4  to provide an authorization for the Coin Drop Markets Twitter

5  account which is the account that he specifically referenced.

6          MR. OAKLAND:  All right.  Your Honor, I want to

7  preview right now because I have a feeling this will come up

8  then, then we will -- you know, without an authorization for

9  the other ones we will subpoena Twitter.  I expect we'll

10  subpoena Twitter.  I can't say we will.  We have to get

11  sign-off on that, but I expect that we'll seek to subpoena

12  Twitter for information regarding the other accounts.

13          THE COURT:  Well, do you -- you say the other

14  accounts.

15          MR. OAKLAND:  There are --

16          THE COURT:  Do you know that there are other

17  accounts?

18          MR. OAKLAND:  We believe that there are other

19  accounts through which people communicated with what they

20  believed was Mr. McDonnell, and these are -- these are Twitter

21  handles, something as simple as @mrpatmcdonnell.  Some of them

22  are -- some of them have the XBT Trade Group name in the

23  Twitter handle.  One of them is -- I don't have all of them

24  right in front of me right now, but the -- these are all based

25  upon, you know, information gathered from customers who

34

1  believed that they were communicating with either Mr.

2  McDonnell or, you know, maybe someone else at Coin Drop

3  Markets, if there is such a person but we don't believe there

4  is, regarding transfers to or from or the status of the

5  trading that was being done.  And so if he is disowning

6  knowledge of these other Twitter handles then, you know, we're

7  going to go ahead and subpoena Twitter at least to try to get

8  the identity of who was using those names, and I just wanted

9  -- I just wanted to tee that up because I don't -- I don't

10 want to be accused now of going around the Court's order as to

11 what the authorization is going to come.  We'll get the

12 authorization for the one Twitter account that he is

13 acknowledging currently, and then we'll pursue the information

14 on the other Twitter accounts.  And that may -- that may take

15 more time.

16         THE COURT:  Well, obviously --

17         MR. McDONNELL:  And I wanted to -- I wanted to --

18         THE COURT:  -- if you're -- any third-parties that

19 you're subpoenaing you have to obviously serve a copy of Mr.

20 McDonnell.

21         MR. OAKLAND:  Yes, and we've done that so far and

22 the remainder of the subpoenas that we're envisioning, you

23 know, we would, you know, following Rule 30 and Rule 45 of the

24 Federal Rules of Civil Procedure.

25         THE COURT:  All right.  There's an open issue about

1   Mr. McDonnell's response to the complaint.  I take it, Mr.

2   McDonnell, on reflection you're prepared to file an answer if

3   you're given more time to do so?

4           MR. McDONNELL:  Yes, Your Honor.  My appointment

5   with my I guess advisor, whatever, is April 23rd.

6           THE COURT:  All right.  So let me see what day of

7   the week that is.  I'm going to set a new date, and this is a

8   final date, of April 25th for filing the answer.

9           MR. McDONNELL:  Okay.

10          THE COURT:  And in terms of the deposition, is that

11  something that can be deferred until after Mr. McDonnell has

12  had an opportunity to confer with the pro bono clinic?

13          MR. OAKLAND:  Yes, Your Honor.  We can definitely

14  defer until after the 23rd.  What we'll do is, you know,

15  withdraw the current notice of deposition and, you know -- you

16  know, I'll have to talk to the people on the team who are

17  going to be more actively on taking the deposition and pick --

18  you know, pick dates and, you know, obviously -- you know, I

19  think, Your Honor, one of the -- one of the problems we've had

20  so far is is that, you know, we notice the deposition and we

21  immediately just get a response I'm not going to be there.

22  And, you know, instead if we could have -- I'd like -- you

23  know, I'd like to have a situation where we can have a more

24  productive working relationship.  If there is -- like, for

25  example, the authorizations.  If we had been -- if we had been

1   told that the authorization was too broad compared to what he

2   understood of the order we could have also entered into a

3   discussion as to is it possible to narrow it.  You know, and I

4   -- and I -- you know, I would just encourage -- you know, I

5   hate to use the Court's conference time in a way to do this,

6   but I would encourage Mr. McDonnell to, you know, attempt to

7   do this without court intervention.

8           MR. McDONNELL:  May I respond to that?

9           THE COURT:  You may.

10          MR. McDONNELL:  And I don't want to waste your time,

11  either, Your Honor.  I had no problem cooperating with you,

12  okay.  I was the one that initiated cooperation.  Okay.  But

13  you cannot cooperate with a snake that when you're telling

14  them the truth they're building five or six other truths.

15  Your beliefs are your beliefs and you have the right to

16  whatever beliefs you have.  But the only way that I will

17  resolve this with the CFTC is when you play fair.  Your

18  exploits that were brought up today are proof of how you've

19  been treating.  I can go back from day one that -- everything

20  that you've done.

21          Now if -- I would like to give you some advice.  If

22  you would like to cooperate with me, okay, you should be

23  honest about your cooperation means and methods like not

24  entering into an exploratory hearing, okay, resolution

25  hearing, with an investigator on the phone that you only

1  addressed by first name and not last but everybody else gets

2  introduced.  Okay.  So the means that you're approaching any

3  type of settlement or negotiations and asking as if I'm not

4  willing to get resolution on this is ridiculous.  I'll come to

5  the CFTC's office if there's a representative from the Court

6  and resolve it with you tomorrow.  But it has to be resolved

7  honestly, and you -- and you know what I mean because we've

8  spoke about this.  We've spoke a month before I entered any

9  courtroom.  I was trying to negotiate from day one.  So don't

10  sit here and try to correct me and give me advice.  I might be

11  stupid legally, but I'm a 45-year-old man.  And I know when

12  I'm the fool in the room.

13            THE COURT:  Mr. McDonnell --

14            MR. McDONNELL:  And that's you been treating me.

15  I've been nothing but honest.

16            THE COURT:  -- when you asked to speak I thought you

17  wanted to address the Court.  Again --

18            MR. McDONNELL:  No, I just wanted to address him

19  because I've been --

20            THE COURT:  -- I really -- I really --

21            MR. McDONNELL:  -- I've been nothing but

22  cooperative.

23            THE COURT:  I really don't want to be a party to

24  this back-and-forth between the parties to this --

25            MR. McDONNELL:  I'm sorry.

1           THE COURT:  -- case.

2           MR. McDONNELL:  I was -- I thought I could address

3   him.

4           THE COURT:  Now since you mentioned resolution, that

5   was something I had said at the outset because I don't know

6   what it is that the CFTC is looking for to try to get this

7   case resolved.  But as I understand it, in terms of injunctive

8   relief, Mr. McDonnell I take it is no longer -- is no longer

9   participating in the kind of activities that are the subject

10  of this case.  And he -- it sounds like wants to get on with

11  his life, so he might well agree to the equitable relief that

12  the CFTC would want if it were to prevail in the case.  And

13  he'd be willing to do that as part of a resolution.

14          What else are you looking for?

15          MR. OAKLAND:  Your Honor, I think obviously there

16  would be, you know, the forward-looking injunctive relief that

17  you identified.  There would be appropriate restitution to --

18          THE COURT:  Well, do you have -- do you have an

19  estimate of what you think the restitution amount would be?

20          MR. OAKLAND:  We have an estimate as to the -- for

21  the customers that we've identified.  And of course the

22  problem here has been that because there have been no books

23  and records we've been unable to validate essentially, you

24  know, is that a fairly completely universe of the conduct.

25  But there would be restitution.  I'll -- there's a

1   computational problem in that most of the people actually

2   transferred in virtual currencies.  And our understanding of

3   the law is that the restitution would have to be valued, you

4   know, at the time of the final entry of judgment of the -- you

5   know, of the virtual currencies involved.

6         But -- so I don't -- I don't want to -- you know,

7   Bitcoin has fallen significantly in the last three months, so

8   the actual amount of the -- the dollar amount of restitution

9   is less than it would have been, for example, in December of

10  in mid-February.  But it fluctuates, and so, you know, that's

11  obviously an issue there in terms of the valuation of the

12  restitution.  Normally, Your Honor, if there is restitution

13  disgorgement is another remedy, but if there is -- you know,

14  if there's restitution there's no need to -- well, I shouldn't

15  speak to that.  We'd have to discuss internally whether

16  there'd be any need for disgorgement remedy.  But there's an

17  argument that there would -- you know, it could be covered by

18  it.

19        And then finally, there's always the issue of the

20  penalty, and the penalty is based upon either a per violation

21  count, which can get quite excessive -- or not excessive I

22  should say but quite substantial, or it's tied to the actual

23  monetary gains that the defendant earned.  And there in terms

24  of recommending a settlement to the Commission, you know, it's

25  going to be influenced by a lot of things, but depending on

1  how quickly we can get to a resolution and how confident we

2  are that we're capturing the wrongdoing, you know, that can

3  factor sort of a sliding scale up from the -- you know, from a

4  low number up to triple the monetary gain which is the maximum

5  under the statute.

6          THE COURT:  And without binding the CFTC, based on

7  the identified victims or complainants what -- and I recognize

8  that you say you haven't -- you haven't uncovered the full

9  scope of the activities, what are we -- what's the ballpark

10 that we're talking about for restitution for the identified

11 alleged victims?

12         MR. OAKLAND:  I would -- I would really hesitate to

13 say, Your Honor, because some of them are actually currencies

14 that are less familiar, but, you know, I think we're probably

15 talking somewhere anywhere from maybe just below $100,000 to

16 $200,000?  And again I -- that's a very preliminary number,

17 Your Honor.  I hate to say that without having my investigator

18 to correct me on the valuations, but Mr. Tomer might know

19 more.

20         MR. TOMER:  Yes, and, Your Honor, the number of

21 transactions in the accounts that he used, according to our

22 records, are -- there are substantially more transfers than

23 the -- than the customers that we've identified.  You know,

24 part of what we're trying to do here is identify whether these

25 transfers were part of Mr. McDonnell's -- you know, some other

1  process or from the customers.  And we've been unable to get

2  there thus far due to the lack of information.

3          THE COURT:  Well, I do -- as part of my work as a

4  judge every day I conduct settlement conferences, and I like

5  to think I'm pretty good at getting cases settled.  But there

6  are cases where you not only have the issue of whether or not

7  the plaintiff will be able to establish liability and how

8  damages will be calculated but also collectibility.  What does

9  the CFTC do when you have someone who apparently, whatever the

10  scope of the alleged wrongdoing, does not have the funds?  I

11  presume if Mr. McDonnell had funds he would have an attorney

12  by now.  So what is CFTC's practice when you're dealing with a

13  defendant who does not have the wherewithal to pay for all the

14  alleged losses?

15          MR. TOMER:  There are certainly times where with

16  respect to a penalty we would -- we would certainly take that

17  into context.  With respect to restitution, Your Honor, the

18  CFTC's practice is full restitution.  We do not engage in

19  collection.  That's handled by Justice and --

20          MR. OAKLAND:  Nor do penalties or even restitution

21  amounts go to the CFTC.  They would go either to a

22  court-appointed monitor for distribution of restitution or to

23  the Treasury.

24          MR. TOMER:  Yes.

25          MR. OAKLAND:  I don't know if that's -- that helps

1   there, Your Honor, but that's essentially -- but the

2   restitution point is the key point.  Essentially full

3   restitution is -- you know, there's -- I'm not aware of us --

4   of the Commission, you know, being in a position to consider

5   settlements where there's at least not full restitution.

6           THE COURT:  Well, that must mean that you -- maybe

7   most of the defendants in your case have assets so you're not

8   faced with a situation where you're just going to litigate and

9   litigate and end up with an uncollectible judgment whether

10  it's your --

11          MR. OAKLAND:  Unfortunately, Your Honor --

12          THE COURT:  -- responsibility or the Department of

13  Justice's.

14          MR. OAKLAND:  Unfortunately, Your Honor, it

15  frequently ends up in their hands and then they and the

16  Treasury Department decide, you know -- you know, what the

17  appropriate enforcement mechanism is or whether to, you know

18  -- you know, decline to, you know, record the judgment after

19  10 years have passed.  You know, that's a decision that's not

20  in the Commission's hands.

21          THE COURT:  Well, if the CFTC would not be prepared

22  to settle the case for less than the full amount of

23  restitution and if Mr. McDonnell's position is that he has no

24  assets at all and assuming that he could persuasively

25  establish that he doesn't have any assets, then there's no way

1  that this case can settle.  That's what I'm hearing.

2          MR. OAKLAND:  Well, I don't know about that, Your

3  Honor.  I mean I know -- I mean we certainly have had

4  settlements entered against people who you know -- you know,

5  can't pay.  And, you know, and then there is unfortunately a

6  uncollected judgment, you know, and -- you know, and again,

7  like I said, that issue remains for the Treasury and for

8  Justice to decide.  You know, is it -- does it warrant

9  collection.  And this happens frequently, especially if he --

10 if he had defaulted or if he does eventually choose to

11 default.  You know, that would be the end result of the

12 judgment.  It would be an uncollected -- there -- the only

13 difference there would be that the judgment -- the final

14 judgment entered on default would have -- you know, wouldn't

15 have his say in it if, for example, in terms of like whether

16 there's any kind of penalty.

17         THE COURT:  All right.  Does anyone have in front of

18 them -- what is -- what is the date for the settlement

19 conference that I scheduled?

20         MR. OAKLAND:  May 2nd, Your Honor.

21         THE COURT:  Well, I'm not -- I'm very pessimistic

22 that anything is going to be accomplished but unless and until

23 I have an application to either adjourn or cancel it we'll

24 plan to go forward.  Is there anything else?

25         MR. McDONNELL:  Your Honor, may I ask you a

1   question?

2           THE COURT:  Yes.

3           MR. McDONNELL:  Can I request that the CFTC offers

4   me a settlement?

5           THE COURT:  You can certainly ask them that.  You

6   don't have to do it through the Court.  And parties do that

7   all time, even parties who are unrepresented.  One thing --

8           MR. McDONNELL:  No, I ask -- I ask you that because

9   I -- that was my initial offer to them.  I had made them an

10  offer, and I really just -- I just made them an offer.  I

11  didn't understand the law.  But if there's some way that they

12  want -- without going through all of this mayhem and

13  exhausting my time, if they can come to me with a settlement

14  within a certain period of time from this date I'm willing to

15  work with that.

16          THE COURT:  Well, I would -- I would encourage the

17  CFTC to do that and to do it before Mr. McDonnell meets with

18  the pro bono clinic later this month so that if he wants to

19  address that with them he would have the opportunity to do

20  that as well as discuss litigating the claims.

21          MR. TOMER:  Your Honor, we'll certainly endeavor to

22  do so.  It is difficult without the Paypal records to come up

23  with a final number, but we will endeavor to see what we can

24  do there.

25          If I can make just one last comment.  Just with

1  respect to the payment of the Paypal account, just to clarify

2  the record, it's not that we, you know, declined to pay his

3  overdue fees there.  It's simply that none of us on this call

4  have researched or looked into whether the CFTC is authorized

5  to make such a payment like that, and that's simply why we

6  couldn't give a definitive answer.

7          THE COURT:  All right.  I just thought that might be

8  the fastest way to get the information.

9          MR. TOMER:  Understood, Your Honor.

10          THE COURT:  All right.  Anything else?

11          MR. McDONNELL:  No, Your Honor.

12          THE COURT:  All right.  Thank you all very much.

13  Goodbye.

14          MR. McDONNELL:  Thank you, Judge Mann.

15          THE COURT:  Goodbye.

16  (Proceedings concluded at 6:34 p.m.)

17                    *  *  *  *  *  *

18

19

20

21

22

23

24

25

46

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                              _____

6                       Sara Winkeljohn CET-808

7  Dated:  April 15, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25