| | |
|---|---|
| **From:** | Patrick McDonnell |
| **To:** | Hurand, Gates |
| **Cc:** | de Urioste, Alejandra; Oakland, David W.; Tomer, K. Brent; Giglio, Christopher |
| **Subject:** | Gates, Please file revised ECF #2, few more to come. TY, Patrick [Docket #86 - Supporting Exhibit(s) 1e, 1f, 1g] -- NOTICE OF MOTION TO DISMISS |
| **Date:** | Tuesday, May 22, 2018 8:53:48 AM |

**RE: [Docket #86 - Supporting Exhibit(s) 1e, 1f, 1g] -- NOTICE OF MOTION TO DISMISS**

**[Docket #86 Supporting Exhibit 1e]**

# News

## CFTC Loses Calif. Suit Against Monex Metals Broker

5/2/2018 *Law360*

May 2, 2018

"CFTC Loses Calif. Suit Against Monex Metals Broker"

Neil Goteiner led the Farella team representing Monex Credit Company in a lawsuit filed against it by the Commodity Futures Trading Commission (CFTC). Monex prevailed in winning the dismissal of the action on May 1.

Mr. Goteiner told Law360 that the decision was carefully thought through and dealt with all the relevant arguments on jurisdiction.

"It also relied on a lot of the CFTC's own statements," Mr. Goteiner said. "The judge relied on the CFTC's own statements in coming to his decision."
Link to the full article on Law360 (subscription required).

**[Docket #86 Supporting Exhibit 1f]**

May 15, 2018

# Two Significant Losses For the CFTC

by Dorsey & Whitney LLP

The Dodd-Frank Wall Street Reform Act strengthened the jurisdiction and enforcement...

capabilities of the CFTC in a number of respects. Once key provision concerned Retail Commodity Contracts, under CEA Section 2(c)((2)(D). It provides that the CFTC shall have jurisdiction over commodity transactions "entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." Once exception is where there is delivery within 28 days.

A second key addition is Section 6(c)(1), an antifraud provision which provides that it "shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery . . . any manipulative or deceptive device or contrivance, in contravention of such rule and regulations as the Commission shall promulgate." The CFTC adopted Rule 180.1 which generally tracks the language of the statute.

Each of these provisions was critical to the recent decision in *CFTC v. Monex Credit Company,* Civil Action No. 8:17-cv-01868 (C.D.Cal. May 1, 2018). There the court rejected the position of the CFTC as to each provision. The court's interpretation of antifraud section 6(c)(1) is also at odds with a recent decision of another district court, according to the decision.

### *Monex*

The CFTC brought an enforcement action against Monex and others based in part on the two provisions cited above. The case was before the court on the defendants' motion to dismiss under Rule 12(b)(6), F. R Civ. and the agency's motion for a preliminary injunction. The former was granted, the latter denied.

Monex offers retail customers two types of transactions, according to the complaint. The first is retail transactions in which the customer pays full price for precious metals. This type of transaction is not at issue here.

The second is what the firm called its Atlas program. There Monex offers precious metals on a leveraged, margined, or financed basis. Retail customers can purchase precious metals by paying a portion of the purchase price and financing the balance under the program. Customers with trading accounts can open positions with Monex acting as the counterparty and setting the price in each transaction. If the transaction is "on leverage" or "on margin," Monex provides the financing. A deposit is required as margin. In this situation Monex retaines complete control – it sets the margin and can liquidate the account for failure to

meet the requirements of the program.

Under the terms of the customer agreement Monex retains control of the metals traded in the Atlas program. The customer does not take actual physical delivery. Rather, the metal is maintained in a depository subject to an agreement Monex has with the depository. The customer only obtains physical possession of the metal on full payment or if they ask for actual delivery.

Otherwise the customer holds a long position. The CFTC complaint claims that the customers do not have actual position but just a book entry which is a sham. The agency alleged prohibited off-exchange transactions and fraud.

In resolving the motion to dismiss the court first turned to section 2(c)(2)(D). The parties disagreed regarding the impact of the delivery exception on the provision. The CFTC argued that since it is an exception, the Defendants had the burden of establishing it applies here. The Defendants disagreed, claiming that it is an exclusion requiring the CFTC to prove that it does not apply here. The court declined to resolve the question.

Rather, the court focused on the meaning of the term delivery. The decision in *CFTC v. Hunter Wise Commodities, LLC,* 749 F. 3d 967 (11th Cir. 2014) is the only case to have focused on the meaning of that term. There the court defined delivery in terms of a transfer of possession and control. The court's holding did not require, however, that the buyer take actual physical control of the commodity. The court also found that the defendant in the action did not have sufficient supplies available to cover its margin accounts. Since it had nothing to deliver, there was no deliver.

In this case Defendants claimed that there was delivery within the meaning of prior CFTC interpretations which have not required actual physical delivery to meet the requirement. Rather, a number of factors have been considered such as ownership, possession, title and the physical location of the commodity purchased or sold. Here Monex claimed is agreements fall within these requirements. The CFTC rejected this claim, contending that the conduct here is a sham. That contention was based primarily on the fact that the customer positions can be liquidated at any time without notice. The agency also cited to provisions in the agreements which give Monex complete control.

The court rejected the CFTC's interpretation based largely on its reading of the statutes. The points cited by the CFTC focus on the Monex business model, the court noted. The

statutory provisions involved "apply to covered retail commodity transactions, which must be entered into or offered on a leveraged or margin basis, or financed by the offeror. . . If this conduct alone negated "actual delivery," every financed transaction would violate Dodd-Frank. . . The Court can conceive of no plausible leveraged retail transaction of fungible commodities that would not involve at least some of the same alleged practices. Thus, if the Court were to adopt the CFTC's construction, the result would be to eliminate the Actual Delivery Exception from the CEA." (internal citations omitted).

Second, the court turned to the application of the antifraud section, 6(c)(1). Initially, the court rejected Defendants' claim that the actual delivery exception negated the application of the statute here. To the contrary, the plain language of the sections provides the CFTC with jurisdiction over covered retail commodity transactions to enforce the antifraud sections.

The court then turned to the construction of the statute. Monex argued that the section only applies to particular commodity transactions that are manipulative in the derivatives market. In contrast, the CFTC claimed that section 6(c)(1) applies to retail commodities transactions with or without market manipulation.

Initially, the court focused on the language of the section which it acknowledged is broad. That language prohibits "manipulation" and makes it unlawful in connection with any swap, or a contract of sale of any commodity — "any manipulative or deceptive device or contrivance. . ." is prohibited. The legislative history is consistent with this reading of the statute. That history reveals that the section was designed to ease the burned of proving manipulation for the CFTC by reducing the "specific intent" element to one of recklessness. This followed the approach used by the SEC in manipulation cases. Viewed in this context, the court concluded that "the CEA unambiguously forecloses the application of Section 6(c)(1) in the absence of actual or potential market manipulation. While this conclusion appears to be inconsistent with *CFTC v. McDonnell,* 287 F. Supp. 3d 213, 226-27, 229-30 (E.D.N.Y. 2018) the main focus of that decision was whether the CFTC could regulate virtual currencies as a commodity," the court stated.

### Comment.

The decision here is significant. Section 2(c)(2)(D) regarding Retail Commodity Transactions broadened the jurisdiction of the CFTC. Under this section the agency argued here that arrangements such as those used by Monex are in fact trading that should be on a regulated exchange and thus violate the statute. Yet if in fact delivery within the time limit, there is an exception, which the court noted.

The court's construction of CEA Section 6(c)(1) clearly delimits its reach. While the court focused on the language of the section, the result seems driven more by its reading of the legislative history. In view of the language of the section, which is also the predicate for the ruling in *McDonnell,* and the Supreme Court's focus on statutory language to the exclusion of history (here), should be considered when evaluating this determination. Nevertheless, the decision represents two significant losses for the CFTC.

Send Print Report

**[Docket #86 Supporting Exhibit 1g]**

May 11, 2018

# Back to Drawing Board for CFTC Cryptocurrency Guidance?

*By Lydia Beyoud*

The nation's top derivatives regulator may have to rethink the direction it takes in regulating cryptocurrency trading after a federal judge this month dismissed an enforcement action against a precious metals dealer. The Commodity Futures Trading Commission's case against Monex, which lacks the name recognition of Bitcoin, may have flown under the radar for much of the cryptocurrency community. But the case is likely to have a significant impact on the industry, as well as the agency's broader enforcement authority.

"I think initially people lost the significance of this case because it had to deal with precious metals, but this case is all about cryptocurrencies," Gary DeWaal, special counsel at Katten Muchin Rosenman LLP in New York, told Bloomberg Law.

The CFTC issued proposed guidance in December exempting retail cryptocurrency trading from direct regulatory oversight, under certain circumstances. A key part of the guidance would extend an exemption from registration and regulation as a commodity future to retail crypto transactions involving a margined, leveraged, or financed transaction, so long as the commodity purchased is delivered to the buyer within 28 days.

However, the U.S. District Court for the Central District of California's May 1 opinion in *CFTC v. Monex* may call into question whether the CFTC can pursue that exemption for virtual

currencies, or whether it needs to reconsider how it defines "actual delivery" of them.

That's because Judge James V. Selna found that the CFTC's reasoning in its enforcement complaint against Monex would effectively eliminate the actual delivery exemption for retail commodities transactions. He also said it would contravene the CFTC's 2013 final interpretation of the meaning of "actual delivery."

The CFTC typically considers who has control to determine whether actual delivery of a commodity has been met within the 28-day window. But in his opinion, Selna said that doesn't work in the context of leveraged transactions.

"No one's lending money without taking a lien," DeWaal said. "To create a safe harbor for lending money but effectively not allowing it to be exercised, that is a problem. [The judge] looked at that and said that doesn't make sense."

In the *Monex* case, the CFTC alleged the gold dealer committed fraud and failed to deliver control over purchased gold and other metals to buyers within 28 days of execution, in part because it held the precious metals in independent depositories while waiting for the buyer to pay the dealer back for the financing used to purchase the metals. "The Court can conceive of no plausible leveraged retail transaction of fungible commodities that would not involve at least some of the same alleged practices," Selna said. Adopting the CFTC's reasoning in that case would eliminate the actual delivery exemption for retail commodities transactions, he said.

Although Selna dismissed the case, it's possible the CFTC may seek an appeal. A CFTC spokeswoman declined to comment on whether the agency would seek an appeal.

**Regulating Digital Assets**

The court's reasoning and interpretation of the Commodity Exchange Act and its legislative history "put the narrow interpretation for what constitutes actual delivery into question," Kari Larsen, counsel with Reed Smith LLP in New York, told Bloomberg Law.

Many cryptocurrency transactions take place on exchanges. However, others involve a financed, margined, or leveraged transaction between a dealer and buyer, with the latter hoping the cryptocurrency will increase in value sufficient to cover the amount borrowed from the dealer. That could take longer than 28 days, and a dealer is unlikely to transfer control of the virtual currency commodity to the purchaser without some sort of lien or security.

Two examples in the proposed guidance would require a dealer not to retain an interest in a virtual currency to gain the actual delivery exemption.

"This requirement would appear inconsistent with the Court's decision in *Monex*, in which the Court held that the fact that Monex continued to have a security interest in the metals purchased on margin did not negate the 'actual delivery' that was made to customers," Jason Grimes, an associate at Covington & Burling LLP in Washington, told Bloomberg Law by email.

The inconsistency may cause the CFTC to revisit that requirement before issuing its final guidance, Grimes said. However, "it is unclear whether the CFTC will take the decision into consideration given the guidance may come out soon," he added.

**Asset-Backed Token Application**

If the CFTC tries to narrowly construe "actual delivery" in the cryptocurrency space, the *Monex* opinion could give groups a basis to challenge that construction, said Larsen, co-lead of Reed Smith's global fintech practice. "I do think that they're going to have to go back a little bit, not necessarily to the drawing board, but really consider whatever proposal they're planning on issuing" for actual delivery of virtual currencies, Larsen said. The CFTC will have to continue to think through the actual delivery question as the use of distributed ledger drives other technology innovations, as well.

"With more and more assets being tokenized, this is going to be an issue for more than just cryptocurrencies," Larsen said.

**Enforcement Reach**

The *Monex* decision may also affect the CFTC's broader enforcement authority. With a change in reading of a single word, Selna called into doubt a major enforcement authority the CFTC has wielded for nearly eight years.

Selna determined the legislative history of the 2010 Dodd-Frank Act should be read as only allowing the CFTC to bring antifraud enforcement cases in connection with charges of market manipulation, but not as a stand-alone charge. Market manipulation can be much harder to prove.

"What you have here now is you have a judge who has basically read an 'or' as an 'and' and said it now has to be fraud-based manipulation only" to bring an enforcement action, said DeWaal, a former CFTC Enforcement Division attorney and specialist in cryptocurrency legal

issues.

"It's a dramatic viewpoint" that is inconsistent with the way the CFTC has previously applied the law, he said.

Although the decision is not binding outside the Central District of California, "as a matter of influence, people will certainly take notice" for future CFTC enforcement actions related to fraud, DeWaal said. The decision may cause the swaps and futures regulator to modify their enforcement tactics, he said. "My guess is they'll plead their cases to include the magic words 'fraud-based manipulation' going forward," DeWaal said of the CFTC.

The case is *CFTC v. Monex Credit Co.* , C.D. Cal., 8:17-cv-01868-JVS-DFM, order issued 5/1/18 .

To contact the reporter on this story: Lydia Beyoud in Washington at lbeyoud@bloomberglaw.com

To contact the editor responsible for this story: Michael Ferullo at mferullo@bloomberglaw.com

**For More Information**

Text of the order is at http://src.bna.com/yFt.

*Copyright © 2018 The Bureau of National Affairs, Inc. All Rights Reserved.*
--
This message and its attachments are sent from a 'Pro Se' litigant and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

 Virus-free. www.avg.com