| | |
|---|---|
| **From:** | Patrick McDonnell |
| **To:** | Hurand, Gates |
| **Cc:** | de Urioste, Alejandra; Oakland, David W.; Tomer, K. Brent; Giglio, Christopher |
| **Subject:** | Hi Gates, Please File ECF With The Court. 2 more left to revise/send. TY, Patrick Styled: "Expert view; Legal weeds of Gary De Waal" [Part I]; [Docket #86 ATTACH.; Supporting Exhibit 1k] |
| **Date:** | Tuesday, May 22, 2018 9:27:07 AM |

**"Expert view; Legal weeds of Gary De Waal" [Part I]; [Docket #86 ATTACH.; Supporting Exhibit 1k]**

**[Docket #86 Supporting Exhibit 1k]**

**PART I; [EXPERT VIEW/LEGAL WEEDS]** *Defendant "Referencing":* *Gary De Waal*
**Special Counsel**
*"Gary DeWaal focuses his practice on financial services regulatory matters. He counsels clients on the application of evolving regulatory requirements to existing businesses and structuring more effective compliance programs."*

# Bridging the Week: April 16 to 20 and April 23, 2018 (Actual Delivery, Manipulative or Deceptive Devices; NY AG Sweep; ATS Breakdown) [VIDEO]

Monday, April 23, 2018

A California federal court may be poised to dismiss an enforcement action brought by the Commodity Futures Trading Commission that could challenge the agency's view of when financed sales of commodities to retail persons are subject to its oversight, as well as the circumstances when the Commission may bring an enforcement action against a person for purported fraud, relying on a Dodd-Frank provision of law that prohibits the use or employment of any manipulative device, scheme or artifice to defraud. Separately, the New York Attorney General's office asked 13 cryptocurrency exchanges to disclose a trove of information about their operations, when only five of the enterprises have ever obtained authority to conduct a virtual currency business from or to persons in the state. As a result, the following matters are covered in this week's edition of *Bridging the Week*:

- California Federal Court Potentially Poised to Limit CFTC's Dodd-Frank Fraud-Based Anti-Manipulation Authority in Monex Enforcement Action (includes **Legal Weeds**);

- New York Attorney General Seeks Information From 13 Cryptocurrency Exchanges

Even If No State Connection (includes **My View** and **Compliance Weeds**);

- Trading Firm Sanctioned by CME for Trading System Breakdown That Prompted Market Spike (includes **Compliance Weeds**); and more.

**Video Version: [Excluded]**

## Article Version:

**California Federal Court Potentially Poised to Limit CFTC's Dodd-Frank Fraud-Based Anti-Manipulation Authority in Monex Enforcement Action**:
The California federal court judge hearing the enforcement action by the Commodity Futures Trading Commission against Monex Deposit Company and other defendants for alleged fraud in connection with their financed sale of precious metals to retail persons issued a Tentative Order in late March dismissing the Commission's complaint.

The court's preliminary decision – which could ultimately be issued "as is" or modified — said that actual delivery of precious metals in financed transactions to retail persons falls outside the CFTC's authority when ownership of real metals is transferred to such persons (e.g., through book entry), even if the seller retains control over the commodities because of the financing. Moreover, the court provisionally held that the CFTC could not use the broad anti-fraud and anti-manipulation authority enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act to prosecute acts of purported fraud except in instances where the alleged fraud affected or potentially affected the market or in cases of fraud-based manipulation.

Last year, the CFTC sued MDC and two affiliated companies (collectively, "Monex"), along with Louis Cabrini and Michael Cabrini, the firms' principals, in a federal court in Illinois. The Commission alleged that, in connection with Monex's precious metals transactions, retail clients purchased and sold precious metals, paid only a portion of the purchase price, and either borrowed the difference (for purchases) or borrowed the metal (for sales). Although Monex delivered customers' precious metals to an independent warehouse and transferred title to the customers, it retained control over the commodities to protect itself in case a customer defaulted on his/her repayment or margin obligations.

The CFTC charged that these leveraged purchases and sales to retail clients constituted prohibited off-exchange futures contracts, and that Monex operated as a futures commission merchant without required registration. In making this claim, the CFTC relied on provisions of law that require all contracts for commodities for future delivery to be executed on or be subject to the rules of a designated contract market and offered and sold through a licensed broker (e.g., a futures commission merchant). (Click [here](#) to access 7 U.S.C § 2(c)(2)(D(i)), [here](#) to access 7 U.S.C. § 6(a)(1), and [here](#) to access 7 U.S.C. §

6d(a)(1).) Although the CFTC conceded these requirements do not apply to outright sales of commodities to retail persons, it said the requirements apply when the sales are financed or on leverage and a firm retains control over its customers' commodities beyond 28 days – even if to protect itself in connection with its financing – because actual delivery has not occurred within 28 days. (Click here to access 7 U.S.C § 2(c)(2)(D)(ii)(III).)

In addition, the CFTC claimed that Monex made material misrepresentations to its customers and that the misstatements constituted fraud. The CFTC based these charges on a provision of law that prohibits fraud in connection with illegal, off-exchange futures transactions (click here to access 7 U.S.C.§ 6b(a)(2)(A)), as well as the authority given to the CFTC under Dodd-Frank that prohibits the use or employment of any manipulative device, scheme or artifice to defraud and a related CFTC rule. (Click here to access 7 U.S.C § 9(1) and here for CFTC Rule 180.1.) The Dodd-Frank provision, argued the CFTC, applies to both fraud in connection with off-exchange futures transactions and to spot market transactions in commodities where there are no derivatives.

In the Tentative Order, the federal court judge rejected the CFTC's legal foundation for its charges and granted the defendants' motion to dismiss for two principal reasons.
First, the Court did not accept the Commission's view that Monex's leveraged metals transactions were like futures contracts and thus subject to provisions of law that imposed registration requirements on brokers of such contracts. The CFTC had claimed that, although Monex transferred physical metals to independent depositories for the account of the retail clients, its retention of control over the precious metals negated that it made actual delivery of the commodities. However, said the court, if this view was correct, "every financed transaction would violate Dodd-Frank… and the result would be to eliminate the Actual Delivery Exception from the [relevant law]."

The Court then ruled that, since Monex's transactions were not prohibited off-exchange futures transactions, they were not subject to the CFTC's traditional anti-fraud prohibition that applies to transactions in futures and not to transactions in commodities.

Second, the Court concluded that enactment of the Dodd-Frank provision, which prohibits the use or employment of any manipulative or deceptive device, was meant solely to assist the CFTC "to protect market participants and promote market integrity." As a result, the Court declined to find that the law "so dramatically augmented the CFTC's regulatory authority to cover all fraud in connection with retail commodity transactions..." Accordingly, Monex could not be held liable under the Dodd-Frank provision as pleaded by the CFTC. The CFTC was invited, however, to amend its complaint to plead that Monex's purported fraud was in connection with market manipulation.

The Court's Tentative Order was subject to oral argument by the parties on March 27. A final decision is pending. (Click here for some background regarding the relevant judge's

(The Hon. James Selna) practices regarding tentative orders.)

The CFTC's action against Monex was transferred to a federal court in California from Illinois in October 2017.

(Click here for additional details on the CFTC enforcement action against Monex in the article "Retail Metals Dealer and Principals Sued by CFTC for Illegal Transactions and Fraud" in the September 10, 2017 edition of *Bridging the Week*.)

**Legal Weeds**: If adopted "as is," the California federal court's proposed ruling in Monex could have a chilling effect on the CFTC's enforcement efforts against persons selling virtual currencies who do so on leverage or who engage in alleged fraudulent practices. This is because such a ruling would raise questions regarding the CFTC's authority to bring such actions in the first place.

In 2016, the CFTC settled an enforcement action against BFXNA Inc. d/b/a Bitfinex, claiming that the firm operated a platform that enabled retail persons to buy and sell virtual cryptocurrencies and to finance their transactions. However, because Bitfinex purportedly retained control over such transactions after the financing – much like the CFTC alleged against Monex –, the CFTC alleged that actual delivery did not occur. As a result, the transactions were akin to futures contracts, and Bitfinex should have been registered as an FCM in order to engage in such activities. (Click here for further details regarding this CFTC action in the article "Bitcoin Exchange Sanctioned by CFTC for Not Being Registered" in the June 5, 2016 edition of *Bridging the Week*.)

Moreover, more recently, the CFTC proposed guidance that, for sales of virtual currency to retail persons, the Commission would consider "actual delivery" to have occurred solely when the person could take "possession and control" of all purchased cryptocurrency, use it freely no later than 28 days from the date of an initial transaction and do so unencumbered. This would require neither the offeror nor the seller, or any person acting in concert with such persons, retaining any interest or control in the virtual currency after 28 days from the date of the transaction. This would presumably preclude a seller from retaining control over the cryptocurrency by having authority over a wallet containing such commodity even when the seller financed the purchase. (Click here for details regarding this proposal in the article "CFTC Proposes Interpretation to Make Clear: Retail Client + Virtual Currency Transaction + Financing + No Actual Delivery by 28 Days + No Registration = Trouble" in the December 17, 2017 edition of *Bridging the Week*.)

If the federal court hearing the CFTC Monex action were to issue its Tentative Order "as is," the ruling could serve as precedent for persons to challenge the CFTC's jurisdiction over financed virtual currency transactions (as well as other financed commodity transactions) to retail persons where sellers retain control.

Additionally, the CFTC has liberally applied the Dodd-Frank law that prohibits the use or employment of any manipulative device, scheme or artifice to defraud, as well as the parallel CFTC rule. This is because the CFTC has regarded the provision of law "as a broad, catch-all provision reaching fraud in all its forms – that is, intentional or reckless conduct that deceives or defrauds market participants."

Relying on the these provisions, the CFTC has brought a wide range of enforcement actions, including the JP Morgan "London Whale" case, and cases based on allegations of illegal off-exchange metals transactions, claims of more traditional manipulation of wheat, allegations of spoofing and claims of insider trading. (Click here for background in the article "CFTC Brings First Insider Trading-Type Enforcement Action Based on New Anti-Manipulation Authority" in the December 6, 2015 edition of *Bridging the Week*.) More recently, in its 2017 enforcement action against Gelfman Blueprint, Inc. and Nicholas Gelfman, its chief executive officer and head trader, the CFTC claimed that the defendants' purported fraudulent conduct running a Ponzi scheme related to Bitcoin violated these provisions of law.

An adverse ruling as proposed in the Monex enforcement action could force the CFTC to more narrowly focus its enforcement actions under the controversial Dodd-Frank provision, leaving the Commission to bring lawsuits only where it can allege that a purported fraud affected the market or constituted fraud-based market manipulation. More likely, however, the CFTC would continue its enforcement activities "as is" and seek to resolve what would then be a split among courts' rulings in different regions of the US regarding the scope of the relevant section of Dodd-Frank. Recently, another federal court – one in Brooklyn, New York – upheld the authority of the CFTC to exercise its enforcement authority in connection with alleged fraud in connection with spot trades in virtual currencies where the CFTC relied on the Dodd-Frank law and its own parallel rule. (Click here for details in the article "A Court, Treasury and the SEC Confirm Substantial Overlap in US Jurisdiction of Cryptocurrencies" in the March 8, 2018 edition of *Between Bridges*.)

**Briefly:**

- **New York Attorney General Seeks Information From 13 Cryptocurrency Exchanges Even If No State Connection**: The New York Attorney General's office requested information from 13 cryptocurrency exchanges regarding their operations. Only five of the exchanges possess either a BitLicense or a New York limited purpose trust company charter that would appear to enable them to conduct a virtual currency business from NY or to persons in NY. (Click here to access background on NY's BitLicense requirements in the July 8, 2015 *Financial Services Advisory*, "New York BitLicense Regulations Virtually Certain to Significantly Impact Transactions in Virtual Currencies" by Katten Muchin Rosenman LLP.)

Generally, the NY AG office's questionnaire seeks information on the exchanges' ownership and control, basic operations and fees, trading policies and procedures, practices regarding outages and other suspension of trading, internal controls, privacy and money laundering, and protections against risks to customer funds. Curiously, the NY AG office also asks for each exchange's application to the NY Department of Financial Services for a limited purpose charter or BitLicense and all supplemental submissions.

In a letter to all of the exchanges, the NY AG office said that after it reviewed all received material, it would "disclose certain information in a publicly accessible format," although it did not detail which specific information it was referencing. The NY AG office indicated it would disclose the identity of any platform that did not provide "meaningfully complete responses."

The five cryptocurrency exchanges that the AG requested information from that either have a limited purpose charter or BitLicense are Coinbase, Inc. (GDAX), Gemini Trust Company, bitFlyer USA, Inc., Circle Financial Limited (Poloniex), and itBit Trust Company. The other exchanges that the AG requested information from are iFinex Inc. (Bitfinex), Bitstamp USA Inc., Payward, Inc., Bittrex, Inc., Binance Limited, Elite Way Developments LLP (Tidex.com), Gate Technology Incorporated (Gate.io), and Huobi Global Limited (Huobi.Pro).

**Separately:**

- NASAA Warns About ICOs: The North American Securities Administrators Association issued a cautionary guidance regarding initial coin offerings aimed at the retail public. In its guidance, NASAA distinguished between utility tokens, which enable the holder to exchange a coin for a good or service in the future, and equity tokens, which entitle a holder to an interest in the revenue or ownership of the underlying project. NASAA noted, however, that "the regulatory treatment of tokens is evolving," and that if a utility token is issued for a non-operational project or is intended to be traded on an exchange, it might fall with "the purview of securities regulation."

- FINRA Fines a Tezos Co-Founder: Arthur Meunier a/k/a Arthur Breitman agreed to be suspended for two years from association with any broker-dealer regulated by the Financial Industry Regulatory Authority to settle FINRA charges that, from February 2014 to April 2016, he participated in the development of Tezos, a blockchain technology project, without notifying the broker-dealer he was then employed by of such activity, as required by FINRA rules. (Click here to access FINRA Rule 3270 and here for FINRA Rule 2010.) Mr. Breitman also agreed to pay a fine of US $20,000 to resolve FINRA's charges. According to FINRA, during the relevant time, Mr. Breitman also falsely attested to his employer broker-dealer that he had disclosed

all outside activities to it, when he had not. Founders of Tezos, including Mr. Breitman, have been named in numerous class action lawsuits alleging the unlawful sale of securities and securities fraud, among other offenses. (Click here for an article on one such lawsuit, "Backers of Tezos Initial Coin Offering Named in Prospective Class Action Litigation," in the November 12, 2017 edition of *Bridging the Week*.)

- Is it a Purchase or a Cash Advance?: Brady Tucker filed a purported class action lawsuit against Chase Bank USA N.A. for, without prior notice, charging higher cash advance fees and interest charges for purchases of virtual currencies with bank-issued credit cards than for other purchases.

According to the plaintiff's lawsuit, filed in a federal court in New York, the bank historically treated purchases of virtual currencies through virtual currency exchanges such as Coinbase as ordinary purchases and charged its standard fees and interest rates. However, alleged Mr. Tucker, without prior notice, the bank began in January 2018 to treat purchases of virtual currencies as cash advances, and charged higher interest rates and fees. Moreover, unlike ordinary credit card interest charges, interest charges on virtual currency purchases began to accrue immediately, said Mr. Tucker. Mr. Tucker claimed that Chase's alleged unilateral action without prior notice violated applicable law (click here to access 15 U.S.C. §1637(i)(2) and here for Regulation Z enacted thereunder). Mr. Tucker seeks recovery of his purported financial damages, statutory damages and recovery of his costs of pursuing a legal remedy.

- SEC Names New Defendant in Centra ICO Lawsuit: The Securities and Exchange Commission amended its April 2 lawsuit against Sohrab Sharma and Robert Farks in connection with the purported illicit initial coin offering by Centra Tech Inc. to add Raymond Trapani, another purported company co-founder. The SEC alleged that Mr. Trapani was the "mastermind" of the allegedly fraudulent ICO. Mr. Trapani was also named in a separate criminal action filed by the United States Attorney's Office in Manhattan, New York. (Click here for background regarding the SEC's initial lawsuit against Mr. Sharma and Mr. Farks in the article "SEC Seeks to Halt another ICO" in the April 8, 2018 edition of *Bridging the Week*.)

- **My View**: New York Attorney General's Office, meet the NY Department of Financial Services. It's hard to imagine that NY State is so flush with taxpayer funds that it can afford two regulators overseeing the same virtual currency activities. The NY DFS has already taken the lead in this area by adopting rules governing virtual currency businesses. Moreover, NY already requires cryptocurrency exchanges to potentially qualify as both money transmitters and to obtain a BitLicense to do business from or with residents of the state. Dealing with another regulator in the same jurisdiction is an additional, unnecessary burden.

That being said, the questionnaire forwarded to the 13 cryptocurrency exchanges provides an excellent basis for persons to formulate their own due diligence inquiries to potential crypto asset exchanges on which they may conduct business.

**Compliance Weeds**: As I have previously written, regulated financial services businesses and proprietary trading entities should consider, if they have not done so already, whether they should amend existing employee personal trading polices to expressly address crypto assets. This may be appropriate even if such firms are not engaged in crypto asset activities today.
The easiest approach would be for firms to ban all personal crypto assets trading by employees because of reputational or other perceived risks. However, such a policy may impede hiring or retention of some employees, especially so-called "millennials."

Alternatively, if firms already have policies addressing employees' trading of securities, including participation in new offerings of securities, it might be appropriate to consider extending these policies to digital tokens issued as part of initial coin offerings that the Securities and Exchange Commission has said are likely securities. (Click here for background regarding the SEC's views in the article "SEC Chairman Warns Lawyers Providing 'It Depends' Advice on ICOs" in the January 28, 2018 edition of *Bridging the Week*.)

Moreover, to the extent firms have existing polices addressing employees' trading of gold or similar commodities, they may wish to extend such policies to employees' trading of virtual currencies like Bitcoin or Litecoin.

However, because of the SEC's views, it is not clear today what the bright line is between virtual currencies and security tokens.

Firms that engage in crypto asset activities should consider the potential impact of employees' front-running firms or a firm's customers' trading or engaging in other wrongful conduct. Firms not engaged in crypto asset activities but contemplating engagement should consider the potential implications of employees purchasing crypto assets in advance of any firm announcement with the expectation that the announcement might cause prices of relevant crypto assets to rise.

However, the monitoring of employee crypto asset activity may be difficult, as crypto asset exchanges may not be willing or able to provide statements of employee activity to employers automatically. At best, it may be up to an employee to authorize such third-party transmissions that he or she could activate or deactivate at his or her discretion.

-

> **Trading Firm Sanctioned by CME for Trading System Breakdown That Caused Market Spike**: Virtu Financial Global Markets, LLC agreed to pay a fine of US $75,000 to resolve a disciplinary action brought by the Chicago Mercantile Exchange claiming that on October 16, 2015, because of a programing error, an automated trading system malfunctioned and sold a Eurodollar futures contract, causing a 74-tick price movement. The exchange claimed that although Virtu's alternative trading system automatically locked down after the "aberrant activity," the firm unlocked the ATS by error, causing further price anomalies.

Unrelatedly, DBF GP, LLC, the general partner of a hedge fund, and David Lambert, the firm's manger, consented to a fine of US $20,000 by Cboe Futures Exchange and disgorgement of US $19,500 in connection with Mr. Lambert's trading for DBF, whereby he purportedly entered orders for CFE VX futures that prompted price changes on Cboe's corresponding options exchange.

Mr. Lambert then allegedly traded against the options exchange's participants at the non-bona prices and cancelled his futures orders.

DBF and Mr. Lambert agreed to be jointly and severally liable for the CFE fine. Mr. Lambert also agreed to a six-month trading suspension on all exchanges owned by Cboe Global Markets. The alleged conduct occurred on "several occasions" from July 30 through September 5, 2014.

Additionally, Shung-Han Liu and Ali Abbassi, both non-members, agreed to fines and trading suspensions imposed by the New York Mercantile Exchange for alleged spoofing-type trading activity. Mr. Abbassi purported disruptive trading occurred from April through June 2016. He consented to a fine of US $5,000 and a three-month all-CME Group trading suspension. Mr. Liu's alleged wrongful conduct – which included using another person's Tag 50 identification for one side of his trades – took place from October 7 through December 16, 2016. He was fined US $40,000 for his conduct and agreed to a 10-business-day all-CME Group trading suspension.

Also, a member firm of both the Chicago Board of Trade and CME was fined by both exchanges US $30,000, in aggregate, for misreporting open interest in various products on both exchanges on numerous dates in January 2017, and on the CBOT only in June 2017.

**Compliance Weeds**: The CFE disciplinary action is unusual because it appears to entail the placement of purported spoofing orders on a futures exchange to induce non-bona fide prices on a securities exchange. The alleged executions prompted by the futures orders appear to have occurred on Cboe's affiliated securities exchange.

Spoofing-type trading activity may occur across asset classes to the extent products are correlated. To the extent firms monitor for disruptive trading conduct, attention should be

paid to the potential of problematic cross-asset activity.

**More Briefly:**

- **SEC Proposes New Regulation to Ensure Broker-Dealers and Associated Persons Act in Best Interest of Retail Clients**: The Securities and Exchange Commission proposed a number of measures to help minimize perceived investor confusion between broker-dealers and investment advisers. These measures include:

- adoption of a new proposed rule, entitled "Regulation Best Interest," that will require broker-dealers when recommending a securities transaction or investment strategy to a retail client to act in the customer's best interest. A broker-dealer would comply with its obligations if it reasonably discloses the material terms of the scope and terms of its relationship with a retail client, has a reasonable basis to believe a recommendation is in the retail client's best interest, and has policies and procedures reasonably designed to eliminate material conflicts of interest with any recommendation;

- issue of a new proposed interpretation regarding a standard of conduct for investment advisers to satisfy their fiduciary duty to their clients; and

- adoption of a new proposed rule that would require investment advisers and broker-dealers to provide retail investors with a relationship summary, explaining differences in the types of services they offer, the legal standards of conduct that apply to each, the fees a client might pay and certain conflicts that may exist.

-
The rule would also prohibit standalone broker-dealers from using the terms "adviser" or "advisor" in their names or title. The SEC will accept comments on its proposals for 90 days after their publication in the *Federal Register*.

- **CFTC and Department of Justice Bring Legal Actions Against Operators of Alleged Fraudulent Scheme Involving Binary Options and a Virtual Currency**: The Commodity Futures Trading Commission brought an enforcement action against Blake Kantor a/k/a Bill Gordon and other defendants for purportedly selling binary options to retail persons while not being appropriately registered as futures commission merchants, and later, offering some customers an opportunity to purchase a virtual currency known as an "ATM" coin, all as part of a fraudulent scheme. According to the CFTC, the defendants also misappropriated at least some of their customers' funds. Concurrent with filing its legal action, the CFTC obtained an emergency order freezing the defendants' assets, while the US Attorney's Office in Brooklyn, New York indicted Mr. Kantor for his role in the alleged fraud. According to

- both the CFTC and the Department of Justice, Mr. Kantor solicited funds from customers for trading binary options, and then manipulated the trades to the customers' disadvantage. Mr. Kantor then persuaded some customers to use balances in their binary options account to purchase ATM coins. The CFTC and the DOJ filed their legal actions in a federal court in Brooklyn.

- **ICE Futures Europe Warns of Incomplete Documentation and Audit Trails in Connection with EFRP Transactions**: ICE Futures Europe issued a reminder that persons engaging in the exchange for related position transactions must, upon request, provide the exchange "sufficient supporting documentation and a complete audit trail in relation to the transactions concerned." The exchange noted that during post-trade reviews, it had learned of the failure "by a number of Members" to comply with exchange requirements related to documentation.

- **Canadian Securities Regulators Propose Registration Scheme for OTC Dealers and Advisers**: The Canadian Securities Administrators proposed new registration requirements for dealers and advisers engaging in over-the-counter derivatives businesses, to the extent they are not already registered under another regulatory scheme or have their head office or principal place of business outside Canada.

CSA also proposed measures to reduce risks to market participants; requirements for principal staff members to have specific education, training and experience; and registration obligations for firms and individuals. Only persons required to register under the new requirements would be subject to the other new requirements. CSA will accept comments through September 17.

- 

- **CME Group to Offer TACOs**: The CME Group proposed that, effective May 14, it will offer Basis Trades at Cash Open (TACO). This functionality will permit traders to enter into Chicago Mercantile Exchange E-mini S&P 500 futures contracts that are priced at a differential to the next regularly scheduled special opening quotation of the cash index underlying the relevant futures contract. Block trades will be permitted for TACO transactions. (Click here for additional information.)

©2018 Katten Muchin Rosenman LLP

Virus-free. www.avg.com