| | |
|---|---|
| **From:** | Patrick McDonnell |
| **To:** | Hurand, Gates |
| **Cc:** | de Urioste, Alejandra; Oakland, David W.; Tomer, K. Brent; Giglio, Christopher |
| **Subject:** | Hi Gates, Please File ECF With The Court. 1 more left to send. TY, Patrick Styled: "Expert view; Legal weeds of Gary De Waal" [Part 2]: [Docket #86 ATTACH.; Supporting Exhibit 1I] |
| **Date:** | Tuesday, May 22, 2018 9:48:38 AM |

**"Expert view; Legal weeds of Gary De Waal" [Part 2]; [Docket #86 ATTACH.; Supporting Exhibit 1I]**

<mark>**[Docket #86 Supporting Exhibit 1I]**</mark>

**PART 2; [EXPERT VIEW/LEGAL WEEDS]** *Defendant "Referencing":* *Gary De Waal*
**Special Counsel**
*"Gary DeWaal focuses his practice on financial services regulatory matters. He counsels clients on the application of evolving regulatory requirements to existing businesses and structuring more effective compliance programs."*

# Bridging the Week by Gary DeWaal



---

**Between Bridges by Gary DeWaal – May 2, 2018 (Actual Delivery; Manipulative Device or Contrivance)**

*Published Date: May 02, 2018*

California Federal Court Tosses CFTC Enforcement Action Against Precious Metals Dealer, Rejecting Commission View of "Actual Delivery" and "Manipulative or Deceptive Device"

The California federal court judge who, at the end of March, tentatively dismissed the

enforcement action by the Commodity Futures Trading Commission against Monex Deposit Company and other defendants for alleged fraud in connection with their financed sale of precious metals to retail persons, issued a final order confirming the dismissal on May 1.

In his ruling, the judge – the Hon. James V. Selna – emphasized the two basic pillars of his tentative order, that:

1.
   actual delivery of precious metals in financed transactions to retail persons falls outside the CFTC's authority when ownership of real metals is legally transferred to such persons within 28 days even if the seller retains control over the commodities because of the financing beyond 28 days; and

2.
   the CFTC cannot use the prohibition against persons engaging in any manipulative or deceptive device or contrivance in connection with the sale of any commodity in interstate commerce enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act to prosecute acts of purported fraud except in instances of fraud-based market manipulation.

(Click here for background on the CFTC enforcement action and an overview of the tentative order in the article, "California Federal Court Potentially Poised to Limit CFTC's Dodd-Frank Fraud-Based Anti-Manipulation Authority in Monex Enforcement Action" in the April 22, 2018 edition of *Bridging the Week*.)

My View: As I indicated in the Legal Weeds section of my earlier article on this enforcement action, this decision has significant implications beyond precious metals. For example, it is very relevant for cryptocurrency exchanges that may desire to provide financing in connection with retail persons' purchases of virtual currencies and propose to hold such commodities in so-called "multi-sig" wallets they control at least in part. It is also very relevant in considering the application of the CFTC's Dodd-Frank granted authority to prosecute persons for alleged manipulative or deceptive devices or contrivances in connection with non-market-based fraud.

However, this is just a decision of one federal court in one district of California. It seems likely the CFTC will appeal this decision.

For further information: click here to access a copy of the relevant court's decision.

The information in this article is for informational purposes only and is derived from sources believed to be reliable as of May 1, 2018. No representation or warranty is made regarding the accuracy of any statement or information in this article. Also, the information in this article is not intended as a substitute for legal counsel, and is not intended to create, and receipt of it does not constitute, a lawyer-client relationship. The impact of the law for any particular situation depends on a variety of factors; therefore, readers of this article should not act upon any information in the article without seeking professional legal counsel. Katten Muchin Rosenman LLP may represent one or more entities mentioned in this article. Quotations attributable to speeches are from published remarks and may not reflect statements actually made. Views of the author may not necessarily reflect views of Katten Muchin or any of its partners or other employees.

© 2018 Katten Muchin Rosenman. All Rights Reserved.

# Bridging the Week by Gary DeWaal



**Bridging the Week by Gary DeWaal: April 30 to May 4 and May 7, 2018 (Cotton Trading Blues; Source Code Theft; XRP a Security?; Monex Redux)**

*Published Date: May 06, 2018*

Two trading firms within a group structure were fined US $2 million in aggregate by the Commodity Futures Trading Commission for alleged violations of various provisions of law and CFTC rules related to their cotton futures transactions, including purported speculative limit violations. Separately, the conviction of a former programmer for a major investment bank for misappropriating his former employer's algorithmic trading system source code was upheld by New York's top appellate court, while a class action lawsuit was filed against Ripple and its chief executive officer, claiming the defendants were engaging in a continuous, unlawful offering of an unregistered security – the XRP digital token. As a result, the following matters are covered in this week's edition of *Bridging the Week*:

- Commodity Trading Firm Sanctioned US $2 Million by CFTC for Various Offenses Related to Cotton Trading Including Violating Speculative Position Limits (includes **Compliance Weeds**);

- Investment Bank Ex-Employee's Conviction Upheld for Theft of High-Frequency Trading Algorithmic Code (includes **Compliance Weeds**);

- Class Action Lawsuit Filed Against Ripple Labs for Unregistered Sales of Securities (includes **My View**);

- **Follow-up**: California Federal Court Dismissal of CFTC Monex Enforcement Action Upsets Stable Legal Theories (includes **My View**); and more.

**Video Version**: **[Excluded]**

**Article Version**:

**Briefly**:

- **Commodity Trading Firm Sanctioned US $2 Million by CFTC for Various Offenses Related to Cotton Trading Including Violating Speculative Position Limits**: Glencore Grain B.V. and Glencore Ltd. collectively agreed to pay a fine of US $2 million to settle charges by the Commodity Futures Trading Commission that, from January 2013 through November 2015, they violated various laws and Commission regulations related to their trading of cotton futures on ICE Futures U.S.

In particular, the Commission alleged that the firm violated speculative position limits on "multiple days" in May and June 2013 and May and June 2014; entered into exchange for related position transactions with each other contrary to IFUS rules, and thus prohibited by law and CFTC rule; and failed to file two reports with it of their physical cotton positions that were accurate as of the last day of May 2013 and May 30, 2014, as required.

The Commission alleged that the Glencore entities violated position limits on the applicable occasions when looking at their positions on an aggregate basis, excluding any bona fide hedging positions which would not be included in a calculation of speculative positions. (Click here to access Commodity Exchange Act § 4a(b), 7 U.SC. § 6a(b) and here for CFTC Rules 150.2 through 150.4.) The Commission said that, because one person – Glencore's Head of Cotton – directly or indirectly controlled the trading at both entities, positions of the two entities were required to be aggregated.

The Commission also said that, under applicable law, wash sales are prohibited, and futures contracts must be executed openly and competitively unless transacted pursuant to an exchange rule it approved. (Click here to access CEA § 4c(a), 7 U.S.C. § 6c(a) and here to access CFTC Rule 1.38(a).) During the relevant time, noted the Commission, IFUS only authorized EFRPs – a potentially approved form of off-exchange transaction – through independently controlled accounts. (Click here to access ICE Futures Rule 4.06(b)(iv).)

Since Glencore Grain and Glencore Ltd. were part of the Glencore plc organization and controlled by the same Head of Cotton, EFRPs between the two entities were not for independently controlled accounts and were thus

impermissible, alleged the CFTC.

Finally, persons holding or controlling futures and options positions in cotton that are deemed "reportable" under CFTC regulation are required to file a Form 304 report with it showing the persons' fixed price cotton positions as of the end of each month it has reportable futures positions and options positions. (Click here to access CFTC Rule 19.00(a)(1).) The CFTC alleged that two Form 304 reports filed by Glencore Grain overstated the quantities of its fixed price cotton cash positions.

In March 2016, Glencore Grain agreed to pay a fine of US $200,000 to settle charges by ICE Futures U.S. that, on May 30, 2014 – a day within the time period identified in the CFTC settlement – the firm may have violated position limits in the July 2014 Cotton futures contract. In addition, alleged the exchange, the firm may have caused "price movement" in the relevant futures contract and a corresponding July/December 2014 futures spread when the firm "waited until the final 20 minutes of trading to execute a high proportion of their transactions on the day prior to first notice day." (Click here for background on the relevant IFUS disciplinary action and Compliance Weeds in the article "IFUS Charges Trader With Possible Spoofing and Market Disruption While Another Entity Is Charged With Allegedly Liquidating Positions in a Disorderly Fashion to Avoid Speculative Limits Issues" in the March 13, 2016 edition of *Bridging the Week*.)

> **Compliance Weeds**:CFTC Form 204 (Statement of Cash Positions in Grains, Soybeans, Soybean Oil and Soybean Meal) and Parts I and II of Form 304 (Statement of Cash Position in Cotton – Fixed Price Cash Positions) must be filed by any person that holds or controls a position in excess of relevant federal speculative position limits that constitutes a bonafide hedging position under CFTC rules (the speculative limits are the reportable levels for these purposes). These documents must be made as of the close of business on the last Friday of the relevant month. Form 204 must be received by the CFTC in Chicago by no later than the third business day following the date of the report, while Form 304 must be received by the Commission in New York by no later than the second business day following the date of the report.

Part III of Form 304 (Unfixed Price Cotton "On-Call") must be filed by any cotton merchant or dealer that holds a so-called reportable position in cotton (i.e., pursuant to large trader reportable levels; click here to access CFTC Rule 15.03) regardless of whether or not it constitutes a bona fide hedge. Form 304 (Part III) must be made as of the close of business on Friday every week and received by the CFTC in New York by no later than the second business day following the date of the report. (Click here for additional guidance regarding the Form 304 related to "On-Call" cotton in a 2013 CFTC Guidance.)

(Click here for a copy of CFTC Form 204 and here for a copy of CFTC Form 304.)

- **Investment Bank Ex-Employee's Conviction Upheld for Theft of High-Frequency Trading Algorithmic Code**: New York's highest court – the NY Court of Appeals – upheld the conviction of Sergey Aleynikov, a former computer programmer for Goldman Sachs & Co., who was charged in a state court in 2012 with illicitly copying with the intent to use for a new employer, Teza Technologies LLC, Goldman's proprietary computer code for a high-frequency trading system. Mr. Aleynikov never used the computer code at Teza, however.

Mr. Aleynikov was initially charged by a federal grand jury for violation of a federal law – the National Stolen Property Act – in February 2010 related to his alleged misappropriation and found guilty in December 2010. (Click here to access the relevant law at 18 U.S.C. § 2314.)  However, the federal appeals court in New York overturned Mr. Aleynikov's conviction in April 2012, concluding that source code was intangible property and not a good, and thus a theft of computer code could not involve the "taking of a physical thing" – a necessary requirement for a violation under the relevant law. (Click here for a copy of the relevant court decision.)

Mr. Aleynikov was subsequently criminally charged in September 2012 and convicted by a NY court jury for violating a provision of NY law that prohibits a person from making an unauthorized "tangible reproduction" of secret scientific material. (Click here to access NY Penal Law § 165.07.) However, the New

York trial court set aside the jury's verdict, claiming that source code is not tangible when it is only stored on a computer.

In January 2017, an intermediate appellate court in New York reversed the trial court's order and remanded the case for sentencing. (Click here to access the relevant court decision.) Acting on Mr. Aleynikov's appeal, the NY Court of Appeals upheld the defendant's conviction.

According to the NY Court of Appeals, Mr. Aleynikov, without Goldman's permission, transferred his then employer's proprietary source code using his work computer to an unauthorized computer server in Germany on June 5, 2009, his last day of employment at Goldman. This action was expressly prohibited by Goldman policy which precluded employees from removing a copy of source code from the company's network. Later, Mr. Aleynikov downloaded the source code to his home computer from the Germany-based server. Subsequently, he placed the source code in a Teza website repository for use by Teza.

The NY Court of Appeals said that a "rational jury" could have concluded that the copy of the source code made by Mr. Aleynikov "was tangible in the sense of 'material' or 'having physical form'." This is because the jury heard evidence that, since source code stored on a computer takes up space on a drive, it is physical in nature. As a result, the court upheld Mr. Aleynikov's conviction.

**Compliance Weeds**: The long tortuous prosecution of Mr. Aleynikov may now be headed to a sentencing phase, but it provides a reminder that companies' cybersecurity procedures should address not only possible unauthorized penetration of systems by external sources and persons, but internal theft. Indeed it has been estimated that 60 percent of all cyber breaches are from internal sources. (Click here for a September 19, 2016 article from the *Harvard Business Review* regarding this.)

Last month, the National Institute of Standards and Technology updated its *Framework for Improving Critical Infrastructure Cybersecurity*. (Click here to access.)

Generally, the Framework sets forth the industry-standard risk-based approach to manage cybersecurity vulnerability.

The objective of the Framework is to provide all firms a common means to describe their current cybersecurity approach; describe their target state; identify and prioritize opportunities for improvement; assess progress towards achieving the target state; and communicate about cybersecurity risk to internal and external stakeholders.

Persons in charge of cybersecurity programs at financial services firms might use the opportunity of the revised NIST framework to review their firm's own approach to assessing, managing and communicating about cybersecurity risk to ensure, among other things, it adequately identifies and mitigates against internal risks.

(Click here for dated but still helpful guidance on proactive measures to minimize to the likelihood of a cyber-attack and to mitigate the consequences of a breach in the article "Cyber-Attacks: Threats, Regulatory Reaction and Practical Proactive Measures to Help Avoid Risks" in the June 25, 2015 edition of *Financial Services Advisory* by Katten Muchin Rosenman LLP.)

**Correction: This article was corrected on May 9 to make clear that Mr. Aleynikov did not use the misappropriated Goldman source code at Teza.**

- **Class Action Lawsuit Filed Against Ripple Labs for Unregistered Sales of Securities**: A purported class action lawsuit was filed in a California court against Ripple Labs, Inc. and other defendants for offering and selling unlicensed securities, namely the Ripple digital token – XRP. The named plaintiff, Ryan Coffey, seeks rescission and punitive damages against all the defendants, who also include XRP II, LLC and Bradley Garlinghouse, the chief

executive officer of Ripple.

- 

According to the complaint filed in this action, all 100 billion XRP tokens currently in existence were created by Ripple Labs in 2013. Twenty percent of these were allegedly given to individual Ripple Lab founders, while 80 percent were retained by Ripple Labs. The complaint alleges that the defendants have steadily sold off their XRP over time "in what is essentially a never-ending initial coin offering" and XRP tokens offered and sold by defendants "have all the traditional hallmarks of a security."

This is because purchases of XRP tokens represent investments in a common enterprise with profits expected through the efforts of Ripple Labs. Because of the restrictive governance of Ripple Labs, the XRP distributed ledger is also a centralized ledger controlled by a few persons, as opposed to a decentralized ledger like Bitcoin or Ethereum, claims the lawsuit Ripple Labs and XRP II were collectively fined US $700,000 by the Financial Crimes Enforcement Network of the US Department of Treasury in May 2015 for facilitating transfers of virtual currency and providing virtual currency exchange transactions services in connection with XRP without registering as a money service business and not complying with anti-money laundering requirements. FinCEN noted that XRP II became registered as an MSB in September 2013, but claimed it did not have an effective, written AML program until early 2014. (Click here for background on the FinCEN legal action against Ripple in the article "Money Service Businesses for Second Largest Virtual Currency Fined for AML Deficiencies; Bitcoin Exchange Gets First NY License as Trust Company" in the May 10, 2015 edition of *Bridging the Week*.)

Ripple represents itself as a "digital asset for payments," claiming it is "the fastest and most scalable digital asset, enabling real-time global payments anywhere in the world." (Click here to access the Ripple website.) The defendants have not yet filed an answer to the complaint and this lawsuit has not been approved by the court for class action status.

**My View**: According to published reports, the Commodity Futures Trading Commission and the Securities and Exchange Commission may meet this

week to discuss whether Ether, the digital token associated with the Ethereum blockchain, and XRP are securities potentially subject to regulation by the SEC. (Click here, for example, to access a recent article in *The Wall Street Journal*.) The CFTC has previously suggested that both Ether and XRP are virtual currencies. (Click here to access the October 17, 2015 LabCFTC primer on Virtual Currencies; see footnote, page 5.) FinCEN in its lawsuit against Ripple Labs and XRP 2 also referenced XRP as a virtual currency and, in fact, grounded its lawsuit on the defendants' exchange activities involving their virtual currency.

Recently there have been suggestions – most notably by former CFTC Chairman Gary Gensler – that digital tokens issued as part of initial coin offerings or subject to limited governance might be regarded as securities as investors purchase them with the expectation of profits through the activities of others, in one case those of the Ethereum Foundation and in the other case, Ripple Labs. (Click here for access to a purported transcript of a speech by Mr. Gensler at MIT on April 24 as provided by *Coindesk*.)

The SEC and CFTC have long dealt with products that have characteristics of futures and securities – instruments known as security futures – and have worked out rules for the exercise of their jurisdiction over such products. (Click here for a general background.)

To me, a discussion over when a digital token might be a security as opposed to a virtual currency would be very helpful, particularly if it is followed by the issuance of clear guidance and an opportunity to cure for cryptocurrencies that might be forced to change their existing, popular characterization. However, no guidance should be issued without public input. CFTC Commissioner Brian Quintenz indicated that a subcommittee of the Technology Advisory Committee might be formed to consider this issue (Click here for Mr. Quintenz's opening remarks before the February 14, 2018 Technology Advisory Committee.) This would be a great forum to initiate such conversations.

Notwithstanding the class action lawsuit filed in California, the more common view is that Ether and Ripple are virtual currencies. Ether clearly

is the payment mechanism for transactions on the Ethereum blockchain requiring "gas" and is used in some real-world transactions. Ripple likewise was designed and is used as a payment vehicle. Moreover, Ripple was not issued as part of an ICO, and while 60 million Ether tokens were issued as part of the Ether ICO in July 2014 (valued at approximately US $18.4 million), today Ether tokens are exclusively created through mining – just like Bitcoin. Ripple was previously criticized by some for having too few validators to approve blockchain transactions. However, the amount of so-called "validator nodes" was increased to 55 last year.

Today, when I analyze whether a particular digital token is likely a security or a virtual currency, I consider a number of factors:

1.
    What was the initial stated purpose for the digital token?

2.
    How is the digital token promoted today?

3.
    Is the digital token generally regarded as a currency, currency substitute or payment substitute, serving as a medium of exchange, store of value or unit of account?

4.
    Do merchants or any third parties accept the digital token for payment? If yes, how widespread? Is the digital token used for payment on a blockchain? If yes, how?

5.
    Was the digital token initially issued as part of an ICO or a type of continuous offering? If not, how are new digital tokens currently issued and what is the percentage of ICO and non-ICO derived digital tokens? Was there a pre-sale associated with the ICO (e.g., SAFT)?

6.
    What is the governance regarding the blockchain associated with the

digital token? Is there a different governance for the token itself? If yes, what is it?

7.
   Is the blockchain associated with the digital token centralized or decentralized?

8.
   How are transactions involving the digital token validated and recorded on the associated blockchain?

9.
   Do holders of digital tokens directly or indirectly have any rights to income? Are there any other rights associated with ownership of the digital token? If yes, what are they?

No one or two answers are definitive for me. But when thinking about all the answers it more often than not becomes clearer to me how the digital token should likely be classified. To me collectible cars and private-minted gold coins are not securities even if they behave somewhat like investment contracts. Likewise, a virtual currency is not a security even if it has some characteristics of an investment contract. Moreover, the nature of a digital asset may morph over time. As divisions of the SEC have seemingly acknowledged on multiple occasions, just because something has some qualities of an investment contract – like a baseball stadium's seat leases – and trade on secondary markets – like eBay – doesn't mean they should be regulated as securities.

(Click here, e.g., for a request for no action by the San Francisco Baseball Associates L.P related to seat leases and here for the grant of no-action relief by the Office of Chief Counsel of the Division of Corporate Finance on February 24, 2006.)

- **Follow-up: California Federal Court Dismissal of CFTC Monex Enforcement Action Upsets Stable Legal Theories**: The California federal court judge who, at the end of March, tentatively dismissed the enforcement action by the Commodity Futures Trading Commission against Monex Deposit Company and other defendants for alleged fraud in connection with their

financed sale of precious metals to retail persons issued a final order confirming the dismissal on May 1.

•

In his ruling, the judge – the Hon. James V. Selna – emphasized the two basic tenets of his tentative order, that:

1.
   actual delivery of precious metals in financed transactions to retail persons falls outside the CFTC's authority when ownership of real metals is legally transferred to such persons within 28 days – the so-called "Actual Delivery Exception" – even if the seller retains control over the commodities because of the financing beyond 28 days; and

2.
   the CFTC cannot use the prohibition against persons engaging in any manipulative or deceptive device or contrivance in connection with the sale of any commodity in interstate commerce enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act to prosecute acts of purported fraud except in instances of fraud-based market manipulation.

The CFTC had argued that Monex's practices did not result in actual delivery and were a "sham." The CFTC said, "Customer positions can be liquidated at any time and in Monex's sole discretion, without notice to customers." Moreover, "the terms [of the relevant] agreements… deprive customers of all control and authority over any metals that underlie their trading positions."

However, said the judge, "the legislative history of Dodd-Frank supports the Court's conclusion that Congress did not intend to exclude the sort of conduct that CFTC alleges Monex engaged in from the ambit of the Actual Delivery Exception." The judge claimed that if he was to follow the CFTC's position, every financed transaction would violate Dodd-Frank, and the Actual Delivery Exception under law would be nullified.

The CFTC had also argued that it has broad authority to prosecute fraud under its new Dodd-Frank authority – not just fraud-based market manipulation. However, the judge said he did not see this authority in the relevant law or Congressional dialogue leading to the adoption of the relevant statute. Moreover, he claimed that the Commission itself seemed to concede this point in a July 2011 discussion related to the law and Commission Regulation 180.1 which the CFTC issued when finalizing the regulation. (Click here to access this guidance.) According to the Commission (as quoted by the judge),

> "although CEA section 6(c)(1) and final Rule 180.1 give the Commission broad enforcement authority to prohibit fraud and manipulation in connection with a contract of sale for any commodity in interstate commerce, the Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or *where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets.*" (Emphasis added by the court. Click here to access Commodity Exchange Act § 6(c)(1), 7 U.S.C § 9(1) and here for CFTC Rule 180.1.)

According to the judge, the CFTC has three basic anti-fraud authorities, and each has a distinct purpose and limitations: § 4b, that solely prohibits fraud and deceptive conduct (click here to access 7 U.S.C. § 6b(a)(2)), § 6(c)(1), that prohibits fraud-based manipulation and § 6(c)(3), that prohibits market manipulation when there is no fraud (click here to access 7 U.S.C § 9(3)).

(Click here for background on the CFTC enforcement action and an overview of the tentative order in the article "California Federal Court Potentially Poised to Limit CFTC's Dodd-Frank Fraud-Based Anti-Manipulation Authority in Monex Enforcement Action" in the April 22, 2018 edition of *Bridging the Week*.)

**My View**: The court's ruling on the Actual Delivery Exception appears to make perfect sense. If actual delivery within 28 days of the sale of a commodity excludes from CFTC oversight any commodity sold to a retail person on a leveraged or financed basis except where the seller/grantor of financing is not willing to release all liens or control on the financed commodity – even if the financing or leverage is not paid off – the Actual

Delivery Exception is meaningless. This is because, realistically, no lender will release its lien or control on collateral supporting financing until a debt is repaid. It seems improbable that Congress would have drafted a law to create a carve-out from CFTC jurisdiction that realistically would never occur.

The difficulty of the CFTC's position is highlighted in its proposed interpretive guidance on retail commodity transactions involving virtual currencies issued in December 2017, which parallels the CFTC's 2013 guidance regarding actual delivery of tangible commodities. (Click here to access a copy of the CFTC's 2013 guidance and here for a copy of the CFTC's proposed 2017 guidance.) Both proposed examples 1 and 2 suggest situations where actual delivery might only be deemed to have occurred in financed transactions involving virtual currency for retail persons where the financed virtual currencies were delivered to a wallet not controlled in whole or in part by the seller. However, not being able to exercise control would leave the seller with no effective security interest over collateral it financed even when it has not been repaid. This would render the theoretical ability to sell virtual currencies to buyers on finance subject to actual delivery within 28 days a meaningless option.

However, while the court's view that the CFTC's ability to prosecute fraud under its new Dodd-Frank authority is limited to fraud-based manipulation might be compelling, it is not as clear to me. This outcome requires a reading of the word "or" in the applicable prohibition to mean "and."

As drafted, the applicable provision of law reads,

"It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate…" (Emphasis added.)

If "or" means "or," the plain reading of the law suggests that either manipulative or deceptive devices are prohibited, not solely deceptive

devices that are manipulative.

The judge insisted that, despite this plain language, a holistic view of this statutory provision considering other sections of law, as well as a review of legislative history, leaves no doubt that the use of "or" was likely careless, and the "or" should be read as an "and." This analysis is well reasoned and sensible, and it is the basis for his view that only fraud-based manipulation may be prosecuted under this provision. Moreover, I believe the CFTC has unfairly used this statutory provision as the wild junkyard dog of its enforcement arsenal without any leash or other restraint. However, I'm intuitively not so sure about the federal judge's reasoning. Still thinking about this one!

**More Briefly**:

- **Global Investment Bank Fined US $110 Million for FX Trading by Federal and NY Regulators**: The Goldman Sachs Group Inc. agreed to pay a combined fine of US $110 million to the Federal Reserve Board and the New York Department of Financial Services related to allegations that, from 2008 through early 2013, firm traders shared confidential customer information to coordinate with others trading activity in foreign exchange that could improperly affect prices detrimentally for customers for the benefit of traders. Goldman Sachs also agreed to enhance its internal controls for foreign exchange trading as part of its settlement. Both the FRB and DFS acknowledged Goldman Sachs' full cooperation with their investigation, and that the firm has already instituted improvements in internal controls, compliance, risk management and audit programs related to its foreign exchange business.

- **Federal Court Rejects States' Challenge to Potential OCC Fintech Charter**: A second federal court has rejected a challenge to a proposed Fintech charter being considered by the Office of the Comptroller of the Currency. Under the proposal, a financial services business – such as a cryptocurrency exchange – could potentially apply for a national nonbank charter provided it did not accept deposits. With such a charter, a financial services business would be exempt from

state obligations. In response, the Conference of State Bank Supervisors challenged the authority of OCC to grant such nonbank charters in a federal court in Washington, DC. The court rejected CSBS's challenge, however, claiming that the plaintiff had suffered no injury at this time, and that the lawsuit was premature as OCC has not yet taken any final decision on granting the relevant nonbank charter. A federal court in New York reached a similar conclusion in December 2017 in response to a lawsuit by the head of the New York Department of Financial Services, Maria Vullo. (Click here for details in the article, "Challenges to NY BitLicense and Potential OCC Fintech Charter Quashed" in the January 7, 2018 edition of *Bridging the Week*.)

- **CFTC Staff Clarifies Aggregation Requirements of Investor in Commodity Fund**: The Division of Market Oversight of the Commodity Futures Trading Commission stated in an Interpretation that an institutional investor in a commodity pool that is not required to aggregate the pool's futures positions with its own because the investor is a passive investor does not have to aggregate futures positions of a portfolio company the pool is invested in. This is the case even where the institutional investor's investment in the pool causes it to have a 10 percent or more indirect interest in the portfolio company. The institutional investor that sought Division relief represented that it did not control the pool's operations or its investment decisions, and did not know "or want to know" if a prospective portfolio company intended to trade futures.

- **NFA Reminds FCM and IB Members to Comply With OFAC FAQs Regarding Virtual Currencies**: The National Futures Association reminded futures commission merchants and introducing brokers to comply with the US Department of Treasury's Office of Foreign Asset Control's recent guidance for virtual currency transactions. Recently, OFAC addressed virtual currencies in its Frequently Asked Questions and said that persons that identify digital currency identifiers or addresses associated with prohibited persons on blockchains "should take the necessary steps to block the relevant digital currency and file a report with OFAC that includes information about the wallet or address's ownership, and any other relevant details."

(Click here for further details in the article "OFAC Warns Prohibited Persons Using

Virtual Currencies Are Still Prohibited Persons" in the March 25, 2018 edition of *Bridging the Week*.) Separately, CFTC Commissioner Rostin Behnam indicated during a speech before the 40th annual FIA Law and Compliance conference held last week that NFA staff had proposed an interpretive notice to enhance disclosure requirements for members trading underlying/spot virtual currencies and virtual currency derivatives. (Click here to access Mr. Behnam's speech.)

- **FINRA Revises Sanctions Guidelines**: The Financial Industry Regulatory Authority updated its Sanction Guidelines to instruct adjudicators to consider customer-initiated arbitrations that result in adverse results in assessing sanctions. FinCEN also updated its anti-money laundering rule to reflect new requirements for identifying beneficial ownership of legal entity customer accounts that go into effect this week. (Click here to access FINRA Rule 3310; click hereto access information on FinCEN's new requirements in the article "FINRA Provides AML Guidance to Members" in the December 3, 2017 edition of *Bridging the Week*.)

- **IOSCO and BIS Criticize Some CCPs for Lacking on Risk Management and Recovery Planning**: The International Organization of Securities Commissions and the Committee on Payments and Infrastructures of the Bank for International Settlements issued a report noting that some global central counterparties have not yet implemented a number of recommended risk management and recovery planning measures. Among other things, some CCPs only employ one loss allocation tool (i.e., special assessments) as opposed to multiple tools to address uncovered credit losses, as recommended, and some derivatives CCPs and most cash CCPs "continue to lack mandatory rule-based recovery tools to re-establish a matched book (or to otherwise close out a defaulter's outstanding obligations) and rely only on voluntary, market-based tools." The regulatory organizations believes CCPs need a "range of tools" to ensure a CCP can establish a matched book.

**For further information**:

**California Federal Court Dismissal of CFTC Monex Enforcement Action Upsets Stable Legal Theories**:

https://bridgingtheweek.com/ckfinder/userfiles/files/
Monex%20Motion%20to%20Dismiss%20Granted.pdf

**CFTC Staff Clarifies Aggregation Requirements of Investor in Commodity Fund**:

https://www.cftc.gov/sites/default/files/idc/groups/public/%40lrlettergeneral/
documents/letter/2018-05/18-12.pdf

**Class Action Lawsuit Filed Against Ripple Labs for Unregistered Sales of Securities**:

https://static1.squarespace.com/static/5938711a9de4bb74f63b4059/t/
5aebc4112b6a28e0ef4a0381/1525400594617/Coffey+v+Ripple+Labs+Complaint.pdf

**Commodity Trading Firm Sanctioned US $2 Million by CFTC for Various Offenses Related to Cotton Trading Including Violating Speculative Position Limits**:

https://www.cftc.gov/sites/default/files/2018-04/enfglencoreorder04302018.pdf

**Federal Court Rejects States' Challenge to Potential OCC Fintech Charter**:

https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2017cv0763-19

**FINRA Revises Sanctions Guidelines**:

- AML:

- http://www.finra.org/sites/default/files/notice_doc_file_ref/Regulatory-Notice-18-19.pdf

- Sanctions:

- http://www.finra.org/sites/default/files/notice_doc_file_ref/Regulatory-Notice-18-

19.pdf

**Global Investment Bank Fined US $110 Million for FX Trading by Federal and NY Regulators**:

- Federal Reserve Bank:

- https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180501b1.pdf

- NY DFS:

- https://www.dfs.ny.gov/about/ea/ea180501.pdf

**Investment Bank Ex-Employee's Conviction Upheld for Theft of High-Frequency Trading Algorithmic Code**:

https://www.nycourts.gov/ctapps/Decisions/2018/May18/47opn18-Decision.pdf

**IOSCO and BIS Criticize Some CCPs for Lacking on Risk Management and Recovery Planning**:

https://www.iosco.org/library/pubdocs/pdf/IOSCOPD601.pdf

**NFA Reminds FCM and IB Members to Comply With OFAC FAQs Regarding Virtual Currencies**:

https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=5003

**The information in this article is for informational purposes only and is derived from sources believed to be reliable as of May 5, 2018. No representation or warranty is made regarding the accuracy of any statement or information in this article. Also, the information in this article is not intended as a substitute for**

**legal counsel, and is not intended to create, and receipt of it does not constitute, a lawyer-client relationship. The impact of the law for any particular situation depends on a variety of factors; therefore, readers of this article should not act upon any information in the article without seeking professional legal counsel. Katten Muchin Rosenman LLP may represent one or more entities mentioned in this article. Quotations attributable to speeches are from published remarks and may not reflect statements actually made. Views of the author may not necessarily reflect views of Katten Muchin or any of its partners or other employees.**

---

© 2018 Katten Muchin Rosenman. All Rights Reserved.

---

 Virus-free. [www.avg.com](www.avg.com)