| | |
|---|---|
| **From:** | Patrick McDonnell |
| **To:** | Hurand, Gates |
| **Cc:** | de Urioste, Alejandra; Oakland, David W.; Tomer, K. Brent; Giglio, Christopher |
| **Subject:** | Gates, Here is my last ECF filing [ATTACHMENT] for today a total of 6. -5 revised DOCKET styling, 1 new. TY, Patrick RE: Docket #86 [Supporting Exhibit 1m] |
| **Date:** | Tuesday, May 22, 2018 10:01:13 AM |
| **Attachments:** | My Big Coin a Exhibit 1m ATTACH.pdf |

RE: Docket #86 [Supporting Exhibit 1m]

## RE: Docket #86 [Supporting Exhibit 1m]

**RE:** *COMMODITY FUTURES TRADING COMMISSION, v. MY BIG COIN PAY, INC.; MY BIG COIN, INC.; RANDALL CRATER; MARK GILLESPIE; JOHN ROCHE; and MICHAEL KRUGER; [Case No.: 1:18-cv-10077-RWZ] [Exhibit 1m]*

**Referencing Sections III. - IV. [Exhibit 1m; "My Big Coin a"; Referring to Pages 14-17 "collectively"]. Topic: Section 6(c)(1) and Regulation § 180.1 Address Market Manipulation, Not the Retail Fraud Alleged in the Amended Complaint.**

**Exhibit 1m; "My Big Coin a"; EMAIL ATTACHMENT #1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MY BIG COIN PAY, INC.; MY BIG COIN, INC.;<br>RANDALL CRATER; MARK GILLESPIE; JOHN<br>ROCHE; and MICHAEL KRUGER;<br><br>Defendants,<br><br>KIMBERLY RENEE BENGE; KIMBERLY RENEE<br>BENGE d/b/a GREYSHORE ADVERTISEMENT a/k/a<br>GREYSHORE ADVERTISET; BARBARA CRATER<br>MEEKS; ERICA CRATER; GREYSHORE, LLC; and<br>GREYSHORE TECHNOLOGY, LLC;<br><br>Relief Defendants. | Case No.:<br>1:18-cv-10077-RWZ |

## DEFENDANT RANDALL CRATER AND RELIEF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

The Plaintiff has taken a second bite at the apple, and its Amended Complaint does not cure the fatal flaws of the original Complaint. The cryptocurrency at issue in the Amended Complaint is not a "commodity" under the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (the "CEA") because it is not a service, right, or interest in which contracts for future delivery are presently or in the future dealt in. Accordingly, because the Amended Complaint does not and cannot allege that the CEA applies, the Plaintiff lacks jurisdiction to bring any claims against the Defendants and the Relief Defendants, there is no subject matter jurisdiction for this Court, and the Amended Complaint does not state any claim for relief because there are no violations of the CEA. Further, the CFTC's theory of misappropriation is unsupported and contradicted by its own pleadings and filings. Defendant Randall Crater and all Relief Defendants submit this Memorandum of Law in Support of their Joint Motion to Dismiss the Amended Complaint.

1

Case 1:18-cv-00361-JBW-LB Document 67-5 Filed 05/29/18 Page 3 of 21 PageID #: 950

## STATEMENT OF THE CASE

In its Amended Complaint, the Commodity Futures Trading Commission ("CFTC") alleges that Defendants My Big Coin Pay, Inc. ("MBCPay"), My Big Coin, Inc., Randall Crater ("Crater"), Mark Gillespie, John Roche, and Michael Kruger (collectively, "Defendants") operated "a virtual currency scheme in which they fraudulently offered the sale of a fully-functioning virtual currency" called My Big Coin during the period of January 2014 through June 2017. *Amended Complaint*, ¶ 1. The Defendants allegedly misappropriated more than $6 million from at least twenty-eight customers through fraudulent solicitations by making misrepresentations about My Big Coin's "value, usage, trade status, and that My Big Coin was backed by Gold." *Id.* ¶¶ 1-2. The CFTC also alleges that the Defendants funneled the misappropriated funds through various accounts in the names of the Relief Defendants, some of whom were family members of Crater and the remainder of which were entities. *Id.* ¶ 6. Notably, there are no allegations that any futures or other derivative contracts are traded on My Big Coin.

Count I alleges that the Defendants violated Section 6(c)(1) of the CEA and 17 C.F.R. § 180.1(a)(2017) ("CFTC Regulation 180.1" or the "CFTC Regulation") by engaging in Fraud by Deceptive Device or Contrivance. *Id.* ¶¶ 74-87. The CFTC claims that the CEA and the CFTC Regulation govern virtual currencies, such as My Big Coin, because virtual currencies are "encompassed in the definition of 'commodity'" under Section 1a(9) of the [CEA]." *Id.* ¶ 77. This definition is an essential element to the CFTC's case, as it serves as the sole basis for the CFTC's jurisdiction to bring these claims and it serves as the sole basis for the federal question that provides subject matter jurisdiction for this Court. *Id.* ¶¶ 9, 12, 77.

Count II seeks disgorgement of any funds that the Relief Defendants received from the

Defendants' fraudulent conduct (or the value of those funds if they have been transferred to third-parties). *Id*. ¶ 88-93. There are no allegations that the Relief Defendants engaged in wrongdoing.

## I.    Standard of Review

When faced with a motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the jurisdictional issues first. *See Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 149 (1st Cir. 2002) ("When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter.") If the Court must dismiss the Amended Complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined. *See e.g., Miller v. Nichols*, 592 F. Supp. 2d 191 (D. Me. 2009), *aff'd*, 586 F.3d 53 (1st Cir. 2009) (only after the Court has determined it has jurisdiction may it turn to the question of the sufficiency of the complaint).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See, e.g., Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998). See also *CFTC v. Zelener*, No. 03 C 4346, 2003 WL 22284295, at *1 (N.D. Ill. Oct. 3, 2003) aff'd, 373 F.3d 861 (7th Cir. 2004) (dismissing case at preliminary injunction stage because "the Court lacked jurisdiction over the case because the trading at issue did not involve futures contracts and thus the Commodity Exchange Act did not apply"). For factual challenges to subject matter jurisdiction, the "plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). See also *Torres-Negron v. J & N Records, Inc*., 504 F.3d 151, 162 n. 8 (1st Cir. 2007)

("[I]f the movant, either in his motion or in any supporting materials, denies or controverts the pleader's allegations of jurisdiction, the allegations of the complaint are not controlling.") When adjudicating factual attacks on its subject matter jurisdiction, the court may take into account matters that fall outside the pleadings. *Valentin*, 254 F.3d at 363 ("the court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction.")

Should the Court reach the 12(b)(6) arguments herein, the complaint should be dismissed when even the most generous reading of a complaint fails to state a plausible basis for relief. *Wilson v. HSBC Mortg. Servs*., 744 F.3d 1 (1st Cir. 2014). There must be more than mere "labels and conclusions" to find that a claim is plausible on its face. *Charest v. Fannie Mae*, 9 F.Supp. 3d 114, 118 (D. Mass. 2014). That is, the complaint must "possess enough heft" to support a claim. *Hanrahran v. Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 153 (D. Mass. 2014). A complaint satisfies the plausibility requirement only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). But "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief." *Id*. at 679 (internal punctuation marks omitted).

## II. My Big Coin is Not a "Commodity" Under the CEA – Thus the CFTC Lacks Jurisdiction to Bring this Action and the Court Lacks Subject Matter Jurisdiction to Hear This Case.

### A. Overview

The CEA's definition of "commodity" does not include the virtual currency at issue in this case, My Big Coin. The plain language of the CEA's definition of the term "commodity"

proves that My Big Coin is not a commodity. Under the CEA's definition, only services, rights, or interests upon which futures are dealt in are commodities. 7 U.S.C. § 1(a)(9). The Amended Complaint pays nothing more than lip service to this fundamental jurisdictional requirement, declaring without explanation that "virtual currencies are encompassed in the definition of 'commodity' under Section 1a(9) of the [CEA]." *Amended Complaint* ¶ 77. This unfounded declaration is not enough to survive a motion to dismiss.

The statutory and regulatory violations that the CFTC alleges can only be invoked if the alleged misconduct occurred "in connection with . . . a contract of sale of any ***commodity*** in interstate commerce."[1] The CFTC alleges misrepresentations made in connection with only one "commodity" -  My Big Coin.

Aside from the thirty specifically enumerated agricultural products irrelevant to this case, Section 1(a)(9) of the CEA defines the term "commodity" to mean: "all other goods and articles, . . . and **all services, rights, and interests** (except motion picture box office receipts, or any index, measure, value or data related to such receipts) **in which contracts for future delivery are presently or in the future dealt in**." 7 U.S.C. § 1(a)(9) (*emphasis added*). The definition of the term "commodity" in the CFTC's Regulations[2] is identical to the CEA's definition.

As a virtual currency with no physical or tangible existence, My Big Coin is not a "good" or an "article." Instead, My Big Coin, like any other virtual currency, represents a set of "services, rights or interests." **Per the plain language of the CEA, intangible "services, rights and interests" are only included in the CEA's definition of the term "commodity" if there are futures contracts traded on them.** The only virtual currency on which futures contracts are

---

[1] CEA § 6(c)(1); 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a).
[2] 17 C.F.R. § 1.3(e).

traded is Bitcoin.[3] Because there are no futures contracts traded on My Big Coin, it is not a "commodity" as that term is defined in the CEA, the CFTC has no jurisdiction to bring this action, and there is no subject matter jurisdiction for this Court.

B.     The Legislative History of the CEA's Definition of "Commodity" Confirms that My Big Coin is Not a Commodity

### 1.     Congress Initiates Regulation of Intangible Commodities

The definition of the term "commodity" in the CEA stems from the Commodity Futures Trading Commission Act of 1974 (the "1974 Act")[4] which worked "a sweeping overhaul" of the CEA.[5] It created the CFTC and granted it extensive authority over commodity futures markets not then regulated by the CFTC's predecessor, the Commodity Exchange Authority, a division of the Department of Agriculture.

Prior to 1974, the CEA and its predecessor statutes, the Futures Trading Act of 1921[6] and Grain Futures Act of 1922,[7] specifically enumerated commodities that are subject to regulation under the CEA. As the number of commodities with futures contracts trading on them increased, Congress repeatedly amended the statute to have the new markets regulated. When Congress amended the Grain Futures Act in 1936, renaming it the Commodity Exchange Act, it extended the law's regulatory authority to cover cotton and other specified commodities. Amendments to

---

[3] CFTC supervised bitcoin derivatives have been listed and traded since 2014. TeraExchange, a swap execution facility ("SEF"), listed bitcoin swaps on September 11, 2014. The North American Derivatives Exchange("NADEX") listed bitcoin binary options on November 26, 2014. LedgerX, another SEF, listed bitcoin options on September 19, 2017. CFTC Backgrounder on Oversight of and Approach to Virtual Currency Futures Markets ("Virtual Currency Futures Backgrounder") at 2 nn. 9 & 10. Available at: https://www.cftc.gov/sites/default/files/idc/groups/public/%40customerprotection/documents/file/backgrounder_virt ualcurrency01.pdf

[4] Pub. L. No. 93-463, 88 Stat. 1389 (1974).

[5] T. Snider & R. Bartlett, Chapter 10: United States Jurisdiction published in *The Regulation of the Commodities Futures and Options Markets* 2d ed. (McGraw-Hill Cos. 1995) § 10.01.

[6] Pub. Law No. 67-66, 42 Stat. 187 (1921). The ill-fated Futures Trading Act of 1921 was Congress's first attempt to regulate futures trading. It was meant to address speculative excesses on the grain exchanges following World War I. It based its regulatory authority on the taxing power under the Federal Constitution and was declared unconstitutional for that reason in *Hill v. Wallace*, 259 U.S. 44 (1922).

[7] Pub. Law No. 67-331, 42 Stat. 998 (1922).

the CEA in 1968 added more specifically enumerated commodities under the regulatory purview of the law such as livestock, livestock products, and frozen concentrated orange juice.

By 1974, it had become clear that the strategy of naming specific commodities in the CEA's definition could not keep up with the growth of the futures markets, which were expanding to cover additional goods and services:

> While the futures markets in a number of agricultural commodities had been regulated to varying degrees since 1922, many large and important futures markets were completely unregulated by the federal government prior to 1974. These included such agricultural and forestry commodities as coffee, sugar, cocoa, lumber and plywood plus various metals including the highly sensitive silver market and markets in a number of foreign currencies.
> A person trading in one of the then unregulated futures markets needed the same protection afforded to those trading in the regulated markets. . . . [8]

Discussions were underway concerning futures markets in such things as home mortgages and ocean freight. Accordingly, Congress considered using generic categories to define the commodities subject to the jurisdiction of the CEA. These included the phrases "all other goods and articles" to cover tangible commodities in addition to the specifically enumerated agricultural commodities, and "all services, rights, and interests" to cover the intangible commodities such as home mortgages which seemed just over the horizon to Congress in 1974.[9]

### 2. Congress Limits CFTC's Jurisdiction in Response to Concerns of the Treasury and SEC

The generic approach, however, generated concerns at the Treasury Department, SEC and other regulators. During the drafting process leading up to the enactment of the 1974 Act, for instance, Treasury wrote to Congress to express its concerns that the proposed legislation gave unnecessary jurisdiction to the CFTC over intangible commodities such as foreign currencies,

---

[8] S. Rep. 850, 95th Cong., 2d Sess. 1978; 1978 U.S.C.C.A.N. 2087, 2097 ("1978 Senate Report"); H.R. Rep. 93-975, Commodity Futures Trading Commission Act of 1974 (Apr. 4, 1974) at 44.

[9] H.R. Rep. 93-975 at 31-32.

and "a wide variety of transactions involving financial instruments,"[10] given the regulation of these markets by the Office of the Comptroller of the Currency and the Federal Reserve. The letter concluded, "[W]e strongly urge the Committee to amend the proposed legislation to make clear that its provisions would not be applicable to futures trading in foreign currencies or other financial transactions . . . other than on organized exchanges."[11]

Congress addressed the Treasury Department's concerns, in part, by including a qualifier to "all services, rights and interests." With the qualifier, the term "commodity" only included "services, rights and interests" if "contracts for future delivery are presently or in the future dealt in [such services, rights or interests]." In other words, Congress gave the CFTC exclusive jurisdiction only of futures exchange trading of such intangible financial commodities in recognition of the jurisdiction of other regulators over trading in the cash markets for such financial instruments.[12]

In Congressional proceedings leading up to the 1978 reauthorization of the CFTC, the Treasury Department again expressed concerns regarding the CFTC's jurisdiction over futures on Treasury securities and mortgage-backed securities.[13] The SEC advocated that the "services, rights and interests" be narrowed to exclude those that are securities or any security index.[14] The Senate Committee rejected the proposals. "[T]he basic conclusion reached in 1974 that there should be a single regulatory agency responsible for futures trading is as valid now as it was then."[15]

---

[10] Letter to Herman E. Talmadge, Chairman of the Senate Committee on Agriculture and Forestry from Donald L.E. Ritger, Acting General Counsel, Department of the Treasury dated July 30, 1974 reprinted in Commodity Futures Trading Commission Act, S. Rep. 1131, 93rd Cong., 2d Sess. 1974; 1974 U.S.C.C.A.N. 5843,5885-86.

[11] *Id*. at 5886.

[12] H.R. Rep. 93-975 at 31.

[13] 1978 Senate Report at 2107.

[14] *Id*.

[15] *Id*. at 2110 (emphasis added)

### 3. Federal Court Decisions Have Recognized the Futures Trading Requirement for Intangible Instruments to be "Commodities"

The federal courts that have addressed the meaning of the definition of the term "commodity" under the CEA confirm that for a service, right, or interest to be a commodity there must be a futures contract traded on that service, right, or interest. In *Board of Trade of the City of Chicago v. SEC*,[16] the Seventh Circuit ruled that the CFTC had exclusive jurisdiction over *options* on GNMA mortgage-backed securities, explaining:

In 1974, Congress enacted the Commodity Futures Trading Commission Act, which amended the CEA's definition of "commodity" to include "all other goods and articles, except onions * * *, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in * * *." CEA s 2(a)(1), 7 U.S.C. § 2. By this amendment, literally anything other than onions could become a "commodity" and thereby subject to CFTC regulation simply by its futures being traded on some exchange.

Further clarifying that the CEA governs the futures contracts but not the underlying securities, the District Court in *Abrams v. Oppenheimer Government Securities, Inc*., 589 F. Supp. 4, 6-7 (N.D. Ill. 1983), *aff'd*, 737 F.2d 582 (7th Cir. 1983) ruled that *cash transactions* in GNMA mortgage-backed securities were not subject to the CEA.

In sum, the Courts have recognized and endorsed Congress' express limitation of the jurisdiction of the CFTC over financial instruments to only those that are traded on futures exchanges in recognition of the jurisdiction of numerous other regulators over the trading of such products in the cash markets.[17]

---

[16] 677 F.2d 1137, 1142 (7th Cir. 1982), *judgment vacated as moot*, 459 U.S. 1026 (1982).

[17] Cash market transactions in virtual currency have been subject to regulation by the same federal regulators that voiced concerns regarding the CFTC's jurisdiction in 1974. The Treasury Department's Financial Crimes Enforcement Network has asserted jurisdiction over the cash market for virtual currencies since 2013. FIN-2013-G001, *Application of FinCEN's Regulations to Persons Administering, Exchanging or Using Virtual Currencies* (March 18, 2013). The Office of the Comptroller of the Currency has proposed a national FinTech banking license to regulate virtual currency businesses. *OCC Issues Draft Licensing Manual Supplement for Evaluating Charter Applications From Financial Technology Companies, Will Accept Comments Through April 14*, NR 2017-31 (OCC March 15, 2017) available at: https://www.occ.treas.gov/news-issuances/news-releases/2017/nr-occ-2017-31.html. In addition, the Securities and Exchange Commission has asserted jurisdiction over the cash market for virtual

9

This limited jurisdiction has remained unchanged through the numerous amendments to the CEA, up to and including the Dodd-Frank Act.[18]

C.    Prior CFTC "Speaking Orders" Provide No Basis for the Proposition that All Virtual Currencies Are "Commodities

The CFTC has issued two "speaking orders" in which it has declared, broadly, that virtual currencies are commodities under the CEA. The reasoning in these orders, however, applies solely to Bitcoin, the only virtual currency upon which futures are traded.[19] In *In re Coinflip Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29 (Sept. 17, 2015),[20] the CFTC found that the respondents had violated various sections of the CEA and CFTC regulations by providing a trading platform through which users could buy and sell options on Bitcoin without the trading platform being registered as required with the CFTC. Pertinent here, the CFTC wrote:

> Section 1a(9) of the Act defines "commodity" to include, among other things, "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. §1a(9). The definition of a "commodity" is broad. See, e.g., Board of Trade of City of Chicago v. SEC, 677 F.2d 1137, 1142 (7th Cir. 1982). Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities. *Id*. at 3.

The CFTC was correct to claim Bitcoin as a "commodity" because at the time, Bitcoin swaps

---

currencies that it considers to be securities. *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Release No. 81297* (SEC July 25, 2017) Available at:

https://www.sec.gov/litigation/investreport/34-81207.pdf; *In re Munchee Inc.*, Docket No. 3-18304 (SEC Dec 11, 2017). Available at: https://www.sec.gov/litigation/admin/2017/33-10445.pdf. To avoid inconsistent and redundant regulation of the cash markets by the CFTC in addition to the Treasury Department, OCC, and SEC, Congress's restriction of the CFTC's jurisdiction over intangible commodities to just the derivatives trading in such commodities is as applicable today as it was in 1974.

[18] Since 1974, Congress has amended the CEA numerous times (including in the Futures Trading Acts of 1978 and 1986, the Futures Trading Practices Act of 1992, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the CFTC Reauthorization Act of 1995, the Commodity Futures Modernization Act of 2000, the CFTC Reauthorization Act of 2008, and finally, the Dodd-Frank Wall Street Reform and Consumer Protection Act – Title VII – Wall Street Transparency and Accountability Act of 2010 (the "Dodd Frank Act")) Throughout each of these amendments, the definition of "commodities" as applied to intangible commodities has never been altered; intangible commodities only fall under the CEA if they are traded on a futures exchange.

[19] Virtual Currency Futures Backgrounder.

[20] Available at:

https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfl iprorder09172015.pdf

were offered for trading on TeraExchange and Bitcoin binary options were traded on NADEX.[21] In contrast, the CFTC had no basis for asserting that "other virtual currencies are encompassed in the definition and properly defined as commodities." The CFTC did not (and could not) provide support for this claim, as there have never been futures exchange trading on "other virtual currencies." [22]

The very case on which the CFTC relied in *Coinflip*, the *Board of Trade v. SEC*, expressly notes the futures exchange trading requirement for a service, right, or interest to become a "commodity" subject to the CFTC's jurisdiction.[23] Indeed, it is unclear why CFTC was opining about "other virtual currencies" in its *Coinflip* decision, as Coinflip traded only Bitcoin options. CFTC's statement about "other virtual currencies" is at best unsupported dictum in a speaking order where the respondents had no reason to challenge or negotiate with the CFTC over that conclusion. *Coinflip* offers this Court no basis for concluding that My Big Coin is a "commodity" under Section 1(a)(9) of the CEA.

In the second speaking order, *In re BFXNA Inc., d/b/a Bitfinex*, CFTC Docket No. 16-19 (2016),[24] the CFTC fined Bitfinex for a margin lending program it provided to retail investors which enabled them to trade Bitcoin on margin in violation of CEA Section 2(c)(2)(D).[25] In its legal discussion, the *Bitfinex* order makes the same claim that the CFTC made in *Coinflip*: that

---

[21] Virtual Currency Futures Backgrounder.

[22] Furthermore, the CFTC's unfounded assumption that virtual currencies other than Bitcoin are commodities is disputed by its own primer on virtual currencies, which recognizes the substantial differences between various virtual currencies:

> It is important to note that there are many other virtual currencies [other than Bitcoin] with sizeable market capitalizations that are built upon various Blockchain technologies, *but may have different characteristics or functionalities than Bitcoin,* including Ethereum (or Ether), Litecoin, and Ripple.

*A CFTC Primer on Virtual Currencies* (CFTC Oct. 17, 2017) at 5 n.1 (emphasis added). Available at: https://www.cftc.gov/sites/default/files/idc/groups/public/%40customerprotection/documents/file/labcftc_primercurr encies100417.pdf

[23] 677 F.2d at 1142.

[24] Available at: https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfbfxna order060216.pdf

[25] 7 U.S.C. § 2(c)(2(D).

11

Bitcoin and "other virtual currencies" meet the definition of a "commodity" under the CEA.[26] Other than citing its own *Coinflip* speaking order, the CFTC again offered no basis for asserting that virtual currencies other than Bitcoin are "commodities" under the CEA. Moreover, like in *Coinflip*, the CFTC's discussion of other virtual currencies being "commodities" is dictum. Bitfinex's margin program which violated the CEA only financed retail investors' purchase or sale of Bitcoin, not other virtual currencies.[27]

These speaking orders boil down to one undisputed conclusion: Bitcoin, the only virtual currency on which futures contracts are traded, is a "commodity." But neither speaking order provides any support for the CFTC's claim of jurisdiction over My Big Coin.

### D. *CFTC v. McDonnell* Is Inapposite

On March 8, 2018, the CFTC filed a Notice of Supplemental Authorities. The notice called the Court's attention to a March 6, 2018 decision of the United States District Court for the Eastern District of New York, *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (EDNY 2018) (Weinstein, J.). In the *McDonnell* Complaint,[28] the CFTC alleged that McDonnell had "operated a deceptive and fraudulent virtual currency scheme to induce customers . . . to send money and virtual currencies to Defendants in exchange for purported virtual currency trading advice concerning the trading of virtual currencies, **including Bitcoin** and Litecoin . . . ." McDonnell Complaint ¶ 1 (*emphasis added*). Judge Weinstein granted the CFTC's motion for a preliminary injunction over the opposition of McDonnell who was representing himself *pro se*.

---

[26] *Id*. at 5-6.

[27] In its brief in support of its motion for a preliminary injunction in the instant matter, CFTC also cites its speaking order *In re TeraExchange LLC* (CFTC Docket No. 15-33 (2015) for the proposition that My Big Coin is a "commodity." That order offers no such support. In a footnote, that speaking order says, "Bitcoin is a commodity under Section 1a of the Act . . . and is therefore subject as a commodity to applicable provisions of the Act and Regulations." It is silent as to whether other virtual currencies are "commodities."

[28] Available at:

https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcdmc omplaint011818.pdf

Although the CFTC's purpose in flagging *McDonnell* to this Court is not clear, to the extent that the CFTC intended to use *McDonnell* to advance its claim that "My Big Coin" is a commodity under the CEA, that is a misreading of the facts in *McDonnell* and of Judge Weinstein's decision. At the time the *McDonnell* complaint was filed, there were futures contracts trading on Bitcoin on the CBOE Futures Exchange and the Chicago Mercantile Exchange, and Bitcoin binary options listed on the Cantor Fitzgerald Futures Exchange. Moreover, Bitcoin swaps and Bitcoin binary options had been available for trading on TeraExchange and NADEX, respectively, since 2014.[29]

It is undisputed that the *McDonnell* case involved Bitcoin which is a "service, right, or interest, in which contracts for future delivery presently are or in the future dealt in." Importantly, Judge Weinstein expressly acknowledges the futures trading requirement in the definition of the term "commodity": "Where a futures market exists for a good, service, right, or interest, it may be regulated by CFTC as a commodity, without regard to whether the dispute involves futures contracts."[30] The *McDonnell* case does not, however, offer any support for the CFTC's assertion that My Big Coin is a "commodity" under the CEA when there are no futures contracts trading on My Big Coin.

The Amended Complaint does not allege that futures or other derivatives contracts are traded on the virtual currency at issue in this case, My Big Coin. Without that allegation, My Big Coin is not a "commodity" under the CEA under the plain language of the CEA's definition of a "commodity." Therefore, the CFTC has no jurisdiction to bring charges under the CEA, and this court lacks subject matter jurisdiction. Accordingly, the Amended Complaint should be

---

[29] Virtual Currency Backgrounder at 2 nn. 9 & 10.
[30] 287 F. Supp. 3d. at 227.

dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(1). [31]

## III. Section 6(c)(1) and Regulation § 180.1 Address Market Manipulation, Not the Retail Fraud Alleged in the Amended Complaint.

The provisions of the CEA that the CFTC alleges Defendant Crater violated were added

by the Dodd Frank Act.[32]  Section 753 of the Dodd Frank Act created a new Section 6(c)(1) to

the CEA. Section 6(c)(1) provides:

> **(1) Prohibition against manipulation** It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010 . . . . 7 U.S.C. § 9(1) (*emphasis in original*).

On July 7, 2011, the CFTC promulgated a final rule under the authority granted to it in Section

6(c)(1), CFTC Regulation § 180.1, which states in pertinent part:[33]

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

---

[31] There can be no jurisdiction over the Relief Defendants where there is no subject matter jurisdiction.  See, e.g., *Commodity Future Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-192 (4th Cir.2002) ("[b]ecause a nominal defendant has no ownership interest in the funds at issue, once the district court has acquired subject matter jurisdiction over the litigation regarding the conduct that produced the funds, it is not necessary for the court to separately obtain subject matter jurisdiction over the claim to the funds held by the nominal defendant"). As the Fourth Circuit has made clear, "a nominal defendant is part of a suit only as the holder of assets that must be recovered in order to afford complete relief; no cause of action is asserted against a nominal defendant." *Id*. at 192.
[32] Pub. Law 111-203
[33] *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398 (CFTC July 14, 2011).  The rule promulgated essentially mimics the antifraud provisions contained in the Securities Exchange Act of 1934 ("34 Act") and rules thereunder. This is likely no coincidence given the plethora of case law developed under the 34 Act and its implementing regulation that the CFTC would expect courts to rely upon when the CFTC brings an action under its antifraud provisions.

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .[34]

The legislative history shows that these provisions were meant to combat fraudulent market manipulations – not the kind of garden variety sales puffery that the Amended Complaint alleges. Senator Maria Cantwell in introducing Section 753 stated:

> My amendment strengthens the Commodity Futures Trading Commission's authority to go after **manipulation** and **attempted manipulation** in the swaps and commodities markets. . . . Some people might be thinking: Why do we need legislation like that? Don't we already have something in place? Unfortunately, current law does not have enough protections for our consumers, and we have found in other areas that it is very important to have a strong bright line, a law on the books against **manipulation**. . . . [T]he federal courts have recognized that with the CFTC's weaker **anti-manipulation** standard, market "**manipulation** cases generally have not fared so well." In fact, the law is so weak that in the CFTC's 35-year history, it has only had one successfully prosecuted case of **market manipulation** . . . [35]

The comments of the Chair of the Senate Agriculture and Forestry Committee, Senator Blanche Lincoln, echo those of Senator Cantwell:

> Section 753 adds a new *anti-manipulation* provision to the Commodity Exchange Act (CEA) addressing fraud-based *manipulation*, including *manipulation* by false reporting. Importantly, this new enforcement authority being provided to the CFTC supplements, and does not supplant, its existing *anti-manipulation* authority for other types of *manipulative* conduct. Nor does it negate or undermine any of the case law that has developed construing the CEA's existing *anti-manipulation* provisions.[36]

There is nothing in Senator Lincoln's remarks regarding fraud unrelated to manipulation. Senator Lincoln's reference to false reporting conduct further demonstrates that the thrust of Congress's intent in amending the CEA was to combat manipulation.

The CFTC's narrative explanation of its adoption of the final text of Regulation Section 180.1 is consistent with the thrust of the legislative history of Section 6(c)(1) of the CEA.

---

[34] 17 C.F.R. § 180.1(a).

[35] 156 Cong. Rec., 111th Cong., No. 67 S3348 (May 6, 2010) (emphasis added).

[36] 156 Cong. Rec., 111th Cong., No. 105 S5924 (July 15, 2010) (emphasis added).

> [T]he Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets. [37]

The CFTC stated that the fears commenters had expressed in response to the Notice of Proposed Rulemaking that "the word 'commodity' in proposed Rule 180.1 'indicates that the rule will apply to virtually every commercial transaction in the economy' are ***misplaced***."[38]

For the CFTC to employ Section 6(c)(1) and Regulation § 180.1 here, the Court would need to read the disjunctive "or" between "manipulative" and "deceptive" literally. In *CFTC v. Monex Credit Co.*, 8:17-cv-01868 (C.D. Cal. May 1, 2018), a federal court recently rejected that interpretation, concluding that the rules of statutory construction mandated that the "or" in Section 6(c)(1) must be read as an "and."[39] The court looked to the headings Congress gave: Section 6(c) is labeled "Prohibition regarding Manipulation and False Information," whereas Section 6(c)(1) is titled "Prohibition against Manipulation" and Section 6(c)(2) is captioned as "Prohibition regarding false information." Thus, the court reasoned that the Section 6(c)(1) prohibited fraudulent manipulation but *not* fraud without manipulation.

Based on the clear legislative history to Section 6(c)(1) described above, the court in *Monex* rejected any argument that interpretations of similar language in Section 10(b) of the Securities Exchange Act to apply to both fraud and manipulation should result in the same interpretation for Section 6(c)(1).[40] The court noted:

> Nowhere does the legislative history contemplate extending CFTC's authority under § 6(c)(1) to allow it to combat fraud absent market manipulation. Senator Cantwell's references to § 10(b) make clear that Congress only intended to lower the scienter

---

[37] 76 Fed. Reg. at 41401.

[38] *Id*. (emphasis added).

[39] *CFTC v. Monex Credit Co.*, 8:17-cv-01868 Docket Doc. 191 (Civil Minutes) at 11 citing *De Sylva v Ballentine*, 351 U.S. 570, 573 (1956) (noting that the word "or" is often used as a careless substitute for the word "and"; that is, it is often used in phrases where "and" would express the thought with greater clarity").

[40] *Id*.at 13.

standard to recklessness, not adopt wholesale the full scope of enforcement available under § 10(b).[41]

*Monex* was not the first time that a federal court ruled that the "or" should be interpreted as an "and." In a case where the CFTC argued that the disjunctive "or" meant that it could use Section 6(c)(1) and § 180.1 to prosecute a manipulation that did not involve deception, the court disagreed. Relying on the rejection of that reading of the identical terms in SEC Rule 10b-5 in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976), the district court in *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015) noted that claims of securities manipulation "must involve 'conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."

The Amended Complaint does not allege a manipulation of the futures or swaps markets or prices of commodities in interstate commerce. As a result, the CFTC has not pled two elements required to state a claim under Section 6(c)(1) and Regulation § 180.1: (i) as set forth above, My Big Coin is not a "commodity" under the CEA  so the Amended Complaint does not allege actionable misconduct "in connection with a contract of sale of [a] commodity in interstate commerce," and (ii) the Amended Complaint does not allege a fraudulent manipulation of the price of My Big Coin even, assuming arguendo, that it is a "commodity."[42] Accordingly, the Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.[43]

---

[41] *Id.* at 14.

[42] If the Court dismisses Count 1, Count II, the only count that applies to the Relief Defendants, must be dismissed as well.  The CFTC's request for the equitable relief of disgorgement depends on a violation of the CEA; if there is no violation, there can be no request for disgorgement.

[43] In the event that this Court does not adopt the above arguments, the Amended Complaint must be dismissed because the allegations of fraud have not been pled with the particularity required by Fed. R. Civ. P. 9(b). The essential elements of a fraud claim under the CEA are that the defendant "intended to make and did make a material misrepresentation with scienter." *CFTC v. Wilson,* 19 F. Supp. 3d 352, 362 (D. Mass. 2014) (internal citations omitted). *See also CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir.2002) (noting that to establish a violation of section 6(b)(1)(A)-(C), the CFTC must prove that (1) a misrepresentation was made, (2) with scienter,

## IV.    The CFTC's Theory of Misappropriation is Unsupported and Contradicted by its Own Pleadings and Filings.

The CFTC alleges that the Defendants misappropriated customer funds for their own personal use. *Amended Complaint*, ¶ 4. This theory is both unsupported and directly contradicted by the CFTC's own pleadings. "Misappropriation" implies the fraudulent use of money by someone to whom the money is entrusted for a particular purpose.[44] But there are no allegations in the Amended Complaint that the customers entrusted their money to the Defendants. Rather, the Amended Complaint alleges that the Defendants' business was to solicit customers to purchase virtual coins called "MBC." *Amended Complaint*, ¶¶ 26, 31. The customers purchased coins, the Defendants facilitated the purchases, and once the customers received their coins, the sale was complete.[45]

The Amended Complaint does not allege that the Defendants had an ongoing obligation to the customers once the sales were completed. The Defendants were not paid to deliver trading advice once the customers purchased their coins. The Defendants were not expected to continue to invest a portion of the customers' money after the sale of coins occurred. To the contrary, the Amended Complaint makes no averments that the Defendants' authority to use their profits was or should have been restricted in any manner.

In other cases where the CFTC has relied upon a "misappropriation of funds" theory, it includes allegations to support such a claim. In *McDonnell,* the CFTC alleged that the defendant misappropriated investors' funds by soliciting and obtaining customer funds for trading, and then

---

and (3) that the misrepresentation was material). Here, the Amended Complaint alleges generally that certain statements were "misrepresentations" but it fails to allege that the statements were, in fact, false, or that any of the Defendants knew that the statements were false at the time they was made.  "General averments of the defendants' knowledge of material falsity will not suffice." *Serabian v. Amoskeag Bank Shares, Inc*., 24 F.3d 357, 361 (1st Cir.1994) (citation omitted).

[44] *See e.g. U.S. v. O'Hagan*, 521 U.S. 642, 654 (1997) (defining misappropriation as akin to "the fraudulent appropriation to one's own use of the money or goods **entrusted** to one's care by another") (emphasis added).

[45] There are also no allegations to support the CFTC's accusation that the Defendants engaged in a Ponzi scheme. *Amended Complaint*, ¶ 2.

ceasing communication with the customers. 287 F. Supp. 3d at 229-30. In *CFTC v. Noble Wealth Data Info. Servs., Inc.*, the defendants had promised to hold customer funds and make trades for their customers but instead used the customer funds to pay operating expenses, personal expenses, salaries, and commissions. 90 F. Supp. 2d 676 (D. Md. 2000). In *CFTC v. Skorupskas*, the CFTC alleged that the defendant solicited funds for trading, traded a small percentage of those funds and disbursed the rest to other investors, herself, and her family. 605 F. Supp. 923 (E.D. Mich. 1985). Similarly, in *CFTC v. Weinberg*, the defendant misappropriated customer funds entrusted to him for trading purposes. 287 F.Supp.2d. 1100 (C.D. Cal. 2003).

Here, the CFTC's own investigative interview of one of its alleged complainants contradicts the "misappropriation" theory. *Nollet v. Justices of Trial Court of Com. Of Mass.*, 83 F.Supp. 2d 204, 208 (D. Mass) (when ruling on 12(b)(6) motion, court may consider facts alleged in pleadings or documents attached as exhibits or incorporated by reference in the complaint). Customer A's testimony makes clear that he had no expectation about how the funds he paid to the Defendants would be used once he received his coins. ECF #20-1, Relevant excerpts of MBC Customer A's testimony on July 9, 2017, at 151:11-152:23. Indeed, Customer A never testified that the Defendants had misappropriated his money in any way or that he had lost any funds as a result of the Defendants' business.

As the CFTC has failed to state a claim for relief based on its "misappropriation" theory, the Amended Complaint must be dismissed.

## CONCLUSION

As "My Big Coin" is not a commodity under the CEA, the CFTC lacks jurisdiction to bring these claims, this Court lacks subject matter jurisdiction, and there is no violation of the CEA. In the alternative, even on its second bite at the apple, the CFTC has failed to state a claim

for "misappropriation" of funds. The Amended Complaint should be dismissed.

Respectfully submitted,

| | |
|---|---|
| /s/ Katherine Cooper | /s/ Steven N. Fuller |
| Katherine Cooper | Steven N. Fuller, NH Bar 4813 |
| kcooper@mmlawus.com | sfuller@mzclaw.com |
| MURPHY & MCGONIGLE P.C. | MARKUN ZUSMAN FRENIERE & |
| 1185 Avenue of the Americas, 21st Floor | COMPTON, LLC |
| New York, NY 10036 | 40 Grove Street, Suite 275 |
| Telephone: (212) 880-3630 | Wellesley, MA. 02482 |
| | Telephone: (781) 489-5464 office |
| | |
| *Counsel for Randall Crater* | *Counsel for Randall Crater and Erica Crater* |

| | |
|---|---|
| /s/ Laura Greenberg-Chao | /s/ Ray Chandler |
| Laura Greenberg-Chao, BBO# 650916 | Ray E. Chandler, #93 |
| lgreenbergchao@henshon.com | rchanatty6@aol.com |
| HENSHON KLEIN LLP | CHANDLER & JENNINGS, LLC |
| 120 Water Street, 2d Floor | 1060 E. Montague Avenue, Ste. 301 |
| Boston, Massachusetts 02109 | N. Charleston, SC 29405 |
| Telephone: (617) 367-1800 | Telephone: (843)745-4542 |
| | |
| *Counsel for Relief Defendants Kimberly Renee* | *Counsel for Randall Crater and Erica Crater* |
| *Benge; Kimberly Renee Benge d/b/a Greyshore* | |
| *Advertisement aka Greyshore Advertiset;* | |
| *Barbara Crater Meeks, Greyshore, LLC; and* | |
| *Greyshore Technology, LLC* | |

Date: May 4, 2018

## CERTIFICATE OF SERVICE

I, Laura Greenberg-Chao, certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 4, 2018.

/s/ Laura Greenberg-Chao
Laura Greenberg-Chao