UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING

COMMISSION,                                    Case No. 18-CV-00361 (JBW) (RLM)

        **Plaintiff**,

                                **<u>MEMORANDUM OF LAW IN</u>**

      **v.**                        **<u>SUPPORT OF MOTION TO DISMISS</u>**

PATRICK K. MCDONNELL,

and CABBAGETECH, CORP. d/b/a COIN

DROP MARKETS,



        **Defendants.**

## MEMORANDUM OF LAW

## I.  <u>BACKGROUND</u>

Plaintiff alleges the following facts. Plaintiff Complaint ("Complaint") filed in UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK on January 18, 2018. <u>Id.</u> ["*Since at least in or around January 2017 to the present (the "Relevant Period"), Patrick Kerry ("PK") McDonnell ("McDonnell") and CabbageTech, Corp. d/b/a Coin Drop Markets ("CDM") (collectively, "Defendants"), operated a deceptive and fraudulent virtual currency scheme to induce customers ("CDM Customers") to send money and virtual currencies to Defendants in exchange for purported virtual currency trading advice concerning the trading of virtual currencies, including Bitcoin and Litecoin, and for virtual currency purchases and trading on behalf of customers under McDonnell's direction."*] quoting Plaintiff Complaint at 1. [18-cv-00361; Docket #1].

1.

Id. ["*In an attempt to conceal the scheme, Defendants removed website and social media materials from the internet, and ceased communicating with CDM Customers, who lost most if not all their invested funds due to Defendants' **fraud** and **misappropriation.**"*] quoting Plaintiff Complaint at 2. [18-cv-00361; Docket #1]. Id. ["*Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-27f (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt 1-190 (2017), **specifically Section 6(c)(1) of the Act**, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. §180.1(a) (2017)"*]. quoting Plaintiff Complaint at 3. [18-cv-00361; Docket #1]. Id. ["*Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin such such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, recission, pre- and post- judgement interest, and such other relief as the Court may deem necessary and appropriate.*"] quoting Plaintiff Complaint at 4. [18-cv-00361; Docket #1]. Id. ["*Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.*"] quoting Plaintiff Complaint at 5. [18-cv-00361; Docket #1].

*Plaintiff alleged Defendant violation(s) in Complaint refer* **"specifically"** *to* **'retail commodity spot transactions'** *where CDM customer's allegedly* <u>paid</u> **'full price with'** *bitcoin, litecoin, and/or virtual currencies, for membership/subscription fees, informational services, trading advice, and/or trading/alerts,* "**bearing absolutely no leveraged, margined, and/or financed-based**" *claim(s)*. Plaintiff Complaint is *absent* of 'any' claim(s) specifying '**fraud-based market manipulation'**. Plaintiff clearly has no true authority to state a claim or execute scope of Commission *action*, *enforcement*, *jurisdiction*, *regulation*, and/or *rule* over Defendant transaction(s) under § 6(c)(1) of the Act. Id. **"§ 6(c)(1) only confers anti-fraud jurisdiction where a particular commodity transaction manipulates or potentially manipulates the derivatives market."** [quoting 2018 WL 2110935 at *7 (4)(a).].

## Id. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS
### Count I--Fraud by Deceptive Device or Contrivance
**"Violations of Section 6(c)(1) of the Act and Regulation 180.1(a) by McDonnell and CabbageTech, Corp. d/b/a/ Coin Drop Markets"** quoting Plaintiff Complaint at 46 V. [18-cv-00361; Docket #1]. Defendant is **'inappropriately'** charged under § 6(c)(1).

Plaintiff "specifically" claims violations of, Section 6(c)(1) of the Act. Id. "*Through this conduct, Defendants were engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-27F (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pt. 1-190 (2017),* **specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2017)***. quoting Plaintiff Complaint at 3. [18-cv-00361; Docket #1].

May 01, 2018, United States District Judge James V. Selma proceeding over the case *COMMODITY FUTURES TRADING COMMISSION vs MONEX CREDIT COMPANY, et al.* **'Exhibit 1'** ruled against the CFTC granting a Motion To Dismiss and further denied/declared CFTC Preliminary Injunction Motion excluding it as moot *via* a well researched and thought out decision covering CFTC's § 6(c)(1) jurisdictional scope. Id. "*For the foregoing reasons, the Court grants Defendants' motion to dismiss. The Court denies the CFTC's motion for preliminary injunction and Defendants' motion to exclude as moot.*" [quoting 2018 WL 2110935 at *11.] **Therefore, § 6(c)(1) 'does not' cover retail commodity spot transaction fraud *"in the absence of derivative market manipulation"* rendering Plaintiff claim(s) null and void regarding alleged Defendant transaction(s).**

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 8(a) requires that a complaint contain *"a short and plain statement of the claim showing that the pleader is entitled to relief."* Fed. R. Civ. P. 8(a)(2). A plaintiff must state *"enough facts to state a claim to relief that is plausible on its face."* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has *"facial plausibility"* if the plaintiff pleads facts that *"allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."* Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion under Twombly, the Court must follow a two-pronged approach. Id. First, the Court must accept all well-pleaded factual allegations as true, but *"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."* Iqbal, 556 U.S. at 678 and Id. Second, assuming the veracity of well-pleaded factual allegations, the Court must *"determine whether they plausibly give rise to an entitlement to relief."* at 679.

3.

This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility *"where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."* Id. For purposes of ruling on a Rule 12(b)(6) motion, the court must *"accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."* at Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008). Id. However, courts *"are not bound to accept as true a legal conclusion couched as a factual allegation."* Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S. at 555).

Under Federal Rule of Civil Procedure 9(b), a plaintiff must plead each element of a fraud claim with particularity, i.e., the plaintiff *"must set forth more than the neutral facts necessary to identify the transaction."* Cooper v. Pickett, 137 F.3d 616, 625 (9th Cir. 1997) (emphasis in original) (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) ). *A fraud claim must be accompanied by "the who, what, when, where, and how" of the fraudulent conduct charged.* Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting Cooper, 137 F.3d at 627). *"A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations."* Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989). Statements of the time, place, and nature of the alleged fraudulent activities are sufficient, but mere conclusory allegations.

## THE ACTUAL DELIVERY EXCEPTION

The Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, § 742, 124 Stat. 1376 (2010) ("Dodd–Frank"), expanded the enforcement authority of the CFTC. CFTC v. Hunter Wise Commodities, LLC, 749 F.3d 967, 970 (11th Cir. 2014). *Relevant to the present action,* **Dodd–Frank added CEA § 2(c)(2)(D) (the "Retail Commodity Provision"), which extended the scope of CEA §§ 4(a), 4(b), 4b to apply to covered "retail commodity transactions," as if they were contracts of sale of a commodity for future delivery, unless the transactions resulted in "actual delivery" within 28 days (the "Actual Delivery Exception").** 7 U.S.C. § 2(c)(D); CFTC v. Worth Grp., Inc., No. 13–80796–CIV, 2014 WL 11350233, at *1 (S.D. Fla. Oct. 27, 2014). *Only retail commodity transactions "entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" fall within this authority.*

4.

7 U.S.C. § 2(c)(2)(D)(i)(II). The CEA does not otherwise define the term "actual delivery" in the statute. Worth, 2014 WL 11350233, at *1; Hunter Wise, 749 F.3d at 978 (citing 7 U.S.C. § 1(a) ). Defendant argues that Plaintiff lacks regulatory jurisdiction over this case pursuant to the Actual Delivery Exception. Plaintiff contends that it had broad anti-fraud enforcement authority, independent of § 2(c)(2)(D), and therefore § 6(c)(1) nevertheless applies to Defendant. *However, Defendant argues that the Actual Delivery Exception divests Plaintiff of jurisdiction over all alleged claims in the Complaint.*

Id. *"The parties debate whether the Exception is an exception or an exclusion. The CFTC argues that it is an exception to its jurisdiction and, therefore, Defendants bear the burden of establishing that the exception applies. (Opp'n to MTD, Docket No. 164 at 4–6.) Defendants argue that it is an exclusion, meaning that the CFTC bears the burden of proving that the exception does not apply. (Mem. re MTD, Docket No. 41–1 at 24–25.) The Court declines to resolve this argument because, regardless of who bears the burden, Defendants show that the Actual Delivery Exception precludes the application of §§ 4, 4b, and 4d to Defendants' conduct."* [quoting 2018 WL 2110935 at Footnote 2.].

The Eleventh Circuit is the only circuit to have analyzed the meaning of "actual delivery" in the context of the Exception. Applying the "ordinary meaning of the term," the court defined "delivery" to mean " '[t]he formal act of transferring something'; it denotes a transfer of possession and control." Hunter Wise, 749 F.3d at 978 (quoting Black's Law Dictionary 494 (9th ed. 2009) ). Id. Further, it concluded that " '[a]ctual delivery' denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent.' 'Actual' is that which 'exist[s] in fact' and is 'real,' rather than constructive." at 979 (citations omitted).

The court's holding does not require that a buyer take actual possession and control of the purchased commodities; it requires instead that the possession and control of commodities that exist in fact be transferred from the seller. Id. ("If 'actual delivery' means anything, it means something other than simply 'delivery.' ") But the court did not "define the precise boundaries of 'actual delivery' " because it found that the Exception clearly did not apply to the "sort of constructive delivery" at issue in the case. Id. The defendant in Hunter Wise "did not own a sufficient inventory of metals to cover its liabilities to the retail customers." at 979–80.

5.

Id. *"Rather than possessing or controlling an inventory of metals from which it could deliver purchased metals to retail customers, the defendant had margin trading accounts with its suppliers that were subject to minimum margin requirements and margin calls. at 980.* Id. *Accordingly, the court found the defendant had nothing to deliver, actually or constructively. at 979.* Id. *"Defendant argues that the Plaintiffs' own interpretation does not require physical delivery to the customer." [quoting 2018 WL 2110935 at \*4 (a).]* Id. *By way of example, the CFTC provided that "[a]ctual delivery will have occurred if, within 28 days, the seller has physically delivered the entire quantity of the commodity purchased by the buyer, including any portion of the purchase made using leverage, margin, or financing, whether in specifically segregated or fungible bulk form, into the possession of a depository other than the seller and its parent company, partners, agents, and other affiliates." [quoting 2018 WL 2110935 at \*4 (a).]*

Id. *The CFTC stated that "an agreement, contract, or transaction that results in 'physical delivery' within the meaning of section 1.04(a) (2)(i)–(iii) of the Model State Commodity Code ["Model Code" 3 ] would ordinarily result in 'actual delivery' under new CEA section 2(c)(2)(D)(ii)(III)(aa), absent other evidence indicating that the purported delivery is a sham." at 77672 n.25.* Id. *The factors and the example were adopted by the CFTC in its final interpretation issued in 2013. 78 Fed. Reg. at 52428.* Id. *Though the Eleventh Circuit did not rely on the final interpretation in construing "actual delivery," it found that the CFTC's guidance comported with its construction of the term. Hunter Wise, 749 F.3d at 980.* Id. *The CFTC argues that Monex's alleged conduct does not fall within the example provided in its own interpretation because the purported delivery is a "sham." (Opp'n to MTD, Docket No. 164 at 11.) It argues that the Complaint alleges the following facts showing that Monex's delivery is in fact a sham: [quoting 2018 WL 2110935 at \*4 (b).]* Id. *However, all of these allegations relate to Monex's business model of selling commodities on a leveraged basis. [quoting 2018 WL 2110935 at \*5.]* Defendant alleged retail commodity spot transaction(s) involving bitcoin, litecoin, and/or all virtual currencies **are not** *"leveraged"*, *"margined"*, and/or *"financed-based"*. Plaintiff clearly *"defined"* and *"stated"* in Complaint [Docket #1] they were *"fully paid"* type commodity transactions, settling *"instant"*, *"on the spot"*, and in *"real-time"* exempt from Plaintiff Actual Delivery Exemption.

*§§ 4(a), 4(b), and 4b only apply to covered retail commodity transactions, which must be entered into or offered on a leveraged or margined basis, or financed by the offeror. 7 U.S.C. § 2(c)(2)(D) (i)(II).* Id. *If this conduct alone negated "actual delivery," "every financed transaction would violate Dodd-Frank." Worth, 2014 WL 11350233, at \*2.*

6.

Id. The Court can conceive of no plausible leveraged retail transaction of fungible commodities that would not involve at least some of the same alleged practices. **Thus, if the Court were to adopt the CFTC's construction, the result would be to eliminate the Actual Delivery Exception from the CEA.** E.E.O.C. v. Chicago Club, at 86 F.3d 1423, 1426 (7th Cir. 1996) (refusing to endorse the Equal Employment Opportunity Commission's "eviscerating interpretation" of "bona fide private membership club" when doing so would mean no organization would satisfy the statutory definition). This Court has no basis to do so. Corley v. United States, 556 U.S. 303, 314 (2009) ("The Government's reading is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ....' " (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004) ).

Id. *"The CFTC argues that the transfer of title to metals held at a third-party depository does not constitute "actual delivery." (Opp'n re MTD, Docket No. 164 at 7.) [quoting 2018 WL 2110935 at \*5 (a).].* Id. *The Ninth Circuit's decision in CFTC v. Noble Metals Int'l, 67 F.3d 766, 772 (9th Cir. 1995), a pre–Dodd–Frank case, concerned the distinction between a futures contract and a cash forward contract under the CEA. The CEA excluded cash forward contracts from CFTC jurisdiction if both parties to the contract contemplated and intended future delivery of the actual commodity.* Id. *The defendants argued that their contracts were cash forward contracts and satisfied the delivery requirement by transferring title to investors.* Id. *Instead of delivering the purchased metals to their customers, the defendants arranged for third-party depositories to take delivery on their behalf.* Id. *at 769. But no metal would change hands. [quoting 2018 WL 2110935 at \*5 (a).].* Id. *Instead of taking delivery from the third-party, customers would contract for the third-party to receive, and then sell, the metal.* Id. *The third-party sold the metal back to the defendants in a paper transaction.* Id. *Under this scheme, the court found that there was "no legitimate expectation" that the defendants' customers would take actual delivery.* Id. *at 773."* [quoting 2018 WL 2110935 at \*5 (a).].

Id. *"Noble Metals is distinguishable for two primary reasons. First, and most notably, it predates Dodd–Frank. The court did not construe "actual delivery" within Dodd–Frank's statutory framework. Instead, the court assessed whether the defendants could take advantage of the cash forward exclusion to the CEA."* [quoting 2018 WL 2110935 at \*5 (b).].

Id. "*Second, the court found that the defendants' contracts did not contemplate "actual delivery" of the purchased metals because they merely transferred title to the metals. Id. Though not discussed by the Ninth Circuit, Defendants did not have enough metals on hand to satisfy their delivery obligations. (Request for Judicial Notice 5 ("RJN"), Docket No. 189–4, Ex. 5 at 31; see also RJN, Docket No. 189–2, Ex. 4 at 32.) Even if this Court were to apply the definition of "delivery" applicable to the cash forward contract exclusion, Monex's contracts differ from the Noble Metals defendants' contracts. Regardless, the Court is not persuaded that the definition of "delivery" applicable to the cash forward contract exclusion similarly applies to the Actual Delivery Exception.*" [quoting 2018 WL 2110935 at \*5 (b).].*

Id. "*Moreover, the legislative history of Dodd–Frank supports the Court's conclusion that Congress did not intend to exclude the sort of conduct the CFTC alleges Monex engaged in from the ambit of the Actual Delivery Exception. The Senate adopted an earlier version of §2(c)(2)(D) that excluded from the definition of "actual delivery" any "delivery to a third party in a financed transaction in which the commodity is held as collateral." H.R. 4173, 111th Cong., 2nd Sess. § 742(2)(D)(v) (May 20, 2010). The final bill omits this exclusion. "As a general canon of statutory construction, where the final version of a statute deletes language contained in an earlier draft, a court may presume that the earlier draft is inconsistent with ultimate congressional intentions." In re Town & Country Home Nursing Servs., Inc., 963 F.2d 1146, 1151 (9th Cir. 1991). The Court therefore presumes that Congress did not intend to exclude the conduct alleged against Monex — the actual delivery of precious metals in financed transactions where the metals are held as collateral by a depository — from the definition of "actual delivery." *" [quoting 2018 WL 2110935 at \*5 (c).].

Id. *The CFTC does not distinguish between short and long positions in describing how the metals are stored by depositories. (See, e.g., Compl. Docket No. 1 ¶¶ 39, 41–42 ("Atlas customers with open trading positions do not take physical delivery of the precious metals that underlie their trading positions. Rather, the metals are stored in depositories subject to contracts between Monex and the depositories which provide Monex with exclusive authority to instruct the depositories as to the disposition of metals ... When an Atlas customer opens a long position, Monex claims to transfer to the customer ownership of all of the metals underlying his position, including the financed portion of the position.*

8.

Id. *This 'transfer,' however, is in reality just a book-entry in Monex's records. ... In the context of a short position, Monex claims to loan the customer metals that the customer immediately sells back to Monex. As with a long position, the purported transfer of metals is in reality a book-entry in Monex's records that Monex can close out at any time in its sole discretion and at a price of Monex's choosing.") There are two reasons for treating long transactions and short transactions similarly. First, by virtue of the CFTC's investigations in 1987 and 1998, Congress was aware of the phenomenon of short sales in commodities in the years before Dodd–Frank was adopted. (See Declaration of Gregory Walker ("Walker Decl."), Docket No. 169 ¶¶ 12–13.) Second, and more critical to the goal of the Actual Delivery Exclusion, the commodities are actually there.*

Id. *There is no contention that Monex does not in fact possess the commodity which the customer borrows, and then sells. The investor takes title, and the title is transferred to Monex by virtue of the customer's sale. (L. Carabini Depo., Docket No. 9–2, Ex. 14 at 97–98.) Louis Carabini points out that the borrower need not sell the commodity, but could maintain it, presumably in a depository. (*Id.*) The analysis would be different if the commodities borrowed and sold were non-existent. Moreover, possession is no longer relevant when the customer completes the short transaction since the purpose of a short transaction is to sell the commodity and divest the investor of ownership.*" [quoting 2018 WL 2110935 at Footnote 6.].

Id. *"In sum, the Court finds that, based on the Eleventh Circuit's construction of "actual delivery" in Hunter Wise, the CFTC's own final interpretation, and the legislative history of the Dodd–Frank amendments to the CEA, Monex's alleged practices of delivering precious metals to independent depositories within 28–days of their purchase by retail customers on margin falls within the Actual Delivery Exception to the CFTC's authority. Accordingly, the Court grants Defendants' motion to dismiss counts one, two, and four 7 of the Complaint."* [quoting 2018 WL 2110935 at *6.].

**The Actual Delivery Exception "bars" enforcement of CEA § 6(c)(1) against Defendants' alleged bitcoin, litecoin, and/or all virtual currency retail commodity spot transactions as bitcoin, litecoin, and/or all virtual currencies settle, *"instant"*, *"on the spot"*, and in *"real-time"* transparently on what is called an "open-source blockchain ledger". Each virtual currency maintains their own blockchain ledger.**

9.

**The Actual Delivery Exemption *"exempts"* bitcoin, litecoin, and/or all virtual currency retail commodity spot transactions executed *"without"* the use of *"leverage"*, *"margin"* and/or *"financing"* as they settle *"instant"*, *"on the spot"*, and in *"real-time"*, 100% satisfying the Plaintiff requirement of 28 day settlement.**

**Furthermore, § 6(c)(1) of the COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS "only" prohibits "fraud-based market manipulation". Plaintiff is not afforded regulatory authority and/or scope of enforcement jurisdiction over Defendant transaction(s) under § 6(c)(1) rendering Plaintiff Complaint dismissive lacking subject-matter jurisdiction and/or personal jurisdiction with Plaintiff Complaint failing to state a claim upon relief can be granted. *Thus*, meriting full dismissal of Plaintiff claim(s).**

Defendants' alleged retail commodity spot transactions involving bitcoin, litecoin, and/or all virtual currencies are not even remotely characterized under the Actual Delivery Exception definition of ***"leveraged"*, *"margined"*,** and/or ***"financed"*** based commodity transactions. Plaintiff alleged claims in Complaint [Docket #1] clearly *'define'* and *'state' in fact*, that "all" Defendants' alleged bitcoin, litecoin, and/or virtual currency retail commodity spot transactions were ***"fully paid type"*** retail commodity spot transactions *"without"* the use of *"leverage"*, *"margin"* and/or *"financing"* legally **exempt** from the Actual Delivery Exemption and Plaintiff regulatory jurisdiction, settling *"instantly"*, *"on the spot"* and in *"real-time"*. **See** 'Exhibit 1a'; 6351-01-P [COMMODITY FUTURES TRADING COMMISSION 17 CFR Part 1 RIN 3038-AE62 Retail Commodity Transactions Involving Virtual Currency. -- Actual Delivery of Virtual Currency -- (*Prepared by the CFTC*)] -- ACTION: "Proposed interpretation"; request for comment. (**NOTE:** *Proposed vs Law*.)

Id. *"Monex argues that the Actual Delivery Exception divests the CFTC of jurisdiction over all claims in the Complaint. (Mem. re MTD, Docket No. 41–1 at 25.) The CFTC contends that it had broad anti-fraud enforcement authority, independent of § 2(c)(2)(D), and therefore § 6(c)(1) nevertheless applies to Monex. (Opp'n to MTD, Docket No. 164 at 19.)"* [quoting 2018 WL 2110935 at *6 (3)(b).].

Id. The Court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The Court's] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (citation omitted).

10.

Id. "Section 2(a)(1)(A) provides that the CFTC "shall have exclusive jurisdiction, except to the extent otherwise provided in ... subsections (c) and (f)." 7 U.S.C. § 2(a)(1)(A). Section 2(c) (2)(D)(ii) provides that "[s]ections 6(a), 6(b), and 6b of this title apply to any agreement, contract or transaction described in clause (i), as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery." Id. § 2(c)(2)(D)(iii). Clause (i) describes the retail commodity transactions covered by "this subparagraph," excepting those transactions described in clause (ii). Id. § 2(c)(2)(D)(i). As noted above, clause (ii) in turn provides that "[t]his subparagraph shall not apply to ... a contract of sale... results in actual delivery within 28 days." Id. § 2(c)(2)(D)(ii). Thus, the plain language of the subparagraph provides the CFTC with exclusive jurisdiction over covered retail commodity transactions to enforce §§ 4(a), 4(b), and 4b of the CEA, 7 U.S.C. §§ 6(a), 6(b), and 6b." [quoting 2018 WL 2110935 at *6 (3)(b).].

Id. "Monex argues that CFTC jurisdiction comes only from § 2, and the CFTC cannot rely on § 6(c)(1) without a jurisdictional grant from § 2. (Reply re MTD, Docket No. 180 at 12.) Section 2 provides the CFTC with exclusive jurisdiction over certain accounts, agreements, and transactions, and divests the CFTC of authority over others, but does not otherwise grant the CFTC with jurisdiction to enforce the provisions of the CEA. See Id. § 2(a)(1)(A). Monex's reliance on CFTC v. White Pine Trust Corp., 574 F.3d 1219 (9th Cir. 2009), to argue otherwise, is misplaced. (See Reply re MTD., Docket No. 180 at 12.) White Pine concerned foreign currency options trading accounts and a different section of the CEA, § 4c(b), 7 U.S.C. § 6c(b). 574 F.3d at 1223. Section 4c(b) only applies to "transactions involving any commodity regulated under this chapter." 7 U.S.C. § 6c(b). The Ninth Circuit construed that limitation to exclude transactions exempted from the CEA's coverage by § 2(c). White Pines, F.3d at 1223. Section 2(c)(1) provides that "[e]xcept as otherwise provided in paragraph (2), nothing in this chapter ... governs or applies to an agreement, contract, or transaction in foreign currency." 7 U.S.C. § 2(c)(1). However, paragraph (2) restored jurisdiction over certain foreign currency transactions. Id. § 2(c)(2)(B). The court ultimately concluded that neither § 2(c)(2)(B) nor § 6c(b) granted the CFTC jurisdiction over the trading accounts at issue in the case. White Pines, F.3d at 1227." [quoting 2018 WL 2110935 at *6 (3)(c).].

Id. "The jurisdictional provision at issue in White Pines is not at issue here. Section 2(c)(1) limits the types of transactions over which the CFTC has jurisdiction, but it does not exclude retail precious metal transactions. See 7 U.S.C. § 2(c)(1). Therefore, the Court need not look to §§ 2(c)(2)(A) or (B) to determine whether or not the conduct at

11.

Id. *issue here is nevertheless within the CFTC's jurisdiction. Instead, § 2(c)(2)(D) merely specifies, irrespective of the exclusions described in § 2(c)(1), which retail commodity transactions to which §§ 4(a), 4(b), and 4b apply, "as if [it was] a contract of sale of a commodity for future delivery.* Id. § 2(c)(2)(D)(iii)."* [quoting 2018 WL 2110935 at \*7.].

Id. *"Moreover, unlike § 4c, § 6(c)(1) does not limit its enforcement to "any transaction involving any commodity regulated under this chapter." By its plain language, § 6(c)(1) applies broadly "to any swap, or a contract of sale of any commodity in interstate commerce." 7 U.S.C. § 9(1). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' " Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) ). Section 6(c)(1) provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."* Id. *Thus, it is not similarly limited to transactions regulated by the CEA."* [quoting 2018 WL 2110935 at \*7 (a).].

Id. *"Monex argues that the rule of lenity mandates a narrow reading of the CFTC's authority in this case. (Mem. re MTD, Docket No. 41–1 at 26.) However, the rule only applies where "after consulting traditional canons of statutory construction, [the Court] is left with an ambiguous statute." Burgess v. United States, 553 U.S. 124, 135 (2008) (quoting United States v. Shabani, 513 U.S. 10, 17 (1994) ). Section 6(c)(1) unambiguously applies broadly to the use or attempted use of any manipulative or deceptive device "in connection with any swap, or a contract of sale of any commodity in interstate commerce."* [quoting 2018 WL 2110935 at \*7 (b).].

## Actual Delivery of Virtual Currency

**6351-01-P [COMMODITY FUTURES TRADING COMMISSION 17 CFR Part 1 RIN 3038-AE62 Retail Commodity Transactions Involving Virtual Currency. -- Actual Delivery of Virtual Currency -- (Prepared by the CFTC)] --**
**ACTION:** "Proposed interpretation"; request for comment. (**NOTE:** Proposed vs Law.)

Id. *"As underscored by its efforts to engage the FinTech community, the Commission emphasizes that it does not intend to impede market-enhancing innovation or otherwise*

Id. harm the evolving virtual currency marketplace with this interpretation. To the contrary, the Commission believes this interpretation can help advance a healthy ecosystem and support further market-enhancing innovation. Additionally, the Commission takes seriously its goal of protecting U.S. retail market participants engaged in the virtual currency marketplace that falls within the Commission's jurisdiction – as it would with respect to retail market participants trading in any other retail commodity marketplace that falls within its jurisdiction.

Id. The Commission drafted this interpretation with such a balance in mind. As discussed above, a retail commodity transaction may be excepted from CEA section 2(c)(2)(D) (and thus not subject to CEA sections 4(a), 4(b), and 4b) if actual delivery of the commodity occurs within 28 days of the transaction. The longstanding Model State Commodity Code also contains an exception from its "commodity contract" regulation when physical settlement occurs within 28 days. However, the Model State Commodity Code provides for the ability to lengthen or shorten its 28-day physical delivery exception time period, while CEA section 2(c)(2)(D) only provides the Commission with the ability to lengthen its actual delivery exception time period.

Id. Therefore, absent Congressional action, the Commission is unable to reduce the actual delivery exception period for speculative, leverage-based retail commodity transactions in virtual currency. **The one-size-fits-all 28 day delivery period in CEA section 2(c)(2)(D) may not properly account for innovation or customary practice in certain cash markets, such as virtual currency transactions that would presumably take much less than 28 days to deliver to a purchaser in a typical spot transaction.** Without the application of CEA section 2(c)(2)(D), retail market participants that transact on platforms offering speculative transactions in virtual currency **(involving margin, leverage, or other financing)** will not be afforded many of the protections that flow from registration under the CEA. **Despite the statutory limitations, the Commission will utilize its current statutory authority as best it can to prevent fraud in retail commodity transactions involving virtual currency.**

Id. The Commission, in interpreting the term actual delivery for the purposes of CEA section 2(c)(2)(D)(ii)(III)(aa), will continue to follow the 2013 Guidance and "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction. Further, the Commission will continue to assess all relevant factors to aid in such an actual delivery determination.

13.

Id. More specifically, the Commission's view of when "actual delivery" has occurred within the context of virtual currency requires: (1) A customer having the ability to: (i) take possession and control of the entire quantity of the commodity, whether it was purchased on margin, or using leverage, or any other financing arrangement, and (ii) use it freely in commerce (both within and away from any particular platform) no later than 28 days from the date of the transaction; and (2) The offeror and counterparty seller (including any of their respective affiliates or other persons acting in concert with the offeror or counterparty seller on a similar basis) not retaining any interest in or control over any of the commodity purchased on margin, leverage, or other financing arrangement at the expiration of 28 days from the date of the transaction.

Id. Consistent with the 2013 Guidance, a sham delivery does not constitute actual delivery for purposes of this interpretation. The offeror and counterparty seller, including their agents, must retain no interest or control whatsoever in the virtual currency acquired by the purchaser at the expiration of 28 days from the date of entering into the transaction. Indeed, in its simplest form, actual delivery of virtual currency connotes the ability of a purchaser to utilize the virtual currency purchased **"on the spot"** to immediately purchase goods or services with the currency elsewhere.

Id. In the context of an "actual delivery" determination in virtual currency, physical settlement of the commodity must occur. A cash settlement or offset mechanism, as described in Example 4 below, will not satisfy the actual delivery exception of CEA section 2(c)(2)(D). The distinction between physical settlement and cash settlement in this context is akin to settlement of a spot foreign currency transaction at a commercial bank or hotel in a foreign nation – the customer receives physical foreign currency, not U.S. dollars. As mentioned, such physical settlement must occur within 28 days from the date on which the "agreement, contract, or transaction is entered into" to constitute "actual delivery."

Id. Consistent with the interpretation above, the Commission provides the following non-exclusive examples to further clarify the meaning of actual delivery in the virtual currency context: **Example 1: Actual delivery of virtual currency will have occurred if, within 28 days of entering into an agreement, contract, or transaction, there is a record on the relevant public distributed ledger network or blockchain of the transfer of virtual currency**, whereby the entire quantity of the purchased virtual currency, including any portion of the purchase made using leverage, margin, or other

14.

*Id. financing, is transferred from the counterparty seller's blockchain wallet to the purchaser's blockchain wallet, the counterparty seller retains no interest in or control over the transferred commodity, and the counterparty seller has transferred title of the commodity to the purchaser.*

*Id. **Example 2: Actual delivery will have occurred if, within 28 days of entering into a transaction:** (1) the counterparty seller has delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, into the possession of a depository (i.e., wallet or other relevant storage system) other than one owned, controlled, or operated by the counterparty seller (including any parent companies, partners, agents, affiliates, and others acting in concert with the counterparty seller) that has entered into an agreement with the purchaser to hold virtual currency as agent for the purchaser without regard to any asserted interest of the offeror, the counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis; (2) the counterparty seller has transferred title of the commodity to the purchaser; (3) the purchaser has secured full control over the virtual currency (i.e., the ability to immediately remove the full amount of purchased commodity from the depository);*

*Id. and (4) no liens (or other interests of the offeror, counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis) resulting from the use of margin, leverage, or financing used to obtain the entire quantity of the commodity purchased will continue forward at the expiration of 28 days from the date of the transaction.*

*Id. **Example 3:** Actual delivery will not have occurred if, within 28 days of entering into a transaction, a book entry is made by the offeror or counterparty seller purporting to show that delivery of the virtual currency has been made to the purchaser, but the counterparty seller or offeror has not, in accordance with the methods described in Example 1 or Example 2, actually delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, and transferred title to that quantity of the virtual currency to the purchaser, regardless of whether the agreement, contract, or transaction between the purchaser and offeror or counterparty seller purports to create an enforceable obligation 72 to deliver the commodity to the purchaser.*

15.

Id. **Example 4:** *Actual delivery will not have occurred if, within 28 days of entering into a transaction, the agreement, contract, or transaction for the purchase or sale of virtual currency is rolled, offset against, netted out, or settled in cash or virtual currency (other than the purchased virtual currency) between the purchaser and the offeror or counterparty seller (or persons acting in concert with the offeror or counterparty seller).*

**PLEASE NOTE:** This is just a **"Proposed interpretation".** *"A Proposed interpretation has no bearing over current regulation already set in place."*

### As noted above;

Id. *The Commission, in interpreting the term actual delivery for the purposes of CEA section 2(c)(2)(D)(ii)(III)(aa), will continue to follow the 2013 Guidance and "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction. Further, the Commission will continue to assess all relevant factors to aid in such an actual delivery determination.*

Id. **Question 1:** *As noted in this proposed interpretation, the Commission is limited in its ability to shorten the length of the actual delivery exception period for retail commodity transactions in virtual currency -- which presumably take much less than 28 days to deliver to a purchaser. Would a 2-day actual delivery period, such as the actual delivery exception in CEA section 2(c)(2)(C), more accurately apply to such transactions in virtual currency?*

Id. *Would another actual delivery period be more appropriate? What additional information should the Commission consider in determining an appropriate actual delivery exception period for retail commodity transactions in virtual currency? If the Commission were to decide that a shorter actual delivery exception period would be more appropriate in the context of virtual currency,* **should the Commission engage Congress to consider an adjustment to CEA section 2(c)(2)(D)'s the actual delivery exception?**

Id. **For example, should the Commission seek that Congress amend CEA section 2(c)(2)(D)'s actual delivery exception to be more aligned with the broader delivery period adjustment language in the Model State Commodity Code?**

16.

Id. **Question 2:** *With respect to the Commission's proposed interpretation, are there additional examples the Commission should consider in satisfaction of the "actual delivery" exception to CEA section 2(c)(2)(D)?*

**The Plaintiff in their proposed interpretation continues to raise a series of questions on this topic including but not limited to;**

Id. *Depending on their use, the tokens or units issued in an ICO may be commodities, commodity options, derivatives, or otherwise fall within the Commission's virtual currency definition described in this interpretation. However, any such tokens that are deemed securities (and trade in a manner that qualifies as a retail commodity transaction) would be* **excepted** *from the retail commodity transaction definition pursuant to section 2(c)(2)(D)(ii)(II) of the Act.* **Are there concerns with the scope of this exception with regard to retail commodity transactions?** *What factors should the Commission consider if it were to issue further guidance regarding this exception?"* [quoting 6351-01-P COMMODITY FUTURES TRADING COMMISSION 17 CFR Part 1 RIN 3038-AE62 Retail Commodity Transactions Involving Virtual Currency at C pages 13-23.]

**Defendants' argue that until Congress rules otherwise "proposed interpretations" are just that, *"proposed"* not defined *regulation* or *rule*.**

Id. *"Section 6(c)(1)* **only prohibits fraud-based market manipulation.***"* [quoting 2018 WL 2110935 at *7 (4).]. Id. *"Monex argues that, regardless of the limitations imposed by the Actual Delivery Exception, § 6(c)(1) only confers anti-fraud jurisdiction where a particular commodity transaction manipulates or potentially manipulates the derivatives market. (See Mem. re MTD, Docket No. 41– 1 at 27; Opp'n to Mot. for PI, Docket No. 166 at 28.) The CFTC argues that § 6(c)(1) is not limited to futures market contracts and applies to retail commodities transactions with or without market manipulation. (Opp'n to MTD, Docket No. 164 at 23.)"* [quoting 2018 WL 2110935 at *7 (4) (a).]. Id. *"Courts must defer to an agency's construction of a statute if Congress has not "spoken directly to the precise question at issue" and the agency's construction of the statute is "permissible." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984). However, if "Congress has directly spoken to the precise question at issue," courts "must give effect to the unambiguously expressed intent of Congress."* Id. *Courts apply "traditional tools of statutory construction" to ascertain whether Congress expressed such an intent.* Id. *at 843 n.9.*

17.

Id. *Additionally, regulations enacted pursuant an express delegation of authority "to elucidate a specific provision of the statute by regulation ... are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute." Id. at 843–44. Therefore, the Court must first decide whether the CEA unambiguously forecloses the CFTC's interpretation, and, if not, whether the interpretation is otherwise an impermissible construction of the CEA. Id. at 843; Barnhart v. Walton, 535 U.S. 212, 218 (2002)." [quoting 2018 WL 2110935 at *7 (4) (b).].*

Id. *"To determine the meaning of a statutory provision, courts "look first to its language, giving the words used their ordinary meaning." Artis v. District of Columbia, 138 S. Ct. 594, 603 (2018) (quoting Moskal v. United States, 498 U.S. 103, 108 (1990)). Section 6(c)(1), titled the "[p]rohibition against manipulation," makes it unlawful to use, "in connection with any swap, or a contract of sale of any commodity in interstate commerce, ... any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." 7 U.S.C. § 9(1) (emphasis added). Terms connected by a disjunctive must ordinarily be given separate meanings. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)." [quoting 2018 WL 2110935 at *8.]. Id. "Pursuant to that rule, the plain language of § 6(c)(1) suggests that Congress intended to prohibit either manipulative or deceptive conduct. However, the rule is not steadfast. See De Sylva v. Ballentine, 351 U.S. 570, 573 (1956) (noting that "the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity"). Another district court interpreting § 6(c)(1) has rejected the argument that its use of "or" necessarily means that the section bars two distinct types of conduct." [quoting 2018 WL 2110935 at *8.]. Id. "CFTC v. Kraft Foods Grp., Inc. ("Kraft I"), 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015) (holding that the § 6(c)(1) barred only fraudulent manipulation, not manipulation in the absence of fraud). The title of § 6(c)(1) sheds light on whether the Court should construe "or" in the disjunctive. See Bhd. of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 529 (1947) (concluding that section headings are may be used as tools for "the resolution of a doubt"). Section 6(c) is titled "Prohibition regarding manipulation and false information." 7 U.S.C. § 9. While § 6(c)(1) is the "Prohibition against manipulation," § 6(c)(2) is the "Prohibition regarding false information," and § 6(c)(3) is entitled "Other manipulation." These headings imply that § 6(c)(1) and § 6(c)(3) concern forms of market manipulation and § 6(c)(2) alone concerns false information. Section 6(c)(2) prohibits making false or misleading statements to the CFTC, but does not otherwise prohibit fraudulent conduct.*

18.

Id. *While "the title of a statute and the heading of a section cannot limit the plain meaning of the text," these headings suggest that the court should construe the prohibition on the use of "manipulative or deceptive device[s] or contrivance[s]" to require both manipulative and deceptive conduct, not one or the other. See Bhd. of R. R. Trainmen, 331 U.S. at 528–29."* [quoting 2018 WL 2110935 at *8.].

Id. *"The rule against surplusage also supports interpreting "manipulative or deceptive" to require both manipulative and deceptive conduct. "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ). Section 4b already prohibits fraud in covered retail commodity transactions. 7 U.S.C. §§ 2(c)(2)(D)(iii), 6b(a)(2)(A) (making it unlawful "for any person, in or in connection with an order to make, or the making of, any contract of sale of any commodity for future delivery or swap, ... to cheat or defraud or attempt to cheat or defraud the other person")."* [quoting 2018 WL 2110935 at *8 (a).].

Id. *"The Actual Delivery Exception exempts retail commodity transactions that result in actual delivery within 28 days from the application of § 4b. Id. § 2(c)(2)(D)(ii)(III)(aa). If the Court were to construe § 6(c)(1) to prohibit all fraud made in connection with any swap, or contract of sale of any commodity in interstate commerce, it would necessarily cover all retail commodity transactions, including those that result in actual delivery within 28 days. Not only would such a construction render § 4b superfluous, it would also eliminate the Actual Delivery Exception. See Corley, 556 U.S. at 314. Moreover, it would make § 6(c)(3), which already prohibits the manipulation of the price of any swap or commodity in interstate commerce, redundant. The Court may not construe § 6(c)(1) to render any other section of the CEA redundant or inoperative. Rather, the Court must "fit, if possible, all parts [of the CEA] into an harmonious whole." Brown, 529 U.S. at 133 (quoting FTC v. Mandel Brothers, Inc., 359 U.S. 385, 389 (1959) ). Construing § 6(c)(1) to prohibit fraudulent conduct alone would violate that basic principle."* [quoting 2018 WL 2110935 at *8 (a).].

Id. *"However, yet another interpretive tool clashes with the rule against superfluity in this instance. "[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter."* [quoting 2018 WL 2110935 at *9.].

19.

Id. "United States v. Novak, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc). Section 10(b) of the Securities Exchange Act ("SEA") similarly prohibits "any manipulative or deceptive device or contrivance" used "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Though the Supreme Court has held that the SEA "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)," it has also explained that "the statute should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.' " S.E.C. v. Zandford, 535 U.S. 813, 819–20 (2002) (citations omitted)." [quoting 2018 WL 2110935 at *9.].

Id. "Moreover, the Supreme Court has "recognized that the interest in 'preserving the integrity of the securities markets' was one of the purposes animating the [SEA]," it has "rejected the notion that § 10(b) is limited to serving that objective alone." Id. at 821–22. The Securities Exchange Commission ("SEC") routinely uses § 10(b) and Rule 10b–5 to prosecute fraud in connection with the purchase or sale of securities. See, e.g., Id. at 825 (holding that allegations of a fraudulent scheme alone adequately stated a claim for violation of § 10(b) )." [quoting 2018 WL 2110935 at *9.]. Id. "The legislative history of § 6(c)(1) clarifies this ostensible conflict. Senator Cantwell introduced section § 6(c)(1) as an amendment to the Senate's version of Dodd–Frank. 156 Cong. Rec. S3099–100 (daily ed. May 4, 2010). Introducing the amendment, Senator Cantwell emphasized that current law made it very difficult for the CFTC to prosecute market manipulation cases because it required the CFTC to prove "specific intent" to manipulate. (RJN, Docket No. 172–1, Ex. 4 at S3348.) She noted that the CFTC had only successfully prosecuted a single case of manipulation. (Id.) Senator Cantwell explained that the amendment would give the CFTC the same "antimanipulation standard" as the Securities Exchange Commission ("SEC"), which only requires a showing of recklessness. (Id.) She noted that the language of § 6(c)(1) closely tracks § 10(b) because "Federal case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner." (Id.) However, she went on to note that the SEC's manipulation authority is only intended to cause "those who attempt to affect the market or prices by artificial means unrelated to the natural forces of supply and demand." (Id.) And she noted that Congress recently granted the same antimanipulation authority to the Federal Energy Regulatory Commission ("FERC") "as a result of the Enron market manipulation," which FERC had used to bring "enforcement actions against manipulation." (Id.) Consistent with Senator Cantwell's remarks, Senator Lincoln, the

20.

Id. then—Chairman of the Senate Committee on Agriculture, explained that § 753 "adds a new anti-manipulation provision to the [CEA] addressing fraud-based manipulation" and that the "new enforcement authority being provided to the CFTC supplements, and does not supplant, its existing antimanipulation authority." 11 (RJN, Docket No. 181–1, Ex. 2 at S5920.)" [quoting 2018 WL 2110935 at \*9 (a).]. Id. "Nowhere does the legislative history contemplate extending CFTC's authority under § 6(c)(1) to allow it to combat fraud absent market manipulation. Senator Cantwell's references to § 10(b) make clear that Congress only intended to lower the scienter standard to recklessness, not adopt wholesale the full scope of enforcement available under § 10(b). (RJN, Docket No. 172–1, Ex. 4 at S3348.)" [quoting 2018 WL 2110935 at \*9 (b).].

Id. "Because § 6(c)(1) unambiguously forecloses the CFTC's interpretation, the Court owes no deference to the its interpretation of the statute. However, the CFTC's interpretation of the statute and its regulations is not entirely inconsistent with the Court's construction. See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398 (July 14, 2011). The CFTC focuses on footnote 37 in the interpretation, which provides that: By way of non-exclusive example, if an entity employed a deceptive device to sell precious metals to customers as a way for the customers to speculate on the value of such commodities, or if an entity employed a deceptive device to sell an agricultural commodity to persons seeking to hedge price risk in that commodity, depending on the facts and circumstances, the Commission would exercise its authority against the entity under Section 6(c)(1) and final Rule 180.1. Id. at 41401 n. 37 (emphasis added). Though the footnote, read in isolation, seems to cover the conduct alleged against Monex, read in context, it is clear that the CFTC only intended for the example to apply in instances of market manipulation. Footnote 37 appends the following sentence: And although CEA section 6(c)(1) and final Rule 180.1 give the Commission broad enforcement authority to prohibit fraud and manipulation in connection with a contract of sale for any commodity in interstate commerce, the Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets. Id. at 41401 (emphasis added). The interpretation goes on to state that "[t]his application of the final Rule respects the jurisdiction that Congress conferred upon the Commission and fulfills its core mission and the purposes of the Act to protect market participants and promote market integrity." Id. [quoting 2018 WL 2110935 at \*10.].

Id. *"Read in its entirety, the CEA unambiguously forecloses the application of § 6(c)(1) in the absence of actual or potential market manipulation. 12 Fundamentally, the Court is tasked with interpreting § 6(c)(1) in a "holistic" manner. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." Id. In this instance, the only plausible interpretation of the Dodd–Frank amendments mandate that § 4b alone prohibits fraud and deceptive conduct, § 6(c)(1) prohibits fraud-based manipulation, and § 6(c)(3) prohibits market manipulation in the absence of fraud."* [quoting 2018 WL 2110935 at *10 (a).].

## III.   <u>CONCLUSION OF LAW</u>

For the foreging reasons, Defendant respectively moves the Court to dismiss Plaintiff Complaint and alleged Count(s) **'with prejudice'** *again*, citing Plaintiff lack of; **Subject-matter jurisdiction** (pursuant to Rule 12 (b)(1), Fed. R. Civ. P.) and/or **Personal Jurisdiction** (pursuant to Rule 12 (b)(2), Fed. R. Civ. P.) and specifically for Plaintiff **Failure to state a claim upon relief can be granted** (pursuant to Rule 12 (b)(6), Fed. R. Civ. P.). The Actual Delivery Exception "bars" enforcement of CEA § 6(c)(1) against Defendants' alleged bitcoin, litecoin, and/or all virtual currency retail commodity spot transactions as bitcoin, litecoin, and/or all virtual currencies settle, *"instant"*, *"on the spot"*, and in *"real-time"* transparently on what is called an "open-source blockchain ledger". Each virtual currency maintains their own blockchain ledger. The Actual Delivery Exemption *"exempts"* bitcoin, litecoin, and/or all virtual currency retail commodity spot transactions executed *"without"* the use of *"leverage"*, *"margin"* and/or *"financing"* as they settle *"instant"*, *"on the spot"*, and in *"real-time"*, 100% satisfying the Plaintiff requirement of 28 day settlement. *Furthermore*, § 6(c)(1) of the COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS "only" prohibits "fraud-based market manipulation". Plaintiff is not afforded regulatory authority and/or scope of enforcement jurisdiction over Defendant transaction(s) under § 6(c)(1) rendering Plaintiff Complaint dismissive lacking subject-matter jurisdiction and/or personal jurisdiction with Plaintiff Complaint failing to state a claim upon relief can be granted. *Thus again*, meriting full dismissal of Plaintiff claim(s)

CC: CFTC

Respectfully Submitted,

May 14, 2018

_Patrick K. McDonnell_

Defendant/Pro Se

Prepared By: Patrick K. McDonnell "Pro Se"

20 Rawson Place, Staten Island, NY 10314

Telephone: (718) 524-6312 Email: cdm@gmx.us

23.

## EXHIBITS

**exhibit 1;** (United States District Court, C.D. California. *COMMODITY FUTURES TRADING COMMISSION v. MONEX CREDIT COMPANY, et al.* Case No. SACV 17-01868 JVS (DFMx) 5/1/18 Westlaw Citation ["2018 WL 2110935"] 11 pages.) and;

**exhibit 1a;** 6351-01-P [COMMODITY FUTURES TRADING COMMISSION 17 CFR Part 1 RIN 3038-AE62 Retail Commodity Transactions Involving Virtual Currency. -- Actual Delivery of Virtual Currency -- (*Prepared by the CFTC*)] -- ACTION: "Proposed interpretation"; request for comment. (**NOTE:** *Proposed vs Law.*)