6351-01-P

**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Part 1**

**RIN 3038-AE62**

**Retail Commodity Transactions Involving Virtual Currency**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Proposed interpretation; request for comment.

**SUMMARY:** The Commodity Futures Trading Commission (the "Commission" or "CFTC") is issuing this proposed interpretation of the term "actual delivery" as set forth in a certain provision of the Commodity Exchange Act ("CEA") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). Specifically, this proposed interpretation is being issued to inform the public of the Commission's views as to the meaning of actual delivery within the specific context of retail commodity transactions in virtual currency. The Commission requests comment on this proposed interpretation and further invites comment on specific questions related to the Commission's treatment of virtual currency transactions.

**DATES:** Comments must be received on or before [INSERT DATE 90 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:** You may submit comments, identified by RIN 3038-AE62, by any of the following methods:

- CFTC website: http://comments.cftc.gov. Follow the instructions for submitting comments through the Comments Online process on the website.

1

- Mail: Christopher Kirkpatrick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Center, 1155 21st Street, NW, Washington, DC 20581.

- Hand Delivery/Courier: Same as Mail, above.

- Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

Please submit your comments using only one method.

All comments must be submitted in English or, if not, accompanied by an English translation. Comments will be posted as received to http://www.cftc.gov. You should submit only information that you wish to make available publicly. If you wish the Commission to consider information that you believe is exempt from disclosure under the Freedom of Information Act ("FOIA"),[1] a petition for confidential treatment of the exempt information may be submitted according to the procedures established in Commission Regulation 145.9.[2]

The Commission reserves the right, but shall have no obligation, to review, pre-screen, filter, redact, refuse or remove any or all of your submission from http://www.cftc.gov that it may deem to be inappropriate for publication, such as obscene language. All submissions that have been redacted or removed that contain comments on the merits of the interpretation will be retained in the public comment file and will be considered as required under the Administrative Procedure Act and other applicable laws, and may be accessible under FOIA.

---

[1] 5 U.S.C. 552.
[2] 17 CFR 145.9. Commission regulations referred to herein are found at 17 CFR Chapter I.

**FOR FURTHER INFORMATION CONTACT:** Philip W. Raimondi, Special

Counsel, (202) 418-5717, praimondi@cftc.gov; or David P. Van Wagner, Chief Counsel,

(202) 418-5481, dvanwagner@cftc.gov; Office of the Chief Counsel, Division of Market

Oversight, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington,

DC 20581.

**SUPPLEMENTARY INFORMATION:**

## I.    Background

With certain exceptions, the CFTC has been granted exclusive jurisdiction over

commodity futures, options, and all other derivatives that fall within the definition of a

swap.[3]  Further, the Commission has been granted general anti-fraud and anti-

manipulation authority over "any swap, or a contract of sale of any commodity in

interstate commerce, or for future delivery on or subject to the rules of any registered

entity."[4]  The Commission's mission is to foster open, transparent, competitive and

financially sound markets; and protect the American public from fraudulent schemes and

abusive practices in those markets and products over which it has been granted

jurisdiction.

Pursuant to CEA section 2(c)(2)(D),[5] the marketplace for "retail commodity

transactions" is one such area over which the Commission has been granted explicit

oversight authority.[6]  CEA section 2(c)(2)(D) applies to any agreement, contract or

---

[3] 7 U.S.C. 2(a)(1)(A).  The CFTC shares its swap jurisdiction in certain aspects with the Securities and Exchange Commission ("SEC").  *See* 7 U.S.C. 2(a)(1)(C).

[4] 7 U.S.C. 9(1).

[5] 7 U.S.C. 2(c)(2)(D).

[6] The authority provided to the Commission by CEA section 2(c)(2)(D) is in addition to, and independent from, the jurisdiction over contracts of sale of a commodity for future delivery and transactions subject to regulation pursuant to CEA section 19 that the CEA has historically granted to the Commission.  It is also in addition to, and independent from, the jurisdiction over swaps granted to the Commission by the Dodd-Frank Act.  Further, the authority granted under CEA section 2(c)(2)(D) is in addition to, and independent

3

transaction in any commodity that is entered into with, or offered to (even if not entered into with), a person that is neither an eligible contract participant[7] nor an eligible commercial entity[8] ("retail") on a leveraged or margined basis, or financed by the offeror, the counterparty or a person acting in concert with the offeror or counterparty on a similar basis.[9]  CEA section 2(c)(2)(D) further provides that such an agreement, contract or transaction is subject to CEA sections 4(a),[10] 4(b),[11] and 4b[12] "as if the agreement, contract or transaction was a contract of sale of a commodity for future delivery."[13]  The statute, however, excepts certain transactions from its application.  In particular, CEA section 2(c)(2)(D)(ii)(III)(aa)[14] excepts a contract of sale that "results in actual delivery within 28 days or such other longer period as the Commission may determine by rule or regulation based upon the typical commercial practice in cash or spot markets for the commodity involved."[15]  If no exception is applicable, these retail transactions are "commodity interests" subject to Commission regulations together with futures, options, and swaps.[16]  Under this authority, the Commission regulates retail commodity

---

of, the Commission's ability to bring enforcement actions for fraud or manipulation in connection with swaps, contracts of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.  7 U.S.C. 9(1), 9(3), 13(a)(2); 17 CFR 180.1, 180.2.

[7] 7 U.S.C. 1a(18).

[8] 7 U.S.C. 1a(17); *see also* 7 U.S.C. 2(c)(2)(D)(iv).

[9] 7 U.S.C. 2(c)(2)(D)(i).

[10] 7 U.S.C. 6(a) (prohibiting the off-exchange trading of futures transactions by U.S. persons unless the transaction is conducted on or subject to the rules of a designated contract market).

[11] 7 U.S.C. 6(b) (permitting foreign boards of trade registered with the Commission with the ability to provide direct access to U.S. persons).

[12] 7 U.S.C. 6b (prohibiting fraudulent conduct in connection with any contract of sale of any commodity in interstate commerce, among other things).

[13] 7 U.S.C. 2(c)(2)(D)(iii).

[14] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[15] The Commission has not adopted any regulations permitting a longer actual delivery period for any commodity pursuant to this statute.  Accordingly, the 28-day actual delivery period remains applicable to all commodities, while retail foreign currency transactions remain subject to a 2-day actual delivery period pursuant to CEA section 2(c)(2)(C).

[16] 17 CFR 1.3(yy).

transactions, with the exception of contracts of sale that result in actual delivery within 28 days.[17]

The Dodd-Frank Act added CEA section 2(c)(2)(D) to address certain judicial uncertainty involving the Commission's regulatory oversight capabilities. The Commission has long held that certain speculative commodity transactions involving leverage or margin may have indicia of futures contracts, subjecting them to Commission oversight.[18] However, judicial decisions emerged that called into question the Commission's oversight over certain leveraged retail transactions in currencies and other commodities.[19] In 2008, Congress addressed this judicial uncertainty by providing the Commission with more explicit authority over retail foreign currency transactions in CEA section 2(c)(2)(C).[20] These new statutory provisions established a two-day actual delivery exception for such transactions.[21] Two years later, Congress provided the Commission with explicit oversight authority over all other "retail commodity transactions" in CEA section 2(c)(2)(D).[22] As noted, these new statutory provisions

---

[17] In addition, certain commercial transactions and securities are excepted pursuant to CEA section 2(c)(2)(D)(ii).

[18] *See In re Stovall*, CFTC Docket No. 75-7 [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777 (CFTC Dec. 6, 1979) (applying traditional elements of a futures contract to a purported cash transaction).

[19] *See, e.g., CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004); *CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008).

[20] *See* Food, Conservation and Energy Act of 2008, Public Law 110-246, 122 Stat. 1651 (2008).

[21] 7 U.S.C. 2(c)(2)(C)(i)(II)(bb)(AA).

[22] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Public Law 111-203, 124 Stat. 1376 (2010); *see also Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture*, 111th Cong. 52–664 (2009) (statement of Rep. Marshall, Member, H. Comm. on Agriculture) ("If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftsmanship is."); 156 Cong. Rec. S5,924 (daily ed. July 15, 2010) (statement of Sen. Lincoln) ("Section 742 corrects [any regulatory uncertainty] by extending the Farm Bill's *'Zelener* fraud fix" to retail off-exchange transactions in *all* commodities.") (emphasis added).

established an exception for instances when actual delivery of the commodity occurs within 28 days.[23]

In connection with its retail commodity transaction oversight, the Commission previously issued a proposed interpretation of the term "actual delivery" in the context of CEA section 2(c)(2)(D), accompanied by a request for comment.[24]   In that interpretation, the Commission provided several examples of what may and may not satisfy the actual delivery exception.  After reviewing public comments, the Commission issued a final interpretation in 2013 (the "2013 Guidance").[25]

The 2013 Guidance explained that the Commission will consider evidence "beyond the four corners of contract documents" to assess whether actual delivery of the commodity occurred.[26]   The Commission further noted that it will "employ a functional approach and examine how the agreement, contract, or transaction is marketed, managed, and performed, instead of relying solely on language used by the parties in the agreement, contract, or transaction."[27]   The 2013 Guidance also included a list of relevant factors the Commission will consider in an actual delivery determination[28] and again provided examples[29] of what may and may not constitute actual delivery.  As per the 2013 Guidance, the only satisfactory examples of actual delivery involve transfer of title and

---

[23] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

[24] Retail Commodity Transactions Under Commodity Exchange Act, 76 FR 77,670 (Dec. 14, 2011).

[25] Retail Commodity Transactions Under Commodity Exchange Act, 78 FR 52,426 (Aug. 23, 2013).

[26] *Id.* at 52,428.

[27] *Id.*

[28] "Relevant factors in this determination include the following: Ownership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction, including all related documentation; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed."  78 FR at 52,428.

[29] In the 2013 Guidance, Examples 1 and 2 illustrate circumstances where actual delivery is made, while Examples 3, 4 and 5 illustrate circumstances where actual delivery is not made.  In setting forth the examples, the Commission made clear that they are non-exclusive and were intended to provide the public with guidance on how the Commission would apply the interpretation.  78 FR at 52,427-28.

possession of the commodity to the purchaser or a depository acting on the purchaser's behalf.[30] Among other things, mere book entries and certain instances where a purchase is "rolled, offset, or otherwise netted with another transaction" do not constitute actual delivery.[31]

Within a year after the 2013 Guidance was released, the Eleventh Circuit issued an opinion affirming a preliminary injunction obtained by the Commission in *CFTC v. Hunter Wise Commodities, LLC.*[32] *Hunter Wise* further reinforced the Commission's interpretation of actual delivery in the 2013 Guidance. Specifically, the Eleventh Circuit recognized that delivery "denotes a transfer of possession and control."[33] Indeed, "[i]f 'actual delivery' means anything, it means something other than simply 'delivery,' for we must attach meaning to Congress's use of the modifier 'actual.'"[34] Accordingly, the Court stated that actual delivery "denotes '[t]he act of giving real and immediate possession to the buyer or the buyer's agent" and constructive delivery does not suffice.[35] Notably, the Eleventh Circuit found that its own holding harmonized with the 2013 Guidance and recognized that the legislative history behind CEA section 2(c)(2)(D) also "complements" its decision.[36]

Soon after the *Hunter Wise* decision, the Commission established that virtual currency is a commodity as that term is defined by CEA section 1a(9).[37] Subsequently,

---

[30] *Id.*

[31] *Id.*

[32] *CFTC v. Hunter Wise Commodities, LLC, et al.*, 749 F.3d 967 (11th Cir. 2014) (hereinafter, *Hunter Wise*).

[33] 749 F.3d at 978-79, (citing *Black's Law Dictionary* 494 (9th ed. 2009)).

[34] 749 F.3d at 979.

[35] *Id.*

[36] 749 F.3d at 977.

[37] *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, 2015 WL 5535736, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,538 (CFTC Sept. 17, 2015) (consent

the Commission brought its first enforcement action against a platform that offered virtual currency transactions to retail customers on a leveraged, margined, or financed basis without registering with the Commission.[38]  In the *Bitfinex* settlement order, the Commission found that the virtual currency platform violated CEA sections 4(a) and 4d because the unregistered entity "did not actually deliver bitcoins purchased from them" as prescribed within the actual delivery exception.[39]  Rather, the entity "held the purchased bitcoins in bitcoin deposit wallets that it owned and controlled."[40]

After *Bitfinex*, the Commission received requests for guidance with regard to the meaning of the actual delivery exception in the specific context of virtual currency transactions.  Accordingly, the Commission has decided to issue this proposed interpretation and seek public comment.  The Commission is issuing this proposed interpretation to inform the public of the Commission's views as to the meaning of the term "actual delivery" in the context of virtual currency and to provide the public with guidance on how the Commission intends to assess whether any given retail commodity transaction in virtual currency (whereby an entity or platform offers margin trading or otherwise facilitates[41] the use of margin, leverage, or financing arrangements for their retail market participants) results in actual delivery, as the term is used in CEA section 2(c)(2)(D)(ii)(III)(aa).[42]  The Commission requests comment generally on this proposed

---

order); *In re TeraExchange LLC*, CFTC Docket No. 15-33, 2015 WL 5658082, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,546 (CFTC Sept. 24, 2015) (consent order).

[38] *In re BFXNA INC. d/b/a BITFINEX*, CFTC Docket No. 16-19 (June 2, 2016) (consent order) (hereinafter, *Bitfinex*).

[39] *Id.*

[40] *Id.*

[41] Specifically, CEA section 2(c)(2)(D)(i) captures any such retail commodity transaction "entered into, or offered … on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."

[42] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).

8

interpretation and further invites comment on specific questions, as outlined within this release.

## II.   Commission Interpretation of Actual Delivery for Virtual Currency

### A.   *Virtual Currency As a Commodity*

As noted previously, the Commission considers virtual currency to be a commodity,[43] like many other intangible commodities that the Commission has recognized over the course of its existence (e.g., renewable energy credits and emission allowances, certain indices, and certain debt instruments, among others).[44]  Indeed, since their inception, virtual currency structures were proposed as digital alternatives to gold and other precious metals.[45]  As a commodity, virtual currency is subject to applicable provisions of the CEA and Commission regulations.

The Commission interprets the term virtual currency broadly.  In the context of this interpretation, virtual or digital currency:[46]  encompasses any digital representation of value (a "digital asset") that functions as a medium of exchange, and any other digital unit of account that is used as a form of a currency (i.e., transferred from one party to another as a medium of exchange); may be manifested through units, tokens, or coins,

---

[43] *In re Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29, 2015 WL 5535736, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,538 (CFTC Sept. 17, 2015) (consent order); *In re TeraExchange LLC*, CFTC Docket No. 15-33, 2015 WL 5658082, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 33,546 (CFTC Sept. 24, 2015) (consent order).

[44] *See generally* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 FR 48,208 at 48,233 (Aug. 13, 2012) (discussing exclusion of the swap forward exclusion to intangible commodities).

[45] Nick Szabo, *Bit gold*, Unenumerated (Dec. 27, 2008), http://unenumerated.blogspot.com/2005/12/bit-gold.html.

[46] The Commission uses the term "virtual currency" and "digital currency" interchangeably for purposes of this proposed interpretation.  However, the Commission acknowledges that the two terms may have certain practical differences in other contexts.  For example, one view is that "digital currency" includes fiat currencies, while "virtual currency" does not.  *See* The Financial Action Task Force [FATF], *Virtual Currencies: Key Definitions and Potential AML/CFT Risks*, at 4 (June 27, 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf. Further, this interpretation is not intended to encompass transactions otherwise covered by CEA section 2(c)(2)(C) and related Commission regulations.

among other things; and may be distributed by way of digital "smart contracts," among other structures.[47]  However, the Commission notes that it does not intend to create a bright line definition at this time given the evolving nature of the commodity and, in some instances, its underlying public distributed ledger technology ("DLT" or "blockchain").

B.      *The Commission's Interest in Virtual Currency*

       The Commission recognizes that certain virtual currencies and their underlying blockchain technologies have the potential to yield notable advancements in applications of financial technology ("FinTech").  Indeed, as part of its efforts to facilitate beneficial FinTech innovation and help ensure market integrity, the Commission launched the LabCFTC initiative.[48]  This initiative provides the Commission with a platform to engage the FinTech community and promote market-enhancing innovation in furtherance of improving the quality, resiliency, and competitiveness of the markets overseen by the Commission.  As such, the Commission is closely following the development and continuing evolution of blockchain technologies and virtual currencies.

       Moreover, since virtual currency can serve as an underlying component of derivatives transactions, the Commission maintains a close interest in the development of the virtual currency marketplace generally.  As a practical matter, virtual currency, by

---

[47] One prominent type of virtual currency is cryptocurrency.  Cryptocurrency is described as "an electronic payment system based on cryptographic proof instead of trust, allowing any two willing parties to transact directly with each other without the need for a trusted third party."  Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008), https://bitcoin.org/bitcoin.pdf.  Transactions are represented by a hash or "chain of digital signatures," which takes into account the previous owner and the next owner.  Given the lack of a centralized authority, transaction verification is "publicly announced" in a transparent ledger "system for participants to agree on a single history" of transactions.  *Id.*  Each transaction moves from one digital wallet to another, recognized as "nodes" on a distributed ledger network.  This structure represents one form of DLT or blockchain technology, which underlies bitcoin – a widely traded virtual currency.

[48] *See* Press Release, Commodity Futures Trading Commission, CFTC Launches LabCFTC as Major FinTech Initiative (May 17, 2017), http://www.cftc.gov/PressRoom/PressReleases/pr7558-17.

virtue of its name, represents a digital medium of exchange for goods and services, similar to fiat currency.[49]  Over time, numerous centralized platforms have emerged as markets to convert virtual currency into fiat currency or other virtual currencies.  These platforms provide a place to immediately exchange one commodity for another "on the spot."

Some of these centralized platforms also attempt to cater to those that wish to speculate on the price movements of a virtual currency against other currencies.  For example, a speculator may purchase virtual currency using borrowed money in the hopes of covering any outstanding balance owed through profits from favorable price movements in the future.  This interpretation is specifically focused on such "retail commodity transactions," whereby an entity or platform:  (i) offers margin trading or otherwise facilitates[50] the use of margin, leverage, or financing arrangements for their retail market participants; (ii) typically to enable such participants to speculate or capitalize on price movements of the commodity – two hallmarks of a regulated futures marketplace.[51]

---

[49] Michael J. Casey and Paul Vigna, *Bitcoin and the Digital-Currency Revolution*, The Wall Street Journal (Jan. 23, 2015), https://www.wsj.com/articles/the-revolutionary-power-of-digital-currency-1422035061 ("Once inside the coffee shop, you will open your wallet's smartphone app and hold its QR code reader up to the coffee shop's device" to buy a cup of coffee).

[50] As noted earlier, CEA section 2(c)(2)(D)(i) captures any such retail transaction "entered into, or offered … on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."  The Commission views any financing arrangements facilitated, arranged, or otherwise endorsed by the offeror or counterparty to satisfy this statutory definition for purposes of this interpretation.

[51] *See, e.g., CFTC v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004) (listing elements typically found in a futures contract); *In re Stovall*, CFTC Docket No. 75-7 [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,777 (CFTC Dec. 6, 1979) (describing how futures contracts, being traded on margin, "are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."); David J. Gilberg, *Regulation of New Financial Instruments Under the Federal Securities and Commodities Laws*, 39 Vand. L. Rev. 1599, 1603-04, n.14 (1986) (typically, futures "traders are interested only in obtaining cash payments of price differentials, not actual commodities").

Beyond their practical and speculative functions, the emergence of these nascent markets has also been negatively marked by a variety of retail customer harm that warrants the Commission's attention, including, among other things, flash crashes and other market disruptions,[52] delayed settlements,[53] alleged spoofing,[54] hacks,[55] alleged internal theft,[56] alleged manipulation,[57] smart contract coding vulnerabilities,[58] bucket shop arrangements and other conflicts of interest.[59] These types of activities perpetrated by bad actors can inhibit market-enhancing innovation, undermine market integrity, and stunt further market development.

---

[52] *See, e.g.*, Paul Vigna, *Virtual Currencies Bitcoin and Ether Wrap Up a Wild Quarter*, The Wall Street Journal, Jul. 3, 2017, at B6 (describing a recent flash crash affecting the price of virtual currency Ether, caused by "a multimillion-dollar sell order" that subsequently "sparked a cascade of stop-loss orders"); Paul Vigna, *BitBeat: Bitcoin Price Drops on Block-Size Debate, 'Flash Crash,'* The Wall Street Journal (Aug. 20, 2015), http://blogs.wsj.com/moneybeat/2015/08/20/bitbeat-bitcoin-price-drops-on-block-size-debate-flash-crash/ ("bitcoin's speculative traders love this kind of stuff [margin trading]; these guys could easily give Wall Street's casino hotshots a run for their money").

[53] Paul Vigna, *Virtual Currencies Bitcoin and Ether Wrap Up a Wild Quarter*, The Wall Street Journal, Jul. 3, 2017, at B6 ("[t]here were delays of hours and even days.").

[54] Lionel Laurent, *Bitcoin Wrestles With Spoofy the Trader*, Bloomberg Gadfly (Aug. 7, 2017), https://www.bloomberg.com/gadfly/articles/2017-08-07/bitcoin-has-a-spoofy-problem.

[55] *See, e.g.*, Paul Vigna and Gregor Stuart Hunter, *Bitcoin Sinks After Exchange Reports Hack*, The Wall Street Journal (Aug. 3, 2016), http://www.wsj.com/articles/bitcoin-sinks-after-exchange-reports-hack-1470195727; Nathaniel Popper and Rachel Abrams, *Apparent Theft Rattles the Bitcoin World*, N.Y. Times, Feb. 25, 2014, at B1; Alex Hern, *A History of Bitcoin Hacks*, The Guardian (Mar. 18, 2014), http://www.theguardian.com/technology/2014/mar/18/history-of-bitcoin-hacks-alternative-currency.

[56] Jessica Lipscomb, *Cryptsy Founder Paul Vernon Disappeared, Along With Millions of His Customers' Cash*, Miami New Times (Jun. 28, 2016), http://www.miaminewtimes.com/news/cryptsy-founder-paul-vernon-disappeared-along-with-millions-of-his-customers-cash-8557571.

[57] Izabella Kaminska, *When OTC markets backfire, bitcoin edition*, Financial Times - Alphaville (Mar. 8, 2017), https://ftalphaville.ft.com/2017/03/08/2185731/when-otc-markets-backfire-bitcoin-edition.

[58] Matthew Leising, *The Ether Thief*, Bloomberg Markets Magazine (Jun. 13, 2017), https://www.bloomberg.com/features/2017-the-ether-thief/ (while not technically an event specific to any one platform, this hack illustrates an event that dramatically affected the price and status of a virtual currency traded on such platforms).

[59] *See, e.g.*, Vitalik Buterin, *Bitfinex: Bitcoinica Rises From The Grave*, Bitcoin Magazine (Nov. 22, 2012), http://bitcoinmagazine.com/articles/bitfinex-bitcoinica-rises-from-the-grave-1353644122; Matt Levine, *How A Bank Should Be?*, Bloomberg View (Mar. 11, 2015), https://www.bloomberg.com/view/articles/2015-03-11/how-should-a-bank-be- ("Just because you mumble the word 'blockchain' doesn't make otherwise illegal things legal"); Matt Levine, *Bitcoin Bucket Shop Kicks Bucket*, Bloomberg View (Jun. 19, 2015), https://www.bloomberg.com/view/articles/2015-06-19/bitcoin-bucket-shop-kicks-bucket.

C.    *Actual Delivery of Virtual Currency*

As underscored by its efforts to engage the FinTech community, the Commission emphasizes that it does not intend to impede market-enhancing innovation or otherwise harm the evolving virtual currency marketplace with this interpretation.  To the contrary, the Commission believes this interpretation can help advance a healthy ecosystem and support further market-enhancing innovation.  Additionally, the Commission takes seriously its goal of protecting U.S. retail market participants engaged in the virtual currency marketplace that falls within the Commission's jurisdiction – as it would with respect to retail market participants trading in any other retail commodity marketplace that falls within its jurisdiction.  The Commission drafted this interpretation with such a balance in mind.

As discussed above, a retail commodity transaction may be excepted from CEA section 2(c)(2)(D) (and thus not subject to CEA sections 4(a), 4(b), and 4b) if actual delivery of the commodity occurs within 28 days of the transaction.[60]  The longstanding Model State Commodity Code also contains an exception from its "commodity contract" regulation when physical settlement occurs within 28 days.[61]  However, the Model State Commodity Code provides for the ability to lengthen *or shorten* its 28-day physical delivery exception time period, while CEA section 2(c)(2)(D) only provides the Commission with the ability to lengthen its actual delivery exception time period.[62]  Therefore, absent Congressional action, the Commission is unable to reduce the actual delivery exception period for speculative, leverage-based retail commodity transactions

---

[60] 7 U.S.C. 2(c)(2)(D)(ii)(III)(aa).
[61] *See* Model State Commodity Code section 1.01(e), [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,568 (Apr. 5, 1985).
[62] To date, the Commission has not chosen to extend the 28-day actual delivery period in any instance.

in virtual currency.  The one-size-fits-all 28 day delivery period in CEA section

2(c)(2)(D) may not properly account for innovation or customary practice in certain cash

markets, such as virtual currency transactions that would presumably take much less than

28 days to deliver to a purchaser in a typical spot transaction.[63]  Without the application

of CEA section 2(c)(2)(D), retail market participants that transact on platforms offering

speculative transactions in virtual currency (involving margin, leverage, or other

financing) will not be afforded many of the protections that flow from registration under

the CEA.  Despite the statutory limitations, the Commission will utilize its current

statutory authority as best it can to prevent fraud in retail commodity transactions

involving virtual currency.

The Commission, in interpreting the term actual delivery for the purposes of CEA

section 2(c)(2)(D)(ii)(III)(aa), will continue to follow the 2013 Guidance and "employ a

functional approach and examine how the agreement, contract, or transaction is marketed,

managed, and performed, instead of relying solely on language used by the parties in the

agreement, contract, or transaction."[64]

Further, the Commission will continue to assess all relevant factors[65] to aid in

such an actual delivery determination.  More specifically, the Commission's view of

when "actual delivery" has occurred within the context of virtual currency requires:

(1) A customer having the ability to:  (i) take possession and control of the entire

quantity of the commodity, whether it was purchased on margin, or using leverage, or

---

[63] Notably, Congress provided a 2-day actual delivery exception for retail foreign currency transactions. *See* 7 U.S.C. 2(c)(2)(C)(i)(II)(bb)(AA).

[64] 78 FR at 52,428.

[65] This list includes, but is not limited to "[o]wnership, possession, title, and physical location of the commodity purchased or sold, both before and after execution of the agreement, contract, or transaction, including all related documentation; the nature of the relationship between the buyer, seller, and possessor of the commodity purchased or sold; and the manner in which the purchase or sale is recorded and completed." *Id.*

any other financing arrangement, and (ii) use it freely in commerce (both within and away from any particular platform) no later than 28 days from the date of the transaction; and

   (2) The offeror and counterparty seller (including any of their respective affiliates or other persons acting in concert with the offeror or counterparty seller on a similar basis)[66] not retaining any interest in or control over any of the commodity purchased on margin, leverage, or other financing arrangement at the expiration of 28 days from the date of the transaction.[67]

   Consistent with the 2013 Guidance, a sham delivery does not constitute actual delivery for purposes of this interpretation. The offeror and counterparty seller, including their agents, must retain no interest or control whatsoever in the virtual currency acquired by the purchaser at the expiration of 28 days from the date of entering into the transaction. Indeed, in its simplest form, actual delivery of virtual currency connotes the ability of a purchaser to utilize the virtual currency purchased "on the spot" to immediately purchase goods or services with the currency elsewhere.

   In the context of an "actual delivery" determination in virtual currency, physical settlement of the commodity must occur. A cash settlement or offset mechanism, as described in Example 4 below, will not satisfy the actual delivery exception of CEA

---

[66] The Commission recognizes that the offeror of the transaction and the ultimate counterparty may be two separate entities or may be the same. For example, the Commission would consider as the offeror of the transaction a virtual currency platform that makes the transaction available to the retail customer or otherwise facilitates the transaction. That virtual currency platform could also be considered a counterparty to the transaction if, for example, the platform itself took the opposite side of the transaction or the purchaser of the virtual currency enjoyed privity of contract solely with the platform rather than the seller. Additionally, the Commission recognizes that some virtual currency platforms may provide a purchaser with the ability to source financing or leverage from other users or third parties. The Commission would consider such third parties or other users to be acting in concert with the offeror or counterparty seller on a similar basis.

[67] Among other things, the Commission may look at whether the offeror or seller retain any ability to access or withdraw any quantity of the commodity purchased from the purchaser's account or wallet.

section 2(c)(2)(D).  The distinction between physical settlement and cash settlement in this context is akin to settlement of a spot foreign currency transaction at a commercial bank or hotel in a foreign nation – the customer receives physical foreign currency, not U.S. dollars.  As mentioned, such physical settlement must occur within 28 days from the date on which the "agreement, contract, or transaction is entered into" to constitute "actual delivery."[68]

Consistent with the interpretation above, the Commission provides the following non-exclusive examples to further clarify the meaning of actual delivery in the virtual currency context:

*Example 1*:  Actual delivery of virtual currency will have occurred if, within 28 days of entering into an agreement, contract, or transaction, there is a record on the relevant public distributed ledger network or blockchain of the transfer of virtual currency, whereby the entire quantity of the purchased virtual currency, including any portion of the purchase made using leverage, margin, or other financing, is transferred from the counterparty seller's blockchain wallet[69] to the purchaser's blockchain wallet, the counterparty seller retains no interest in or control over the transferred commodity, and the counterparty seller has transferred title[70] of the commodity to the purchaser. When a matching platform or other third party offeror acts as an intermediary, the virtual currency's public distributed ledger must reflect the purchased virtual currency transferring from the counterparty seller's blockchain wallet to the third party offeror's

---

[68] 78 FR at 52,427.

[69] The source of the virtual currency is provided for purposes of this example.  However, the focus of this analysis remains on the actions that would constitute actual delivery of the virtual currency to the purchaser.

[70] For purposes of this interpretation, title may be reflected by linking an individual purchaser with proof of ownership of the particular wallet or wallets that contain the purchased virtual currency.

blockchain wallet and, separately, from the third party offeror's blockchain wallet to the purchaser's blockchain wallet, provided that the purchaser's wallet is not affiliated with or controlled by the counterparty seller or third party offeror in any manner.

*Example 2*:  Actual delivery will have occurred if, within 28 days of entering into a transaction:  (1) the counterparty seller has delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, into the possession of a depository (i.e., wallet or other relevant storage system) other than one owned, controlled, or operated by the counterparty seller (including any parent companies, partners, agents, affiliates, and others acting in concert with the counterparty seller)[71] that has entered into an agreement with the purchaser to hold virtual currency as agent for the purchaser without regard to any asserted interest of the offeror, the counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis; (2) the counterparty seller has transferred title of the commodity to the purchaser; (3) the purchaser has secured full control over the virtual currency (i.e., the ability to immediately remove the full amount of purchased commodity from the depository); and (4) no liens (or other interests of the offeror, counterparty seller, or persons acting in concert with the offeror or counterparty seller on a similar basis) resulting from the use of margin, leverage, or financing used to obtain the entire quantity of the commodity purchased will continue forward at the expiration of 28 days from the date of the transaction.

---

[71] The Commission recognizes that an offeror could act in concert with both the purchaser and the counterparty seller in the ordinary course of business if it intermediates a transaction.  It is not intended that such activity would prevent an offeror from associating with a depository, as otherwise allowed by this example.

*Example 3*:  Actual delivery will *not* have occurred if, within 28 days of entering into a transaction, a book entry is made by the offeror or counterparty seller purporting to show that delivery of the virtual currency has been made to the purchaser, but the counterparty seller or offeror has *not*, in accordance with the methods described in Example 1 or Example 2, actually delivered the entire quantity of the virtual currency purchased, including any portion of the purchase made using leverage, margin, or financing, and transferred title to that quantity of the virtual currency to the purchaser, regardless of whether the agreement, contract, or transaction between the purchaser and offeror or counterparty seller purports to create an enforceable obligation[72] to deliver the commodity to the purchaser.

*Example 4*:  Actual delivery will *not* have occurred if, within 28 days of entering into a transaction, the agreement, contract, or transaction for the purchase or sale of virtual currency is rolled, offset against, netted out, or settled in cash or virtual currency (other than the purchased virtual currency) between the purchaser and the offeror or counterparty seller (or persons acting in concert with the offeror or counterparty seller).

## III.    Request for Comment

The Commission requests comment from the public regarding the Commission's proposed interpretation of "actual delivery" in the context of virtual currency and further invites comments on specific questions related to the Commission's treatment of virtual currency transactions.  The Commission encourages all comments including background information, actual market examples, best practice principles, expectations for the

---

[72] This "enforceable obligation" language is provided in reference to an exception to CEA section 2(c)(2)(D) that is limited by its terms to a commercial transaction involving two commercial entities with a pre-existing line of business in the commodity at issue that is separate and distinct from the business of engaging in a retail commodity transaction.  *See* 7 U.S.C. 2(c)(2)(D)(ii)(III)(bb).

possible impact on further innovation, and estimates of any asserted costs and expenses.

Specifically, the Commission requests comment on the following questions:

*Question 1*:  As noted in this proposed interpretation, the Commission is limited in its ability to shorten the length of the actual delivery exception period for retail commodity transactions in virtual currency -- which presumably take much less than 28 days to deliver to a purchaser.  Would a 2-day actual delivery period, such as the actual delivery exception in CEA section 2(c)(2)(C), more accurately apply to such transactions in virtual currency?  Would another actual delivery period be more appropriate?  What additional information should the Commission consider in determining an appropriate actual delivery exception period for retail commodity transactions in virtual currency?  If the Commission were to decide that a shorter actual delivery exception period would be more appropriate in the context of virtual currency, should the Commission engage Congress to consider an adjustment to CEA section 2(c)(2)(D)'s the actual delivery exception?  For example, should the Commission seek that Congress amend CEA section 2(c)(2)(D)'s actual delivery exception to be more aligned with the broader delivery period adjustment language in the Model State Commodity Code?

*Question 2*:  With respect to the Commission's proposed interpretation, are there additional examples the Commission should consider in satisfaction of the "actual delivery" exception to CEA section 2(c)(2)(D)?

*Question 3*:  The Commission is concerned about offerors of virtual currency retail commodity transactions that may be subject to conflicts of interest, including situations such as an offeror or its principals taking the opposite side of a customer transaction, either directly or through an affiliated liquidity provider or market maker.

These arrangements may, in certain circumstances, resemble bucket shops.[73]  How should the Commission evaluate such circumstances if a platform seeks to avail itself of the actual delivery exception?  Are there any additional factors that the Commission should consider in its determination of whether the "actual delivery" exception is available?

*Question 4*:  As noted above, CEA sections 4(a), 4(b), and 4b apply to retail commodity transactions "as if" the transaction was a futures contract.[74]  Therefore, absent an exception, a retail commodity transaction must be offered on or subject to the rules of a designated contract market ("DCM").[75]  Separately, an entity soliciting or accepting orders for retail commodity transactions and accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure such transactions must register with the Commission as a futures commission merchant ("FCM").[76]  As a result of these requirements, the Commission recognizes that certain entities or platforms will choose not to offer virtual currency retail commodity transactions.  This business decision is not unique to any particular commodity.  However, as noted earlier, the Commission does not intend to stifle innovation.  Rather, it is acting to protect U.S. retail customers regarding transactions that fall within its jurisdiction.  Therefore, the Commission requests comments as to what factors may be relevant to consider regarding the Commission's potential use of its exemptive authority under CEA section 4(c)[77] in this regard.  For example, please note any advantages and disadvantages regarding the

---

[73] Vitalik Buterin, *Bitfinex: Bitcoinica Rises From The Grave*, Bitcoin Magazine (Nov. 22, 2012), http://bitcoinmagazine.com/articles/bitfinex-bitcoinica-rises-from-the-grave-1353644122 (describing a bucket shop arrangement whereby a platform "steps in and acts as the counterparty to some of its users," creating "perverse incentives").
[74] 7 U.S.C. 2(c)(2)(D)(iii).
[75] 7 U.S.C. 6(a).
[76] 7 U.S.C. 1a(28); 7 U.S.C. 6d(a).
[77] 7 U.S.C. 6(c).

potential to establish a distinct registration and compliance regime for entities that seek to offer retail commodity transactions in virtual currency. Why would such treatment be uniquely warranted[78] in the context of virtual currency? Please also note any other issues that the Commission should consider regarding such an analysis. What other alternatives should the Commission consider instead of establishing a distinct registration and compliance regime?

*Question 5*: In Example 2, the Commission sets forth a proposed set of facts that permits actual delivery to a depository instead of the purchaser. What should the Commission consider in further clarifying the meaning of "depository" for purposes of this interpretation? For example, could the depository maintain certain licenses or registrations in order to qualify for this example? In addition, should the Commission further prohibit the depository from being owned or operated by the offeror (including any offeror parent company, partner, agent, and other affiliates)? Please note any factors the Commission should consider in making this determination (such as the effect of contractual agreements between the depository and the offeror).

*Question 6*: Example 2 also requires the purchaser to secure full control over the virtual currency once it is deposited in a depository in order for the fact pattern to constitute actual delivery. The Commission requests comment regarding what types of circumstances would ensure a purchaser has obtained "full control" of the commodity. For example, is possession of a unique key or other credentials that allow full access and ability to transfer virtual currency sufficient to provide full control? Similarly, how

---

[78] Arguably, beyond the distributed ledger technologies, entities offering virtual currency retail commodity transactions operate in a similar manner to any other entity offering retail commodity transactions online.

should the Commission view full control by a user in light of commonly used cybersecurity techniques and money transmitter procedures otherwise required by law?

*Question 7*:  Example 2 also requires that no liens resulting from the use of margin, leverage, or financing used to obtain the entire quantity of the commodity purchased by the buyer continue forward at the expiration of 28 days from the date of the transaction.  The Commission requests comment regarding circumstances under which a lien would be considered terminated for purposes of this interpretation.  For example, are there circumstances where the Commission should consider allowing "forced sale" scenarios, whereby the purchased virtual currency is used to satisfy any resulting liens from the retail commodity transaction, while still interpreting the transaction as having resulted in actual delivery to the purchaser?  Should the Commission consider other types of lien scenarios or interests, such as those liens that would not provide a right to repossession of the commodity?

*Question 8*:  As noted above, the status of "title" is one of the factors the Commission considers in an actual delivery determination for retail commodity transactions.[79]  In Examples 1 and 2, this interpretation notes that "title" may be reflected by linking an individual purchaser with proof of ownership of the particular wallet or wallets that contain the purchased virtual currency.  What additional examples, if any, should the Commission consider to address the status of "title" for the purposes of an actual delivery determination?

*Question 9*:  While this interpretation is solely focused on the actual delivery exception to CEA section 2(c)(2)(D), the Commission recognizes other exceptions may

---

[79] *See* 78 FR at 52,428.

be available.[80]  Specifically, the Commission recognizes that the SEC recently issued a statement regarding the application of federal securities laws to certain initial coin offerings ("ICOs").[81]  Depending on their use, the tokens or units issued in an ICO may be commodities, commodity options, derivatives, or otherwise fall within the Commission's virtual currency definition described in this interpretation.  However, any such tokens that are deemed securities (and trade in a manner that qualifies as a retail commodity transaction) would be excepted from the retail commodity transaction definition pursuant to section 2(c)(2)(D)(ii)(II) of the Act.  Are there concerns with the scope of this exception with regard to retail commodity transactions?  What factors should the Commission consider if it were to issue further guidance regarding this exception?

Issued in Washington, DC, on December 15, 2017 by the Commission.


Christopher J. Kirkpatrick,

*Secretary of the Commission.*

**Appendix to Retail Commodity Transactions Involving Virtual Currency –**

**Commission Voting Summary**

On this matter, Chairman Giancarlo and Commissioners Quintenz and Behnam voted in the affirmative.  No Commissioner voted in the negative.

---

[80] *See generally* 7 U.S.C. 2(c)(2)(D)(ii).
[81] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207 (Jul. 25, 2017).