1

1

2

3          UNITED STATES OF AMERICA

4     COMMODITY FUTURES TRADING COMMISSION

5

6

7

8

9

10     PUBLIC MEETING OF ADVISORY COMMITTEE

11

12

13

14

15

16

17

18            Washington, D.C.

19      Wednesday, October 26, 2010

20

21

22

2

```
 1    PARTICIPANTS:

 2    Commission Members:

 3         GARY GENSLER, Chairman

 4         BART CHILTON, Commissioner

 5         MICHAEL V. DUNN, Commissioner

 6         SCOTT D. O'MALIA, Commissioner

 7         JILL E. SOMMERS, Commissioner

 8    Staff:

 9         ADRIANNE JOVES

10         General Counsel

11

12         BELLA ROZENBERG

13         Division of Market Oversight

14

15         JON DEBORD

16         Division of Clearing and Intermediary Oversight

17

18         EILEEN DONOVAN

19         Division of Clearing and Intermediary Oversight

20

21         ROBERT PEASE

22         Division of Enforcement
```

3

```
 1                  P R O C E E D I N G S

 2                       (9:30 a.m.)

 3          CHAIRMAN GENSLER:  Good morning.  This

 4    meeting will come to order.  This is a public meeting
in

 5    the Commodity Futures Trading Commission to consider

 6    issuance of a number of proposed rules to further the

 7    Commissions' actions on the Dodd-Frank Reform and

 8    Consumer Product Act.

 9              Today we will be considering -- it's six,
but

10    let me list them.  It's six rules, I think:

11    Certification and Approval of Rules, and New Products
for

12    Designated Contract Markets, Derivative Clearing

13    Organizations, Swap Execution Facilities, and Swap Data

14    Repositories.  These are rules that would have on how

15    they move forward on their rules.

16              Secondly, removing, as the Dodd-Frank Act

17    asked us to do, any reliance on credit ratings in
various

18    Commission regulations.

19              Thirdly, amending various regulations we have

20    to provide greater protections for customer funds held
by

21    futures, commission, merchants, and derivative, and

22    clearing organizations.
```

4

1          Fourthly, I processed a review in the

2     designation of swaps for mandatory clearing.

3          Fifthly, enhancing the Commission's ability

4     to protect against manipulation.

5          And then sixth, an advanced notice of

6     proposed rulemakings.  This is not actually a proposed

7     rule, but it's to ask the public -- I think it's 18

8     questions -- advanced notice and proposed rulemaking on

9     disruptive trading practices.

10          Before we hear from the staff, once again I'd

11     like to thank my fellow Commissioners for all of their

12     hard work on the Dodd-Frank Act and all of our existing

13     authorities.

14          I believe that Commissioner Dunn, I just want

15     to make sure, is tied in somehow through modern

16     technology.  Commissioner Dunn, are you with us?

17          COMMISSIONER DUNN:  I am here.

18          CHAIRMAN GENSLER:  Terrific.

19          COMMISSIONER SOMMERS:  He's on the video.

20          CHAIRMAN GENSLER:  He's on the video there in

21     our Chicago office, if I understand it right.  I would

22     also like to welcome members of the public market

5

1    participates and members of the media to today's
meeting,

2    as well as welcome those listening and watching by

3    webcast.

4              This is our third public meeting to
consider

5    Dodd-Frank rulemaking.  And included in today's
actions,

6    I anticipate that we will have published two final
rules;

7    one of them called an "interim final rule."  I think
that

8    we would have proposed 11 rules, if the rule count is

9    correct, and published three advanced notices of
proposed

10   rulemakings.

11             And while a great deal of effort is going

12   into this, this is still likely to be about a quarter
of

13   the work that we have.  And that's only a quarter in
the

14   first phase called proposals; because, of course,
really

15   the very importance of finalizing these rules next
spring

16   will be before us.

17             We currently plan to have at least three

18   public meetings in November and two public meetings in

19   December.  The dates and topics will be published, of

20   course, in the Federal Register.  And we're looking to

21   our next meeting on the Dodd-Frank Act rulemaking on

22   November 10.

6

```
 1              The arithmetic of course will show that
 2     this will be a very busy next seven weeks.  And no
doubt
 3     as we're human, some of these rules may slip.
 4              And there will be new stories, I guess,
on
 5     whatever that may be.  Butour goal is really to
complete
 6     the proposal stage by mid December.  And as you will
see
 7     even on this disruptive trade practices, we'll probably
 8     have that proposal after mid December because we
thought
 9     it was appropriate to go out to the public to get more
10     information.
11              I want to thank the staff for all of the
12     work that they've put in drafting the rulemakings and
13     consideration today.  I thank them for their thoughtful
14     recommendations how the Commission shall go forward.
And
15     we look forward to receiving the public comment which
is
16     really just enormously critical for us.
17              These, again, are just proposals that we're
18     considering.  So each of these rules will have a
serious
19     of questions in them and seek public comment.
20              We're also putting fact sheets and Q&As on
```

21     our website, which I hope will help the public understand

22     what we're doing.

7

1          Before we turn to the staff, I would like to

2      turn my fellow Commissioners for opening statements.  I

3      think Commissioner Dunn, if we can do this through the

4      video conference.

5          COMMISSIONER DUNN:  Thank you Mr. Chairman.

6      Is this working?

7          CHAIRMAN GENSLER:  Yes.

8          COMMISSIONER DUNN:  Can you hear me?

9          CHAIRMAN GENSLER:  We can hear you very well.

10         COMMISSIONER DUNN:  Fine.  Today we will

11     consider the next set of proposed rules that come before

12     the Commission pursuant to the Dodd-Frank Act.  As with

13     other proposed rules, today's set of rules offer a

14     glimpse into the resource-intense reengineering the CFTC

15     will be doing throughout to provide regulatory framework

16     to prevent many new -- to implement many new

17     responsibilities under the Dodd-Frank.

18         As I have previously stated, I am very

19     concerned about the CFTC budget situation and possible

20     attempts to thwart implementation of the Dodd-Frank by

21     cutting off funding for this agency.  There was just a

22     piece in Reuters this morning indicating that that
might

8

1    be a strategy.  Without the requisite level of funding, I

2    see possibilities of several unfortunate outcomes as a

3    result of that.  Let me enumerate these.

4              First, without the necessary human capital

5    to review new SEFs, DCMs and DCOs applications, I can

6    envision a long waiting periods for potential registrants

7    before their applications are approved to conduct

8    business in the markets we regulate.

9              This inability to quickly and efficiently

10   process applications, through no fault of the SEF, would

11   undoubtedly prevent the immediate creation of a

12   competitive market environment, at least in the OTC

13   space.  And may lead to greater systemic risk as portions

14   become concentrated in the small group of SEFs, DCMs, and

15   DCOs that are not versed to navigate the registration

16   process.

17             Similarly, the lack of adequate resources may

18   undoubtedly affect the agency's ability to approve new

19   products for trading.  If the CFTC does not have the

20   people to review new product applications to ensure they

21    are not violative of the Act and are not readily

22    susceptible to manipulation, the new products cannot be

9

1    listed for trading.

2              Again, I fear that a long queue will

3    develop for new products waiting approval.  And that the

4    inability to get new products approved will prevent

5    innovation and competition in our markets.

6              Without adequate funding, the CFTC may need

7    to delegate a substantial portion of its duties under

8    Dodd-Frank to the industry established as SROs.

9              If we cannot be the frontline regulator, it

10   is incumbent upon the Commission to find someone who will

11   be.  Delegation of this oversight duties to the existing

12   SROs will obviously be very costly to them, but

13   necessary.

14             And lastly, a principle-based regulatory

15   regime only works if the regulator has the staff

16   necessary to ensure that its regulatees are adhering to

17   the principle.  Without sufficient staff to conduct

18   proper oversight, the CFTC may need to write a more

19   prescriptive set of rules and rely more heavily on

20   burdensome reporting requirements.  Again, this

21   undoubtedly will be very costly to the industry and

22   market users.

10

1          It is my hope the CFTC receive the necessary

2     funding and allow us to continue to provide the quality

3     oversight it's always provided.  This oversight to

4     following a principles-based approach in my opinion

5     fosters an environment of compliance, competition, and

6     innovation.

7          Mr. Chairman, I want to thank you and I want

8     to thank the staff for again hosting these series of

9     meetings.  I think this has been one of the most open

10    processes that any regulators has ever had asked.  And I

11    appreciate all of the hard work that has gone into it.

12    Thank you.

13         CHAIRMAN GENSLER:  Thank you, Commissioner

14    Dunn for your remarks.  Commissioner Sommers?

15         COMMISSIONER SOMMERS:  Thank you, Mr.

16    Chairman.  I want to say that I first agree with many of

17    the comments made by Commissioner Dunn this morning

18    regarding our resource restraints.  And I hope that that

19    gets worked out as Congress returns.

20         I want to say thank you to the rulemaking

21    teams for all of their hard work that have been put into

22    these proposals that are before us today.

11

1          And I guess I thought that with proposing our

2     11 rule today out of 30 rulemaking teams, that we were a

3     third finished, not a quarter finished.

4          CHAIRMAN GENSLER:  Commissioner Sommers, my

5     math is not very good.

6          COMMISSIONER SOMMERS:  Okay.  Good.  I was

7     thinking there's something I don't know about this.

8          CHAIRMAN GENSLER:  Well, I do have to admit

9     that Sarah has broken her business conduct into numerous

10    rules.

11         COMMISSIONER SOMMERS:  Right.  There's more

12    than we even know.  Anyway, thank you very much.  I look

13    forward to discussing the important rules before us this

14    morning.

15         CHAIRMAN GENSLER:  Thank you, Commissioner

16    Sommers.  Commissioner Chilton?

17         COMMISSIONER CHILTON:  Thanks, Mr. Chairman.

18    I agree with the fiscal concerns that were raised by

19    Commissioner Dunn and Commissioner Sommers and constantly

20    by our Chairman and by our appropriations s staff, too.

21         This is important because we're dealing

22      with anti-disruptive practices and with manipulation.

12

1    The law has been really weak in these regards over the

2    years, which is why many of us fought to get it

changed.

3    And this rule, the proposal will help promulgate these

4    things.  And we will be better to enforce the rules to

5    make more efficient, effective markets in the future

6             I did want to take a moment to comment on

7    precious metals, in particular silver.  We've been

having

8    an investigation that's been going on 25 months now.

And

9    I've been urging -- not that there's any individual

that

10   has not agreed, but I've been urging that we say

11   something publically at some point.

12             I think that the public has been for two

13   years asking about whether or not there's wide-spread

14   manipulation in the markets.  And it just seems to me

15   that after a couple of years we should say something.

We

16   can say yes.  We can say no.  But it's time to say

17   something.

18             The legal definition, as I said, of

19   manipulation is really hard to prove.  It's a high bar.

20   It's a much test.  It's a much different test than what

21   the average person if we walked out on the street might

22   think of as manipulation; because you not only need to

13

1    have a specific intent, but you also need to prove as a

2    result of that intent and the market control that the

3    adaptively caused an artificial price.  And causing an

4    artificial price is something that can be debated by an

5    economist, so it's a really high bar.  But what we're

6    doing today will help in that regard.

7                    Attempted manipulation is a little easier
to

8    prove than manipulation.  It requires the intent to

9    manipulate and some overt act in furtherance of that

10   intent.

11                   And then there are lesser violations,
there's

12   are several of them.  And after we do disruptive
trading

13   practices, there will be even more.  So we will be
adding

14   additional tools to sort of our tool box of things that

15   can help in these markets.

16                   I do believe that there have been repeated

17   attempts to influence price in the silver markets.
There

18   has been fraudulent efforts to persuade what I consider

19   deviously control that price.  And this is based upon

20   what I have been told by members of the public and

21   reviewed in pubically, available documents.

22                              I believe there are violations to
Commodities

14

1    Exchange Act that have taken place in the silver
markets.

2    And that any such violation should be en forcibly

3    prosecuted by the government.

4           Now, in saying this, I'm prohibited from

5    divulging anything about ur investigation, about
getting

6    individual trader names, or about positions, and I'm

7    specifically not doing.  And I can't pre-judge anything

8    that my colleagues and I may or may not do on this or
any

9    other matter.

10          So I appreciate that we're going forward on

11   this.  I believe that disruptive trading and the

12   anti-manipulation rule along with position limits will

13   help not only the precious metal markets and fully

14   implemented, but help all markets to make them more

15   efficient and effective and avoid fraud, abuse, and

16   manipulation.  Thank you.

17          CHAIRMAN GENSLER:  Thank you, Commissioner

18   Chilton.  Commissioner O'Malia?

19          COMMISSIONER O'MALIA:  Thank you, Mr.

20   Chairman.  I would like to thank the teams for their
many

21   long hours developing these rules that we will consider

22   here today.  The staff has activity sought input from
the

15

1    Commissioners and worked cooperatively to approve each

2    these rulemakings.

3              I'd like to thank Bella Rozenburg and her

4    team, Adrianne Joves, and Eileen O'Donovan and their

5    respective teams.  I would also like to thank Phyllis

6    Dietz and John DeBord for their efforts.

7              However, I'm quite concerned about the

8    proposed rule with the investment customer funds.  I

9    think they're overly prescriptive, especially given that

10   the Commission released an advanced notice of public

11   ruling on this very issue in May of 2009.

12             My main concern with this proposal is that

13   the Commission is proposing to significantly revise the

14   scope and f character of permitted investments of

15   customer funds in the face of numerous public comments to

16   the contrary.

17             In fact, the concentration limits in today's

18   proposed rule seem to suggest that the 2000 plus pages of

19   the Dodd-Frank Act have done nothing to improve the

20   safety and the liquidity of the money market funds.

21             I strongly urge the public to comment on the

22     reasonableness of the asset-backed concentration

limits,

16

1    especially the 10 percent limitation on money-market

2    funds.  I also question whether it is wise to allow 50

3    percent of the allocation to be invested in one

4    government-sponsored enterprise.

5                 I intend to oppose the rulemaking, as it

6    fails to consider the public comments and fails to

7    provide sufficient justification for the proposed

8    allocations.

9                 Moving to the Anti-Manipulation.  I'd like to

10   thank Bob Pease and Mark Higgins for their efforts to

11   present us with rules regarding an incredible

12   controversial area of our law.

13                In the vernacular of the futures industries,

14   there is one term that stands out above all others.

15   Manipulation.  "M" is the Scarlet Letter of the futures

16   market.

17                When the Enforcement Division, traders, and

18   the defense bar speaking of the big "M" they are thinking

19   of a very specific kind of conduct.  The intentional

20   creation of an artificial price, as Commissioner Chilton

21   pointed it out.

22                It requires having the specific intent to

17

1    affect prices in a manner that is not legitimately

2    brought about by the forces of supply and demand.

3              To fully comprehend the scope of this

4    rulemaking and the advanced notice of proposed rulemaking

5    on disruptive trading practices, one must understand the

6    range of prohibited misconduct under the CEA.

7              To do this, it helps to the think of the

8    possible violations of the CEA on a continuum ranging

9    from the trade price violations such as wash sales to

10   full manipulation.

11             New sections provided by the Dodd-Frank Act

12   and provide additional points on the continuum in the

13   form of disruptive trading practices and fraud-based

14   manipulative schemes.  The placement of these points on

15   the continuum will be determined by these rulemakings.

16             The foundation of the Commission's rulemaking

17   authority is preserved on one end of the continuum to the

18   new section 6(c)(3).  These rulemakings mirror the

19   statutory prohibition to clarify the Commission's

20   interpretation of price manipulation is an intentional

21   interference with the legitimate forces of supply and

22   demand.

18

1          It is important to know this will not change

2     the Commission's enforcement under the existing 9(a)(2).

3     Fraud-based manipulative schemes described in new section

4     6(c)(1) differs from big "M" manipulation in that the

5     prohibited conduct may be intentional or reckless.  And

6     that there is no requirement for such conduct to result

7     in artificial price.

8          Taking one step back along the continuum,

9     disruptive trading practices are also defined in some

10    instances as reckless conduct.

11         Accordingly, trade strategy that is executed

12    under unpredictable, atypical market conditions could

13    misfire and fall under the enumerated disruptive trading,

14    practices.

15         If the Commission determines that the

16    strategy was engaged in recklessly, it could find that

17    the strategy was manipulative even if the trader had no

18    intent to impact market prices or disrupt the market

19    itself.  This would be an aggressive outcome, but it is

20    entirely possible under this continuum.

21         It is therefore incumbent upon this

22    Commission to be clear about which type of activity is

19

1    prohibited and how we intend to use our new
authorities.

2                     Last week NFL Commissioner Roger Goodell

3    notified players that striking an opponent in the head

4    and neck will result far more significant discipline

5    including suspension.

6                     When I read this, I realized that

7    Commissioner Goodell's job is very similar to that of
the

8    Commission.  He places a high priority on protecting
the

9    players from needless injury.

10                    The CFTC also places an equal value on

11   protecting markets participants from manipulation,
market

12   disruptions, fraudulent behavior, and other abuse

13   practices.  The new statutory provisions charge us with

14   defining controls to ensure that the trading is neither

15   disruptive nor manipulative.

16                    These provisions also impose high penalties

17   for conduct which may only be reckless.  A rather low

18   standard under the law to ensure that market
participates

19   are incentives to follow the rules.  To the NFL's
credit,

20   it has been very specific about what it will and will
not

21   tolerate.

22                         However, in my opinion, this rulemaking

20

1    will not provide, our rulemaking will not provide
market

2    participants with the same comfort or sufficient

3    direction.  This is especially true with regard to

4    disruptive trade practices.

5            One would think after requesting this

6    language in the legislation, the Commission could
provide

7    some more details as to how it will interpret the

8    language on spoofing or trading in the close.

9            As a result, it is appropriate for the

10   Commission to receive more feedback from the public to

11   better refine these definitions and understand how they

12   might, in fact, impact markets or the players affected.

13   And I appreciate, Mr. Chairman, you going with advanced

14   notice of proposed rulemakings to further flush these

15   out.

16           We must not lose sight of the technology

17   investments such rulemakings might require.  In order
to

18   effectively oversee trading schemes and practices, the

19   Commission will need to reconstruct the order book and
to

20   understand how various bidding strategies have impacted

21   market practices.  Regardless if we apply intent of a

22   reckless standard, all cases must be supported by the

21

1    facts and empirical data.

2              As we work through the particular

3    rulemakings, it is critical to remember that our

4    responsibility is broader than simply responding to the

5    last crisis.  Going forward, prevention and deterrence

6    must be the twin goals that are furthered by

7    anti-manipulation and disruptive trading rules.

8              Stating upfront that the Commission may

9    always go back to the instant replay to review the call

10   does not provide market participants with a fair notice

11   as to when their strategies will run afoul of the
rules.

12             It is my sincere request that the public

13   provide input on the complicated rulemakings to ensure

14   that everyone is in agreement of the boundaries and
fair

15   play.  Thank you.

16             CHAIRMAN GENSLER:  Thank you, Commissioner

17   O'Malia.  I want to thank all of my Commissioners,
fellow

18   Commissioners for their comments.  And I find my

19   associating with each of you in a different way.  So I

20   hope it's a third, by the way.

21             I definitely associate with Commissioner
Dunn

22   on the need for resources.  I'm going to continue to be

22

1    sort of a happy advocate for resources.  And I truly do

2    hope that when Congress comes back from the election,

3    that we get the necessary resources to move forward.

4            I do believe even our estimate of 400 new

5    staff to incorporate Dodd-Frank may well end up being a

6    low estimate given the markets that we're to oversee.
We

7    probably will have 300 to 400 new registrants.  And the

8    markets are presently seven to nine times the size of
the

9    markets that we currently oversee.

10           And I find myself associating with

11   Commissioners O' Malia and Chilton, though maybe a
little

12   bit different perspectives, on the need to have clearer

13   rules of the road when handling manipulation an

14   disruptive trading practices.  I do think that we need
to

15   enhance or authorities in that regard, and Dodd-Frank

16   gave us that.

17           Let me turn over to the staff
presentations.

18   The first set of proposed rules that we are considering

19   relate to something in our Commission which we call
"Part

20   40."  Part 40 is just part of our rules.  And these are

21   about how we as the Commission approve or consider the

22      various rules and new products of registrants, that's

23

1    what Part 40 is.

2              Bella Rozenburg with the Division of Market

3    Oversight, I guess with support from her boss Rick
Shilts

4    at times is going to discuss these proposals.

5              With that I think I might -- I think I'm

6    supposed to go through and introduce everybody.  So I

7    will introduce everybody.

8              The second set of proposals considered
today

9    will address the removal of the reliance on credit

10   ratings and proposals, alternatives to this alliance

11   reliance.  So Adrianne Joves from our Division of the

12   Office of General Counsel is going to prevent that.

13             The third set the proposed rulings being

14   considered relate to the investment of customer funds

15   under regulations 1.25 and 30.7.  And also in that set
of

16   rules we'll regard the use of credit rating agencies as

17   well.  And I believe that -- I see Phyllis sitting
there.

18   Are you going to present that?

19             MS. DIETZ:  Jon DeBord.

20             CHAIRMAN GENSLER:  So Jon Debord from out

21   Division of Clearing an Intermediary Oversight will

22   assist Phyllis and present that.

24

1           The fourth set of proposal describe the

2    process for reviewing swaps for mandatory clearing

Eileen

3    Donovan -- where is Eileen -- there on the second row

4    will be doing that from the Division of Clearing and

5    Intermediary Oversight.

6           The fifth set will be addressing the

7    discussion about the manipulation standards where I

think

8    Mark Higgins and Bob Pease will be coming to table from

9    the Division of Enforcement.

10          And then finally, there will be the

proposals

11   regarding disruptive practices, and Bob Pease will be

12   doing that.

13          In terms of the staff will present the

14   proposal in each case.  And in each these the floor

will

15   be open for questions and we will take a vote.

16          So number one, Bella.  I think then if you

17   want to give a presentation and then we will do a

motion.

18          MS. ROZENBURG:  Good morning, Mr. Chairman,

19   Commissioners.  Today's staff is recommending that the

20   Commission approve a number of proposed rulemaking to

21   implement new rules certification procedures for

existing

22      registered entities such as designated contract market

25

1    and derivatives clearing organizations, and for new

2    registered candidates such as Swap Execution Facilities

3    and Swap Data Repositories.

4              The proposed regulation also prohibits
event

5    contracts based on certain excluded commodities special

6    procedures for certain rule changes proposed by

7    systemically important derivatives clearing
organizations

8    or safe codes.  And provide for the following of review

9    periods for certain novel derivative products pending
the

10   resolution of jurisdictional determination.  I will

11   address major changes for Part 40.

12             With respect to rule certification

13   procedures, under the proposed rules, the Commission
will

14   have 10 business days to review certification or will

15   amend them.

16             If within 10 business days the Commission

17   determines that the submission involves a novel or

18   complex issue or is submitted with an inadequate

19   explanation or is potentially inconstant with the Act,

20   then the certification will be stayed for an additional

21   90 days.

22             The rule amendment will be certified upon

26

1    expiration of the 90-day review period unless the

2    Commission objects to the certification.

3              Under the proposed rule, if the Commission

4    stays the review for an additional 90 days, then the

5    Commission will provide a 30-day public comment period.

6    The Commission will provide notice of the comment by

7    posting the notice and their submission on the

8    Commission's website.

9              With respect to certification procedures

10   for submission of rules by the SIDCO, the proposed

11   regulations will require SIDCO to provide the Commission

12   with a 60-day advanced notice of any proposed change to

13   its rules or procedures that could materially affect the

14   nature or level of risk presented by the SIDCO.

15             Under the proposed rules, changes that

16   could materially affect the nature or level of risk are

17   those that there's reasonable possibility that the

18   changes could substantially affect the performance of the

19   essential inquiry and settlement function or the overall

20   nature or level of risk presented by the SIDCO.

21             Such changes could include changes that

22   materially affect financial resources, participates and

27

1    product eligibility, risk managements, default

2    procedures, system safeguards, and governance.

3              The proposed regulation would allow SIDCO

4    to implement the proposed rule change if the review

5    period lapses without Commission action.

6              The proposed rule would allow the

7    Commission during the 60-day review period to extend
the

8    review period for an additional 60 days if the proposed

9    change raises novel or complex issues.

10             With respect to event contracts, the
proposed

11   rule prohibits the listing, trading, or clearing of

12   products that are based on certain excluded commodities

13   and that involve, terrorism, assignation, war, gaming,
or

14   an activity that is unlawful under any State or Federal

15   Law.  These prohibited activities are specifically

16   enumerated in the statute.

17             In addition, the proposed rule provided
in

18   the product involved activity similar to that activity

19   prohibited by the statute.  And if the Commission

20   determines such product to be contrary to the public

21   interest, then the product will be prohibited in the

22   future rulemaking.

28

1                    If during the review of a new contract, the

2       Commission determines that such product may involve any

3       of the prohibited activities, the Commission will request

4       that the registered entity suspended the listing or

5       trading of the product and will conduct a 90-day review

6       to determine whether the product violates the

7       prohibitions on certain event contracts.  Upon completion

8       of this review, the Commissioner will issue a

9       determination order.

10                   Finally, under the proposed rules, if the

11      registered entity submits a product that may have

12      elements of both a security and a derivative, the

13      Commission or the SEC may request a jurisdictional

14      determination from the other agency.

15                   If a jurisdictional determination is

16      requested, the Commission will toll the applicable

17      product certification or approval review period until the

18      issuance of a final determination order.

19                   If the Commission or the SEC seeks additional

20      review of the jurisdictional determination, then the

21      charge order as well as the review period for the product

22      will be stayed until the United States Court of Appeals

29

1    for the District of Columbia circuit issues a final

2    determination.  This review period will resume only

upon

3    a finding that the Commission has jurisdiction over the

4    submission.

5               That concludes my remarks.  I will be happy

6    to take any questions.

7               CHAIRMAN GENSLER:  Thank you, Bella.  The

8    Chair will now entertain a motion to accept the staff

9    recommendation and issue the proposed rules regarding

10   Part 40.

11              COMMISSIONER O'MALIA:  So moved.

12              COMMISSIONER SOMMERS:  Second.

13              CHAIRMAN GENSLER:  With the motion made and

14   seconded, I would like to open the floor to my fellow

15   Commissioners to ask any questions.

16              I just have one, Bella.  If you can help to

17   clarify for the public.  In terms of these rules as I

18   under them, we have a different approach for rule

review

19   and product review.  The presumption -- is that correct

20   that product reviews would only happen in a small set

of

21   circumstances, but rule reviews might happen more

often?

22              MS. ROZENBURG:  That is correct.  We have

30

1    different procedures for product approval and product

2    certification versus rule approval and rule

3    certification.   Product certification procedures and

4    products approve procedures remain largely the same.

5                With respect to the rule approval procedures,

6    would have this new requirement and applies to rule

7    amendments, as well.   We have this new requirement of 10

8    and 90 days.

9                I just want to be clear that when the

10   registered entity submits a contract that changes the

11   terms and conditions of a contract, it is considered to

12   be a rule amendment.   And therefore, it has to follow the

13   new rule amendment certification procedures for 10 and 90

14   days.

15               CHAIRMAN GENSLER:   I see.   But the goal of

16   Congress was to give these clearing house rules and maybe

17   the designated market rules.   We have 10 days.   Most

18   rules probably within the 10 days would not be novel or

19   complex and they would go into being.

20               MS. ROZENBURG:   That is correct.

21               CHAIRMAN GENSLER:   And if staff then says no

22     there is something novel, complex, or is systemically

31

1    important clearing house, if it might be a different

2    term, material, then we have further review in that

3    period 90 extra days to review it?

4              MS. ROZENBURG:  That's right.

5              CHAIRMAN GENSLER:  Thank you.

6              MR. SHILTS:  And with the opportunity for

7    public comment during that 90 days.

8              CHAIRMAN GENSLER:  Right.  That's a good

9    point.  So if we put it out for the 90 days and we seek

10   public comment by putting it right up on our website

11   getting public comment?

12             MS. ROZENBERG:  That is correct.  If we're

13   going to stay, if the Commission is going to stay the

14   review period for 90 days, then the Commission will

15   publish a notice on the website along with this

16   Commission.  That will be available.

17             CHAIRMAN GENSLER:  Again, the presumption

at

18   the end of the 90 days is that the rule would go into

19   effect unless the Commission determines by majority

rule

20   and so forth that it not go into effect?

21             MS. ROZENBERG:  That is correct.

22             CHAIRMAN GENSLER:  I didn't have anything

32

1    further.  Commissioner Dunn?

2         COMMISSIONER DUNN:  Thank you, Mr. Chairman.

3    Bella, could you describe for me the difference in the

4    procedures that we are currently operating versus the

5    these proposed procedures on the timeline implementing a

6    new product.

7         MS. ROZENBURG:  On the products or rule

8    amendments or new rules?  For products the procedure, as

9    I said, remain the same.  When a registered entity

10   submits a knew product for certification, this product

11   will be certified within one business day.

12        If a registered entity submits a product for

13   approval, they follow the standard procedures that are

14   currently Part 40.  The product will be approved within

15   45 days or maybe expanded in the rules novel for complex

16   issues.

17        With respect to rule certification

18   procedures, this process is different from what we have

19   currently in Part 40.  Right now under current

20   regulation, when the registered entity submits a rule

21   amendment or new rule by certification, this rule will go

22      into effect within one business day.  One business day

33

1    after it submits the submission to us, provided

2    submission to the Commission.  This will change.  Now the

3    Commission will have 10 business days to review

4    submission before it goes into effect.

5              As I mentioned, many submission probably will

6    go will -- become effective within 10 business days.

7    However, is if the submission have one of those novel or

8    complex issues, then the Commission may stay the review

9    for an additional 90 days and the Commission will provide

10   a notice of comment and post the notice on the Commission

11   website.

12             COMMISSIONER DUNN:  As I understand on that

13   procedure, we're going from immediate the next day to as

14   long as 160 days.  Is that --

15             BELLA ROZENBERG:  I'm sorry, would you repeat

16   your question?

17             COMMISSIONER DUNN:  For a rule then instead

18   of being certified and going into effect the next day, it

19   will be at least 150 days or up to?

20             BELLA ROZENBERG:  No.  The rule will go into

21     effect once the registered entity submits -- once the

22     Commission receiving a certification, then the
Commission

34

1    will have 10 business days to review the submission.

2             If the Commission determines that, you know,

3    it's just this regular submission.  It didn't involve any

4    novel or complex issue and it's complete, then the rule

5    will go into effect upon expiration of 10 business days

6    review period.

7             However, within 10 business days Commission

8    determines that there is a novel or complex issue or the

9    submission is incomplete, then it will inform the

10   registered entity that it will stay the review for an

11   additional 90 days.

12            And after that expiration of the 90 days, if

13   the Commission didn't act on it or didn't inform the

14   registered entity, the rule will go into effect unless

15   the Commission notifies otherwise.

16            CHAIRMAN GENSLER:  Commissioner Dunn, I think

17   what you're asking what the total review period would be

18   for a submission that raises novel issues.  It would be

19   the 10 business days plus the 90 days.  So around 105

20   days or something like that, if that's what you're

21   asking?

22                    COMMISSIONER DUNN:   Then how is that

35

1    different from current process?

2              MS. ROZENBERG:   Currently, rule amendments

3    and rule certifications are effective within one business

4    day.   So there is 10 and 90 days.

5              COMMISSIONER DUNN:   Thank you.

6              CHAIRMAN GENSLER:   Thank you, Commissioner

7    Dunn.   Commissioner Sommers?

8              COMMISSIONER SOMMERS:   Thank you, Mr.

9    Chairman.   My questions are with regard to the review of

10   event contract.   If I understand correctly the process

11   for self-certification of the event contracts they would

12   follow the same procedures.   That if you self-certify,

13   they can go into effect the next business day as long as

14   everything is in order.

15             And my question is:   What kind of review do

16   we contemplate under 40.11 that would allow us the time

17   to review an event contract within one business day?

18             MS. ROZENBERG:   Well, currently, under the

19   Dodd-Frank Act there are certain contracts, event

20   contracts that are explicitly prohibited that will be in

21   Part 40.   If a registered entity submits an even

22     contract, and its opinion does not involve one of those

36

1    prohibited activities, it will file a regular

2    certification.  It will the follow product
certification

3    procedures under 40.2.

4              So during that staff conduct review of

5    certifications or they become in effect within one

6    business day, so during that review, the Commission
staff

7    determines that one of those contracts may involve one
of

8    prohibited activities, the Commission, the staff will

9    request that the registered entity will suspend the

10   trading of this contract and will conduct a 90-day
review

11   as required by Dodd-Frank Act.

12             So within 90 days if the Commission

13   determines that this contract involves the similar to
one

14   of the prohibited activities and is contrary to public

15   policy, then the Commission will issue determination,
and

16   it will issue a rule prohibiting this type of a
contract.

17             So basically for now the procedure is going

18   to be if the registered entity thinks that its contract

19   does not involve one of the prohibited activities, that

20   will fall under 40 the regular certification procedure.

21   And it's the staff's responsibility to look for this

22      contract and, you know, to see if, they may be prohibited

37

1    understand 40.12.

2              MR. SHILTS:  Yes.  There's no specific

3    statutory stay or whatever for these types of
contracts.

4    So presumably, we get them in.

5              For those that are enumerated are pretty

6    clear as to what they mean.  So it's mostly the staff

7    have to look at them and say this is potentially
similar

8    to one of these.  It raises questions.  We immediately

9    get back to the Exchange.  And mostly likely they

10   wouldn't list it until this determination is made with

11   the 10-to-90-day provision for rule certification
during

12   the specific statutory provision for that.  So it's

13   something we have to work with the Exchange.

14             But typically, if the Exchange has a

15   contract that they think is questionable, as we've seen

16   in the past, they usually talk to us in advance.  And

17   we'll have some notice about that.

18             COMMISSIONER SOMMERS:  And I assumed that.

19   But I guess I just had some concerns about whether we

20   were comfortable with that one day review.

21             MS. ROZENBERG:  Dodd-Frank didn't give us
the

22   authority to play any sort of stay on the review.

38

1                    COMMISSIONER SOMMERS:  Okay.  Thank you.

2                    CHAIRMAN GENSLER:  And just for the public,

3        these enumerated items are terrorism, war, gaming --

4                    MS. ROZENBERG:  Assassination.

5                    CHAIRMAN GENSLER:  -- assassination.

6                    MS. ROZENBURG:  Any contract that my
violate

7        any State or Federal law.  It's pretty clear.

8                    CHAIRMAN GENSLER:  Hopefully, terrorism,

9        assassination, these things are pretty clear, but there

10       may have been some ambiguity at the time.  Anything,

11       Commissioner O'Malia?

12                   COMMISSIONER O'MALIA:  So I'm clear, if the

13       movie guys came in under this language and were not

14       previously banned, we will have to certify them in one

15       day?

16                   MS. ROZENBERG:  Well, the contract will

17       go into effect, but certifying doesn't mean approval.

18       The Commission can come back anytime an ask them if we

19       determined that one of the activities is involved in

20       prohibited activity, we can request now under the new

21       authority, we can request the registry and stop trade

22       will conduct review.

39

1          In my opinion, that will become -- fall under

2     the issue of whether this event contract is gaming or

3     not.  But it's clearly not assignation or war that will

4     be the most controversial issue to define what gaming is.

5          MR. SHILTS:  Typically, as with those, the

6     Exchanges don't certify them and list them immediately.

7     They wouldn't want the legal uncertainty of not knowing

8     what the Commission is going to do.

9          So even though I guess conceivably that could

10    happen, our experience is that if they think there's any

11    sort of a question, they walk talk to the staff and the

12    Commission as to what they think, with respect to these

13    new rules, whether they think they might violate, the

14    Commission my have some concerns for them.

15          COMMISSIONER O'MALIA:  So your recommendation

16    to the events contracts entity people might be proposing

17    event contracts and then expect a 90-day review?

18          MR. SHILTS:  If it relates to some of those

19    and anything that's listed in that list.  It wouldn't be

20    something else like a cropped deal or something or

21    whatever.

          22                    CHAIRMAN GENSLER:  Rick, I understand --
and

40

1    I think it's a very good question.  I understand that

2    today, prior to Dodd-Frank, if one of the designated

3    contracts markets of the Chicago Mercantile * Exchange

4    had decided to do a movie future, they could self-certify

5    it in one day.

6            But, you know, it was just because of the

7    unique circumstance where somebody is coming in for a

8    both, they were both setting up a new exchange and doing

9    a new product.  Is that right?

10           MS. ROZENBERG:  That's right.

11           CHAIRMAN GENSLER:  As they say, timing is

12   everything.  But now those are banned.  Any other

13   questions?  There's a motion on the floor and seconded.

14   So I would like to just, if there are no further

15   questions, thank the staff and for their presentation.

16           And I will say I do support this rule.  I

17   will have my little statement published in the Federal

18   Register, but I do support the rule.  I think it does

19   give market participants clarity on how we will do this.

20           The Dodd-Frank Bill set up the 10 and 90

21   day procedure and it systematically imported contract

22   clearing organization 60 and 60.  But I think the rule is

41

1    an excellently drafted trying to give market participants

2    the clear procedures to do that.  But I didn't know if

3    anybody else wanted to say anything.

4                COMMISSIONER CHILTON:  I'd like to thank the

5    staff for doing a great job on this.  We appreciate it.

6                CHAIRMAN GENSLER:  So if there are no other

7    views, all those in favor say "Aye"?

8                (Chorus of ayes.)

9                CHAIRMAN GENSLER:  Any opposed?  The ayes

10   having it, we'll send it long to the Federal Register.

11   With that, I think we might have swap out of some folks

12   here.  Adrianne Joves I think will present with the

13   General Counsel's office with regard to credit rating

14   agency.

15               As I understand the Dodd--Frank Act, I can't

16   remember.  It must have been Title 9 said we have to stop to

17   relying on that in any of our rules.  Being the first to

18   review to see where we relied, Adrianne will tell us

19   probably the seven places we do that.

20               And Adrianne Joves is assisted by our Deputy

21   General Counsel.  And his entire staff have been

22      tirelessly working on all of the rules because he heads

42

1    up the regulatory piece from the General Counsel's

2    office.  Adrienne?

3              MS. JOVES:  Thank you, Chairman Gensler.

4    Before I provide a brief summary on our proposal and

5    credit rating, I don't want to recognize and thank our

6    other team members.  Jon DeBord, who will shortly give

7    you another proposal and another rulemaking, for all of

8    the efforts he attributed to on a proposal that we will

9    be discussing on credit rating.

10              I also wanted to briefly thank the other

11    federal financial regulators who provided some very

12    valuable feedback on this issue for us, especially the

13    Securities and Exchange Commission and the FDIC.

14              Title 9 of the Dodd-Frank Act, as you know,

15    included findings that credit ratings are of systemic

16    importance.  And it also found that, in the recent

17    financial crisis, inaccurate credit ratings contributed

18    significantly to the mismanagement of risks by financial

19    institutions and by investors.  As a result, Congress

20    found that increased accountability on the part of credit

21    agencies is necessary.

22              Title 9 contains several provisions that are

43

1    designed to improve the accountability of credit rating

2    agencies including Section 939A.

3              939A requires all federal agencies to do

4    three things:  All federal agencies are required to

5    review the regulations for any assessment of the

6    credit-worthiness of the security or money market

7    instrument and your reliance on that kind of
assessment.

8              It requires that all federal agencies to

9    remove those references ands replace them with the

10   substitute standard that the agencies deem as

11   appropriate.

12             And the third requires a report to Congress

13   at the end of that process.

14             Upon completing our required review of our

15   relations, we found five instances that contained

16   reference to credit ratings in relation to financial

17   instruments.  I will briefly identify the regulations

18   that we are proposing to remove those references to

19   credit ratings and the substitute standards that we're

20   proposing along with those.

21             First, our required review identified two

22   regulations that addressed in what foreign depositories

44

1    future commission merchants and designated clearing

2    organization may place customer funds.

3              Commission regulation 30.7 and 1.49

4    currently permit FCMs or DCOs to place customer funds
in

5    foreign depositories that holds either in excess of $1

6    billion of regulatory capital or whose commercial paper

7    or long-term debt instruments is rated in one of the
two

8    highest rated categories by at least one credit rating

9    agency.  We are proposing to amend both of those

10   regulations in concert albeit in two separate

11   rulemakings.

12             Jon is going to be discussing another

13   proposal related to Commission Regulation 30.7 shortly.

14             Our proposal for 1.49 includes removing the

15   reference to credit rating and substituting the
standard

16   the foreign depositories must hold in $1 billion in

17   regulatory capital.

18             The proposal also requests comments

19   specifically on whether a leverage ratio or capital

20   adequacy ratio requirement consistent with or similar
to

21   the standards that have been included in the recent

22   accords would be an appropriate additional standard to

45

1    include in our regulations.

2              Next, our review identified a third

3    regulation that referenced credit ratings for financial

4    instruments.

5              Commission Regulation 4.24 requires
Commodity

6    Pool Operators to disclose the type of commodity
interest

7    or other interest in which the pool will be trading,

8    including by disclosing the investment rating of the

9    pool's interest.

10             We are proposing to remove the reference to

11   investment ratings for 4.24 and replace it with the

12   phrase "credit-worthiness."  The proposal requests

13   comment on this alternative standard.

14             Finally, the last two regulations that we

15   identify that contain some reference to credit rating
as

16   they relate to financial institutions or financial

17   instruments -- sorry -- will no longer make any
reference

18   to credit-worthiness due to other unrelated proposed

19   amendments that we are going to be noticing in other

20   proposed rulemakings.

21             As we mentioned a couple of times, Jon

22   DeBord will be discussing the wholesale amendments to

46

1    Regulation 1.25 that the staff is going to proposing.

2    And as a result of those amendments, those proposals,

3    there will no longer be any need to reference credit

4    rating in Commission Regulation 1.25.

5             Similarly, the proposal that Bella just

6    walked through on Part 40 contained reference to the
word

7    "rating" in Appendix A Guideline 1 as a way to help

8    disclose the characteristics of the certain contracts

9    listed on DCMs.

10            Because Part 40, the Appendix say that Part

11   40 will be removed in its entity by Bella's proposal,

12   also don't have to make any changes to that regulation
in

13   this proposal.  Thank you.  And I will be happy to
answer

14   any questions you have.

15            CHAIRMAN GENSLER:  Thank you very much,

16   Adrianne.  With that, I would entertain a motion.

17            COMMISSIONER SOMMERS:  So moved.

18            COMMISSIONER O'MALIA:  Second.

19            CHAIRMAN GENSLER:  And then I just have one

20   question because I keep thinking there were seven

21   references and you referred to five, so my math has
been

22   faulty today.

47

1                 MS. JOVES:  You were correct that there

2      were seven total references.  So all of our regulations

3      that talked about any reference to credit rating.

4      Dodd-Frank required us to look for assessments of

5      credit-worthiness related securities or money market

6      instruments.  There were only five references in our

7      regulation that talked about the financial investments
or

8      those types of things.

9                 CHAIRMAN GENSLER:  I see.  And between
your

10     proposed rule and Jon's proposed rule and maybe the
Part

11     40 rule that we just voted on, do we address all seven
or

12     just five?

13                MS. JOVES:  We addressed five.

14                CHAIRMAN GENSLER:  So there are two that

15     we're not actually addressing?

16                MS. JOVES:  The two that we're not
addressing

17     are related to the credit-worthiness of counter parties

18     and not relating to the types of investment vehicles or

19     those kind of things, which is required under Dodd-
Frank.

20                CHAIRMAN GENSLER:  I see.  So the math

21     again is there are seven references, but through these

22      three different rules today, we're addressing the five

48

1    that the Dodd-Frank Act requires?

2                    MS. JOVES:  That's correct.

3                    CHAIRMAN GENSLER:  Thank you.
Commissioner

4    Dunn?

5                    COMMISSIONER DUNN:  I have no questions
on

6    this.

7                    CHAIRMAN GENSLER:  Thank you.  Seeing
that

8    there are no further questions, and I will throw a
little

9    statement in the Federal Register why I support it.  If
I

10   can could hear all those in favor say "Aye"?

11                   (Chorus of ayes.)

12                   CHAIRMAN GENSLER:  Any opposed?  The ayes

13   being unanimous, we will send yours along to Federal

14   Register, as well, for public comment.  How many days
for

15   public comment is yours?

16                   MS. JOVES:  We have a 30-day public
comment

17   period.

18                   CHAIRMAN GENSLER:  On the first one it
was

19   probably 60.  So the first one was 60 days public

20   comment.  Thank you.

21                   With that, we're going to move forward to

22      the next rulemaking.  So John you can come up.  I expect

49

1     there will be a few more questions on this one.   Jon will

2     be ably supported by his boss or his boss' boss Phyllis

3     Dietz, who was also the team leader on the Clearing Rules

4     and Ananda Radhakishnan, who runs the whole Clearing an

5     Intermediary Oversight Division.   Jon?

6                    MR. DEBORD:   Good morning.   I'm Jon DeBord

7     with DCIO.   I'm pleased to recommend that the Commission

8     approve the publication in the Federal Register, the

9     Federal Register notice questioning public comment for

10    rules opposing, for proposed rules regarding investment

11    customer funds and secured funds of Regulation 1.25 and

12    30.7.   I will go over the background of the rule and then

13    an overview of the proposal and then take any questions.

14                   Under Section 4(d)(a)(2) of the Commodity

15    Exchange Act, customer segregated funds may be invested

16    in the obligations of the United States and obligations

17    fully guaranteed as the principal and interest by the

18    United States such as treasuries and general obligations

19    of any State or any political subdivision thereof.

20                   Municipal securities.   In December 2000 and

21      again in 2004 and 2005, the Commission amended Regulation

22      1.25 to include additional permitted investments such as

50

```
         1    GSE Securities, CDs, commercial paper, corporate l
notes
         2    and bonds, foreign sovereign debt, and interest in
money
         3    market mutual funds.
         4              Our amendments also include additional
         5    safeguards such as credit ratings requirements, issue
of
         6    base concentration limits, or requirement that all
         7    investments be readily marketable and sufficiently
         8    liquid.  Amendments regarding new purchase agreements
and
         9    certain requirements regarding in-house transactions,
as
        10    well as other changes.
        11              In 2007 DCIO wants to review to learn
more
        12    about the nature and extent by FCMs and DCOs.  It was
        13    voluntary.  We received an overwhelming response from
        14    FCMs that were very helpful.  It helped shape our views
        15    as lead to our proposal.
        16              As we were wrapping up 2008 that review,
we
        17    experienced a financial crisis.  This also helped shape
        18    our views on the safety and liquidity of certain
        19    permitted investments during times of market
volatility.
        20              In May of 2009, the Commission issued a
```

21      name regarding this topic seeking public comment

22      regarding regulatory requirements that might better

51

1    safeguard customer funds.  We received 12 comment letters

2    and reviewed them and relied on them as well to formulate

3    our proposal.

4              As noted, this is not technically a

5    Dodd-Frank rulemaking.  However, this is a link to

6    Dodd-Frank.  And as Adrianne mentioned, which is the

7    Section 939A required the review and removal of credit

8    rating.  She mentioned several credit ratings appear in

9    1.25 and 30.7.  That's the background.

10             Our proposal is as follows:  First, I will

11   run through the list of permitted investments.

12   First, we're proposing no changes to treasuries.  We'll

13   be leaving them safe as liquid and we're not going to

14   limit them in the proposal.

15             We propose that municipals remain a committed

16   investment.  However, due to liquidity and volatility

17   concerns, we are recommending proposing a 10 percent

18   asset-based concentration limit.  That means that an FCM

19   can invest the maximum of 10 percent of their total

20   assess in segregation municipals.

21                  Third, GSE Securities.  Currently, the term

22    "GSE Securities" incorporates two different types of

52

1    entities.  The first is the GSE, which is a privately

2    owned and operated entity charted by Congress.  It has an

3    implicit guarantee of the federal government; examples

4    might be Fannie Mae Freddie Mack.

5              Second, public agency -- I'm sorry.  U.S.

6    Agency.  U.S. Agency is an entity of the Federal

7    Government.  It has explicit guarantee.  We're prosing to

8    limit written investments into just U.S. Agency

9    obligations in the second type.  We're also proposing a

10   50 percent asset-based concentration for those

11   investments.

12             CDs.  A CD is another investment type that

13   include for our purposes two categories that we will

14   distinguish between.  The first is non-brokerage CDs.

15   The second is brokerage CDs.

16             Non-brokerage CDs is what people typically

17   think of when they think of a CD.  An FCM purchased from

18   the bank.  A CD has a maturity date that the FCM wants to

19   redeem early, it simply goes to the bank and redeems it.

20   Any penalty is limited to a penalty involved in the

21   interest.

22                              An non-broker CD in my opinion is a very

53

1     different instrument.  It's purchased on large size by a

2     broker and sliced up and sold individually to purchasers.

3               If the purchaser chooses to redeem early,

4     it cannot go directly to the bank.  Its only option is to

5     go into the secondary market, which can often be

6     illiquid.

7               Therefore, we're proposing to limit CDs to

8     just non-brokerage CD's.  We're also proposing a 25

9     percent asset-based concentration limit to that

10    investment.

11              Commercial paper, corporate notes and bonds,

12    we're proposing to limit those to only commercial paper

13    and corporate notes and bonds that are guaranteed by the

14    Temporary Liquidity Guarantee Program as administered the

15    by the FTIC.

16              Commercial paper, we're proposing a

17    commercial paper having a 25 percent asset-based

18    concentration limit.  We're also proposing that corporate

19    notes and bonds up to 25 percent asset-based

20    concentration.

21                    We're also proposing to eliminate foreign

22        sovereign debt.  First, over the last few years its

54

1   experienced certain instances of volatility.  And second,

2   it's been negligently used by instruments by FCMs.

3               Eight.  Money market mutual funds.  We're

4   proposing to maintain money market mutual funds

5   investment 1.25.  However, due to the safe and liquidity

6   certain during periods of market volatility, we're

7   proposing a 10 percent asset-based concentration limit.

8               We're also proposing a two percent

9   issuer-based concentration limit for families of funds.

10              Additionally, filing of those permitted

11  investments, CD's, corporate notes and bonds, commercial

12  paper, municipals -- is that five?  And GSE agencies all

13  have certain requirements regarding credit ratings.  As

14  Adrianne mentioned, we're proposing to eliminate all of

15  those.

16              A few other notes regard 1.25.  We're

17  proposing to eliminate in-house transactions.

18              We're proposing to eliminate the purchase

19  agreements with affiliates.

20              We're proposing a five percent counterparty

21  concentration limit for repurchase agreements.  The

22  situation we're trying to avoid there is where a FCM

55

1    re-certification or repurchase agreement takes a 100

2    percent of its cash into a repo and then the
counterparty

3    default.  This will limit that to a five percent

4    counterparty concentration.  So we have a safeguard

5    against that situation.  The additional technical

6    amendments to 1.25 I can discuss if you want me to.

7              30.7 regards customers investing in
foreign

8    futures.  Currently, there's not an enumerated list of

9    investments that customer are limited to rather than

10   saying a more general obligation to investment in only

11   liquid investments that are submitted to meet
obligations

12   to customer.  We're proposing today to limit 30.7 funds

13   to the investment limitations of 1.25.

14             We're also, as Adrianne mentioned, are

15   proposing to eliminate references to credit agreements

16   along with a couple of other amendments to 30.7.

17             This concludes the overview.  Thank you.  I

18   will be happy to answer any question.

19             MR. RADHAKISHNAN:  Just to add one point.

20   1.25 goes to what a FCM and a DCO can do.  Once it gets

21   money or securities from a customer, what are you
allowed

22   to do with the assets that you get from the customer.

56

1    1.25 does not go towards what an FCM can take of its

2    customers.  That is usually guided by Exchange rules.

3                For example, the CME, for example, has a rule

4    that it direct to its member FCM as to what they can

5    accept from its customers.  So I want to make sure this

6    information is once you get the money in, what can you

7    do.

8                CHAIRMAN GENSLER:  Thank you Jon and Ananda

9    and Phyllis for supporting it.  With that, I will

10   entertain a motion to accept the staff's recommendations.

11               COMMISSIONER SOMMERS:  So moved.

12               COMMISSIONER CHILTON:  Second.

13               CHAIRMAN GENSLER:  With that, there are some

14   discussions.  Ananda, as I under it, this is only if that

15   futures commission merchant or the clearing organization

16   takes cash, what he can do with the cash.  Is that what

17   you're saying?

18               MR. RADHAKISHNAN:  Either cash or any other

19   type of collateral that it allow to accept.  For example,

20   a customer may give treasuries to an FCM.  We're

21   proposing to allow them to engage in reversals in doing

22      repos.

57

1                    CHAIRMAN GENSLER:  But if the Exchange allows

2      them to take what I will a non-permitted asset here, this

3      rule will not force them?

4                    MR. RADHAKISHNAN:  Correct.  It will not.

5                    CHAIRMAN GENSLER:  They can do that?

6                    MR. RADHAKISHNAN:  Sure.

7                    CHAIRMAN GENSLER:  If the Exchange says you

8      can take municipals or corporate  --

9                    MR. RADHAKISHNAN:  Correct.

10                   CHAIRMAN GENSLER:  -- or money market funds

11     created in 10 percent --

12                   MR. RADHAKISHNAN:  Correct.

13                   CHAIRMAN GENSLER:  -- they can continue to do

14     that?

15                   MR. RADHAKISHNAN:  Correct.

16                   CHAIRMAN GENSLER:  This is basically -- well,

17     what do you with it?

18                   MR. RADHAKISHNAN:  Once you bring it in, what

19     can you do with it.  Once the FCMS accepts something.

20                   CHAIRMAN GENSLER:  Right.  Basically, that's

21     cash, then?

22                    MR. RADHAKISHNAN:  Yes.

58

1           CHAIRMAN GENSLER:  The other question for Jon

2     as I understand maybe it's five -- I might be counting it

3     wrong.  I've been counting poorly today -- but that there

4     may have been four or five areas where we had to address

5     this because it relates to ratings, rating agencies in

6     sovereign debt, rating agencies from municipals, that how

7     we find ourselves in this position.  Is that correct?

8           MR. DEBORD:  That is correct.

9           CHAIRMAN GENSLER:  And in some instances like

10    sovereign, you say there's such negligible use of it

11    occurring, we don't have a ready alternative to ratings.

12          MR. RADHAKISHNAN:  Right.  And the other

13    issue with sovereign is you have two risks.  You've got

14    liquidity risks and the currency risk, as well.

15          CHAIRMAN GENSLER:  Nonetheless, we don't have

16    a good alternative.

17          MR. RADHAKISHNAN:  Correct.  We don't.

18          CHAIRMAN GENSLER:  Your staff recommendation

19    is that it's not used that much?

20          MR. RADHAKISHNAN:  Correct.

21          CHAIRMAN GENSLER:  But then getting to an

22     area where Commissioner O'Malia spoke to and I'm

59

1    supportive of this proposal -- and it's just that, a

2    proposal -- but I think the public should commence on

it.

3    Why did you decide to limit money market funds to 10

4    percent that Commissioner O'Malia raised?

5              MR. RADHAKISHNAN:  Our big concern was with

a

6    significant money market fund or reserve fund broke the

7    bank.  That was described in government money market

8    fund.  But, as we found out, funds that are described

as

9    government money market funds do not necessarily have

to

10   invest all of their money in government securities.  So

11   that fund had significant holdings of Lehman commercial

12   paper.

13             One our rules said that if you want to be a

14   money market that wants to participate in our program,

15   you've got to allow for next-day redemption.  The SEC

16   rules allow for seven-day redemptions.  But we say

that's

17   nice.  If you want to participate in our rule, you must

18   allow for next-day redemption and you're offering

19   documents have to show that.

20             Two things happened.  That fund broke the

21   bank and applied to the SEC for a waiver of the next-

day

22     redemption.  In fact, the SEC I think said you don't
have

60

1      to redeem it.

2                So we were left with the situation where
FCMs

3      had significant investments in that particular money

4      market fund.  And there was a lot of confusion as to
when

5      that fund was able to return money to customers.

6                We were working on a daily basis with staff

7      of the SEC to find out the answer to when is this fund

8      going to pay the customer back, and how much is it
going

9      to pay back.

10               As I said before, I guess in this was an

11     issue that hadn't confronted the SEC staff for so some

12     time.  So there was a lot of confusion.  It was clear
the

13     value of the fund was not zero.  That asset value was
not

14     zero because they had a lot of investments.  The issue

15     was what was the value and when did you realize it.

16               And, eventually, we began to make
decisions

17     as to how to value that fund.  And we issued a
redemption

18     letter.  Basically, a graduating scale downward toward

19     where we said after a particular point in time value it

20     90 cents to the dollar.

21               And that was based on the value, the market

22      value of investments the fund did have, which were not

61

1    under water.  The Lehman stuff, zero value.  But the
rest

2    of the stuff, it was sold.  Finally, there was a

3    resolution.  And I think people got more than 90 cents
on

4    the dollar.

5              But the object of the story is:  Once what

6    people thought were very safe investments are not

7    necessarily so.  And, to our knowledge, there is no

8    government guarantee.  There is a Temporary Grantee

9    Program for money market funds.  But to this day, we
are

10   not aware of any money market fund that has a guarantee

11   of that name.

12             So basically we want to make sure that --

13   these are investments that other people make for
customer

14   money.  I think that needs to be born in mind.  This is

15   not what the customer tell you to do.  This is what the

16   FCM and the DCOs does with customer funds.  And our

17   regulations permit FCMs and DCOs to keep the spread.

18   They're not obliged to give their earnings back to the

19   customer.  So we want to make sure that investments are

20   of customer money are made very safe.  And that's why

21   we're proposing the limitation to on money market
funds.

22             MS. DIETZ:  I would also just add, putting

62

1    this into a broader context, there is an overarching

2    requirement that the FCM or DCO investment be objective

3    of preserving principal and maintaining liquidity.

4            And, technically, the reserve primary fund

5    met all of the requirements of 1.25.  It had next-day

6    redemption.  It was a 2(a)(7) fund.  There was nothing

7    wrong with the investment.  But, as it turns out, it

8    didn't meet the overarching requirements.

9            And liquidity is particularly important, and

10   we just made a judgment as to what we thought an

11   appropriate threshold would be for what we now understand

12   to be the nature and characteristics of money market

13   mutual funds at this point.

14            CHAIRMAN GENSLER:  I think that you included

15   -- we have documents, but you included it.  I can't find

16   it.  Do we have a specific set the questions about money

17   market funds?  We way we request comments on money market

18   funds investments should be limited to treasuries or

19   those, et cetera , et cetera.  But do we actually,

20   specifically ask about this 10 percent limit?

21            MS. DIETZ:  Yes.

22                     CHAIRMAN GENSLER:  We do.  Okay.  We do.  I

63

1    have one other question that came up.  And I didn't

2    follow the discussions on GSEs.  I understand that GSEs

3    are not guaranteed by the government and all that.  But

4    what is the limit that in the rule?  And maybe this is

5    off of Commissioner O'Malia's question, but what are we

6    say specifically on GSEs?

7                MR. DEBORD:  Do you have the asset-based

8    concentration limit?  The asset-based concentration limit

9    for U.S. Agency obligation is 50 percent.  There's

10   already --

11               CHAIRMAN GENSLER:  Five zero?

12               MR. DEBORD:  Five zero.  There's already a 25

13   percent issuer-based limitation.  So, at most, an FCN can

14   have two 25 perfect investments totaling 50 percent in

15   U.S. Agency obligations.

16               CHAIRMAN GENSLER:  So it's not we have a 50

17   percent limitation, it's just that you're saying that we

18   have a 25 percent limit because there's two, Fannie Mae

19   Freddie Mac?

20               MR. RADHAKISHNAN:  No. That's not true.  We

21   actually proposing a 50 percent limit.  Right now under

22   the current law there is no limit.  So 100 percent of

64

1    your investments can be in GSEs.

2              We're proposing two things:  These entities,

3    GSE government corporations, they must be fully,

4    explicitly backed, by the Full Faith & Credit Act of

5    United States.

6              CHAIRMAN GENSLER:  But they're not.

7              MR. RADHAKISHNAN:  That is right.  There is

8    one.

9              MR. DEBORD:  The important distinction

10   between GSEs and their private entities and U.S.

11   agencies, which ae entities for the Federal Government.

12   The first is having implicit backing of the United

13   States.  So Fannie Mae and Freddie Mac are not actually

14   explicitly guaranteed.

15             U.S. agencies like Ginnie Mae, small business

16   administration are federal entities.  They are explicitly

17   backed by the Full Faith & Credit Rating by the United

18   States.  That's the distinction that we made.  On top of

19   that we add 50 percent asset-backed concentration limit

20   and a 25 percent issuer-based limit

21             So, Commissioner O'Malia -- if we're

22   allowed to deliberate --  you're thinking it should be

65

1    less than 50 percent, just so I can learn more here?

2             COMMISSIONER O'MALIA:  No.  I think these

3    rules are overly prescriptive.  We have a limit of 10

4    percent on money markets.  We have a 50 percent limit on

5    these GSEs, but one only GSE actually qualifies.  So

6    we're putting -- you're allowed to put 50 percent of your

7    money into one entity based on Ginnie Mae, I believe.

8             MR. RADHAKISHNAN:  True.  But on the flip

9    side, that entity is explicitly backed by the Full Faith

10   & Credit of United States Government.

11            COMMISSIONER O'MALIA:  Why don't we just put

12   it all in treasuries and Ginnie Mae and just get over it.

13   Money markets are, you know, I'm concerned that you're

14   saying that money markets are not some place where people

15   should not put their money anymore.

16            MR. RADHAKISHNAN:  I don't think that we are

17   saying that.  I think what we are saying is that --

18            COMMISSIONER O'MALIA:  This may be news to

19   the Fed, by the way.

20            MR. RADHAKISHNAN:  I think what we're saying

21     is want you want to do with your money is your business.

22     But if you're investing other people's money, it should

66

1   be safe.  That's the overarching message because the
time

2   when you need it the most, as we saw in 2008, you know,

3   there's a flight to equality, and that' that where you

4   have issues.  Tether

5            We want to make sure that in a time when
FCM

6   or a DCO needs to get access to -- and this is

7   tessentially marginal -- that there be no instances in

8   which untethered access to liquid assets, that there's
a

9   minimalization as to when there is a barrier.

10           CHAIRMAN GENSLER:  So, as I understand it,
I

11  find myself -- I mean, I'm voting for this rule.  I
sense

12  you might not be.  But it's a proposal, and we'll get

13  comments.  Is that I'm very interested on the public
view

14  on this 10 percent.  It's really that which, the GSE

15  thing, now that we've clarified it, that Ginnie Mae can

16  be up to half of that portfolio?

17           MR. RADHAKISHNAN:  Right.

18           CHAIRMAN GENSLER:  That's not Fannie and

19  Freddie?

20           MR. RADHAKISHNAN:  No.  It's not Fannie and

21  Freddie because Fannie and Freddie are not explicitly

22    guaranteed.  Now, the reason we left a reference to
GSE,

67

1    there might be in the future, the Federal Government may

2    explicitly back the dead instrument.

3              CHAIRMAN GENSLER:  But they haven't now.

4              MR. RADHAKISHNAN:  But they haven't now.

5    That's right.  And we admit that.

6              CHAIRMAN GENSLER:  Phyllis?

7              MS. DIETZ:  I would just like to clarify on a

8    couple of points.  As far as GSEs, Government Sponsored

9    Enterprises, that was a term that we use and use

10   currently.  And we have become aware now since the Fannie

11   and Freddie problems that there are two different types

12   of agency securities, as Jon mentioned.

13             There are U.S. government corporations like

14   Ginnie Mae.  And then there are technically GSEs that are

15   Fannies and Freddies.  But there's actually -- and I

16   believe its Title 31 -- an enumerated list of U.S.

17   government corporations.  And the idea is there is a 50

18   percent limit on U.S. government agencies, what we're

19   calling agency securities that are backed by the Full

20   Faith & Credit of the U.S.

21             So as an opposite, that's only the Ginnie Mae

22   type corporations, but we include within the definition

68

1   of GSE.  So at such time we don't have an implicit, but

2   an explicit guarantee, if that should happen, those would

3   be encompassed within our regulation.  We don't have to

4   go back and amendment it.

5            There is, however, a 25 percent issuer-based

6   concentration limit and today we're not changing that.

7   So indeed even though up to 50 percent of a portfolio of

8   total assets segregation could be in these government

9   agencies securities only 25 percent of total assets can

10   be in securities of one issuer.

11            So there are different types of concentration

12   limits:  There's issuer-based and that which goes to

13   credit risk.  And then there is asset-based or

14   instrument-based which goes to the category of the

15   investment.

16            So, for example, with money market mutual

17   funds, there is a 10 percent asset-based limit, which

18   would apply to total assets and say, you know, any money

19   market mutual fund.  And then there is a two percent

20   issuer-based limit related to family of funds.

21            CHAIRMAN GENSLER:  I think I understand now.

22    I'm supporting the rule.  I think Commissioner Dunn

69

1   sometimes says that it's more liberal when you're

2   supporting proposals.

3           I think this is a necessary rule because of

4   the credit rating piece.  There's like if five or six

5   place that we have to, in essence, clean up 1.25 for that

6   reason.

7           In addition, I think it's appropriate to

8   address ourselves to what happened if the 2008 crisis

9   around Government Sponsored Enterprises and money market

10  funds.  My question is similar to Commission O'Malia

11  rather 10 percent is too tight.  But we will hear from

12  the public.  Commissioner Dunn?

13          COMMISSIONER DUNN:  Thank you, Mr. Chairman.

14  I think that safeguarding customer funds is one of the

15  basic functions of the Commodity Futures Trading

16  Commission.  I applaud the staff for their actions in

17  this area.  I have some concerns very similar to

18  Commissioner O'Malia on the limitations.

19          And I'm wondering, Jon, do we have an idea of

20  how much is currently invested this these various

21  categories?

22          MR. DEBORD:  Our 2007 survey address that;

70

1    although it's been three years since then.  Certainly,

2    there's some that have been used.

3              As I mentioned, foreign sovereign debt barely

4    used it all.  It seems like treasuries and money market

5    funds were the two largest categories.  And then,

6    frankly, not very much in municipals, minimal amounts in

7    commercial paper and corporate notes.

8              I think just from, antidotally, I think

9    there's a larger percentage in CDs now than there was a

10   few years ago.  That's just antidotal, so I don't have

11   set figures, just my impression.

12             MR. RADHAKISHNAN:  Basically, cash, money

13   market fund, and some agencies.  But the others were not

14   that heavily used.

15             COMMISSIONER DUNN:  But it's very difficult

16   for us to determine if these are high or low or just

17   right because we don't really have a handle how much

18   you're currently invested in these various assets

19   classes.

20             One other thing I'd like to bring out are the

21   GSEs.  Two GSEs that are very near and dear to my heart

22   Farmer Mac and the Farm Credit System.  It's my

71

1    understanding if we adopt this proposed rule as is, they

2    would not be eligible classes for investment.

3         MR. RADHAKISHNAN:  They're not if their debt.

4    If the issue is not explicitly backed by the Full Faith &

5    Credit of the United States, then they would not be

6    eligible.

7         Again, for municipalities and others there

8    is this fold in the realm of unintended consequences. I

9    would hope that the commentary on here give us some type

10   of insight as to what the effect of that this proposed

11   rule is on.

12        As the Chairman said, I'm liberal on proposed

13   rules.  I look forward for the public to give us comments

14   and the industry to give us comments to help us to direct

15   these financial rules that will make sure that we

16   safeguard the customer funds because I think that's

17   paramount.  But to make sure that we're not doing

18   something else that will have some impact that would not

19   like to follow.  Thank you.

20                    CHAIRMAN GENSLER:  I think Phyllis was about

21      to speak.

22                    MS. DIETZ:  Yes.  I want to add that -- I'm

72

1    looking through my draft now.  But we did do the advanced

2    notice of proposed rulemaking, so we did get some more the

3    up-to-date data.  I think that the consensus was that

4    investments were mostly in treasuries and money market

5    mutual funds.  I can't find my place right now, but we do

6    have we some more up-to-date data.

7              Also, the survey that we did at the end of

8    2007 I think is still useful in that it reflects a more

9    normal and stable market situation.  So there were

10   dramatic changes of course after September 2008.  And,

11   presumably, slowly but surely, people are resuming normal

12   investment practices.

13             So I think that even though we don't have,

14   you know, empirical data as of today, I think we have a

15   pretty good sense based on our survey, based on the

16   comments we've got from the ANOPR, and based on filings

17   that we get from our FCM registrants, and questions also

18   that I get informally; phone calls asking questions about

19   permitted investments.  So we have a pretty good idea in

20   what people are investing in.

21             CHAIRMAN GENSLER:  Commissioner Sommers?

22                    COMMISSIONER SOMMERS:   Thank you, Mr.

73

1    Chairman.  I have a question with regard to what I

2    understand may have been a change in Second 627 of

3    Dodd-Frank to remove the prohibition on payments of

4    interest on demand deposits.

5                And I was just wondering what kind of
impact

6    that change may have had on decisions that you made for

7    what is permitted or not permitted in the future.

8                MR. RADHAKISHNAN:  I think certainly that
did

9    have a variance.  That did have some influence because

10   historically the reason why nobody thought to cash

11   because you couldn't get interest, because we said when

12   you bought cash, it has to be in a demand-deposit

13   account.  And there was a prohibition against paying

14   interest on a demand-deposit accounts.

15               So if we see as a result of 627 the
allowance

16   in, commercial banks paying interest on demand-deposit

17   accounts, you might see a move to money being put in

18   demand-deposit accounts; although, given the interest

19   that's currently being paid on demand-department

20   accounts, there may be some sort of reluctance.  But
that

21   certainly would have a varying.

22               For example, if you look at in the U.K.
after

74

1   Lehman, there was huge move to toward cash.  And in the

2   U.K. they've never had this prohibition.

3            At one point, the London Clearing House
staff

4   told me that they had 25 billion euro in cash because

5   people were not trusting any other form of instrument.

6   Now, that's change since then, so there might be a move

7   towards cash.

8            COMMISSIONER SOMMERS:  I guess my question

9   was more as to whether demand, interest on demand-
deposit

10  accounts could be seen as a substitute for anything
that

11  we are now prohibiting.

12           RADHAKISHNAN:  It could be.  It could be.

13  And I don't think so because I think if you look at

14  interest rates -- may be substituted for CD's because
you

15  don't have, you know, assuming that a CD had a penalty

16  for every withdrawal of interest, so people might put

17  more in a demand-deposit account instead of CDs.  But I

18  believe historically, the other instrument tended to
pay

19  a better rate of return then demand fund accounts.

20           But, on the other hand, there might be
people

21  because they perceived, because of liquidity and safety

22    demand, don't put money into that account.

75

1          COMMISSIONER SOMMERS:  I just have one other

2     question.  The chart that you're working of, is this

3     included in the proposed rule?  I guess I'm wondering if

4     it could be posted with the proposed rule.

5          MR. RADHAKISHNAN:  We actually had just done

6     that as an aid for the Commissioners.

7          COMMISSIONER SOMMERS:  I think it's really

8     helpful.

9          MR. RADHAKISHNAN:  We can put it on the

10    website.  Sure.  Sure.

11         COMMISSIONER SOMMERS:  Thank you.

12         CHAIRMAN GENSLER:  Thank you.  I think that's

13    a good suggestion on putting that on the website.

14    Commissioner Chilton?

15         COMMISSIONER CHILTON:  I don't have any

16    questions.  Thank you.

17         CHAIRMAN GENSLER:  Commissioner O'Malia,

18    adding to our colloquies?

19         COMMISSIONER O'MALIA:  For us growing up on

20    farm there's an old saying there's no second education in

21    kick of a mule.  Or, there's no education in the second

22    kick of a mule, actually.

76

1         I'm a little frustrated with this rulemaking

2    because we did do an advanced notice proposal.  And we

3    did receive comments that said put it in treasuries.  Put

4    it in money markets and we completely ignored that.

5         I think that if we've done anything, I hope

6    that Dodd-Frank has at least restored some stability to

7    our banking system and the financial integrity therein.

8    And I do believe that your analogy on it is fine.  It was

9    a real concern.  That was a problem.  That was a

10   breakdown if our financial system.

11        After 2000 pages of Dodd-Frank, I hope we

12   fixed that.  And I think we should be able to put money

13   back.  And I think we ought to raise these numbers

14   significantly.  And I'm just going to leave it at that.

15        CHAIRMAN GENSLER:  If I might.  I can't

16   remember our procedures.  I would like to propose one

17   amendment and see if I have support.  But it's an

18   amendment to have an explicit question because I just

19   can't find it on Page 17.  But have an explicit question

20   about the 10 percent limit money market funds.  And to

21   have a variation on it to say; one, is this appropriate

22   level given the events of 2008 and the passage of

77

1    Dodd-Frank.  And second, if not, what other level might

2    be appropriate.  And thirdly, that if it was a higher

3    level, might there be limits per issuer.

4                    MR. RADHAKISHNAN:  Issuer-based.

5                    CHAIRMAN GENSLER:  Issuer-based.

6                    MR. RADHAKISHNAN:  So what would be the

7    appropriate number?

8                    CHAIRMAN GENSLER:  Yes.  Yes.  If there's

9    some other number other than 10 percent, maybe there's

10   some set of issuer-based.  So I'd like to offer that as

11   an amendment.  It's really just questions but important

12   questions.  I think I have to see whether there's a

13   second to my amendment.

14                   COMMISSIONER O'MALIA:  Second.

15                   CHAIRMAN GENSLER:  So I will take a vote on

16   the amendment and then I'll take a vote on the
underlying

17   rules.  So first we'll take on the amendment.  All aye?

18                   (Chorus of ayes.)

19                   CHAIRMAN GENSLER:  Any Opposed?  And now on

20   the underlying rule as amended.  All in favor say
"Aye."

21                   (Chorus of ayes.)

22                   CHAIRMAN GENSLER:  Any opposed?

78

1          COMMISSIONER O'MALIA:  Naye.

2          CHAIRMAN GENSLER:  I think it's 4-1 on the

3   proposal sending it to the Federal Register as amended

4   and I thank you all.  And this is very helpful.  The

5   debate is very helpful, too.  I thank you Phyllis and

Jon

6   and Ananda.

7          And now I think we're turning the fourth

rule

8   set.  Eileen Donovan of the Clearing Intermediary

9   Oversight will now present proposed rules on the

propose

10   for swaps to be determined to be mandatory clearing.

11          MS. DONOVAN:  Good morning.

12          CHAIRMAN GENSLER:  Good morning, Eileen and

13   Ananda.

14          MS. DONOVAN:  The staff is recommending

that

15   the Commission approve for publication in the Federal

16   Register a notice of proposed ruling on the process for

17   reviews of swaps for mandatory clearing.

18          The rulemaking is divided into four parts.

19   The first part concerns the eligibility of a DCO to

clear

20   swaps.  Section 745(b) of the Dodd-Frank Act directs

the

21   Commission to put to criteria conditions over rules

under

22      which the Commission will determine initial eligibility

79

1    or continuing qualification of DCO to clear swaps.

2                    Under the proposed rule, a DCO will be

3    presumed eligible to accept for clearing any swap that is

4    within a group, category, or type or class of swaps that

5    the DCO already clears.

6                    The DCO that plans to accept for clearing any

7    swap that is not within a group category, type, or class

8    of swaps that the DCO already clears would be required to

9    request a determination by the Commission of its

10   eligibility to clear the swap.

11                   To receive such a determination, a DCO would

12   have to file a written request with the Commission that

13   addresses its abilities to maintain compliance with the

14   DCO core principles if it accepts the swap for clearing.

15                   In particularly, the sufficiency of its

16   financial resources and its ability to imagine the risks

17   associated with clearing the swap, especially if the

18   Commission determines that the swap is required to be

19   cleared.

20                   The second part of the rulemaking concerns

21    submission of swaps to the Commission.  Section

22    7(23)(a)(3) of the Dodd-Frank Act provides that it
shall

80

1    be unlawful for any person to engage in a swap unless

2    that person that submitted such swap for clearing to a

3    DCO that is registered under the CEA or a DCO that is

4    exempt from registration under the CEA if the swap is

5    required to be cleared.

6              Section 723(a)(3) requires the Commission to

7    adopt the rules for the review of the swap group,

8    category, type, or class of swaps to make a determination

9    as to whether the swaps should be required to be cleared.

10             The proposed rule requiring the DCOs

11   submitting swaps to the Commission to provide certain

12   information to assist the Commission in its review

13   including a statement that addresses the five specific

14   factors that the Dodd-Frank Act requires the Commission

15   to take into account when reviewing swaps for submission.

16             Those five factors are:  First, the existence

17   of significant outstanding notional exposures, trading

18   liquidity, and adequate pricing data.

19             Second, the availability of rule framework,

20   capacity, operational expertise and resources, and credit

21   support infrastructure to clear the contract on terms

22    that are consistent with the materials terms and trading

81

1    conventions on which the contract has been traded.

2          Third, the effect of the mitigation of

3    systemic risk taking into account the size of the market

4    for such contract and for the resources of the DCO

5    available to clear the contract.

6          Fourth, the effect on completion, including

7    appropriate fees and charges applied to clearing.

8          And, finally, the existence of reasonable

9    legal certainty in the event of the insolvency of the

10   relevant DCO or one or more of the clearing members with

11   regard to the treatment of customer and swap counterparty

12   positions, funds, and property.

13         The DCO would also be required to provide a

14   description of the manner in which the DCO provided

15   notice of its members and a summary of any opposition

16   expressed by members.

17         As required by Dodd-Frank, the submission

18   would be posted for a 30-day public comment period. And

19   the Commission would make its determination no later than

20   90 days after receiving a complete submission unless the

21   DCO agrees to an extension.

22                    The third part of the rulemaking concern

82

1    Commission-Initiated Reviews of Swaps.  The Dodd-Frank

2    Act requires the Commission on an ongoing basis to review

3    swaps that have not been accepted for clearing by a DCO

4    to make a determination as to whether the swaps should be

5    required to be cleared.

6             If no DCO has is accepted for clearing swaps

7    that the Commission finds would otherwise be subject to a

8    clearing requirement, the Commission would investigate

9    the relevant facts and circumstances within 30 days of

10   the completion of its investigation, issue a public

11   report containing the results of the investigation.

12             The Commission would take such actions as it

13   determines to be necessary and in the public interest,

14   which may include establishment of margin or capital

15   requirements for parties to the swaps.

16             And finally the last part of the rulemaking

17   concerns the Stay of Clearing Requirements.  After making

18   a determination that a swap is required to be cleared,

19   the Commission, on application of a counterparty to a

20   swap or on its own initiative, my stay the clearing

21   requirement until it completes a review of the terms of a

22     swap and the clearing arrangement.

83

1           If the Commission decides to issue a stay, it

2     would have 90 days to complete its review of the clearing

3     of the swap unless the DCO agrees to an extension.

4           Upon completion of its review, the Commission

5     could determine, subject to any terms and conditions as

6     the Commission determines to be appropriate, that the

7     swap must be cleared, or that the clearing requirement

8     will not apply but clearing may continue on a non

9     mandatory basis.  Thank you.  I will take any questions.

10          CHAIRMAN GENSLER:  Thank you, Eileen.  I will

11    entertain ae a motion?.

12          COMMISSIONER SOMMERS:  So moved.

13          COMMISSIONER O'MALIA:  Second.

14          CHAIRMAN GENSLER:  With the motion made and

15    seconded just a couple of question.  As I understand,

16    Eileen -- I support this proposal.  I think it's very

17    important process rule.  But as I understand, we are

18    earlier on under Dodd-Frank asked each of the clearings

19    organizations that currently clear swaps to wait a little

20    while until their swaps are submitted under this process

21     from.  Can you walk us through, just walk us through how

22     that relates to the rule?

84

1            MS. DONOVAN:  Sure.  Under Dodd-Frank, those

2    swaps that are already being cleared deemed submitted to

3    the Commission for review.  So the Commission has 90 days

4    to review those swaps unless the DCO has agreed to an

5    extension.

6            We requested that all DCOs agreed to an

7    extension.  They did agree.  So that once these rules

8    become final, which we're hoping will be in April, the

9    Commission could begin its 90 days of those swaps meaning

10   a determination on the varying requirement could be made

11   by July, which would be the effective date of the

12   legislation.

13           CHAIRMAN GENSLER:  If I remember, I think

14   there were eight or so.

15           MS. DONOVAN:  It was eight DCO'S that

16   currently cleared OTC products that may or may not be

17   swapped.

18           CHAIRMAN GENSLER:  Again, so those eight

19   clearing organizations under the statute, it was deemed

20   that they were submitted unless they agreed to an

21   extension.  They've all agreed to an extension, all

22   eight?

85

1                    MS. DONOVAN:  That's correct.

2                    CHAIRMAN GENSLER:  And the goal of the

3        staff, one that I endorsed, is that we try to complete

4        this rule before the 360 days, but complete it at 270
or

5        so days by next April 15 tax day.  I think it's also

6        Pete's birthday.  But by tax day so we can run the 90-
day

7        process.  Is that's what your thinking is?

8                    MS. DONOVAN:  Yes.  That's correct.

9                    CHAIRMAN GENSLER:  Okay.  Thank you.  I

10       don't have any questions.  Commissioner Dunn?

11                   COMMISSIONER DUNN:  I have no questions
on

12       this.  I think the taxing point is that staff and the

13       Commission to be able to do these review.

14                   CHAIRMAN GENSLER:  Commissioner Dunn, I

15       agree with you.  In terms of just some of the figures,
we

16       don't know how we'll group these.  But the largest

17       interest rate swap clearing house LCH in some
discussion

18       with them, they have in the interest rate space I think

19       nearly three quarters of a million contracts that they

20       clear.  And some of their non-interest rates it adds up

21       to about a million.  Is that right?

22                   MR. RADHAKISHNAN:  Yes.  That's correct.

86

1         CHAIRMAN GENSLER:  Presumably, IT will be

2    grouped by class and so forth.  But next spring, we might

3    be putting out the public comments this nearly three

4    quarters of million interest rate swaps that they

5    currently clear.  Hopefully, it will boil down to

6    hopefully dozens of categories.  But I share your views.

7    Without staff, it's going to get clogged up pretty fast.

8    Commissioner Sommers?

9         COMMISSIONER SOMMERS:  Thank you, Mr.

10   Chairman.  Just to walk through that type of example that

11   he used with LCH.  LCH or another clearing house that may

12   want to clear interest rates swaps applies to clear a

13   class of swaps and tells the Commission that they intend

14   to clear 300,000t different interest rate swaps, what is

15   the process for that from our point of view?

16        MS. DONOVAN:  Well, each of those swaps have

17   to be submitted.  But there is a provision in the rule

18   that requires that they specifically can do so if they

19   group them by class, type, or category.  And it also give

20      es the Commission the right under the rule to group those

21      appropriately for review.

22                  COMMISSIONER SOMMERS:  And if they submit

87

1    them as a group, them from our point of view, the process

2    is to go through 300,000 different interest rate swaps.

3    Do we then make a determination that 200,000 of them are

4    okay but 100,000 are not?

5              MR. RADHAKISHNAN:  That's possibly.  That

6    could be a possible outcome.  Although, I would think

7    that, without pre-judging the issue, if clearing houses

8    are already successfully clearing swaps, then we would

9    have, the staff would have to have good reasons to

10   recommend to the Commission that, let's say it was

11   300,000, 200,000, 100,000 either should not be cleared,

12   or there should not be a determination they should be

13   cleared.

14             But, Commission come as you are pointing to

15   the enormity of tasks, and I will not tell you otherwise.

16   It is an enormous task.  It could be that one group is

17   U.S. dollar-based fixed-payment and fixed-flowing.  And

18   the flowing is liable and the fixed-rate, depends on the

19   day, a five-year swap.  So that would be easier to

20   evaluate.  But we will really know what our task is once

21   we start investments.  Hopefully that the public comment

22      period will help the Commission help the staff making

88

1    recommendations.

2              COMMISSIONER SOMMERS:   That was my next

3    question really.   For final rules in the this area, do
we

4    expect that there will be more specific information
about

5    exactly what the process is going to be and how,

6    especially in a situation where you may have a clearing

7    house that already clears a million different contracts

8    in interest rates swaps, but a new clearing house that

9    wants to clear the exact same, what's process of
deciding

10   whether or not that new clearing house is eligible, or

11   how do we decide, you know?   Will there be more
substance

12   in that final rule?

13             MS. DONOVAN:   Well, a new clearing house
that

14   wants to clear would first have to go to the first
part,

15   the review eligibility under 745(b).

16             COMMISSIONER SOMMERS:   I guess I was just

17   assuming that a new clearing house that has already
been

18   approved to clear.

19             MR. RADHAKISHNAN:   Clear swaps or a new
DCO?

20   I think Eileen is talking about if a DCO has not
started

21    clearing swaps and wants to clear swaps, then it will

22    have to apply to us for eligibility to clear swaps.

89

1          So basically they will tell us what does it

2     want to clear.  What it's marginal regime is.  What the

3     ongoing risk management is.  What the default procedures

4     are.  Basically, a demonstration to the Commission that

5     it is qualified to clear and price the swap.

6          COMMISSIONER SOMMERS:  So that approval will

7     be by asset class?

8          MR. RADHAKISHNAN:  Yes.  It will be by asset

9     class.  It depends on what it wants to clear.

10         COMMISSIONER SOMMERS:  I'm sorry, I have one

11    other question regarding the stay.  If you could explain

12    what a reason would be for a counterparty to apply for a

13    stay, and what would be a reason that we would grant a

14    stay to the counterparty.

15         MS. DONOVAN:  The rule doesn't go to that.

16    We just ask that they provide explanation and why.  I'm

17    sure the presumption would be one of those five factors.

18    But I list that for some reason the Commission's decision

19    is on any of those factors that the counterparty is

20    disputing the finding on those.  We could ask that in the

```
21    proposal.

22                It's possible, based on comments we got in
```

90

1    response to the proposal that we would define that in the

2    final rule.

3              COMMISSIONER SOMMERS:  And then the

4    determination approval of that stay would have an affect

5    on all other swaps of that category?  If a particular

6    counterparty applied and said they requested a stay, that

7    stay would be applicable to that class?

8              MS. DONOVAN:  Right.  All swaps would fall

9    under that requirement, yes.

10             COMMISSIONER SOMMERS:  Thank you.

11             CHAIRMAN GENSLER:  Thank you, Commissioner

12   Sommers.  I think this highlights -- and I can only speak

13   for one Commissioner -- I believe that's the only way

14   this is going work is if it's done by class, group, or

15   contracts.  There is no way.  We don't have the

16   resources, nor does the public through a 30-day period.

17             LCH, for instance, currently clears interest

18   rate swaps for a group of currencies, and let's say

19   that's 15 or 20 different currencies.

20             Ananda used the example of U.S. dollar swaps,

21   that they would somewhat submit to us their U.S. dollar

22      swap business may be broken down by three or four or
five

91

1    or maybe 10 or 20 categories, but not the hundreds of

2    thousands of contracts.

3              I think that's the only way we can do it.

4    And I think it's the best way for the public to react.

5    But I can't predict how they'll submit it.  They could

6    submit next April in a way that we ask them.  I think

7    under this rule, we could ask them to re-categorize this

8    right.  This gives us permission to regroup and

9    re-categorize.

10              MR. RADHAKISHNAN:  Yes, it does.

11              CHAIRMAN GENSLER:  And it's correct that if

12    it were approved for one swap clearing house one clearing

13    house it relates to others.  If there's another eligible

14    interest rate clearing house they, too, would be able to

15    do it.  Is that right?  I mean once you're eligible in

16    that category?

17              MR. RADHAKISHNAN:  Once you're eligible in

18    that category, once you've already been approved to clear

19    the swaps.

20              CHAIRMAN GENSLER:  So we're not try to pick

21    amongst them?

22              MR. RADHAKISHNAN:  No.

92

1          CHAIRMAN GENSLER:  Even though Commissioner

2     Sommers -- I'll use as an example -- is trying to pick

3     amongst them?

4          MR. RADHAKISHNAN:  Correct.

5          CHAIRMAN GENSLER:  Commissioner Chilton?

6          COMMISSIONER CHILTON:  I have no questions.

7          CHAIRMAN GENSLER:  Not having any further

8     questions, I will call a vote.  All in favor?

9          (Chorus of ayes.)

10         CHAIRMAN GENSLER:  Any opposed?  It being

11    unanimous 5-0.  I think, Eileen and Ananda, we'll send it

12    off to the Federal Register.  And so what do we have

13    next?

14         So we have one proposed rule and one proposed

15    set of questions called "An Advanced Notice of Proposed

16    Rulemaking on Anti-Manipulation and Disruptive Trading

17    Practices."

18         Bob Pease has been the team lead with Mark

19    Higgins, but they will be assisted by Vince McGunagle,

20    who is the acting head of the Division of Enforcement.

21    And you're not Ananda, but Brad Berry is Deputy Director

22    of our general counsel and appellate litigation there.

93

1    So Bob or whomever is taking the lead on this one.

2                 MR. HIGGINS:  Good morning, Mr. Chairman

3    and Commissioners.  In section 753 of Dodd-Frank amended

4    section 6(c) the Commodity Exchange Act.  The team

5    presentation today is proposing anti-manipulations rules

6    concerning two subsections.

7                 New section (c)(1) expands the authority of

8    the Commission to prevent any person from using or

9    attempting to use any manipulative or deceptive device.

10                Section (c)(1) is patterned after Section

11    10b of the Securities and Exchange Act of 1934, which

12    courts interpreted as a broad, anti-fraud, catch-all

13    designed to reach intentional or reckless conduct the

14    deems or defraud market participates.

15                New section (c)(1) is also similar to

16    anti-manipulation authority granted to the Federal

17    Regulatory Commission in 2005 and the Federal Trade

18    Commission in 2007.

19                FERC and the FTC have promulgating rules

20    based on SEC Rule 10b-5 with an appropriate modifications

21    to their Regulatory Commission.

22                The first two proposed rules before you today

94

1    under Section 753 are also modeled on SEC Rule 10b-5
with

2    tailoring that reflects not only the distinct regularly

3    mission of the CFTC, but also CFTCs own experience and

4    precedent policing market manipulation and fraud.

5              In Section 753, Congress also created a new

6    section (6)(c)  entitled "Other manipulation."

7              The second proposed rule before you today

8    mirrors the text of new Section (6)(c)(3).  The purpose

9    of this rulemaking is to affirm certain legal practices

10   and principles relevant to the CEAs prohibition against

11   price manipulation of any swaps or any commodity in

12   intrastate commerce for future delivery.

13             Separately, Section 753 also provides for a

14   prohibition manipulation by false reporting that
affects

15   or tends to affect the price of any commodity.

16              This provision is entitled "Special

17   Provision by Manipulation by False Reporting," and no

18   rulemaking is needed to implement it.

19             Section 753 also protects against good
faith

20   mistakes that result in false or misleading or
inaccurate

21   information being transmitted to a price reporting

22   service.

95

1          753 also prohibits any person from making
any

2     false or misleading statements of material fact to the

3     Commission.

4          As with the false reporting provision

5     previously mentioned, no rulemaking is needed to

6     implement this Section.

7          Finally, Section 753 expressly preserves
the

8     applicability of the anti-manipulation found in CEA

9     Section 9(a)(2).

10         Last, as stated in Section 754 of

11    Dodd-Frank, the prohibitions in 753 that require no

12    rulemaking will become effective in 360 days after the

13    date of enactment of Dodd-Frank.

14         The proposed rules before you, should they

15    become final rules, will become effective 60 days after

16    the final rules are publish for 360 days from the date
of

17    enactment whichever is later.

18         In the course leading up to this note

19    proposed rule, we received one public comment.

20         Before concluding my presentation, I would
be

21    remiss if I did not give acknowledge the individuals

22    contributions to the Assistant General Counsel, Ralph

96

1    Avery, Counselor Mary Connelly, and Enforcement
Attorney

2    Brian Walsh to drafting these proposed rules, as well
as

3    the outstanding administrative support of Yolanda Smith

4    and the leadership of Bob Pease.  That concludes my

5    presentation.

6              CHAIRMAN GENSLER:  Thank you, Mark.  I
will

7    entertain a motion on the staff recommendation on the

8    rule related to -- it's one rule, right?  You mentioned

9    two.

10              MR. HIGGINS:  Under 753 there are two

11    rules:  One under subsection (c)(1)

12              CHAIRMAN GENSLER:  Again, two motions?

13              MR. HIGGINS:  They're contained within
one

14    document.

15              CHAIRMAN GENSLER:  All right.  Thank you.
I

16    will entertain a motion?

17              COMMISSIONER CHILTON:  So moved.

18              COMMISSIONER O'MALIA:  Second.

19              CHAIRMAN GENSLER:  With discussion.  I just

20    had one question.  And sorry I didn't have anything

21    prepared for this one, but when you mentioned the SEC

22      Rule of 10b-5 and their statute provision 10b, you remind

97

SEC

1    me of insider trading.  That that is how over at the

2    many cases have been brought.

3            Can you just walk us through how you would

4    address that theory and so forth?

5            MR. HIGGINS:  Right.  The CFTC, as you

6    know, does not have a prohibition on insider trading.
So

7    a market participate that is trading or hedging their

8    crops or their expected production would still be able
to

9    continue to do so.  The rule does not upset any of the

10   Commissions long-standing precedence in that regard.

11       CHAIRMAN GENSLER:  And is that because the SEC

12   put that in rule 10b-5 and you've not done that here?

13           MR. HIGGINS:  That is true.  10b-5-1, I

14   believe is specific prohibition on insider trading.
More

15   fundamentally, the SEC's regulatory mission about the

16   disclosure.  And part of that, it's not allowing market

17   participates to trade on inside information.

18           We're about product integrity of the market

19   recognizing that for people to hedge and for price to

20   discovery to occur, people will be trading on knowledge

21   that they have that's not public

22           CHAIRMAN GENSLER:  I'm going to just say I

98

1   support this proposed rulemaking today.  I think that'
it

2   really helps the Commission broaden our ability to
police

3   markets as the statute says to make sure fair and

4   equitable trading.

5           Congress granted the Commission this

6   authority in addition to the disruptive trading
practices

7   authority.  And I think this brings new under the first

8   half of it, which is called the "first rule" to police

9   for fraud-based manipulation.  Whereas, this Commission

10  has had I guess what you call the other one price-based

11  manipulation in the past.

12          I would be remiss without thanking Senator

13  Cantwell for her leadership.  She worked with Senator

14  Lynn I know in making sure that this part of their

15  statutory regime.  Commissioner Dunn?

16          COMMISSIONER DUNN:  Thank you, Mr.
Chairman.

17  I greatly appreciate saying this as a part of the

18  Dodd-Frank Act and the Commission acting on this.  I

19  share the frustration of my fellow Commissioner Chilton

20  in his opening remarks.

21          It often times looks to us that things are

22  very apparent.  When we get into the case law and

99

1    determining what is it manipulation, we find that our

2    hands are often tied.  I think this goes a long way and

3    in helping our Enforcement Division.

4                    I would want to make sure that
clarification

5    that everyone understands when we talk about any

6    manipulative or deceptive devise or contrivance, that

7    would also include any electronic, algorithmic-driven

8    trading.  Is that correct?

9                    MR. HIGGINS:  If the elements of the rules

10   are satisfied, it matters not the vehicle by which the

11   person perpetrated the fraud.

12                   COMMISSIONER DUNN:  Thank you.  I think
that

13   again issued a real challenge to both or Surveillance

14   Division and Enforcement Divisions to recruit folks
that

15   have a strong understanding of how these devices
operate.

16   Thank you, Mr. Chairman.

17                   CHAIRMAN GENSLER:  Thank you, Commissioner

18   Dunn.  Commissioner Sommers?

19                   COMMISSIONER SOMMERS:  Thank you, Mr.

20   Chairman.  I just have a couple of questions with
regard

21   to the new authority.  The fact that we're all familiar

22   with the elements of proof of manipulation that we work

100

1     with under 9 (a)(2).

2            And if you could, first of all, answer if you

3     know what kind of difference there would be under the new

4     authority between a false reporting case or brought under

5     9 (a)(2) and under this new authority.

6            MR. HIGGINS:  Sure.  Under 9(a)(2) as you all

7     know is a four-part test.  I won't recite all of those

8     elements except to say artificial price is a key element

9     in that test.

10           Artificial price is not a required element

11    under (c)(1).  So a false reporting case could be brought

12    under (c)(1).  And assuming it's not within the false

13    reporting that's already specifically defined underneath

14    (c)(1) special provision for prohibition by false

15    reporting.

16           But let's just say it didn't fit in that

17    bucket and it was going to brought under (c)(1), the

18    elements, required elements would be that you prove up

19    the fraud, which would be the false report.  That is as

20    done with intent.  And now intent can be satisfied by

21    showing recklessness.

22                     So unlike C(3) claim or the old 9(a)(2)

101

1   claim, there to requirement for specific intent under

2   (c)(1).  Recklessness is enough.

3           And the last element would be that is has to

4   be, the fraud has to in connection with a jurisdictional

5   products.  So a swap or a commodity in intrastate

6   commerce or a commodity for future delivery.

7           COMMISSIONER SOMMERS:  Do you think that

8   there's any case that comes to mind for you that you

9   would be able to bring under this new authority that we

10  were not able to bring under 9 (a)(2)?

11          MR. HIGGINS:  It's hard for me in the

12  abstract to think of the fact pattern that a person that

13  the Commission could not have reached under one of its

14  prior authorities.

15          I will say though, harkening back to

16  Commissioner O'Malia's opening comment , that there were

17  several prohibitions.  This is an additive.  This

18  supplements the Commission's existing anti-fraud and

19  anti-manipulation regimes.

20          And it's additive in the sense that for the

21  first time you have a manipulation rule that prohibits

22  fraudulent conduct.  And so in that way it's different

102

1    and it's additive.  Now you can get a market manipulation

2    by fraud.  And you can get there by proving that the

3    intent element at least by recklessness.

4            So it's new and it's additive in the sense we

5    can now have manipulation by fraud.

6            COMMISSIONER SOMMERS:  Thank you, Mark.

7            MR. MCGUNAGLE:  Commissioner, if I could just

8    expound a little bit on Mark's comment without going back

9    to the cases that we filed or didn't make recommendations

10   on, but look at the types of conduct at interest and how.

11   I think Commissioner O'Malia hit it correctly about this

12   continuum, how we evaluate our cases when we're looking

13   at manipulative device, say illegal activity, wash

14   trading, or pre-arranged trading.  For example, how that

15   is going to work in our evaluation in determining

16   potential liability under 6 (c)(1).

17           So conduct like, for example, where someone

18   says that are testing the market on how the facts and

19   circumstances evaluation during or investigation, what

20   does that actually mean to test the market and what steps

21     we're actually taken in furtherance.

22               So under 6(c)(1) we're looking at

103

1    manipulative devices where we're looking at the conduct

2    that we see first as whether there's other violations

to

3    the Act like wash trading or pre-arranged or false

4    statements that has been enhanced through this

5    rulemaking.

6              False statements to the Commission.

7    Someone, for example, isn't up-front about the status

of

8    ownership of accounts.  And that information might be

9    useful in terms of getting a true picture of what

10   actually the trading strategy is.  As well as looking

at

11   what otherwise would have been legitimate devices as we

12   do in manipulation cases.  But for intent become

13   illegitimate vehicle getting toward manipulative

14   activity.

15             So I think that the framework of the

16   evaluation is in place, but we now have additional

tools

17   to assist us in doing that evaluation.

18             COMMISSIONER SOMMERS:  Thank you, Vince.

19             CHAIRMAN GENSLER:  I think there's a little

20   bit of aversion.  The document that we probably looked

at

21   last night said exactly what Vince said.  It was

22   basically to use or employ or attempt to use or employ

104

1    any manipulative device, scheme, or artifice to
defraud.

2              I want to confirm that's what we're talking

3    about.  Not that we're worried about what will go out
of

4    this building, but right now we have another document

5    that might have gotten pulled of a share point site

6    internally that didn't have the final orders in it.

7              MR. MCGUNAGLE:  You are correct.

8              CHAIRMAN GENSLER:  I just want to confirm

9    that because I have same share point site here.

10   Commissioner Chilton?

11             COMMISSIONER CHILTON:  Mr. Higgins said

12   exactly what I wanted to make a point on, but I will
put

13   a little bit finer point on it.  And it went
Commissioner

14   Sommers' question.

15             This doesn't make the standard that existed

16   that exists currently, the manipulation standard that I

17   spoke about that's referred to, it doesn't change that.

18   It is additive.  So it's a new thing that we could go

19   after folks for along with the disruptive trade
practice.

20             So we've got more tools, but there's still

21   that high standard that we've only had one successful

22   manipulation case in 35 years, correct.

105

1          MR. HIGGINS:  That is correct.  In the

2      absence of fraud, you have a pure (c)(3) case.  That

3      standard doesn't change.

4          COMMISSIONER CHILTON:  A lot of folks have

5      asked me why don't they get on with it and put this
stuff

6      in place.  One, we've been getting it on for a long
time.

7      The Chairman set this whole process up on the rules
even

8      before the bill passed.  You all and everybody else

9      that's been in this building and Chicago and New York
are

10     working very hard on these rules.  So we are moving

11     forward on them.

12         I also want to point out and I guess I'll

13     make it a question.  We're prohibited by law
implementing

14     this until next July.  Is that correct?

15         MR. HIGGINS:  That is correct.  The statute

16     in Section 754 I, which I mentioned in my presentation,

17     prohibits the Commission from giving affect to any rule

18     or provision before 360 days from enactment.

19         COMMISSIONER CHILTON:  Okay.  Even it's all

20     done today, we couldn't implement it and couldn't start

21     working?

22         MR. HIGGINS:  Yes.

106

1           COMMISSIONER CHILTON:  Mr. Chairman, are we

2      waiting to go around on the disruptive practices, or do I

3      do that now?  What would you prefer.  I had a question

4      about destructive practice.

5           CHAIRMAN GENSLER:  It's meant to be separate.

6           COMMISSIONER CHILTON:  Okay.

7           CHAIRMAN GENSLER:  Commissioner O'Malia?

8           COMMISSIONER O'MALIA:  Mr. Chairman, I have a

9      lengthy list of questions.

10          CHAIRMAN GENSLER:  That's why we're here.

11          COMMISSIONER O'MALIA:  And I would be happy

12     to ask them if somebody wants to interrupt and take some

13     turns going around, I'd be happy to break them up.

14          CHAIRMAN GENSLER:  Do you want us to ask some

15     of your questions for you?

16          COMMISSIONER O'MALIA:  We might divide it.  I

17     have several pages and I can give everybody one.  I just

18     want to be respectful to other Commissioners.  And if you

19     have a question and you want to jump in, please don't

20     hesitate to cut me off.  I will keep asking question

21      until I run out of paper.

22                 I do appreciate the team's efforts here.

107

1    We've worked very hard to make this a better product. I
2    especially want to thank Laura Gardy, my senior counsel
3    whose done an outstanding job to approve this product, as
4    well.  I appreciate you all working with her.
5              As I note in my statement, I think that we
6    would all benefit, that Mark would benefit, we as
7    Commissioners, and Enforcement Division would benefit by
8    understanding what processes are going to be allowed or
9    not allowed.  That's a lots of flavoring in my questions.
10             CHAIRMAN GENSLER:  I was just going to say that
11   disruptive trading practices are separate.  We can do
12   them all together, but I have to give Commissioner
13   Chilton a chance, too, on disruptive trading practices
14             COMMISSIONER O'MALIA:  I'm happy to break
15   them up.
16             CHAIRMAN GENSLER:  Thank you.
17             COMMISSIONER O'MALIA:  I just wanted to get a
18   better understanding.  6(c)(1) the violation, is it
19   $140,000 per violation or a million dollars?  I'm trying
20   to understand this conduct is manipulation (6)(c)(1)
21   what would be the penalty be ?

22                    MR. HIGGINS:  6 (c)(1) is styled "The

108

1       prohibition on manipulation."  So if you violate the rule

2       promulgated under that, the penalty set forth is up to $1

3       million dollars in Section 753.

4                 COMMISSIONER O'MALIA:  In order to satisfy a

5       violation of 6 (c)(1) you must prove that there was,

6       quote, "manipulative or deceptive device or contrivance."

7       How would we prove that?  What make something

8       manipulative or deceptive?

9                 MR. HIGGINS:  Those words, manipulative

10      device or contrivance, were first interpreted by the

11      Supreme Court.  In that case, the Supreme Court said

12      those words were terms of art that the meaning could be

13      found only in the statute.

14                In so doing -- and this is under 10b law --

15      they interpreted those words to mean fraud.  So to

16      violate (c)(1) and the rule proposed rule promulgated

17      thereunder, should it become final rule, you would have

18      to show fraud existed.

19                Now, in the preamble -- I'm sure your next

20      question will be what is fraud --  in this context fraud

21      is a term of art.  Fraud it's not associated with all the

22      common law element of fraud that you would have in state

109

1    law action.

2              Here, fraud in the preamble we propose to

3    mean any conduct that impairs, obstructs, or defeats a

4    well-functioning market or the integrity of the market.

5              COMMISSIONER O'MALIA:  Would a individual

6    trade strategy me manipulative because each bid and
offer

7    will feed a price trend?  How will we look at that?

8    Would we look at it by bid and offer, or we look at a

9    kind of scheme?

10             MR. HIGGINS:  Here's where it's difficult

11   from where I stand because these cases are really fact

12   and circumstance specific.  So to -- and I'm going
leave

13   you wanting, I think, with your question because
without

14   those facts and circumstances, it's hard to give
meaning

15   to these words.  They don't mean much in isolation.
They

16   mean something when they're enveloped by any given
case.

17             So I really, I defer to others, but I don't have

18   a good answer for you without factual record around
which

19   to apply the rule.

20             CHAIRMAN GENSLER:  Are there cases?
Because

21    really what happened with Senator Cantwell worked to

22    insure that FERC had these authorities FTC had these

110

1   authorities, and now we have these authorities as the SEC

2   has over decades.  So maybe if there is guidance from

3   other cases.  Brad or Vince?

4           MR. MCGUNAGLE:  I do I think, as Mark said,

5   this will be a case-by-case development.

6           When I was speaking earlier to Commissioner

7   Sommers, I focused on, for example, activity that we've

8   already found to be illegal because I think that making

9   the arguments in front of the courts with respect to the

10  activity that already violates some aspect of the

11  Commodity Exchange Act.  That working an evaluation

12  statute saying in furtherance of it's a manipulative

13  device or deception, that that will be, should be

14  persuasive to the court.

15          As we talk about other areas of trading

16  activity, where arguably, you know, it might otherwise

17  appear to be legitimate trading, you know, on the market.

18          But we're offering that there is a

19  manipulative scheme in play.  And so the actual trade

20  strategy that's being employed constitutes a manipulative

21  or deceptive device under 6 (c)(1).  And the courts will

22      help guide us in terms of how those issues get decided

as

111

1    we go forward.

2            So I don't think there's going to be a

3    hard-and-fast rule coming out of the applicability of 6

4    (c)(1) after the effective date.  There will be a lot
of

5    discussions in the cases just going forward.

6            CHAIRMAN GENSLER:  I'm sorry.  I'm just

7    trying to hep.  But wouldn't the Courts -- and maybe

8    Brad, because you're an appellate litigator, wouldn't
the

9    courts look to a lot of the law that's been established

10   by the courts around the Securities And Exchange

11   Commission enforcing the same words?

12           MR. BERRY:  Yes, they would.  And the

13   proposed ruled acknowledges that talk about the fact
that

14   there's been a lot of case law developed under Section

15   10b and 10b-5.

16           And that, in many respects, the we're

17   proposing that this provision be guided by the law that

18   has developed around 10b and 10b-5) with appropriate

19   modifications.

20           CHAIRMAN GENSLER:  Commissioner O'Malia?

21           COMMISSIONER O'MALIA:  Thank you, Mr.

22   Chairman.  The manipulative or deceptive devise must
be,

112

1    quote, "Used in connection with a jurisdictional

2    transaction," correct?

3            MR. BERRY:  That's correct.

4            COMMISSIONER O'MALIA:  Can you help me

5    understand how the SEC is interpreted this and how we're

6    interpreting this in our rulemaking?  And maybe any

7    flavor you can -- is there a nexus between the conduct

8    and the jurisdictional transaction?

9            MR. HIGGINS:  Right.  So the Supreme Court

10   again has weighed in on this specific issue in connection

11   with the SEC versus Sanford case, which can came down in

12   200w.

13            In that case, the Supreme Court breathed

14   light in the three-words phase "in connection with" by

15   saying:  So long as the fraud coincides with the SEC

16   jurisdictional transaction, there is that sufficient

17   nexus, as you said.

18            Now, the Court was careful in that case to

19   not be unlimited.  I believe it's footnote 4 of that cas

20   the Court went on to say -- this was a 9-0 case, by the

21   way.  I think it was unanimous.  The Court said:  When

22   we're saying "in connection with," it's not limitless.

113

1          So they gave the example of a stockbroker who

2     steals cash.  Not a money-market fund, but cash from a

3     client's account and uses that cash to buy real estate.

4     There is a not a sufficient nexus.  And you would not

5     violate 10b-5 under that fact pattern.

6               So it's broad, is as the entire rule.  It's

7     meant to be flexible, but it's not limitless.

8               COMMISSIONER O'MALIA:  I think I'm done with

9     my disruptive trading practices questions.

10              CHAIRMAN GENSLER:  Manipulative questions.

11              COMMISSIONER O'MALIA:  Right.  Yes.

12              CHAIRMAN O'MALIA:  I gather, and I think

13    Commissioner O'Malia's questions are very helpful, we're

14    not alone in this because there's a tremendous amount of

15    case law, I think.  There's a tremendous amount of case

16    law, and that's what I understood, at least I understand

17    was the intent of Congress here.  So if we have new

18    fraud-based manipulation, it wouldn't be, as you say,

19    unfounded because it would be grounded in this case law.

20              And you've answered a very important second

21    question, Mark, is that we're not trying to incorporate

22      the insider trader piece in that case law, but if you

114

1    could you answer those two pieces to the questions

2              MR. HIGGINS:  Yes.  Justice Renquist said
of

3    10b-5:  That from a egg corn a new oak has grown.

4              CHAIRMAN GENSLER:  Which Justice was that?

5              MR. HIGGINS:  Renquist.  So he's making a

6    point in this statement there is a huge body of case
law

7    under 10b-5 that we can avail ourselves to.  And I'm
sure

8    the courts will too as they interpret it.  So yes, we

9    will be guided by but tailored to our specific mission.

10             As far as insider trading, just to
reiterate

11   this rule does not prohibit insider trading, nor does
it

12   impose any new duty of disclosure on any market

13   participants.

14             There's a specific provision in 753 that
says

15   you do not have to divulge inside or confidential

16   information to the public before you trade.  However,
if

17   you do speak, you must speak fully and completely and
not

18   be misleading in your statements.

19             CHAIRMAN GENSLER:  Other questions?

20             COMMISSIONER O'MALIA:  Thank you, Mr.

21      Chairman.  Your question did bring up in what I think

22      will be helpful is helping everybody understand how this

115

1     continuum works as I noted.  9(a)(2) in our statute,

2     obviously, and we're not getting rid of that.  Do you

3     want to elaborate on what that relationship is?

4                MR. HIGGINS:  Yes.  I think it's status quo,

5     as far as 9(a)(2).  So I think today, just as we have in

6     the past, a person, depending on the right facts and

7     circumstances could conceivably be charged with multiple

8     (c)(1) violation and a 9(a) (2) violation.

9                Congress was explicit that 753 would not

10    upset 9(a)(2)  or the applicability of 9(a)(2).

11               COMMISSIONER O'MALIA:  Now, you've showered

12    praise on the SEC 4 and FERC for their new authorities.

13    We are not without our own fraud authorities.  How will

14    those be -- and in case law therein.  So how are we going

15    to use our case law?  Are we going to band in it, or are

16    we going to just go with SEC, or stand by it?

17               MR. HIGGINS:  No.  We do not and we're clear

18    in the preamble and I tried to make clear in our

19    precedence, this is new authority.  It's new.  But we

20    have decades of precedent in policing fraud manipulation.

21    We have no intention amending that.

22                    I think any manipulation case that was

116

1    brought before could still potentially be used in

2    guidance in cases going forward on.

3             COMMISSIONER O'MALIA:  So now we have the

4    SEC, FERC, our fraud, 9(a)(2), obviously this is

5    extraordinarily complicated.  We've given you significant

6    tools.  Congress has given us significant tools obviously

7    with fraud and manipulation in changing the price element

8    a little bit here.

9             Now how do we form the industry of how

10   they're going to be charged what the rules are going to

11   be going forward and what applies?  Are they going to be

12   a 6(c)(1)?  6(c)(3)?  9(a)(2)?  Fraud versus

13   manipulation?

14            You did dodge the 140 versus million-dollar

15   question earlier on whether it will be fraud or

16   manipulation because it has that reckless standard in

17   there.  What's the market to think about all of this?

18   How can we give them the confidence, or what bin they

19   will be bucketed?  There's no confidence.

20            MR. HIGGINS:  Again, I'm not trying to dodge

21   your questions.  I'm simply saying that this area of the

22      law is extremely fact and circumstance dependent.  So
to

117

1    tell you today how somebody would be charged tomorrow is

2    foolish from where I sit.  So, you know, in that respect

3    or with that caveat, everything is still on the table and

4    it always will be.

5              If a specific fact person merits a 4b charge

6    but not (c)(1) charge, that would be something that the

7    Commission would consider.

8              And a fact patten that may fit that profile

9    is where you have somebody that is perpetrating a fraud,

10   they have requisite intent, but there in not a sufficient

11   connection through a connection jurisdictional

12   transaction.  If they're selling widgets or something

13   like that that aren't jurisdictional, maybe you have a 4b

14   fraud and not a (c) (1) fraud.

15             So as you can see with every new fact there's

16   a new permientation and new analysis that goes into this.

17             MR. BERRY:  Can I add just one comment?

18             CHAIRMAN GENSLER:  Please.

19             MR. BERRY:  The one thing that I would hope

20      that would be of comfort to the industry is that most of

21      the provisions that you just recited, Commission O'Malia,

22      requires specific intent or intent to defraud.

118

1           So in most instances, with the exception

2    recklessness under (c)(1)if you are acting without

3    fraudulent intent or without specific intent to

4    manipulate to effect the price, you should be okay.
It's

5    when you are acting with that intent that you can get

6    into trouble.

7           MR. HIGGINS:  And just one other point with

8    recklessness.  I want to be real clear on this.  It's
not

9    your standard tort definition, recklessness.  The
courts

10   are very clear in securities context and we are in our

11   rulemaking and in our preamble in the cases we cite.

12   When we say "recklessness," we mean a lesser showing of

13   intent.  We don't mean a higher degree of negligence.
I

14   hope that's eliminating.  I just want to make that
point.

15          People aren't, I don't think, are going to

16   stumble into a (c)(1) violation.  You have to have the

17   requisite of that intent.

18          COMMISSIONER O'MALIA:  Thank you, both.

19          CHAIRMAN GENSLER:  I can tell we have four

20   extremely, accomplished, and knowledgeable lawyers.  I

21   didn't go to law school, but I followed most of that.

22          COMMISSIONER CHILTON:  Mr. Chairman?

119

1          CHAIRMAN GENSLER:  Yes, Commissioner Chilton.

2          COMMISSIONER CHILTON:  I would just want to

3     compliment, and I appreciate Commissioner's O'Malia's

4     questions.  I think they're good questions.

5          As I think all of us here know, particularly

6     the Chairman, this language was sort of a compromise that

7     was sort of banged out at the 11th hour of the

8     conference.  And, well, people may write if differently

9     from one person or another.  Congress wrote it, and it's

10    the law.  And so this is what we're left with.  And I

11    think you all have done a really spectacular job in

12    putting a lot of meat on the bone.

13         I do look forward to the comment we will get

14    on this because I. Do think there's some legitimate

15    questions.  But I compliment you on the work that you've

16    done so far.

17         CHAIRMAN GENSLER:  Again, if there are no

18    further questions, I will entertain a call of the

19    question.  All that's in favor say "Aye"?

20         (Chorus of ayes.)

21         CHAIRMAN GENSLER:  Any nayes?  It being

22      unanimous 5-0, we'll send this one, as well, to the

120

1    Federal Register.  Some of you can stay, or all of you

2    can stay for disruptive trading practices.

3              Brad, don't go anywhere.  We have four great

4    lawyers here.  I don't want to give you up.  So Bob, are

5    you going to present this one?

6              MR. PEASE:  Yes, Mr. Chairman.  Good morning,

7    Mr. Chairman.  Good morning, Commissioners.  I would like

8    to introduce our team member with the anti-manipulation

9    and disruptive trading practices, the matter we're

10   discussing today.

11             As you can see from Mark's presentation a lot

12   of hard work and very high qualify work was put into

13   these efforts.  Ralph Avery, Mary Connolly, Maria Godell

14   from the Office of the General Counsel.  William Pennet

15   from DCIO.  Christine Sorenson and Michael Pennet from

16   OCE.  James Goodwin and Dave Taft from DMO.  And Mark

17   Higgins, of course, Brian Walsh and Jeremy C. From

18   Enforcement.

19             I would also like to thank John Mark B., Brad

20   Berry, and Andre C. For their invaluable assistance in

21   these matters.

22                    Today we're here to discuss an advanced

121

```
          1    notice of proposed rulemaking concerning Section 747 of
          2    Dodd-Frank which prohibits, among other things,
specific
fair      3    trading practices disruptive that are disruptive of
          4    and equitable trading.
          5            Separately and not part of our proposed
          6    rulemaking, Section 747 also makes it unlawful for any
          7    for any person to enter into swap knowing they're
acting
will      8    in reckless disregard the fact that its counterparty
          9    use the swap as part of their device to scheme or
          10   artifice to defraud any third party.
          11           Section 747 under Dodd-Frank, in Section
747
          12   under Dodd-Frank, Congress expressly prohibits certain
          13   trading practices that it determines is disruptive to
          14   fair and equitable trading.
          15           Congress made it unlawful to violate bids
or
          16   offer demonstrate intentional or reckless disregard for
          17   the orderly execution of transactions during the
closing
          18   period, or is of the character of, or is commonly know
          19   the trade as "spoofing."  And spoofing is defined as
          20   bidding or offering with the intent to cancel the bid
or
```

21      offer before execution.

22                      Dodd-Frank Section 747 grants the
Commission

122

1    optional rulemaking authority to promulgate such rules

2    and regulations as in the judgment of the Commission

are

3    reasonably necessary to prohibit trading practice

4    enumerated and any other trading practice this is

5    disruptive to fair and equitable trading.

6            The prohibition on the three disruptive

7    trading practices specified in Section 4c(a) become

8    effective 360 days after the enactment of the Dodd-

Frank

9    Act.

10           In this proposed advanced notice proposed

11   rulemaking, the staff requests comments to 18 questions

12   ranging from the Commission to promulgate additional

13   guidance on the three enumerated statutory provisions.

14           Promulgation prohibition against additional

15   disruptive trading practice, supervision, and

monitoring

16   requirements, and applications of rules to electronic

17   trading and algorithmic automated trading systems.

18           For example, some of the questions

contained

19   in ANOPR are:  Should the Commission provide additional

20   guidance as to the nature of the conduct that is

21   prohibited by the specifically enumerated paragraphs

22   practices in the statutes.

123

1          How should the Commission distinguished

2      spoofing as articulated the statute from a legitimate

3      trading act where an individual enters an order larger

4      than necessary with the intent to cancel part of the

5      order to ensure his or her order is filled.

6          Does a partial fill of an order or series
of

7      orders necessarily exempt that activity from being

8      defined as spoofing.

9          Should there be obligations to supervise

10     against prohibited trading practices.

11          Similarly, should executorial brokers have

12     affirmative obligation under the rules to ensure that

13     customer trades are not disruptive.

14          Should the Commission consider promulgating

15     rules to regulate the use of algorithmic trading to

16     prevent disruptive trading practices.  And, if so, what

17     kind of rules should the Commission consider.

18          Should the Commission consider promulgating

19     rules to regulate the design of algorithmic or
automatic

20     trading systems to prevent disruptive trading
practices.

21          Should the Commission consider promulgating

22     rules to regulate the supervision and monitoring of

124

1   algorithmic or automatic trading systems to prevent

2   disruptive trading practices.

3           And should the Commission promulgate

4   additional rules specifically applicable to the use of

5   algorithmic trading programs, front trading

6   methodologies, and programs reasonably necessary to

7   prevent such systems from disrupting fair and equitable

8   markets.

9           The staff is recommending a 60-day comment

10  period for this advanced notice.  The staff also intends

11  to hold a public roundtable discussion on December 2,

12  2010, to provide a forum to discuss questions contained

13  in the ANOPR, as well as other issues prospective

14  commentators may raise.  Thank you.  I'll will be happy

15  to answer any questions.

16          CHAIRMAN GENSLER:  I think I'm supposed to

17  first entertain a motion.  So I'll entertain a motion.

18          COMMISSIONER SOMMERS:  So moved.

19          COMMISSIONER CHILTON:  Second.

20          CHAIRMAN GENSLER:  With that just questions

21  on this I don't have really have.  I just want to say I'm

22  supporting the proposed advanced notice of proposed

125

1    rulemaking.

2            I think that Congress in granting us these

3    additional authorities on disruptive trade practices
they

4    listed three.  And you pointed to the questions A. B.
C.

5    But I think it is helpful to ask the public how to best

6    give meaning to those three points, give specificity to

7    those three points.

8            Not everybody in the marketplace knows what

9    it is to, quote, "violate a bid or offer," but it's in

10   the statute now.  And not everybody knows what spoofing

11   is.  So I'm glad that we would ask questions.

12           I was more helpful in the last three months

13   we would get more public comments.  How many comments

14   have we gotten into our e-mail boxes on this?

15           MR. PEASE:  On disruptive trading, we did
not

16   receive any.

17           CHAIRMAN GENSLER:  So I'm really hopeful
that

18   market participants understand that it is at least this

19   Chairman's intent to move forward on rulemaking.

20           I think it is incumbent to do rulemaking to

21   give greater meaning to first three points violating
bids

22   and offers and spoofing and so forth.  But also to

126

1    consider whether we had a D or E or F as the provisions

2    provide.

3            In the 18 questions, we asked a series of

4    questions also with regard to automated trading.  We
will

5    have a staff roundtable I think it will be December 2.

6    We had a lot other staff roundtables, so this will

7    probably take a similar format.  But when there are
busy

8    schedules for November, this is just frankly the first

9    time we got those.  I think I think that will be very

10   helpful.

11           In moving forward, these possible comments

12   will also be informed by the Joint Advisory Committee,

13   the CFTC.  The Joint Advisory Committee, the CFTC has a

14   Joint Advisory Committee.  November 5 is our next
meeting

15   with that.  But during this period of time, I wouldn't
be

16   surprised we have some comments and advise back from
the

17   committee and additional meetings.

18           So I think all of this public comment
period

19   on these 18 questions, the Joint Advisory Committee, I

20   hope that market participates.  They're also busy.

21   They're busy making markets and hedging their risks and

22    so forth.  They're business trying to racket to our rules

127

1    and the SECs rules, but I hope they would help us on
out

2    on this one.  But I don't have any specific questions.

3    Commissioner Dunn?

4              COMMISSIONER DUNN:  Thank you, Mr.
Chairman.

5    I have no specific questions on this.  I do look
forward

6    to that roundtable on it.  I appreciate the hard work
in

7    there.  And I would implore the public to take part.

8              I also would like to thank all of the staff

9    and the participants in the roundtables that we have
been

10   having.  I think last Friday was a very, very good

11   roundtable event.  And I really appreciate the hard
work

12   that goes into that and what's coming out of it.

13             CHAIRMAN GENSLER:  Commissioner Sommers?

14             COMMISSIONER SOMMERS:  Thank you, Mr.

15   Chairman.  I would just like to say that I agree
entirely

16   with what you were just saying about these rules and

17   being able to get public comment because this
rulemaking

18   --  although this rulemaking is optional, I do think
that

19   the practices that are expressly prohibited under
Section

20    747 the A. B. C are less than clear.  And I would suggest

21    that any sort of rulemaking that we would do our -- our

22    goal through any sort of rulemaking here would be to make

128

1    them as clear as possible.

2              I know this is enormously complex.  And
that

3    working through these sort of complicated issues is not

4    easy.  And I want to say how much I appreciate this

5    team's effort in this area.  But that the public needs
to

6    understand that this roundtable on December 2 is really

7    important for us.

8              I think, let's see, if we put the rule out

9    today, they will have about three weeks after that

10   roundtable to get their comments in under a 60-day
extent

11   period.

12             So just to suggest to the public that if
they

13   have certain sections with regard to the ability for us

14   to make these rules very clear, that they participate
in

15   this process.

16             CHAIRMAN GENSLER:  Thank you.  Actually,
about

17   we'll probably get an extra week.  It always takes

18   a week between us and the Federal Register.

19             That, by the way, for the press is not us.

20   We usually hit the send button shortly or within 24

21   hours.  But the Federal Register has a process to get

22     into the Federal Register that's been taking six or
seven

129

1    days.  Commissioner Chilton?

2                COMMISSIONER CHILTON:  Thank you, Mr.

3    Chairman.  That last point that Commissioner Sommers was

4    making about making things as clear as possible, I think

5    is important.

6                But what we've learned is that we also want

7    to preserve some discretion in the future because you

8    either look at what people are thinking now about robotic

9    trading like algorithmic trading had the Flash-Trade

10   Report come out nine months ago instead of after the bill

11   was passed, maybe there would have been a provision in

12   the law that would sort of outlaw algorithm anomalies.

13               So I think we just need to be cognizant that

14   this authority can change in future if we see something

15   else.

16               Folks are always looking for ways around the

17   laws and regulation.  And this, while I agree with

18   Commissioner Sommers, to be clear, it also allows us to

19   possibility change things in the future.

20               There was an old Styx song Mr. Roboto.  Do

21   you remember what it said there:  The problem is plain to

22    see.  Too much technology.

130

1          Now, I don't think there's too much

2     technology, but we've definitely seen instances this
year

3     where algorithms go wild and it costs people money.
And

4     it's not acceptable for the trader to just say sorry.
My

5     bad.  To me it seems like that should be punished in
some

6     way.

7          The Chairman and Commission Sommers talked

8     about not getting a lot of comments on this.  I gave a

9     talk yesterday in Las Vegas to 200 engineer traders.
And

10    they were not asking many questions, so I asked them
some

11    questions.  By the way, the first question is:  Is 70

12    percent of a market too much?  People raised both
hands.

13         The other question where I go unanimity

14    was:  Should algorithmic traders and algorithmic
programs

15    that wild and impact royal markets, should they be held

16    accountable?  Everybody raised their hand.

17         Now, that's not an official, public
comment,

18    but it seems to me even though you asked those four

19    questions in here 15 through 18 about algorithmic

20    traders, do we really want to add one more.

21                    I don't know if my colleagues would agree,

22       but something should algorithmic traders who impact
royal

131

1    markets be held accountable.  And, if so, in what fashion

2    or something like that.  And if the staff would like to

3    fine-tune my question, or if the Chairman would like to

4    second.

5              CHAIRMAN GENSLER:  I would be glad to second

6    if you change royal to disrupt.  I think that's what this

7    is a disruptive trading practice.

8              COMMISSIONER CHILTON:  Yes.

9              CHAIRMAN GENSLER:  That's an amendment that

10   we'll go to at the proper time.

11             COMMISSIONER O'MALIA:  Yes, I would like to

12   associate myself with Commissioner Chilton's remarks on

13   this.  This is a good question to ask.

14             COMMISSIONER CHILTON:  I will move my

15   question.

16             CHAIRMAN GENSLER:  All in favor of the

17   amendment to add the question?

18             (Chorus of ayes.)

19             CHAIRMAN GENSLER:  Any opposed?  I think it's

20   unanimous.  We have Commissioner O'Malia's rest of the

21   list of two pages.

22             COMMISSIONER O'MALIA:  Right.  I'd like

132

1    associate myself with Commissioner Sommers' comments on

2    this issue.  These are complicated.  The specifics

3    matters and we're asking some questions.  But, again, I

4    will try to inquire with the staff how to some of these

5    are being treated going forward.

6              Obviously, under 4c(a) of our current

7    authority, the first three A through C might be covered.

8    How do you respond to that?  Is this redundant with

9    4c(a), or not?

10             MR. Yes:  Are you asking whether -- can you

11   repeat the question?  I'm sorry, I didn't follow it.

12             COMMISSIONER O'MALIA:  Disruptive trading

13   practices, are they're covered under 4c(a) already?

14             MR. PEASE:  Yes.

15             COMMISSIONER O'MALIA:  The disruptive trading

16   practices described in Section 747 is described in the

17   e-mail for generally prescribed pre-trade conduct.

18   Absent in the ad hoc how analysis, how will the

19   Commission monitor for these violations?

20             MR. PEASE:  Monitor in advance?

21             COMMISSIONER O'MALIA:  Monitor at all.  Pre.

22   Post.

133

                1            MR. PEASE:  We've been working with the DMO

                2    and we will continue to work with them to come up with

                3    different markers that they would be able to use to try

                4    to figure out whether that would be violations.  But I

                5    think it's a little bit premature to say what they would

                6    use for the surveillance activities.  That's the purpose

                7    of this ANOPR to get more comments.  As the Commissioner

                8    would say:  Put more clarity around these terms.

                9            And as we get more clarity, then I think we

                10   can build some surveillance programs to be able to look

                11   at those type of practices in advance.

                12           COMMISSIONER O'MALIA:  Great.  What are the

                13   civil monetary penalties attached with each of these

                14   violations?

                15           MR. PEASE:  If they would be brought

                16   understanding Section 747 alone, they would be $140,000

                17   plus restitution, as well.

                18           COMMISSIONER O'MALIA:  If the $1 million

                19   dollar a day applies only to manipulation, could these be

                20   viewed as a scheme and therefore be subject to $1 million

                21   dollar a day?

                22           MR. PEASE:  There could be circumstances.

134

1      Depending upon the facts and circumstances, conduct that

2      may also violate is 747 would be a manipulation.

3                COMMISSIONER O'MALIA:  With regard to the

4      bids, the violation of bids or offer, what are the

5      elements of a violation of this provision?  What is the

6      level of intent, specifically, are we looking for?

7                MR. PEASE:  That's exactly what we're seeking

8      comments on.  Right now the statute doesn't state what

9      the intent would be for violating bids and offers.  I

10     think we would be looking at both specific intent and

11     recklessness behavior.

12               COMMISSIONER O'MALIA:  Are there any

13     instances that you can think of where a trader may bid

14     for over but not be in violation of this provision?

15               MR. PEASE:  I would rather not speculate on

16     various fact patterns there.  Again, it's very fact and

17     circumstance specific.

18               COMMISSIONER O'MALIA:  How about a

19     hypothetical?  What if a price at NYMEX and Globex they

20     pick a price that might have been lower on one rather

21     than the other.  Would be that be considered bidding to

22     the offer?  With all these steps coming into play, how we

135

1    would deal with that?

2           MR. PEASE:  We would have to look at the

3    totality of the circumstances at look at the intent.

4           MR. BERRY:  Can I interject?

5           COMMISSIONER O'MALIA:  Sure.

6           MR. BERRY:  Before you get too far done your

7    list, I want to call to your attention.

8           I'm looking at 4c(a) in my green book, and

9    it's not clear to me how that intersects with the

10   disruptive practices in 747.

11          I think one of the question that you've ask

12   whether disruptive practices that Congress spelled out in

13   747 are already cover in Section 4c(a).  And I don't see

14   that they are in the terms that Congress used.

15          It may be that for the provision that you're

16   referring is a broad provision that could encompass some

17   of those, but I don't see -- for example, 4c(a), I don't

18   see anything about violating bids or offers or spoofing.

19   So I wanted to -- I'm not sure that when Bob answered

20   that question, he's seems to say -- I think he meant

21   4c(a), right?

22                     MR. PEASE:  As I understand your question,

136

1    Commissioner, the statutory requirement in A. B. and C,

2    no rulemaking is needed to give effect to those.  And

3    then we are promulgating the rule that reflects those,

4    that mirrors those already enumerated provision and

5    giving more meaning to them, if that was your question.

6         COMMISSIONER O'MALIA:  Right.  That was my

7    question.  Thanks.  With regard to the reckless intent

8    that the orderly execution, the disregard for orderly

9    execution of the close, do we have any thoughts on how

10   you might define ordinarily execution?

11        MR. PEASE:  That particular area we're

12   seeking comment on.  We're also seeking comment on what

13   action defines closing period, good activity in advance

14   which has been executed during period, what all would be

15   encompassed to cover those terms. They're not defined at

16   all and there's little, if any, legislative history.

17        I'm a little concerned about the vagueness of

18   this probation that might prevent people from trading in

19   the close.

20        We have these trade and settlement &

21   contracts on the Exchanges.  How will those be treated?

22        MR. PEASE:  That will be an opportunity in

137

1    the next roundtable to be able to make -- clarify those

2    issues and address them specifically.  We won't be

3    looking at here; although it doesn't use those type

4    words.  Market and close.  That's type of activity that

5    we're trying to prohibit here, not legitimate behavior

6    during the closing period.

7              MR. MCGUNAGLE:  Certainly with respect to

8    using TAZ, the TAZ trading activity is subject

impending

9    Commission compliance against an entity by the name of

10   Optibor.  But in promulgated the rules with the

Exchange

11   and in conversations with the Exchange about conduct

12   that's otherwise disruptive on the market and what that

13   the Exchange is doing to ensure that there is

sufficient

14   liquidity during the closing range to accomplish the

goal

15   of the close to get an appropriate or meaningful

16   settlement price and how is that activity that there

17   isn't attraction by -- distraction during the closing

18   range when we're effecting what the closing price

should

19   be.

20             COMMISSIONER O'MALIA:  And question 12,

it's

21   a disorderly execution question.  How are we defining

22     that?  Are you asking for definition?  Do you have a

138

1    sense what the definition might be?  Do you have an

2    opinion on that?

3            MR. MCGUNAGLE:  No.  Again, this would be

4    another -- this is a fact and circumstances.  I think
the

5    analysis that we will have getting some input certainly

6    from industry about where they would wee maybe there's

7    markers currently activity that disorderly, but the

8    expectation is that we're going to be developing this
in

9    cases as we evaluate the trade strategies and make the

10   recommendations and have discussion with these traders

11   about whether we see conduct as being violative.

12           CHAIRMAN GENSLER:  Let me just jump in,

13   Commissioner O'Malia.  I think this is an amendment,
but

14   question 12 can you add -- and it's an amendment to see
I

15   support it -- if so because you have an if so, what
size?

16   Well, you do have it.  You do have it.  How should it

17   distinguish between orderly and disorderly?

18           COMMISSIONER O'MALIA:  To the size
question,

19   my question is how are we going define particularly
large

20   orders?

21           MR. PEASE:  That's one of the things we're

22     seeking comment on.  What we're trying to do is get

139

1    objective criteria that we can use for what would

2    consider a large trade.  So it would vary over the

3    circumstances.

4              And there are regulations that say what 15

5    (0)(3) in our regulations right now which have some

6    guidance, but that may not be appropriate in this

7    circumstance.  So we're looking to see to get comments

8    what would constitute a large trade.  And then once we

9    have a large trade, when it's as the questions are

asking

10   for concerning disorderly execution of those, does that

11   vary over time.  Does it very under circumstances of

12   market conditions.

13             We're looking for comments along those

14   directions because it can be -- a large trade can go in

15   at a certain time of the market and not cause a

16   disruption, other times depending on facts and

17   circumstances.  Should there be a monitoring question.

18   We're asking another question where you're monitor this

19   large trade as it's come into the market.  And taking

20   into account and consideration such as what's changed

21   during the day and what's changed when they made the

22   decision to execute that transaction.  All different

140

1    factors we want to look at.

2             We're asking the question should there be

3    additional controls when you're having a large trade

4    which would have the potential to disrupt the market.

5             COMMISSIONER O'MALIA:  Well, you have a very

6    difficult job in defining this with regard to technology

7    and the Advisory Committee.  And we've asked many of

8    these questions.  We either get different definitions, or

9    different ideas about what's the definition means for

10   various strategies.  Good luck.

11            MR. PEASE:  We look forward to working with

12   your committee to try help solve this problem.

13            CHAIRMAN GENSLER:  Thank you, Commissioner

14   O'Malia for your thoughtfulness on this.  If there are no

15   further questions on disruptive trading practices

16   advanced notices for proposed rulemaking, I will then

17   call the question.  All in favor say "Aye"?

18            (Chorus of ayes.)

19            CHAIRMAN GENSLER:  Any opposed?  The ayes

20   being unanimous, we will send this on to the Federal

21   Register.  Let me find the right thing to read from here.

22            If I'm allowed to do this, this is

141

1    housekeeping in trying to set up a new meeting schedule

2    and so forth.  But first I need a unanimously consent
on

3    something.

4              The Sunshine Act Commission rule requires

5    one-week notice of the subject matter to be considered
at

6    a public meeting.  And I actually asked a lawyer

7    yesterday could we consider today what our next meeting

8    is.  Apparently, we didn't notice the public that we'd

9    just be talking when our next meeting is.

10             So I would like a vote to approve that,

11   though we didn't notice that we would vote on when our

12   next meeting was, that we just vote to pick our next

13   meeting.

14             So consequently, I guess in order to ensure

15   that we conduct this meeting, and in accordance with
the

16   Sunshine Act, the Chair will entertainer a motion that

17   the business of the Commission requires a change in

18   todays agenda so we actually discuss when our next

19   meeting is.

20             COMMISSIONER SOMMERS:  So moved.

21             COMMISSIONER O'MALIA:  Second.

22             CHAIRMAN GENSLER:  All in favor say "Aye"?

142

```
 1              (Chorus of ayes.)

 2              CHAIRMAN GENSLER:  Any opposed?  We did
that

 3    administrative thing.  Now, in terms of our next
meeting

 4    -- we always want to be in accordance with the Sunshine

 5    Act.  In terms of the next meeting, I think that
Deborah

 6    Ridgway, who does all this scheduling between us, I
said

 7    three dates in November.  One of them might end up
being

 8    December 1.

 9              December 10 -- we'll put this all in
Federal

10    the Register.  December 10 -- November 10.  November 10

11    from 1:00 to 4:00 in the afternoon.  November 19, which

12    must be all day thing, but it's 9:30 to 5:30.  I think
we

13    have a calendar here internally six or seven of these

14    things.

15              And then December 1, actually, even though
we

16    were trying to do November 30.  I think somebody wasn't

17    available December 1 again in the morning 9:30 to
12:30.

18              So I would like offer a motion that those
are

19    our next three meetings.  And, of course, as we have
been
```

```
20      seven days before putting it on our website the actual

21      agenda items of the meeting.  Do I hear a second?

22                 COMMISSIONER SOMMERS:  Second.
```

143

1                    CHAIRMAN GENSLER:  All in favor say "Aye"?

2                    (Chorus of ayes.)

3                    CHAIRMAN GENSLER:  Any opposed?  No

4       opposed.  That is carried unanimously that are next three

5       meetings are the 10th, 19th, and December 1st.

6                    I do think we still, just for the press,

7       we're sort of anticipating two meetings after the

8       December 1st one.  We're human.  Some of this is going to

9       slip, inevitably.

10                   I know we're getting down to the crunch time,

11      so there will be somebody inevitably, because we're

12      coordinating a lot with the SEC, the Federal Reserve, and

13      other others, as well.

14                   Do I need to also do a unanimous consent for

15      any technical corrections?  So I have one last thing to

16      do on the script.

17                   At this point, I also ask unanimous consent

18      to allow staff to make technical corrections to documents

19      voted on prior today prior to sending them to the Federal

20      Register.  And I will make that motion.

21          COMMISSIONER SOMMERS:  Second.

22          CHAIRMAN GENSLER:  All in favor, "Aye"?

144

1            (Chorus of ayes.)

2            CHAIRMAN GENSLER:  Again, I want to thank

3    everybody.  I don't know if my fellow Commissioners have

4    closing remarks.  But we've done 30 topics areas that

5    we're plowing through.  Whether we're through a quarter

6    or a third, we know that this an lawful lot to get done,

7    but we're trying to get these out so the public can

8    comment.

9            We'll change the final rules that will be

10   given in the proposals all in accordance with the

11   Administrative Procedures Act.  But I look forward to

12   seeing you all back here on November 10.

13           Any other closing?  No.  With that, I

14   guess I need a motion to adjourn the meeting.

15           COMMISSIONER SOMMERS:  So moved.

16           COMMISSIONER O'MALIA:  Second.

17           CHAIRMAN GENSLER:  All in favor say "Aye"?

18           (Chorus of ayes.)

19           CHAIRMAN GENSLER:  The meeting is

20   adjourned.  Thank you.

21           ( Whereupon, the PROCEEDINGS were adjourned.)

22                     *   *   *   *