# Exhibit B

NEIL A. GOTEINER (State Bar No. 083524)
ngoteiner@fbm.com
C. BRANDON WISOFF (State Bar No. 121930)
bwisoff@fbm.com
JESSICA NALL (State Bar No. 215149)
jnall@fbm.com
ELIZABETH A. DORSI (State Bar No. 282285)
edorsi@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# (SOUTHERN DIVISION)

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, MICHAEL CARABINI and LOUIS CARABINI,<br><br>Defendants. | Case No. 8:17-cv-01868-JVS-DFM<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>The Hon. James V. Selna<br>Dept. 10C<br>Date: March 19, 2018<br>Time: 3:00 p.m. |

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

LEGAL STANDARDS .......................................................................................... 6

ARGUMENT ......................................................................................................... 7

    A.    Because Monex Makes "Actual Delivery" Under The CEA, The CFTC Lacks Jurisdiction To Bring These Claims. .................................... 7

        1.    Monex's Delivery Mechanism Satisfies The Plain Text Of The "Actual Delivery" Exclusion. .................................................... 9

        2.    The Statute and Legislative Record Support Monex. .................. 11

        3.    Congress Rejected the CFTC's "Actual Delivery" Definition. .... 13

        4.    Monex's Physical Delivery Follows the CFTC's Public Guidance. ...................................................................................... 14

        5.    The CFTC Grossly Mischaracterizes *Hunter Wise*. .................... 15

        6.    The CFTC's "Sham" Assertion is Frivolous. .............................. 18

        7.    The Short/Commodity Loan Is Not a Sham. ............................... 22

    B.    The CFTC's Newly-Minted Definition Of Actual Delivery Deprives Defendants Of Fair Notice And Violates Their Due Process Rights. ........................................................................................ 23

    C.    The CFTC's § 6(c)(1) Fraud Claim Does Not Create Jurisdiction. ...... 23

        1.    The CFTC's § 6(c) Theory Is Contradicted By Controlling Law. ................................................................................................ 25

        2.    The CFTC's § 6(c)(1) Theory Leads To Absurd Results. ........... 27

        3.    Section 6(c)(1) Is Limited To Market Manipulation. .................. 28

    D.    There Is No Evidence of Fraud To Support The Requested Relief ...... 32

        1.    Customers Lost Because of the Market, and Profits Were Far From Virtually Impossible According to the CFTC's Expert. ............................................................................................ 32

        2.    There Are No Material Misstatements Or Omissions in the Relevant Documents. .................................................................... 34

            a.    Atlas Marketing Materials and Statements Are Not False and Admittedly Influenced No Customer. ............... 34

b. There is No Duty To Disclose Customer Track Records. ...................................................................... 37

c. The Challenged Training Materials Do Not Establish Fraud, And In Any Event Have Been Discontinued. ................................................................... 39

d. The Sales Practices Do Not Suggest Fraud. ..................... 40

e. The CFTC Blinded Itself To The Truth. .......................... 41

mischaracterizing the Eleventh Circuit's explanation of actual delivery in *CFTC v. Hunter Wise*, 749 F.3d 967 (11th Cir. 2014). The *Hunter Wise* defendants had no metals in a depository or otherwise to deliver to customers who repaid their loans. When the *Hunter Wise* court discussed a lack of possession and control as defeating actual delivery, it was observing that the **defendants** possessed and controlled **no** metals to deliver in the first place. When the court said that the delivery in *Hunter Wise* was "constructive" and not "actual," it was rejecting the defendants' naked book-entry accounting system that was not backed by any real metals. Nothing in *Hunter Wise* suggests that "actual delivery" requires physical possession and control of metals **by individual customers** who have not yet paid off their loans. Nor could it reasonably do so given the explicit CFTC Guidance permitting margin-financed delivery to third-party depositories in fungible bulk form. Indeed, *Hunter Wise* quoted with approval the CFTC's own Final Guidance providing that: "'actual delivery' would be satisfied, among other things, by 'physical delivery [of] the entire quantity of the commodity purchased by the buyer, *including any portion of the purchase made using leverage, margin, or financing'* into possession of the buyer *or a depository other than the seller*." *Id.* at 980 (emphasis added). That is precisely what Monex does, as the CFTC's own 30(b)(6) witness admits.

**The CFTC Has No General Fraud Jurisdiction Over "Actual Delivery" Transactions:** To mask its lack of jurisdiction, and to inflame the Court, the CFTC fabricates a fraud theory. It then asserts with no authority that even if Monex meets the "actual delivery" exemption, the CFTC still has general anti-fraud authority over Monex under CEA § 6(c)(1) which prohibits deceptively manipulative devices in connection with commodity contracts in interstate commerce. But Ninth Circuit precedent makes clear that **substantive** CEA provisions, such as § 6(c)(1), do not trump **jurisdictional** limitations in CEA § 2, which defines the CFTC's jurisdiction and which expressly exempts "actual delivery" transactions. Indeed, under the CFTC's unprecedented construction, it would have general anti-fraud jurisdiction

Defs.' Opp'n to Motion for Preliminary Injunction -
Case No. 8:17-cv-01868-JVS-DFM

3

over *every* retail "commodity" transaction in interstate commerce, including those at grocery stores and pawn shops. Moreover, Congress explicitly directed § 6(c)(1) at fraudulent "manipulation" of markets that the CFTC regulates, not sales fraud by non-regulated entities. That the CFTC Division of Enforcement floats this assertion, demonstrates further its rogue derogation of Congressional intent.

**There is No Fraud:** While the CFTC has no jurisdiction over any supposed retail fraud at Monex, there is no fraud in any event. The CFTC self-described "heart" of its fraud case is the allegation that Monex hypes the safety, security and profit potential of metals investment *generally* without disclosing that ***Monex-specific*** transaction costs and fees make it virtually impossible to make a profit. Monex's extensive risk disclosures repeated with each trade, which the CFTC witnesses, including its 30(b)(6) witness, now admit are clear and understandable, expressly set forth all fees and costs, discuss their impact on a break-even analysis and invite customers to comparison shop. More importantly, the CFTC's own expert admitted that the CFTC's core theory—the hidden virtual impossibility of profits with Atlas—is wrong: he saw "no reason why an investor couldn't earn a profit using, you know, in the Atlas account." When asked about the CFTC's allegation that Atlas was almost a "certain loser," his candid response was that "in legal proceedings, hyperbole is common."

The CFTC misleadingly blames Atlas costs for customer losses (claiming that 90% of customers lose), but chose as its "review period" a time of dramatically declining metals prices. The CFTC's own expert agrees that even with ***no transaction costs*** eight of the ten "sample" accounts that the CFTC selected for his analysis would have lost money during the CFTC's chosen review period based on market declines alone. While this fact disposes of the CFTC's entire premise, the ten accounts that the CFTC chose to analyze were not randomly selected, but were cherry-picked because those customers made significantly more trades, and thus incurred exponentially more transaction costs, than the average customer. As a

notice, which attack Mr. Schwartz rejected in connection with the long Atlas product, noting that there was no increased risk with Atlas' passage of title and notice of transferred ownership. *Compare* PI Mem 14-15, *with* Goteiner Decl. Ex. 4 (Schwartz) 61:17-63:8, 72:1-6. Just as the CFTC argues that there is no difference between the Atlas long and the short in its analysis, the CFTC's secondary attack on the short as being speculative suffers from the same contumacy as the CFTC's ongoing rejection of Congress' actual delivery exemption. *See* PI Mem. 15; *see* Carabini Decl. ¶¶30-32 (explaining short).

**B.     The CFTC's Newly-Minted Definition Of Actual Delivery Deprives Defendants Of Fair Notice And Violates Their Due Process Rights.**

The CFTC's Complaint violates Defendants' due process right to adequate warning of the legal consequences of their actions. *See* MTD 27-33. Indeed, ***after*** its initiation of this enforcement action, the CFTC issued a new "proposed interpretation" of the actual delivery exception in the context of virtual currency. The CFTC 30(b)(6) witness first testified that that proposed interpretation was a source of the CFTC's actual delivery interpretation. Goteiner Decl. Ex. 4 (Schwartz) 8:24-9:7. This admission strongly supports Defendants' due process claim. The proposed Interpretation introduces for the first time many of the same "sham" factors that the Enforcement Division is advancing here, for instance that actual delivery will not have occurred unless the virtual currency is delivered to a depository "that has entered into an agreement with the purchaser," and the virtual currency is free from "liens . . . resulting from the use of margin, leverage, or financing." RJN Ex. 9. Due Process prohibits the deployment of these proposed theories against Monex, in contravention of the CFTC's prior Guidance and Congressional intent.

**C.     The CFTC's § 6(c)(1) Fraud Claim Does Not Create Jurisdiction.**

After spending the majority of its brief arguing that it has jurisdiction over Monex *because* Atlas transactions do *not* result in actual delivery, the CFTC abruptly pivots—asserting *ipse dixit* that it has jurisdiction for its fraud claims *even if* actual

Defs.' Opp'n to Motion for Preliminary Injunction -     23
Case No. 8:17-cv-01868-JVS-DFM

delivery occurs. PI Mem. 20 (relying on CEA § 6(c)(1) and Rule 180.1 promulgated thereunder at 17 C.F.R. § 180.1). CEA § 6(c)(1), amended as part of Dodd-Frank, makes it: "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.]" 7 U.S.C. § 9(1). The CFTC's fraud allegations are factually baseless as explained in Section D. But they are also legally irrelevant because the *substantive* prohibitions of § 6(c)(1) do not override the *jurisdictional* limitations of § 2 that expressly exempt transactions resulting in 28-day actual delivery. The CFTC's contumacious reading of § 6(c)(1) would nullify the "actual delivery" exemption in CEA § 2(c)(2)(D)(ii)(aa) and give the CFTC anti-fraud authority over all cash "commodity" transactions "in interstate commerce" including purchases at grocery stores or pawn shops.

It is telling that the Commission cites no case supporting this breathtaking jurisdictional grab; it instead cites only to the district court opinion in *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014), to list the elements of a fraud case *assuming it has jurisdiction in the first place.* PI Mem. 21. But, as noted, the *Hunter Wise* defendants had no metals to deliver. 21 F. Supp. 3d at 1327-28, 1330-33. That court reached the fraud allegations only after finding that the defendants made no actual delivery under the section 2(c)(2)(D) exemptions. Nothing in *Hunter Wise* suggests the CFTC has jurisdiction under § 6(c)(1) for transactions expressly exempted under § 2(c)(2)(D).[22]

---

[22] Indeed, in the Eleventh Circuit *Hunter Wise* opinion the court expressly declined to consider the CFTC's argument that section 6(c)(1) provides jurisdiction independent of the section 2 exemptions. 749 F.3d at 981.

Defs.' Opp'n to Motion for Preliminary Injunction -  24
Case No. 8:17-cv-01868-JVS-DFM

1. **The CFTC's § 6(c) Theory Is Contradicted By Controlling Law.**

The CFTC's jurisdiction is defined and limited by CEA § 2 which is unambiguously entitled "Jurisdiction of Commission." 7 U.S.C. § 2(a)(1). The Ninth Circuit has rejected prior CFTC reliance on substantive prohibitions contained in, and associated regulations promulgated under, *other* sections of the CEA (as with the CFTC's reliance on § 6(c)(1) and Rule 180.1 here) to avoid the express *jurisdictional* exemptions in § 2. In *CFTC v. White Pine Trust Corp.*, a pre-Dodd Frank case, the CFTC brought an anti-fraud action against a foreign currency options trader claiming that it had jurisdiction under both CEA § 2 and a substantive prohibition contained in 7 U.S.C. § 6c(b) prohibiting "fraud and misrepresentation in the solicitation or offering of options."[23] 574 F.3d 1219, 1223 (9th Cir. 2009). The Ninth Circuit held that the CFTC failed to establish its jurisdiction and remanded the case for dismissal, stating that "all roads lead back to section 2 of the Act" and that other substantive provisions of the commodities laws "**do not confer jurisdiction on the CFTC by themselves**." *Id.* at 1223, 1227.[24]

This District subsequently applied *White Pine* in *CFTC v. 20/20 Trading Co., Inc.*, a fraud case brought by some of these same CFTC counsel involving a precious metals dealer accused of selling financed metals that it did not actually possess or deliver. Judge Tucker recognized that: "[t]he jurisdiction of the CFTC derives from section 2 of the Act," which in that case limited the CFTC's authority to "leveraged contracts" within the meaning of 7 U.S.C. § 2(a)(1)(A) and, by express reference, 7 U.S.C. § 23. 2011 WL 2221177, at *4 (C.D. Cal. 2011). The court found that the

---

[23] The CFTC also claimed independent jurisdiction under § 13a-1, which provides that courts "shall have jurisdiction to entertain" actions seeking to enjoin violations of the commodities laws. The Ninth Circuit held that Section 13a-1 is not a jurisdictional grant but rather a statement of "the relief available to the CFTC regarding the claims it is permitted to bring." 574 F.3d at 1223 & n.3.

[24] *White Pine* also noted that Commission regulations (such as Rule 180.1 invoked here) are irrelevant without independent jurisdiction: "regulations, of course, cannot go beyond the jurisdictional limits of the statute." 574 F.3d at 1223.

CFTC had "failed to provide any evidence that the [at-issue contracts between the defendant and its customers] qualify as leverage contracts." *Id.* at *5, 7. The court thus denied the CFTC's application for a preliminary injunction for lack of CFTC jurisdiction.

It makes no difference, as the CFTC is likely to argue, that *White Pine* and *20/20* were decided before the CEA Dodd-Frank amendments. Indeed, it was the Dodd-Frank amendments to § 2 (the jurisdictional portion of the statute) that expressly gave the CFTC jurisdiction over *certain* retail commodity transactions in the first place (those involving leverage, margin or financing), 7 U.S.C. § 2(c)(2)(D)(i)(II), *while expressly exempting* any such retail transactions that result in actual delivery within 28 days. *Id.* § 2(c)(2)(D)(ii)(III)(aa). Both provisions are entitled to equal weight. The obvious purpose of the jurisdictional amendments in § 2 was to give the CFTC jurisdiction over only those retail transactions masquerading as cash delivery transactions but which are in reality futures-type transactions because they result in no actual delivery within a reasonable period of time (28 days) following sale. The Congressional sub-committee was explicit on this point (RJN Ex. 1 at 31, 38, 43), consistent with the CFTC's Mission Statement to prevent abusive practices, "related to derivatives and other products that are subject to the [CEA]."[25] As *White Pine* instructs, *substantive* CEA prohibitions (such as anti-fraud prohibitions in § 6(c)(1)) must be read in conjunction with, not as overriding, the express *jurisdictional* limitations of section 2.[26] And, following the Dodd-Frank amendments, § 2 remains captioned "Jurisdiction of Commission."

---

[25] U.S. CFTC Mission & Responsibilities, www.cftc.gov/About/MissionResponsibilities. CEA § 2(a)(1)(A) grants jurisdiction over certain accounts, agreements, and transactions "involving swaps or contracts of sale of a commodity for future delivery." CEA § 1a(27) provides, "the term 'future delivery' does ***not*** include any sale of any cash commodity for deferred shipment or delivery." (emphasis added).

[26] Subsection 2(a)(1)(A) limits CFTC jurisdiction: "The Commission shall have exclusive jurisdiction, ***except to the extent otherwise provided in . . . subsections (c)*** and (f)[.]" "Subsection (c)" refers to CEA § 2(c), which defines and limits CFTC jurisdiction.

Defs.' Opp'n to Motion for Preliminary Injunction - 26
Case No. 8:17-cv-01868-JVS-DFM

### 2. The CFTC's § 6(c)(1) Theory Leads To Absurd Results.

That Congress did not intend for the CFTC to wield CEA § 6(c)(1) anti-fraud authority over every "commodity" sale in interstate commerce is further confirmed by both the statutory structure and common sense.

First, the Court must read the relevant statutory provisions as a coherent whole, particularly because they were all amended by Dodd-Frank at the same time. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). There is no dispute that the CFTC can bring anti-fraud actions under CEA § 4b with respect to retail commodities transactions *only* if the actual delivery exception does not apply. 7 U.S.C. § 2(c)(2)(D)(iii). It would be nonsensical for Congress to exempt in § 2 retail financed transactions with 28-day delivery from the Commission's broad CEA § 4b anti-fraud jurisdiction (consistent with the Model Code and all prior CFTC precedent), while in the same Dodd-Frank amendments to allow the CFTC to circumvent that framework by asserting claims under § 6(c)(1). *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (recognizing "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"). Such a reading would make the exception's specific application to § 4b superfluous and should be rejected. That the CFTC is suing Monex under § 6(c)(1), given Congress' endorsement of Monex's actual delivery model for the § 2(c) exemption, highlights and worsens the CFTC's derogation.

Second, The CFTC's reading leads to an absurd expansion of its jurisdiction that Congress never would have adopted without explicit discussion. If the 28-day delivery exemption in § 2 did not apply to the anti-fraud prohibitions in § 6(c)(1), then the CFTC—the Commodity Futures Trading Commission—would have limitless anti-fraud jurisdiction over the sale of *any* defined "commodity" in interstate commerce. That would be true whether the sale involved a futures, leverage or financed contract, or a pure cash sale, even one with immediate delivery such as sales of grains and potatoes at a grocery store or sales of gold coins at a pawn

shop. *Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) (noting that "statutory interpretations that lead to absurd results are to be avoided"). The CFTC can cite nothing in the history of the amendments supporting Congressional intent for such a radical change.

### 3. Section 6(c)(1) Is Limited To Market Manipulation.

Even if the Commission could avoid the express actual delivery exemption in § 2, Congress meant § 6(c)(1) only to address fraudulent manipulation or potential manipulation of the markets that the CFTC regulates. Nothing supports the notion that Congress gave the CFTC jurisdiction over ordinary retail sales misrepresentations by non-regulated entities, as the CFTC muses in its brief.

A comparison of the structure and language of §§ 4b and 6(c)(1) demonstrates the point. The CEA had already addressed run-of-the-mill retail fraud in CEA § 4b. CEA § 4b, which Dodd Frank made applicable to financed metals transactions not resulting in actual delivery, makes it unlawful *inter alia* "to cheat or defraud" customers both in exchange traded futures contracts and illegal off-exchange contracts. In contrast, CEA § 6(c)(1) discusses disclosure in broad market terms without focus on individual players, consistent with the section's anti-market manipulation objective: "no [Commission] rule or regulation . . . shall require any person to disclose to another person nonpublic information that may be material to ***the market price, rate, or level of the commodity transaction***[.]" 7 U.S.C. § 9(1) (emphasis added). Also, § 6(c)(1) repeatedly refers to manipulation, whereas § 4b focuses on bad players cheating customers and in that context cabins the CFTC's anti-fraud jurisdiction to transactions on regulated markets.

Even before Dodd-Frank, the CEA already made it a felony to knowingly "manipulate or attempt to manipulate the price . . . of any commodity in interstate commerce." 7 U.S.C. § 9(3). But this provision required proof of specific intent to affect market prices, making CFTC enforcement all but impossible. RJN Ex. 10 at 40-41 (CFTC Chairman Gensler); RJN Ex. 4 at S3348 (Sen. Cantwell introducing

§ 753). Congress' purpose in CEA § 6(c)(1) was to strengthen the CFTC's weak tools for bringing manipulation cases to protect businessmen relying on the integrity of commodities markets, not to address retail consumer fraud: "This amendment is about protecting the integrity of markets for people who rely on them for their business." RJN Ex. 4 at S3348 (Sen. Cantwell)). The § 6(c)(1) amendments and the Commission's Rule 180.1 were thus not meant to make the CFTC a nationwide sales fraud policeman, but merely to "augment the Commission's *existing* authority to prohibit fraud and manipulation." 76 Fed. Reg. 41398, 41401 (July 14, 2011) (emphasis added).[27] This augmentation was necessary since, as Senator Cantwell pointed out, "In the 35 years of its history, the CFTC has only successfully prosecuted one single case of manipulation." RJN Ex. 4 at S3348. With the section 6(c) amendments, Congress permitted a general civil manipulation or recklessness standard under CEA § 6(c) as an alternative to the criminal manipulation scienter element under CEA § 9(a)(2), and jettisoned the causation element of having to prove a manipulation's actual impact on prices. 76 Fed. Reg. at 41401, 41404; 17 C.F.R. § 180.1.

Section 6(c) did not, however, give the CFTC general retail fraud authority over all cash markets absent potential manipulation. Indeed, the CFTC expressly rejected as "misplaced" any concerns that the use of the term "commodity" in Rule 180.1 would apply "to virtually every commercial transaction in the economy." 76 Fed. Reg. at 41,401. It instead assured market participants that it, "expects to exercise its authority under § 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation *has the potential to affect cash commodity, futures, or swaps markets*

---

[27] Before Dodd-Frank, the CFTC already had cash market manipulation jurisdiction *when it affected futures prices* even though it did not have then, and does not have now, the power to regulate the cash market. *See CFTC v. Reed*, 481 F. Supp. 2d 1190, 1196-97 (D. Colo. 2007) (finding allegations that cash market manipulations affected natural gas futures prices to be within the CEA's jurisdiction).

Defs.' Opp'n to Motion for Preliminary Injunction - 29
Case No. 8:17-cv-01868-JVS-DFM

*or participants in these markets.*" *Id.* (to be codified at 17 C.F.R. § 180) (emphasis added). The Commission also referred to subsection G of the rules, which said that "in connection with" means in connection with futures contracts. *Id.* at 41,405-06.

The CFTC's misinterpretation here also ignores the CFTC Director of Enforcement David Meister's contemporaneous presentation to the Commissioners leading to adoption of Rule 180, a presentation which focused on fraudulent market manipulation and never mentioned run-of-the-mill consumer fraud, consistent with Chairman Gensler's comments. RJN Ex. 10 at 34-35, 38, 52 (David Meister, Enforcement Division), 40 (Gensler). Indeed, Meister could not think of a hypothetical that "suggested a distinction or difference between fraud and fraud based manipulation." *Id*. at 52. If section 6(c)(1) and Rule 180.1 were meant to cover every routine sales misrepresentation, those hypotheticals would abound.

Moreover, Dodd-Frank § 753, which added these amendments, was entitled "Anti-Manipulation Authority," and five of the statute's next eight subheadings mentioned "manipulation," including § 6(c)(1) entitled "PROHIBITION AGAINST MANIPULATION." CEA § 6(c)(1) prohibits the use of "any manipulative or deceptive device or contrivance" in connection with, among other things, cash commodity sales. 7 U.S.C. § 9(1). Section 6(c)(3) makes it unlawful "to manipulate or attempt to manipulate" their price. *Id*. § 9(3). And each time that Rule 180.1 mentioned penalties or lowering the scienter standard to recklessness, the CFTC discussed only manipulation of prices and of markets, not penalties or scienter for consumer fraud. *See, e.g.*, 76 Fed. Reg. at 41,404-05 & nn. 72, 77, 79, 80 ("algorithmic market manipulation"), 81 ("automatic trading systems"), 82-85, 86 (Commission Determination referring to manipulation-based comments), 90.

"Congress is presumed to understand the legal import of words it uses in light of existing case law." *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp. 2d 1123, 1133 (E.D. Cal. 2000). The word "manipulative" is "especially significant" because it "is and was virtually a term of art" that "connotes

intentional or willful conduct designed to deceive or defraud investors ***by controlling or artificially affecting the price of securities***." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). The CFTC acknowledges that this specialized meaning applies to the CEA. *See* 76 Fed. Reg. at 41,400 & n.13.

While there are few decisions interpreting section 6(c)(1), one decision rejected a similar CFTC attempt, albeit in a different context, to read "manipulative" and "deceptive" in the disjunctive so as to expand agency jurisdiction. *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015). *Kraft*, relying on *Hochfelder*, rejected the CFTC's literal reading of section 6(c)(1)'s use of the disjunctive "or" between "manipulative" and "deceptive" to mean you could have one without the other. There, the CFTC argued that the statute's use of the disjunctive meant that it could prosecute manipulation without having to show deception. Notwithstanding the statutory language, *Kraft* rejected this interpretation as leading to absurd, unintended results. 153 F. Supp. 3d at 1010. While in *Kraft* the CFTC was arguing that it could use section 6(c)(1) to prove manipulation without deception, the result should be the same here where the CFTC argues it can prove deception without manipulation. Notwithstanding the statute's disjunctive language, the points made here demonstrate that neither Congress nor the Commission envisioned the kind of radical jurisdictional expansion that the Enforcement Division seeks here.[28]

Against this backdrop, the CFTC wrongly suggests that the Court find that it now has jurisdiction to regulate every routine sales misrepresentation involving any retail commodity sale in the country, regardless of whether the transaction was a futures or cash transaction and regardless of whether the practices had any impact or even potential impact on markets the CFTC does have jurisdiction to regulate. The

---

[28] Tellingly, the CFTC itself never mentioned § 6(c)(1) as an independent jurisdictional grant when it commented to the public concerning its Dodd-Frank § 2(c)(2)(D) jurisdictional authority over retail commodity transactions. RJN Ex. 6 (Request for Comments) at 77671 n.7.

Defs.' Opp'n to Motion for Preliminary Injunction -   31
Case No. 8:17-cv-01868-JVS-DFM

Court should reject that invitation. *See, e.g.*, *Indep. Ins. Agents of Am., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 838 F.2d 627, 632 (2d Cir. 1988) (courts should not defer to "dubious" agency arguments to avoid limits on their jurisdiction).

### D. There Is No Evidence of Fraud To Support The Requested Relief.

Even if the CFTC has proper jurisdiction to pursue its fraud claims, it has failed to present evidence of fraud, much less a "pervasive," "ongoing," and "massive" fraud to justify the extreme injunctive and freeze relief it now seeks. PI Mem. 2, 19. It is undisputed that Monex lent real money to customers and that real metal was purchased for each and every Atlas customer. The crux of the CFTC's theory of "widespread" and "massive" fraud against thousands of customers is that Monex's marketing materials and uniform sales practices purportedly downplay the risk of financed investing and lure customers into risky leveraged trades with the "false promise of a safe, secure and profitable investment," PI Mem. 19, while failing to disclose that 90% of Monex customers lose money because of high costs, *see id.* at 22-27. This failure makes every admittedly benign Monex marketing statement a misrepresentation because it is "virtually impossible" to make a profit at Monex. *Id.* at 1. The CFTC's 30(b)(6) witness and expert backed away from all these assertions, leaving the CFTC with an individualized customer-account representative interaction theory (case-by-case per the CFTC's expert) based on 8 customer declarations and 2 former account representative declarations, all now discredited.[29]

#### 1. Customers Lost Because of the Market, and Profits Were Far From Virtually Impossible According to the CFTC's Expert.

The CFTC asserts what is largely an omission theory based on its contention that Monex's cost structure makes it virtually impossible to profit and that 90% of Monex customers lost (during a down trending market),thus requiring Monex to

---

[29] The CFTC initially submitted 12 customer declarations with its PI Motion but has since withdrawn reliance on 4 of them (Susan Cappello, Brian Caulfield, Candice Hubert, and Sheena Liu). *See* Goteiner Decl. Ex. 7 (12/6/2017 Email).

Defs.' Opp'n to Motion for Preliminary Injunction -   32
Case No. 8:17-cv-01868-JVS-DFM