# Exhibit D

NEIL A. GOTEINER (State Bar No. 083524)
ngoteiner@fbm.com
C. BRANDON WISOFF (State Bar No. 121930)
bwisoff@fbm.com
ELIZABETH A. DORSI (State Bar No. 282285)
edorsi@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (SOUTHERN DIVISION)

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, MICHAEL CARABINI and LOUIS CARABINI,<br><br>Defendants. | Case No. 8:17-cv-01868-JVS-DFM<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>The Hon. James V. Selna<br>Courtroom: 10C<br>Date: March 19, 2018<br>Time: 3:00 p.m. |

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.    THE RECORD PROVES BOTH THE CFTC'S LACK OF JURISDICTION AND ITS DUE PROCESS VIOLATIONS. ............... 2

        A.    The Statute And On-Point Final Guidance Control. ..................... 2

        B.    The CFTC's Own Complaint And Matters Subject To Judicial Notice Establish That Monex Makes "Actual Delivery." ............................................................................................ 4

        C.    If Necessary To Resolve Jurisdiction, The Court Can Consider Matters Outside The Rule 12(b)(6) Record. ................ 8

        D.    The CFTC's Flip-Flop Violates Defendants' Due Process Rights. .............................................................................................. 11

        E.    Congress Limited CEA §6(c)(1) To Fraudulent Manipulation That Potentially Impacts Market Prices But Did Not Take Back §2 Limitations On CFTC Authority Over Retail Transactions. ..................................................... 11

    II.    THE CFTC's FRAUD ALLEGATIONS FAIL TO STATE A CLAIM. ..................................................................................................... 19

    III.    THE CFTC's ALLEGATIONS AGAINST THE INDIVIDUAL DEFENDANTS ARE INADEQUATE. ........................................... 20

# INTRODUCTION AND SUMMARY OF ARGUMENT

The CFTC's complaint, and its opposition brief arguments, demonstrate a rogue agency effort to expand its jurisdiction through litigation-specific statute, rule and guidance interpretations that both: (1) vitiate clearly expressed Congressional intent, and (2) directly conflict with the CFTC's own prior public Guidance. Indeed, the CFTC's position on "actual delivery" – that the exemption should not apply to a financed transaction where metals are held as collateral at a third-party depository – is the precise CFTC suggestion that Congress considered and rejected with the Dodd-Frank amendments. The CFTC's further assertion that it is not trying to change its prior Guidance is false and contradicted by the CFTC's position in the *Worth* litigation. And the CFTC alleges no increased risk from any "sham" factors.

The CFTC goes even further with its assertion that it has general fraud jurisdiction over Monex under CEA §6(c)(1) even if Monex makes "actual delivery." Congress' Dodd-Frank amendments to §6, entitled the "Derivative Market Manipulation Prevention Act of 2009," merely augmented the CFTC's established authority to combat fraud-based manipulation of markets, including cash commodity markets where such manipulation impacted transactions like futures contracts traditionally within the CFTC's jurisdiction. Congress was explicit that it intended only to relax standards necessary to prove manipulation by incorporating less demanding SEC §10(b) anti-manipulation scienter and causation elements. Congress did not, as all legislative statements demonstrate, expand the CFTC's jurisdiction via §6(c)(1) to nationwide antifraud authority over each and every cash commodity sale in interstate commerce, irrespective of market/price impact on the futures markets within the CFTC's jurisdiction. Yet the CFTC here still asserts authority over *every retail* commodity transaction whether cash, leveraged, margined or financed and whether for deferred or immediate delivery; it would thus have antifraud jurisdiction over ordinary, everyday cash transactions. This is as rogue as it gets; the CFTC cannot through a litigation-specific agenda gain jurisdiction over Monex in defiance of

1  Congressional intent.

2  But even supposing that the CFTC had jurisdiction, its fraud and individual control person allegations would nevertheless be deficient. Similarly, the CFTC cannot convert otherwise truthful or non-actionable statements into fraud by alleging that Monex had a (non-existent) duty to disclose customer track records. Nothing in any firm-wide marketing or training gives rise to such a duty. Further, the CFTC presents none of the required Rule 9(b) details in its few anecdotal and individualized unnamed customer allegations against unnamed account representatives who allegedly made non-specific oral profit claims, contrary to Monex's robust written and oral risk disclosures.

## ARGUMENT

### I. THE RECORD PROVES BOTH THE CFTC'S LACK OF JURISDICTION AND ITS DUE PROCESS VIOLATIONS.

#### A. The Statute And On-Point Final Guidance Control.

Notwithstanding that the CFTC seeks to: (1) shut down Monex's Atlas business, (2) freeze Monex's assets, and (3) appoint a monitor, the CFTC justifies its failure even to mention the glaring "actual delivery" exemption because the lack of CFTC jurisdiction is Monex's "affirmative defense." CFTC's Opp. to Mot. to Dismiss ("MTD Opp.") at 4-6 (Dkt. 164).

Pleading burdens aside, the complaint's utter silence on both the dispositive statutory provisions – it doesn't mention the "actual delivery" exemption – and on the CFTC's own public Guidance is emblematic of the CFTC's jurisdictional overreaching, detached from fundamental law and facts. Thus, the CFTC's complaint makes no mention of the precise statutory provision on which the dispute admittedly turns – CEA § 2(c)(2)(D)(ii)(III)(aa) – and which expressly exempts from CFTC jurisdiction financed retail commodity transactions resulting in "actual delivery" within 28 days. The CFTC's complaint also makes no mention of the CFTC's own 2011 Interpretation and Request for Comment, or its 2013 Final

Case 1:18-cv-00361-JBW-RLM Document 134-40 Filed 07/13/18 Page 6 of 14 PageID #: 1759
Case 8:17-cv-01868-JVS-DFM Document 180 Filed 03/06/18 Page 15 of 24 Page ID
#:7471

Just as the EEOC in *Chicago Club* sought to expand its jurisdiction through litigation, the CFTC now sues Monex using its *Hunter Wise* misdirection to eliminate the jurisdictional exemption and re-exhume its proposed Dodd-Frank amendment that Congress rejected. *Compare* MTD 22, *and* PI Opp. 22, *with* MTD Opp. 1.

### D.  The CFTC's Flip-Flop Violates Defendants' Due Process Rights.

The CFTC's chutzpah in telling the Court that its Guidance should have put Monex on notice of its new "actual delivery" definition proves its denial of due process. *See* MTD Opp. 10. Example 2 states that "Actual delivery *will have occurred*" by the very delivery that Monex: (1) admittedly does make, (2) was making when Congress used Monex as the model for "actual delivery" during the Dodd-Frank hearings with the CFTC present, and (3) has been making consistently for over 30 years. The CFTC's bald assertion of "sham" factors with no allegation of increased risk, reads the exemption out of the statute and achieves *de facto* the Congressionally-rejected CFTC definition of actual delivery. The CFTC nevertheless tells this Court that their litigation definition is not "new," *id*. at 9, even though they told the federal court in *Worth* the exact opposite. *See* MTD 30. That denial of reality should end the inquiry and establish a clear due process violation.

### E.  Congress Limited CEA §6(c)(1) To Fraudulent Manipulation That Potentially Impacts Market Prices But Did Not Take Back §2 Limitations On CFTC Authority Over Retail Transactions.

Not content with eliminating the "actual delivery" jurisdictional exemption in CEA §2, the CFTC next claims Congress gave it plenary general antifraud authority over the entire national retail economy under CEA §6(c)(1). *See* MTD Opp. 19-20 (arguing it has general fraud jurisdiction over each and every commodity sale in interstate commerce). Congress, however, directed §6(c)(1) at fraud-based market manipulation, not at garden variety fraud in all retail transactions (which is instead specifically covered in CEA §4, as limited by §2 to leveraged retail transactions not resulting in actual delivery). The CFTC plucks the words: "any manipulative or

deceptive device or contrivance" "in connection with . . . a contract for sale of a commodity, in interstate commerce" from §6(c)(1) out of context, and claims that this language "lends itself to no other meaning," than to exponentially expand the CFTC's jurisdiction from a narrow class of transactions which §2 specifically defines (such as certain futures and options contracts) to embrace general fraud jurisdiction over all commodities in American commerce. MTD Opp. 20. But, even the one §6(c)(1) decision on which the CFTC relies (*id*. 20:3-6) rejected the CFTC's "plain meaning" interpretation, and held that "manipulative or deceptive" must be read as "deceptive" modifying "manipulative." *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1010 (N.D. Ill. 2015) (discussed in Defendants' PI Opp. at 31). Further *Kraft* never endorsed the CFTC's reading that §6(c)(1) incorporates wholesale all of SEC §10(b) customer fraud law, beyond anti-manipulation doctrine; indeed, *Kraft* itself was only a manipulation case.

    Section 6(c)(1), like any statutory provision, must be sensibly read in conjunction with the statute as a whole. To begin with, CFTC jurisdiction comes from CEA §2, not from §6(c)(1) by itself. *CFTC v. White Pine Trust Corp*. 574 F.3d 1219, 1223, 1227 (9th Cir. 2009); discussed in PI Opp. 25-26. When Congress as part of the Dodd Frank amendments (§741) overruled *White Pine*'s result of no jurisdiction over pooled foreign currency transactions, Congress' legislative fix was to amend CEA §2 to include CFTC jurisdiction over those transactions. RJN Ex. 2 at S5924. This Congressional Dodd Frank fix confirms *White Pine*'s controlling holding here that it is CEA §2 that gives the CFTC its jurisdiction and that all substantive provisions must be read in conjunction with, not as overriding, §2 jurisdiction limits. Congress' action leaves no room for the CFTC either to search for jurisdiction in §6(c)(1), or alternatively to claim that the CEA must, in addition to the §2(c)(2)(D)(ii) jurisdiction exemption, somewhere else in the CEA superfluously exempt Atlas from jurisdiction. *Compare with* MTD Opp. 20:14-21:15.[2]

---

[2] Cash transactions were already, and always, outside the Commission's

Section 6(c)(1) must also be read in conjunction with the other simultaneously enacted Dodd-Frank amendments,[3] and with a view to its legislative context, in order to avoid absurd results.[4] The context of the §6(c)(1) amendments was the unprecedented 2008 collapse of financial markets based on rampant, fraudulently-manipulative schemes in derivatives and swaps which the CFTC has always regulated. *See* Reply RJN Ex. 1 at S9557-59 (Sen. Cantwell). All reported contemporaneous discussion of §6(c)(1), both in Congress when Dodd-Frank was enacted and with the Commission during rulemaking, focused on such fraudulent manipulation schemes that had the potential to impact the integrity and prices of the commodity markets over which the CFTC already had §2 jurisdiction. While §2 did not specifically cover cash markets, courts traditionally read it to give the CFTC limited jurisdiction over cash market transactions where manipulation of the cash markets also impacted futures markets and prices. *See* PI Opp. 29, n.27 (citing authorities). The §6(c)(1) Dodd-Frank amendments were meant only to "augment" the CFTC's "existing authority" over such schemes by lowering proof standards to prove actual market or price effects against market manipulators. *Id.* at 29.

Indeed, the title of the §6 amendment itself is "Derivative Market Manipulation Prevention Act of 2009." RJN Ex. 1 at S9557. The title of subsection (c)(1),thc specific section at issue here, is "Prohibition Regarding Market

---

jurisdiction, except when used to manipulate futures prices. PI Opp. 29 n.27. The new Dodd Frank §2(c)(2)(D) was a limited carve out from the long established CEA's lack of jurisdiction over cash transactions. Actual delivery within 28 days was therefore the carve out from the carve out; nothing more is necessary.

[3] Sections of the same statute, particularly when passed at the same time, must be read consistently with one another. *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371 (1988) ("[s]tatutory construction . . . is a holistic endeavor").

[4] *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 455 (1989) ("Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention, since the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'").

DEFS.' REPLY MEMO. ISO MOTION TO DISMISS     13
Case No. 8:17-cv-01868-JVS-DFM

Manipulation." *Id.* When Senator Cantwell introduced the bill in the Senate on September 17, 2009, she made clear two points. **First**, Congress was not attempting with the amendment to police ordinary consumer fraud, but to catch those bad actors manipulating commodity prices and markets essential to the American economy. Thus, Senator Cantwell, described how: "when bad actors like Enron and Amaranth Advisors, LLC, manipulate commodities prices, it means that Americans pay more for commodities like oil, gasoline, heating oil, food and natural gas." *Id.* Congress borrowed from the SEC's anti-manipulation doctrine to catch "***only those*** who attempt to affect the market or prices by artificial means unrelated to the natural forces of supply and demand." *Id.* (emphasis added); *see also* PI RJN Ex. 4 at S3348 (Sen. Cantwell, introducing §753) (using same language in 2010 ); *id*. ("Unfortunately, current law does not protect our economy with a tough enough standard to prevent, deter, and enforce illegal market manipulation ***in critical commodity futures markets***." (emphasis added)).

**Second**, Congress' incorporation of SEC §10(b) language into CEA §6(c)(1) was meant only to reduce the CFTC's burden of proving manipulation scienter and impact in commodities markets already subject to the CFTC's jurisdiction, not to wholesale create a new CFTC mission to cover every retail fraud in those cash commodity markets which had always been outside the CFTC's jurisdiction except in the limited manipulation context where futures prices were also affected. *See* RJN Ex. 1 at S9557 (noting the amendment gives "the CFTC the same anti-manipulation standard currently employed by the SEC," meaning the "recklessness" standard that courts use under §10(b) of the Securities Exchange Act); PI RJN Ex. 4 at S3348 (noting it was important to have a strong "law on the books against manipulation."). Thus, Congress was not delegating to the CFTC plenary SEC §10(b) securities investor fraud authority, but only anti-manipulation authority: "I hope my colleagues will support this strong anti-manipulation standard being inserted into the Commodity Exchange Act." PI RJN Ex. 4 at S3348. Thus, Congress did not insert

into §6(c) other SEC §10(b) provisions or analogies that were not necessary to address the CFTC's traditional anti-market manipulation authority.[5] To underline Congress' historical anti-manipulation precedents and now Congress' anti-manipulation focus on the CEA, Senator Cantwell noted that the Energy Policy Act granted the "same anti-manipulation authority to [FERC] . . . as a result of the Enron market manipulation . . . [and resulted in FERC using] its authority to conduct 135 investigations [including] enforcement actions against manipulation, one against Amaranth for $291 million." *Id.*

Nothing then supports the CFTC's view that Congress was delegating to the CFTC wide ranging authority to enforce its general anti-fraud Rules and theories against tens of millions of individual participants in all commodity markets, big and small, covering billions of dollars in daily transactions from grocery stores to pawn shops. This has never been the CFTC's futures and derivative enforcement/ regulation mission. Such an historical increase in an agency's authority would require clear Congressional statements,[6] in contrast to the CFTC's notion of Congress expanding agency delegation through wished for subtexts.[7]

Nor does §6(c)(1) or its legislative history suggest a Congressional intent to nullify the very limitations on CFTC jurisdiction over retail commodity transactions that Congress had just simultaneously enacted in CEA §2. *See* PI Opp. 26. Yet, the

---

[5] Senator Lincoln introduced materials to the Senate Record explaining Dodd Frank §753: "Importantly, this new enforcement authority . . . supplements, and does not supplant, its existing anti-manipulation authority[.]" RJN Ex. 2 at S5924. It "re-formats CEA Section 6(c), which is where the new anti-manipulation authority is placed" – changes were "not to effect substantive changes to these provisions." *Id.*
[6] *FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120, 126, 160 (2000) (noting Congress' long history of not granting the FDA explicit powers to regulate tobacco constituted evidence that it did not intend to do so: "We are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion").
[7] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes.").

DEFS.' REPLY MEMO. ISO MOTION TO DISMISS     15
Case No. 8:17-cv-01868-JVS-DFM

CFTC asserts here that – notwithstanding Congress' limited "*Zelener* fix" delegation of CFTC authority over certain deferred-delivery financed retail commodity transactions in §2 – Congress really intended with §6(c)(1) to delegate to the CFTC authority over each and every retail commodity transaction, not only for limited anti-manipulation purposes as Congress repeatedly and carefully delineated, but for ordinary sales fraud and enforcement purposes nowhere suggested in the legislative history. The CFTC is as wrong here as it is in its strawman argument that Defendants oppose the CFTC's jurisdiction over cash markets. MTD Opp. 23:16-33. Defendants agree that the CFTC has Congressionally delineated jurisdiction over cash markets for the sole purpose of stopping market and price manipulation which impacts futures markets. *Compare* p.12-13 above and fn.2, citing to MTD.

      The CFTC's current litigation-specific reading of §6(c)(1) would also impermissibly render CEA §4's customer fraud provisions superfluous, since §6(c)(1) would, as the CFTC reads it, already prohibit CEA §4 fraudulent conduct, but in broad terms when contrasted with CEA §4's specificity. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion) (it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"). The CFTC's reading would then also violate the statutory maxim that specific statutory provisions, such as the precise §2(c) exemption, control the more general §6(c)(1), and not the other way around. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."[8]

      Unable to fashion a §6(c)(1) statutory or policy interpretation to justify its grab for all retail commodity transactions irrespective of any potential for market price manipulation, the CFTC myopically focuses on footnote 37 of its Rule 180.1. The

---

[8] *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (discussed at MTD 26); *Am. Fed'n of Gov't Emps., Local 2782 v. FLRA*, 702 F.2d 1183, 1187 (D.C. Cir. 1983) (noting that where an agency's interpretation would deprive a statutory provision of virtually all effect, a court should not affirm the agency's interpretation absent "legislative history of exceptional clarity").

CFTC asserts that this footnote supports its jurisdictional claim here, although the footnote only suggests a possible fraud action against a metals selling "entity" under explicitly undefined circumstances. *See* MTD Opp. 23. The CFTC conveniently ignores the text to which footnote 37 is directly appended, and which actually defines and controls the circumstances where the CFTC will apply Rule 180.1. The CFTC wrote this text in response to market participants' expressed fears that the CFTC might try to use Rule 180.1 to expand its authority over "virtually every commercial transaction in the economy." RJN Ex. 3 at 41401. The CFTC assured the marketplace to the contrary – that "although" the statute and Rule reads broadly:

> [T]he Commission expects to exercise its authority under 6(c)(1) to cover transactions related to the futures or swaps markets, or prices of commodities in interstate commerce, or where the fraud or manipulation has the potential to affect cash commodity, futures, or swaps markets or participants in these markets.

*Id.* (Rule 180.1). The Commission also referred to subsection G of the rules, which said that "in connection with" means in connection with futures contracts. *Id*. at 41406. The CFTC itself thus announced that §6(c)(1)'s reach to commodities in interstate commerce is tethered to deceptive schemes having the potential to manipulate commodity markets and prices.

This text then makes nonsensical the CFTC's litigation-only suggestion that Rule 180.1 or its footnote 37 could ever reach Monex, whose Atlas transactions between Monex and customers obviously could not affect futures markets or commodity prices. In contrast, there are fraudsters such as the notorious Hunt brothers, whose manipulation of cash transactions can and do have the potential to affect futures markets and who thus come squarely within Congress' intention in §6(c)(1) to augment the CFTC's anti-manipulation tools. It is these types of transactions and bad actors to which footnote 37, with its explanatory text, logically refer. So the CFTC did not apparently then in 2013 read the statute or its Rule 180.1

DEFS.' REPLY MEMO. ISO MOTION TO DISMISS   17
Case No. 8:17-cv-01868-JVS-DFM

n.37 the way it now asserts to impermissibly expand CFTC jurisdiction. But it is nonetheless now doing precisely what it assured the market it would not do: assert authority over every commodity sale in interstate commerce. If the CFTC secretly intended in footnote 37 to do other than what the text stated, it was doubly misleading the market and Congress regarding both §6(c)(1)'s focus on market manipulators, and Congress' §2(c) exemption of Atlas-modeled financed retailers.

Thus, and also contrary to its assertions, the CFTC is entitled to no *Chevron* deference. Even supposing charitably the CFTC's "plain reading" view of §6(c)(1), the CFTC's position would lead to patently absurd results contrary to Congressional intent. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (if literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, those intentions must be controlling); *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).[9] This is especially true where, as here, the CFTC's own prior interpretation in its Rule tells the world that §6(c)(1) and Rule 180.1 are directed at potential market manipulation frauds and schemes.[10]

Indeed, the very Congressional rulemaking delegation that the CFTC says proves its point, in fact demonstrates the exact opposite. Thus, the CFTC claims that the only limit on its rulemaking under §6 is irrelevant: a prohibition against any requirement that market participants disclose any "nonpublic information that may be material to the ***market price, rate or level*** of the commodity transaction[.]" MTD Opp. 22-23 & n.7 (emphasis added). Far from irrelevant, this very language illustrates Congress' understanding that the statute addresses potential market

---

[9] *See Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 105 (2007) (Stevens, J. concurring) (finding clear intent in legislative history where "legislative history is pellucidly clear and the statutory text is difficult to fathom"); *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (no *Chevron* deference where interpretation inconsistent with Congressional intent with deep political implications).

[10] *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." (internal quotations omitted)); *Am. Precious Metals*, 845 F. Supp. 2d at 1287.

DEFS.' REPLY MEMO. ISO MOTION TO DISMISS 18
Case No. 8:17-cv-01868-JVS-DFM

manipulations and frauds involving the prices, rates and levels of commodities. Congress, in its limited rulemaking delegation was concerned that the CFTC not go too far by requiring disclosure of nonpublic information even if withholding such information might have those very market impacts. But the CFTC goes much farther here, claiming to regulate the entire retail economy for all cash commodity transactions regardless of any impact or potential impact on futures prices or other §2 covered transactions. This type of breathtaking jurisdictional expansion goes beyond any notion of unfair surprise; it illustrates the CFTC's litigation-specific objective to expand its reach beyond Congress' delegation.[11]

## II. THE CFTC's FRAUD ALLEGATIONS FAIL TO STATE A CLAIM.

The CFTC complains primarily about Monex's cost structure, about commissions that incentivize sales, about how customers are not qualified investors and how sales training exhorts sales persons to sell. None of this is unlawful. Its complaint neither challenges Monex's disclosure of costs and trading risks, nor suggests any suitability rule for financed commodity sales – there is no such rule.[12]

The CFTC instead tries to make fraudulent perfectly lawful statements about secure depository storage by contending that most customers lose, which alleged track record Monex thus had a duty to disclose. But none of the challenged firm-wide marketing materials or training comes close to the kind of unbalanced presentation that the split panel in *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1332 (11th Cir. 2002), found could give rise to such a disclosure duty. There defendants hyped in uniform presentations that the market was "ripe for 'huge' profits of '200-300 percent,'" based on the claimed inevitability of El Nino, with

---

[11] *See Akhtar v. Burzynski*, 384 F.3d 1193, 1202 (9th Cir. 2004) (denying *Chevron* deference to an agency's construction because it was contrary to congressional policy and would frustrate congressional intent).

[12] *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) ("[T]here is no suitability rule under the Commodity Exchange Act."); *Trustman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1985 WL 28 (C.D. Cal. Jan. 24, 1985) ("no rule of suitability governs the commodity broker-customer relationship").

DEFS.' REPLY MEMO. ISO MOTION TO DISMISS    19
Case No. 8:17-cv-01868-JVS-DFM