UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                          Plaintiff,

              v.

PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

                          Defendants.

Case No. 18-CV-0361 (JBW)

ECF Case

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Cause comes before the Court for final disposition of the issues presented during a

bench trial held from July 9 through July 12, 2018.  This opinion constitutes the Court's findings

of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a) and 55(b)(2).

## I.   INTRODUCTION

1.      Plaintiff Commodity Futures Trading Commission ("CFTC" or "the

Commission") seeks judgment against Defendants Patrick K. McDonnell ("McDonnell") and

CabbageTech, Corp. d/b/a Coin Drop Markets ("CabbageTech," and together with McDonnell,

"Defendants") for violations of Section 6(c)(1) of the Commodity Exchange Act (the "Act"), 7

U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. § 180.1(a).  The

CFTC also seeks a permanent injunction as well as an award of restitution and imposition of civil

monetary penalties against Defendants.

## II.   PROCEDURAL HISTORY

2.      On January 18, 2018, Patrick K. McDonnell and his company CabbageTech,

Corp. d/b/a Coin Drop Markets were charged with operating "a deceptive and fraudulent virtual

1

currency scheme . . . for purported virtual currency trading advice" and "for virtual currency purchases and trading . . . and simply misappropriated [investor] funds." (*See* CFTC Complaint, Jan. 18, 2018, ECF No. 1, at 1.)

3.      The Complaint seeks injunctive relief, monetary penalties, and restitution of funds received in violation of the Commodity Exchange Act ("CEA"). (*Id*. at 11-14.)

4.      On March 6, 2018, with advanced notice, (*see* ECF No. 23, Feb. 27, 2018), the Court held an evidentiary hearing (the "preliminary injunction hearing") on the CFTC's motion for entry of a preliminary injunction and received testimony and evidence from the CFTC. McDonnell invoked his Fifth Amendment privilege against compelled self-incrimination.

5.      CabbageTech failed to appear, answer, or otherwise move, and the Court granted default as to CabbageTech. (Minute Entry for Proceedings, March 6, 2018, ECF No. 40.)

6.      Following the preliminary injunction hearing, the Court issued a Memorandum and Order granting the Commission's motion for a preliminary injunction and holding that under the CFTC's broad anti-fraud authority the CFTC may exercise its enforcement power over fraud related to virtual currencies transacted in interstate commerce. (*See generally* Memorandum and Order of Preliminary Injunction and Other Relief, March 6, 2018, ECF No. 29.)

7.      From July 9, 2018, to July 12, 2018, a trial was held before the Court. The Court heard testimony from several witnesses, including four alleged victims of the scheme, and received more than 150 exhibits into evidence in support of the CFTC's allegations. The Court determined that all four alleged victims testified credibly. (*See* Trial Transcript ("Trial Tr.") 432:08-18, 433:12-14, 433:24-25.) McDonnell introduced no evidence at all.

8.      On the first day of trial, McDonnell participated vigorously, arguing a motion for reconsideration of his motion to dismiss, presenting an opening statement, cross-examining three

witnesses, and requesting additional time to argue his motion the following day.  (ECF No. 130 (Minute Entry for Proceedings, July 9, 2018); *see generally* Trial Tr. 03:01-14:25 (motion), 30:01-39:21 (opening), 74:01-76:20 (cross), 79:09-89:25 (re-cross), 109:20-112:08 (cross), 136:24-141:05 (cross), 143:03-17 (granted request for more time).)  After this first day, however, McDonnell elected not to attend further proceedings.  In particular, he declined to appear to testify.

9.     McDonnell did not testify at trial, but a number of his statements under oath, or confirmed under oath, are in the record.  In advance of the bench trial, McDonnell testified under oath at deposition on June 5, 2018 (Trial Exhibits ("Trial Exs.") 84 ("June 5 dep."), 84A (video)), and again on June 19, 2018 (Trial Exs. 85 ("June 19 dep."), 85A (video)).  McDonnell provided responses to the preliminary injunction order in the form of an e-mail dated March 16, 2018 (Trial Ex. 62 (docketed as ECF No. 113-4)), and after a discovery conference also made certain revised responses to the CFTC's interrogatories and to the CFTC's document requests (*e.g.*, Trial Ex. 73 (conference transcript excerpt)).  McDonnell made his interrogatory responses under penalty of perjury (Trial Ex. 63) and with respect to all three of his interrogatory responses, document requests responses (Trial Ex. 64), and March 16 e-mail (Trial Ex. 62), McDonnell further confirmed, under oath, that each was true, complete, and accurate, and that there was nothing to add to them (Trial Ex. 84 (June 5 dep.) at 84:11-86:04).

10.     Although McDonnell elected not to attend portions of the trial in person, he acquiesced to the proceedings and remained involved from home.  For instance, he continued to receive same-day trial transcripts, to correspond with Plaintiff's counsel, and to make submissions to the Court.  (*See* Court Exhibit ("Court Ex.") 1 of July 10, 2018, Court Ex. 1 of July 11, 2018, and Court Exs. 2-6 of July 12, 2018.)  McDonnell also was informed multiple

3

times he could return to the proceedings at any time and, on July 11, that he could attend summations on July 12 and make any motion he wished, or oppose any motion made by the CFTC, such as the CFTC's motion to withdraw its jury demand that it had made in the Complaint.  (*See* Court Ex. 1 of July 12, 2018 (ECF No. 121, CFTC notice of motion to withdraw jury demand); ECF No. 135 (CFTC initial response to McDonnell's untimely opposition to withdrawal of jury demand).)

11.    On July 12, the fourth and final day of trial, McDonnell elected not to attend summation or oppose any motions made by the CFTC.  (*See* Trial Tr. 427:03-07.)  The Court granted the Commission's unopposed motion to withdraw its demand for trial by jury.  (*See* Trial Tr. 427:09-11.)  Summation proceeded and trial concluded.

12.    The CFTC now seeks entry of final judgment against Defendants, including entry of a permanent injunction, an award of restitution, and imposition of civil monetary penalties and ancillary equitable relief.

## III.   FINDINGS OF FACT REGARDING PATRICK K. MCDONNELL'S SCHEME TO DEFRAUD IN CONNECTION WITH VIRTUAL CURRENCIES

### A.   The Parties

13.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

14.    Defendant Patrick Kerry "PK" McDonnell is a resident of Staten Island, New York.  (*E.g.*, Trial Ex. 84 (June 5 dep.) at 21:13-21.)  McDonnell owned and controlled CabbageTech.  (Trial Ex. 85 (June 19 dep.) at 10:12-14; Trial Ex. 57, 58 at 2 (entity records).)  McDonnell has never been registered with the Commission.

4

15.     Defendant CabbageTech is a New York corporation based in Staten Island, New York, and was incorporated on May 6, 2016.  (Trial Ex. 58 (entity records).)  Default was granted against CabbageTech on March 6, 2018.  (ECF No. 40.)  CabbageTech's service address is 20 Rawson Place, Suite B, Staten Island, New York, 10314.  (Trial Exs. 57, 58, 84 (June 5 dep.) at 225:19-226:02.)

**B.      CabbageTech, Corp. d/b/a Coin Drop Markets**

16.     McDonnell created, owned, and exclusively controlled CabbageTech.  (*See* Exs. 58 at 2 (incorporation filed by Patrick K. McDonnell), 84 (June 5 dep.) at 122:08-20, 85 (June 19 dep.) at 10:12-14.)  At times, CabbageTech did business under the name "Coin Drop Markets." (Trial Ex. 84 (June 5 dep.) at 39:23-40:06.)

17.     Neither CabbageTech, Corp. nor Coin Drop Markets has ever been registered with the Commission.

18.     McDonnell was the sole operator and owner of the CabbageTech business.  (Trial Ex. 63 at no. 3.)  At times, McDonnell identified himself as CabbageTech's CTO (Chief Technology Officer), among other titles.  (*E.g.*, Trial Exs. 1 at 1, 42; Trial Tr. 73:05-12; 205:12-18.)  But there was no one else involved in the company besides McDonnell.  (Trial Ex. 84 (June 5 dep.) at 125:07-13, 142:08-13.)

19.     McDonnell operated CabbageTech from his home at 20 Rawson Place, Apt. B, Staten Island, New York, 10314.  (*E.g.*, Trial Ex. 84 (June 5 dep.) at 21:13-21, 144:10-16, 145:08-12, 157:18-158:14 (McDonnell's "pretty dusty and grimy" home basement was "headquarters of [his] business"); *see also* Trial Exs. 57, 58, 102 (subscriber information); *see also* Trial Tr. 370:15-19 and Trial Ex. 124 (activity log reflecting logins from IP addresses 24.168.89.122 and 72.227.210.194); Trial Exs. 90-91, 95-96 (account records) and Trial Tr.

130:02-132:16, 136:02-136:20 (IP addresses associated with logins); Trial Exs. 56, 104-113

(Federal Express records relating to 20 Rawson Place).)

### C.     McDonnell Used a Wide Array of Accounts to Further His Scheme

> *i.*    *McDonnell used multiple telephone numbers to further his scheme*

**20.**     McDonnell used several different telephone numbers in connection with

CabbageTech, including (718) 524-4718, the cellular telephone number (929) 428-6422, (718)

524-6312, and the toll-free number (888) 614-6445. (*E.g.*, Trial Tr. 97:12-25, 99:02-20, 202:19-

203:11, 205:03-205:18, 284:11-286:09, 287:03-15; *see also* Trial Exs. 1 at 1, 56 (label with

home number), 84 (June 5 dep.) at 34:05-35:02, 102 (subscriber information), 122 (toll-free

account records), 128 (Simple Bank account information), 129 (recorded telephone call), 129A

(transcript).)

**21.**     McDonnell solicited potential and existing customers by telephone. (*E.g.*, Trial

Tr. 96:25-97:11; 99:02-20, 202:19-203:11.)  McDonnell also supplied his numbers to potential

and actual customers in various ways, such as through his social media sites, by e-mail, and by

facsimile. (*E.g.*, Trial Tr. 99:02-99:20, 203:12-204:13; *see also* Trial Ex. 1 at 1.)

> *ii.*    *McDonnell used multiple e-mail accounts to further his scheme*

**22.**     In addition to a variety of telephone numbers, McDonnell used a wide array of e-

mail addresses in connection with CabbageTech, such as coindropmarkets@gmail.com,

cdm@gmx.us, cdmmerchant@gmx.com, cryptoclown@gmx.com,

patrickpkmcdonnell@gmail.com, patmcdonnell@gmx.com, info@coyotewallstreet.com, and

loramcdonnell@gmx.com, among several others. (*E.g.*, Trial Exs. 1, 14, 72, 84 (June 5 dep.) at

38:08-16, 43:22-44:15, 88-91, 93-96 (Bittrex records), 102 (subscriber information), 119

(subscriber information reflecting a McDonnell telephone number); *see also* 56, 104-113, 115

(FedEx records), 128-129A (Simple Bank records), 133 (Slack account), 176 (e-mail to customer).)

23.     McDonnell testified under oath that no one else besides him had access to his e-mail accounts.  (*See* Trial Ex. 84 (June 5 dep.) at 67:19-67:21.)

>    ***iii.***     *McDonnell used numerous social media accounts, such as Facebook, Twitter, and Slack, to further his scheme*

24.     McDonnell maintained a social media presence on various platforms, including Twitter, Facebook, and Slack.  Among other things, his social media accounts lured potential customers to the Coin Drop Markets website and to McDonnell.  (Trial Tr. 45:03-17, 154:08-155:03; 158:09-14.)

25.     McDonnell's social media accounts at times featured a representation of his face, such as a photograph or a sketch-like portrayal.  (*See* Trial Tr. 163:09-16, 187:01-23; 249:17-24; Trial Exs. 36; 36A (article with picture); 39-40 (Facebook); 84B (still image from video recording of June 5 deposition).)

26.     McDonnell used several Twitter accounts under names such as @BTCXBTDEV, @MrPatMcDonnell, @coindropmarkets, and @TIGRtokens.  (*See, e.g.*, Trial Tr. 67:10-68:09; 69:09-70:14; 163:11-14; 187:04-23; *see also* Trial Exs. 6, 8, 12, 14, 23, 27, 66, 141-142 (subscriber information).)

27.     McDonnell's @coindropmarkets Twitter account purported to have thousands of "followers."  (Trial Ex. 66 (Defendant's Website and Twitter Descriptions, June 4, 2018, ECF No. 113-1, with screenshot of @coindropmarkets excerpt); *see also* Trial Tr. 158:09-14.)

28.     One of McDonnell's Facebook pages relating to CabbageTech and Coin Drop Markets used the name "Bitcoinxbtradegrp" and, in addition to the Coin Drop Markets toll free

number and website, listed a purported business address at 110 Wall Street.  (Trial Exs. 39, 40; Trial Tr. 155:14-20.)

29.    McDonnell also created and controlled a Slack "team" named Bitcoin XBT Trade Group (the "CabbageTech Slack account") in May 2017 in connection with purportedly providing CabbageTech membership services.  (*E.g.*, Trial Exs. 133, 157, 158; *see* Trial Tr. 249:15-250:25; 392:01-394:15.)

> ### iv.    *McDonnell used the Coin Drop Markets websites to further his scheme*

30.    McDonnell published or maintained a number of websites related Coin Drop Markets.  One was www.coindropmarkets.com.  (Trial Exs. 66 (excerpt of screen shot), 69 at 37:23-38:19, 81.)  Another was www.coindrops.club.  (*See, e.g.*, Trial Exs. 40 (Facebook page).) McDonnell also registered the website tigrtokens.org as part of soliciting customers for money in connection with the purported purchases of the virtual currency Tigr.  (Trial Ex. 78; *see also* Trial Tr. 66:06-14; 169:08-21.)

31.    Some customers who invested with CabbageTech could log into Coin Drop Market's website and receive account and balance statements.  (*E.g.*, Trial Tr. 222:15-224:22; Trial Exs. 49-50.)

> ### v.    *McDonnell used the Coin Drop Markets PayPal account to further his scheme*

32.    McDonnell maintained the PayPal account associated with the e-mail address cdm@gmx.us (the "Coin Drop Markets PayPal account").  (*E.g.*, Trial Exs. 62 (McDonnell March 16 e-mail), 125 (Coin Drop Markets PayPal account transaction log); Trial Tr. 370:20-371:05, 373:13-15 (describing Coin Drop Markets PayPal account transaction log).)

33.    Customers could and did direct payments to the Coin Drop Markets PayPal account through links in the CabbageTech website.  (*E.g.*, Trial Test. 159:23-160:04; *see also*

Trial Ex. 125 (Coin Drop Markets PayPal account transaction log, payments received worksheet).)

        *vi.*    *McDonnell used multiple bank accounts to further his scheme*

     **34.**    McDonnell maintained an account in his name and home address at Simple Bank and Bancorp Bank (Trial Exs. 100, 128 (account information), 171; Trial Tr. 282:10-283:06, 315:21-318:17), and in the name of CabbageTech and McDonnell's home address at TD Bank (Trial Tr. 277:20-278:24; Trial Exs. 137, 138, 139).

     **35.**    Customer funds were deposited into, and withdrawn from, all of these accounts. (Trial Tr. 277:20-281:17, 320:07-15, 323:12-325:03, 376:16-378:16; *see* Trial Exs. 100, 137-139, 171, 172.)

        *vii.*    *McDonnell used multiple virtual currency accounts to further his scheme*

     **36.**    McDonnell maintained an account at Bittrex, a virtual currency exchange, associated with the e-mail address cdmmerchant@gmx.com (the "Bittrex cdmmerchant account").  (*See* Trial Tr. 120:10-25; Trial Exs. 62 at 2-3, 85 (June 19 dep.) at 14:22-19:09.)

     **37.**    The Bittrex cdmmerchant account was created on April 27, 2017.  (Trial Exs. 90 at 1, 91 at 1.)

     **38.**    On June 24, 2017, another account was created at Bittrex in the name of McDonnell's wife, Lora McDonnell, and associated with the e-mail address cryptoclown@gmx.com (the "Bittrex cryptoclown account").  (Trial Tr. 133:03-135:12; Trial Exs. 93-96.)

     **39.**    McDonnell controlled both the Bittrex cdmmerchant account and the Bittrex cryptoclown account.  (*E.g.*, Trial Tr. 133:15-136:18, 356:12-367:12; *see also* Trial Exs. 89, 90, 91, 94, 95, 96 (accounts associated with same IP addresses, telephone number).)

        *viii.*    *McDonnell used numerous FedEx accounts to further his scheme*

40.     McDonnell created and maintained several FedEx accounts under a variety of names and e-mail addresses.  (*E.g.*, Trial Exs. 56, 80, 104-113, 115.)  McDonnell used the accounts to solicit and obtain funds from customers.  (*E.g.*, Trial Exs. 53, 56, 104-109, 111, 115; *see also* Trial Tr. 96:17-98:05, 211:14-23, and 216:04-217:14.)

### D.     Fraud Involving Virtual Currency Trading Advice

#### *i.*     *Fraudulent solicitations as to track record*

41.     As mentioned above, customers were attracted by McDonnell's social media and internet presence, which included misleading statements and omissions about his credentials. (*E.g.*, Trial Tr. 158:08-17, 159:11-19.)

42.     As part of his solicitations to potential customers to become members of groups supposedly receiving his and Coin Drop Markets' expert trading guidance, McDonnell made false and misleading claims about his track record and prowess as a professional trader, such as through Twitter and through his website.  (*E.g.*, Trial Ex. 161 ("Made over 73 BTC today bud great day man"); Trial Tr. 48:19-49:03; 61:03-17; 255:09-19.)

43.     McDonnell made false and misleading claims to prospective and actual customers about being a Wall Street trader.  For example, McDonnell misrepresented his company's credentials by advertising a fake Wall Street address on social media, and by telling customers he was heading into the office to trade.  (*E.g.*, Trial Exs. 39, 40; Trial Tr. 155:17-20; 260:04-11; 261:18-22; *see also* Ex. 51 at June 16, 2017 8:47 AM e-mail mentioning both a "Staten Island office" and an office in "NYC").)

44.     McDonnell also made false and misleading claims about his experience and expertise with virtual currency, including the development and promotion of new virtual currencies.  (*E.g.*, Trial Tr. 160:05-161:02.)  Under oath, however, McDonnell stated he did not

recall being involved in the development of any such virtual currencies.  (Trial Ex. 84 (June 5 dep.) at 86:05-88:10.)

45.     McDonnell also misled customers by building a relationship of trust over time. (*E.g.*, Trial Tr. 83:14-22, 158:02-08.)  He did so using e-mail, social media, and internet-based chats to develop relationships and rapport with victims.  (*E.g.*, Trial Tr. 158:02-08; Trial Exs. 6, 8, 14.)  He also did so through numerous telephone calls.  (*E.g.*, Trial Tr. 99:02-04; 203:01-11.)

       *ii.*     *Fraudulent statements as to the officers and employees of CabbageTech*

46.     CabbageTech promotional materials made claims that the membership and trading groups were operated by teams of experts, such as "a dedicated team of digital asset trading specialists trend spotting."  (*E.g.*, Trial Ex. 70 at "Exhibit 19" and "Exhibit 20")  These and other CabbageTech materials falsely suggested that the company consisted of a specialized and expert "team."  (Trial Tr. 239:08-14; Trial Ex. 63 at Response No. 3, *cf.* Trial Ex. 84 (June 5 dep.) at 125:22-126:03 (admitting there was no one else involved in the company).)

47.     At times, McDonnell falsely assumed the fake identity Jason Flack (purporting to be a CabbageTech representative whose boss was McDonnell) to solicit customers by telephone, including by cold-calls, as well as e-mails.  (Trial Tr. 94:19-95:04, 96:25-97:11, 202:19-203:11, 205:03-18 (McDonnell was supposedly Flack's "boss"); Trial Exs. 42-45, 47, 51, 77, 79.)  At trial, McDonnell's voice was recognized as that of "Jason Flack."  (Trial Tr. 240:25-242:09 (customer recognizing defendant's voice as Jason Flack's), 305:17-309:08 (identifying records of calls to customers from defendant's telephone number); *see also* Trial Tr. 176:16-19, 180:06-23; 187:18-188:05 (customer recognizing defendant's voice as Patrick K. McDonnell's); *see also* Trial Ex. 168.)  McDonnell also falsely assumed the names Michelle Robertson and Michelle Robinson in connection with Coin Drop Markets.  (*E.g.*, Trial Ex. 79.)

48.     McDonnell use of FedEx labels reflecting multiple company names also misleadingly exaggerated the size and complexity of the business.  (*E.g.*, Trial Exs. 53, 56.)

*iii.    Fraudulent solicitations as to services offered*

49.     McDonnell and CabbageTech purported to offer a wide array of memberships and services.  (*E.g.*, Trial Exs. 38 (Coin Drop Markets membership services), 44 (membership confirmation e-mail); 66 (ECF No. 113-1, a screenshot produced by McDonnell reflecting six memberships), 84 (June 5 dep.) at 132:15-19 (referring to ECF No. 113-1).)

50.     In early 2017, McDonnell and his company advertised memberships in a variety of membership levels ranging from "Bronze" to "Diamond," with the level of services supposedly increasing with the price of the membership.  (*E.g.*, Trial Exs. 44 ("Diamond" membership confirmation), 66 (screenshot excerpt), 84 (June 5 dep.) at 132:15-19; *see also* Trial Tr. 159:08-10; 161:03-22, 205:03-206:20.)

51.     In or around April 2017, McDonnell and his company also advertised membership in trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to Bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to the virtual currency Litecoin. (*E.g.*, Trial Exs. 1 (e-mail confirming RLGLLTC membership), 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements), 162-63 (Twitter messages regarding RLGLLTC); Trial Tr. 173:09-20.)  These memberships supposedly offered expert entry-and-exit-price guidance for day trading of certain virtual currencies.  (Trial Exs. 1, 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements); *see also* Trial Tr. 45:14-17, 173:09-20, 257:13-18.)  As McDonnell himself told the Court during the March 6, 2018 hearing, in reference to the webpages promoting RLGLLTC (Trial Ex. 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements)), they "were posts that list what we do" (*see* Trial Ex. 71, at 41:01-04, 41:16-19).

52.     Defendants also solicited memberships or subscriptions to other groups and services, such as a "Turn-Key Annual Membership" providing access, for instance, to McDonnell's and CabbageTech's supposed virtual currency trading expertise, mentorship, and guidance.  (*See* Trial Tr. 46:03-14; Trial Exs. 38, 69 at 39:16-24.)  As McDonnell himself told the Court during the March 6, 2018 hearing, in reference to the screenshot of a CabbageTech webpage advertising CabbageTech memberships such as RLGLLTC and Crypto Annual Turnkey Membership (Trial Ex. 70 at "Exhibit 18"; *see also* Trial Ex. 38), "that's an actual picture of my website" (*see* Trial Ex. 69, at 38:17-19).

53.     CabbageTech promised these expert services for 12 months in exchange for an up-front fee.  (*See* Trial Exs. 1 (reflecting extension from 12 to 24 months), 44, 66, 70.)

54.     The nominal price of the trial membership and the relatively inexpensive prices of the next-higher membership levels fraudulently produced income for McDonnell (*e.g.*, Trial Ex. 125 (Coin Drop Markets PayPal account transaction log, payments received worksheet)), but more importantly the low entry prices developed targets to defraud for greater gains.  Once customers had made an initial purchase, for example, McDonnell solicited "lifetime" memberships in a more exclusive trading sector or "elite" group that supposedly would provide greater opportunities to profit from virtual currency trading.  (*E.g.*, Trial Ex. 6 ("You may wanna consider joining RLGLBTC it's direct 1-on-1 trading alongside me and all members involved real-time."; "The program is 1 BTC for it's [sic] lifetime been running since 2010 so there is a lot of BTC buying power"), 8, 163 ("You send me 1 BTC I'll trade w/ you personally minute-2-minute all coins"); Trial Tr. 52:20-53:16, 56:13-57:09; 161:07-161:22.)

55.     McDonnell and CabbageTech never provided the promised expert membership services.  (*E.g.*, Trial Tr. 66:06-21 (complaints regarding the lack of trading advice that Mr.

13

McDonnell portrayed that he would be giving), 174:20-24; Trial Ex. 19.)  McDonnell shut his

company down in mid-2017, well before he and CabbageTech had provided a year's worth of

services.  (*E.g.*, Trial Tr. 174:20-24, 239:20-240:01; Trial Ex. 84 (June 5 dep.) at 160:23-

161:11.)  In addition, McDonnell never provided the promised entry-and-exit-point guidance for

a specific transaction related to Titcoin via the Slack group that he had formed.  (*E.g.*, Trial Tr.

163:20-165:14.)  Instead, McDonnell directed his customers to buy Titcoin "at any price," and

then ceased communicating with customers.  (*Id.*)  As a result, investors who followed this

direction suffered substantial losses.  (Trial Tr. 165:10-14, *see also* Trial Tr. 174:20-174:24;

Trial Ex. 133 (Slack group information).)

### iv.   *McDonnell misappropriated customers' funds*

**56.**     Many customers made payments in U.S. dollars and in virtual currency to

McDonnell and CabbageTech in exchange for the promised expert-guidance subscription

services.  (*E.g.*, Trial Tr. 45:22-46:14, 159:23-160:04, 161:07-13, 206:05-207:17, 337:01-342:14,

348:09-356:11; Trial Exs. 90-91 (Bittrex account records).)

**57.**     The customers knew McDonnell's bitcoin, litecoin, and other virtual currency

addresses because McDonnell specified certain of his addresses to them.  (*E.g.*, Trial Tr. 54:01-

08, 54:14-56:22; Trial Exs. 8 at 2, 163.)

**58.**     McDonnell never provided the promised expert services, and he ceased providing

any services at all in the weeks after receiving customer funds.  (Trial Tr. 66:06-68:12, 68:16-23,

174:20-175:19; 229:05-15, 230:21-232:08; 253:23-254:04.)

**59.**     No customer ever received a refund from CabbageTech or McDonnell.  (*E.g.*,

Trial Tr. 71:03-15, 107:07-107:24, 108:08-109:12, 232:07-21; *e.g.*, Trial Exs. 76, 77, 79, 82, 83.)

McDonnell has not disputed this, and, when asked, McDonnell claimed under oath that he did

not recall even a customer request for one.  (Trial Ex. 84 (June 5 dep.) at 254:17-20.)

### *v.*     *The memberships were a tissue of lies*

**60.**     There is no evidence that McDonnell ever intended to provide a year's worth or a lifetime's worth of the promised expert services or even was capable of doing so. Instead, the only reasonable inference is that the fraudulent membership offers were designed not only to generate income, but more importantly to get victims in the door and to position them for further fraudulent solicitations for even greater amounts. (*E.g.*, Trial Tr. 52:17-53:02, 53:13-54:08, 58:11-59:15, 161:03-22, 205:19-206:20, 208:18-209:11.)

### E.     <u>Fraud Involving the Purchase and Trading of Virtual Currency</u>

### *i.*     *Fraudulent solicitations for virtual currency transactions*

**61.**     As mentioned above, McDonnell used the lure of less-expensive memberships to get potential victims in the door and to position them for further fraudulent solicitations for virtual currency purchases and/or trading on their behalf under McDonnell's direction. (*E.g.*, Trial Tr. 57:22-58:06 (after sending litecoin to join Elite group, customer was solicited to send remaining litecoin for Patrick McDonnell to trade).)

**62.**     As part of soliciting customers to provide funds for him to trade on their behalf, McDonnell falsely claimed Wall Street trading expertise, virtual currency expertise, and an ongoing record of exceptional trading performance. (*E.g.*, Trial Tr. 61:11-17, 97:02-11, 159:11-16, 160:05-161:02, 197:07-08, 265:24-266:16; Trial Exs. 14 ("Hey Rich I'm going over trading blotter your [sic] up big on amount of $LTC traded will discuss tom. Hey listen IDK how big an investor you are but there is real $ to be made just w/ $LTC"; "Outside of twitter I have a very big retail business with over 8,000+ active investors who trade my stock rec's this honestly is just building the crypto side. I trade over $50M in BTC for this group gathered since 2010"), 161 ("made over 73 BTC today bud great day man"), 166 (I wish I was trading your $LTC bro I'm caking made $122k total yesterday").)

63.     Also as part of soliciting customers to provide funds for him to trade on their behalf, McDonnell falsely promised customers rapidly profitable in-and-out virtual currency investments.  (*E.g.*, Trial Tr. 58:18-24; 168:05-25; 169:03-06; 169:15-19, 255:09-19; Trial Exs. 6 at 1 (promising 300% returns in less than three days) ("1 BTC in should produce 3 BTC out"); 8 at 2 (promising 200 to 300% profit on 76 litecoin each day of trading); 167 (promising to make 0.5 to 2 bitcoin daily for a customer).)

64.     McDonnell also fraudulently solicited customers to provide funds in exchange for virtual currency from CabbageTech at supposedly below-market rates.  (*E.g.*, Trial Ex. 43 ("Our cryptocurrency division headed by Pat McDonnell/CTO has discounted Bitcoin below current market price for exchange. There is currently 9,400 $BTC available . . . to provide low entry to those looking to profit. We are also accepting $ETH, $LTC in exchange for $BTC outside of USD"); Trial Tr. 208:16-210:02.)  McDonnell falsely claimed CabbageTech would provide escrow services for virtual currency that customers purchased through CabbageTech.  (Trial Tr. 213:09-21, 218:16-20; Trial Ex. 50 ("CDM acts as escrow").)

65.     McDonnell also falsely told customers that CabbageTech would manage their invested funds.  (*E.g.*, Trial Tr. 218:19-218:20 ("For the stuff in escrow, he's managing it for me").)

### ii.     *Misappropriation—McDonnell wrongfully kept customers' funds*

66.     McDonnell fraudulently dissipated customer funds deposited into the Simple Bank account, the Bancorp account, and the CabbageTech TD Bank account.  (*E.g.*, Trial Exs. 137 (TD Bank deposits), 138 (check records for TD Bank), 139 (TD Bank account statements); 100, 171 (Bancorp); Trial Exs. 128, 129, 129A, 172 (Simple Bank); *see also* Trial Tr. 315:21-318:17.)

67.     McDonnell often withdrew customer funds deposited into the CabbageTech TD Bank Account from ATMs soon after receipt.  (*E.g.*, Trial Ex. 139, at 1; *see also* Trial Tr. 279:21-280:04 (detailing withdrawals shortly after deposit of customer check), 394:18-22, 395:05-11.)  McDonnell also used customer funds deposited into the TD Bank account to pay his rent.  (Trial Tr. 280:01-04, 455:01-09; Trial Ex. 138.)

68.     McDonnell also misappropriated customer funds sent to the Bittrex cdmmerchant account.  On June 17, 18, and 19, 2017—at the same time that customer demands for refunds were mounting (*e.g.*, Trial Exs. 51, 77, 79, 82, 83)—McDonnell transferred more than 660 litecoin from his Bittrex cdmmerchant account to the Bittrex cryptoclown account opened in the name of his wife.  (*See* Trial Exs. 150-52 (demonstratives), 144-49; *see also* Trial Exs. 90-91, 95-96; Trial Tr. 133:17-136:23, 356:12-18, 357:16-20, 365:04-07, 367:06-12.)

69.     When customers asked to withdraw their investment and purported gains, McDonnell would offer a series of false excuses for delays in repayment before ultimately ceasing communications entirely.  (*E.g.*, Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; Trial Exs. 27, 76, 77, 79, 82, 83.)

70.     For example, McDonnell falsely told victims that their profitable investments had been reinvested (*e.g.*, Trial Tr. 220:06-17, Trial Ex. 82 at 3-5), or that his secretary had forgotten to send a check to the customer requesting his money (*e.g.*, Trial Tr. 229:05-230:13), or that there had been a hack (*e.g.*, Trial Ex. 52; Trial Tr. 173:21-174:20, 238:12-240:01).

71.     No customer ever received a refund.  (*E.g.*, Trial Tr. 71:03-15, 107:07-107:24, 108:08-109:12, 232:07-21; *e.g.*, Trial Exs. 76, 77, 79, 82, 83.)  McDonnell has not disputed this, claiming under oath that he did not recall even a single customer who requested a refund.  (Trial Ex. 84 (June 5 dep.) at 254:17 to 254:20.)

### iii.   *McDonnell provided false account statements to customers*

**72.**     McDonnell provided false account statements to customers through the Coin Drop

Markets website.  (*E.g.*, Trial Tr. 221:22-222:23, 223:04-24, 226:10-17; Trial Exs. 49, 50.)

**73.**     McDonnell also provided false account statements and performance updates to

customers who had sent funds to CabbageTech for investment in virtual currency in written

communications as well as by telephone.  (*E.g.*, Trial Exs. 14, 47, 49; Trial Tr. 59:16-19, 104:03-

104:09, 211:11-212:08.)

**74.**     The statements and reports generally conveyed the false impression that

CabbageTech was achieving profits for the customer.  For example, on or around June 17, 2018,

customer David Martin received a purported account balance update from Patrick McDonnell via

e-mail falsely stating that Martin's account balance was up to 676 Litecoin.  (Trial Ex. 82 at 4

("Your gonna be real happy . . . You have exactly 636 LTC's"); Trial Tr. 331:22-332:09.)

### iv.   *Fraudulent omissions*

**75.**     McDonnell's blatantly fraudulent scheme was replete with fraudulent omissions.

For example, McDonnell omitted from telling his customers that he was simply misappropriating

their assets, rather than successfully trading them.  (*E.g.*, Trial Ex. 82 at 4.)

**76.**     Also for example, McDonnell omitted from telling his customers that he never

intended to manage their funds as he had promised.  (*E.g.*, Trial Ex. 139; *see also* Trial Tr.

279:21-280:4; 394:18-22, 395:05-11.)

**77.**     Similarly, McDonnell omitted from telling his customers that his excuses for

delays were false.  (*E.g.*, Trial Tr. 70:20-25, 106:02-109:12; 229:05-230:13; Trial Exs. 27, 76,

77, 79, 82, 83.)

**78.**     Likewise, McDonnell omitted from telling his customers that he was using fake

identities in dealing with them.  (*E.g.*, Trial Tr. 96:25-97:11, 205:03-23.)

*v.*    *McDonnell faked a hack and deleted records to cover up his scheme*

**79.**    In June 2017, McDonnell falsely claimed that there had been a hack of CabbageTech.  (*E.g.*, Trial Ex. 52; Trial Tr. 173:21-174:19, 237:14-238:24; *cf.* Trial Ex. 84 (June 5 dep.) at 254:02-16 (stating under oath he did not recall a hack ever happening).)

**80.**    In June and July 2017, McDonnell shut down the website and chatroom, deleted social media accounts, ceased communicating with customers by e-mail or telephone, and kept the customers' funds.  (*E.g.*, Trial Tr. 67:07-68:12; 174:12-19; 237:14-240:01; Trial Exs. 19, 52, 82, 83.)

**81.**    McDonnell admitted under oath that he shut down or deleted the coindropmarkets.com website and the Coin Drop Markets Twitter account he used to communicate with customers.  (*See* Trial Ex. 84 (June 5 dep.) at 304:14-22.)

**82.**    McDonnell shut down the Slack team that he had created as part of a Coin Drop Markets membership service barely one month after he created it.  (Trial Tr. 66:06-21, 67:07-68:12, 392:01-394:15; Trial Exs. 19, 133 (indicating primary owner of team was McDonnell, creation date was May 14, 2017, and was deletion date June 15, 2017).)

**83.**    McDonnell admitted that "90 percent" of the website and social media has been deleted.  (Trial Ex. 84 (June 5 dep.) at 322:18-323:12.)

**84.**    During discovery, McDonnell told Chief Magistrate Judge Mann that he had deleted CabbageTech records routinely.  (Trial Ex. 74A at 18:20-23.)  Similarly, McDonnell testified under oath it was his practice to "delete everything at all times."  (Trial Ex. 84 (June 5 dep.) at 311:10-25.)

**85.**    Call records relating to McDonnell's toll-free number reflect numerous unanswered calls from various victims of his scheme.  (Trial Ex. 122 at 8-9 (J2 call records); Trial Tr. 308:04-309:11; *see also* Trial Tr. 176:04-06.)

19

86.     McDonnell admitted under oath that he threw away the computers he used for CabbageTech business, and he did not recall when he did so.  (Trial Ex. 84 (June 5 dep.) at 26:5-30:9.)

      ***vi.***     *After the March 6, 2018 preliminary injunction order, McDonnell made further transfers of virtual currency to perpetuate his fraudulent scheme and further dissipate his misappropriated assets*

87.     Among other things, the Preliminary Injunction Order issued March 6, 2018, enjoined McDonnell from further violations of Section 6(c)(1) and Regulation 180.1.  (*See* ECF No. 29, Appendix A at 7-8.)

88.     On March 7, 2018, at approximately 12:02 am, 0.4 BTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 7.)

89.     On March 8, 2018, at approximately 12:03 am, another 0.4 BTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 6.)

90.     On March 9, 2018, at approximately 12:04 am, another 0.4 BTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 5.)

91.     On March 10, 2018, at approximately 12:05 am, another 0.4 BTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 4.)

92.     On March 11, 2018, at approximately 12:09 am, 19.5 LTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 3.)

93.     On March 12, 2018, at approximately 9:17 am, 3.32795963 LTC was withdrawn from the Bittrex cryptoclown account.  (*See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 2.)

94.     On March 7 through March 12, 2018, logins to the Bittrex accounts were made with two-factor authentication.  (*See* Trial Exs. 95, 96, IP addresses used tab, pages 1-2.)

95.     Among the IP addresses logged by Bittrex during this time period after the preliminary injunction order was issued, one address that was identified (*id.*, pg. 2, lines 59-61)

20

was the same address that cable service provider records also indicated was associated with McDonnell's account (*cf.* Trial Ex. 102 at 1 (subscriber information for "Patrick K. McDonnell, 20 Rawson Pl., Apt. B Staten Island, NY 10314, 718-524-6312, *72.227.210.194*") (emphasis added)).

### F.   Customer Funds Misappropriated by McDonnell and CabbageTech

#### i.   *McDonnell attracted numerous customers to his business*

96.     McDonnell's and CabbageTech's solicitations attracted more than 100 customers from numerous states and countries.  (*E.g.*, Trial Ex. 125 (Coin Drop Markets transaction log, payments received worksheet, reflecting customer payments).)  McDonnell told the Court on March 6, 2018, that CabbageTech had approximately 200 customers.  (Trial Ex. 68 (March 6, 2018 Hrg. tr. 10:13-14).)  The Coin Drop Markets PayPal account and Slack records reflect between 100 and 150 different sign-ups.  (Trial Ex. 125; Trial Ex. 133 (CabbageTech Slack account subscribers).)  The Coin Drop Markets PayPal account reflects more than $4,500 in deposits.  (Trial Tr. 373:06-09.)

#### ii.   *Customers provided funds for virtual currency trading advice and virtual currency transactions*

97.     Richard Brewell transferred U.S. dollars and virtual currency (litecoin) to McDonnell and CabbageTech for virtual currency trading advice and for the trading of virtual currency on his behalf.  (*E.g.*, Trial Tr. 45:22-14, 57:03-09.)  Brewell transferred $1.99, $99.98, and $99.98 in U.S. Dollars to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Ex. 125.)  Brewell also transferred 76.297 and 70.497 litecoin (LTC) to McDonnell and CabbageTech.  (Trial Ex. 180; *see generally* Trial Tr. 71:03-13, 337:05-338:05, 380:05-381:06; *see also* Trial Exs. 90-91 at Deposit Tab, pp.2-3, lines 67-68.)  On January 18, 2018, the date the Complaint was filed, the litecoin amounts respectively were worth $14,713.11 and $13,594.64.

(Trial Ex. 180; *see also* Trial Tr. 380:03-382:24; Trial Ex. 181 (litecoin closing price as of January 18, 2018).)

98.     Anthony Dimovski transferred U.S. dollars and virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  (*E.g.*, Trial Tr. 172:15-22.)  Dimovski transferred $1.99 and $47.52 in U.S. Dollars to McDonnell and CabbageTech.  (*See* Trial Ex. 180, *see also* Trial Ex. 125.)  Dimovski also transferred approximately 1 and 0.5 Bitcoin.  (Trial Ex. 180; Trial Tr. 161:12-13, 172:15-22; *see also* Trial Exs. 90-91 at Deposit tab, p. 1, line 31 (BTC), and p. 3, line 70 (BTC); Trial Exs. 159, 160.)  On January 18, 2018, the date the Complaint was filed, those bitcoin amounts respectively were worth $11,474.90 and $5,737.45.  (Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).)

99.     Christopher Drake transferred virtual currencies to McDonnell and CabbageTech for the purchase of virtual currency on his behalf.  (*See* Trial Ex. 178.)  Drake transferred 219.9872767 and 400.0050585 ethereum classic (ETC), 1 bitcoin (BTC), and 1,342,634.729 verge (XVG) to McDonnell and CabbageTech.  (*See* Trial Ex. 180; *see also* Trial Ex. 90-91 at Deposit tab, p. 1, lines 10 (XVG), 19 (ETC), 29 (BTC), 35 (ETC); Trial Ex. 178; Trial Tr. 341:02-342:13, 350:16-351:08, 352:07-353:08.)  On January 18, 2018, the date the Complaint was filed, the ETC amounts respectively were worth $6,641.42 and $5,737.45, the BTC amount was worth $11,474.90, and the XVG amount was worth $153,193.28.  (Trial Ex. 180; *see also* Trial Exs. 183 (bitcoin closing price as of January 18, 2018), 184 (Ethereum classic closing price as of January 18, 2018), 185 (verge closing price as of January 18, 2018).)

100.     Bailey Grady transferred virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his

22

behalf.  Grady transferred $99.00 in U.S. dollars to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Ex. 125.)  Grady also transferred 0.4619459 bitcoin to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p.1, line 34, 180, 125; Trial Tr. 354:21-355:12.)  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth $5,300.78.  (Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).)

 **101.** David Martin transferred virtual currency (litecoin) to McDonnell and CabbageTech for the trading of virtual currency on his behalf.  (*See* Trial Ex. 82, 83.)  Martin transferred 30 litecoin and then another 30 litecoin to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p. 2, lines 56, 60 (LTC); Trial Tr. 353:17-354:03.)  On January 18, 2018, the date the Complaint was filed, those litecoin amounts were each worth $5,785.20.  (Trial Ex. 180; *see also* Trial Tr. 381:07-82:24; Trial Ex. 181 (litecoin closing price as of January 18, 2018).)

 **102.** Charles Mills transferred the following amounts of U.S. Dollars to McDonnell for the purchase of virtual currency on his behalf: $5,000.00, $20,000.00, $3,750.00, $21,000.00, $10,000.00, $2,480.00, $10,000.00, $3,000.00, $4,910.00, $3,500.00, $2,480.00, $5,000.00, $5,000.00, $10,000.00, $10,000.00, $7,500.00, $6,000.00, $3,000.00, $5,000.00, $2,000.00, $3,000.00, $1,000.00, $1,000.00, $4,000.00, $5,000.00, $5,000.00, $2,080.00, and $4,000.00.  (Trial Ex. 180; *see also* Trial Exs. 171-77, 179-80; Trial Tr. 318:03-329:02.)

 **103.** Martin Newman transferred U.S. dollars to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  (*See* Trial Exs. 55, 56, 125.)  Newman transferred $4,020 and $99.98 in U.S. Dollars to McDonnell and

CabbageTech.  (Trial Ex. 180; *see also* Trial Exs. 55, 125; Trial Tr. 101:01-102:08, 107:07-24, 108:09-18, 109:03-12.)

104.    Jacob Sappington transferred U.S. dollars and virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  Sappington transferred $99 in U.S. Dollars to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Ex. 125.)  Sappington also transferred 0.45 bitcoin to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p. 1, line 26 (BTC); Trial Tr. 355:13-356:11.)  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth $5,163.70.  (Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).)

105.    Jake Stainbrook transferred U.S. dollars and virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  Stainbrook transferred $99.98 in U.S. Dollars to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Ex. 125).  Stainbrook also transferred 1 bitcoin to McDonnell and CabbageTech.  (Trial Ex. 180; *see also* Trial Exs. 90, 91 at Deposit tab, p.1, line 23(BTC); Trial Tr. 353:03-16.)  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth $11,474.90.  (Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).)

106.    Junor Taylor transferred U.S. dollars to McDonnell and CabbageTech for virtual currency trading advice and for the purchase and trading of virtual currency on his behalf.  Taylor transferred the following amounts of U.S. Dollars to McDonnell and CabbageTech: $4,044.00, $1,327.50, $1,032.50, $1,417.50, $1,000.00, $4,000.00, $4,000.00, $2,000.00, $3,500.00, and $3,285.00.  (Trial Ex. 180; *see also* Trial Exs. 48, 54; Trial Tr. 213:22-215:16.)

**107.**     Ariel Yabo transferred $1.99 to McDonnell and CabbageTech.  (Trial Ex. 180;

*see also* Trial Tr. 372:02-11; Trial Ex. 125.)

**108.**     In sum, these eleven customers alone transferred the equivalent of $457,393.54 to

McDonnell and CabbageTech.  (*See* Trial Ex. 180.)

### G.     McDonnell's Control of and Connections to Certain Relevant Accounts

**109.**     McDonnell controlled and used several telephone numbers for his business,

including to communicate with customers and to conduct business.  (Trial Exs. 98 (subscriber

information for (929) 428-6422), 102 (subscriber information for (718) 524-6312 and (718) 524-

4718), 122 (subscriber information for (888) 614-6445); *see also, e.g.*, Exs. 42 (McDonnell e-

mail to customer referencing (718) 524-4718), 104-113 (Federal Express accounts reflecting use

of various phone numbers), 128, 129, 129A (telephone numbers associated with McDonnell's

Simple Bank account); Trial Tr. 284:11-287:06 (noting instances of McDonnell's telephone

number use).)

**110.**     McDonnell created and used the numerous FedEx accounts under a variety of

different individual and company names.  (Trial Exs. 104-113, 115; Trial Tr. 287:03-288:10.)

**111.**     McDonnell logged into his numerous online accounts from various IP addresses

associated with his home.  (*See, e.g.*, Trial Exs. 102 (Charter subscriber information showing IP

address 72.227.210.194) and Trial Tr. 286:10-11 (concerning Charter account); Trial Ex. 124

(PayPal activity log reflecting logins from IP addresses 24.168.89.122 and 72.227.210.194) and

Trial Tr. 370:15-19 (concerning PayPal logins); Trial Exs. 91, 96 (Bittrex records) and Trial Tr.

130:09-132:16, 136:01-136:18 (noting IP addresses 24.168.89.122 and 72.227.210.194

associated with Bittrex logins).)

**112.**     McDonnell controlled the CabbageTech e-mail accounts and Coin Drop Markets

PayPal account.  (Trial Ex. 72, 84 (June 5 dep.) at 67:19-21, 332:12-17; Trial Tr. 373:13-15.)

113.     McDonnell controlled both the Bittrex cdmmerchant account and the Bittrex cryptoclown account.  (*E.g.*, Trial Exs. 90, 91 (account identity information), 95-96 (account identity information), 89 at 2, 94 at 2 (same telephone number linked to each account); Trial Tr. 311:20-312:08 (same telephone number); 136:02-18 (logins from same IP addresses); 133:15-136:18 (transfers from one account to the other).)

114.     McDonnell controlled the TD Bank account in the name of CabbageTech.  (*See* Trial Exs. 137-139 (TD Bank account records); *see generally* Trial Tr. 277:11-281:24.)

115.     McDonnell controlled the Bancorp and Simple Bank accounts in his name.  (*See* Trial Exs. 100 (Bancorp); Trial Exs. 128, 129, 129A, 171, 172 (Simple Bank); *see also* Trial Tr. 277:11-19, 282:10-288:06, 317:02-16.)

## IV.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

116.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

117.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District and because acts and practices in violation of the Act have occurred, are occurring, or are about to occur in this District.

26

**B.**     **Defendants Repeatedly Violated Section 6(c)(1) and Regulation 180.1**

**118.**     To prove a violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation

180.1(a), 17 C.F.R. § 180.1(a), the Commission must show that Defendants engaged in

prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation,

misleading statement or deceptive omission; or engaged in a business practice that operated as a

fraud); with scienter; and in connection with a contract of sale of a commodity in interstate

commerce.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018); *see also CFTC

v. S. Tr. Metals, Inc.*, No. 16-16544, 2018 WL 3384266, at \*7 (11th Cir. July 12, 2018); *CFTC v.

Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014).

**C.**     **Defendants Made Misrepresentations, Misleading Statements, and Omissions**

**119.**     "Whether a misrepresentation has been made depends on the 'overall message'

and the 'common understanding' of the information conveyed."  *CFTC v. Rolando*, 589 F. Supp.

2d 159, 168 (D. Conn. 2008) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th

Cir. 2002)).  The representations should be viewed through the eyes of an objectively reasonable

person who would interpret the overall message.  *R.J. Fitzgerald*, 310 F.3d at 1328-29.

**120.**     Defendants' fraudulent scheme involved making numerous misrepresentations

and omissions concerning CabbageTech's business.  For example, Defendants represented that

CabbageTech had multiple offices, including one at 110 Wall Street (*see* Trial Exs. 39, 42, 51),

that McDonnell was the "boss" of a CabbageTech representative named "Jason Flack" (Trial Tr.

205:12-15), and that CabbageTech had a "team of digital asset trading specialists" (*e.g.*, Trial Ex.

70 at 4, 6) and a "management team" (Trial Ex. 52; Trial Tr. 240:5-8).  In reality, however,

CabbageTech was run by McDonnell alone from his home basement in Staten Island.  (Ex. 84

(June 5 dep.) at 144:10-145:12.)  Defendants omitted this information in communications with

customers.

121.    Defendants also made misrepresentations, misleading statements, and omissions in connection with solicitations to purchase trading advice.  For example, Defendants offered a wide variety of subscription or membership services to purchase trading advice.  (*See, e.g.*, Trial Exs. 38, 66, 84 (June 5 dep.) at 132:15-133:20, 205:19-205:23.)  Defendants also advertised membership in trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to litecoin.  (Trial Exs. 1, 70 at 4, 6; 162; Trial Tr. 173:09-20.)  These memberships supposedly offered expert entry-and-exit-price guidance for day trading of certain virtual currencies.  (Trial Exs. 1; 70 at 4, 6; Trial Tr. 173:09-20, 257:13-18.)  The solicitations promised services for 12 or more months in exchange for an up-front fee.  (*See, e.g.,* Trial Ex. 1 (referring to "2 Year" membership); Ex. 44 (referring to "Annual Fee"); Trial Tr. 257:22-258:12 (referring to "lifetime membership" for guidance and training).)  Customers did not, however, receive a year's worth of annual membership.  Instead, McDonnell ceased all communications with customers around June or July 2017.  (*E.g.*, Trial Tr. 174:20-24, 239:20-240:01.)  As another example, Dimovski testified that McDonnell gave him entry advice for a specific trade concerning Titcoin, but McDonnell then failed to give any exit signal, which ultimately resulted in Dimovski incurring a significant trading loss.  (Trial Tr. 163:20-165:14.)

122.    Defendants made further misrepresentations and omissions in solicitations concerning trading virtual currencies on behalf of customers.  For example, McDonnell falsely claimed a virtual currency trading track record and an ongoing record of exceptional trading performance.  (*E.g.*, Trial Ex. 14, 161.)  These claims were false because, rather than trading over $50 million in BTC for an established group (Trial Ex. 14), or earning 73 BTC in a single day (Tr. Ex. 161), McDonnell was simply misappropriating customer funds (*see, e.g.*, Trial Tr.

28

278:22-280:04).  McDonnell also made false and misleading claims about his experience and expertise with virtual currency, including in the development and promotion of new virtual currencies.  (Trial Tr. 160:05-161:02.)  Under oath, however, McDonnell stated that he did not recall being involved in the development of any such currencies.  (Trial Ex. 84 (June 5 dep.) at 86:19-87:14.)  McDonnell also falsely promised customers rapidly profitable in-and-out virtual currency investments.  (*E.g.*, Trial Ex. 6 (promising 300 percent returns in less than three days); *id.* (stating "1 BTC in should produce 3 BTC out"); Trial Ex. 8 at 2 (promising 2 to 300 percent profit on 76 Litecoin each day of trading); Trial Ex. 167 (promising to make 0.5 to 2 bitcoin daily for a customer).)  These solicitations were false because in fact McDonnell never accomplished such trading results for customers and simply misappropriated the funds.  (*E.g.*, Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; Trial Exs. 51, 77, 79, 82, 83.)  Defendants also represented to Taylor that Defendants would purchase virtual currencies on his behalf, hold the virtual currencies in escrow, and trade them on Taylor's behalf.  (Trial Tr. 213:9-21, 218:14-20, 221:12-20.)  In reality, however, Defendants misappropriated Taylor's funds and never returned them.  (*See, e.g.*, Trial Tr. 232:07-18, 278:22-280:04.)

**123.**     Defendants also misrepresented to CabbageTech's managed trading customers the value of their investments and/or the profitability of trades.  For example, Defendants sent Taylor multiple emails showing the value of Taylor's account, including one showing that the account balance had grown to $176,703.34 from an original investment of around $25,000.  (Trial Tr. 221:22-222:23; Trial Ex. 49.)  Defendants sent another customer an email on June 17, 2018 stating that the customer's account balance was up to 676 Litecoin, when at the same time McDonnell had been looting the Bittrex cdmmerchant account and begun transferring litecoins to the account opened his wife's name.  (*See* Trial Ex. 82 at 4; Trial Tr. 357:22-367:12.)

Defendants also made false account information, including account balances, available to CabbageTech customers through the CabbageTech website.  (Trial Tr. 223:4-225:17; Trial Ex. 50.)

124.    Defendants also made repeated misrepresentations concerning the availability of customer funds for withdrawal and in connection with withdrawal requests.  For example, Defendants falsely represented to Taylor that he could withdraw funds at any time (Trial Tr. 228:18-229:4), but when Taylor requested to withdraw $25,000, McDonnell gave Taylor a litany of false excuses and misrepresentations, including that Taylor's check was on the secretary's desk, that it would be sent by Fedex, and that funds would be repaid in bitcoin deposited into a Coin Base account (Trial Tr. 229:5-230:20; Tr. Ex. 51).  Defendants omitted to tell Taylor that his funds had been misappropriated, and Taylor never received his money or virtual currency back.  (Trial Tr. 236:19-23.)  Defendants also falsely represented to multiple CabbageTech customers that the company's website had been hacked and shut down the CabbageTech website to cover up the fact that CabbageTech customer funds had been misappropriated, used by McDonnell for personal expenses almost immediately after depositing his customers' checks or secreted in an account in his wife's name.  (Trial Ex. 52; Trial Tr. 237:14-239:4.)

125.    In order to conceal their fraudulent scheme, Defendants omitted to disclose their misappropriation of CabbageTech customer funds or that they would not return customer funds.

126.    Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the Act and Regulation 180.1(a).  *See CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (default judgment) (defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1) by misappropriating funds and making misrepresentations and omissions); *cf., e.g., CFTC v. Van Beuningen*, No.

1:16-cv-978, 2016 WL 9454431, at *4 (N.D. Ga. Mar. 29, 2016) (noting that, as with Rule 10b-5, misappropriation of funds violates Regulation 180.1); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005) (defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 by misappropriating investor funds for his personal benefit).

127.    Defendants misappropriated all of the funds obtained from customers. McDonnell often withdrew customer funds deposited into the CabbageTech TD Bank Account from ATMs soon after receipt.  (*See* Trial Ex. 139; Trial Tr. 394:18-22, 395:5-11.)  McDonnell also used customer funds deposited into the TD Bank account to pay his rent.  (Trial Tr. 279:21-280:04.)  Defendants also misappropriated customer funds sent to the Bittrex cdmmerchant account.  On June 17, 18, and 19, 2017—at the same time that customer demands for refunds were mounting—McDonnell transferred more than 660 litecoin from the Bittrex cdmmerchant account to the Bittrex cryptoclown account.  (Trial Exs. 90-91, 95-96, 150-152; Trial Tr. 133:17-136:23, 357:22-367:12.)  Further, no customer received their funds or virtual currency back (Trial Tr. 71:03-15, 109:03-109:12, 236:19-23; *see also* Trial Ex. 83), apart from a small amount of virtual currency given to Brewell that was not intended as a return on investment (Trial Tr. 65:6-66:5).  Defendants' misappropriation violates 7 U.S.C § 9(1) and 17 C.F.R. § 180.1.  *See, e.g., CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (misappropriation of funds earmarked for trading constituted "willful and blatant fraudulent activity that clearly violates" the Act) (quotation marks and citations omitted)).

D.    **Defendants' Misrepresentations and Omissions Were Material**

128.    A statement of fact is material "if a reasonable investor would consider it important in deciding whether to make an investment."  *S. Tr. Metals*, 2018 WL 3384266, at *8 (citing *R.J. Fitzgerald*, 310 F.3d at 1328-29).  Any fact that enables investors to assess the risk inherent in their investment and the likelihood of profit is material.  *See, e.g., In re Commodities*

31

*Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543, at *8–9 (Jan. 14, 1997).  "[M]isrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law."  *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2004) (quoting *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002)).

**129.**    Each of Defendants' numerous misrepresentations are individually and collectively material because a reasonable investor would consider each important in deciding whether to invest, remain invested, or make additional investments with CabbageTech and McDonnell in the purchase or sale of virtual currencies.  For example, the Defendants' misrepresentations concerning CabbageTech's business are material because a reasonable investor would find it important to know if the firm they had entrusted their funds to was only a one-man boiler room that did not have a prestigious Wall Street address, virtual currency expertise, or multiple employees.  *See SEC v. Constantin*, 939 F. Supp. 2d 288, 306-07 (S.D.N.Y. 2013) (in securities fraud action under SEC Rule 10b-5, holding that defendants' numerous misleading representations, including references to company divisions that did not exist and advertising office locations in expensive metropolitan areas where firm did not have offices, were individually and collectively material).

**130.**    Defendants' misrepresentations in solicitations to purchase trading advice are material because a reasonable customer would consider it important to know if they would not receive the advice they believed they were purchasing.

**131.**    Defendants' misrepresentations in solicitations to trade virtual currency on the customer's behalf are material because a reasonable investor would want to know if their funds

would not be used for trading virtual currencies as promised.  Defendants' misrepresentations

concerning the value of CabbageTech customers' investments or the profitability of trading are

material because a reasonable customer would consider it important to know if their investments

were not profitable due to Defendants' misappropriation or would not be used for virtual

currency trading as promised.  *See Constantin*, 939 F. Supp. 2d at 307 (finding account

statements setting forth fictitious account values material); *CFTC v. Driver*, 877 F. Supp. 2d 968,

978 (C.D. Cal. 2012) (finding false account statements depicting trading profits material because

they impacted investor's decisions to invest, remain invested, or make additional investments);

*CFTC v. Rolando*, 589 F. Supp. 2d at 170 ("a reasonable investor would want to know that his

account statements were false").  Defendants' misrepresentations and omissions concerning their

customer's ability to withdraw funds are material because a reasonable investor would consider

it important to know if they would be unable to withdraw funds.  Likewise, Defendants'

omissions and failure to disclose their misappropriation is material because a reasonable

customer or investor would want to know if their funds were misappropriated.  *Cf. SEC v.*

*Gallard*, No. 95-CIV-3099(HB), 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is

no question a reasonable investor would consider important the fact that the 'security' at issue

did not exist ... and that the money paid for those securities would be misappropriated.").  In

sum, Defendants' numerous misrepresentations concerned facts that were important to customers

and went to the heart of their investment decisions and were therefore material.

## E.    Defendants Acted with Scienter

**132.**    Under Regulation 180.1, the Commission must show that Defendants' conduct

was intentional or reckless.  17 C.F.R. § 180.1; *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d

996, 1015 (N.D. Ill. 2015).  This standard is met if a defendant "intended to defraud, manipulate,

or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of

33

ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328; *see also Kraft*, 153 F. Supp. 3d at 1015.  The Commission can establish recklessness by showing that the conduct "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. v. CFTC*, 676 F.2d 1, 6-7 (1st Cir. 1982); *see also R.J. Fitzgerald*, 310 F.3d at 1328 (holding that scienter is met when a defendant's conduct "involves highly unreasonable omissions or misrepresentations that . . . present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it" (ellipses and brackets in original)).

133.    Defendants' conduct in making material misrepresentations and omissions and misappropriating customer funds was intentional or, at a minimum, reckless.  For example, Defendants intentionally, or with reckless disregard to their truth, made representations concerning CabbageTech's size, location, and number of employees were false because McDonnell himself owned and controlled CabbageTech and knew that he operated it by himself from his home basement in Staten Island.  (*See* Trial Ex. 84 (June 5 dep.) at 144:10-145:12.)

134.    Further, when Defendants solicited customers, they intentionally, or with reckless disregard to their truth, made representations concerning the trading advice subscriptions that were false because customers were promised one or more years, or even a lifetime, of advice services shortly before McDonnell abruptly closed the enterprise.  (*E.g.*, Trial Ex. 133 (showing Slack group creation on May 14, 2017 and deletion on June 15, 2017).)

135.    When Defendants solicited customers to provide funds for virtual currency trading on the customers' behalf, they intentionally, or with reckless disregard to their truth, made exaggerated representations and promises of profits that were false.  In fact, Defendants never intended to provide the promised trading signals and advice, or to trade on behalf of

customers, as evidenced by the immediate misappropriation of customer funds.  For example, McDonnell deposited one cashier's check for investments from Taylor, and the next day wrote a check in a similar amount simply to pay his rent.  (Trial Exs. 138, 139; Trial Tr. 455:01-09; *see also* Trial Ex. 171, 172.)

136.    The intentional nature of Defendants' conduct is also evidenced by the blatant disregard of customers' complaints and their refusal to return investors' funds.  When customers asked to withdraw their investments and purported gains, McDonnell would offer a series of false excuses for delays in repayment.  (*See, e.g.*, Trial Ex. 51, 77.)  Taylor sent repeated emails asking for his funds to be returned and made phone calls that went unanswered.  (Trial Tr. 231:6-8; 239:25-240:01; Trial Ex. 51.)  Other customers asked for withdrawals that were never honored.  (Trial Tr. 70:20-25; Trial Ex. 27, 82, 83.)  Instead, Defendants cut off communications with the customers.  (Trial Tr. 174:12-19, 239:20-240:1.)  Except for the one gratuitous payment, no customer ever received money or virtual currency from Defendants.  (Trial Tr. 71:03-15, 109:03-109:12, 236:19-23.)  Further, at deposition and under oath, McDonnell stated that he "d[idn't] recall" any CabbageTech customer ever requesting a refund (Trial Ex. 84 (June 5 dep.) at 254:17-20) or complaining about anything (Trial Ex. 85 (June 19 dep.) at 50:3-51:15). McDonnell also stated that he did not recall Brewell ever asking him for any money or virtual currency back (*id.* at 48:19-49:3), did not recall ever communicating with Anthony Dimovski (*id.* at 52:16-53:5), and did not recall any customer named Junor Taylor, or ever emailing Taylor, speaking with Taylor on the telephone, or sending or receiving anything to or from Taylor via Federal Express (*id.* at 58:13-61:7).

F.     **Defendants' Fraud  Was In Connection with a Contract of Sale of a Commodity in Interstate Commerce**

137.    The "in connection with" requirement of Section 6(c)(1) of the Act and Regulation 180.1(a) is construed broadly and satisfied where the contract of sale of a commodity in interstate commerce and the fraud are not independent events.  *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding that Section 10(b) of the Exchange Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal citation omitted)); *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41405 (July 14, 2011) (consistent with *Zandford*, "[t]he Commission interprets the words 'in connection with' broadly, not technically or restrictively"); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (concluding that the "in connection with" requirement, broadly read pursuant to *Zandford*, can be met even in cases involving "completely fictitious" securities transactions).

138.    Defendants' fraudulent acts, including making material misrepresentations and omissions and misappropriating customer funds and virtual currencies, were in connection with contracts of sale of virtual currencies such as Bitcoin and Litecoin, each a commodity in interstate commerce.  *McDonnell*, 287 F. Supp. 3d at 228.

G.     **CabbageTech Is Liable for the Acts of Its Agent McDonnell**

139.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, impose strict liability on a principal for acts and omissions by its agent who acts within the scope of their employment or office.  Pursuant to these provisions, "it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197

F.3d 33, 39-40 (2d Cir. 1999).  Additionally, that an agent's actions are illegal does not

automatically place those acts outside of his scope of employment.  *See, e.g., Guttman*, 197 F.3d

at 39-40 (upholding Commission's finding of principal-agent liability under Section 2(a)(1)(B)

of the Act, where agent engaged in trading that was both within scope of employment, and

illegal); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-30 (S.D.N.Y. 2014) (company may be liable

under Section 2(a)(1)(B) of the Act for agents' violations of the Act within scope of

employment, including any acts intended to serve any purpose of the employer).

140.    The well-pled allegations in the Complaint and the preponderance of the evidence

demonstrated at trial establish that McDonnell's violations of 7 U.S.C § 9(1) and 17 C.F.R. §

180.1 occurred within the course and scope of his work for CabbageTech.  Accordingly,

CabbageTech is liable for McDonnell's violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17

C.F.R. § 1.2.

### H.    McDonnell Is Liable As a Controlling Person

141.    Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), an individual who possesses,

directly or indirectly, the power to direct or cause the direction of the management and policies

of an entity may be liable as a controlling person of that entity, provided that the individual either

knowingly induces, directly or indirectly, the violative acts, or fails to act in good faith.  To

establish controlling person liability under 7 U.S.C. § 13c(b), the Commission must show (1)

control and (2) lack of good faith or knowing inducement of the acts constituting the violation.

*Int'l Fin. Servs.*, 323 F. Supp. 2d at 504–05 (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th

Cir. 2002)).  The statute is construed liberally, and even indirect means of discipline or influence,

short of actual direction, is sufficient to find liability as a controlling person.  *Monieson v. CFTC*,

996 F.2d 852, 859-60 (7th Cir. 1993).  Proof of recklessness will demonstrate that the controlling

person acted in bad faith.  *Id.* at 860.  To establish "knowing inducement," the Commission must

show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (Jan. 12, 1988).

**142.** McDonnell not only exercised general control over CabbageTech, he also controlled the specific activities that are the basis for CabbageTech's violations of the Act and Regulations. For example, McDonnell was the sole owner and operator of the business, controlled the content on the CabbageTech website and related social media, and controlled the accounts at PayPal, Simple Bank, TD Bank, and Bittrex, where customer funds and virtual currencies were deposited and then misappropriated. (*E.g.*, Trial Exs. 63 at 3, 84 (June 5 dep.) at 122:8-10, 125:11-126:5, 141:21-23, 142:14-19; Trial Exs. 88-91, 93-96 (showing Bittrex identity information).) McDonnell was also responsible for developing and disseminating the false and misleading information about CabbageTech to customers through solicitation materials. (Trial Ex. 84 (June 5 dep.) at 142:8-13, 141:24-142:7 (research reports), 38:8-38:16, 40:7-22, 43:14-44:15 (emails).) McDonnell also and controlled the various telephone numbers used to communicate with CabbageTech customers (*see* Trial Exs. 42, 98, 102 (telephone subscriber information)) and solicited customers by telephone (*e.g.*, Trial Tr. 96:25-97:11, 99:02-99:20 (Newman), 202:19-203:11 (Taylor)). Thus, McDonnell not only exercised general control over CabbageTech, he also controlled and undertook the specific activities that are CabbageTech's violations of the Act and Regulations. *See Int'l Fin. Servs.*, 323 F. Supp. 2d at 505.

**143.** McDonnell also knowingly induced, directly or indirectly, the conduct constituting violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 or failed to act in good faith, as evidenced by his making of the fraudulent misstatements and omissions to CabbageTech customers and his personal operation of the fraudulent scheme and misappropriation of customer

funds.  (*See, e.g.*, Trial Ex. 84 (June 5 dep.) at 67:19-21; (Trial Tr. 279:21-280:04).)

McDonnell's failure to act in good faith is evidenced by his blatant disregard of customers'

complaints and his refusal to return investors' funds.  (*E.g.*, Trial Exs. 82, 83, 122; Trial Tr.

174:12-19, 237:14-240:01, 308:06-309:25.)  Accordingly, McDonnell is liable for

CabbageTech's violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 to the same extent as

CabbageTech itself pursuant to 7 U.S.C. § 13c(b).

### I.    <u>Judgment by Default Against CabbageTech is Granted</u>

**144.**    Rule 55 of the Federal Rules of Civil Procedure authorizes a default judgment

when "a party against whom a judgment for affirmative relief is sought has failed to plead or

otherwise defend."  Fed. R. Civ. P. 55(a).  As to corporate defendants, "[i]t is settled law that a

corporation may not appear in a lawsuit against it except through an attorney, and that, where a

corporation repeatedly fails to appear by counsel, a default judgment may be entered against it."

*Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006) (quoting *SEC v.*

*Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975)).

**145.**    CabbageTech has failed to answer or otherwise defend this action, and this Court

has already found CabbageTech in default.  (ECF 40.)  The well-pled allegations in the

Complaint, and the findings of fact herein, establish that CabbageTech is liable for fraud by

misrepresentations, omissions, and misappropriation, in violation of 7 U.S.C § 9(1) and 17

C.F.R. § 180.1.  Accordingly, final judgment by default against CabbageTech should be entered

pursuant to Rule 55 of the Federal Rules of Civil Procedure.

## V.    <u>RELIEF</u>

### A.    <u>Permanent Injunction</u>

**146.**    The Court's authority to grant the injunctive relief requested is set forth in Section

6c(a) of the Act, 7 U.S.C. § 13a-1(a).  The statutory injunctive relief contemplated in Section 6c

of the Act is remedial in nature, and is designed to prevent injury to the public and to deter future

illegal conduct.  "The Commission, like the SEC in the securities area, is the 'statutory guardian'

entrusted with the enforcement of the congressional scheme for safeguarding the public interest

in commodity futures markets." *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135,

142 (2d Cir. 1977)).  Unlike private litigants seeking injunctions, the Commission does not need

to show irreparable injury or the inadequacy of other remedies when seeking an injunction.  *Id.*,

at 141-42; *cf. SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (noting same exception

applies in actions by SEC); *SEC v. Unifund SAL*, 910 F.2d 1028, 1035-36 (2d Cir. 1990)

(explaining the public interest inherent in such actions).

147.    The Commission is entitled to injunctive relief under Section 6c of the Act upon a

showing that "there is a likelihood that, unless enjoined, the violations will continue."  *See CFTC

v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986); *SEC v. Credit Bancorp, Ltd.*,

738 F. Supp. 2d 376, 390 (S.D.N.Y. 2010) ("An enforcement action requesting a permanent

injunction must only show a 'reasonable likelihood of future violations.'") (quoting *CFTC v.

Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).  In determining whether a "reasonable likelihood" of

future violations exists, courts generally consider the egregiousness of the defendant's actions;

the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the

defendant's recognition of the wrongfulness of the conduct; and the likelihood that the

defendant's customary business activities will present opportunities for future violations.  *See

SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972); *see also SEC v. Blatt*,

583 F.2d 1325, 1334 n.29 (5th Cir. 1978).  "[T]the ultimate test ... is whether the defendant's

past conduct indicates that there is a reasonable likelihood of further violations in the future."

*CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (citation omitted).  A

"district court may properly infer a likelihood of future violations from the defendant's past unlawful conduct." *CFTC v. Am. Bd. of Trade*, 803 F.2d at 1251; *see also SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1477 (2d Cir. 1996) (holding that such an injunction is particularly within the court's discretion where a violation was "founded on systematic wrongdoing, rather than an isolated occurrence").

148.    Defendants engaged in a recurrent, systematic process of egregious intentional violations of the Act: Defendants defrauded investors about the nature of the advice and managed trading services offered and then misappropriated the investors' assets for McDonnell's personal purposes.  Given the systematic nature of the past conduct, the high degree of scienter involved, McDonnell's failure to accept responsibility, and a lack of any constraints on future conduct, there is a reasonable likelihood that Defendants may engage in future violations.  Thus, a permanent injunction is warranted including, among other things, permanent bans on trading virtual currency, controlling trading accounts for other persons, soliciting or accepting funds from any person for trading in commodity interests, or applying for or claiming exemption from registration with the Commission or engaging in any activity requiring such registration or exempt from registration pursuant to Commission Regulation.

**B.    Restitution**

149.    Restitution may be granted pursuant to the Court's statutory authority under Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A).  With the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), the CEA was amended to specifically allow the Commission to seek "restitution to persons who have sustained losses proximately caused by [a] violation (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3)(A).  The addition of this language provided by statute clarified the method to calculate restitution.

41

150.    Where a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution. *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986) (per curiam) (where there existed systematic and pervasive fraud, dispensing with the general rule that in calculating disgorgement a party must distinguish between the legally and illegally derived profits).

151.    The appropriate calculation of restitution in cases of pervasive fraud under the CEA includes all customer losses even where only a subset of those customers testified at trial. *See, e.g., Hunter Wise*, 21 F. Supp. 3d at 1352 (determining in connection with violations of Section 6(c) of the Act and Rule 180.1 that "[t]he systematic and pervasive nature of [the defendant's] fraud necessitates restitution not only for the retail customers who testified to the losses they sustained due to [the defendant's] scheme, but for all of [defendant's] customers as well.").

152.    Where there are material misstatements or omissions in the context of a fraudulent scheme, the Court can presume reliance of the defendant's customers. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 131 (1972) (determining that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."). Thus, where customer funds are obtained under false pretenses, the appropriate calculation of restitution includes all customers who are presumed to have relied on those misstatements. *See CFTC v. Paramount Mgmt., LLC*, No. 13 CIV 4436-CM, 2013 WL 5586216, at *8 (S.D.N.Y. Sept. 9, 2013) (consent order) (where customer funds intended for forex trading were misappropriated, finding "that it is not necessary that the Commission prove customers relied on the misrepresentations and omissions of [defendants] for purposes of calculating customer restitution because reliance is presumed").

42

**153.**     The testimony and evidence presented at trial established that Defendants engaged in a systemic and pervasive scheme to misappropriate customer funds.  There can be no more fundamental omission than the Defendants' failure to disclose that they had no intent to provide the services promised but rather were misappropriating customer assets and intended to continue to do so.  *See CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at *5 (S.D. Fla. May 17, 2013), 2013 WL 2158428, at *5 ("On the whole, however, this case is most accurately described as an omissions case.  The heart of the fraud was the Defendants' failure to tell pool participants of the Defendants' scheme to misappropriate the pool participants' funds . . . .").  Accordingly, this Court orders restitution in the full amount of customer losses for funds transferred by customers to the Defendants for the purchase and sale of virtual currencies and the trading services they did not receive.

**154.**     In total, Defendants wrongfully received $457,393.54 from victims.  (*See* Trial Ex. 180.)  No victim received any returns.  Thus restitution in the amount of $457,393.54 is appropriate in this matter.

### C.     Civil Monetary Penalties

**155.**     Under Section 6c(d)(1)(A) of the Act, the Court may impose "on any person found to have committed any violation a civil penalty in the amount of not more than the greater of" $177,501 per violation (as adjusted for inflation pursuant to statute) or triple the monetary gain to the person for each violation.  *See* 7 U.S.C. § 13a-1(d)(1)(A) (setting forth the basic statutory amount or triple the monetary gain); Regulation §§ 143.8(a) and (b)(1), 17 C.F.R. § 143.8(a) and (b)(1) (implementing statutory requirement to adjust maximum amount of penalties for inflation pursuant to 28 U.S.C. § 2461 note (Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (as amended))).

156.    "The court should consider a variety of factors in assessing a civil monetary penalty, and has broad discretion in fashioning an appropriate remedy that is 'rationally related to the offense charged or the need for deterrence.'"  *CFTC v. Yorkshire Grp., Inc.,* No. 13-cv5323, 2016 WL 8256380, at *6 (E.D.N.Y. Aug. 19, 2016) (quoting *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008)), *report and recommendation adopted by*, 2016 WL 5942310, at *3 (E.D.N.Y. Oct. 12, 2016).  "Accordingly, the court should focus on the gravity of the misconduct, considering such factors as (1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) respondent's state of mind; (3) the consequences flowing from the violative conduct; and (4) respondent's post-violation conduct."  *Id.* (internal quotation marks omitted).  Conduct that violates the core provisions of the Act, such as customer fraud, is considered very serious.  *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995).

157.    In light of the core relationship of the anti-fraud regulations to the purpose of the Act, the egregiousness of Defendants' intentional conduct to misappropriate the investor funds, the length of time over which Defendants engaged in the wrongful trading activity, and McDonnell's failure to accept any responsibility or attempt to ameliorate the wrongful conduct even following the Court's findings of victim credibility, the Court finds a CMP of triple the monetary gain for the fraudulent behavior of Defendants in violation of Section 6(c)(1) of the Act and Regulation 180.1 appropriate.

158.    Defendants' gain is the amount raised from customers $ 457,393.54, and triple the monetary gain is $ 1,372,180.62.  The Court therefore imposes a CMP of $ 1,372,180.62, plus post-judgment interest as prescribed by statute.

## VI.    CONCLUSION

159.    This Court finds in favor of Plaintiff Commodity Futures Trading Commission and against Defendants on Count I of the Complaint.  Injunctive relief, restitution, civil monetary

44

penalties, and ancillary equitable relief are appropriate based on the Findings and Conclusions in this Order.  Judgment including the specific terms and the amounts of restitution and civil monetary penalties will be set out in a separate Final Judgment pursuant to Federal Rules of Civil Procedure 58 and 55(b)(2).

      DONE AND ORDERED

_____

**JACK B. WEINSTEIN**
Senior United States District Judge

Dated: _____, 2018
           Brooklyn, New York