UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COMMODITY FUTURES TRADING
COMMISSION,

               Plaintiff,

      v.

PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

               Defendants.

Case No. 18-CV-0361 (JBW)

ECF Case

---

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S
POST-TRIAL BRIEF IN SUPPORT OF PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND FINAL JUDGMENT AGAINST
DEFENDANTS PATRICK K. MCDONNELL AND CABBAGETECH, CORP.
D/B/A COIN DROP MARKETS**

COMMODITY FUTURES
TRADING COMMISSION
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9700

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

PRELIMINARY STATEMENT ........................................................................................... 1

PROCEDURAL BACKGROUND ....................................................................................... 2

LEGAL STANDARD .......................................................................................................... 4

STATEMENT OF FACTS ................................................................................................... 5

    A.  The Parties ................................................................................................................ 5

    B.  McDonnell and CabbageTech Solicited Customers Through Wire
       Communications, including Social Media Accounts, Websites and Telephone
       Calls ......................................................................................................................... 6

          1.    The Use of Social Media Accounts and Websites to Solicit Customers ............... 6

          2.    The Use of Telephone Calls to Solicit Customers ................................................ 8

          3.    The Use of Email to Solicit and Communicate with Customers ........................... 8

    C.  Defendants' Solicitation of and Communications with Customers Used
       Misleading or False Information and Omitted Material Information ................................. 9

          1.    McDonnell Solicited New Customers with Misleading Information
              Regarding His Trading Background and Success .................................................. 9

          2.    Defendants Told Customers That Trading for Customers Was Very
              Profitable ............................................................................................................. 10

          3.    Defendants Made Fraudulent Statements Regarding Other Supposed
              Officers and Employees of CDM ......................................................................... 11

          4.    Defendants Made Fraudulent Statements Regarding the Membership
              Advice Services Offered ...................................................................................... 11

          5.    Defendants Falsely Claimed There Had Been a Hack of CDM and Then
              Deleted Records ................................................................................................... 14

          6.    Customers Lost Substantial Amounts Due to McDonnell's
              Misappropriation .................................................................................................. 14

ARGUMENT .................................................................................................. 17

    A.  This Court Has Jurisdiction over This Action .................................................. 17

    B.  Defendants Repeatedly Violated Section 6(c)(1) and Regulation 180.1 ......................... 18

          1.     Defendants Made Misrepresentations, Misleading Statements, and Omissions ..................................................................................... 19

          2.     Defendants' Misrepresentations and Omissions Were Material ........................ 26

          3.     Defendants Acted with Scienter .................................................... 28

          4.     Defendants' Fraud Was In Connection with a Contract of Sale of a Commodity in Interstate Commerce ................................................. 30

    C.  CabbageTech Is Liable for the Acts of Its Agent McDonnell ......................... 31

    D.  McDonnell Is Liable As a Controlling Person ................................................ 32

    E.  McDonnell Is Not Entitled to a Second Trial ................................................. 34

    F.  In the Alternative, the Unrebutted Record Entitles the Commission to Summary Judgment Against McDonnell ..................................................................... 37

          1.     Summary Judgment Standard ....................................................... 38

          2.     No Reasonable Factfinder Could Find in Favor of McDonnell ........................ 39

          3.     The Commission Is Entitled to Summary Judgment ........................ 40

    G.  The Court Should Enter Final Judgment by Default Against CabbageTech .................. 41

RELIEF REQUESTED ................................................................................ 42

    A.  A Permanent Injunction Is Appropriate ......................................................... 43

    B.  Restitution Should Be Ordered to Compensate Victims ................................. 45

          1.     The Commodity Exchange Act Explicitly Provides for Restitution of Losses Proximately Caused by a Violation of the Act ......................... 45

          2.     The Evidence at Trial Provides a Reasonable Basis for Calculation of the Value of the Virtual Currencies Sent by Victims to McDonnell ........................ 49

          3.     The NFA Should Be Appointed as Monitor for Disbursement of Funds to Satisfy the Restitution Obligation ................................................. 51

ii

C.  The Court Should Impose a Civil Monetary Penalty Equal to Triple the Monetary Gain ............................................................................................................. 52

D.  CabbageTech Is Equally Liable for the Restitution and Civil Monetary Penalty Obligations. ..................................................................................................... 55

CONCLUSION ................................................................................................................ 56

# **TABLE OF AUTHORITIES**

## **Cases**

*Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937) ................................................35

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ................................47, 48

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985) ...................................................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................38

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981) ................................42

*Boritzer v. Calloway*, No. 10-CV-6264 (JPO),
   2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) ................................................42

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors
   Inc.*, 699 F.3d 230 (2d Cir. 2012) ................................................42

*CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir. 1986) ...........................43, 44

*CFTC v. Arjent Capital Mkts. LLC*, No. 12-CV-1832 (LAK),
   2013 WL 2477275 (S.D.N.Y. May 15, 2013) ................................................42

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ................................................26, 33

*CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977) ...........43

*CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92 (2d Cir. 1986) .......45, 46

*CFTC v. Byrnes*, 58 F. Supp. 3d 319 (S.D.N.Y. 2014) ................................................32

*CFTC v. Cloud*, No. H-10-706, 2011 WL 1157530 (S.D. Tex. Mar. 24, 2011) .............47

*CFTC v. Driver*, 877 F. Supp. 2d 968 (C.D. Cal. 2012) ................................................27

*CFTC v. Emerald Worldwide Holdings, Inc.*, No. 03-8339 (AHM),
   2005 WL 1130588 (C.D. Cal. Apr. 19, 2005) ................................................53, 54

*CFTC v. First Capitol Futures Grp.*, No. 1:09–00488–CV–W–DW,
   2010 WL 1713617 (W.D. Mo. Feb. 18, 2010) ................................................46

*CFTC v. Gibraltar Monetary Corp., Inc.*, No. 04-80132-CIV,
   2006 WL 1789018 (S.D. Fla. May 30, 2006) ................................................47

*CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21708,
   2013 WL 5212237 (S.D. Fla. Sept. 12, 2013) ................................................24, 25

*CFTC v. Hays*, No. 09-cv-259, 2011 WL 311366 (D. Minn. Jan. 28, 2011) ...........53, 55

*CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) ................................................43

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) ........4, 18, 46, 47

*CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004) ..................26, 32, 34

*CFTC v. JBW Capital*, 812 F.3d 98 (1st Cir. 2016) ...........................................................49

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015).................................28

*CFTC v. Leben*, No. 3:14-cv-866-TLW, 2016 WL 7354359 (D.S.C. Aug. 5, 2016)...................49

*CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2008) ................................................................52

*CFTC v. Marquis Fin. Mgmt. Sys., Inc.*, No. Civ.A. 03-74206, 2005 WL 3752232...................48
   (E.D. Mich. June 8, 2005)

*CFTC v. McCullough*, No. 5:14–CV–83–F, 2015 WL 4877850 (E.D.N.C. Aug. 14, 2015) ........49

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018)...........................................18, 30, 50

*CFTC v. Miklovich*, 687 F. App'x 449 (6th Cir. 2017) .....................................................45

*CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428 (S.D. Fla. May 17, 2013)...............48, 49

*CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676 (D. Md. 2000). ....................26

*CFTC v. Paramount Mgmt., LLC*, No. 13 CIV 4436-CM, 2013 WL 5586216
    (S.D.N.Y. Sept. 9, 2013)...........................................................................................47

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002)....................................19, 26, 28

*CFTC v. Rolando*, 589 F. Supp. 2d 159 (D. Conn. 2008)........................................19, 27

*CFTC v. S. Tr. Metals, Inc.*, No. 16-16544,
    2018 WL 3384266 (11th Cir. July 12, 2018)............................................................18, 26

*CFTC v. SK Madison Commodities, LLC*, No. 14-02025 (SHS),
    2014 WL 3887755 (S.D.N.Y. June 9, 2014) ...............................................................53

*CFTC v. U.S. Bank, N.A.*, No. 13-cv-2041,
    2014 WL 6474183 (N.D. Iowa Nov. 19, 2014)...........................................................45

*CFTC v. Van Beuningen*, No. 1:16-cv-978,
    2016 WL 9454431 (N.D. Ga. Mar. 29, 2016)...............................................................25

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003).................................................25

*CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339 (11th Cir. 2008) ....................................44, 45

*CFTC v. Yorkshire Grp., Inc.,* No. 13-cv5323,
    2016 WL 8256380 (E.D.N.Y. Aug. 19, 2016), *report and recommendation*
    *adopted by*, 2016 WL 5942310 (E.D.N.Y. Oct. 12, 2016) .........................................52, 54

*Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*, No. 14 Civ. 8727 (NRB),
  2017 WL 3610585 (S.D.N.Y. July 25, 2017) ............................................................41, 42

*D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998) ...................................38, 39

*First Commodity Corp. v. CFTC*, 676 F.2d 1 (1st Cir. 1982) ......................................28

*FTC v. Verity Int'l Ltd.*, 443 F.3d 48 (2d. Cir. 2006) .................................................45

*Fuller v. City of Oakland, Cal.*, 47 F.3d 1522 (9th Cir. 1995) ...................................35

*Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180 (2d Cir. 2006) ........................41

*Gusler v. City of Long Beach*, 715 F. App'x 68 (2d Cir. Mar. 16, 2018) ................35, 36

*Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999) ....................................................31, 32

*Herman & Maclean v. Huddleston*, 459 U.S. 375 (1983) .............................................4

*Hosking v. New World Mortg., Inc.*, 570 F. App'x 28 (2d Cir. 2014) ...........................41

*In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154 (E.D.N.Y. 1996) ............................41

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................30

*JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995) ....................................................53

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) .........................................38

*Kahn v. Gen. Motors Corp.*, 865 F. Supp. 210 (S.D.N.Y. 1994) .................................36

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993) ......................................................33

*Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823 (4th Cir. 1994) ..............................38

*Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011 (2d Cir. 1989) ........35

*S.E.C. v. Grotto*, No. 05 CIV. 5880 (GEL), 2006 WL 3025878 (S.D.N.Y. Oct. 24, 2006),
  *aff'd sub nom. S.E.C. v. Leffers*, 289 F. App'x 449 (2d Cir. 2008) ...........................39

*S.E.C. v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996) ...............................................4, 5

*Schenek v. FSI Futures, Inc.*, No. 94 Civ. 6345 (CSH),
  1998 WL 427625 (S.D.N.Y. July 28, 1998) ...........................................................47

*Scott v. Harris*, 550 U.S. 372 (2007) ..........................................................38, 39, 41

*SEC v. Aronson*, 11 Civ. 7033 (JSR),
  2015 WL 10792021 (S.D.N.Y. Aug. 24, 2015) .......................................................46

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978) ............................................................44

*SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) .................................................43

vi

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ....................................................26, 27

*SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376 (S.D.N.Y. 2010) ...........................................43

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)......................................................44

*SEC v. Gallard,* No. 95 Civ. 3099, 1997 WL 767570 (S.D.N.Y. Dec. 10, 1997) ........................27

*SEC v. Hasho*, 784 F. Supp. 1059 (S.D.N.Y. 1992) .....................................................................46

*SEC v. Lawbaugh*, 359 F. Supp. 2d 418 (D. Md. 2005) ...............................................................25

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996)....................................................................................49

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................................44

*SEC v. Mortenson,* No. CV-04-2276 (SJF) (WDW),
    2013 WL 991334 (E.D.N.Y. Mar. 11, 2013) .....................................................................46

*SEC v. Patel,* 61 F.3d 137 (2d Cir.1995) ...............................................................................49, 50

*SEC v. Pentagon Capital Mgmt.*, 725 F.3d 279 (2d Cir. 2013)....................................................54

*SEC v. Razmilovic*, 822 F. Supp. 2d 234 (E.D.N.Y. 2011),
    *aff'd in part, vacated in part on other grounds*, 738 F.3d 14 (2d Cir. 2013) ...................46

*SEC v. Research Automation Corp.*, 521 F.2d 585 (2d Cir. 1975)...............................................41

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)....................................................................43

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998).................................................................................50

*SEC v. Zandford*, 535 U.S. 813 (2002).......................................................................................30

*Stotler & Co. v. CFTC*, 855 F.2d 1288 (7th Cir. 1988) ...............................................................31

*Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971) .......................................41

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004).........................41

*Washington v. New York City Bd. of Estimate*, 709 F.2d 792 (2d Cir. 1983)..............................36

## Administrative Decisions

*In re Commodities Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543 (Jan. 14, 1997) ....................26

*In re Ray*, CFTC No. 03-1, 2011 WL 639921 (Feb. 18, 2011)......................................................53

*In re Spiegel*, CFTC No. 85-19, 1988 WL 232212 (Jan. 12, 1988)..............................................33

*In re Staryk*, CFTC No. 95-5, 2004 WL 1657544 (July 23, 2004)...............................................53

## Statutes

7 U.S.C. § 2 (2012) ....................................................................................................31, 32, 55

7 U.S.C § 9 (2012) ....................................................................................................... *passim*

7 U.S.C. § 13 (2012) .................................................................................................... *passim*

7 U.S.C. § 21 (2012) ...........................................................................................................51

Federal Civil Penalties Inflation Adjustment Act of 1990,
    Pub. L. No. 101-410, 104 Stat. 89028
    (codified as amended at 28 U.S.C. § 2461) (2012)) ........................................................52

## Regulations and Court Rules

17 C.F.R. § 1.2 (2018) ..............................................................................................31, 32, 55

17 C.F.R. § 143.8 (2018) ....................................................................................................52

17 C.F.R. § 180.1 (2018) .............................................................................................. *passim*

Fed. R. Civ. P. 50 ...............................................................................................................38

Fed. R. Civ. P. 52 .................................................................................................................5

Fed. R. Civ. P. 55 ...............................................................................................................41

Fed. R. Civ. P. 56 ............................................................................................................1, 38

Prohibition on the Employment, or Attempted Employment, of Manipulative and
    Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398,
    41405 (July 14, 2011) ....................................................................................................4

## **Treatises and Other Authorities**

9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2321 (3d ed. 2018 update)...................................................................................................................35

Hon. J. Travis Laster & Marcel T. Rosner, *Distributed Stock Ledgers and Delaware Law*, 73 Bus. Law. 319, 319 n. 3 (Spring 2018) ......................................................................50

Dave Michaels*, Ether Shouldn't Be Subject to SEC Regulation, Official Says*, Wall St. J., June 15, 2018 ...........................................................................................................50

Plaintiff Commodity Futures Trading Commission ("CFTC" or "the Commission") respectfully moves pursuant to Federal Rules of Civil Procedure 52 and 55 for an order adopting the proposed Findings of Fact and Conclusions of Law, and an order entering final judgment, including a permanent injunction, restitution, civil monetary penalties, and ancillary equitable relief against Defendant Patrick K. McDonnell and defaulted Defendant CabbageTech, Corp. d/b/a Coin Drop Markets ("CabbageTech" or "CDM") for violations of Section 6(c)(1) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. § 9(1) (2012), and Commission Rule 180.1 of the Commission's Rules and Regulations ("Regulations"), 17 C.F.R. § 180.1 (2018),[1] and submits this memorandum of law in support of its motion.[2]  The motion is supported by this memorandum of law, the evidence received at trial, the July 26, 2018, Declaration of Christopher Giglio, the July 24, 2018 Declaration of Daniel A. Driscoll, the Complaint, and all prior filings in this action.

## PRELIMINARY STATEMENT

The evidence in this case presents clear proof that, in connection with a contract of sale of a commodity in interstate commerce, McDonnell and his company CabbageTech employed a deceptive device or contrivance to trick customers from the United States and around the world to send Defendants money and valuable amounts of virtual currencies.  Victims of McDonnell and CabbageTech's fraud believed they were paying for the purchase and sale of virtual currencies and expert virtual currency trading advice from him and from his company's team of advisors.  But instead of purchasing virtual currency on their behalf or providing more than an

---

[1] All citations to the transcript of the trial held before this Court from July 9-12, 2018, shall be referenced as "Trial Tr. __" and citations to exhibits admitted at trial shall be referenced as "Trial Ex. __."  All citations herein to the United State Code and the Code of Federal Regulations are to the 2012 and 2018 editions respectively unless otherwise noted.  No material change to the relevant statutes or regulations at issue in this action has been enacted or promulgated since those editions were published.

[2] Plaintiff also moves in the alternative for summary judgment pursuant to Fed. R. Civ. P 56 based on the same record that establishes there are no material issues of fact to be resolved.  *See* pp 37-41, *infra*.

ephemeral and superficial illusion of advice, McDonnell and CabbageTech simply misappropriated customers' funds.

Defendants accomplished this through direct phone calls, through advertisements and websites on the internet, and through social media, all designed to add a gloss of sophistication and legitimacy to the fraudulent scheme.  Defendants touted extensive assets under management, McDonnell's experience as a virtual currency promoter and developer, an office on Wall Street, and a large organizational structure—none of which existed.

In some cases, McDonnell employed a false name in cold calls to solicit customers directly to sending him tens of thousands of dollars to buy virtual currencies.  Defendants also hooked victims by offering entry into trading advice circles for low starter fees from $1.99 to $99, and then coaxing them to send bitcoins, litecoins, or other virtual currencies in order to join more trading advice groups, to purchase virtual currencies from Defendants, or to allow Defendants to trade virtual currencies on the customers' behalf.  Defendants did this through constant pressure to build what the victims believed was a relationship of trust.

Instead, McDonnell took the money and converted it to cash, paid for personal expenses, or else transferred the virtual currencies to undisclosed wallets (some of which were held at an exchange in the name of his wife).  At the time the Complaint in this action was filed, January 18, 2018, McDonnell and CabbageTech had taken and never returned almost $200,000 in checks and wire transfers, and virtual currencies worth at that time over $250,000.

## PROCEDURAL BACKGROUND

On January 18, 2018, Plaintiff filed its Complaint for injunctive and other equitable relief and for civil monetary penalties (ECF 1) against McDonnell and his company CabbageTech. The Complaint alleged that Defendants fraudulently solicited customers to purchase trading advice services and to provide Defendants money and virtual currency to trade on their behalf.

On January 22, 2018, true and correct copies of the Summons and Complaint were served on both Defendants by hand delivery to McDonnell's home address (and the primary business address for CabbageTech) as well as by service via the New York Secretary of State.  (ECF 7 and 8.)  The Court directed that the parties appear for a hearing on March 6, 2018.  (ECF 17.)  McDonnell appeared at the hearing pro se and invoked his Fifth Amendment privilege, but no appearance was made for CabbageTech.  After the hearing, the Court held that the CFTC could exercise its enforcement power over the conduct alleged in the Complaint, entered a preliminary injunction against McDonnell (ECF 29), and found that CabbageTech was in default (ECF 40).[3]

From July 9 to 12, 2018, a trial was held before the Court.  The Court heard testimony from several witnesses, including four victims of the scheme, and received more than 150 exhibits into evidence in support of the CFTC's allegations.  McDonnell, proceeding pro se, participated vigorously[4] on the first day, but then declared that he would not attend the remainder of the trial:  "Defendant is gracefully withdrawing his defense . . . . Defendant will not be appearing this point forward . . . . Defendant understands the process will continue with remedy . . . ."  (ECF 119-1; *see also* ECF 131-132 (minute entries for trial).)  Although McDonnell did not testify, transcribed and videotaped testimony of his sworn deposition on June 5 and 19, 2018, was admitted (Trial Exs. 84 (June 5 transcript), 84A (June 5 video), 85 (June 19 transcript), and 85A (June 19 video)), as were his responses to the Court's order dated March 6 (Trial Ex. 62; docketed previously as ECF 113-4), responses to the CFTC's interrogatories (Trial Ex. 63), and responses to the CFTC's document requests (Trial Ex. 64), all of which McDonnell affirmed

---

[3] Plaintiff is also moving by today's filing for final judgment by default against CabbageTech.

[4] For example, McDonnell argued his motion for reconsideration of the Court's denial on March 6 of his motion to dismiss, presented an opening statement, cross-examined three witnesses, and requested and was granted additional time to argue his motion further the next day.  (ECF No. 130 (minutes); *see generally* Trial Tr. 03:01-14:25 (motion), 30:01-39:19 (opening), 74:01-76:20 (cross), 79:09-89:25 (re-cross), 109:19-112:08 (cross), 136:24-141:05 (cross), 143:03-17 (request for more time granted).

under oath.  (*See* Trial Ex. 84 (June 5 dep.) at 84:23-86:04.)  During the trial, Plaintiff emailed

McDonnell transcripts every evening and informed him that the Court invited him to return at

any time.

After the CFTC orally moved in open court to withdraw its jury demand prior to the close

of its evidence (Trial Tr. 412:2-6), the Court again gave McDonnell the opportunity to return on

July 12 and oppose the CFTC's motion or make any motion he chose.  (*Id.* at 412:7-16).  As

directed by the Court, on July 11, the CFTC renewed its motion by written notice (ECF 121);

later that same day McDonnell requested a delay in closing arguments (ECF 122-123) and then

rescinded that request (ECF 125).  McDonnell did not appear on July 12, and the Court granted

the CFTC's motion to withdraw its jury demand.  (Trial Tr. 427:09-11.)

After the CFTC rested, the Court found on the record that all four alleged victims

testified credibly.  (*See* Trial Tr. 432:08-433:25.)  McDonnell then filed the next day an

opposition to the CFTC's motion to withdraw its jury demand.  (ECF 128.)

## LEGAL STANDARD

In a civil enforcement action such as this one, the Commission must prove the elements

of its claim for relief by a preponderance of the evidence.  *See CFTC v. Hunter Wise*

*Commodities, LLC*, 21 F. Supp. 3d 1317, 1353 (S.D. Fla. 2014) (applying preponderance of the

evidence standard); *see also Prohibition on the Employment, or Attempted Employment, of*

*Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg.

41398, 41405 (July 14, 2011) (in promulgating Rule 180.1, determining that it will be the

plaintiff who "bears the burden of proving the violation by a preponderance of the evidence"); *cf.*

*Herman & Maclean v. Huddleston*, 459 U.S. 375, 387–90 (1983) (holding that preponderance of

the evidence standard applies to private actions alleging Section 10(b) fraud under federal

securities laws); *S.E.C. v. Moran*, 922 F. Supp. 867, 888-90 (S.D.N.Y. 1996) (holding that the

standard of proof in an SEC Rule 10b-5 enforcement action is by a preponderance of the

evidence).  The court's findings of fact will be reviewed and set aside only if "clearly

erroneous," Fed. R. Civ. P. 52(a)(6), with particular deference to a finding based in part on the

"decision to credit the testimony of one of two or more witnesses, each of whom has told a

coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if

not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer*, 470

U.S. 564, 575 (1985).[5]

## STATEMENT OF FACTS

### A.     The Parties

*Plaintiff Commodity Futures Trading Commission.*  The CFTC is an independent

federal regulatory agency that is charged by Congress with the administration and enforcement

of the Act and the Regulations. The Commission maintains its principal office at Three Lafayette

Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

*Defendant Patrick K. McDonnell.*  McDonnell resides in Staten Island, New York.

(*E.g.*, Trial Ex. 84 (June 5 dep.) at 21:13-21.)  McDonnell has lived there for the past five or six

years.  (*Id.* at 23:20-24.)  McDonnell has never been registered with the Commission.

*Defendant CabbageTech, Corp. d/b/a Coin Drop Markets.*  Defendant CabbageTech,

Corp. is a New York corporation based in Staten Island, New York, and was incorporated on

May 6, 2016.  (Trial Ex. 58.)  CabbageTech's service address is 20 Rawson Place, Suite B,

Staten Island, New York, 10314.  (Trial Exs. 57-58, Trial Ex. 84 (June 5 dep.) at 225:19-226:02.)

---

[5] Indeed, the evidence submitted by the Commission was unrebutted and could not have been contested
even if McDonnell had chosen to appear after the first day of the trial.  As noted below, *see* pp. 39-40, McDonnell
acknowledged repeatedly that he had no extrinsic evidence and in sworn testimony denied recollection of almost
every part of the case.

McDonnell created CabbageTech.  (Trial Ex. 84 (June 5 dep.) at 122:08-15; Trial Ex. 58, at 2.)  McDonnell wholly owned and controlled CabbageTech.  (*See* Trial Ex. 85 (June 19 dep.)) at 10:12-14; Trial Ex. 84 (June 5 dep.) at 122:16-20; Trial Exs. 57-58.)

CabbageTech did business as "Coin Drop Markets."  (Trial Ex. 84 (June 5 dep.) at 39:23-40:03.)  Coin Drop Markets was just an extension of CabbageTech.  (*Id.*)  As McDonnell acknowledged, he was the sole operator and owner of CabbageTech.  (Trial Ex. 63, Resp. no. 3.)

At times, McDonnell identified himself as CDM's CTO (Chief Technology Officer), among other titles.  (Trial Ex. 1; Trial Tr. 73:05-12, 205:13-18.)  But McDonnell was the sole employee of CabbageTech—there was no one else involved in the company besides McDonnell.  (Trial Ex. 84 (June 5 dep.) at 142:08-13; Trial Ex. 63, Resp. no. 3)  McDonnell operated the business from his home.  (*Id.* at 145:08-12.)

CabbageTech has never been registered with the Commission.

**B.     McDonnell and CabbageTech Solicited Customers Through Wire Communications, including Social Media Accounts, Websites and Telephone Calls**

As part of his business, McDonnell used a variety of methods to solicit customers, including telephone calls, websites, and social media accounts on networks like Twitter, Facebook, and Slack.  McDonnell used these communication methods to magnify his reach, while at the same time concealing the true nature of what was a one-man boiler room.

**1.     The Use of Social Media Accounts and Websites to Solicit Customers**

In order to advertise to and communicate with customers, McDonnell used a variety of social media accounts and websites.  He used several Twitter accounts in this regard.  (*See, e.g.*,

Trial Tr. 67:10-68:09, 69:09-70:14, 163:11-15, 187:04-23.)[6]  McDonnell's Twitter account @coindropmarkets purported to have thousands of "followers."  (Trial Ex. 66 (screenshot of @coindropmarkets excerpt); *see also* Trial Tr. 158:09-14.)  One of McDonnell's Facebook pages for CabbageTech used the name "Bitcoinxbtradegrp," featured the same line drawing of McDonnell's face that accompanied the @coindropmarkets Twitter account, provided a toll free number used for its business, linked to a website www.coindrops.club, and gave a purported business address on Wall Street.  (Trial Exs. 39, 40; Trial Tr. 155:14-16; 163:09-13, 187:01-23; 249:17-24.)  Additionally, McDonnell published or maintained a number of websites related to CDM, including www.coindropmarkets.com and www.coindrops.club.  (*See, e.g.*, Trial Exs. 40 (Facebook page), 41 (email with customer referencing URL), 66 (excerpt of screen shot), 69 at 38:17; Trial Ex. 81.)  Some customers like Junor Taylor could log into the website and obtain account and balance statements.  (*E.g.*, Trial Tr. 224:07-22; Trial Ex. 50.)

McDonnell's social media presence, such as his Twitter and Facebook accounts, led potential customers to the Coin Drop Markets website and to McDonnell.  (Trial Tr. 45:03-17, 154:08-155:03; 158:09-14.)

In addition to the public-facing Twitter and Facebook pages, McDonnell created and used a Slack "team" named Bitcoin XBT Trade Group (the "CDM Slack account") in connection with purportedly providing Coin Drop Markets membership services.  (*E.g.*, Trial Exs. 133, 157, 158.)  McDonnell was the primary owner of the CDM Slack account and controlled the account.  (*See* Trial Tr. 250:05-25, 392:01-394:16, Trial Ex. 133.)  The CDM Slack account was in existence from only May until June 15, 2017, when McDonnell deleted it.  (*See* Trial Ex. 133.)

---

[6] *See also* Trial Exs. 2-13 (@BTCXBTDEV), Trial Ex. 14 (e-mail enclosing @BTCXBTDEV messages), Trial Ex. 23 (@BTCXBTDEV mentioning @MrPatMcDonnell), Trial Ex. 27 (@TIGRtokens), Trial Ex. 37 (@MisterLTC), Trial Ex. 66 (ECF No. 113-1, @coindropmarkets); Trial Exs. 141-42 (subscriber information).

## 2.    The Use of Telephone Calls to Solicit Customers

McDonnell also solicited customers through cold calls.  (Trial Tr. 94:19-95:04 (Newman), 202:19-203:11 (Taylor).)  At times, as noted below, he fraudulently used a fake identity to do so.  (Trial Tr. 240:25-242:09 (Taylor).)  McDonnell continued to communicate and solicit more money from these existing customers by telephone as well.  (*E.g.*, Trial Tr. 96:25-97:11, 99:02-20 (Newman), 202:19-203:11 (Taylor).)

McDonnell provided customers with several different telephone numbers, including at least one toll-free number, in soliciting their funds.  (*See, e.g.*, Trial Ex. 1 at 1 (providing toll free number to Brewell), 14 at 2 (providing "personal" phone number to same customer), 56 (using same phone number identified in Trial Ex. 14 on FedEx label addressed to BTCXBT Development Corp); Trial Tr. 97:12-25, 99:02-20, 202:19-203:11, 205:03-18, 284:11-286:09, 287:03-10.)

## 3.    The Use of Email to Solicit and Communicate with Customers

In addition to a variety of telephone numbers, McDonnell used a wide array of email addresses in connection with CabbageTech to communicate with customers and in relation to various other accounts.  For example, McDonnell created and used the email account coindropmarkets@gmail.com as the CabbageTech business email account.  (Trial Ex. 84 (June 5 dep.) at 380:08-16; Trial Exs. 72, 119.)  McDonnell communicated with customers using this account.  (Trial Exs. 1, 6, 8, 14 (Brewell); 47, 51, 52 (Taylor).)[7]  No one else besides McDonnell had access to his email accounts.  (*See* Trial Ex. 84 (June 5 dep.) at 67:19-21.)

---

[7] In addition, McDonnell also created and used a second e-mail account, cdm@gmx.us, in connection with CabbageTech, including for use with Coin Drop Markets' PayPal account.  (*See* Trial Ex. 72 at 26:25-27:11; Trial Ex. 84 (June 5 dep.) at 332:12-17.)  Further, McDonnell employed a variety of other e-mail accounts in connection with accounts at the virtual currency exchange Bittrex, FedEx, Charter Communications, Simple Bank, Slack, and Twitter, such as cdmmerchant@gmx.com, patrickpkmcdonnell@gmail.com, patmcdonnell@gmx.com, info@coyotewallstreet.com, and loramcdonnell@gmx.com, among several others.  (Trial Exs. 87-96 (Bittrex

C.    **Defendants' Solicitation of and Communications with Customers Used Misleading or False Information and Omitted Material Information**

As mentioned above, customers were attracted by McDonnell's social media presence, including its misleading statements and omissions about his credentials.  (*E.g.*, Trial Tr. 158:09-17, 159:11-19.)

1.    **McDonnell Solicited New Customers with Misleading Information Regarding His Trading Background and Success**

As part of his solicitations to potential customers to become members of groups supposedly receiving his and CDM's expert trading guidance, McDonnell made false and misleading claims about his track record and prowess as a professional trader, such as through Twitter and through his website.  McDonnell made false and misleading claims to prospective and actual customers about being a Wall Street trader.  For example, Defendants misrepresented CabbageTech's credentials by advertising a fake Wall Street address on social media, and by telling customers that McDonnell was heading in to the office to trade.  (Trial Exs. 39, 40; Trial Tr. 155:17-20, 260:04-11, 261:18-22.)  McDonnell claimed to have over 8,000 customers following his stock recommendations and told one customer that, since 2010, he had earned over $50 million trading bitcoin since 2010 for a select group of customers.  (Trial Ex. 14, at 1.)  Customers found that claims like the business address on Wall Street and the impression that CabbageTech had so many people following its advice "legitimized the business and added credentials to Mr. McDonnell's business."  (Trial Tr. 155:14-20; *see also id.* 158:12-159:3; Trial Ex. 66 (copy of @coindropmarkets Twitter page displaying over 3,300 followers).)

---

records); Trial Tr. 120:09-14 (discussing Bittrex); Trial Exs. 56, 104-113, 115 (FedEx records), 102 (Charter subscriber records), 120 (patrickpkmcdonnell@gmail.com subscriber information), 128, 129, 129A (Simple Bank records linked to e-mail address), 133 (Slack), 176 (e-mail to customer); *see also* Trial Tr. 62:15-63:06 (discussing Slack).)

McDonnell also made false and misleading claims about his experience and expertise with virtual currency, including involvement in the development and promotion of new virtual currencies.  (Trial Tr. 160:05-161:02.)  Under oath, however, McDonnell stated he did not recall being involved in the development of any such virtual currencies.  (Trial Ex. 84 (June 5 dep.) at 86:05-88:10.)

### 2. Defendants Told Customers That Trading for Customers Was Very Profitable

Defendants repeatedly told customers that McDonnell's trading was showing large and significant profits.

If customers (like Dimovski) had not yet entrusted Defendants with assets to purportedly trade for them, McDonnell would tell them exaggerated stories of profitable trading.  (*See* Trial Ex. 161 ("Made over 73 BTC today bud great day man"); Trial Ex. 166 ("I wish I was trading your $LTC bro I'm caking made $122K total yesterday").)  McDonnell would also promise rapidly profitable trading on these virtual currency investments.  (Trial Tr. 58:18-24; 168:05-25; 169:03-07; 169:15-21, 255:09-19; Trial Exs. 6 (promising 300% returns in less than three days) ("1 BTC in should produce 3 BTC out"); 8 at 2 (promising 200 to 300% profit on 76 litecoin each day of trading); 167 (promising to make 0.5 to 2 bitcoin daily for a customer).)

Customers who had entrusted virtual currency or money to Defendants to trade for them, consistently received positive reports.  For example, McDonnell repeatedly told customers that his trading of their litecoin was profitable.  (*See* Trial Ex. 14 ("Hey Rich I'm going over trading blotter your [sic] up big on amount of $LTC traded will discuss tom[orrow]."); *see also* Trial Ex. 82 at 5 ("you have exactly 676 LTC's David").)  McDonnell and CabbageTech provided detailed account statements to some customers that falsely identified significant holdings for them.  (*See* Trial Ex. 50 (Taylor account statement).)

10

McDonnell bolstered these false and misleading statements about his performance by building relationships of trust with customers.  McDonnell used email, social media, and Internet-based chats to develop relationships and trust with victims.  (*E.g.*, Trial Tr. 158:02-08; Trial Exs. 6, 8, 14.)  He also did so by telephone.  (*E.g.*, Trial Tr. 99:02-04, 203:01-11.)

### 3.   Defendants Made Fraudulent Statements Regarding Other Supposed Officers and Employees of CDM

At times, McDonnell falsely assumed the fake identity, Jason Flack, in telephone calls as well as emails.  At trial, McDonnell's voice was recognized as that of "Jason Flack."  (Trial Tr. 240:25-242:09 (customer recognizing defendant's voice as Jason Flack's); *see also* Trial Tr. 176:16-19, 180:06-19, 187:18-188:05, 205:03-18 (customer recognizing defendant's voice as McDonnell's); Trial Tr. 96:25-97:11.)[8]

CabbageTech's communications and promotional materials made claims that the membership and trading groups were operated by a team of professionals.  (*See*, *e.g.*, Trial Ex. 52; Trial Tr. 239:08-14 (regarding email to Taylor about the efforts of its "team").)  As McDonnell acknowledged, he was the only person and there was no such team.  (Trial Ex. 63 Response no. 3; *cf.* Trial Ex. 84 (June 5 dep.) at 125:20-126:05 (admitting there was no one else involved in the company).)

### 4.   Defendants Made Fraudulent Statements Regarding the Membership Advice Services Offered

McDonnell and CabbageTech purported to offer a wide array of memberships and services, ranging from "Bronze" to "Diamond," with the level of services supposedly increasing with the price of the membership.  (*E.g.*, Trial Exs. 38 (Coin Drop Markets membership services), 44 (email confirming "Diamond" membership); 66 (ECF No. 113-1, a screenshot

---

[8] McDonnell also falsely assumed in emails the names Michelle Robertson (and once the name Michelle Robinson) in speaking with a customer.  (*E.g.*, Trial Ex. 79 at 1.)

produced by McDonnell reflecting six membership levels), 84 (June 5 dep.) at 132:15-19

(referring to ECF No. 113-1); *see also* Trial Tr. 159:08-10 (Dimovski); 205:03-206:20 (Taylor).)

By April 2017, Defendants also advertised membership in trading groups such as

RedliteGreenLite, BTC ("RLGLBTC"), relating to bitcoin, and RedliteGreenLite, LTC

("RLGLLTC"), relating to litecoin.  (Trial Exs. 1 (e-mail confirming RLGLLTC membership),

70, at 4, 6 ("Exhibit 20" (bitcoin forum advertisements confirmed by McDonnell during March

6, 2018 hearing)), 162-63 (Twitter messages regarding RLGLLTC); Trial Tr. 173:09-20

(Dimovski).)  These memberships supposedly offered expert entry-and-exit-price guidance for

day trading of certain virtual currencies.  (Trial Exs. 1 (email to Brewell), 70 at 4, 6 (bitcoin

forum descriptions); *see also* Trial Tr. 45:14-17 (Brewell), Trial Tr. 173:09-20, 257:04-260:11

(Dimovski).)  As McDonnell himself told the Court during the March 6, 2018, hearing, in

reference to the webpages promoting RLGLLTC, they "were posts that list what we do."  (*See*

Trial Ex. 71 (Mar. 6 Hrg. Tr.), at 41:01-04, 41:16-19 (describing Trial Ex. 70 (Ex. 20 at Mar. 6

Hrg.) at 4, 6).)

Defendants also solicited customers to purchase memberships in or subscriptions to other

groups and services, such as a "Turn-Key Annual Membership" providing access, for instance, to

McDonnell and CabbageTech's supposed virtual currency trading expertise, mentorship, and

guidance.  (*See* Trial Tr. 46:03-14 (Brewell); Trial Exs. 38 (webpage screenshot), 69 (March 6

Hrg. Tr.) at 39:16-24.)  As McDonnell himself told the Court during the March 6, 2018 hearing,

in reference to the screenshot of a CabbageTech webpage advertising memberships such as

RLGLLTC and Crypto Annual Turnkey Membership (Trial Ex. 70 at 2; *see also* Trial Ex. 38),

"that's an actual picture of my website."  (Trial Ex. 69 at 38:17-19.)

CabbageTech promised these expert services for 12 months in exchange for an up-front fee.  (Trial Exs. 1 (reflecting extension to 24 months), 44, 66, 70.)

The nominal price of the trial membership and the relatively inexpensive prices of the higher membership levels fraudulently produced income for McDonnell, *see generally* Trial Ex. 125 (CDM PayPal account), but more importantly the low entry prices developed targets to defraud for greater gains.  Once customers had made an initial purchase, for example, McDonnell solicited "lifetime" memberships in a more exclusive trading sector or "elite" group that supposedly would provide greater opportunities to profit from virtual currency trading.  (*See*, *e.g.*, Trial Exs. 6, at 1 (email from McDonnell of his Twitter direct messages to Brewell: "You may wanna consider joining RLGLBTC it's direct 1-on-1 trading alongside me and all members involved real-time" and "The program is 1 BTC for it's [sic] lifetime been running since 2010 so there is a lot of BTC buying power,") 8 at 6 ("Just need 1 BTC to make 3"), 163 ("You send me 1 BTC I'll trade w/ you personally minute-2-minute all coins"); Trial Tr. 52:20-53:16, 56:13-57:09; 161:07-22.)

In fact, the trading advice services that Defendants actually provided fell far short of what had been promised.  (*See, e.g.*, Trial Tr. 66:06-21 (describing complaints regarding the lack of trading advice that McDonnell portrayed that he would be giving); Trial Ex. 19.)  As one example, McDonnell never provided the promised entry-and-exit-point guidance for a specific transaction that he promoted to the users of the CDM Slack group that he had formed.  (*E.g.*, Trial Tr. 163:20-165:14.)  Instead, McDonnell directed his customers to buy Titcoin "at any price," and then ceased communicating with customers after the price collapsed, and indeed, chose to shut the Slack group down.  (Trial Ex. 133;Trial Tr. 66:06-21.)  As a result, the many

13

users who followed this direction suffered substantial losses.  (Trial Tr. 174:20-24; Trial Ex. 135

(Slack group member details).)

### 5. Defendants Falsely Claimed There Had Been a Hack of CDM and Then Deleted Records

In June 2017, in a transparent effort to stall Taylor's demands to withdraw a portion of

his purported earnings, Defendants claimed that there had been a hack of CDM.  (Trial Ex. 52;

Trial Tr. 238:12-240:01.)  At some point after that statement, the CDM website posted a message

that it was suspending services due to a hack.  (Trial Tr. 173:21-174:20.)  Of course, this claim

was false.  (Trial Ex. 84 (June 5 dep.) at 254:02-16 (stating under oath that he did not recall a

hack ever happening).)

In reality, in June and July 2017, Defendants shut down the website and chatroom,

deleted social media accounts, ceased communicating with customers by email or telephone, and

kept the customers' funds.  (Trial Tr. 67:07-68:12, 174:14-19, 237:18-20, 238:12-240:01; Trial

Exs. 52, 133 (Slack records showing team deletion on June 15, 2017); Trial Ex. 84 (June 5 dep.)

at 304:14-19 (admitting that he shut down or deleted the coindropmarkets.com website and the

Coin Drop Markets Twitter account he used to communicate with customers.)[9]

McDonnell admitted under oath that he threw away the computers he used for

CabbageTech business, and did not recall when he did so.  (Trial Ex. 84 (June 5 dep.) at 29:04-

15.)

### 6. Customers Lost Substantial Amounts Due to McDonnell's Misappropriation.

As detailed at the trial, many customers made payments in U.S. dollars and in virtual

currency to McDonnell and CabbageTech for the purpose of virtual currency trading services,

---

[9] During discovery, McDonnell told Chief Magistrate Judge Mann that he had deleted CDM records routinely.  (Trial Ex. 74A (Apr. 9, 2018 Tel. Hrg. Tr.) at 18:20-23.)  Similarly, McDonnell testified it was his practice to delete everything at all times.  (Trial Ex. 84 (June 5 dep.) at 311:10-19.)

14

including both trading advice and the purchase or sale of virtual currencies.  (*See* Trial Tr. 58:11-17, 107:07-24, 108:09-18, 109:03-12; *see generally* Trial Tr. 337:02-340:25, 350:16-356:11; Trial Ex. 90-91 (Bittrex records); Trial Ex. 170 (Bank Simple records), Trial Ex. 137 (checks deposited in CabbageTech account at TD Bank).)  In fact, these funds were not used as McDonnell claimed, but were ultimately misappropriated for personal use.

Of course, McDonnell omitted to disclose to customers that he was simply misappropriating their assets.

### a.     Misappropriation of U.S. dollars

McDonnell directed some customers to send U.S. dollars in personal checks or money orders via UPS or FedEx or by wire transfer instructions in order to purchase virtual currencies for their account.  (Trial Tr. 213:03-214:04 (Taylor); Trial Ex. 48; Trial Exs. 55, 56 (Newman); Trial Tr. 101:01-102:08, 107:07-24, 108:09-18, 109:03-12 (Newman); Trial Exs. 171 (wires), 173-75 (checks); Trial Tr. 318:11-319:01, 323:24-328:23 (Mills).)

McDonnell fraudulently dissipated customer funds deposited into the Simple Bank account and the CabbageTech TD Bank account.  (*E.g.*, Trial Ex. 180 (summary including amounts for Mills, Newman and Taylor); *see also* Trial Exs. 137, 139 (TD Bank), 128-129A, 172 (Simple Bank); *see also* Trial Tr. 282:13-25, 315:21-318:17.)  McDonnell often withdrew customer funds deposited into the CabbageTech TD Bank Account from ATMs soon after receipt.  (Trial Ex. 139; *see also* Trial Tr. 394:18-22, 395:05-11.)  McDonnell also used customer funds deposited into the TD Bank account to pay his rent.  (Trial Tr. 280:01-04.)  Similarly, wire transfers to the Bank Simple account (*see* Trial Ex. 172) show that money received by the wire transfers would be immediately used for personal expenses, transferred to family members, or taken by cash withdrawals from ATMs.

b.    **Misappropriation of Virtual Currency Received from Customers**

A number of customers sent Defendants virtual currency rather than U.S. dollars to McDonnell's Bittrex cdmmerchant account, including Brewell (Trial Tr. 57:03-09, 337:05-338:04; Trial Exs. 90 and 91 at Deposit Tab, pp.2-3, lines 67, 68); Dimovski (Trial Tr. 172:15-22, 341:20-342:1, Trial Exs. 90, 91 at Deposit tab, p. 1, line 31 (BTC), and p. 3, line 70 (BTC), Trial Ex. 160); Drake (Trial Tr. 350:16-351:08, 352:07-353:08, Trial Exs. 90, 91 at Deposit tab, p. 1, lines 10 (XVG), 19 (ETC), 29 (BTC), 35 (ETC), Ex. 178); Sappington (Trial Exs. 90, 91 at Deposit tab, p. 1, line 26 (BTC)); Stainbrook (Trial Tr. 353:09-16, Trial Exs. 90, 91 at Deposit tab, p.1, line 23 (BTC)); Grady (Trial Exs. 90, 91 at Deposit tab, p.1, line 34 (BTC)); and Martin (Trial Tr. 353:17-354:03, Trial Exs. 82, 83, 90, 91 at Deposit tab, p. 2, lines 56, 60 (LTC)).

McDonnell also misappropriated customer funds sent to the Bittrex cdmmerchant account.  On June 17, 18, and 19, 2017—at the same time that customer demands for refunds were mounting (*e.g.*, Trial Exs. 51, 77, 79, 82, 83)—McDonnell transferred more than 660 litecoin from the Bittrex cdmmerchant account to the Bittrex cryptoclown account that was opened under the name of his wife.  (*See* Trial Exs. 150-52 (demonstratives), 144-49; *see also* Trial Exs. 90-91, 95-96; Trial Tr. 133:17-136:23, 356:12-367:12.)

When customers asked to withdraw their investment and purported gains, McDonnell and CabbageTech would offer a series of false excuses for delays in repayment before ultimately ceasing communications entirely.  (Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; Trial Exs. 27, 76, 77, 79, 82, 83.)  For example, McDonnell falsely told victims that their profitable investments had been reinvested (Trial Tr. 220:06-17, Trial Ex. 82 at 3-5) or that his secretary had forgotten to send a check to the customer requesting his money (Trial Tr. 229:05-230:13), or that there had been a hack (Trial Ex. 52; Trial Tr. 173:21-174:19, 238:12-240:01).

No customer ever received a refund.[10]  (Trial Tr. 71:03-15, 107:07-107:24, 108:08-109:12, 232:07-21; *see also, e.g.*, Trial Exs. 76, 77, 79, 82, 83.)

   c.  **The Total Losses Identified at Trial**
       **Equaled $457,393.54**

   As Mr. Giglio, the CFTC investigator, testified at trial, the total losses for the customers was $457,393.54.  (*See* Trial Ex. 180.)  Of this amount $651.41 can be attributed to the payments from some customers by PayPal for trading advice services.  (*Id.* (reflecting certain payments by Brewell, Dimovski, Grady, Newman, Sappington, Stainbrook, and Yabo); Giglio Dec. ¶11.)  The remaining $456,742.13 is attributed to the direct transfers of money and virtual currency to McDonnell.

## ARGUMENT

   The overwhelming and entirely undisputed evidence the Commission set forth at trial shows by a preponderance—and indeed by any burden of proof—that McDonnell and CabbageTech repeatedly violated the Act and Commission Regulations by intentionally and recklessly engaging in a scheme to defraud customers in connection with contracts of sale of virtual currencies in interstate commerce.  Defendants' serious misconduct and abuse of CabbageTech customers' trust warrants entry of an order for final judgment, including permanent injunctive relief, restitution, and civil monetary penalties.

**A.**  **This Court Has Jurisdiction over This Action**

   This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has

---

[10] McDonnell has not disputed this, and, when asked, McDonnell claimed under oath that he did not recall even a customer request for one.  (Trial Ex. 84 (June 5 dep.) at 254:17-20.)

  One victim (Brewell) unexpectedly received approximately 75 Ethereum Classic (ETC) on May 29, 2017. Brewell testified that he understood the transfer as a gratuitous recognition of assistance in helping other users of McDonnell's Slack channel.  (Trial Tr. 65:06-66:05; Ex. 91, Tab Withdrawal, Line 22.)   At the time of this transfer, this amount represented approximately $1,282.50.  (Giglio Dec., ¶10.)

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder. As discussed further below, Defendant's fraudulent scheme and material misstatements and omissions, and their acts and practices which operated as a fraud or deceit, in connection with a contract of sale of a commodity in interstate commerce, constitute violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a).

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District and because acts and practices in violation of the Act have occurred, are occurring, or are about to occur in this District. Among other things, McDonnell is a Staten Island, New York resident (Trial Ex. 84 (June 5 dep.) at 21:13-18) and CabbageTech is a New York corporation based in Staten Island, New York (Trial Ex. 58).

**B.      Defendants Repeatedly Violated Section 6(c)(1) and Regulation 180.1**

To prove a violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a), the Commission must show that Defendants engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); with scienter; and in connection with a contract of sale of a commodity in interstate commerce. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018); *see also CFTC v. S. Tr. Metals, Inc.*, No. 16-16544, 2018 WL 3384266, at *7 (11th Cir. July 12, 2018) (same); *Hunter Wise*, 21 F. Supp. 3d at 1347.

18

Here, Defendants' fraudulent scheme involved making a multitude of false and misleading representations and omissions to solicit customers to purchase CabbageTech's trading advice and to trade virtual currencies on customers' behalf.  Defendants then misappropriated virtually all of the money they received from customers.  As explained below, Defendants' misconduct constitutes numerous violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

> **1.      Defendants Made Misrepresentations, Misleading
> Statements, and Omissions**

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding' of the information conveyed." *CFTC v. Rolando*, 589 F. Supp. 2d 159, 168 (D. Conn. 2008) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)).  The representations should be viewed through the eyes of an objectively reasonable person who would interpret the overall message. *R.J. Fitzgerald*, 310 F.3d at 1328-29.  Here, Defendants' fraudulent scheme involved making numerous misrepresentations and omissions (1) concerning CabbageTech's business, (2) in connection with solicitations to purchase trading advice, (3) in connection with solicitations to purchase virtual currency on behalf of customers, (4) concerning the value of customer's investments or the profitability of trading on behalf of customers, (5) concerning withdrawals from customer's accounts, and (6) concerning Defendants' misappropriation.

> **a.      Misrepresentations, Misleading Statements and
> Omissions Concerning CabbageTech's Business**

In order to draw customers in and instill a false sense of confidence in potential customers, Defendants made repeated misrepresentations concerning CabbageTech's business that created the appearance that CabbageTech was a larger, more prestigious entity than it was. For example, Defendants represented that McDonnell was the "Chief Technology Officer" or

19

"CTO" of CabbageTech (*e.g.*, Trial Exs. 1, 42), that CabbageTech had multiple offices, including one at 110 Wall Street (*see* Trial Exs. 39-40, 42, 51), that McDonnell was the "boss" of a CabbageTech representative named "Jason Flack" (Trial Tr. 205:12-15), that CabbageTech had a "secretary" (Trial Tr. 229:5-19) and an executive assistant named Michelle Robertson (*see* Trial Ex. 77); and that CabbageTech had a "team of digital asset trading specialists" (*e.g.*, Trial Ex. 70 at 4, 6) and a "management team" (Trial Ex. 52; Trial Tr. 240:5-8).  Defendants' Twitter account purported to have thousands of "followers," creating an impression that legitimized the claims of McDonnell and CabbageTech.  (Trial Ex. 66; *see* Trial Tr. 158:12-159:3.)  In written materials sent to customers, Defendants represented that "Coin Drop Markets" was "a Division of CabbageTech, Corp."  (Trial Ex. 46 at 2.)

In reality, however, CabbageTech was run by McDonnell alone from his "dusty and grimy" home basement in Staten Island.  (Trial Ex. 84 (June 5 dep.) at 144:10-145:12; 157:18-158:3.)  McDonnell testified under oath that he was the sole person behind CabbageTech, that he was his own secretary and that he was not aware of ever having done CabbageTech work outside his home.  (*Id.* at 125:20-126:3, 144:14-16, 157:15-17.)  Moreover, the company did not have multiple divisions.  In McDonnell's own words Coin Drop Markets "was just . . . an extension" of CabbageTech.  (*Id.* at 39:23-40:6.)  Defendants omitted this information in communications with customers.

Thus, the overall message conveyed to a reasonable customer was that CabbageTech was a prosperous, reputable, and large entity, with divisions, multiple employees, and a prestigious Wall Street location, when in fact CabbageTech was entirely a scam run by McDonnell himself from his home basement in Staten Island.

      **b.**    **Misrepresentations, Misleading Statements, and Omissions in Solicitations to Purchase Trading Advice**

Defendants also made misrepresentations, misleading statements, and omissions in solicitations to purchase trading advice.  Defendants offered a wide variety of subscription or membership services to purchase trading advice.  (Trial Exs. 38, 66, 84 (June 5 dep.) at 132:15-133:20, 205:19-205:23.)  Defendants also advertised membership in trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to litecoin.  (Trial Exs. 1; 70 at 4, 6; 162; Trial Tr. 173:09-20.)  These memberships supposedly offered expert entry-and-exit-price guidance for day trading of certain virtual currencies.  (Trial Exs. 1; 70 at 4, 6; Trial Tr. 173:09-20, 257:13-18.)  And, the solicitations promised services for 12 or more months in exchange for an up-front fee.  (*See* Trial Exs. 1 (referring to "2 Year" membership), 44 (referring to "Annual Fee"), 45 (same); Trial Tr. 257:22-258:12 (referring to "lifetime membership" for guidance and training).)

Defendants misrepresented the length and quality of services that would be offered and omitted to disclose to customers that they would only receive a fraction of what was advertised.  For example, customers never received a year's worth of annual membership from McDonnell and McDonnell ceased all communications with them around June or July 2017.  (*E.g.*, Trial Tr. 174:20-24, 239:20-240:01.)  As another example, Dimovski testified that McDonnell gave him entry advice for a specific trade concerning Titcoin, but McDonnell then failed to give any exit signal, which ultimately resulted in Dimovski incurring a significant trading loss.  (Trial Tr. 163:20-165:14.)  Thus, the overall message conveyed to a reasonable customer was they were signing up for constant and frequent expert trading advice, when in fact McDonnell took their money and virtual currency and never provided the services offered.

        **c.**      **Misrepresentations, Misleading Statements and Omissions in Solicitations Concerning Managed Trading**

Defendants made further misrepresentations in solicitations concerning trading virtual currencies on behalf of customers.  For example, McDonnell falsely claimed a virtual currency trading track record and an ongoing record of exceptional trading performance.  (*E.g.*, Trial Ex. 14, 161.)  These claims were false because, rather than trading over $50 million in BTC for an established group (Trial Ex. 14), or earning 73 BTC in a single day (Trial Ex. 161), McDonnell was simply misappropriating customer funds (*see, e.g.*, Trial Tr. 278:22-280:04).  McDonnell also made false and misleading claims about his experience and expertise with virtual currency, including in the development and promotion of new virtual currencies.  (Trial Tr. 160:05-161:02.)  Under oath, however, McDonnell stated that he did not recall being involved in the development of any such currencies.  (Trial Ex. 84 (June 5 dep.) at 86:19-87:14.)

McDonnell also falsely promised customers rapidly profitable in-and-out virtual currency investments.  (*E.g.*, Trial Ex. 6 (promising 300 percent returns in less than three days); *id.* (stating "1 BTC in should produce 3 BTC out"); Trial Ex. 8 at 2 (promising 2 to 300 percent profit on 76 litecoin each day of trading); Trial Ex. 167 (promising to make 0.5 to 2 bitcoin daily for a customer).)  These solicitations were false because in fact McDonnell never accomplished such trading results for customers and simply misappropriated the funds.  (*E.g.*, Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; *e.g.*, Trial Exs. 51, 77, 79, 82, 83.)  Defendants also represented to Taylor that Defendants would purchase virtual currencies on his behalf, hold the virtual currencies in escrow, and trade them on Taylor's behalf.  (Trial Tr. 213:9-21; 218:14-20; 221:12-20.)  In reality, however, Defendants misappropriated Taylor's funds and never returned them.  (*See*, *e.g.*, Trial Tr. 232:07-18; 278:22-280:04.)  Thus, the overall message conveyed to a reasonable customer was that McDonnell was an experienced and successful trader that would

trade virtual currencies on CabbageTech customers' behalf, when in fact McDonnell was only luring customers in to misappropriate their funds and virtual currency.

> **d.    Misrepresentations, Misleading Statements, and Omissions Concerning the Value of Investments and/or Profitability of Trading**

Defendants also misrepresented to CabbageTech's managed trading customers the value of their investments and/or the profitability of trades.  For example, Defendants sent Taylor multiple emails showing the value of Taylor's account, including one showing that the account balance had grown to $176,703.34 from an original investment of around $25,000.  (Trial Tr. 221:22-222:23; Trial Ex. 49.)  Defendants sent another customer an email on June 17, 2018, stating that the customer's account balance was up to 676 litecoin, when at the same time McDonnell had been looting the Bittrex cdmmerchant account and had  begun transferring litecoins to the account opened using his wife's name.  (*See* Trial Ex. 82 at 4; Trial Tr. 357:22-367:12.)  Defendants also made false account information, including account balances, available to CabbageTech customers through the CabbageTech website.  (Trial Tr. 223:4-225:17; Trial Ex. 50.)  These representations created the impression that CabbageTech was not only managing customers' accounts, but achieving significant profits, when in reality Defendants had misappropriated the customer's funds.  (*See, e.g.*, Trial Tr. 226:10-17.)

> **e.    Misrepresentations, Misleading Statements, and Omissions Concerning Withdrawals**

Defendants also made repeated misrepresentations concerning the availability of customer funds for withdrawal and in connection with withdrawal requests.  For example, Defendants falsely represented to Taylor that he could withdraw funds at any time (Trial Tr. 228:18-229:4), but when Taylor requested to withdraw $25,000, McDonnell gave Taylor a litany of false excuses and misrepresentations, including that Taylor's check was on the secretary's

desk, that it would be sent by Fedex, and that funds would be repaid in bitcoin deposited into a

coinbase.com account.  (Trial Tr. 229:05-230:20; Trial Ex. 51.)  Of course, Defendants omitted

to tell Taylor that all the checks that he had sent to CabbageTech for purchasing virtual

currencies and that were deposited in CabbageTech's TD bank account had been

misappropriated to pay for personal expenses.  Taylor never received his money or virtual

currency back.  (Trial Tr. 236:19-23.)  Defendants also falsely represented to multiple

CabbageTech customers that the company's website had been hacked, when in fact he had and

shut down the CabbageTech website to cover up the fact that CabbageTech customer funds had

been misappropriated, used by McDonnell for personal expenses almost immediately after

depositing his customers' checks or secreted in an account in his wife's name.  (*E.g.*, Trial Ex.

52; Trial Tr. 237:14-239:4.)  The overall message conveyed to a reasonable customer through

these representations was that their funds were available to be returned and would in fact be

returned, when in reality, except for one gratuity, none of the customers received any money or

virtual currency from McDonnell or CabbageTech.

### f.   Omissions and Failure to Disclose Misappropriation

In order to conceal their fraudulent scheme, Defendants omitted to disclose their

misappropriation of CabbageTech customer funds or that they would not return customer funds.

Although Defendants promised trading advice that would achieve 300% returns (Trial Exs. 6 at

1, 8 at 2) and managed trading on customers' behalf (Trial Tr. 218:16-20), Defendants never

disclosed to CabbageTech customers or prospective customers that their funds would be

misappropriated.

Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the

Act and Regulation 180.1(a).  *See CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-

21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (default judgment) (defendant

violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1) by misappropriating funds and

making misrepresentations and omissions); *cf., e.g., CFTC v. Van Beuningen*, No. 1:16-cv-978,

2016 WL 9454431, at *4 (N.D. Ga. Mar. 29, 2016) (noting that, as with Rule 10b-5,

misappropriation of funds violates Regulation 180.1); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418,

422 (D. Md. 2005) (defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 by

misappropriating investor funds for his personal benefit).

Here, Defendants misappropriated all of the funds obtained from customers. McDonnell

often withdrew customer funds deposited into the CabbageTech TD Bank Account from ATMs

soon after receipt. (*See* Trial Ex. 139, Trial Tr. 394:18-22; 395:5-11.) McDonnell also used

customer funds deposited into the TD Bank account to pay his rent. (Trial Tr. 279:21-280:04.)

Defendants also misappropriated customer funds sent to the Bittrex cdmmerchant account. On

June 17, 18, and 19, 2017—at the same time that customer demands for refunds were

mounting—McDonnell transferred more than 660 litecoin from the Bittrex cdmmerchant account

to the Bittrex cryptoclown account. (Trial Exs. 90-91, 95-96, 150-152; Trial Tr. 133:17-136:23,

357:22-367:12.) Further, no customer received their funds or virtual currency back (Trial Tr.

71:03-15, 109:03-109:12, 236:19-23; *see also* Trial Ex. 83), apart from a small amount of virtual

currency given to Brewell that was not intended as a return on investment (Trial Tr. 65:6-66:5).

Defendants' misappropriation violates 7 U.S.C § 9(1) and 17 C.F.R. § 180.1. *See, e.g., CFTC v.*

*Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (misappropriation of funds earmarked

for trading constituted "willful and blatant fraudulent activity that clearly violates" the Act

(quotation marks and citations omitted)).

25

2.      **Defendants' Misrepresentations and Omissions Were Material**

A statement of fact is material "if a reasonable investor would consider it important in deciding whether to make an investment."  *S. Tr. Metals*, 2018 WL 3384266, at \*8 (citing *R.J. Fitzgerald*, 310 F.3d at 1328-29).  Any fact that enables investors to assess the risk inherent in their investment and the likelihood of profit is material.  *See, e.g., In re Commodities Int'l Corp.*, CFTC No. 83-43, 1997 WL 11543, at \*8–9 (Jan. 14, 1997).  "[M]isrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law."  *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 500–01 (S.D.N.Y. 2004) (quoting *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002)).

Here, each of Defendants' numerous misrepresentations and omissions are individually and collectively material because reasonable investors would consider each important in deciding whether to invest, remain invested, or make additional investments with CabbageTech and McDonnell in the purchase or sale of virtual currencies.  For example, Defendants' misrepresentations concerning CabbageTech's business are material because reasonable investors would find it important to know if the firm they had entrusted their funds to was only a one-man boiler room that did not have a prestigious Wall Street address, virtual currency expertise, or multiple employees.  *See SEC v. Constantin*, 939 F. Supp. 2d 288, 306-07 (S.D.N.Y. 2013) (in securities fraud action under SEC Rule 10b-5, holding that defendants' numerous misleading representations, including references to company divisions that did not exist and advertising office locations in expensive metropolitan areas where firm did not have offices, were individually and collectively material).

26

Similarly, Defendants' misrepresentations and omissions in solicitations to purchase trading advice are material because reasonable customers would consider it important to know if they would not receive the advice they believed they were purchasing.  Defendants' misrepresentations in solicitations to trade virtual currency on the customer's behalf are material because reasonable investors would want to know if their funds would not be used for trading virtual currencies as promised.

Further, Defendants' misrepresentations and omissions concerning the value of CabbageTech customers' investments or the profitability of trading are material because a reasonable customer would consider it important to know if their investments were not profitable due to Defendants' misappropriation or would not be used for virtual currency trading as promised.  *See Constantin*, 939 F. Supp. 2d at 307 (finding account statements setting forth fictitious account values material); *CFTC v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) (finding false account statements depicting trading profits material because they impacted investor's decisions to invest, remain invested, or make additional investments); *CFTC v. Rolando*, 589 F. Supp. 2d at 170 ("a reasonable investor would want to know that his account statements were false").

Defendants' misrepresentations and omissions concerning their customers' ability to withdraw funds are material because reasonable customers would consider it important to know if they would be unable to withdraw funds.  Likewise, Defendants' omissions and failure to disclose their misappropriation are material because reasonable customers or investors would want to know if their funds were misappropriated.  *Cf. SEC v. Gallard*, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist ... and that the money paid for those

27

securities would be misappropriated.").  In sum, Defendants' numerous misrepresentations and omissions concerned facts that were important to customers and went to the heart of their investment decisions, and were therefore material.

### 3.      Defendants Acted with Scienter

Under Regulation 180.1, the Commission must show that Defendants' conduct was intentional or reckless.  17 C.F.R. § 180.1; *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015).  This standard is met if a defendant "intended to defraud, manipulate, or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of ordinary care."  *R.J. Fitzgerald*, 310 F.3d at 1328; *see also Kraft*, 153 F. Supp. 3d at 1015.  The Commission can establish recklessness by showing that the conduct "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing."  *First Commodity Corp. v. CFTC*, 676 F.2d 1, 6-7 (1st Cir. 1982); *see also R.J. Fitzgerald*, 310 F.3d at 1328 (holding that scienter is met when a defendant's conduct "involves highly unreasonable omissions or misrepresentations that . . . present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it" (ellipses and brackets in original)).

Here, Defendants' conduct in making material misrepresentations and omissions and misappropriating customer funds was intentional or, at a minimum, reckless.  For example, Defendants intentionally, or with reckless disregard to their truth, made representations concerning CabbageTech's size, location, and number of employees that were false because McDonnell himself owned and controlled CabbageTech and knew that he operated it by himself from his home basement in Staten Island.  (*See* Trial Ex. 84 (June 5 dep.) at 144:10-145:12.)

Further, when Defendants solicited customers, they intentionally, or with reckless disregard to their truth, made representations concerning the trading advice subscriptions that

28

were false because customers were promised one or more years, or even a lifetime, of advice services shortly before McDonnell abruptly closed the enterprise.  (*E.g.*, Trial Ex. 133 (showing Slack group creation on May 14, 2017 and deletion on June 15, 2017).)

Additionally, when Defendants solicited customers to provide funds for virtual currency trading on the customers' behalf, they intentionally, or with reckless disregard to their truth, made exaggerated representations and promises of profits that were false.  In fact, Defendants never intended to provide the promised trading signals and advice, or to trade on behalf of customers, as evidenced by the immediate misappropriation of customer funds.  For example, McDonnell deposited one cashier's check for investments from Taylor, and the next day wrote a check in a similar amount simply to pay his rent.  (Trial Exs. 138, 139; Trial Tr. 455:01-09.)  Similarly, McDonnell's Simple Bank records reflect wire transfers from customer Charles Mills with similarly immediate personal usage of the funds by McDonnell.  (*See* Trial Ex. 172; *see also* Trial Ex. 171.)

The intentional nature of Defendants' conduct is also evidenced by the blatant disregard of customers' complaints and their refusal to return investors' funds.  When customers asked to withdraw their investments and purported gains, McDonnell would offer a series of false excuses for delays in repayment.  (*See, e.g.*, Trial Ex. 51, 77.)  Taylor sent repeated emails asking for his funds to be returned and made phone calls that went unanswered.  (Trial Tr. 231:6-8; 239:25-240:01; Trial Ex. 51.)  Customers like Brewell asked for withdrawals that were never honored.  (Trial Test. 70:20-25; Trial Ex. 27; *see also* Trial Exs. 82, 83 (emails between McDonnell and Martin regarding his request to withdraw litecoin.)  Instead, Defendants cut off communications with the customers.  (Trial Tr. 174:12-19, 239:20-240:1).  Except for the one gratuitous payment noted above, no customer ever received money or virtual currency from Defendants.  (Trial Tr.

71:03-15, 109:03-109:12, 236:19-23.)  Further, at deposition and under oath, McDonnell stated

that he "d[idn't] recall" any CabbageTech customer ever requesting a refund (Trial Ex. 84 (June

5 dep.) at 254:17-20) or complaining about anything (Trial Ex. 85 (June 19 dep.) at 50:3-51:15).

McDonnell also coldly stated that he did not recall Brewell ever asking him for any money or

virtual currency back (*id.* at 48:19-49:3), did not recall ever communicating with Anthony

Dimovski (*id.* at 52:16-53:5), and did not recall any customer named Junor Taylor, or ever

emailing Taylor, speaking with Taylor on the telephone, or sending or receiving anything to or

from Taylor via Federal Express (*id.* at 58:13-61:7.).

      **4.**       **Defendants' Fraud Was In Connection with a Contract of Sale of a Commodity in Interstate Commerce**

The "in connection with" requirement of Section 6(c)(1) of the Act and Regulation

180.1(a) is construed broadly and satisfied where the contract of sale of a commodity in

interstate commerce and the fraud are not independent events.  *See SEC v. Zandford*, 535 U.S.

813, 819 (2002) (holding that Section 10(b) of the Exchange Act "should be construed not

technically and restrictively, but flexibly to effectuate its remedial purposes" (internal citation

omitted)); 76 Fed. Reg. at 41,405 (consistent with *Zandford*, "[t]he Commission interprets the

words 'in connection with' broadly, not technically or restrictively"); *see also In re J.P.

Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (concluding that the "in

connection with" requirement, broadly read pursuant to *Zandford*, can be met even in cases

involving "completely fictitious" securities transactions).

Here, the "in connection with," is easily met.  All of Defendants' fraudulent acts were in

connection with contracts of sale of virtual currencies such as bitcoin and litecoin, each a

commodity in interstate commerce.  *McDonnell*, 287 F. Supp. 3d at 228.  Defendants

fraudulently solicited customers throughout the United States and in foreign countries for the

purchase of trading advice for, and/or managed trading of, virtual currencies such as bitcoin and litecoin. (*E.g.*, Trial Ex. 70 at Exs. 19, 20.)  Defendants' material misrepresentations and omissions detailed above concerned Defendants' business and the use, value, and duration of CabbageTech's services.  In addition, Defendants actually obtained and then misappropriated funds and virtual currencies from members of the public for the purpose of trading of virtual currencies such as bitcoin and litecoin on behalf of customers.  (*E.g.*, Trial Tr. 394:18-22, 395:5-11.)  Thus, Defendant's fraudulent acts occurred in connection with contracts of sale of commodities in interstate commerce.

*     *     *

As demonstrated above, the undisputed evidence establishes, by a preponderance, and indeed by any burden of proof, that Defendants intentionally or recklessly made numerous misrepresentations, misleading statements, and omissions during the course of their fraudulent scheme.  The knowing or reckless misrepresentations and omissions of material facts and misappropriation by Defendants constitute fraud in violation of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1.

## C.    CabbageTech Is Liable for the Acts of Its Agent McDonnell

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, impose strict liability on a principal for acts and omissions by its agent who acts within the scope of his or her employment or office.  Pursuant to these provisions, "it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them." *Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197 F.3d 33, 39-40 (2d Cir. 1999).  Additionally, that an agent's actions are illegal does not automatically place those acts outside of his scope of employment. *See, e.g., Guttman*, 197 F.3d at 39-40 (upholding Commission's finding of principal-agent liability under Section 2(a)(1)(B)

of the Act, where agent engaged in trading that was both within scope of employment, and illegal); *CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-30 (S.D.N.Y. 2014) (company may be liable under Section 2(a)(1)(B) of the Act for agents' violations of the Act within scope of employment, including any acts intended to serve any purpose of the employer).

Here, the well-pled allegations in the Complaint and the preponderance of the evidence demonstrated at trial establish that CabbageTech is liable for McDonnell's violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1. McDonnell committed the fraudulent acts detailed above as agent of CabbageTech. (Compl. ¶ 54.) In fact, CabbageTech's operations are entirely comprised of McDonnell's conduct. (*See* Compl. ¶¶ 1-2, 12-56.) McDonnell fraudulently solicited customers on behalf of CabbageTech (Compl. ¶¶ 27, 30, 35, 42), made misrepresentations in emails, telephone calls, and online through chats and social media (Compl. ¶¶ 27, 31, 45), and failed to disclose his and CabbageTech's misappropriation of customer funds (Compl. ¶¶ 1-2, 25, 26, 37.) Because the fraudulent acts that McDonnell committed occurred within the course and scope of his work for CabbageTech, the company is liable for his misconduct under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## D.   McDonnell Is Liable As a Controlling Person

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), an individual who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity, provided that the individual either knowingly induces, directly or indirectly, the violative acts, or fails to act in good faith. To establish controlling person liability under 7 U.S.C. § 13c(b), the Commission must show (1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation. *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 504–05 (S.D.N.Y. 2004) (quoting *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002)). The statute is construed liberally, and

even indirect means of discipline or influence, short of actual direction, is sufficient to find

liability as a controlling person. *Monieson v. CFTC*, 996 F.2d 852, 859-60 (7th Cir. 1993).

Proof of recklessness will demonstrate that the controlling person acted in bad faith. *Id.* at 860.

To establish "knowing inducement," the Commission must show that "the controlling person had

actual or constructive knowledge of the core activities that constitute the violation at issue and

allowed them to continue." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (Jan. 12,

1988).

      Here, McDonnell is liable as a controlling person.  First, McDonnell had general control

over CabbageTech.  McDonnell was the sole owner and operator of the business; there were no

other employees or persons involved in the company.  (Trial Exs. 63 at 3, 84 (June 5 dep.) at

122:8-10, 125:11-126:5.)  McDonnell controlled the content on the CabbageTech website (Trial

Ex. 84 (June 5 dep.) at 141:21-23), 85 (June 19 dep.) at 10:21-23) and related social media (*e.g.*,

Trial Ex. 84 (June 5 dep.) at 142:14-19).  McDonnell used and had control over CabbageTech's

accounts at PayPal and TD Bank, where customer funds were deposited and then

misappropriated.  (*See* Trial Ex. 82 at 3, 139.)  McDonnell also controlled the virtual currency

accounts at Bittrex to which he directed CabbageTech customers to send virtual currency for the

purchase of CabbageTech services and for Defendants-managed trading.  (*See* Trial Ex. 88-91,

93-96 (showing Bittrex identity information).)  McDonnell was also responsible for developing

and disseminating the false and misleading information about CabbageTech to CabbageTech

Customers through CabbageTech's solicitation materials (Trial Ex. 84 (June 5 dep.) at 142:8-13),

research reports (*id.* at 141:24-142:7), and emails (*id.* at 38:8-38:16, 40:7-22, 43:14-44:15).

McDonnell also controlled the various telephone numbers used to communicate with

CabbageTech customers (*see* Trial Exs. 42, 98, 102 (telephone subscriber information)) and

solicited customers by telephone (*e.g.*, Trial Tr. 96:25-97:11, 99:02-99:20 (Newman), 202:19-203:11 (Taylor)).  Thus, McDonnell not only exercised general control over CabbageTech, he also controlled and undertook the specific activities that are CabbageTech's violations of the Act and Regulations.  *See Int'l Fin. Servs.*, 323 F. Supp. 2d at 505.

Second, McDonnell knowingly induced, directly or indirectly, the conduct constituting violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 or failed to act in good faith.  Here, the evidence against McDonnell satisfies either of these two prongs.  McDonnell had actual knowledge of the core activities that constitute the violations: McDonnell knowingly induced the violations of the act because he himself personally made the fraudulent misstatements and omissions to CabbageTech customers and he himself operated the fraudulent scheme.  (*See, e.g.*, Trial Ex. 84 (June 5 dep.) at 67:19-21.)  Further, McDonnell personally misappropriated customer funds and used them for unauthorized personal expenses such as paying rent, or simply withdrawing cash at ATMs.  (Trial Tr. 279:21-280:04.)  McDonnell's failure to act in good faith is evidenced by his blatant disregard of customers' complaints and his refusal to return investors' funds.  (*E.g.*, Trial Exs. 82, 83, 122; Trial Tr. 174:12-19, 237:14-240:01, 308:06-309:25.)

In sum, the preponderance of the evidence shows that McDonnell not only controlled CabbageTech, but he also lacked good faith or knowingly induced the acts constituting the violations of the Act and Regulations.  Accordingly, McDonnell is liable for CabbageTech's violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 to the same extent as CabbageTech itself.

**E.     McDonnell Is Not Entitled to a Second Trial**

The Court can issue a judgment on all claims and relief being requested, including the determination of civil monetary penalties, because McDonnell never requested a jury trial and indeed never raised this issue prior to the conclusion of this Court's bench trial held on July 9 through 12, 2018.  To the extent McDonnell now claims that proceeding without a jury violates

the Seventh Amendment, he waived any such right by actively participating without objection in this Court's bench trial, and by failing timely to object to the Commission's motion to withdraw its jury demand.

While the Seventh Amendment guarantees a right to trial by jury for non-equitable remedies, a party can waive this right.  *E.g.*, *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937).  As relevant here, a party's conduct may constitute a waiver of the right to trial by jury, even when a jury demand was previously made.  *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1018-19 (2d Cir. 1989).  Failure to object and acquiescence to nonjury proceedings constitutes a waiver of the right to a jury trial.  *Id.*; *see also Gusler v. City of Long Beach*, 715 F. App'x 68, 69-70 (2d Cir. Mar. 16, 2018) (summary order) (affirming judgment of district court where plaintiff waived previously demanded right to trial by jury by failing to object to, and participating in, evidentiary hearing); *see also Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1531 (9th Cir. 1995) (stating that the rationale for this rule is the principle that "a party ought not to have two bites at the procedural apple"); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2321 (3d ed. 2018 update) ("The right to jury trial also may be waived as it has in many, many cases, by conduct, such as failing to object to or actually participating in a bench trial . . . .").

Where a party acquiesces to trial, "[i]t would be patently unfair and, in effect, [an] ambush [of the] trial judge" to allow a party to participate in a bench trial without objection and then subsequently claim error.  *Royal Am. Managers*, 885 F.2d at 1018 (internal quotation marks omitted).  Waiver occurs when the party who participates without objection is "on notice that the trial court was planning to adjudicate the dispositive issues of fact."  *Id.* (citation omitted).  In *Gusler*, the Second Circuit recently affirmed by summary order the district court's finding that

the plaintiff had waived his jury right, even though he had demanded a jury trial in the

complaint, by participating in and failing to object to an evidentiary hearing in which the judge

served as factfinder.  *Gusler*, 715 F. App'x at 69-70.  The Second Circuit noted that regardless of

whether it was clear at the beginning of the hearing that the district court intended to make

findings of fact, there was sufficient notice because the trial court expressly indicated during the

proceedings that it would do so.  *Id*.  Moreover, McDonnell's pro se status does not affect the

analysis because "pro se litigants are not treated differently with regard to waiver of jury right."

*Kahn v. Gen. Motors Corp.*, 865 F. Supp. 210, 213 (S.D.N.Y. 1994); *see also Washington v. New

York City Bd. of Estimate*, 709 F.2d 792, 798 (2d Cir. 1983) (holding that the waiver procedures

under the Federal Rules of Civil Procedure apply identically to pro se parties).

    Here, McDonnell by his own conduct waived any possible right to trial by jury.  It was no

secret that the Court was going to determine the issues of the case at trial.  Indeed, the Court

explicitly told McDonnell this on the first day of trial before the first witness was even called.

(Trial Tr. 40:06-21 (". . . Well, we are taking the full record.  You will have an opportunity to

cross-examine their witnesses.  You will have an opportunity to put on your own witnesses.  And

we will proceed with the trial.").)  Thus informed, McDonnell continued his vigorous

participation in the proceedings, including the cross-examinations of three Commission

witnesses.  (*See* Trial Tr. 74:01-76:20 (cross), 79:09-89:25 (re-cross); 109:19-112:08 (cross);

136:22-141:05 (cross); 143:03-17 (making and being granted request for more time to argue).)

At the end of the day, the Court again notified McDonnell that was the Court would adjudicate

the facts.  (Trial Tr. 143:12-13 ("I am interested in trying to get the facts.").)

    Prior to the second day of trial, McDonnell indicated via letter that he was "withdrawing

his defense," that he would "not be appearing this point forward," and that he understood "the

process will continue with remedy." (ECF 119-1.)  The letter did not contain any objection to proceeding without a jury.  McDonnell nevertheless remained involved in and informed of the proceedings.  After each day of trial, McDonnell received (by email and at no expense) same-day trial transcripts.  He also received multiple notices from the Commission, such as that the Court had stated he could return at any time to participate in the trial, and that he participate in summations and could make or oppose motions—including in particular the Commission's motion to withdraw its jury demand.  (ECF No. 121; *see also* ECF 135 (CFTC brief further detailing McDonnell's participation in trial).)  McDonnell also made multiple submissions to the Court over the course of the trial demonstrating his awareness of the progress of the trial, including several *after* the Commission had filed its notice of motion to withdraw its jury demand.  (*See* ECF 120, 122, 123, 125, 126.)

Despite having many opportunities to object to the bench trial, and in particular to the Commission's motion to withdraw its jury demand, at no point before the conclusion of the trial did McDonnell choose to do so.  Only after this Court indicated that it found the Commission's witnesses credible did McDonnell attempt to take "two bites at the procedural apple" and claim that he had been denied a jury proceeding.  Accordingly, McDonnell by his own conduct waived any right to a jury.

**F.    In the Alternative, the Unrebutted Record Entitles the Commission to Summary Judgment Against McDonnell**

Before McDonnell filed his untimely opposition to the Commission's motion to withdraw its jury demand, the Court stated that a motion for summary judgment would be moot because it followed the four-day bench trial.  (Trial Tr. 435:11-12.)  Following McDonnell's untimely and meritless claim to a right to trial by jury, however, the Commission respectfully moves in the alternative for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

and Local Civil Rule 56.1 of the Local Rules of the United States District Court for the Eastern

District of New York.  In this regard, the numbered statements in its Proposed Findings of Fact,

each followed by citation to admissible record evidence, may be treated as a Local Civil Rule

56.1(a) statement.  The Commission respectfully requests that the Court rule in the alternative

that the Commission is entitled to summary judgment on its claim for relief and to the same

remedies identified above.[11]

### 1.    Summary Judgment Standard

A court must grant summary judgment if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A genuine issue of material fact exists only if there is sufficient evidence in the

record such that a reasonable jury could find for the nonmovant.  *Anderson,* 477 U.S. at 248.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact," which only applies to those facts that may affect the outcome of

the suit.  *Id.* at 247-48 (emphasis in original).  While courts must draw reasonable inferences in

the light most favorable to the nonmovant, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation

omitted), the nonmoving party can only defeat summary judgment if they "do more than simply

show that there is some metaphysical doubt as to the material facts, and they may not rely on

conclusory allegations or unsubstantiated speculation."  *Jeffreys v. City of New York*, 426 F.3d

549, 554 (2d Cir. 2005) (internal citations and quotation marks omitted); *see also D'Amico v.*

---

[11] Similarly, the Commission submits that it would have been entitled to judgment by this Court as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (stating that the standard for determinations under Federal Rules of Civil Procedure 50(a) and 56(a) are the same).  Thus, the lack of a jury trial as to the Commission's non-equitable claims is harmless.  *See Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994) (stating that denial of jury trial right would be considered harmless where court "would otherwise have granted defendant's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50")..

*City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (holding that a nonmovant "must offer some

hard evidence showing that its version of the events is not wholly fanciful").  "[M]ere denials or

utterly unsupported alternative explanations of the culpable conduct" are insufficient to defeat a

motion for summary judgment.  *S.E.C. v. Grotto*, No. 05 CIV. 5880 (GEL), 2006 WL 3025878,

at *7 (S.D.N.Y. Oct. 24, 2006) (Lynch, J.), *aff'd sub nom. S.E.C. v. Leffers*, 289 F. App'x 449

(2d Cir. 2008).  In particular, "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

*Scott*, 550 U.S. at 380.

### 2.      No Reasonable Factfinder Could Find in Favor of McDonnell

Drawing all reasonable inferences in McDonnell's favor, there is no genuine issue of

material fact in this matter.  The Commission's Proposed Findings of Fact, construed as a Local

Civil Rule 56.1(a) statement, show no reasonable jury could find in McDonnell's favor.  The

documentary and testimony record adduced throughout this litigation, including in open court

from July 9 through July 12, consists only of overwhelming and unrebutted testimony and

documentary evidence as to McDonnell's liability and the scope of his fraudulent scheme in

violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Rule 180.1, 17 C.F.R. § 180.1.

For his part, while vigorously (and meritlessly) contesting the Commission's authority to

bring the case, McDonnell has never offered a version of events supported by evidence.

McDonnell's Answer and Amended Answer consisted of general denials.  (S*ee, e.g.*, ECF 63 at

¶¶ 9-11 ("Plaintiff fabricated complaint lacks sufficient information and truth."); ECF 62

(same.)  McDonnell did not seek to admit any evidence at trial.  He testified at deposition that

he had no documentary evidence because he deleted or disposed of it.  *See* Trial Ex. 84 (June 5

*dep.*) at 304:14-305:11, 310:23-311:25, 322:18-323:12; *see also* Trial Ex. 64.  In terms of

witnesses, he provided no Rule 26 initial disclosures identifying witnesses, and his responses to

the Commission's interrogatories under penalty of perjury identified no persons with knowledge

of the matter.  *See* Trial Ex. 63.  As for his personal knowledge, McDonnell testified repeatedly

at deposition that he lacked recollection as to the vast majority of material facts in the case.  For

example, at his June 5 deposition, Trial Ex. 84, McDonnell stated he did not recall—

- receiving income from any source from 2014 to 2017, 100:04-12, 100:23-101:08;

- setting up any toll free numbers, 34:18-21; using the toll free number at issue here, 199:15-200:02; for the past six years, using any other telephone number apart from his current one, 35:14-17; for the past three years, speaking with anyone, or doing any business, by telephone, 149:07-18;

- having any Federal Express account of any kind, 327:17-22;

- having any business dealings through the mails for the past six years, 150:05-15;

- using the email addresses at issue, apart from coindropmarkets@gmail.com and cdm@gmx.us, 43:05-08;

- apart from the litigation, never heard of anything like BTCXBTDEV in any context, 261:24 to 262:04;

- any involvement with Tigr Token, 265:15-17;

- any customer ever requesting a refund or complaining about anything, 254:17-255:01;

- his sons' names, 21:25 to 22:02; or

- his wife's name, 21:09-11.

Finally, to the extent McDonnell has denied any material fact, his denials are blatantly

contradicted by the record.  (*See generally* Trial Exs. 84 (June 5 dep.) and 85 (June 19 dep.).)

### 3.   The Commission Is Entitled to Summary Judgment

Accordingly, the Court should grant the Commission's renewed motion for summary

judgment in the alternative.  There is no genuine issue of material fact, and the Commission is

entitled to judgment as a matter of law, because the undisputed record overwhelmingly

establishes McDonnell's fraud in violation of Section 6(c)(1) and Regulation 180.1 and blatantly

contradicts any fanciful account that McDonnell could now concoct.  *See Scott*, 550 U.S. at 380.

**G.    The Court Should Enter Final Judgment by Default Against CabbageTech**

Rule 55 of the Federal Rules of Civil Procedure authorizes a default judgment when "a

party against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend."  Fed. R. Civ. P. 55(a).  This rule "tracks the ancient common law axiom that a default is

an admission of all well-pleaded allegations against the defaulting party."  *Vermont Teddy Bear*

*Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).  A factual allegation will be

deemed not well-pleaded only in "very narrow, exceptional circumstances."[12]  *In re Crazy Eddie*

*Sec. Litig.*, 948 F. Supp. 1154, 1160 (E.D.N.Y. 1996).  Entry of default judgment is left to the

sound discretion of the trial court.  *Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 31 (2d

Cir. 2014).  As to corporate defendants, "[i]t is settled law that a corporation may not appear in a

lawsuit against it except through an attorney, and that, where a corporation repeatedly fails to

appear by counsel, a default judgment may be entered against it."  *Grace v. Bank Leumi Trust*

*Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006) (quoting *SEC v. Research Automation Corp.*, 521

F.2d 585, 589 (2d Cir. 1975)).

While default establishes the truth of all well-pleaded allegations of liability, a plaintiff

must establish "an evidentiary basis for the damages sought."  *Coventry Enters. LLC v.*

*Sanomedics Int'l Holdings, Inc.*, No. 14 Civ. 8727 (NRB), 2017 WL 3610585, at *1 (S.D.N.Y.

---

[12]   These circumstances include, for example, an allegation made indefinite or erroneous by other
allegations in the same complaint; allegations which are contrary to facts of which the court will take judicial notice;
allegations which are not susceptible of proof by legitimate evidence; and allegations which are contrary to
uncontroverted material in the file of the case.  *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971),
*rev'd on other grounds*, 409 U.S. 363 (1973).  None of those exceptions apply here.

July 25, 2017) (quoting *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012)).  Although the Court must make an independent determination regarding damages, an evidentiary hearing is not required; rather, the Court may rely on affidavits or documentary evidence in the record to determine the appropriate sum.  *CFTC v. Arjent Capital Mkts. LLC*, No. 12-CV-1832 (LAK), 2013 WL 2477275, at *1 (S.D.N.Y. May 15, 2013); *see also Boritzer v. Calloway*, No. 10-CV-6264 (JPO), 2013 WL 311013, at *14 (S.D.N.Y. Jan. 24, 2013) (inquest on damages unnecessary where plaintiff's damages are a sum certain).  All reasonable inferences from the evidence presented are drawn in the moving party's favor.  *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

Here, CabbageTech has failed to answer or otherwise defend this action, and this Court has already found CabbageTech in default.  (ECF 40.)  Further, the well-pled allegations in the Complaint (*see* Compl. ¶¶ 1-56), which were also proven at trial (see pp. 5-17, *supra*), establish that CabbageTech engaged in fraud by misrepresentations, omissions, and misappropriation, in violation of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1.  With respect to restitution and civil monetary penalties ("CMP"), the Court has been provided with testimony and documentary evidence in support of the restitution and CMP the Commission seeks, which is susceptible to a mathematical computation (*see* pp. 49-51, *infra*).  Thus, no further inquest on damages is necessary.  In light of the facts established above and based on the well-pled allegations of the Complaint and the Giglio Declaration, the Commission respectfully submits that final judgment by default against CabbageTech is warranted and should be entered.

## **RELIEF REQUESTED**

Plaintiff seeks permanent injunctive relief restitution and a civil monetary penalty against McDonnell, as set forth in the Proposed Final Judgment and Order of Permanent Injunction, Civil Monetary Penalties and Ancillary Equitable Relief separately submitted by the

Commission herewith.  Plaintiff also seeks a default judgment with comparable relief against CabbageTech as set forth in the same Proposed Judgment.

In the alternative, Plaintiff respectfully renews its request and moves in the alternative for summary judgment based on the undisputed material facts established by the Commission.

## A.      A Permanent Injunction Is Appropriate

The Court's authority to grant the injunctive relief requested is set forth in Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a).  The statutory injunctive relief contemplated in Section 6c of the Act is remedial in nature, and is designed to prevent injury to the public and to deter future illegal conduct.  "The Commission, like the SEC in the securities area, is the 'statutory guardian' entrusted with the enforcement of the congressional scheme for safeguarding the public interest in commodity futures markets."  *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 142 (2d Cir. 1977)) ("*British Am. I*").  Unlike private litigants seeking injunctions, the Commission does not need to show irreparable injury or the inadequacy of other remedies when seeking an injunction.  *Id.*, at 141-42; *cf. SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (noting same exception applies in actions by SEC); *SEC v. Unifund SAL*, 910 F.2d 1028, 1035-36 (2d Cir. 1990) (explaining the public interest inherent in such actions).

The Commission is entitled to injunctive relief under Section 6c of the Act upon a showing that "there is a likelihood that, unless enjoined, the violations will continue."  *See CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986); *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 390 (S.D.N.Y. 2010) ("An enforcement a18ction requesting a permanent injunction must only show a 'reasonable likelihood of future violations.'" (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).  In determining whether a "reasonable likelihood" of future violations exists, courts generally consider the egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the

defendant's recognition of the wrongfulness of the conduct; and the likelihood that the defendant's customary business activities will present opportunities for future violations. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972); *see also SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978). "[T]the ultimate test ... is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (citation omitted). A "district court may properly infer a likelihood of future violations from the defendant's past unlawful conduct." *CFTC v. Am. Bd. of Trade*, 803 F.2d at 1251; *see also SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1477 (2d Cir. 1996) (holding that such an injunction is particularly within the court's discretion where a violation was "founded on systematic wrongdoing, rather than an isolated occurrence").

As set forth above, during the relevant period, Defendants engaged in a recurrent, systematic process of egregious intentional violations of the Act: Defendants defrauded investors about the nature of the advice and managed trading services offered and then misappropriated the investors' assets for McDonnell's personal purposes. Given the systematic nature of the past conduct, the high degree of scienter involved, McDonnell's failure to accept responsibility, and a lack of any constraints on future conduct, there is a reasonable likelihood that Defendants may engage in future violations. Thus, a permanent injunction is warranted including, among other things, permanent bans on trading virtual currency, controlling trading accounts for other persons, soliciting or accepting funds from any person for trading in commodity interests, or applying for or claiming exemption from registration with the Commission or engaging in any activity requiring such registration or exempt from registration pursuant to Commission Regulation.

44

**B.      Restitution Should Be Ordered to Compensate Victims**

      **1.      The Commodity Exchange Act Explicitly Provides**
              **for Restitution of Losses Proximately Caused by a**
              **Violation of the Act**

Plaintiff seeks restitution as an equitable remedy to be granted pursuant to the Court's statutory authority under Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A).[13]  With the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. 111-203, Title VII, §744, 124 Stat. 1376, the CEA was amended to specifically allow the Commission to seek "restitution to persons who have sustained losses proximately caused by [a] violation (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3)(A).  The addition of this language provided by statute clarified the method to calculate restitution.[14]

Where a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution.  *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986) (per curiam) (where there existed

---

[13] Prior to the effective date of the Dodd-Frank Act in July 2011, courts awarded restitution under the Act pursuant to general equitable principles, which often focused on the defendant's unjust gain.  In most cases, the unjust gain would approximate the victim's loss.  *See FTC v. Verity Int'l Ltd.*, 443 F.3d 48, 67 (2d. Cir. 2006) ("in many cases . . . the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant. . . .  [I]n these cases it is not inaccurate to say that restitution is measured by the consumer's loss"); *but see Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1345 (holding that restitution pursuant to the inherent equitable powers of the Court should be measured by unjust enrichment to a defendant rather than the losses caused by the violations).

[14] Courts have uniformly recognized that the Dodd-Frank Act's amendment of Section 6(c)(d) forecloses an approach limited only to unjust enrichment:

> [T]he claim that the CEA only authorizes an award of restitution when the defendant was unjustly enriched or possessed identifiable funds subject to a constructive trust or lien is untenable. To read § 13a-1(d)(3) that way would contradict that restitution may be awarded to persons who sustained losses proximately caused by a violation of the CEA "in the amount of such losses."  That would be nonsensical.  Moreover, § 13a-1(d)(3)(A) must be read with the 'equitable remedies' provided for in § 13a-1(d)(3)(B), which separately authorizes the court to order 'disgorgement of gains received in connection with such violation.'

*CFTC v. Miklovich*, 687 F. App'x 449, 453 (6th Cir. 2017); *CFTC v. U.S. Bank, N.A.*, No. 13-CV-2041-LRR, 2014 WL 6474183, at *36 (N.D. Iowa Nov. 19, 2014) ("Based on the plain language of the statute, CFTC is entitled to seek restitution for the customers' losses proximately caused by U.S. Bank.")  All of the activity related to this action occurred after the effective date of the Dodd-Frank Act.

systematic and pervasive fraud, dispensing with the general rule that in calculating disgorgement a party must distinguish between the legally and illegally derived profits) ("*British Am. II*"); *see also SEC v. Razmilovic,* 822 F. Supp. 2d 234, 252–53 (E.D.N.Y. 2011) ("Where, as here, a fraud is pervasive, it is appropriate to order the defendant to disgorge all ill-gotten gains realized during the course of the fraud scheme.") (*citing British Am. II*, 788 F.2d at 93-94), *aff'd in part, vacated in part on other grounds*, 738 F.3d 14 (2d Cir. 2013); *SEC v. Mortenson,* No. CV-04-2276 (SJF) (WDW), 2013 WL 991334, at \*4 (E.D.N.Y. Mar. 11, 2013) (same); *SEC v. Aronson*, 11 Civ. 7033 (JSR), 2015 WL 10792021 at \*2 (S.D.N.Y. Aug. 24, 2015) (finding where defendant received compensation as general counsel of "an entirely fraudulent enterprise . . . any compensation that he received, as a result, bears a causal relation to the fraud" (internal quotations and citations omitted)); *CFTC v. First Capitol Futures Grp.*, No. 1:09–00488–CV–W–DW, 2010 WL 1713617, at \*11 (W.D. Mo. Feb. 18, 2010) ("Disgorgement of all profits is appropriate where a company engages in systematic fraudulent conduct."); *SEC v. Hasho*, 784 F. Supp. 1059, 1111–12 (S.D.N.Y. 1992) ("[W]hen a defendant engages in a pervasive pattern of fraudulent conduct as opposed to isolated instances, it is unnecessary to prove a direct nexus between each instance of unlawful conduct and the disgorgement amount due.")

Thus, courts have found that the appropriate calculation of restitution in cases of pervasive fraud under the CEA includes all customer losses even where only a subset of those customers testified at trial. [15]  *See, e.g., Hunter Wise*, 21 F. Supp. 3d at 1352 (determining in connection with violations of Section 6(c) of the Act and Rule 180.1 that "[t]he systematic and pervasive nature of [the defendant's] fraud necessitates restitution not only for the retail

---

[15] In this instance, although not all of the victims actually testified at trial, the Commission presented evidence concerning other victims who had been defrauded by Defendants. (*See e.g.* Trial Tr. 348:09-356:11)  The Commission has limited the requested restitution set forth below to amounts for which the Commission presented evidence at trial of wrongdoing with respect to both testifying and identified non-testifying customers.

customers who testified to the losses they sustained due to [the defendant's] scheme, but for all of [defendant's] customers as well"); *see also CFTC v. Cloud*, No. H-10-706, 2011 WL 1157530 at *11 (S.D. Tex. Mar. 24, 2011) ("The determination of restitution is not dependent on submissions of claims by the victims. Rather, the pervasive and systematic nature of the Defendants' fraud makes all customer funds received subject to restitution."); *CFTC v. Gibraltar Monetary Corp., Inc.*, No. 04-80132-CIV, 2006 WL 1789018, at *24 (S.D. Fla. May 30, 2006) (granting restitution in the amount of all customer losses where the court found it appropriate to "presume pervasive fraud based upon the testimony of a handful of customers").

Similarly, where there are material misstatements or omissions in the context of a fraudulent scheme, the Court can presume reliance by the Defendants' customers. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 131 (1972) (determining that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery"); *see also Schenek v. FSI Futures, Inc.*, No. 94 Civ. 6345 (CSH), 1998 WL 427625, at *4 (S.D.N.Y. July 28, 1998) (applying the presumption of reliance standard for material misstatements and omissions under the CEA's anti-fraud provisions).  "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of th[e] decision [to buy or sell]." *Affiliated Ute*, 406 U.S. at 153–154. Thus, where customer funds are obtained under false pretenses, the appropriate calculation of restitution includes all customers who are presumed to have relied on those misstatements. *See CFTC v. Paramount Mgmt., LLC*, No. 13 CIV 4436-CM, 2013 WL 5586216, at *8 (S.D.N.Y. Sept. 9, 2013) (consent order) (where customer funds intended for forex trading were misappropriated, finding "that it is not necessary that the Commission prove customers relied on the misrepresentations and omissions of [defendants] for purposes of calculating customer

47

restitution because reliance is presumed"); *see also CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at *5-7 (S.D. Fla. May 17, 2013) (relying on *Affiliated Ute* to order full restitution to all customers where testimony established that defendant misappropriated customer funds instead of trading those funds as was represented to customers); *CFTC v. Marquis Fin. Mgmt. Sys., Inc.*, No. Civ.A. 03-74206, 2005 WL 3752232, at *8-9 (E.D. Mich. June 8, 2005) (granting restitution in full amount of customer losses where defendant failed to disclose that customer funds would be used to trade other products).

Here, the testimony and evidence presented at trial established that Defendants engaged in a systemic and pervasive scheme to misappropriate customer funds.  No customers who had transferred cash or virtual currency to the Defendant for advice or for trading received anything of value in return for their purchase or investment.  (*See, e.g.*, Trial Tr. 71:03-15; 107:07-24; 109:03-12, 232:07-08; *see also, e.g.*, Trial Exs. 76-77, 79, 82-83.)  Customers who purchased so-called "expert" trading advice, some who paid to receive a year or lifetime subscription, received nothing more than a few weeks of attempts by Defendants to misappropriate more funds.  (Trial Tr. 66:06-68:23, 174:20-175:19; 229:05-15, 230:21-232:08,  253:23-254:03.)  By late June to early July of 2017, the Defendants closed all websites, ceased communications, and secreted away whatever customer funds the Defendants had not previously pocketed.  (*E.g.*, Trial Exs. 52, 150-52 (demonstratives re transfers of litecoin), 144-49 (reports of blockchain ledger data regarding same transfers); Trial Tr. 173:21-174:19, 237:14-238:24; *cf.* Trial Ex. 84 (June 5 dep.) at 254:02-16; *see also* Trial Exs. 90-91, 95-96; Trial Tr. 133:17-136:23, 356:12-18, 357:16-20, 365:04-07, 367:06-12.)  Further, there can be no more fundamental omission than the Defendants' failure to disclose that they had no intent to provide the services promised but rather were misappropriating customer assets and intended to continue to do so.  *See Milton*, 2013 WL

2158428, at *5 ("On the whole, however, this case is most accurately described as an omissions case. The heart of the fraud was the Defendants' failure to tell pool participants of the Defendants' scheme to misappropriate the pool participants' funds . . . .").  Accordingly, it is appropriate if not necessitated by precedent and the facts and circumstances of the Defendants' fraud that this Court order restitution in the full amount of customer losses for funds transferred by customers to the Defendants for the purchase and sale of virtual currencies and the trading services they did not receive.

> **2.     The Evidence at Trial Provides a Reasonable Basis for Calculation of the Value of the Virtual Currencies Sent by Victims to McDonnell**

Generally, "[t]he proper amount of restitution is determined by calculating the total amount of funds solicited from victims of the fraud by a defendant, less any funds returned to the victims by defendant."  *CFTC v. Leben*, No. 3:14-cv-866-TLW, 2016 WL 7354359, at *9 (D.S.C. Aug. 5, 2016); *see also CFTC v. JBW Capital*, 812 F.3d 98, 111 (1st Cir. 2016) ("To be clear, restitution, as the CFTC seeks it, includes total losses suffered by the victims."); *CFTC v. McCullough*, No. 5:14-CV-83-F, 2015 WL 4877850, at *4 (E.D.N.C. Aug. 14, 2015) ("To determine the appropriate amount of restitution, courts calculate the amount given to the defendant by investors and subtract any amount returned to investors.") (citations omitted).

In calculating these amounts, the Court need only determine a "reasonable approximation" of the amounts attributable to the defendant's wrongdoing.  *Cf. SEC v. Patel,* 61 F.3d 137, 139-40 (2d Cir.1995) (holding that there "need only be a reasonable approximation of profits causally connected to the violation").  Thus, the calculation of those amounts lies within the discretion of the district court.  *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) ("[T]he decision to order disgorgement of ill-gotten gains, and the calculation of those gains, lie within the discretion of the trial court, which must be given wide latitude in these matters.") (quotation

marks and citation omitted).  Moreover, as long as the measure is reasonable, "'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (quoting *Patel,* 61 F.3d at 140).

In this matter, the restitution calculation is easily computed: the amount of money or virtual currency received from customers minus the amount returned.  However, because many of the transfers involved virtual currencies that fluctuate in value significantly, the Commission here proposes valuing them as of the date of the filing of the Complaint using the closing price as reported by CoinMarketCap, a widely used website freely available at coinmarketcap.com that publishes aggregate data from spot exchanges worldwide for more than a hundred virtual currencies, including all of the ones given by victims to Defendants.  In addition to being used frequently in press reporting[16] on virtual currency markets, both this Court and other jurists have used data from CoinMarketCap to provide data about the virtual currency market.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 219 (2018); Hon. J. Travis Laster & Marcel T. Rosner, *Distributed Stock Ledgers and Delaware Law*, 73 Bus. Law. 319, 319 n. 3 (2018) (using CoinMarketCap data to describe the size of the virtual currency marketplace).

The amount of money received by McDonnell was identified during the trial and falls into two categories:

- ***Victims' payments via PayPal for subscription advice services.***  A number of victims identified at trial were brought into his scheme through an initial subscription to trading services like RedLiteGreenLite.

  The total losses for identified victims attributable to these subscriptions is $ 651.41 (Trial Ex. 180, Giglio Dec. ¶ 11.)

---

[16] CoinMarketCap is used frequently by news publications to report on prices of virtual currencies, including publications that focus on virtual currencies such as CoinDesk and general financial newspapers like the Wall Street Journal and the Financial Times.  *See, e.g.*, Dave Michaels, *Ether Shouldn't Be Subject to SEC Regulation, Official Says*, Wall St. J., June 15, 2018, at B9; *see generally* Giglio Dec. ¶ 15 and Ex.1.

- ***Victims' payments directly to Defendants for lifetime access to his trading services or else to Defendants directly for the purchase or sale of virtual currencies.*** The remaining, significant amount of losses identified at trial were due to the transfer of substantial amounts of money or virtual currencies to Defendants either for lifetime access to his trading services (Giglio Dec. ¶¶ 12-14) or for the purchase or sale of virtual currencies through Defendants. (Giglio Dec.¶¶ 8-9; Trial Ex. 180.)

In total, McDonnell thus wrongfully received $457,393.54 from victims. (*Id.*) No victim received any returns.[17] Thus restitution in the amount of $457,393.54 is appropriate.

### 3. The NFA Should Be Appointed as Monitor for Disbursement of Funds to Satisfy the Restitution Obligation.

Plaintiff requests the Court appoint the National Futures Association ("NFA") as monitor fairly to distribute any restitution amounts contributed by Defendants pursuant to the proposed final judgment and any corresponding award of interest deemed by the Court to be due and owing. The NFA is a registered futures association pursuant to Section 17 of the Commodity Exchange Act, 7 U.S.C. § 21, that serves as the industry-wide, independent, self-regulatory organization for the U.S. futures industry. *See* Declaration of Daniel A. Driscoll dated July 24, 2018 ("Driscoll Declaration"). The NFA will not charge any fees for handling the distribution of restitution (*id.,* ¶¶ 4, 7), and has ample experience and discretion as a settlement administrator

---

[17] McDonnell testified at his deposition that no customers ever requested any refunds. (Ex. 84 (June 5 dep.) 254:17-20.) Although this was plainly untrue, *see* Trial Ex. 36 (direct message to @MrPatMcDonnell stating, "I would like my ltc back") and Trial Ex. 51 (email from coindropmarkets@gmail.com to Taylor apologizing "about the delay in your withdrawal"), what is true is that McDonnell did not refund any assets to any customer.

Thus, the fact that one victim (Brewell) unexpectedly received approximately 75 Ethereum Classic (ETC) on May 29, 2017, as previously described (*see* n. 10, *supra*), should not factor into the restitution calculation. Brewell testified that he understood the transfer as a gratuitous recognition of assistance in helping other users of McDonnell's Slack channel. (Trial Tr. 65:06-66:05; Ex. 91, Tab Withdrawal, Line 22.) At the time of this transfer, this amount represented approximately $1,282.50. (Giglio Dec., ¶10.)

Because McDonnell's transfer of ETC was not intended to be a repayment of any of the money or litecoins that Brewell had sent to him, this amount was not included in the calculations of victim loss. If one credited McDonnell's gratuitous payment to this one victim to offset the victim losses, that transfer would reduce the restitution obligation by $1,282.50 to $456,111.04.

51

(*id.* ¶¶ 5-7).  As such, the NFA is well-positioned in a role to administer the restitution obligation

proposed by the CFTC here.

**C.      The Court Should Impose a Civil Monetary Penalty Equal to Triple
           the Monetary Gain**

Under Section 6c(d)(1)(A) of the Act, the Court may impose "on any person found to

have committed any violation a civil penalty in the amount of not more than the greater of"

$177,501 per violation (as adjusted for inflation pursuant to statute) or triple the monetary gain to

the person for each violation.  *See* 7 U.S.C. § 13a-1(d)(1)(A) (setting forth the basic statutory

amount or triple the monetary gain); Regulation §§ 143.8(a) and (b)(1), 17 C.F.R. § 143.8(a) and

(b)(1) (implementing statutory requirement to adjust maximum amount of penalties for inflation

pursuant to 28 U.S.C. § 2461 note (Federal Civil Penalties Inflation Adjustment Act of 1990,

Pub. L. 101-410, 104 Stat. 890 (as amended))).

"The court should consider a variety of factors in assessing a civil monetary penalty, and

has broad discretion in fashioning an appropriate remedy that is 'rationally related to the offense

charged or the need for deterrence.'"  *CFTC v. Yorkshire Grp., Inc.,* No. 13-cv5323 (AMD)

(ST), 2016 WL 8256380, at *6 (E.D.N.Y. Aug. 19, 2016) (quoting *CFTC v. Levy*, 541 F.3d

1102, 1112 (11th Cir. 2008)), *report and recommendation adopted by*, 2016 WL 5942310, at *3

(E.D.N.Y. Oct. 12, 2016).  "Accordingly, the court should focus on the gravity of the

misconduct, considering such factors as (1) the relationship of the violation at issue to the

regulatory purposes of the Act; (2) [respondent's] state of mind; (3) the consequences flowing

from the violative conduct; and (4) [respondent's] post-violation conduct."  *Id.* (citation and

internal quotation marks omitted).  Just like courts, the Commission also assesses "the gravity of

the violation" when it calculates a CMP.  7 U.S.C. § 9a(1) ("In determining the amount of the

money penalty assessed under [7 U.S.C. § 9], the Commission shall consider the appropriateness

of such penalty to the gravity of the violation."). Conduct that violates the core provisions of the Act, such as customer fraud, is considered very serious. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). "The gravity of fraudulent conduct, for example, is high because such conduct is contrary to one of the Act's core regulatory protections," *In re Staryk*, CFTC No. 95-5, 2004 WL 1657544, at *14 n.30 (July 23, 2004), and therefore triple the monetary gain is an appropriate determination of the civil monetary penalty given the gravity of fraudulent conduct. *In re Ray*, CFTC No. 03-1, 2011 WL 639921, at *16 (Feb. 18, 2011).

      In light of the core relationship of the anti-fraud regulations to the purpose of the Act, the egregiousness of Defendants' intentional conduct to misappropriate the investor funds, the length of time over which Defendants engaged in the wrongful trading activity, and McDonnell's failure to accept any responsibility or attempt to ameliorate the wrongful conduct even following the Court's findings of victim credibility, the Commission requests a CMP of triple the monetary gain for the fraudulent behavior of Defendants in violation of Section 6(c)(1) of the Act and Regulation 180.1. This is in line with other fraud cases brought by the Commission. *See*, *e.g.*, *CFTC v. SK Madison Commodities, LLC*, No. 14-02025 (SHS), 2014 WL 3887755, at *5 (S.D.N.Y. June 9, 2014) (imposing a CMP of triple the gain, as measured by the amount misappropriated); *CFTC v. Hays,* No. 09- 259 (DWF/AJB), 2011 WL 311366, at *4 (D. Minn. Jan. 28, 2011) (imposing CMP of triple the gain, finding such penalties necessary to adequately address defendants' violations and deter future violations); *CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL 1130588, at *13 (C.D. Cal. Apr. 19, 2005) (same). As described above, the Defendants' gain is the amount raised from customers $457,393.54, and triple the monetary gain would thus be $1,372,180.62. The Commission therefore seeks a CMP of $1,372,180.62, plus post-judgment interest as prescribed by statute.

The other method of calculating a CMP under Section 6c of the Act would be to multiply

the maximum amount of $177,501 (as adjusted for inflation pursuant to statute) times the

number of violations.  Courts have determined that the number of violations could be based on

the number of defrauded customers, *see Emerald Worldwide Holdings, Inc.*, 2005 WL 1130588,

at *11 (C.D. Cal. Apr. 19, 2005) (noting that the CMP could have been as high as the then-

maximum penalty per violation, multiplied by 30 customers, before imposing CMP of only triple

the monetary gain); *Yorkshire Grp., Inc.,* 2016 WL 8256380, at *6 (calculating a violation for

each customer account opened), or on the number of fraudulent transactions, *see SEC v.*

*Pentagon Capital Mgmt.*, 725 F.3d 279, 288 n. 7 (2d Cir. 2013) (noting that district court made

no error in using per violation method based on number of trades instead of monetary gain to

calculate the maximum penalty that could be imposed).

If the Court were to calculate a CMP based on the number of defrauded customers, the

trial testimony established that McDonnell defrauded at least eleven customers if not

more.  (Giglio Dec., ¶ 9; *see e.g.* Trial Tr. 348:09-356:11).  If the Court were to calculate a CMP

based on the number of fraudulent statements and transactions, the number is large and would

result in a potentially massive penalty.  Even if the Court were to limit its calculation to the

number of actual transfers by customers to Defendants, the evidence at trial established that

McDonnell defrauded customers into giving him money or virtual currency on 62

occasions.  (Giglio Dec., ¶ 9; Trial. Ex. 180).  Thus, under such a per-violation approach, the

Court could choose to impose a CMP of up to $177,501 per violation, or between $1,952,511

(177,501 x 11) and $11,230,052.00 (177,501 x 62).

Nevertheless, the Commission submits that triple the monetary gain as calculated above

would appropriately reflect the gravity of the customer fraud violations and suffice to provide an

effective and necessary deterrent to both Defendants and to all purported advisors and handlers of customer assets.  *See Hays*, 2011 WL 311366, at *5 (D. Minn. Jan. 27, 2011) (holding that CMP of triple the defendant's gain "necessary to adequately address Defendants' violations and deter against future violations").

**D.      CabbageTech Is Equally Liable for the Restitution and Civil Monetary Penalty Obligations.**

The default judgment against CabbageTech should impose the same obligations.  As alleged in the Complaint, which must be accepted as true for purposes of a default, McDonnell's acts, omissions, and failures occurred within the scope of his agency, employment and office at CabbageTech.  (ECF 1 (Compl.) ¶ 54.)  Thus, CabbageTech is equally liable as principal for his violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, and therefore the restitution and CMP obligations should be joint and several among both parties.

*      *      *

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant its motion for an order entering default judgment (as to CabbageTech), a permanent injunction, civil monetary penalties and ancillary equitable relief (including restitution) against Defendants McDonnell and CabbageTech.  The Commission also respectfully requests that the Court grant its motion, in the alternative, for summary judgment.

Dated:   New York, New York
         July 27, 2018

                              Respectfully submitted,

                              COMMODITY FUTURES
                              TRADING COMMISSION

                              Manal M. Sultan
                              Deputy Director
                              K. Brent Tomer
                              Chief Trial Attorney

                              By:/s/ David W. Oakland_____
                                    Alejandra de Urioste
                                    Gates S. Hurand
                                    David W. Oakland

                              Division of Enforcement
                              140 Broadway, 19th Floor
                              New York, New York 10005
                              Phone: (646) 746-9700
                              Fax: (646) 746-9940