UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COMMODITY FUTURES TRADING
COMMISSION,

  Plaintiff,


    – against –


PATRICK K. MCDONNELL,
and CABBAGETECH, CORP. d/b/a COIN
DROP MARKETS,

                    Defendant.

**MEMORANDUM, FINDINGS
OF FACT, CONCLUSIONS OF
LAW, AND DIRECTIONS FOR
FINAL JUDGMENT AND
INJUNCTION**

18-CV-361

**Parties**

Commodity Futures Trading Commission

**Appearances**

David William Oakland
Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, NY 10005

Kenneth B. Tomer
Commodity Futures Trading Commission
140 Broadway
19th Floor
New York, NY 10005

Gates Salyers Hurand
Commodity Futures Trading Commission
140 Broadway, 19th Floor
Ny, NY 10005
646-746-9700

Patrick McDonnell

CabbageTech Corp.,
d/b/a/ Coin Drop Markets

Pro se

(Defaulted) (No Attorney)

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   Introduction and Overview ........................................................................................... 2

II.  Fact ............................................................................................................................... 10

   A.    Procedural History ................................................................................................ 10

   B.    McDonnell's Scheme to Defraud with Virtual Currencies ................................. 18

     i.   Parties ................................................................................................................. 18

     ii.   Cabbagetech, Corp. d/b/a Coin Drop Markets ................................................ 19

     iii.  Array of Accounts to Execute Fraud ............................................................... 20

     iv.  Fraud Involving Virtual Currency Trading Advice ........................................ 24

     v.   Fraud Involving Purchase and Trading of Virtual Currency ......................... 30

     vi.  Fraud Involving Misappropriated Customer Funds ....................................... 37

     vii. McDonnell's Control ....................................................................................... 45

     viii. Testimony of Victims ...................................................................................... 47

        a.    Junor Taylor ............................................................................................ 47

        b.    Martin Newman ...................................................................................... 71

        c.    Richard Brewell ...................................................................................... 79

        d.    Anthony Dimovski .................................................................................. 92

III. Law ............................................................................................................................... 116

IV. Relief ............................................................................................................................ 132

   A.    Permanent Injunction .......................................................................................... 132

   B.    Restitution ............................................................................................................ 134

   C.    Civil Monetary Penalties ..................................................................................... 137

V.  Conclusion ................................................................................................................... 138

   I.     Introduction and Overview

1.  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to

    Federal Rules of Civil Procedure 52(a) and 55(b)(2), and equity and common law and

applicable administrative law, 7 U.S.C. § 13a-1, following a bench trial held from July 9

through July 12, 2018.  *See*, *infra*, ¶¶ 32–42.

2.  Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") seeks

decrees and judgments against Defendants Patrick K. McDonnell ("McDonnell") and

CabbageTech, Corp. d/b/a Coin Drop Markets ("CabbageTech," and together with

McDonnell, "Defendants") for violations of Section 6(c)(1) of the Commodity Exchange Act

(the "Act" or "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a),

17 C.F.R. § 180.1(a).  The CFTC seeks a permanent injunction as well as an award of

restitution and imposition of civil monetary penalties against Defendants.

3.  The Commission relies for its jurisdiction on 7 U.S.C. § 9(1).  It reads as follows:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to
> use or employ, in connection with any swap, or a contract of sale of any commodity in
> interstate commerce, or for future delivery on or subject to the rules of any registered
> entity, *any manipulative or deceptive device or contrivance*, in contravention of such
> rules and regulations as the Commission shall promulgate by not later than 1 year after
> July 21, 2010, provided no rule or regulation promulgated by the Commission shall
> require any person to disclose to another person nonpublic information that may be
> material to the market price, rate, or level of the commodity transaction, except as
> necessary to make any statement made to the other person in or in connection with the
> transaction not misleading in any material respect.

(emphasis added).

4.  The court's jurisdiction to grant relief is set forth in 7 U.S.C. § 13a-1(a) as follows:

> Whenever it shall appear to the Commission that any registered entity or other person has
> engaged, is engaging, or is about to engage in any act or practice constituting a violation
> of any provision of this chapter or any rule, regulation, or order thereunder, or is
> restraining trading in any commodity for future delivery or any swap, the Commission
> may bring an action in the proper district court of the United States or the proper United
> States court of any territory or other place subject to the jurisdiction of the United States,
> to enjoin such act or practice, or to enforce compliance with this chapter, or any rule,
> regulation or order thereunder, and said courts shall have jurisdiction to entertain such
> actions: Provided, That no restraining order (other than a restraining order which
> prohibits any person from destroying, altering or disposing of, or refusing to permit
> authorized representatives of the Commission to inspect, when and as requested, any

3

books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this chapter shall be issued ex parte by said court.

5. Civil monetary penalties are provided as follows:

> In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation—

>> (A) a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation; or

>> (B) in any case of manipulation or attempted manipulation in violation of section 9, 15, 13b, or 13(a)(2) of this title, a civil penalty in the amount of not more than the greater of $1,000,000 or triple the monetary gain to the person for each violation.

7 U.S.C. § 13a-1(d)(1).

6. Restitution and disgorgement are allowed as follows:

> In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including--

>> (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

>> (B) disgorgement of gains received in connection with such violation.

7 U.S.C. § 13a-1(d)(3).

7. In support of § 9(1) of the United States Code, the Commission has adopted 17 C.F.R. § 180.1(a) dealing with frauds.  17 C.F.R. § 180.1(a) provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

>> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

4

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Notwithstanding the foregoing, no violation of this subsection shall exist where the person mistakenly transmits, in good faith, false or misleading or inaccurate information to a price reporting service.

8.  A default has been entered by the Clerk of this court against CabbageTech.  *See* Clerk's Certificate of Default as to Defendant Cabbagetech, Corp., d/b/a Coin Drop Markets, ECF No. 164, Aug. 01, 2018; ECF No. 40, Mar. 6, 2018.  It failed to appear with an attorney as required of corporations.  *See Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983) ("[I]t is established that a corporation, which is an artificial entity that can only act through agents, cannot proceed pro se.").  It also failed to file an answer or otherwise move with respect to CFTC's complaint.  *See* ECF No. 164; ECF No. 40.

9.  In extensive memoranda and orders, the court has found the Commission has standing and authority to bring this action for fraud involving virtual currencies (also referred to commercially as "cryptocurrencies," "crypto," "crypto coins," "digital currencies," and "digital tokens").  *See*, *e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018), adhered to on denial of reconsideration, No. 18-CV-361, 2018 WL 3435047 (E.D.N.Y. July 16, 2018); Steven Russolillo, et al., *Digital Currencies Tumble*, Wall St. J., Aug. 15, 2018.  Virtual currency may be regulated by the CFTC as a commodity.  *Id.*  CFTC's broad statutory authority, Title 7 U.S.C. § 9(1), and regulatory

authority, Title 17 C.F.R. § 180.1, extends to fraud or manipulation in the virtual currency

derivatives market and its underlying spot market. *Id*.

10. The litigation has been particularly difficult to administrate because McDonnell has appeared

pro se despite various attempts of the court to explain why he needs counsel. He has

appeared in court intermittently. *See* ECF No. 119-1, July 9, 2018; Trial Tr. 146:20–22,

296:20–22, 426:20–22.

11. The court has urged defendant to retain counsel on various occasions, but he has refused to

do so. He was referred by this court to the Eastern District's City Bar Justice Center's Pro Se

Legal Assistance Project ("Clinic"), with whom he met on April 23, 2018. The Clinic

attempted to place McDonnell with pro bono counsel and arranged meetings with two

different law firms. But McDonnell cut himself off from the Clinic on May 9, 2018 after just

two weeks, expressing skepticism that the firms were interested in his case. He expressed

concern that the firms were using these meetings as "fishing expedition[s]" to "acquire

[confidential] information" about him. ECF Nos. 129, 137-1.

12. Despite defendant's contention that he lacks sufficient funds to hire counsel, McDonnell has

yet to show *in pauperis* status warranting appointment of counsel. *See*, *e.g.*, *Order*, ECF No.

153, July 20, 2018.

13. The defendant's primary contention from the outset was that the Commission has no power

to proceed against him, and that the case should be dismissed for lack of standing and

authority to prosecute. On this point, one court has issued an opinion arguably supporting his

view. *See Commodity Futures Trading Comm'n v. Monex Credit Co.*, 311 F. Supp. 3d 1173,

1189 (C.D. Cal. 2018). The district court in that case was aware of, and distinguished, this

court's prior opinion finding that the Commission had authority to bring the instant action

6

against McDonnell.  *Id.*; *but see id.* ("Section 6(c)(1) unambiguously applies broadly to the use or attempted use of any manipulative or deceptive device 'in connection with any swap, or a contract of sale of any commodity in interstate commerce.'").

14. If the Commission is ultimately found to be without jurisdiction and standing, this case should be dismissed.  But, assuming that this court is correct in its finding of authority to prosecute by the Commission, the evidence demonstrates beyond a reasonable doubt a bold and vicious fraud executed by Defendants to illegally deprive large numbers of investors in different states and countries of their assets by trickery, false statements, and misappropriation of funds.

15. McDonnell's "boiler room" scheme defrauded members of the public by conning them into believing they were paying for, and receiving, bona fide advice on investing in virtual currencies—that is to say: expert virtual currency trading advice from him and an imaginary team of advisors—and that he was making purchases and sales of virtual currencies using their assets on their behalf and for their benefit.  In reality, McDonnell never provided or intended to provide these services.  Instead, he ruthlessly misled customers and misappropriated their funds.

16. As part of his scheme to defraud, McDonnell employed various pseudonyms, phone numbers, and bank accounts to conceal his identity and invented fictional employees, a fictional Wall Street office address, and fictional corporate titles to add an aura of legitimacy to his business.  He used a wide array of social media accounts, promised his customers exorbitant gains and lifetime trading services, lied about his own trading record and experience as a virtual currency promoter and developer, and sent customers false reports showing imaginary large profits—all in a scheme to defraud his victims.

17. McDonnell skillfully built personal relationships with his customers, gaining their trust so that he could later defraud them.  He offered them loss-leaders: hooking victims by offering entry into trading advice groups for relatively low starter fees and then enticing them to send additional funds to join more advanced trading advice groups, purchase virtual currencies from him, and allow him to trade in virtual currencies on their behalf using their assets.

18. When his victims caught onto this grift, McDonnell made a variety of false excuses, including a hacking of his accounts, to explain why he could not return their investments, eventually cutting-off all communication with his customers, destroying records, and hiding their funds.

19. The evidence proves beyond a reasonable doubt that McDonnell and Cabbagetech engaged in a systematic pervasive fraudulent scheme between January and July 2017.  The precision of Defendants' scheme, and his detailed method of operations, allows extrapolation backwards and forwards with respect to specific actions of fraud against specific customers (whether or not they testified).  The evidence establishes a detailed modus operandi requiring the inference that all funds obtained by Defendants' illegal enterprise during the relevant time period must be attributed to Defendants' scheme to defraud.

20. Judgment is required by fact and law to be entered in favor of the Commission, including entry of a permanent injunction, an award of restitution, and imposition of civil monetary penalties.

21. A permanent injunction is warranted including, among other elements, a permanent ban on Defendants controlling trading accounts for themselves or other persons, or for soliciting or accepting payments from persons for trading in their commodity interests, or giving trading advice, or applying for or claiming exemption from registration with the Commission or

engaging in any activity requiring such registration or exempt from registration pursuant to Commission Regulation.

22. The Commission's request for the injunction to preclude McDonnell himself from dealing in assets owned by himself is granted. The Court of Appeals for the Second Circuit is rightly concerned with the capacity and ability of fraudulent operators such as the defendant to earn a living. *United States v. Doe*, 79 F.3d 1309, 1319 (2d Cir. 1996) ("[W]e carefully scrutinize unusual and severe conditions, such as one requiring the defendant to give up a lawful livelihood.") (internal quotations omitted); *United States v. Jenkins*, 854 F.3d 181, 195 (2d Cir. 2017) (vacating condition of supervised release where "the nature of these employment restrictions mean that, as a practical matter, he may never be employable"). The instant case is distinguishable from *United States v. Doe* and *United States v. Jenkins*. Those cases involved criminal defendants who could be constantly controlled while on supervised release. If those defendants deviated from the terms of their supervised release, it would be reported to the court by Probation, and the court could punish them with, among other things, incarceration. There is no such procedure in place for the monitoring of McDonnell by the Commission. It would be almost impossible for the Commission to supervise McDonnell's individual trading. The extreme nature of defendant's fraudulent activities, as well as his general mendacity, have demonstrated that he cannot be trusted to trade only on his own behalf. He has used a number of pseudonyms, such as Jason Flack and others, *see*, *infra*, at ¶ 94, and lied about his place of business, *see*, *infra*, at ¶ 56. In addition, he has utilized his wife to transfer assets owed to others to her for hiding abroad, *see*, *infra*, at ¶ 127, he has lied about the location of assets, *see*, *infra*, at ¶ 127–128, he has violated the terms of preliminary injunction entered against him on March 6, 2018, *see*, *infra*, at ¶ 153, and he has refused to

take responsibility for his actions that resulted in his victims being defrauded of assets worth hundreds of thousands of dollars, *see*, *infra*, at ⁋ 246.

23. Restitution in the amount $290,429.29 is awarded in favor of CFTC against McDonnell. Defendant wrongfully received $292,693.54 in United States dollar and virtual currency transfers between February and June 2017.  The final award of restitution requested by the Commission is reduced by $2,264.25, the value of a virtual currency transfer made by McDonnell to an investor in May 2017.

24. A civil monetary penalty of triple the monetary gain is appropriate in the instant case in view of the vicious defrauding of customers.  *See* 7 U.S.C. § 13a-1(d)(1)(A).  It is granted in the amount of $871,287.87.

II.   Fact

A.  Procedural History

25. On January 18, 2018, Patrick K. McDonnell and his company—fully owned and controlled by McDonnell—CabbageTech, were charged by the Commission with operating "a deceptive and fraudulent virtual currency scheme . . . for purported virtual currency trading advice" and "for virtual currency purchases and trading . . . misappropriated [investor] funds."  *See* CFTC Complaint, ECF No. 1, at 1, Jan. 18, 2018.

26. The Complaint seeks injunctive relief, monetary penalties, and restitution of funds received in violation of Section 6(c)(1) of the CEA.  *Id.* at 11-14.

27. On March 6, 2018, with advance notice, *see* ECF No. 23, Feb. 27, 2018, the court held an evidentiary hearing (the "preliminary injunction hearing") on the CFTC's motion for entry of a preliminary injunction; it received testimony and documentary evidence from the CFTC. McDonnell invoked his Fifth Amendment privilege against compelled self-incrimination.

28. The court explained that it expected fuller proof before it could grant relief other than a preliminary injunction.

29. CabbageTech failed to appear, answer, or otherwise move.  The court granted a default as to CabbageTech.  *See* Minute Entry for Proceedings, March 6, 2018, ECF No. 40; *see also* Clerk's Certificate of Default as to Defendant Cabbagetech, Corp., d/b/a Coin Drop Markets, ECF No. 164, Aug. 01, 2018.

30. Following the preliminary injunction hearing, the court issued a Memorandum and Order granting the Commission's motion for a preliminary injunction and holding that under the CFTC's broad anti-fraud authority the Commission may exercise its enforcement power over fraud related to virtual currencies transacted in interstate commerce.  *See generally* Memorandum and Order of Preliminary Injunction and Other Relief, March 6, 2018, ECF No. 29.

31. The CFTC was not seeking authority to regulate trading in virtual currencies.  It was seeking only to stop and to prevent ongoing fraud.  *See* CCN, *CFTC Does Not Regulate Retail Crypto Markets: Chairman Chris Giancarlo*, Bitcoin Politics, ECF No. 156, July 26, 2018 ("The United States Commodity Futures Trading Commission (CFTC) Commissioner J. Christopher Giancarlo has stated that the agency's [intent] is not to exercise regulatory jurisdiction over cryptocurrency trading markets and other cash markets, but to deal with fraud . . . .").

32. From July 9, 2018, to July 12, 2018, a bench trial was held by the court.  Testimony was heard from six witnesses and extensive written evidence was received in the form of more than 150 exhibits in support of the CFTC's allegations. The court determined that four

alleged victims who testified were credible. *See* Trial Tr. 432:08-18, 433:12-14, 433:24-25.

And that technical witnesses were credible. *See* Trial Tr. 115–140, 275–289, 302–401.

33. McDonnell introduced no evidence.  His argument stressed his view that CFTC lacked

jurisdiction and standing.  *See*, *e.g.*, Trial Tr. 30–39.

34. McDonnell rejected the court's repeated admonitions for him to retain counsel.

> COURT: Now, Mr. McDonnell -- I had previously advised you that you need an attorney in this case.
>
> DEFENDANT: Yes, Your Honor.
>
> COURT: Do you want more time to get an attorney?
>
> McDONNELL: No, I came to some understanding at this point that I can't afford an attorney as I mentioned to you previously, but I made an oral argument for a motion to dismiss.
>
> COURT: Well, your papers are very good, but you really do need an attorney. I don't feel that I have the facilities available to help you. Do you have a law degree?
>
> DEFENDANT: No. I'm an indigent lawyer at this point.
>
> COURT: Did you get advice on the briefs that you prepared? They read well.
>
> DEFENDANT: I have contacted dozen of attorneys and telephone calls, things of that nature, if they were willing to, you know, point me to references, maybe help me construct a particular motion. The real point is that I guess I would need, but I'm doing all of this myself right now and everything that you read presented by me is done by my hand. . . . *Through my experience with the legal department here and contacting many attorneys, the amount of due diligence that is needed to be done to actually present this case would have to be somebody that has a vested interest. I don't think that anybody that would be doing something on a pro bono basis would take the necessary time on this case.  I work 24 hours a day on this case, Your Honor.*

Trial Tr. 2–4 (emphasis added).

35. On the first day of trial, McDonnell argued in support of his motion for reconsideration of his

motion to dismiss, presented an opening statement, cross-examined three witnesses, and

requested additional time to argue his motion to dismiss the following day.  Minute Entry for

12

Proceedings, ECF No. 130, , July 9, 2018; *see generally* Trial Tr. 03:01-14:25 (motion),

30:01-39:21 (opening), 74:01-76:20 (cross), 79:09-89:25 (re-cross), 109:20-112:08 (cross),

136:24-141:05 (cross), 143:03-17 (granted request for more time).   Additional time was

granted to him for the second day of trial.   Trial Tr. 143:3–13 ("I will give you some time

tomorrow at 10:30. . . . I will give you what time you want.   I am not interested in trying to

run you over.   I am interested in trying to get the facts.").

36. After this first day, however, McDonnell elected not to attend further evidentiary or other

proceedings.   *See* Trial Tr. 146:20–22, 296:20–22, 426:20–22.   He declined to appear to

testify.

37. In advance of the bench trial, McDonnell testified under oath without counsel at a deposition

on June 5, 2018, Trial Exs. 84 ("June 5 dep."), 84A (video), and again on June 19, 2018 Trial

Exs. 85 ("June 19 dep."), 85A (video).   He provided responses to the preliminary injunction

order in the form of an e-mail dated March 16, 2018, Trial Ex. 62; after a discovery

conference before the magistrate judge, he made responses to the CFTC's interrogatories and

document requests, *e.g.*, Trial Ex. 73 (conference transcript excerpt).   He made his

interrogatory responses under penalty of perjury.   Trial Ex. 63.   With respect to all three of

his interrogatory responses, and document requests responses, Trial Ex. 64, and March 16 e-

mail, Trial Ex. 62, McDonnell confirmed, under oath, that each was true, complete, and

accurate, and that there was nothing to add to them.   Trial Ex. 84 (June 5 dep.) at 84:11-

86:04.

38. On court order, McDonnell received same-day full transcripts at plaintiff's expense.

Scheduling Order, ECF No. 127, July 12, 2018.   He corresponded with Plaintiff's counsel

and made several written submissions to the court. *See* court Ex. 1 of July 10, 2018; court Ex. 1 of July 11, 2018; court Exs. 2-6 of July 12, 2018.

39. McDonnell was informed repeatedly by the court that he could return to the proceedings at any time; on July 11, he was told he could attend summations on July 12 and make any motion he wished, or oppose any motion made by the CFTC, such as the CFTC's motion to withdraw its jury demand that it had made in the complaint. *See* Trial Tr. 412:7–16.

40. On July 12, the fourth and final day of trial, McDonnell elected not to attend summations or oppose any motions made by the CFTC. *See* Trial Tr. 427:03-07. The court granted the Commission's unopposed motion to withdraw its demand for trial by jury without ruling on whether this case was, in whole or in part, an action warranting a jury. *See* Trial Tr. 427:09-11; U.S. Constitution Amendment VII. Summation proceeded and trial concluded.

41. On July 16, 2018, four days after the conclusion of the trial, McDonnell filed a motion for a jury trial. ECF Nos. 137, 138. Defendant's motion was made subsequent to his participation in the first day of trial, where he was made aware at the beginning of the trial that the court intended to hold a bench trial on all of CFTC's claims. Trial Tr. 40:06-21 (". . . Well, we are taking the full record. You will have an opportunity to cross-examine their witnesses. You will have an opportunity to put on your own witnesses. And we will proceed with the trial."); Email from Patrick K. McDonnell, ECF 119-1, July 9, 2018 ("Defendant is gracefully withdrawing his defense. . . . Defendant will not be appearing this point forward. . . . *Defendant understands the process will continue with remedy*.") (emphasis added); *see also*, *supra*, at ⁋ 38 (discussing McDonnell's continued engagement in the trial proceedings despite his failure to attend in person). The court repeatedly indicated during the bench trial that it intended to make findings of fact and law in a full decision on all applications by the

14

Commission.  *See* Trial Tr.  150:2–151:22 ("I don't want you to put your evidence in a summary fashion.  If you are moving for a default, it is not granted.  You will proceed with your case as if the defendant were here.  He can show up.  . . . I am ordering you to continue presenting your case, and I will use normal burdens of proof in connection with assessing that case."); Trial Tr.  346:19–24 ("Well, we have to do a record now.  [We do not know] whether there will be an appeal or not . . . [of] an injunction, if I grant it, . . . and a money judgment, if I grant it."); Trial Tr. 434:21–435:22 ("I will have to see your briefs, finding of fact and law and hear your argument. . . . You are going to have to convince me on the demand for money damages.  I think you have made out a very strong case for equity.  . . . Now, [as to] your motion for summary judgment, I am going to deny that as moot. . . . So I might be in a position of denying summary judgment but granting what you have sought at the trial . . . .").

42. The court finds that there is no right to a jury trial under the special circumstances of the instant administrative enforcement proceeding.  *See*, *e.g.*, *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1018-19 (2d Cir. 1989) ("It would be patently unfair and, in effect, [an] ambush [of the] trial judge on appeal if appellant were allowed to lodge an early demand for a jury, participate in a bench trial without objection, and then assign as error the failure to honor the jury demand.") (internal quotations omitted); *Gusler v. City of Long Beach*, 715 F. App'x 68, 69-70 (2d Cir. Mar. 16, 2018) (summary order) (affirming judgment of district court where plaintiff waived previously demanded right to trial by jury by failing to object to, and participating in, evidentiary hearing); *Kahn v. Gen. Motors Corp.*, 865 F. Supp. 210, 213 (S.D.N.Y. 1994) ("[P]ro se litigants are not treated differently with regard to waiver of jury right.").

43. This court recognizes that there is arguably a right to a jury trial in administrative

proceedings for civil and criminal penalties.  *See* U.S. Constitution, Article III, § 2 (trial of

crimes by jury); U.S. Constitution Amendment VI (trial of crimes by jury); U.S. Constitution

Amendment VII (trial of civil suits at common law by jury); *cf. Tull v. United States,* 481

U.S. 412, 412, (1987) ("The Seventh Amendment guarantees a jury trial to determine

liability in actions by the Government seeking civil penalties and injunctive relief under the

[Clean Water Act]."); Russell L Hewit, *Administrative Civil Money Penalties and the Right*

*to Jury Trial*, 33 Washington & Lee L. R. 719 (1976); *The Imposition of Administrative*

*Penalties and the Right to Trial by Jury*, 65 J. Crim. L. & Criminology  345 (1974); John F.

Duffy, *Jury Review of Administrative Action*, 22 William & Mary Bill of Rights J. 281

(2013).  Defendant participated in the bench trial after it was clear to him and all others

participating in the litigation that the right to all remedies sought by the Commission were

being tried.  As a practical matter, McDonnell waived any of his jury trial rights.  Such a

waiver of jury was made in a formal manner by the plaintiff at the end of the bench trial.

*See*, *supra*, at ⁋ 40.  The defendant, by deliberately absenting himself, denied himself the

right to protest the Commission's waiver.  Pro se inadequacy to deal with procedural

subtleties of a trial, including waiver of a jury, does not warrant, in this case, denial of

waiver.  *Cf.*  Richard H Fallon, Jr, et al., *The Federal Courts and the Federal System*,  Hart &

Weschsler's at 388–389 (2015) ("Few observers would view the Supreme Court's shifting

decisions in this area as having provided a coherent approach to the general question of non-

Article III adjudication.").  Defendant has not properly sought legal assistance for himself,

*see*, *supra*, at ⁋⁋ 10–11, nor has he demonstrated non-possession of sufficient assets to retain

an attorney (even if the assets were wrongfully acquired), *see, supra*, at ⁋ 12.  At this stage of

16

the proceeding, after a full bench trial with full awards sought by the Commission, the

litigation is not subject to an attack of lack of jurisdiction of the court and Commission or of

a denial of a jury trial.  The special factual circumstances of this case require this ruling.

44. The nature of these proceedings—in which the defendant has substantial interests at stake in

terms of his livelihood, as well as injunction, restitution, and monetary penalties—raises the

issue of whether the instant administrative enforcement action brought by the Commission

circumvents the Constitution, and forces McDonnell to try what, in effect, is a criminal case

without counsel and without the protections afforded to him by the Fifth Amendment, Sixth

Amendment, and other constitutional and statutory provisions.  The basic structure of

administrative agencies, such as the Commission, is premised upon the conception that it is

the agency, rather than a jury, which will find guilt.  *See The Imposition of Administrative*

*Penalties and the Right to Trial by Jury*, 65 J. Crim. L. & Criminology  345 (1974) ("Today

agencies commonly utilize the imposition of some type of monetary sanction for an alleged

violation of an agency rule.  In the majority of instances, an individual receives no jury trial

to determine guilt or innocence. *The agency itself performs this function.*) (emphasis added).

Administrative agencies can be thought of as the fourth branch of government; they, like the

executive, legislative, and judicial branches, are bound by the Constitution.  They cannot

avoid a constitutional right of trial by jury in what is, in essence, a criminal case; nor can

administrative agencies avoid their burden of proof beyond a reasonable doubt in such cases.

But, in view of the defaults of McDonnell, waiver by the Commission, and the special

circumstances of this case, the court believes there is no point in addressing this fundamental

administrative law issue further.  It should be noted, however, that all relevant material facts

were proven beyond a reasonable doubt in this case. *See*, *e.g.*, *supra*, at ¶¶ 14, 19; *infra*, at ¶¶ 47, 179, 229.

45. The CFTC filed a motion for summary judgment on July 27, 2018.  *See* ECF Nos. 161, 162. The motion for summary for judgment is dismissed as moot; plaintiff's claims were fully heard at the bench trial.

46. McDonnell filed a motion to dismiss for insufficient evidence on July 16, 2018.  ECF No. 139.  Defendant's motion is denied for the reasons stated above and below.

47. The CFTC now seeks entry of a final judgment against Defendants, including entry of a permanent injunction, an award of restitution, and imposition of civil monetary penalties.  Its evidence establishes by proof beyond a reasonable doubt that Commission is entitled to such a judgment in its favor.  It more than met the preponderance of the evidence standard.  *See CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1353 (S.D. Fla. 2014) (applying preponderance of the evidence standard); *see also Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41405 (July 14, 2011) (in promulgating Rule 180.1, determining that it will be the plaintiff who "bears the burden of proving the violation by a preponderance of the evidence").

### B.  McDonnell's Scheme to Defraud with Virtual Currencies

#### i.  Parties

48. CFTC is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and the Regulations.

49.  McDonnell is a resident of Staten Island, New York.  Trial Ex. 84 (June 5 dep.) at 21:13-21. His address is 20 Rawson Place, Staten Island, New York, 10314.  *Id.*

50. McDonnell owned and controlled CabbageTech.  Trial Ex. 85 (June 19 dep.) at 10:12-14; Trial Ex. 57, 58 at 2 (entity records).  McDonnell has never been registered with the Commission.

51.  Defendant CabbageTech is a New York corporation based in Staten Island, New York, and was incorporated on May 6, 2016.  Trial Ex. 58 (entity records).  Default was granted against CabbageTech on March 6, 2018.  ECF No. 40.  CabbageTech's service address is 20 Rawson Place, Staten Island, New York, 10314.  Trial Exs. 57, 58, 84 (June 5 dep.) at 225:19-226:02. This is the same address as McDonnell's.  *See*, *supra*, at ¶ 49.

ii.     Cabbagetech, Corp. d/b/a Coin Drop Markets

52. McDonnell created, owned, and exclusively controlled CabbageTech.  *See* Trial Exs. 58 at 2 (incorporation filed by Patrick K. McDonnell), 84 (June 5 dep.) at 122:08-20, 85 (June 19 dep.) at 10:12-14.  At times, CabbageTech did business under the name "Coin Drop Markets."  Trial Ex. 84 (June 5 dep.) at 39:23-40:06.

53. Neither CabbageTech, Corp. nor Coin Drop Markets has ever been registered with the Commission.

54. McDonnell was the sole operator and owner of the CabbageTech business.  Trial Ex. 63 at no. 3.  At times, McDonnell identified himself as CabbageTech's CTO (Chief Technology Officer), among other titles.  *E.g.*, Trial Exs. 1 at 1, 42; Trial Tr. 73:05-12; 205:12-18.  There was no one else involved in the company besides McDonnell.  Trial Ex. 84 (June 5 dep.) at 125:07-13, 142:08-13.

55. McDonnell operated CabbageTech from his home at 20 Rawson Place, Apt. B, Staten Island, New York, 10314.  *E.g.*, Trial Ex. 84 (June 5 dep.) at 21:13-21, 144:10-16, 145:08-12, 157:18-158:14 (McDonnell's home basement was "headquarters of [his] business"); *see also*

Trial Exs. 57, 58, 102 (subscriber information); Trial Tr. 370:15-19; Trial Ex. 124 (activity log reflecting logins from IP addresses 24.168.89.122 and 72.227.210.194); Trial Exs. 90-91, 95-96 (account records); Trial Tr. 130:02-132:16, 136:02-136:20 (IP addresses associated with logins); Trial Exs. 56, 104-113 (Federal Express records relating to 20 Rawson Place).

56. McDonnell deliberately suggested to some clients that he had a business office on Wall Street.  *See* Trial Tr. 155:14-20.  He had no such address.

### iii.    Array of Accounts to Execute Fraud

57. McDonnell used multiple telephone numbers to further his frauds.

58. McDonnell used several different telephone numbers in connection with CabbageTech, including (718) 524-4718, the cellular telephone number (929) 428-6422, (718) 524-6312, and the toll-free number (888) 614-6445.  *E.g.*, Trial Tr. 97:12-25, 99:02-20, 202:19-203:11, 205:03-205:18, 284:11-286:09, 287:03-15; *see also* Trial Exs. 1 at 1, 56 (label with home number), 84 (June 5 dep.) at 34:05-35:02, 102 (subscriber information), 122 (toll-free account records), 128 (Simple Bank account information), 129 (recorded telephone call), 129A (transcript).

59. McDonnell solicited potential and existing customers by telephone.  *E.g.*, Trial Tr. 96:25-97:11; 99:02-20, 202:19-203:11.  McDonnell also supplied his numbers to potential and actual customers in various ways, such as through the telephone, social media sites, by e-mail, and by facsimile.  *E.g.*, Trial Tr. 99:02-99:20, 203:12-204:13; *see also* Trial Ex. 1 at 1.

60. McDonnell used multiple e-mail accounts to further his frauds.

61. McDonnell used a wide array of email addresses in connection with CabbageTech, such as coindropmarkets@gmail.com, cdm@gmx.us, cdmmerchant@gmx.com, cryptoclown@gmx.com, patrickpkmcdonnell@gmail.com, patmcdonnell@gmx.com,

info@coyotewallstreet.com, jflack101@gmail.com, and loramcdonnell@gmx.com, among several others.  *E.g.*, Trial Exs. 1, 14, 72, 84 (June 5 dep.) at 38:08-16, 43:22-44:15, 88-91, 93-96 (Bittrex records), 102 (subscriber information), 119 (subscriber information reflecting a McDonnell telephone number); *see also* 104-113, 115 (FedEx records), 128-129A (Simple Bank records), 133 (Slack account).

62. McDonnell testified under oath that no one else besides himself had access to his email accounts.  *See* Trial Ex. 84 (June 5 dep.) at 67:19-67:21.

63. McDonnell used numerous social media accounts, such as Facebook, Twitter, and Slack, to further his frauds.

64. McDonnell maintained a social media presence on various platforms, including Twitter, Facebook, and Slack.  Among other things, his social media accounts lured potential customers to Defendants' Coin Drop Markets website and to McDonnell.  Trial Tr. 45:03-17, 154:08- 155:03; 158:09-14.

65. McDonnell's social media accounts at times featured a representation of his face, such as a photograph or a sketch-like portrayal.  *See* Trial Tr. 163:09-16, 187:01-23; 249:17-24; Trial Exs. 36; 36A (article with picture); 39 (Facebook); 84B (still image from video recording of June 5 deposition).

66. McDonnell used several Twitter accounts under names such as @BTCXBTDEV, @MrPatMcDonnell, @BTCXBTTRADING, @CoinDropMarkets, and @TIGRtokens.  *See, e.g.*, Trial Tr. 67:10-68:09; 69:09-70:14; 163:11-14; 187:04-23; *see also* Trial Exs. 6, 8, 12, 14, 23, 27, 66, 141-142 (subscriber information).

67. McDonnell's @coindropmarkets Twitter account purported to have thousands of "followers."  Trial Ex. 66 (Defendant's Website and Twitter Descriptions, June 4, 2018, ECF No. 113-1, with screenshot of @coindropmarkets excerpt); *see also* Trial Tr. 158:09-14.

68. One of McDonnell's Facebook pages relating to CabbageTech and Coin Drop Markets used the name "Bitcoinxbtradegrp"; in addition to the Coin Drop Markets toll free number and website, listed was a purported business address at 110 Wall Street.  Trial Exs. 39, 40; Trial Tr. 155:14-20.

69. McDonnell created and controlled a "Slack team" named Bitcoin XBT Trade Group (the "CabbageTech Slack account") in May 2017 in connection with purportedly providing CabbageTech membership services.  *E.g.*, Trial Exs. 133, 157, 158; *see also* Trial Tr. 249:15-250:25; 392:01-394:15.

70. McDonnell used the Coin Drop Markets websites to carry out his frauds.

71. McDonnell published and maintained a number of websites related Coin Drop Markets. One was www.coindropmarkets.com.  Trial Exs. 66 (excerpt of screen shot), 69 at 37:23-38:19, 81.  Another website was www.coindrops.club.  *See, e.g.*, Trial Exs. 40 (Facebook page).  McDonnell also registered the website tigrtokens.org as part of his scheme for soliciting customers for money or assets in connection with the purported purchases of the virtual currency Tigr.  Trial Ex. 78; *see also* Trial Tr. 66:06-14; 169:08-21.

72. Some customers who invested with CabbageTech could log into Coin Drop Market's website and receive account and balance statements.  *E.g.*, Trial Tr. 222:15-224:22; Trial Exs. 49-50.

73. McDonnell used the Coin Drop Markets PayPal account to carry out his frauds.

74. McDonnell maintained the PayPal account associated with the e-mail address cdm@gmx.us (the "Coin Drop Markets PayPal account").  *E.g.*, Trial Exs. 62 (McDonnell March 16 e-

mail), 125 (Coin Drop Markets PayPal account transaction log); Trial Tr. 369:21-371:05, 373:13-15 (describing Coin Drop Markets PayPal account transaction log).

75. Customers directed payments to the Coin Drop Markets PayPal account through links in the CabbageTech website.  *E.g.*, Trial Tr. 159:23-160:04; *see also* Trial Ex. 125 (Coin Drop Markets PayPal account transaction log, payments received worksheet).

76. McDonnell used multiple bank accounts to carry out his frauds.

77. McDonnell maintained an account in his name and home address at Simple Bank and Bancorp Bank, Trial Exs. 100, 128 (account information), 171; Trial Tr. 282:10-283:06, 315:21-318:17, and in the name of CabbageTech and his home address at TD Bank, Trial Tr. 277:20-278:24; Trial Exs. 137, 138, 139.

78. Customer funds were deposited into, and withdrawn from, bank accounts.  Trial Tr. 277:20-281:17, 320:07-15, 323:12-325:03, 376:16-378:16; *see* Trial Exs. 100, 137-139, 171, 172.

79. McDonnell used multiple virtual currency accounts to carry out his frauds.

80. McDonnell maintained an account at Bittrex, a virtual currency exchange, associated with the e-mail address cdmmerchant@gmx.com (the "Bittrex cdmmerchant account").  *See* Trial Tr. 120:10-25; Trial Exs. 62 at 2-3, 85 (June 19 dep.) at 14:22-19:09.

81. The Bittrex cdmmerchant account was created on April 27, 2017.  Trial Exs. 90 at 1, 91 at 1.

82. On June 24, 2017, another account was created at Bittrex in the name of McDonnell's wife, Lora McDonnell, and associated with the e-mail address cryptoclown@gmx.com (the "Bittrex cryptoclown account").  Trial Tr. 133:03-135:12; Trial Exs. 93-96.

83. McDonnell controlled both a Bittrex cdmmerchant account and a Bittrex cryptoclown account.  *E.g.*, Trial Tr. 133:15-136:18, 356:12-367:12; *see also* Trial Exs. 89, 90, 91, 94, 95, 96 (accounts associated with same IP addresses, telephone number).

23

84. McDonnell used numerous FedEx accounts to carry out his frauds.

85. McDonnell created and maintained several FedEx accounts under a variety of names and e-mail addresses. *E.g.*, Trial Exs. 56, 80, 104-113, 115.  McDonnell used the accounts to solicit and obtain funds from customers. *E.g.*, Trial Exs. 53, 56, 104-109, 111, 115; *see also* Trial Tr. 96:17-98:05, 211:14-23, 216:04-217:14.

> iv.   Fraud Involving Virtual Currency Trading Advice

86. McDonnell used fraudulent solicitations reflecting false and misleading claims about his track record helping his clients make profits.

87. Customers were attracted by McDonnell's social media and internet presence, which included misleading statements and omissions about his credentials. *E.g.*, Trial Tr. 158:09-17, 159:11-19.

88. As part of his solicitations to potential customers to become members of groups supposedly receiving his and Coin Drop Markets' expert trading guidance, McDonnell made false and misleading claims about his track record and prowess as a professional trader through Twitter and through his website. *E.g.*, Trial Ex. 161 ("Made over 73 BTC today bud great day man"); Trial Tr. 48:19-49:03; 61:03-17; 255:09-19.

89. McDonnell made false and misleading claims to prospective and actual customers about being a Wall Street trader.  For example, McDonnell misrepresented his company's credentials by advertising a fake Wall Street address on social media, and by telling customers he was heading into the office to trade. *E.g.*, Trial Exs. 39, 40; Trial Tr. 155:17-20; 260:04-11; 261:18-22; *see also* Ex. 51 at June 16, 2017 8:47 AM e-mail mentioning both a "Staten Island office" and an office in "NYC").

90. McDonnell made false and misleading claims about his experience and expertise with virtual currency, including the development and promotion of new virtual currencies. *E.g.*, Trial Tr. 160:05-161:02.  By contrast, under oath, McDonnell stated he did not recall being involved in the development of any virtual currencies.  Trial Ex. 84 (June 5 dep.) at 86:05-88:10.

91. McDonnell misled customers by building a false relationship of trust over time with them in order to be able to defraud them. *E.g.*, Trial Tr. 83:14-22, 158:02-08.  He did so using e-mail, social media, and internet-based chats to develop relationships and rapport with victims. *E.g.*, Trial Tr. 158:02-08; Trial Exs. 6, 8, 14.  He did so through numerous telephone calls. *E.g.*, Trial Tr. 99:02-04; 203:01-11.

92. McDonnell used fraudulent statements as to who were the officers and employees of CabbageTech.

93. CabbageTech promotional materials made claims that membership and trading groups were operated by teams of experts, such as "a dedicated team of digital asset trading specialists trend spotting." *E.g.*, Trial Ex. 70 at "Exhibit 19" and "Exhibit 20."  These and other CabbageTech materials falsely suggested that the company consisted of a specialized expert "team."  Trial Tr. 239:08-14; Trial Ex. 63 at Response No. 3; *cf.* Trial Ex. 84 (June 5 dep.) at 125:22-126:03 (admitting there was no one else involved in the company).

94. McDonnell falsely assumed the fake identity Jason Flack (purporting to be a CabbageTech representative whose boss was McDonnell) to solicit customers by telephone, including by cold-calls, as well as by e-mails.  Trial Tr. 94:19-95:04, 96:25-97:11, 202:19-203:11, 205:03-18 (McDonnell was falsely held out by McDonnell as Flack's "boss"); Trial Exs. 42-45, 47, 51, 77, 79.

95. At trial, McDonnell's voice was recognized as that of "Jason Flack," a nonexistent person

who was held out by Defendants as acting for them.  Trial Tr. 240:25-242:09 (customer

recognizing defendant's voice as Jason Flack's), 305:17-309:08 (identifying records of calls

to customers from defendant's telephone number); *see also* Trial Tr. 176:16-19, 180:06- 23;

187:18-188:05 (customer recognizing defendant's voice as Patrick K. McDonnell's); Trial

Ex. 168.  The court found the voice recognition and attribution credible.

96. McDonnell falsely assumed the names Michelle Robertson and Michelle Robinson in

connection with Coin Drop Markets.  *E.g.*, Trial Ex. 79.

97. McDonnell use of FedEx labels reflecting multiple company names greatly exaggerated the

size and complexity of Defendants' business to mislead customers.  *E.g.*, Trial Exs. 53, 56.

98. McDonnell made fraudulent solicitations of the services he offered.

99. McDonnell and CabbageTech purported to offer a wide array of memberships and services.

*E.g.*, Trial Exs. 38 (Coin Drop Markets membership services), 44 (membership confirmation

e-mail); 66 (ECF No. 113-1, a screenshot produced by McDonnell reflecting six

memberships), 84 (June 5 dep.) at 132:15-19 (referring to ECF No. 113-1).

100.    In early 2017, McDonnell and his company advertised memberships in a variety of

membership levels ranging from "Bronze" to "Diamond," with the level of services

supposedly increasing with the price of the membership.  *E.g.*, Trial Exs. 44 ("Diamond"

membership confirmation), 66 (screenshot excerpt), 84 (June 5 dep.) at 132:15-19; *see also*

Trial Tr. 159:08-10; 161:03-22, 205:03-206:20.  Such enriched services were not intended to

be given as promised.

101.    In or around April 2017, Defendants advertised "membership" in trading groups such as

RedliteGreenLite, BTC ("RLGLBTC"), relating to Bitcoin, and RedliteGreenLite, LTC

("RLGLLTC"), relating to the virtual currency Litecoin.  *E.g.*, Trial Exs. 1 (e-mail confirming RLGLLTC membership), 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements), 162-63 (Twitter messages regarding RLGLLTC); Trial Tr. 173:09-20. These memberships supposedly offered expert entry-and-exit-price guidance for day trading of certain virtual currencies; the guidance was never given as promised.  Trial Exs. 1, 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements); *see also* Trial Tr. 45:14-17, 173:09-20, 257:13-18.  The memberships were used to mislead customers and defraud them.

102.    As McDonnell told the court during the March 6, 2018 hearing, in reference to the webpages promoting RLGLLTC, Trial Ex. 70 at "Exhibit 19" and "Exhibit 20" (bitcoin forum advertisements), they "were posts that list what we do," *see* Trial Ex. 71, at 41:01-04, 41:16- 19).   These services were not provided as promised.

103.     Defendants solicited memberships or subscriptions to other groups and services, such as a "Turn-Key Annual Membership," providing access, for instance, to McDonnell's and CabbageTech's supposed virtual currency trading expertise, mentorship, and guidance.  *See* Trial Tr. 46:03-14; Trial Exs. 38, 69 at 39:16-24.  Those "memberships" were of no help to customers and were used to defraud.

104.    McDonnell told the court during the March 6, 2018 hearing, in reference to the screenshot of a CabbageTech webpage advertising CabbageTech memberships such as RLGLLTC and Crypto Annual Turnkey Membership, Trial Ex. 70 at "Exhibit 18"; *see also* Trial Ex. 38, "that's an actual picture of my website," *see* Trial Ex. 69, at 38:17-19.  The website was used in Defendants' fraudulent scheme.

105. CabbageTech promised expert services for 12 months in exchange for an up-front fee. *See* Trial Exs. 1 (reflecting extension from 12 to 24 months), 44, 66, 70. Such expert services were not delivered.

106. The nominal price of the trial membership and the relatively inexpensive prices of the next-higher membership levels fraudulently produced income for McDonnell. *E.g.*, Trial Ex. 125 (Coin Drop Markets PayPal account transaction log, payments received worksheet). The low entry prices deliberately developed targets softened up to be defrauded by McDonnell.

107. Once customers had made an initial purchase, McDonnell solicited "lifetime" memberships in a more exclusive trading sector or "elite" group that supposedly would provide greater opportunities to profit from virtual currency trading. *E.g.*, Trial Ex. 6 ("You may wanna consider joining RLGLBTC it's direct 1-on-1 trading alongside me and all members involved real-time."; "The program is 1 BTC for it's [sic] lifetime been running since 2010 so there is a lot of BTC buying power"), 8, 163 ("You send me 1 BTC I'll trade w/ you personally minute-2- minute all coins"); Trial Tr. 52:20-53:16, 56:13-57:09; 161:07-161:22. These services were not intended to be rendered, leaving customers defrauded.

108. McDonnell and CabbageTech never provided promised expert membership services. *E.g.*, Trial Tr. 66:06-21 (complaints regarding the lack of trading advice that Mr. McDonnell falsely portrayed that he would be giving), 174:20-24; Trial Ex. 19.

109. McDonnell shut his company down in mid-2017, well before he and CabbageTech had provided a year's worth of services. *E.g.*, Trial Tr. 174:20-24, 239:20-240:01; Trial Ex. 84 (June 5 dep.) at 160:23- 161:11. McDonnell never provided, and never intended to provide, the promised entry-and-exit-point guidance for a specific transaction related to Titcoin via the Slack group that he had formed. *E.g.*, Trial Tr. 163:20-165:14.

110.   McDonnell directed his customers to buy Titcoin "at any price," and then ceased

communicating with customers as part of his scheme to defraud.  *Id.*  As a result, investors

who followed this direction suffered substantial losses.  Trial Tr. 165:10-14, *see also* Trial

Tr. 174:20-174:24; Trial Ex. 133 (Slack group information).

111.   McDonnell misappropriated customers' funds.

112.   Many customers made payments in United States dollars and in virtual currency to

McDonnell and CabbageTech in exchange for promised expert-guidance subscription

services.  *E.g.*, Trial Tr. 45:22-46:14, 159:23-160:04, 161:07-13, 206:05-207:17, 337:01-

342:14, 348:09-356:11; Trial Exs. 90-91 (Bittrex account records).  The expected guidance

was never intended to be supplied, and was never supplied as promised.

113.   The customers knew McDonnell's bitcoin, litecoin, and other virtual currency addresses

because McDonnell specified various of these addresses to them.  *E.g.*, Trial Tr. 54:01-08,

54:14-56:22; Trial Exs. 8 at 2, 163.  The addresses were furnished as part of a fraud to obtain

assets from customers by McDonnell.

114.   McDonnell never provided promised expert services, and he ceased providing any

services at all after receiving customer funds.  Trial Tr. 66:06-68:12, 68:16-23,

174:20-175:19; 229:05-15, 230:21-232:08; 253:23-254:04.

115.   No customer found entitled to restitution ever received a refund from CabbageTech or

McDonnell when they properly requested such refunds.  *E.g.*, Trial Tr. 71:03-15, 107:07-

107:24, 108:09-109:12, 232:07-21; *e.g.*, Trial Exs. 76, 77, 79, 82, 83.  McDonnell has not

disputed this; when asked, McDonnell claimed under oath that he did not even recall a

customer's request for a refund. Trial Ex. 84 (June 5 dep.) at 254:17-20.

116.    The large numbers of memberships claimed were a figment of imagination of McDonnell with no basis in fact.

117.    McDonnell never intended to provide a year's worth or a lifetime's worth of promised expert services.  He was not capable of doing so.  Instead, the only reasonable inference is that the fraudulent membership offers were designed not only to generate Defendants' income, but to get victims in the door and to position them for further fraudulent solicitations for greater and greater amounts.  *E.g.*, Trial Tr. 52:17-53:02, 53:13-54:08, 58:11-59:15, 161:03-22, 205:19-206:20, 208:18-209:11.

v.    Fraud Involving Purchase and Trading of Virtual Currency

118.    McDonnell made fraudulent solicitations for virtual currency transactions based on non-existing facts and false promises.

119.    McDonnell used the lure of less-expensive memberships to get potential victims in the door and to position them for further fraudulent solicitations for virtual currency purchases or trading on their behalf under McDonnell's direction.  *E.g.*, Trial Tr. 57:22-58:06 (after sending litecoin to join an Elite group, the customer was solicited to send remaining litecoin for Patrick McDonnell to trade as part of Defendants' fraudulent scheme).

120.    To solicit customers to provide funds for him to trade on their behalf, McDonnell falsely claimed Wall Street trading expertise, virtual currency expertise, an ongoing record of exceptional trading performance, and a large clientele.  *E.g.*, Trial Tr. 61:11-17, 97:02-11, 159:11-16, 160:05-161:02, 197:07-08, 265:24-266:16; Trial Exs. 14 ("Hey Rich I'm going over trading blotter your [sic] up big on amount of $LTC traded will discuss tom. Hey listen IDK how big an investor you are but there is real $ to be made just w/ $LTC"; "Outside of twitter I have a very big retail business with over 8,000+ active investors who trade my stock

30

rec's this honestly is just building the crypto side. I trade over $50M in BTC for this group

gathered since 2010"), 161 ("made over 73 BTC today bud great day man"), 166 (I wish I

was trading your $LTC bro I'm caking made $122k total yesterday").

121.    To solicit customers to provide funds for him to trade on their behalf, McDonnell falsely

promised customers rapidly profitable in-and-out virtual currency investments. *E.g.*, Trial

Tr. 58:18-24; 168:05-25; 169:03-07; 169:15-19, 255:09-19; Trial Exs. 6 at 1 (promising

300% returns in less than three days) ("1 BTC in should produce 3 BTC out"); 8 at 2

(promising 200 to 300% profit on 76 litecoin each day of trading); 167 (promising to make

0.5 to 2 bitcoin daily for a customer).

122.    McDonnell fraudulently solicited customers to provide funds in exchange for virtual

currency from CabbageTech at supposedly below-market rates. *E.g.*, Trial Ex. 43 ("Our

cryptocurrency division headed by Pat McDonnell/CTO has discounted Bitcoin below

current market price for exchange. There is currently 9,400 $BTC available . . . to provide

low entry to those looking to profit. We are also accepting $ETH, $LTC in exchange for

$BTC outside of USD"); Trial Tr. 208:16-210:02.  McDonnell falsely claimed CabbageTech

would provide escrow services for virtual currency that customers purchased through

CabbageTech.  Trial Tr. 213:09-21, 218:16-20; Trial Ex. 50 ("CDM acts as escrow").

123.    McDonnell falsely told customers that CabbageTech would manage their invested funds.

*E.g.*, Trial Tr. 218:19-218:20 ("For the stuff in escrow, he's managing it for me").

124.    McDonnell wrongfully kept customers' funds.

125.    McDonnell fraudulently dissipated customer funds deposited into the CabbageTech TD

Bank account.  *E.g.*, Trial Exs. (TD Bank deposits), 138 (check records for TD Bank), 139

(TD Bank account statements).  He did not invest these funds as he had promised to do, but took possession of them as part of his fraudulent scheme.

126.    McDonnell repeatedly withdrew customer funds deposited into the CabbageTech TD Bank Account from ATMs for his own use soon after receipt.  *E.g.*, Trial Ex. 139, at 1; *see also* Trial Tr. 279:21-280:04 (detailing withdrawals shortly after deposit of customer check), 394:18-22, 395:05-11.  McDonnell used customer funds deposited into the TD Bank account to pay his own rent.  Trial Tr. 280:01-04, 455:01-09; Trial Ex. 138.

127.    McDonnell misappropriated customer funds sent to the Bittrex cdmmerchant account. On June 17, 18, and 19, 2017, at the same time that customer demands for refunds were mounting, *e.g.*, Trial Exs. 51, 77, 79, 82, 83, McDonnell as part of his scheme to defraud transferred more than 660 litecoin worth thousands of dollars in cash from his Bittrex cdmmerchant account to the Bittrex cryptoclown account opened in the name of his wife for hiding abroad.  *See* Trial Exs. 150-52 (demonstratives), 144-49; *see also* Trial Exs. 90-91, 95-96; Trial Tr. 133:17-136:18, 356:12-18, 357:16-20, 365:04-07, 367:06-12; 451:2–6.  He did this to defraud his customers.

128.    When customers asked to withdraw their investment and purported gains, McDonnell would offer a series of false excuses for delays in repayment before ultimately cutting-off communications entirely.  *E.g.*, Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; Trial Exs. 27, 51, 76, 77, 79, 82, 83.

129.    McDonnell falsely told victims that their profitable investments had been reinvested, *e.g.*, Trial Tr. 220:06-17, Trial Ex. 82 at 3-5, or that his secretary had forgotten to send a check to the customer requesting his money, *e.g.*, Trial Tr. 229:05-230:13, or that there had been a

hacking of his accounts so that the money could not be located, *e.g.*, Trial Ex. 52; Trial Tr. 173:21-174:20, 238:12-240:01.

130.    No customer ever received a refund.  *E.g.*, Trial Tr. 71:03-15, 107:07-107:24, 108:09-109:12, 232:07-21; *e.g.*, Trial Exs. 76, 77, 79, 82, 83.  McDonnell has not disputed this, claiming under oath that he did not recall even a single customer who requested a refund. Trial Ex. 84 (June 5 dep.) at 254:17 to 254:20.

131.    Many customers should have received customer assets being controlled by McDonnell when they requested them. The refunds were fraudulently withheld.

132.    McDonnell provided false account statements to his customers.

133.    McDonnell provided false account statements to customers through the Coin Drop Markets website.  *E.g.*, Trial Tr. 221:22-222:23, 223:04-24, 226:10-17; Trial Exs. 49, 50.

134.    McDonnell provided false account statements and performance updates to customers who had sent funds to CabbageTech for investment in virtual currency in written communications as well as by telephone.  *E.g.*, Trial Exs. 14, 47, 49; Trial Tr. 59:16-19 104:03-104:09, 211:11-212:08.

135.    The false statements and reports sent to customers conveyed the false impression that CabbageTech was achieving profits for the customer.

136.    On or around June 17, 2018, customer David Martin received a purported account balance update from Patrick McDonnell via e-mail falsely stating that Martin's account balance was up to 676 Litecoin.  Trial Ex. 82 at 4 ("Your gonna be real happy . . . You have exactly 676 LTC's"); Trial Tr. 331:22-332:09.

137.    McDonnell made fraudulent omissions in his reports to customers.

138.    McDonnell's execution of a fraudulent scheme to defraud his customers was replete with fraudulent omissions.

139.    McDonnell falsely omitted from reports to his customers that he was misappropriating their assets, rather than successfully trading them.  *E.g.*, Trial Ex. 82 at 4.

140.    McDonnell falsely failed to tell his customers that he never intended to manage their funds as he had promised.  *E.g.*, Trial Ex. 139; *see also* Trial Tr. 279:21-280:4; 394:18-22, 395:05-11.

141.    McDonnell falsely failed to tell his customers that his excuses for delays in reporting to them were false.  *E.g.*, Trial Tr. 70:20-25, 106:02-109:12; 229:05-230:13; Trial Exs. 27, 76, 77, 79, 82, 83.

142.    McDonnell falsely failed to tell his customers that he was using fake identities in dealing with them.  *E.g.*, Trial Tr. 96:25-97:11, 205:03-23.

143.    McDonnell faked a hacking of his accounts and deleted records to cover up his scheme to defraud.

144.    In June 2017, McDonnell falsely claimed that there had been a hacking of CabbageTech.  *E.g.*, Trial Ex. 52; Trial Tr. 173:21-174:19, 237:14-238:24; *cf.* Trial Ex. 84 (June 5 dep.) at 254:02-16 (stating under oath he did not recall a hacking ever happening).

145.    In June and July 2017, McDonnell as part of his scheme to defraud shut down his website and chatroom, deleted social media accounts, ceased communicating with customers by e-mail or telephone, and misappropriated the customers' funds.  *E.g.*, Trial Tr. 67:07-68:12; 174:12-19; 237:14-240:01; Trial Exs. 19, 52, 82, 83.

146.    McDonnell admitted under oath that he shut down or deleted the coindropmarkets.com website and the Coin Drop Markets Twitter account he used to communicate with customers.

34

*See* Trial Ex. 84 (June 5 dep.) at 304:14-22.  These shutdowns and deletions were part of his scheme to defraud.

147.   As part of the scheme to defraud his customers, McDonnell shut down the Slack team that he had created as part of a Coin Drop Markets fraudulent membership service one month after he created it.  Trial Tr. 66:06-21, 67:07- 68:12, 392:01-394:15; Trial Exs. 19, 133 (indicating primary owner of team was McDonnell, creation date was May 14, 2017, and deletion date was June 15, 2017).

148.   McDonnell admitted that "90 percent" of the website and social media has been deleted.  Trial Ex. 84 (June 5 dep.) at 322:18-323:12.  Destruction of these records was part of his scheme to defraud.

149.   McDonnell used a type of "boiler room" fraudulent scheme to defraud his customers.

150.   During discovery, McDonnell told Chief Magistrate Judge Mann that he had routinely deleted CabbageTech records.   Trial Ex. 74A at 18:20-23.  McDonnell testified under oath that it was his practice to "delete everything at all times."  Trial Ex. 84 (June 5 dep.) at 311:10-25.  This destruction of records was part of his scheme to defraud.

151.   Call records relating to McDonnell's toll-free number reflect numerous unanswered calls from various victims of his scheme.  Trial Ex. 122 at 8-9 (J2 call records); Trial Tr. 308:04-309:11; *see also* Trial Tr. 176:04-06.  This practice was part of his scheme to defraud.

152.    McDonnell admitted under oath that he threw away the computers he used for CabbageTech business, and that he did not recall when he did so.  Trial Ex. 84 (June 5 dep.) at 26:5-30:9.  This was part of his scheme to defraud and to avoid prosecution.

153.    After this court's March 6, 2018 preliminary injunction order, McDonnell violated the

court's order by making further transfers of virtual currency to perpetuate his fraudulent

scheme and further dissipate misappropriated assets.

154.    The Preliminary Injunction Order issued March 6, 2018, enjoined McDonnell from

further violations of Section 6(c)(1) and Regulation 180.1. *See* ECF No. 29, Appendix A at

7-8. This part of the order was disobeyed by McDonnell.

155.    On March 7, 2018, at approximately 12:02 am, 0.4 BTC was withdrawn from the Bittrex

cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial Exs. 95, 96,

Withdrawal tab, p. 1, line 7.

156.    On March 8, 2018, at approximately 12:03 am, another 0.4 BTC was withdrawn from the

Bittrex cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial Exs.

95, 96, Withdrawal tab, p. 1, line 6.

157.    On March 9, 2018, at approximately 12:04 am, another 0.4 BTC was withdrawn from the

Bittrex cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial Exs.

95, 96, Withdrawal tab, p. 1, line 5.

158.    On March 10, 2018, at approximately 12:05 am, another 0.4 BTC was withdrawn from

the Bittrex cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial

Exs. 95, 96, Withdrawal tab, p. 1, line 4.

159.    On March 11, 2018, at approximately 12:09 am, 19.5 LTC was withdrawn from the

Bittrex cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial Exs.

95, 96, Withdrawal tab, p. 1, line 3.

160. On March 12, 2018, at approximately 9:17 am, 3.32795963 LTC was withdrawn from the Bittrex cryptoclown account by McDonnell as part of his scheme to defraud. *See* Trial Exs. 95, 96, Withdrawal tab, p. 1, line 2.

161. On March 7 through March 12, 2018, logins to the Bittrex accounts were made with two-factor authentication by McDonnell as part of his scheme to defraud. *See* Trial Exs. 95, 96, IP addresses used tab, pages 1-2.

162. Among the IP addresses logged by Bittrex after the preliminary injunction order was issued, one address that was identified, *id.*, pg. 2, lines 59-61, was the same address that cable service provider records also indicated was associated with McDonnell's account, *cf.* Trial Ex. 102 at 1 (subscriber information for "Patrick K. McDonnell, 20 Rawson Pl., Apt. B Staten Island, NY 10314, 718-524-6312, 72.227.210.194"). This was part of McDonnell's scheme to defraud and to violate the preliminary injunction.

### vi.    Fraud Involving Misappropriated Customer Funds

163. McDonnell attracted numerous customers to his business from different states and countries as part of his interstate scheme to defraud.

164. McDonnell's and CabbageTech's solicitations and scheme to defraud attracted more than 100 customers from numerous states and countries as part of his scheme to defraud. *E.g.*, Trial Ex. 125 (Coin Drop Markets transaction log, payments received worksheet, reflecting customer payments). McDonnell told the court on March 6, 2018, that CabbageTech had approximately 200 customers. Trial Ex. 68 (March 6, 2018 Hrg. tr. 10:13-14). The Coin Drop Markets PayPal account and Slack records reflect between 100 and 150 different sign-ups. Trial Ex. 125; Trial Ex. 133 (CabbageTech Slack account subscribers). The Coin Drop

Markets PayPal account reflects more than $4,500 in deposits as part of the scheme to defraud.  Trial Tr. 373:06-09.

165.    Customers provided funds for virtual currency trading advice and virtual currency transactions, but did not get advice as part of the scheme to defraud.

166.    Between April 25 to April 29 2017, Richard Brewell transferred United States dollars and virtual currency (litecoin) to McDonnell and CabbageTech for virtual currency trading advice and for the trading of virtual currency on his behalf.  *E.g.*, Trial Tr. 45:22-46:14, 57:03-09.  Brewell transferred $1.99, $99.98, and $99.98 in United States dollars to McDonnell and CabbageTech.  Trial Ex. 180; *see also* Trial Ex. 125.  Brewell also transferred 76.297 and 70.497 litecoin (LTC) to McDonnell and CabbageTech.  Trial Ex. 180; *see generally* Trial Tr. 71:03-13, 337:05-338:04, 380:05-381:06; *see also* Trial Exs. 90-91 at Deposit Tab, pp.2-3, lines 67-68.  On January 18, 2018, the date the Complaint was filed, the litecoin amounts respectively were worth $14,713.11 and $13,594.64.  Trial Ex. 180; *see also* Trial Tr. 380:03-382:24; Trial Ex. 181 (litecoin closing price as of January 18, 2018).  In total, Brewell transferred to McDonnell and Cabbagetech assets valuing $28,509.70 as part of their scheme to defraud.  Trial Ex. 180.

167.    Brewell received a transfer of 75 Ethereum Classic from McDonnell on May 29, 2017.  *See* Trial Tr. 65:06-66:05; Ex. 91, Tab Withdrawal, Line 22.   The payment was not a refund; Brewell testified that he understood it was for his assistance with the Slack group McDonnell had formed as part of his illegal scheme.  *See* Trial Tr. 65:13-21; *see also* Trial Ex. 84 (June 5 dep.) at 254:17-20.  On January 18, 2018, the date the Complaint was filed, the 75 Ethereum Classic transferred to Brewell amounted to $2,264.25 in value.

168.    Between April 13 to May 28, 2017, Anthony Dimovski transferred United States dollars

and virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading

advice and for the purchase of virtual currency on his behalf.  *E.g.*, Trial Tr. 172:15-22.

Dimovski transferred $1.99 and $47.52 in United States dollars to McDonnell and

CabbageTech.  *See* Trial Ex. 180; *see also* Trial Ex. 125.  Dimovski also transferred

approximately 1 and 0.5 Bitcoin.  Trial Ex. 180; Trial Tr. 161:12-13, 172:15-22; *see also*

Trial Exs. 90-91 at Deposit tab, p. 1, line 31 (BTC), and p. 3, line 70 (BTC); Trial Exs. 159,

160.  On January 18, 2018, the date the Complaint was filed, those bitcoin amounts

respectively were worth $11,474.90 and $5,737.45.  Trial Ex. 180; *see also* Trial Ex. 183

(bitcoin closing price as of January 18, 2018).  In total, Dimovski transferred McDonnell and

Cabbagetech assets valuing $17,261.86.  These transfers were obtained by Defendants as part

of their scheme to defraud.

169.    Between May 27 to June 4, 2017, Christopher Drake transferred virtual currencies to

McDonnell and CabbageTech for the purchase of virtual currency on his behalf.  *See* Trial

Ex. 178.  Drake transferred 219.9872767 and 400.0050585 ethereum classic (ETC), 1 bitcoin

(BTC), and 1,342,634.729 verge (XVG) to McDonnell and CabbageTech.  *See* Trial Ex. 180;

*see also* Trial Ex. 90-91 at Deposit tab, p. 1, lines 10 (XVG), 19 (ETC), 29 (BTC), 35 (ETC);

Trial Ex. 178; Trial Tr. 341:02-342:13, 350:16-351:08, 352:07-353:08.  On January 18, 2018,

the date the Complaint was filed, the ETC amounts respectively were worth $6,641.42 and

$5,737.45, the BTC amount was worth $11,474.90, and the XVG amount was worth

$153,193.28.  Trial Ex. 180; *see also* Trial Exs. 183 (bitcoin closing price as of January 18,

2018), 184 (Ethereum classic closing price as of January 18, 2018), 185 (verge closing price

as of January 18, 2018).  In total, Drake transferred to McDonnell and Cabbagetech assets valued at $183,385.75 as part of Defendants' scheme to defraud.

170.   Bailey Grady transferred virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  Grady transferred $99.00 in United States dollars to McDonnell and CabbageTech on May 24, 2017.  Trial Ex. 180; *see also* Trial Ex. 125.  Grady also transferred 0.4619459 bitcoin to McDonnell and CabbageTech on May 28, 2017.  Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p.1, line 34, 180; Trial Tr. 354:21-355:12.  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth $5,300.78.  Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).  In total, Grady transferred to McDonnell and Cabbagetech assets valued at $5,399.78 as part of Defendants' scheme to defraud.

171.   David Martin transferred virtual currency (litecoin) to McDonnell and CabbageTech for the trading of virtual currency on his behalf.  *See* Trial Ex. 82, 83.  Martin transferred 30 litecoin on May 6, 2017, and another 30 litecoin on May 12, 2017, to McDonnell and CabbageTech.  Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p. 2, lines 56, 60 (LTC); Trial Tr. 353:17-354:03.  On January 18, 2018, the date the Complaint was filed, those litecoin amounts were each worth $5,785.20.  Trial Ex. 180; *see also* Trial Tr. 381:07-382:24; Trial Ex. 181 (litecoin closing price as of January 18, 2018).  In total, Martin transferred to McDonnell and Cabbagetech assets valued at $11,570.40 as part of Defendants' scheme to defraud.

172.   Between February 11, 2015 to November 8, 2016, Charles Mills transferred the following amounts of United States dollars to McDonnell for the purchase of virtual currency on his

40

behalf: $5,000.00, $20,000.00, $3,750.00, $21,000.00, $10,000.00, $2,480.00, $10,000.00, $3,000.00, $4,910.00, $3,500.00, $2,480.00, $5,000.00, $5,000.00, $10,000.00, $10,000.00, $7,500.00, $6,000.00, $3,000.00, $5,000.00, $2,000.00, $3,000.00, $1,000.00, $1,000.00, $4,000.00, $5,000.00, $5,000.00, $2,080.00, and $4,000.00. Trial Ex. 180; *see also* Trial Exs. 171-77, 179-80; Trial Tr. 318:03-329:02.  In total, Mills transferred to McDonnell and Cabbagetech assets valuing $164,700.

173.    Martin Newman transferred United States dollars to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  *See* Trial Exs. 55, 56, 125.  Newman transferred $4,020 on February 3, 2017 and $99.98 on April 19, 2017 in United States dollars to McDonnell and CabbageTech.  Trial Ex. 180; *see also* Trial Exs. 55, 125; Trial Tr. 101:01-102:08, 107:07-24, 108:09-18, 109:03-12.  In total, Martin transferred to McDonnell and Cabbagetech assets valuing $4,119.98 as part of Defendants' scheme to defraud.

174.    Jacob Sappington transferred United States dollars and virtual currency (bitcoin) to McDonnell and CabbageTech for virtual currency trading advice and for the purchase of virtual currency on his behalf.  Sappington transferred $99 in United States dollars to McDonnell and CabbageTech on May 25, 2017. Trial Ex. 180; *see also* Trial Ex. 125. Sappington also transferred 0.45 bitcoin to McDonnell and CabbageTech on May 28, 2017.  Trial Ex. 180; *see also* Trial Exs. 90-91 at Deposit tab, p. 1, line 26 (BTC); Trial Tr. 355:13-356:11.  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth $5,163.70.  Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18, 2018).  In total, Sappington transferred to McDonnell and Cabbagetech assets valued at $5,262.70 as part of Defendants' scheme to defraud.

175.    Jake Stainbrook transferred United States dollars and virtual currency (bitcoin) to
McDonnell and CabbageTech for virtual currency trading advice and for the purchase of
virtual currency on his behalf. Stainbrook transferred $99.98 in United States dollars to
McDonnell and CabbageTech on May 24, 2017. Trial Ex. 180; *see also* Trial Ex. 125.
Stainbrook also transferred 1 bitcoin to McDonnell and CabbageTech on May 28, 2017.
Trial Ex. 180; *see also* Trial Exs. 90, 91 at Deposit tab, p.1, line 23(BTC); Trial Tr. 353:03-
16.  On January 18, 2018, the date the Complaint was filed, that bitcoin amount was worth
$11,474.90.  Trial Ex. 180; *see also* Trial Ex. 183 (bitcoin closing price as of January 18,
2018).  In total, Stainbrook transferred to McDonnell and Cabbagetech assets valued at
$11,574.88 as part of Defendants' scheme to defraud.

176.    Between February 23 and June 8, 2017, Junor Taylor transferred United States dollars to
McDonnell and CabbageTech for virtual currency trading advice and for the purchase and
trading of virtual currency on his behalf.  Taylor transferred the following amounts of United
States dollars to McDonnell and CabbageTech: $4,044.00, $1,327.50, $1,032.50, $1,417.50,
$1,000.00, $4,000.00, $4,000.00, $2,000.00, $3,500.00, and $3,285.00.  Trial Ex. 180; *see
also* Trial Exs. 48, 54; Trial Tr. 213:22-215:16.  In total, Taylor transferred to McDonnell
and Cabbagetech assets valued at $25,606.50 as part of Defendants' scheme to defraud.

177.    Ariel Yabo transferred $1.99 to McDonnell and CabbageTech on April 17, 2017.  Trial
Ex. 180; *see also* Trial Tr. 372:02-11; Trial Ex. 125.  This was part of Defendants' scheme to
defraud.

178.    In sum, these eleven customers in paragraphs 166–177 alone transferred the equivalent of
$457,393.54 to McDonnell and CabbageTech.  *See* Trial Ex. 180.

179.    The Commission's evidence demonstrates beyond a reasonable doubt that McDonnell

was engaged in a widespread and organized fraudulent scheme between January and July

2017.  It establishes a pervasive mode of operation resulting in all funds received by

McDonnell and Cabbagetech over the relevant time period, *see*, *supra*, at ¶¶ 166–171, 173–

177, to be ascribed as part of Defendants' scheme to defraud customers.

180.    The evidence does not establish by a preponderance of the evidence that the many

transfers made by Charles Mills to McDonnell and Cabbagetech—all between February 2015

to November 2016—were part of the same fraudulent scheme.   *See*, *supra,* at ¶ 172.

181.    In total, the customers in paragraphs 166–171 and 173–177 transferred assets valuing

$292,693.54 to McDonnell and Cabbagetech between February and June 2017.  After

factoring in the virtual currency transfer made by the defendant to Brewell, *see*, *supra*, at ¶

167, the total loss attributable to McDonnell's fraudulent scheme is $290,429.29.  This

money was stolen from these customers by McDonnell and not properly returned to them as

part of Defendants' scheme to defraud.

182.    The virtual currency transfers in paragraphs 166–177 were valued as of the date of filing

of the complaint using CoinMarketCap, a widely used website freely available at

coinmarketcap.com that publishes aggregate data from spot exchanges worldwide for more

than a hundred virtual currencies.  CoinMarketCap is used frequently by news publications to

report on prices of virtual currencies, including publications that focus on virtual currencies

such as CoinDesk and general financial newspapers like the Wall Street Journal and the

Financial Times.  *See*, *e.g.*, Dave Michaels, *Ether Shouldn't Be Subject to SEC Regulation*,

Official Says, Wall St. J., June 15, 2018, at B9; *see generally* Giglio Dec. ¶ 15 and Ex.1.

183.    The Commission has requested the appointment of the National Futures Association ("NFA") as monitor in connection with the administration and distribution of restitution in the instant case.  Declaration of Daniel A. Driscoll, Executive Vice President and Chief Operating Officer of NFA, ECF No. 160 at ⁋ 1, July 27, 2018.

184.    NFA is a registered futures association with the CFTC pursuant to Section 17 of the Act, 7 U.S.C. § 21.  *Id.* at ⁋ 3.  NFA is the industry-wide, independent, self-regulatory organization for the United States derivatives industry.  *Id.*  NFA regulates firms and individuals who conduct futures trading business with public customers.  *Id.*  NFA develops rules, programs and services that safeguard market integrity, protect investors and customers, and help its members meet their regulatory responsibilities.  The CFTC has delegated to NFA responsibility for administering the registration of CFTC registrants.  *Id.*

185.    NFA operates at no cost to the taxpayer.  *Id.* at ⁋ 4.  NFA's operations are financed exclusively from membership dues and from assessment fees paid by the users of the futures markets.  *Id.*

186.    In addition to the functions discussed above, since at least the 1990s, the NFA has served as a post-judgment monitor in CFTC enforcement actions.  *Id.* at ⁋ 5.  Specifically, it has been a monitor appointed by federal district court orders in CFTC enforcement litigation, or by CFTC orders in administrative enforcement litigation; NFA processes and administers any post-judgment restitution and disgorgement payments made pursuant to relevant court or administrative orders.  *Id.*

187.    NFA has developed substantial experience and expertise in administering post-judgment restitution and disgorgement programs in connection with the CFTC's anti-fraud enforcement litigation.  *Id.* at ⁋ 6.  In particular, NFA has created and refined a process

44

through which restitution and disgorgement payments are received, accounted for, deposited

into a bank account dedicated to a particular matter, and then disbursed to defrauded

customers or as otherwise appropriate pursuant to the relevant federal district court order or

CFTC administrative order. *Id.*

188.    Since at least 2004, NFA has served as monitor in approximately 345 cases after being

appointed pursuant to a federal district court order or a CFTC administrative order. *Id.* at ¶ 7.

In each of these cases, NFA served a monitor at no cost to the defrauded customers, the

CFTC, or the other parties to the action. *Id.*

189.    Daniel A. Driscoll, Executive Vice President and Chief Operating Officer of NFA,

reaffirmed NFA's willingness to serve as monitor for the administration and distribution of

restitution in the instant case. *Id.* at ¶ 8.  He has reviewed and agreed to the terms of the

CFTC's proposed final judgment. *Id.* at ¶ 9.  He declared that NFA is ready to serve as post-

judgment monitor under the terms of the CFTC's proposed order, adopted in the main by the

court. *Id.* at ¶ 10.

vii.    McDonnell's Control

190.    McDonnell controlled and used several telephone numbers for his illegal business,

including to communicate with customers and to conduct business, as part of the scheme to

defraud.  Trial Exs. 98 (subscriber information for (929) 428-6422), 102 (subscriber

information for (718) 524-6312 and (718) 524- 4718), 122 (subscriber information for (888)

614-6445); *see also*, *e.g.*, Exs. 42 (McDonnell email to customer referencing (718) 524-

4718), 104-113 (Federal Express accounts reflecting use of various phone numbers), 128,

129, 129A (telephone numbers associated with McDonnell's Simple Bank account); Trial Tr.

284:11-287:06 (noting instances of McDonnell's telephone number use).

191.   McDonnell created and used numerous FedEx accounts under a variety of different individual and company names as part of the scheme to defraud.  Trial Exs. 104-113, 115; Trial Tr. 287:03-288:10.

192.   McDonnell logged into his numerous online accounts from various IP addresses associated with his home.  *See*, *e.g.*, Trial Exs. 102 (Charter subscriber information showing IP address 72.227.210.194) and Trial Tr. 286:10-11 (concerning Charter account); Trial Ex. 124 (PayPal activity log reflecting logins from IP addresses 24.168.89.122 and 72.227.210.194) and Trial Tr. 370:15-19 (concerning PayPal logins); Trial Exs. 91, 96 (Bittrex records) and Trial Tr. 130:09-132:16, 136:01-136:18 (noting IP addresses 24.168.89.122 and 72.227.210.194 associated with Bittrex logins).  This was part of Defendants' scheme to defraud.

193.   McDonnell controlled the CabbageTech e-mail accounts and Coin Drop Markets PayPal account as part of the scheme to defraud.  Trial Ex. 72, 84 (June 5 dep.) at 67:19-21, 332:12-17; Trial Tr. 373:13-15.

194.   McDonnell controlled both the Bittrex cdmmerchant account and the Bittrex cryptoclown account. *E.g.*, Trial Exs. 90, 91 (account identity information), 95-96 (account identity information), 89 at 2, 94 at 2 (same telephone number linked to each account); Trial Tr. 311:20-312:08 (same telephone number); 136:02-18 (logins from same IP addresses); 360:16-367:08 (transfers from one account to the other).  This control was exercised in carrying out the scheme to defraud.

195.   McDonnell controlled the TD Bank account in the name of CabbageTech as part of the fraudulent scheme.  *See* Trial Exs. 137-139 (TD Bank account records); *see generally* Trial Tr. 277:11-281:24.

46

viii.     Testimony of Victims

196.    The fraudulent scheme employed by Defendants is described by documents, technical

testimony related to exhibits, and the testimony of four credible defrauded witnesses: Junor

Taylor, Martin Newman, Richard Brewell, and Anthony Dimovski.

a.     Junor Taylor

197.    Junor Taylor, a retired former systems integrator from Canada, testified as to Defendants'

scheme to defraud him.  His losses were over $25,000.

Q  How did you first learn about Coin Drop Markets?

A  Well, I received a call from someone who said that his name was Jason Flack and he
was Coin Drop Markets and they did recommendations for cryptocurrencies and stocks.

Q  And around what time did you first receive that phone call?

A  This was about sometime in January of 2017.

Q  And did you speak with an individual who called himself Jason Flack over the phone
more than once?

A  Yes. From that time until June, quite a few times. A lot of times, actually.

Q  Did you ever call him?

A  Yes, I have called him.

Q  And when you called him, what phone number did you dial?

A  I dialed the number that he sent me in the e-mail, which was a 1-888 number. . . .

Q  Did you ever correspond with him by e-mail?

A  Yes, I did.

Q  When you received e-mails from him, what e-mail address did you receive them at?

A  They are from coindropmarkets@gmail.com. . . .

Q  And about how many times would you say you corresponded with him over e-mail?

A  A lot of times. I e-mail, like, almost every day. So, all the time, yes.

Q  During around what time period were you e-mailing with him?

A  From January of 2017 until June, middle of June [2017] somewhere. . . .

Q  Aside from the 888 number that you mentioned, were there any other phone numbers that were associated with Coin Drop Markets?

A  He sent me another number, but I very rarely got him on that number. So, it was mostly the 1-888 number that we used.

Q  Do you recall what phone number that was?

A  I think it's 718 number. . . .

Q  Mr. Taylor, if you take a look at this e-mail, Exhibit 42, do you see a phone number in this e-mail?

A  Yes. It's 718-524-4718.  [The relevant emails and other documents are set out below where they were introduced with the witnesses' testimony.]

---

6/28/2018                                    Gmail - Coin Drop Markets - Update

                                     Junor Taylor <junort@gmail.com>

## Coin Drop Markets - Update

**Coin Drop Markets** <coindropmarkets@gmail.com> Mon, Mar 13, 2017 at 2:38 PM
To: Junor Taylor <junort@gmail.com>

Hi Junor,

I'm working along side our CTO Pat McDonnell today got a few us in his office educating us on his area of digital. I was discussing $LTC with him and he feels in time it will break $100 USD once the coin lists on CoinBase so we look good. I can be reached easiest today on this line 718-524-4718 he operates on a different telephone system than us. Still working your order of 250 $LTC think it may pull back a bit in the next hour or so.

Regards,

Jason

48

Q And this is the e-mail the individual calling himself Jason Flack told you he could be reached at?

A Yes.

Q This e-mail also references someone named Patrick McDonnell?

A Yes, it does.

Q What was your understanding of who Pat McDonnell was?

A He was the CTO [Chief Technology Office] of the company that Jason represented, Coin Drop Markets. And he was Jason's boss, as far as Jason would say to me. . . .

Q In your conversions with Jason Flack, did he ever offer any services?

A Yes. He called me and he offered me -- to sell me a membership that would allow me then to recommend stocks and cryptocurrencies as a service.

Q And did you ever sign up for any of those services?

A Yes, I did.

Q Which ones?

A I signed up for two services; one was a diamond service, and one was an agritech service. . . .

Q And when you signed up for these services, what did you believe you would receive?

A Well, they were for a year and I was supposed to get recommendations every week. . . . So, my concept was that this was a recommendation service to buy and sell crypto coins and stocks. . . .

Q And after you paid and signed up for the services, did you receive any type of invoice or receipt?

A I got an e-mail stating that they received the payment, how much the payment was, and what the service was proposed to me. . . .

Q With respect to [Exhibit] 44, do you recognize this document?

A Yes. This was a diamond service.

Q And what does this e-mail reflect?

49

A  It tells me that I'm now a member of the service and what the privileges that was listed on the website, when they had the website there, and the cost of $1.99, which was more of a teaser-type service. . . .

Q Could you turn to [Exhibit] 45?  Do you recognize this document?

A Yes. This was for the agritech analyzer and it was more in-depth membership for 249.99.

# Coin Drop Markets -- Membership Receipt/Terms -- Agritech Analyzer™

**Coin Drop Markets** <coindropmarkets@gmail.com>   Tue, Feb 7, 2017 at 7:06 PM
To: Junor Taylor <junort@gmail.com>

February 07, 2017

**RE:** Coin Drop Markets -- Membership Receipt/Terms -- Agritech Analyzer™

*Greetings Mr. Taylor,*

It was a pleasure speaking with you on the telephone this evening, your card was on file and will delete from our system 02-08-17. *As per our conversation*, we have established your **Agritech Analyzer™** 12 month membership for agreed upon terms listed below.

*Your 'Membership' Terms go as follows;*

**Member:** Junor Taylor
**Member ID:** CDM4004
**Member Address:** 95 Allan Drive St. Catherine, Ontario L2N1G1
**Member Email:** junort@gmail.com
**Member Phone:** +1.416.907.3836

**Membership Dues:** $249.99 [1X Annual Fee]
**Membership Rewards:** 250 $CAB [Delivery 24 hours]
**Membership Term:** [12 Months] *02/07/17-02/07/18*
*Your credit/debit card ending in **XXXXXXXXXXX9459** statement should reflect a charge from: **CabbageTech, Corp.***

*Our next agritech report is hitting the press shortly, if you have any questions upon receipt please contact me. I look forward to servicing you as a Coin Drop Markets member!*

**Jason Flack/Research Specialist**
Coin Drop Markets
**Toll Free:** +1.888.614.6445
M-Sat 8am-8pm, Sun 12pm-3pm EST

*Sincerest Regards,*

Jason Flack

Q This is a receipt for signing up?

A Yes, it is.

Q Let me draw your attention down to the middle of the page. There's a reference to "membership rewards."

A Yes.

Q What was membership rewards?

A It was 250 off their Cabbage dollar, which was supposed to be their own crypto token. So, it's a form of, like, Bitcoin, only it was just a small fraction.

Q Was that a reward for signing up for this subscription?

A That was a reward for signing up for the subscription. . . .

Q Now, what made you want to sign up for these services from Coin Drop and Jason Flack?

A Well, he called me and he told me he offered these services. When I signed up with the $1.99, he actually sent me recommendations for two stocks and they did very well. And then afterwards, he called me up and said I can get more of an in-depth membership for the 249 and that would also be cryptocurrency. And with a cryptocurrency, they could offer -- I'm trying to find the word here. Anyway, they could keep the currency for me and trade it for that service.

Q So, aside from signing up for subscriptions, are you saying they offered another service in which they would buy cryptocurrency for you?

A That's correct.

Q Did you receive solicitations for Coin Drop Markets to buy virtual currency for you?

A Yes. The first was they offered me Bitcoins at $1,011, I think it was, and I said, Okay, yeah, I'll buy four of them.

Q And how did you receive those solicitations?

A He called me by phone. And after I said I will buy four, he sent me an e-mail with somewhat of an invoice, stating what the transaction was, how much it would cost, and what I would need to send him. . . .

Q Do you recognize this document [Exhibit 43]?

A Yes.

51

Q What is it?

A This one was offering to sell me Bitcoins at $1,000 because he said that there was someone in his -- one of his clients wanted to sell some of their Bitcoins, so he could get me them at $1,000. . . .

---

**Coin Drop Markets - Bitcoin Market**

**Coin Drop Markets** <coindropmarkets@gmail.com>                   Thu, Feb 23, 2017 at 10:10 AM
To: Junor Taylor <junort@gmail.com>

February 23, 2017
**RE:** Bitcoin Market

*Greetings Members,*

Our cryptocurrency division headed by Pat McDonnell/CTO has discounted Bitcoin below current market price for exchange. There is currently 9,400 $BTC available for $1,000.00 USD per coin to provide low entry to those looking to profit. We are also accepting $ETH, $LTC in exchange for $BTC outside of USD to build our inventory in these positions as well.

If you would like to take advantage of this price offer, please give us a call at +1.888.614.6445 by day end.

*Sincerest Regards,*

Jason Flack

Q About how many times did you end up buying virtual currencies from Jason Flack and Coin Drop?

A  Ten.

Q And what types of virtual currencies did you buy?

A Bitcoin, Botcoin, Ethereum, Litecoin, and Ethereum Lite.  And, also, Tigr ICO.

Q And during what time period was it that you were making these virtual currency purchases?

A Between February and June of 2017. . . .

Q When you were buying virtual currencies, how did you go about making your purchase?

A I would buy a money order from the bank. And first few times, what he did was he send me a Federal Express package that had his self-addressed FedEx envelope, and I would put the money order into the envelopes and drop it at the Federal Express office.

Q You mentioned you got cashier's checks from the bank. What bank was that?

A The Bank of Nova Scotia.

Q And when you sent the Federal Express back to Jason Flack, were you using an account number he provided?

A Yes. He always provided, give me an account number.

Q And you mentioned you would receive an invoice for your purchases; is that right?

A Yes.

Q When you received the invoice, how did you receive it?

A By e-mail.

Q And what would the invoice reflect?

A It would state the number of coins that it was buying, how much it would cost, when is the closing, the settlement date, send -- yeah, how I need to send it back, send him money. . . .

Q What is [Exhibit 47]?

A This is an invoice for Bitcoin tokens at $1,011 each for $4,044.

*Greetings Mr. Taylor,*

Below is a receipt for your recent P2P off-exchange purchase of (4) **Bitcoin** [Ticker Symbol: $BTC]

**Order Details:**

**Member:** Junor Taylor
**Member ID:** CDM4004
**Member Address:** 95 Allan Drive St. Catherine, Ontario L2N1G1 [Canada]
**Member Email:** junort@gmail.com
**Member Phone:** +1.416.907.3836

**Digital Token:** Bitcoin
**Trade Size:** 4
**Price Lock:** $1,011.00 USD
**Total Amount Due:** $4,044.00 USD

**Settlement Date:** 02/23/17
**Delivery Date:** Settled Funds [CDM Escrow]
* Please make your check payable to: **CabbageTech, Corp.**

FedEx International First Overnight air package sent w/return envelope on 02-18-17.
**Tracking #** 8103 5420 1091

(If possible please print out a copy of this receipt placing it in return FedEx package)

If you have any concerns or questions, please give me a call or shoot me an email.

*Sincerest Regards,*

Jason Flack

Q And after you purchased the virtual currency, how did you receive it?

A I didn't receive the tokens like as it said here, settlement funds and CDM escrow, because they would -- as part of the service that they offered was to keep the coins in escrow and they trade because they have other clients that they offer the service to, and, so, because they're buying in bulk and trading in bulk, they could get better prices for them.

Q Just to make sure I understand, you understood that they were going to be holding it in escrow, but trading it for you; is that right?

A Yes.

Q In total, how many money orders did you send to Jason Flack?

A Ten. . . .

Q And in total, what was the total -- around the total amount of the 10 checks?

A Somewhere around $25,000. . . .

Q Mr. Taylor, you said when you sent the money orders you sent them by Fed Ex; is that right?

A That's correct.

Q And you sent them using a Fed Ex account number Jason Flack provided?

A That's correct. . . .

Q Where did you send the Fed Exes to?

A They are to 20 Rawson Place, . . . Staten Island. . . .

Q After you signed up for the services from Jason Flack and Coin Drop Markets, did you receive recommendations for virtual currency purchases?

A Yes, I did.

Q And how did you receive those recommendations?

A By e-mail . . . .

Q Could you turn to [Exhibit] 46. Do you recognize this document?

A Yes, I do. It was a sell alert for Ethereum coin.

**Coin Drop Markets - Ethereum [BLOCKCHAIN: ETH] - "SELL ALERT" EXIT POINT $53.11 - ROI 300%+**

**Coin Drop Markets** <coindropmarkets@gmail.com>                    Fri, Mar 24, 2017 at 8:02 PM
To: Junor Taylor <junort@gmail.com>

*We are exiting Ethereum BLOCKCHAIN Ticker Symbol: ETH for the following reasons;*
**Projected ROI realized**
Ethereum [BLOCKCHAIN: ETH] - "SELL ALERT" EXIT POINT $53.11 - ROI 300%+
http://coinmarketcap.com/currencies/ethereum/



Ethereum [BLOCKCHAIN-ETH] BUY ALERT [Initiated Coverage Report] ENTRY POINT - $12.77.png
544K

Q At the time you received this alert, had you already purchased Ethereum from Coin Drop Markets?

A Yes, I purchased from them. But with this alert -- because when I got this alert and he says, okay, you have this stuff in escrow, but we're selling it. And he said well, this is for the people who they don't have an escrow for. For the stuff in escrow, he's managing it for me.

Q Could you turn to the second page of Exhibit 46. What is this document?

A This is their recommendation for the Ethereum currency and it gives a breakdown of -- well, they have a graph, a breakdown of the entry point and what target they're looking at and then an analysis of why they think it would get to that price.



Q And after receiving this type of analysis, what was your impression?

A I thought it was good. I thought they were professional and they seemed to know what they were doing, so. . . .

COURT: What does it mean when it says we are exiting Ethereum, BLOCKCHAIN in caps, symbol ETH, for the following reasons, and then in black letter it says projected RO1 realized . . . ?

WITNESS: .So the initial purchase that they recommended I think was for $12 and something, and they had a goal of getting to $50. So the stock was -- the crypto was -- went over -- I think at $53 at the time.

COURT: Was in that the 300 percent increase?

WITNESS: That's correct. . . .

COURT:  So your impression was that they were selling your investment in this security or . . .  commodity?

WITNESS: Because they had that investment for me in escrow.

COURT: Well, did you receive that profit?

WITNESS: No.

COURT: What happened to the profit?

WITNESS: I didn't receive anything from them.

COURT: Did you ask for it?

WITNESS: Yes, I did.

COURT: You asked for the 300 percent.

WITNESS: Not at that moment. I asked for it; they said -- well, they said they had sold -- they sold Ethereum and he bought the Litecoin because he was trading it in this account, so he sold Ethereum and bought Litecoin at the time. . . .

COURT: Did you have any other [virtual currencies]?

WITNESS: I had Bitcoin. . . .

COURT:  You had more [virtual currency]?

WITNESS:  Yes

COURT: That he didn't sell?

WITNESS: Right, he didn't sell.

COURT: How much more?

WITNESS: I would have to look at it. I don't remember how much it was at the time, because at this time both Bitcoin and Ethereum had appreciated, so this was like a couple months after I had initially bought them and he was managing the account, so all I looked at was what they sent  me, a daily report -- I mean, a daily report saying that your investment is at this level. I didn't print off the stuff  every day, I just looked at it.

COURT: But you gave him permission to manage the account, did you?

WITNESS: Yes. . . . Because that was one of the services    that they offered, to keep the account, the coins in escrow,  and to trade them because that would give a better return than just putting the coins in an account and just let it appreciate.

Q And, Mr. Taylor, after you made your virtual currency purchases and Flack was holding them in escrow, was there a way for you to know what was being held in escrow?

A Yes, they sent me -- they sent me an update, an account update every week day. Every morning on each week day they would send me an e-mail with an account update, how much was in the account, and also a link to their web pages that had my account summary in it.

Q Was it important to you to know what your account balance was?

A Yes, it was, because if the thing wasn't appreciating, then, you know, I don't know if it's going up or down so you can tell him to get rid of it and get your money out of it, right.

Q Can you turn to [Exhibit] 49. Do you recognize this document?

A  Yes

Q  What is it?

A It was one of the daily e-mail reports.

---

**Coin Drop Markets - DIGITAL CURRENCY MULTI-WALLET AS OF JUNE 20, 2017 - $176,703.34 USD**

**Coin Drop Markets** <coindropmarkets@gmail.com>
To: Junor Taylor <junort@gmail.com>                                    Tue, Jun 20, 2017 at 8:12 AM

**DIGITAL CURRENCY MULTI-WALLET AS OF JUNE 20, 2017 -** $176,703.34 USD
**ACCESS:** https://www.coindropmarkets.com/dffg1rtp9mnj5fcc1e4f
**PASSWORD:** 1BQLNJtMDKmJuNO

---

Q Now, at the top of the page it states digital currency multi-wallet as of June 20, 2017, and there is a figure there of about $176,000. . . . What did this reflect?

A That reflects the current value of all the coins that he had in escrow for me.

Q And is $176,000 more than you originally sent him to purchase the coins?

A Yes.

Q Is it significantly more?

A It is significantly more.

Q Now, you mentioned that you could click on the link and it would take you to a website; is that right?

A Yes.

Q What website was that?

A That would be Coin Drop Markets website, which had a -- which took me right into my account on their website. That was their member -- they have -- just a regular site and their membership section, and that took me into the member's section with my account.

Q And once you had logged into the website and were looking at your account, what could you see?

A I could see the summary of all the transactions that was done, how much it's worth, and how many coins I had and what coins I had.

Q And about how many times would you say did you log into the website to look at your account?

A Two or three times a week . . . [d]uring the course of February to June . . . 2017.  . . .

Q Would you turn to [Exhibit] 50. Do you recognize this document?

A Yes, I do.

Q What is it?

A This is the -- my account summary of my membership page that I would go to to see what I had and the value of it.



**Coin Drop Markets**
*'A Division of CabbageTech, Corp.'*

CAB   CDM OPEN TRADES   SERVICES   CONTACT

Member Login

 Coin Drop Markets d/b/a CDM

CabbageTech, Corp. Escrow Services    073
20 Rawson Place Suite B
Staten Island, New York 10314
+1.718.524.4718

CabbageTech, Corp.
**Member ID:** CDM4004
**Reporting Period**
FEB 18 - JUN-13-17
**Research Specialist**
Jason Flack
**Toll Free:** +1.888.614.6445

**TIGR TOKENS S**

DIGITAL CURRENCY MULTI-WALLET AS OF JUN 13, 2017 - $109,289.58 USD

Unique Identifier: 7BQLNJtMDKmJuNO

## CDM4004 - Junor Taylor & Junie Boswell Relationship Summary:

**Address:** 95 Allan Drive St. Catherine, Ontario L2N1G1 **Country:** Canada **Email:** Junort@gmail.com **Tel:** +1.416.907.3836    *Security Pin: 2017

### MEMBER INTERESTS

LTC (3,265.85709834 LTC)

ETC (451.61290300 ETC)

TIGR (1,500.00000000 TIGR)

### MULTI-WALLET (ESTIMATED COMBINED VALUE)
$109,289.58 USD as of Jun-13-17 8:55AM EST

### ESCROW CHARGE SUMMARY
(Waived Indefinitely)

### MEMBER ACTIVITY
02-18-17 - (B)    4.00 BTC @ $1,011.00 USD
02-27-17 - (B)   90.00 ETH @ $14.75 USD
03-13-17 - (B)  250.00 LTC @ $4.13 USD
03-17-17 - (B)  350.00 LTC @ $4.05 USD
03-26-17 - (B)  61,728.39 POT @ $0.016200 USD
04-17-17 - (B) 189.753321 LTC @ $10.54 USD
04-22-17 - (B) 178.890876 LTC @ $11.18 USD
05-03-17 - (B) 219.659528 LTC @ $18.21 USD
05-09-17 - (B) 67.2494956 LTC @ $29.74 USD
05-20-17 - (B) 322.58064500 ETC @ $7.75 USD
05-23-17 - (B) 129.03225800 ETC @ $7.75 USD
06-08-17 - (B) 1,500.00000000 TIGR @ $2.19 USD

### MEMBER DEPOSITS
02-23-17 - Int'l Bank Draft Deposit - $4,044.00 USD
03-02-17 - Int'l Bank Draft Deposit - $1,327.50 USD
03-15-17 - Int'l Bank Draft Deposit - $1,032.50 USD
03-21-17 - Int'l Bank Draft Deposit - $1,417.50 USD
03-28-17 - Int'l Bank Draft Deposit - $1,000.00 USD
04-26-17 - Int'l Bank Draft Deposit - $4,000.00 USD
05-09-17 - Int'l Bank Draft Deposit - $4,000.00 USD
05-18-17 - Int'l Bank Draft Deposit - $2,000.00 USD
05-24-17 - Int'l Bank Draft Deposit - $3,500.00 USD
06-08-17 - Int'l Bank Draft Deposit - $3,285.00 USD

### MEMBER WITHDRAWALS
N/A

### MEMBERSHIPS
Diamond Annual    **Term:** 01/25/17 - 01/25/18

## BITCOIN XBT TRADE GROUP MEMBERSHIP ENROLLMENT
BITCOIN XBT TRADE GROUP OFFERS 6 COMMUNITY MEMBERSHIPS...

**P2P OFF-EXCHANGE TRADING WINDOW - BUY/SELL BTC/LTC**
**BUY EXAMPLE:** ENTER BUY/1 BTC/$1,200.00 USD - **SELL EXAMPLE:** SELL/1 BTC/$1,999.99 USD

| MEMBER EMAIL | | BUY/SIZE/BTC EXCHANGE RATE |
| --- | --- | --- |
| | | BUY BTC |
| MEMBER EMAIL | | SELL/SIZE/BTC EXCHANGE RATE |
| | | SELL BTC |
| MEMBER EMAIL | | BUY/SIZE/LTC EXCHANGE RATE |
| | | BUY LTC |
| MEMBER EMAIL | | SELL/SIZE/LTC EXCHANGE RATE |
| | | SELL LTC |

**TRADE SETTLEMENT**
All P2P Off-Exchange trades are offered on a 'best-efforts' basis. CDM acts as escrow ensuring honest and timely digital currency exchange. Settlement of trades vary depending on agreed upon terms of both buyer and seller.

Typical settlement is 3-5 business days unless parties execute an instant payment agreement. (T+3 Settlement)

| Name | Message | CDM Initiated Coverage Reports |
| --- | --- | --- |
| Email | | BTC - 2/17/17 Target Price: $10.5K USD |
| | | ETH - 2/20/27 Target Price: $50.00 USD |
| Subject | | Report Passwords: BTC & ETH (Case Sensitive) |

Contact Jason Flack

Q And is this a screen shot of what you saw on the website when you logged in?

A Yes [from June 2017]. . . .

Q Now, drawing your attention to the left-hand side of the document, there is a section that says member interest and there are some entries below it. What did the member interest represent?

A This is the amount of coins that I had. At that time I had Litecoin, I had Ethereum Classic, and I had some of that IDCO, TIGR that they were offering.

Q If you go a little bit farther down on the left side, it says multi-wallet estimated combined value. What does the figure below that represent?

A That's the combined value of all of the above coins.

Q And below that it says escrow charge summary waived indefinitely. What does that reflect?

A They waive the escrow charges because they're doing their -- their charges from the trading. . . .

Q A little bit farther on the left-hand side, there is a section that says member deposits and there are some entries below it. What does the member deposits represent?

A Those are all of the money orders that I sent to purchase  for the purchases.

Q And do those 10 entries match the cashier's checks that you sent to 20 Rawson Place?

A That's correct.

Q Above that section there is a section that says member activity. What did the member activity represent?

A Those are all the Bitcoins -- I should say all of the coins that I bought and also that he sold on my behalf.

Q And when you were able to log into the Coin Drop Markets website and see this information about your account, what impression did you get?

A Well, I thought it was good, that they were doing good, they were managing fairly well. I, you know -- it gave me all the summary of all the stuff that was going on and I could see all the activity that was taking place in the account, so I thought they were doing sufficient on my behalf. . . .

Q What was your understanding about your ability to withdraw funds from your Coin Drop Markets account?

A Well, he said that I could withdraw at any time and he cancelled – he [Jason Flack] assured me that everything was safe and I kept trying to tell him that I want it. . . .

Q And when he made those assurances, was that over the telephone?

A Yes.

Q Was there a time when you actually tried to withdraw funds from your account?

A Yes, around mid-June I told him I wanted to withdraw 25,000.

Q And what happened?

A He said that he would do it and a day later he said that he had liquidated $30,000 and he had prepared a check and he had put it in a Fed Ex envelope and put it on his secretary's desk for her to send out.

Q Did you ever receive that Fed Ex envelope?

A No, I did not.

Q Did you follow up with him?

A Yes, I followed up with him and then he gave me – he said that well, his secretary forgot to send it out, and then he said it would be out the next day. The next day nothing happened and I talked to him again, and then he said that Patrick McDonnell had put a hold on some on some of the stuff, but he was working on getting it released. And then he said well, he had gotten it released and it was supposed to be going out, but nothing happened, nothing came. And this went on for a few days and then he said what he would do is that he would put it in Bitcoin into a Coin Base account.

Q And did you have an account at Coin Base?

A So I opened an account at Coin Base. Then he said he tried to put it into the account, but Coin Base came back and said they need to have the know-your-customer system set up. So then I went onto Coin Base, used my passport and all that to create the know-your-customer information set up in Coin Base, and then I sent him back that information, and then a day later he came back and says, well, Coin Base said that CDM needs to set up their own know-your-customer. And then I just said well, I mean, you're not coming -- you are not being forthcoming with my money. So we went back and forth and back and forth and then that was it. He didn't send me any money.

COURT: Excuse me. What did you want the $30,000 for?

63

WITNESS: Well, that was to take out my initial investment, out. When I went into it, I told him I had – I had a piece of property in Jamaica that I was closing on that I was using the money for, so the time came up for that and I needed to do that.

COURT: Well, how long between the time you first asked for it and the time, as I understood you, you gave up?

WITNESS: First I asked for it, so somewhere about -- I think about the 12th, 13th of June and all the stuff went on until about the 23rd of June, and somewhere about there they shut down their website.

COURT: From the 13th of June to the 23rd of June?

WITNESS: Yes.

COURT: How many times did you ask for this?

WITNESS: It was daily. We had e-mail going back and forth for like all day sometimes.

COURT: So how did you close your Jamaica purchase?

WITNESS: I had to come up with the money some other way.

COURT: How did you come up with it?

WITNESS: Well, I had to sell some other stuff that I have.

COURT: What kind of stuff?

WITNESS: Stocks and some other . . . regular securities.

COURT: How much did you have in the Stock Exchange at that time?

WITNESS: Maybe 90,000.

COURT: And did you have any more virtual money?

WITNESS: No. The only virtual stuff -- when I started, when we started with Jason, I told him I didn't know anything about these virtual currency, but he was on the phone with me sometimes like for an hour trying to explain how it worked, what it was, and why it would appreciate. So that was my first and only foray into virtual currencies.

COURT: So you never got the 30,000?

WITNESS: Never got anything.

64

COURT: How much did you calculate he owed you at the end of your relationship?

WITNESS: Well, at the end of the relationship, by the summary that they had, the investment was worth over $170,000.

COURT: On their reports to you?

WITNESS: Yes, but my initial investment was in the order of 25,000.

COURT: So you invested 25,000 and he told you that he had worked it up to 170,000?

WITNESS: Yes.

COURT: So you lost $170,000 in your mind?

WITNESS: Pretty much, yes.

COURT: Well, why didn't you go to some authority?

WITNESS: Well, that's when I sent off an e-mail to these folks.

COURT: To the Commission?

WITNESS: Yes. . . .

COURT: Have you turned over to the Commission all your papers, documents and records?

WITNESS: Yes, I have. . . .

Q Could you turn to [Exhibit] 51?  [Exhibit] 51 has two communications that are separated by a pink sheet. Taking the first nine pages, which is before the pink sheet, do you recognize this document?

A Yes, I do.

Q What is it?

A This is the e-mail that we had going back and forth when I was trying to get the money. . . .

From: **Coin Drop Markets** <coindropmarkets@gmail.com>
Date: Tue, Jun 20, 2017 at 8:50 AM
Subject: Re: CDM Update
To: Junor Taylor <junort@gmail.com>

Also Junor, Told you I would send you $25K in $BTC personally until rectified so I'm confused as to why you would secure a loan on your home? I'm really trying to work with you because I feel this is all my fault getting you involved in crypto etc. CDM will process your withdrawal they are not thieves Pat stopped anything and everything with no regard to anyone CDM included. Jason

On Tue, Jun 20, 2017 at 8:42 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

Hey Junor,
I just read this I will pass it on as asked but I think your jumping the gun CDM system has corrected today. I totally understand your concerns the last few days seemed dark so I cannot argue with you Junor. Pat was asked to resign yesterday and a new technician has been hired to handle site, etc. I have a full transfer in to your coinbase account and will stay on top today to get wallet closed out. Anyhow, Junor you have the right to do or post whatever you choose I'm on your side yet I believe in may create legal issues because outside of Pat CDM is a legitimate outfit that is also a product of his recent stunts. The company itself has honestly done everything possible to rectify the whole ordeal and I believe in a pretty reasonable time frame with all that needed fixing. I will get this rectified as promised the last few days have been constructive so we may see withdrawal processed today know they are doing a full blown audit of all coins since early morning. CDM Junor is not the cause of these issues we are incurred it was Pat 100% the co. is really good folks.

Regards,

Jason

On Tue, Jun 20, 2017 at 7:16 AM, Junor Taylor <junort@gmail.com> wrote:

I did nor sleep well last night. Despite your assurances, I think CDM is screwing me and my money is gone and I just needed $25000 from my account to deal with my Jamaican issue. I am going to the bank today to get a line of credit secured by our house to resolve my issue.
I can't figure out why a big crypto coin guru company like CDM would do that to a poor retiree. And then I think they may have done it to others. I decided that once I get back from the bank that I am going to spend all my time finding some answers. I know you said they will push back, but if I think my money is gone what do I have to lose. So here is

. . .

66

On Mon, Jun 19, 2017 at 5:24 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

Please tell Junie I'm on the case and on your side.

On Mon, Jun 19, 2017 at 5:22 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

Hey Junor,
Sorry for delay in message totally understandable. I'm only calm because I dealt with my emotions last week. We have a horrible storm here today tornado watch in NYC amazing. It seems to be ironing out I'll keep you updated will be working at things all night. I'm going to email you better contact info. for me just in case I get locked out of here. I'm amazed they have not changed this emails password after I was dismissed yet not complaining.

Jason

On Mon, Jun 19, 2017 at 11:59 AM, Junor Taylor <junort@gmail.com> wrote:

Thank you for being calm. I am running out of time and my wife is not a patient person.
Here are the wallet addresses:
BTC Wallet 168pMmLCixKXZ6tugsaaSWPdFEBFmjC2mj
LTC Wallet  LX1CyvShL6NmMD16vHpzQFkj392iWDvL1c

On Mon, Jun 19, 2017 at 11:48 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

I'm calm and gathered my composure working on solutions vs anger.

On Mon, Jun 19, 2017 at 11:48 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

I need your $BTC & $LTC receiving addresses gonna sell $ETC for more $LTC. The $BTC will be your Jamaica monies and I think we should continue to buy/hold $LTC it broke $50 today going $100 like $ETH+++. We cannot allow this to distract our true focus.

On Mon, Jun 19, 2017 at 11:46 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

Pat did not want to reveal he was hacked paid the ransom quietly behind my ex bosses back. I found this out from a close co-worker of his who feels shafted by the guy as well.

On Mon, Jun 19, 2017 at 11:45 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

I'm thinking it already happened we just have not seem the site updated because they had to pay hackers $BTC to release files which they did. There is a wave of ransomware attacks globally if you google and his lack of knowledge got CDM site caught up in that web. Everyone from Major corps to Police Dept's. have been infected with this malware top US Gov't. agencies advise paying the ransom fee because it's anonymous encryption that cannot be reversed.

. . .

On Fri, Jun 16, 2017 at 8:47 AM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

> Morning Junor,
> Hey I am very sorry about the delay in your withdrawal it was beyond my
> control. About 2 days ago I noticed that our website was frozen with no multi-
> wallet updates. I asked Pat over a dozen times what is going on and he kept
> saying the techs are on it. Come to find out yesterday that the site has been
> hacked no money lost just info. that has no use to anyone. But I was told for
> two days while I relayed it to members that exchange launch was happening
> with TIGR. Well that was true until Pat's team failed to do a standard
> malware check prior to uploading and exposing our system to many
> vulnerabilities. In the process of uploading they infected our site with crypto-
> lock ransomware that encrypted all our company files throughout our systems
> entire network which costs money. Now I understand that these things happen
> yet Pat continued on trading 'HIS' clients with no further explanation like all
> was good while me personally was in limbo. I sat in the Staten Island office
> for hours calling Pat in NYC to no avail and started messaging him on twitter
> because he was posting all day while avoiding me. Finally after reading his
> twitter posts I got fed up because they were so insignificant and with him
> having the time to post vs take an employees call during an emergency was
> insulting. I got myself into NYC to see him and basically all hell broke lose

Q And there are several communications going back and forth in this e-mail chain. Did you ever get any money back from Coin Drop Markets?

A No.

Q And did you ever get any virtual currency back?

A No. . . .

Q Mr. Taylor, could you turn your attention to Exhibit 52? Do you recognize this document?

A Yes, I do.

Q And what is it?

A This is an e-mail from Jason saying that the website was attacked and there they are suspending their membership services until it's resolved.

## Coin Drop Markets - Website Under Repair

Coin Drop Markets <coindropmarkets@gmail.com>                    Thu, Jun 22, 2017 at 9:34 AM
To: Junor Taylor <junort@gmail.com>

June 22, 2017
RE: Website Under Repair

Attention CDM Members:

Our website has been attacked by an unknown hacker(s) and most files have been deleted or infected. CDM is
suspending all membership services as of 9:30AM EST. until further notice. Our team is steadily working on a solution
while researching vulnerabilities to avoid future online breaches.

CDM will keep all members updated regularly until things resolve.

Sincerely,

CDM Management Team

Q And did you ever hear anything further from Jason Flack after this?

A I guess I had correspondence with him just saying, well, he's trying to -- he's trying to get me the money, but – and he came up with saying, okay, well, I mean their website was attacked and -- but that was it.

Q And after the time you received this e-mail, which was around June 22nd, 2017, were you able to log into the Coin Drop's website?

A No.

COURT: Why don't we focus for a moment on this interesting document? . . . It says: Our website has been attacked by an unknown hacker(s) and most files have been deleted or infected.  What did you think that meant?

WITNESS: That meant that at that time, I guess, some sites were being attacked and being held for ransom payment, that someone was encrypting people's files and computers and they had to pay money to get -- in order to get back their system.

COURT: And then it goes on to say that CDM [Coin Drop Markets] . . . is suspending all membership services as of 9:30 a.m. Eastern . . .  until further notice. What did that mean?

WITNESS: Well, I talked to him about that and he said, well, they are working on getting back the site up. So once it's up, they'll notify me, but nothing ever came of that. I never got any correspondence from -- from them.

COURT: And then it says: Until further notice they are suspending. Our team . . . is steadily working on a solution while researching vulnerabilities to avoid future online breaches. What did that mean to you?

69

WITNESS: Well, it means they were working on shoring up their system and getting it back online.

COURT: And CDM will keep all members updated regularly until things resolve.

WITNESS: Right.

COURT: What did that mean?

WITNESS: They never kept me updated.

COURT: Did they ever update?

WITNESS: No. They ceased all communications.

COURT: Did you ever get a further communication from CDM?

WITNESS: No.

COURT: Did you try to contact CDM?

WITNESS: I tried calling, but no answer. . . .

COURT: And then it said: [Sincerely] CDM management team. Is that an actual or a virtual team?

WITNESS: I think it's a virtual team. It must be a team of one.

COURT: Is this when you started reaching out to prosecuting elements of the federal government?

WITNESS: Yes.

Q Mr. Taylor, did you ever meet Jason Flack in person?

A No.

Q Did you ever meet Patrick McDonnell in person?

A No.

COMMISSION: Your Honor, at this time we would like to play an audio deposition excerpt for voice identification purposes. . . . *This is the deposition of the defendant, [Patrick McDonnell], Your Honor. . . . We are playing the video testimony from page 33, line 3 through line 21. (Video played.) . . .*

Q *Mr. Taylor, did you recognize the voice*?

A *Yes*.

Q *How did you recognize it?*

A *That's the person who called me and says he's Jason Flack*.

Trial Tr. 202–242 (emphasis added).

b.   Martin Newman

198.     Martin Newman, a 76-year-old pharmacist from Michigan, testified with respect to

Defendants' scheme to defraud him that resulted in a loss to himself of over $4,000.

Q Did there come a time that you invested with a company called Coin Drop Markets?

A Yes, there is.

Q How did that investment come to pass?

A It came at a period of time where the investment in coins like Bitcoin was very, very popular and in a very positive mode of upward gains in investing. I got a cold-call, or a phone call to listen to an investment, which I did go into.  It wasn't a large investment, but it was awfully interesting because the stock market was very active and I thought, well, this was even better. . . .

Q Mr. Newman, do you have a [Exhibit 56, a Fed Ex] mailing label in front of you? . . .

A Okay, yes, I do.

Q And do you recognize this document?

A Yes, I do.

Q What is it?

A It is a Fed Ex package, U.S. Airmail.

71

Q And who is it from?

A It's from the CabbageTech Corporation.

Q And did you receive this label in any way?

A It came through a Fed Ex airbill mail.

Q And who did you understand sent it to you?

A Jason Flack. . . .

Q Is that the name of the person you spoke to on the telephone?

A Yes.

Q What did you understand Jason Flack's role at Coin Drop Markets was?

A That he was an expert with coins.

Q And he talked to you about investing in virtual currency?

A He did, yes.

Q Is the Fed Ex label that you have there, do you see the "to" line BTCXBT Development D-E-P-T, did I read that right?

A Yes.

Q And the number is (718) 524-4718, did I read that right?

A Yes.

Q The company is listed at CabbageTech Corp, did I read that right?

A CabbageTech.Corp.

Q And it is at 20 Rawson Place, Unit B, did I read that right?

A Yes.

Q In Staten Island, New York City 10314-4712, did I read that right?

A Yes.

Q Up in the "from" section it is from a sender's name, Mr. Martin Newman. Do you see that?

A Yes.

Q Is that you?

A That's me. . . .

Q Mr. Newman, how many times did you speak with the person who you understood to be Jason Flack?

A Many, many times.

Q What was the area code of the number that you spoke with him on? . . .

A I'd have to pull it, it's in the paper and it was a long distance. I mean, there was no charge for the call. It was on a...

Q Are you referring to a toll free number?

A Yes, a toll free number.

Q And where did you learn the toll free number to call Mr. Flack?

A They gave it to me. And when I had received faxes from him, it was on the fax.

Q So in addition to telephone calls, you received faxes from the person you understood to be Jason Flack?

A Correct. Yes.

Q And that related to Coin Drop Markets?

A Yes.

Q And Coin Drop Markets, your understanding is that they sent you this mailing label?

A Yes.

Q And this was the mailing label that you used to send a check for your investment in Coin Drop Markets?

A Yes. . . .

Q And do you have a document in front of you that's a set of check images[, Exhibit 55]?

A Yes. . . .

Q Focusing only on the bottom left-hand corner of this document, do you see there is an image of the front of the check?



A Yes.

Q And the name Martin Newman and Annette Newman, those names are on the check?

A Yes, sir.

Q Is that your name?

A Martin Newman, yes.

Q And is Annette Newman the name of your late wife?

A Yes.

Q And that's your address underneath it?

A Yes, it is.

Q And it is paid to the order of CabbageTech Corp; is that right?

A Yes.

Q Whose handwriting is on this check?

A Martin Newman, myself.

Q Is that your handwriting?

A Yes.

Q And how much is this check for?

A $4,020 and no coin.

Q And you sent this check using this mailing label, Exhibit 56, to CabbageTech, Corp. for purposes of investing in Coin Drop Markets?

A Yes.

Q And that was in response to the solicitations from a person named Jason Flack?

A Yes.

Q Is this check image here on this piece of paper a fair and accurate representation of the front of the check you sent?

A Yes, it is. . . .

Q Mr. Newman, did you ever speak with Mr. Flack, the person you understood to be Mr. Flack, using a telephone number that was not the toll free number?

A Yes.

Q Do you remember the area code or region of the country of that number?

A I can only think that it was from the Brooklyn area of New York. . . .

Q Mr. Newman, did you have any understanding of the success of your investment with Coin Drop Markets?

A I had very little investing going on, but it was one or two, and I believe they were both profitable.

Q You understood from what Jason Flack told you that they were both profitable?

A Yes.

Q Did you ever ask for your money back from Coin Drop Markets?

A Yes. Yes, I did.

Q And what happened when you asked for your money back?

A I requested it and what happened was I never got it. The, the, I got a note that there was a problem but they were working on it. And then I got a couple more calls back. They said I would have my funds back within five to seven days and they had put in a, a lower amount of money that I would have had coming. The amount they put in was, I believe, like $4,880 and I knew it would -- had to be in to the $5,500 or even more, but it wasn't a large amount of money.

Q Did you ever call them to ask for your money back?

A Yes.

Q How many times, do you think?

A Countless number of times.

Q Did you ever send any e-mails asking for your money back?

A Several.

Q  We are looking at Exhibit 76. At the top it says: Send June 29th, 2017 from Marty Newman e-mail address RockyRose1234@aol.com to CoinDropMarkets@gmail.com, subject Martin Newman all funds returned to client. Mr. Newman, did I read that right?

A Yes.

Q Do you recognize this to be an e-mail that you sent to the company Coin Drop Markets asking for your money back?

A Yeah. I think I was requesting it. By Newman, all funds returned to client. That's why I put the complaint in. I wanted all of the funds.

**Sent:** Thu, 29 Jun 2017 23:21:27 -0400
**From:** MARTY NEWMAN <rockyrose1234@aol.com>
**To:** coindropmarkets@gmail.com
**Subject:** Martin Newman,All funds returned to client

MY address is Martin Newman.
  6970 Hatchery RD.
  Waterford,MICH.48327

They delay of delivery of my funds is delayed, WHY??  Because of this delay, you are holding back profits that where successful.  You owe me more money then previously stated.

Get me out the proper amount of money immediately or suffer the consequences.

Martin Newman.
1-248-996-2412

Q And after you sent this e-mail, did you get your money back?

A No. They wanted to know why I was making the complaint. And that was the complaint. I didn't put the word must return to client. I never got -- this is a, perhaps, perhaps it was misunderstood, but there was a lot that come after this. It's  that I don't have the money.

Q Mr. Newman, can you look and see a second e-mail, it's Exhibit 77, for us. . . . And is this an e-mail that you wrote on or around that time in May?

A I am waiting for a reply, please contact me. I don't know the status of my account. I have left several messages on the toll free number and no replies. Please contact me.

**Sent:** Thu, 29 Jun 2017 23:46:32 -0400
**From:** MARTY NEWMAN <rockyrose1234@aol.com>
**To:** coindropmarkets@gmail.com
**Subject:** Re: Jason

ATT: Michelle Robertson,.Because of the delay of return of my money.  I recall trades where made and they made profits.
You are holding back more money than stated.  If you cannot respond stat, my private investigator will correct the situation.
Address is 6970 Hatchery Rd. Waterford,Mich 48327

-----Original Message-----
From: Coin Drop Markets <coindropmarkets@gmail.com>
To: MARTY NEWMAN <rockyrose1234@aol.com>
Sent: Fri, Jun 23, 2017 6:52 am
Subject: Re: Jason

Hey Marty, No problems at all I just saw your message I check their email here and there sorry. Again, I will track and be in touch.
Jason

On Thu, Jun 22, 2017 at 5:35 PM, MARTY NEWMAN <rockyrose1234@aol.com> wrote:

> Dear Jason; today is 6-22-2017 Thursday.  Still no package.  Is there a problem??
> Marty-248-996-2412

-----Original Message-----
From: Coin Drop Markets <coindropmarkets@gmail.com>
To: MARTY NEWMAN <rockyrose1234@aol.com>
Sent: Fri, Jun 9, 2017 1:41 pm
Subject: Re: Jason

Mr. Newman,
Please email me back the correct payee which assuming is: Martin Newman for payment and your current address if different then
  one on file so there is no snags.

Sincerely,

Michelle Robertson not the other spellcheck err.

Q That's a message that you sent to Coin Drop Markets?

A Yes.

Q And when you say "Jason" in that message, are you referring to Jason Flack, the person you talked to on the telephone?

A Yes.

Q And going to the next message up on the thread, it looks like there was a reply from someone named Michelle Robertson. Do you see that?

A Yes.

Q And who did you understand Michelle Robertson to be?

A The manager.

Q Someone at Coin Drop Markets?

A Yes.

Q And looking to the next e-mail, which is dated 8th July, 2017 at the very top, this is Exhibit 79 for us. . . .  Is this another e-mail exchange that you had with Coin Drop Markets asking for your money back?

A Yes.

---

**Sent:**     Sat, 8 Jul 2017 18:36:20 -0400
**From:**     MARTY NEWMAN <rockyrose1234@aol.com>
**To:**       coindropmarkets@gmail.com
**Subject:**  Re: Jason

Dear Ms.Michelle Robertson or Management; I will send my complaint to the U.S. DEPT. OF JUSTICE EASTERN DISTRICT OF NEW YORK 271 CADMAN PLAZA EAST
BROOKLYN,NY 11201 if I don't have all my all funds. For Sure. Martin Newman 7-08-2017


-----Original Message-----
From: Coin Drop Markets <coindropmarkets@gmail.com>
To: MARTY NEWMAN <rockyrose1234@aol.com>
Sent: Fri, Jun 9, 2017 1:37 pm
Subject: Re: Jason

Hi Mr. Newman,
I am sorry that you have gone through all of this. Jason is no longer with us I will have your wallet closed out today. You will receive your monies within 5-7 business days from this email please allow that time. I will handle this myself so you do not get the run around your monies are safe all will be there soon.

Sincerely,

Michelle Robinson
Executive Assistant

---

Q And you never got your money back?

A Never.

Trial Tr. 94–109.

### c.   Richard Brewell

199.    Richard Brewell, a senior gas inspector from Australia, testified regarding McDonnell's

scheme to defraud him of virtual currency and United States dollars worth over $28,500.

Q Are you familiar with a company that went by the name of Coin Drop Markets?

A Yes, I am.

Q How did you first come to hear of Coin Drop Markets?

A I found it on the application Twitter and there was also a presence on the Internet as well. . . .

Q What did you observe about the presence on Twitter for Coin Drop Markets?

A It looked very professional and it was offering services that I was currently looking for.

Q And what were the services that you were looking for?

A I was looking for professional trading services that would give me indications for entry and exit prices, specifically for Litecoin.

Q Prior to this point in time, had you previously used services like that to advise you on trading of cryptocurrencies?

A No.

Q What did you do after you found the advertisement there for Coin Drop Markets?

A I applied for a subscription to his advertised services.

Q Okay. Do you recall what those advertised services were?

A Yes. Well, there was a dollar 99, I think it was for a certain amount of days, and then there was certain tier of memberships, plus also what was a turnkey service also.

Q And do you recall what the name of the trading service advice that you applied for was?

A I applied for the -- what was called RedliteGreenlite LTC.

Q Did you actually subscribe to that service?

A Yes, I did. . . .

Q Do you recall how much you paid?

A I paid $99 for one of the memberships and also I believe $99 for the turnkey service. . .

Q Do you recognize Exhibit 38?

A Yes, I do.

Q What is Exhibit 38?

A It is one of Patrick McDonnell's advertisements.



Q Do the images on this page appear to reflect the advertisement that you saw back in the spring of 2017?

A 100 percent. . . .

Q You saw the advertisement and then you paid for the subscription?

A Yes.

Q You paid for two levels?

A Yes, I did.

Q Did you have an understanding at the time what the difference was between the two levels?

A Not really. I was just very new to the market.

Q Did the advertisements that you looked at, or the Twitter pages that you reviewed, contain any other data about Coin Drop Markets's success?

A Yes, it -- I think it was from maybe about four or five charts showing substantial gains on calls that Mr. McDonnell had previously made.

Q Did those representations encourage you in any way to sign up for the subscription service?

A Yes.

Q In addition to the website that we just looked at and the Twitter that you mentioned, were you aware of any other websites or social media promoting Coin Drop Markets?

A No. There was a Twitter presence and there was also a web page, which was the CoinDropMarkets.com. . . .

Q You mentioned previously that the advertisement touted the services that were being provided in terms of entry and exit points; the reports showing profitable previous trades and that there were a number of followers. Were there any other factors that led you to decide to subscribe?

A Yes. It seemed like it was a legitimate business and professional service. . . .

Q Do you recognize Exhibit 6, please.

A Yes.

Q What is Exhibit 6?

A These are e-mails between myself and Mr. McDonnell. . . .

Q If you can look at the portion of the middle [on page 3] that says from Coin Drop Markets. Can you tell, for the record, what the e-mail address is that it's coming from?

A The e-mail address it's coming from CoinDropMarkets@gmail.com. . . .

**From:** Coin Drop Markets [mailto:coindropmarkets@gmail.com]
**Sent:** Thursday, 27 April 2017 11:18 AM
**To:** Brewell, Richard
**Subject:** Re: New message via your website, from richard.brewell@atcogas.com.au

Hi Mr. Brewell,

Sorry for delay in response first thing in the morning your membership will be activated. We are gathering all members currently getting them over to new @RLGLLTC twitter. If you could email me back your twitter handle & follow I'll approve so your ready for LTC picks when initiated. Your receipt/terms will be in your inbox once secretary gets in tom. morning around 9-9:30AM.

Regards,

Pat McDonnell

Q And who is it signed by?

A Pat McDonnell. . . .

Q You mentioned previously that he asked you at some point to send more money; is that correct?

A That's correct.

Q How did exactly that come up?

A It was -- basically, he described to me that there was another group that had been in existence since 2010 that got a lot of Bitcoin buying power. It was a fairly elite, solid group and to join it would cost one Bitcoin.

Q Prior to this is, this the first you heard of -- had you heard about this before, rather?

A No.

Q If you look at the first page of Exhibit 6. Would you please describe for the Court what the portions that are in blue refer to in this e-mail from Coin Drop Markets.

A Portions in blue is how Patrick sent through to me because I didn't know how to use Twitter at the time, and I was actually missing a lot of messages he was trying to send me.

**To:**      Brewell, Richard[Richard.Brewell@atcogas.com.au]
**From:**    Coin Drop Markets
**Sent:**    Fri 4/28/2017 10:44:43 AM
**Subject:** Re: New message via your website, from richard.brewell@atcogas.com.au

Hi Richard,
Don't know if you check your twitter messages? Sent you a few somewhat time sensitive with ton. trade.

Regards,

Pat McDonnell

> Hi Richard, Glad you joined us bud. Hey TY for new membership your receipt will be there in a few. You may wanna consider joining RLGLBTC it's direct 1-on-1 trading alongside me and all members involved real-time. We trade 24/7 and you can make a couple BTC depending on your BTC power.
> 2h Sent

> The program is 1 BTC for it's lifetime been running since 2010 so there is a lot of BTC buying power we when move because there are a few early adopters who have some real coin. Let me know it's a better option vs relying on reports we all trade on same exchange talk via @Slack RT.

> *couple BTC per trade more if your a BTC whale.
> 2h Sent

> Hi again Richard. Also if you decide to join RLGLBTC we will credit all your membership payments to 1 BTC to save $ and you get all sub perks even new to launch. We have our own IPO coming in 2 weeks only 500K tokens gonna fly.

> Today we have a trade on yobit that will run tonight until sunday should produce 300%.

> 1 BTC in should produce 3 BTC out.

On Thu, Apr 27, 2017 at 7:46 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

Q And if you look at the second group here, is this a statement from Mr. McDonnell about this special group for one Bitcoin?

A Yes, it is.

Q Did you take up Mr. McDonnell on this offer?

A Yes.

Q How did that come about?

A I asked if he would be accepting of Litecoin instead of Bitcoin, and he said yes. So I sent across the equivalent of one Bitcoin's worth of Litecoin. . . .

84

Q Do you recall how much Litecoin you sent?

A I think it was roughly around 70.

Q All right. . . .

Q How did you know where to send the Litecoin to?

A Mr. McDonnell provided me with an address to send it to. . . .

Q If you take a minute to examine Exhibit 8 and let me know if you recognize it?

A Yes, I do.

Q What is Exhibit 8?

A Exhibit -- Exhibit 8 is -- is when I sent my remaining Litecoin to Mr. McDonnell as he was offering to professionally trade it on my behalf. . . .

**To:** Brewell, Richard[Richard.Brewell@atcogas.com.au]
**From:** Coin Drop Markets
**Sent:** Fri 4/28/2017 11:40:37 PM
**Subject:** Re: Coin Drop Markets - TRADE ALERT - 300% PUMP TONIGHT ON YOBIT EXCHANGE - OPEN & FUND A WALLET - IN & OUT VERY QUICK!

I give you my word as a man I will protect & trade with you as my own.

On Fri, Apr 28, 2017 at 11:39 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

   *LTC address to monitor

On Fri, Apr 28, 2017 at 11:39 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

   It's honestly a trust factor Richard your control is our relationship. You'll have an LTC to monitor daily trading balance and if you need it get in touch I'll send.

On Fri, Apr 28, 2017 at 11:33 PM, Brewell, Richard <Richard.Brewell@atcogas.com.au> wrote:

   Ok, so when I send you my last LTC do I have any control left? How will it end up coming back to me

   Just need to clarify before I send

   Cheers

   **Richard Brewell**

   Senior Gas Inspector.

Q Is that the transfer for joining the Elite Group . . .?

A Yes, it is.

Q What happened after you sent that 70-and-a-half Litecoin to join the Elite Group?

A Basically, I was, I suppose, solicited or encouraged to send my remaining Litecoin through to Patrick so he could trade the volatility in the market prior to it being listed on Coinbase. . . .

Q Did you send more money for him to trade on your behalf?

A Yes, I did.

Q And do you recall how much that was?

A That would have been the 76 Litecoin.

Q Did you send it to the same address that he previously gave you?

A I believe so, yes.

Q Did Mr. McDonnell tell you anything regarding the transfer directly to him of Litecoins for him to trade?

A Yes, he -- he mentioned that he would be making 2 to 300 [percent] or would be making a certain amount of money trading volatility per day.

Q If you could turn to page -- the second page of Exhibit 8, please. If you look in the middle of the page there is a message at Friday, April 28th, 2017 at 11:27 p.m. . . . Could you read for the record that message from CoinDropMarkets@gmail.com?

A The message says: Don't sell MPRO at all. Do you want me to trade the LTC? Send it now. I'll produce 2 to 300 profit on the 76 each day with volatility until Coinbase.

Q And that's the promise that you were thinking of when you just testified previously?

A Yes.

Q Did you actually send the 76 LTC to that address?

A I did.

Q After he received it, did he ever tell you about how the trading of the LTC was going?

A Yes, he was always saying he was being very successful with it and making a lot of money and -- yeah.

Q Did he ever give you exact numbers as to how you were doing?

A No, he didn't. . . .

Q The first blue box on Exhibit 14, is that a description of the kind of report that he would give you about the trading of the Litecoin?

A That's -- that's generally what he would say, yes.

To:      Brewell, Richard[Richard.Brewell@atcogas.com.au]
From:    Coin Drop Markets
Sent:    Wed 5/10/2017 1:19:26 AM
Subject: Re: Catch up

Hey Rich, I sent this through twitter then realized email was better. Time sensitive do to $LTC pricing IK some things just cannot speak them bud. Pat

Hey Rich I'm going over trading blotter your up big on amount of $LTC traded will discuss tom. Hey listen IDK how big an investor you are but there is real $ to be made just w/ $LTC.

I'm not nuts why I post I cracked 177 code me and another smart member caught it 2 weeks ago or more. I believe Rich that I can make members millions in $LTC alone.

19mSent

Q And what did he say in this -- in this direct message?

A In that direct message it says: Hey, Rich, I'm going over trading blotter. You are up big on amounts of LTC traded. Will discuss tom, which I presume means tomorrow. Hey, listen, I don't know how big an investor you are, but there is real dollars to be made just with LTC.

Q Did you form an impression at the time regarding the profitability of the trading that Mr. McDonnell was doing?

A Yes.

Q And what was that impression?

A Well, I believed him to be a professional trader.

Q And did you also believe the trading was profitable?

A I did, yes.

Q Actually, if you could turn to the second page of Exhibit 14. If you could see after the blue blocks of the Twitter direct messages, there is a message that says on Tuesday, May 19th, 2017 at 10:40 p.m.?

87

A Yes.

Q And the e-mail is coming, again, from coindropmarkets@gmail.com?

A That's correct.

On Tue, May 9, 2017 at 10:40 PM, Coin Drop Markets <coindropmarkets@gmail.com> wrote:

OK cool Rich got it definitely need to speak man you'll be happy that fucking trade killed tonight are these traders this stupid? If this continues I'm coming out by you to retire NEXT WEEK. lol My personal p[hone is +1.718.524.4718 call me anytime but tonight my wife is giving me that where are you look? lol Luv ya as a bud good night, Pat

Q Do you see in the middle of the message it says: My personal phone is, and then it gives a number that ends 4718?

A Yes, I do.

Q Did you ever happen to speak with Mr. McDonnell by telephone?

A I've never spoken to Patrick McDonnell by phone.

Q So the only methods of communication were by e-mail -- how else did you communicate with Mr. McDonnell besides e-mail?

A It was just e-mail, and then once we'd finished with the -- the formal e-mails, we -- we, basically, just moved to direct messages through Twitter. And then later there was also a Slack channel as well.

Q Could you describe what the Slack channel that you're referring to is?

A Well, the Slack channel was, if I remember right, it was made up of roughly a hundred people that subscribed or joined Patrick's whether that -- the RedliteGreenlite LTC or whatever they joined, but it was -- it was a trading group. . . .

Q What happened to the Slack group?

A The Slack group -- basically, a lot of people started to become frustrated with -- with the lack of trading advice that Mr. McDonnell portrayed that he would be giving. There was a lot of -- a lot of angry people there, but also in the Slack channel Mr. McDonnell was pushing a crypto currency that he claimed he was designing and coding at the time called TIGR tokens. He was, I think, trying to sell this to members of the Slack group.

Q And so you were describing that there were a number of users complaining about it.

And then what happened?

A They just started to disappear overnight. I believe Patrick started to delete them if they argued or questioned, and eventually it led to him closing the entire Slack channel down. . . .

Q Do you recognize Exhibit 19?

A I do.

Q What is Exhibit 19?

A It's [a twitter message from] Patrick informing me that he's about to shut down the Slack channel. . . .



Q  Could you read the name of it into the record please?

A The Twitter account is the XBTradeGroup@BTCXBTTrading.

Q And what was that Twitter account?

A That was Mr. McDonnell's account.

Q And is that the account that he had been communicating with you previously about your subscription to Redlite-Greenlite?

A Yes.

Q And is this the -- is this direct message the description of him shutting down the Slack?

A Yes, it is.

Q At this point on June 10th had you received any returns on the Litecoin that you had given him?

A No.

Q What happened after the Slack group shut down?

A After the Slack group was shut down, Patrick changed his Twitter name. He remained in contact with me and a handful of the other members.

Q And for about how much longer did you stay in contact with Mr. McDonnell?

A Things started to turn quite bad around the July 4th date in 2017. . . .

Q Do you recognize Exhibit 27?

A Yes, I do.

Q What is Exhibit 27?

A It's one of Patrick's many promises to get my Litecoin back to me.



Q And what is the Twitter account that it's sent from?

A That's sent from the TIGR tokens Twitter handle.

Q So to date, just to sum up here, to date you sent in a small amount for the trial membership, and then shortly thereafter sent in $99 twice for a subscription to the Redlite Greenlite service and the turnkey service, is that correct?

A That's correct.

Q And then you subsequently sent him 70.5 Litecoin to join the Elite Group?

A That's correct.

Q And then you subsequently sent him 76 Litecoin to trade on your behalf, is that correct?

A That's correct.

Q Have you received any of that money back?

A No.

Trial Tr. 44–71.

### d.   Anthony Dimovski

200.    Anthony Dimovski, a 27-year-old resident of Kentucky, testified to McDonnell's scheme

to defraud him of over $17,000.

Q Were you a Coin Drop Markets customer?

A I was, sir.

Q When was the first time that you learned of Patrick McDonnell or Coin Drop Markets?

A The first time I learned about Coin Drop Markets was in the spring of 2017, approximately March/April.

Q How did you learn about Coin Drop Markets or Patrick McDonnell?

A At the time I was interested in learning more about trading cryptocurrency as I was totally inexperienced about trading cryptocurrency. I would search various media platforms about big players and potentially people that could help you. . . .

Q How would you describe your experience and knowledge of cryptocurrency at that point?

A At that time I was completely new to trading and wanted to learn and get better. I was completely new to trading cryptocurrency.

Q When you came across Patrick McDonnell, did you see any social media account that he had?

A Mr. McDonnell ran a Twitter account and a Facebook account beginning with my interaction with him in March.

Q Do you remember any information from the Facebook account that you saw?

A On the Facebook account, I saw a Wall Street address and an e-mail, a G-mail linked address with Coin Drop Markets and just a general brief description of the business.

Q You remember looking at a Facebook account that had the coindropmarket@gmail.com address?

A The Facebook account did have a G-mail address to it.

Q Okay. And that was the Coin Drop Markets G-mail address?

A That is correct.

Q And there was a Wall Street address, you said, listed on the Facebook?

A That is correct.

Q Did you take anything from there being a Wall Street address on the Facebook?

A The Wall Street addressed in my mind legitimized the business and added credentials to Mr. McDonnell's business.

Q Were there other social media accounts that you understood to be used by Mr. McDonnell around that time?

A Yeah. Later on in our interactions, Mr. McDonnell opened up a Slack group. Slack is another alternative social media platform.

Q You mentioned Twitter?
A That is correct.

Q Are there one or more Twitter accounts that you understand to be Mr. McDonnell's?

A Yes. Mr. McDonnell ran several Twitter accounts. The two at the top of my mind that I remember are XBTC trade, XBT trade. It had BT trade in it.

Q And was there another one?

A And one that was Mr. Pat McDonnell and Coin Drop Markets. He had several -- those were three that I remember vividly at the top of my head, but he had several Twitter accounts.

Q Just to be clear, you mentioned Coin Drop Markets Twitter account, a Twitter account that had something like XBT trade in it, and a Twitter account of something like Mr. Pat McDonnell?

A That is correct.

Q And you were communicating with him on those?

A That is correct.

Q Have you ever heard the term Coyote Wall Street?

A Yes, I have.

Q Do you have any sense of whether that has any connection to Mr. Patrick McDonnell? .
. .

A Via Twitter messages, Mr. McDonnell told me that Coyote Wall Street was the inner circle, which was a trading group he previously ran back in years past, in years past, and he would talk about how another Twitter personality installed -- enabled that group to head their own educational social media platform.

Q You understood from Mr. McDonnell that Coyote Wall Street was something that he had done before?

A That is correct.

Q Did you ever send any money or virtual currency to Mr. McDonnell or Coin Drop Markets?

A Yes, I did.

Q What was the first one that you did?

A My first transaction with Mr. McDonnell was a trial membership, which was a couple dollars. It was fairly cheap. My second -- and there were several more.

Q Sticking with the first one, that was a trial membership with Coin Drop Markets?

A That is correct.

Q What were some of the factors in your decision to buy a trial membership in Coin Drop Markets?

A Mr. McDonnell, I started messaging him in March or April. He was very personable and he built a relationship with you. There were days we would message quite often. We would talk about the market. He would try to be your friend. He built a     relationship with you and he became a trustworthy figure in my  mind after spending so much time talking to him and being so personable.

Q Was there anything about the Coin Drop Markets Twitter account that lent it a sense of legitimacy the way that you mentioned the Facebook page had?

A So Mr. McDonnell's Twitter accounts had thousands of followers, you know, which legitimized in my mind his credentials.

Q In the mind of a [new trader] lots of followers seemed a positive aspects?

A That's correct.

Q Sitting here today, is that still your view?

94

A No, it isn't. . . .

Q After you bought the trial membership, did you ever send Mr. McDonnell any more money?

A Yes.

Q What was the second amount of money that you sent him?

A On McDonnell's Coin Drop Markets website, there was an upgraded gold or diamond membership, which I recall was $50 or $60, which I signed up for.

Q What were the factors in your decision to sign up for that?

A I signed up for that because Patrick McDonnell portrayed that he had a Wall Street background and he could make me a more profitable and better trader. It was an upgraded package with more sophisticated trade exit and trade entry signals.

Q You expected a higher level of service and expertise based on that membership?

A That is correct.

Q And that expectation was from what Mr. McDonnell told you?

A That is correct. . . .

Q Did Mr. McDonnell ever talk to you about his background in cryptocurrency?

A Yes, he did.

Q What did he tell you his background in cryptocurrency was?

A Mr. McDonnell told me that he was a developer/promoter of several coins that were introduced during 2014, during the past years, previous to my time with McDonnell, including Potcoin, Titcoin, and he was a promoter of Dogecoin. . . .

Q And did Mr. McDonnell's supposed background in virtual currency and supposed to Wall Street trading background, were those things that factored into your decision to buy membership services from him?

A Yes, it was.

Q Did you send McDonnell any more money for any membership service at any point in time?

A Yes, I did.

Q What was the next one?

A The next one was sending McDonnell Bitcoin for more minute-to-minute guidance on trading. McDonnell told me show me you're committed, you know, within a year, you know, you will be an expert trader and you'll never have to pay me again, bro, I love you as one of my kids.

Q And what did you pay for that membership?

A I sent McDonnell Bitcoin.

Q Do you remember the name of that membership or how it was described?

A The -- from what I recall, the membership was not on his website. It was more of a -- through Twitter direct messages, an offer of his guidance. It was an offer through Twitter messages.

Q It was a lifetime membership?

A Yes. Mr. McDonnell told me that he would never ask for money again.

Q [Y]ou expected lifetime-service expertise guidance and so forth from Mr. McDonnell in exchange?

A Yes, I did.

Q And that's based on what he told you?

A Yes, I did. . . .

Q Did Mr. McDonnell ever give specific entry and exit guidance with respect to the virtual currency Titcoin through Slack?

A Yes, he did. Well, Mr. McDonnell told us to buy but never when to exit.

Q I should ask two questions. Did he say that he was going to give a specific entry and exit trade guidance with respect to a Titcoin trade through the Slack group?

A Mr. McDonnell just only told us to buy it. He never told us -- he never gave us an exit -- he never told us when to exit.

Q He told you to get in?

A At any price.

Q And did you follow that advice?

A I did.

Q What was your understanding about receiving exit guidance?

A My understanding was, you know, I would listen to Pat since he was so knowledgeable and I would sell when he told me to.

Q And you understood he was going to tell you when to sell?

A Yes.

Q And you thought he was going to tell you when to sell and you thought it was going to be profitable?

A Yes.

Q What happened when he didn't tell you when to sell?

A Shortly after, whether it was minutes or hours, the price crashed significantly. I don't remember the exact percentage, but it crashed pretty significantly. . . .

Q And the result of the trade, was it profitable or unprofitable for you?

A Unprofitable.

Q How unprofitable was it for you?

A Definitely more than 50 percent. It might have been as high as 80, 90 percent. It was pretty significant. . . .

COURT: What was that in United States currency, roughly?

WITNESS: I had invested approximately about around one Bitcoin to 1.5 Bitcoin and I had about a .79 Bitcoin loss, roughly . . . and at the time I believe Bitcoin was worth two to three thousand dollars. I would say definitely around, from my recollection, it was around a thousand dollars. . . .

Q Did Mr. McDonnell ever suggest that he should trade your virtual currency on your behalf?

A Yeah. Mr. McDonnell told me via message that he made approximately 120 to 123K trading Litecoin that day, that he wished he had my capital to also trade with it, and he told me that there was a day where he made 73 Bitcoin, and he was pushing on the subject where he said I wish I was trading with your capital.

Q He suggested to you that he was enjoying a great trading success?

A Yes, sir.

Q And that he could accomplish the same results with your virtual currency?

A Yes. He said with my capital he could -- you know, I would make half to two Bitcoin a day.

COURT: Was that before you sold or after?

WITNESS: This was my capital not associated with Titcoin. On Titcoin, I didn't go all in, I only went with a portion of my funds at the time. So, with Titcoin, there was only about like maybe five, ten percent of my funds, and McDonnell was trying to, you know, get the majority of -- he was implying that he wanted to use the majority of my capital -- if I lent him the majority of my capital to trade with, then he could make good profits.

COURT: Approximately how much [capital in total did you have]?

WITNESS: At the time it was worth about 40 to 50,000.

COURT: Was he aware of that? Had you told him?

WITNESS: Yes. Mr. McDonnell told me that if he, you know, if he had access to my funds that he could have doubled it by now at the time.

COURT: In how long?

WITNESS: He said, you know, within that timeframe that I knew him that he could have doubled it by now. This was -- I first bought Litecoin in April and he said -- and that time was May and he said by then he would have already been able to double it.

COURT: Between April and May?

WITNESS: With regard to my Litecoin virtual currency, yes.

Q Did Mr. McDonnell offer you any other investment opportunities or solicit you to invest in anything that he was developing?

A Yes, Mr. McDonnell offered an opportunity in a new ICO coin that he was creating called TIGR tokens. . . .

Q And did Mr. McDonnell suggest that there was an upside to paying him for TIGR?

A Yes, Mr. McDonnell said that he could turn, you know, one Bitcoin and up to -- up to 25 Bitcoin in a matter of three hours. . . .

Q And did you have any awareness of Mr. McDonnell soliciting others for TIGR?

A The Twitter messages Mr. McDonnell told me to keep -- keep our conversation about TIGR tokens to Twitter and he would -- he would also promote it on the Slack social media platform. But I -- in interacting with other members of the group, I knew that -- I knew of at least one person that had also purchased TIGR tokens from -- alleged TIGR tokens from McDonnell. . . .

Q Mr. Dimovski, did you ever convey any money or virtual currency to Mr. McDonnell for TIGR?

A Yes, I did.

Q Approximately how much did you send?

A I sent Mr. McDonnell .5 Bitcoin.

Q To what address did you send it?

A The exact same address provided that I sent him to the Coin Drop Markets Bitcoin address.

Q And you understood that to be Mr. McDonnell's Bitcoin address?

A Yes, sir.

Q And why did you think it was his?

A Mr. McDonnell, through Twitter, told me you're the brand new -- it's a brand new Coin Drop Markets Bitcoin address. You're the first one to pop its cherry. . . .

Q Did you have any sense or did you see at the time that Coin Drop Markets was offering a service that sounded something like Redlite or Greenlite?

A Yes, sir.

Q What do you remember of that?

A Mr. McDonnell was going to offer a new service for -- going to buy Litecoin and he would give entry and exit signals.

Q And that was called Redlite Greenlite LTC?

99

A That is correct.

Q And Mr. McDonnell told you about this at some point?

A Yes, he did, through Twitter messages.

Q After your Titcoin trade around about May 2017, did you understand anything about any security issues at Coin Drop Markets?

A In June the website Coin Drop Markets had a brief message that said, We have been hacked and for safety concerns we are suspending membership services. And that was also updated on the Coin Drop Markets Twitter. . . .

Q Do you remember any deactivation of any of the accounts that you associated with Mr. McDonnell?

A Yes. Mr. McDonnell deactivated the -- several Twitter accounts, including the Coin Drop Markets, the XBT Trading Group Twitter account was suspended, and the only Twitter account that, you know, from June to early July that was active was the Mr. Pat McDonnell account, and that soon was -- it soon vanished as well.

Q Did you ever -- did you get a year's worth of an annual membership from Mr. McDonnell?

A No, sir.

Q Did you get a lifetime of expert trading guidance?

A No, sir.

Q Did you get any TIGR token?

A No, sir.

Q Never?

A Never.

Q Did you try to contact Mr. McDonnell to get your money back or to follow up on these services?

A Yes, sir.

Q How many times?

A So I tried calling Mr. McDonnell previously in April. April -- late April, early May he sent me a phone number, which was supposed to be Mr. McDonnell's direct access. I called that number, you know, during -- you know, several times during the month of June. I also kept trying to message McDonnell through his -- the Mr. Pat McDonnell Twitter account which was still active, and I tried e-mailing the Coin Drop Markets Gmail account.

Q What happened to the Slack account?

A Shortly after the Titcoin scenario where the price crashed, the Slack account was deleted shortly after then. . . .

Q And did you ever speak with Mr. McDonnell by telephone?

A Yes, I did.

Q And so you are aware of what his voice sounds like?

A Yes, I am.

Q Have you looked on any publicly-available websites to try to find other instances of recordings of his voice being available?

A Yes, I did.

Q What did you find?

A On YouTube there were a couple of videos, PK McDonnell, Pat McDonnell, like Wolf of Wall Street videos, the name of it had Wolf of Wall Street in it like Crypto PK McDonnell. And there was another one called CabbageTech. . . .

Q You mentioned there was a video involving CabbageTech that's publicly available online. Do you believe it's Mr. McDonnell in that video?

A Yes, I do.

Q Can you see his face?

A In the video Mr. McDonnell wore a mask, but the audio was matching what the audio sounded like on the phone when I was -- when I was on the phone with Mr. McDonnell.

Q How sure are you that it's the same person in the video as the person you talked to?

A As pretty certain you can -- as you can be. . . .

101

MR. HURAND: So we are going to play starting at approximately 1 minute 28 seconds of Exhibit 129 [audio recording]. (Audio played.)  . . . [D]id you hear two voices on there?

A Yes, I did.

Q Do you recognize either one?

A Yes, I do . . . one of them appeared to be Mr. McDonnell . . .

Q And your basis for recognizing the voice on that recording is having spoken with Mr. McDonnell by telephone earlier?

A That is correct.

Q And that is the same sound of the voice also that you've seen in some of those other videos or recordings and interviews?

A That is correct. . . .

Q Mr. Dimovski, in one of the Twitter accounts that you believe to be Mr. McDonnell's, was there ever a picture of his face?

A Yes, there was.

Q What shape was that picture?

A He had a backwards hat -- he had a hat on and it looked -- it looked very similar to the defendant which I saw yesterday. . . .

COURT: How old are you?

WITNESS: I'm 27.

COURT: And you have a Bachelor's degree?

WITNESS: That is correct.

COURT: From where?

WITNESS: Michigan State. . . .

COURT: Didn't it seem odd to you that he was promising that within minutes he would, as I remember, treble your investment?

WITNESS: Initially, Your Honor, looking at the website, you know, looking at his website I had my suspicions. It looked shady to me, but developing a relationship with Mr. McDonnell who said that his past misdeeds, he was a changed man. He was very personable with me. He would always message me. It took a lot of effort on McDonnell's behalf to communicate with me. And emotionally I, you know, formed a relationship with him. He said he was a changed man and I began to build a relationship and realized this guy must be a changed man and that my -- my emotional connection with him over-road my initial gut feeling.

COURT: Changed from what?

WITNESS: My initial gut feeling was who is Mr. McDonnell? I mean, it's over the Internet. Anyone could -- you know, it could be anybody, but my interaction with him, you know, Twitter, on the telephone, Mr. McDonnell showing me, you know, articles of his previous work. You know, we formed -- I formed a relationship with him talking to him and he seemed very personable and I had no reason to doubt differently.

COURT: Well, I do not understand what he was changed from. Did you have a suspicion that he was some kind of a thief?

WITNESS: Your Honor, Mr. McDonnell would openly talk about his previous misdeeds with the law, with his time in Wall Street, and he would openly talk about it and how he was -- he was -- he was a changed man from that.

COURT: That was his posture as a wolf of Wall Street in his earlier personification?

WITNESS: That is correct, your Honor.

COURT: And when he was talking to you as a friend, he was no longer a wolf?

WITNESS: Your Honor, to me, he came as experienced from his time on Wall Street. And talking to him, you know, through an extended period of time, I began to put a little bit more trust in credentials to Mr. McDonnell.

COURT: What kind of a job did you have at that time?

WITNESS: At that time, I worked part-time as a Kaplan test prep instructor and I would sell electronics on eBay.

COURT: And what was your income?

WITNESS: Where I got it or how much I made?

COURT: How much?

WITNESS: That year, I made 30 to 40 thousand. . . .

Q Mr. Dimovski, I'm handing you still another e-mail that's been marked 160. This is another e-mail from your e-mail account?

A That is correct, sir.

Q And you received it around June 1, 2017?

A That is correct.

Q And who is it from?

A It is an e-mail verification that I sent .5 Bitcoin to an external Bitcoin address. . . .



Q And that's Mr. McDonnell's wallet address, you understand?

A Yes, sir.

Q And this is in connection with one of the -- actually, what was this .5 Bitcoin in connection with?

A That was the .5 Bitcoin I sent Mr. McDonnell for the Tigr token ICO that he was selling.

Q And you never got any Tigr token in exchange for this .5 Bitcoin?

A I never did, sir.

Q You never got any virtual currency from Mr. McDonnell as part of your investments with him?

A I never got any Tigr token, sir. . . .

Q [Exhibit 161] appears to be a one-page e-mail, dated April 21, 2017. Did you receive this e-mail, Mr. Dimovski?

A Yes, I did, sir.

Q This Twitter message, according to this e-mail, says: Made over 73 BTC today, bud. Great day, man. Do you see that?

A Yes, I do, sir.



Q What did you understand that to mean?

A I understood it to mean Mr. McDonnell's boasting about his expertise trading and his skillful trading and how he could help me become a more profitable trader.

Q Things like this, talking about his trading prowess, led you to do business with him?

A Yes, sir. . . .

COURT: So, he had how much of your Bitcoins at that moment?

105

WITNESS: Your Honor, I paid him half a Bitcoin for Tigr tokens, I paid him one Bitcoin for the lifetime membership. And at that time, that was the only currency that I sent to McDonnell.

COURT: So, he wasn't owing any of your capital Bitcoin.

WITNESS: Besides the one Bitcoin for the lifetime membership and the half a Bitcoin for the Tigr tokens, the 1.5 Bitcoin was the only capital he was holding that I paid him.

COURT: That wasn't capital, that was a lifetime payment.

WITNESS: Yes, that was the only --

COURT: That was his.

WITNESS: That was the only thing I sent McDonnell, sir. . . .

Q Mr. Dimovski, I'm handing you what's been marked 162.  162 is a one-page document. It appears to be an e-mail dated April 25, 2017. This is another direct message notification from Twitter to you?

A Yes, it is, sir.

Q And who is the Twitter direct message from?

A It is from the Bitcoin XBT Trade Twitter handle, sir.

 Gmail

diesel tv <jailbrokentvboxes@gmail.com>

**Bitcoin XBTrade GRP™ (@BTCXBTDEV) has sent you a Direct Message on Twitter!**

Bitcoin XBTrade GRP™ (via Twitter) <notify@twitter.com>
To: DieselDmov <jailbrokentvboxes@gmail.com>

Tue, Apr 25, 2017 at 1:58 PM





Bitcoin XBTrade GRP™ sent
you a Direct Message.

hey will watch trying to launch
RLGLLTC tonight.

Reply

Q Who is the person who had that Twitter handle?

A Mr. McDonnell was of control of that Twitter handle, sir.

Q The message here says: Hey, we'll watch. Trying to launch RLGLLTC tonight.
Do you see that?

A Yes I do, sir.

Q What is RLGLLTC, to your understanding?

A It was a trading service that Mr. McDonnell was developing to inform people exit and entry points for the virtual currency Litecoin.

Q And what does "RLGLLTC" stand for?

107

A It was Redlite Greenlite Litecoin, sir.

Q Mr. Dimovski, I've handed you what's been marked Exhibit 163. This is [an] e-mail you received to your address reflecting a Twitter direct message from Mr. McDonnell?

A That is correct, sir. . . .

Q And the message as reflected here says: You send me one BTC. I'll trade W/U personally minute-to-minute all coins, blockchain.info/address/1KIRS and then three periods. Did I read that right?

A Yes, sir.

 diesel tv <jailbrokentvboxes@gmail.com>

**Bitcoin XBTrade GRP™ (@BTCXBTDEV) has sent you a Direct Message on Twitter!**

Bitcoin XBTrade GRP™ (via Twitter) <notify@twitter.com>
To: DieselDmov <jailbrokentvboxes@gmail.com>

Thu, Apr 27, 2017 at 10:48 PM





Bitcoin XBTrade GRP™ sent
you a Direct Message.

You send me 1 BTC I'll trade w/ you
personally minute-2-minute all coins.
blockchain.info/address/1KirsN…

Q Can you translate it?

A Mr. McDonnell, that was what he offered to provide me more guidance for the lifetime membership. And he sent me his Bitcoin address in order to send the one Bitcoin for the more advanced guidance and training from Mr. McDonnell.

Q And you sent him a Bitcoin in response to this?

A I did, sir. . . .

COURT: What do you think this message meant?

WITNESS: Your Honor, it was an offer by Mr. Pat McDonnell at the time, who I trusted because he gave me his phone number, he told me about his children, told me where he grew up. From looking on Google, it appeared -- he appeared to be who he said he was. And at that time, I was speaking to him for a longer duration of time. I thought he was who he said he was and he was going to help me become a better trader.

COURT: What did this mean to you, this message?

WITNESS: The message meant to me, your Honor, that I was going to get more advanced training and guidance from Mr. McDonnell if I gave him one Bitcoin.

COURT: This was, again, for advice you were buying. Not your Bitcoin after you gave it to him.

WITNESS: Your Honor, in exchange for his advice and training, I was supposed to give him first a Bitcoin and then I would receive his wealth of knowledge from his days on Wall Street and his expertise when he was working on Wall Street.

COURT: Where did you think he was physically working from?

WITNESS: Your Honor, I had every intention to believe that Mr. Pat McDonnell had an office on Wall Street. When I tried to do a background check on McDonnell, everything checked in and I had no reason to believe otherwise.

COURT: What led you to believe he was operating from Wall Street?

WITNESS: Your Honor, Mr. McDonnell showed me, you know, a couple of YouTube videos of him doing interviews with people, he showed me a couple articles of his involvement with several cryptocurrencies, and, you know, the phone number that he gave me checked out. We talked about -- he talked to me about his kids and, you know, I did a search for him and he was who he said he was and I had no reason to doubt Mr. McDonnell.

COURT: But did he say to you he was operating from Wall Street?

WITNESS: Your Honor, he said he had an office, he was going into the office to trade the company funds.

COURT: On Wall Street?

109

WITNESS: Your Honor, he had -- Mr. McDonnell said he had an office and the address was on Wall Street and I had no reason to suspect it wasn't.

Q Mr. Dimovski, could you turn to Tab 39 of Binder 1? . . . Can you tell me what we're looking at?

A Yes, sir. We are looking at a Facebook group that is the Bitcoin XBT Trade Group, which was created to promote the XBT Trade Group. And it has the address of where the group is located. . . .



Q Sitting here looking at this today, in sum and substance, does this resemble the Facebook image that you saw back in 2017?

A Yes, it does, sir.

Q And that 888 number, is that a toll-free number you're familiar with?

A I believe it's a toll-free number which was also on the receipt that I received when I initially paid for my free trial from Coin Drop Markets.

COURT: That has the address 110 Wall Street and it has the red dot indicating that's the location; right, with the Brooklyn Bridge?

WITNESS: That is correct, your Honor. That was the address provided on the trading group's Facebook page. . . .

Q [Exhibit 164] is another e-mail that you received at your Gmail account reflecting a direct message on Twitter from Mr. McDonnell?

A That is correct, sir.

Q And the first message says: Would you be interested in being one of the first hundred stakeholders in Tigr Bitcoin XBT Trade GRP trademark @tigrtokens website launching Monday? Do you see that, sir?

A I do, sir.

**Bitcoin XBTrade GRP™ (via Twitter)** <notify@twitter.com>
To: DieselDmov <jailbrokentvboxes@gmail.com>                    Sat, May 27, 2017 at 11:46 PM





## Bitcoin XBTrade GRP™ sent you a Direct Message.

Would you be interested in being one of the 1st hundred stake holders in TIGR?Bitcoin XBTrade GRP™ @TIGRTOKENS dev website launching Monday.

Reply

Q What is this communication about?

A Pat McDonnell told me that he was going to make a new cryptocurrency and he was going to offer it for -- offer it for sale to the public.

Q And are the second and third pages also relating to Tigr token?

A The second message, sir, is related to Tigr tokens.

Q And the message says: Hey, bud. Sorry, complete deal sold out in three hours. Do you see that?

A Yes, I do, sir.

Q What was he telling you?

A Mr. McDonnell told me that it sold out. And I didn't really think much of it at the time, but Mr. McDonnell was trying to pester me to invest and he kept bringing it up. And I

113

originally didn't want to put any more capital into anything else, but Mr. McDonnell was very persistent and he was trying to convey that it was a hot selling new cryptocurrency.

Q And the third message, on May 29, that's in that exhibit, the message is: But, bro, you should honestly have that $48 turned into 100K by now. I know it's been a ride, though, but there is a better way.

A I see it, sir.

Q What's your understanding of that message? A First off, I believe Mr. McDonnell meant $48,000 into $100,000. $48,000 represented my Litecoin capital at the time, and I saw that as a way of him trying to solicit to trade my capital for me, my Litecoin virtual currency. And the second part of that statement, "it's been a ride, though, but there's a better way," was Mr. McDonnell trying to change my opinion into, you know, giving him some capital for his new ICO cryptocurrency that he was coming out with -- allegedly coming out with.

Q You understood this to be Mr. McDonnell soliciting you for your Litecoin so that he could trade and essentially double the money?

A Yes, I do, sir. Yes, I did, sir. . . . There was also an additional message where Mr. McDonnell said: Man, I wish I had your capital. I made about 120 grand trading today. That was an additional message that I got, which I assume was him, you know, trying to talk me into trading with my capital. Not just this one. . . .

Q Mr. Dimovski, I'm handing you what's been marked 166. Mr. Dimovski, is 166 another e-mail notification of a direct message from Mr. McDonnell to you, this one on May 10, 2017?

A Yes, it is, sir.

Q This message reads: I [wish] was trading your $LTC, bro. I'm caking. Made 122K total yesterday. Did I read that right? . . .

A Now that is correct, sir. . . .

 Gmail

diesel tv <jailbrokentvboxes@gmail.com>

**Bitcoin XBTrade GRP™ (@BTCXBTDEV) has sent you a Direct Message on Twitter!**

Bitcoin XBTrade GRP™ (via Twitter) <notify@twitter.com>
To: DieselDmov <jailbrokentvboxes@gmail.com>

Wed, May 10, 2017 at 11:56 AM





EXHIBIT
166

Bitcoin XBTrade GRP™ sent
you a Direct Message.

I wish I was trading your $LTC bro
I'm caking made $122K total
yesterday.

Q And you understood this to be McDonnell bragging about his trading achievements and soliciting you for LTC for him to trade on your behalf?

A Yes, sir. . . .

Q Mr. Dimovski, I've handed you what's been marked 167. Is this yet another e-mail reflecting a direct message on Twitter from Mr. McDonnell to you?

A Yes, it is, sir. . . .

Q And this message is: Think about it. Let me know. With the dollar sign you have, I can make you .5 to 2 BTC a day.

A Yes, sir. . . .



diesel tv <jailbrokentvboxes@gmail.com>

**Bitcoin XɃTrade GRP™ (@BTCXBTDEV) has sent you a Direct Message on Twitter!**

Bitcoin XɃTrade GRP™ (via Twitter) <notify@twitter.com>
To: DieselDmov <jailbrokentvboxes@gmail.com>

Thu, Apr 27, 2017 at 10:51 PM





Bitcoin XɃTrade GRP™ sent
you a Direct Message.

Think about it, let me know. With the
$ you have I can make you .50-2
BTC a day.

Q What does this message mean?

A I am not a hundred percent sure of the context of that Mr. McDonnell presented this. It was either, you know, in reference to Mr. McDonnell trying to influence me to give him my Litecoin capital to trade with or it was with reference to the one Bitcoin I paid him for additional guidance that was not given to me.

Q And he was advertising the potential for great gain very quickly?

A Yes, sir.

Trial Tr. 153–267.

III.   Law

201.   This court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. §

13a-1 (2012), which provides that whenever it shall appear to the Commission that any

116

person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

202.    As already indicated, *supra*, at ⁋ 4, the provision reads as follows:

> Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions: Provided, That no restraining order (other than a restraining order which prohibits any person from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this chapter shall be issued ex parte by said court.

7 U.S.C. § 13a-1(a).

203.    Venue properly lies with this court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this district and because acts and practices in violation of the Act have occurred, are occurring, or are about to occur in this district.

204.    The venue provision reads as follows:

> Any action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur, and process in such cases may be

117

served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

7 U.S.C. § 13a-1(e).

205.    Defendants repeatedly violated Section 6(c)(1) of the Act and Regulation 180.1.

206.    To prove a violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation

180.1(a), 17 C.F.R. § 180.1(a) (set forth as *supra*, at ¶¶ 3, 7), the Commission must show that

Defendants engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a

material misrepresentation, misleading statement or deceptive omission; or engaged in a

business practice that operated as a fraud); with scienter; and in connection with a contract of

sale of a commodity in interstate commerce. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213,

226 (E.D.N.Y. 2018); *see also CFTC v. S. Tr. Metals, Inc.*, No. 16-16544, 2018 WL

3384266, at *7 (11th Cir. July 12, 2018); *CFTC v. Hunter Wise Commodities, LLC*, 21 F.

Supp. 3d 1317, 1347 (S.D. Fla. 2014).  The Commission has shown each of the above

elements.

207.    Defendants deliberately and knowingly made misrepresentations, misleading statements,

and omissions as part of a scheme to defraud.

208.    "Whether a misrepresentation has been made depends on the 'overall message' and the

'common understanding' of the information conveyed." *CFTC v. Rolando*, 589 F. Supp. 2d

159, 168 (D. Conn. 2008) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th

Cir. 2002)).  The representations should be viewed through the eyes of an objectively

reasonable person who would interpret the overall message.  *R.J. Fitzgerald*, 310 F.3d at

1328-29.

209.    Defendants' fraudulent scheme involved making numerous misrepresentations and

omissions concerning CabbageTech's business. For example, Defendants represented that

118

CabbageTech had multiple offices, including one at 110 Wall Street, *see* Trial Exs. 39, 42, 51, that McDonnell was the "boss" of a fictional CabbageTech representative named "Jason Flack," Trial Tr. 205:12-15, and that CabbageTech had a "team of digital asset trading specialists," *e.g.*, Trial Ex. 70 at 4, 6, and a "management team," Trial Ex. 52; Trial Tr. 240:5-8.  In reality, CabbageTech was run and staffed by McDonnell alone from his home basement in Staten Island.  Ex. 84 (June 5 dep.) at 144:10-145:12.  Defendants deliberately omitted information in communications with customers in connection with their scheme to defraud.

210.    Defendants made misrepresentations, misleading statements, and omissions in connection with solicitations to purchase trading advice.  For example, Defendants offered a wide variety of subscription or membership services to purchase trading advice.  *See, e.g.*, Trial Exs. 38, 66, 84 (June 5 dep.) at 132:15-133:20, 205:19-205:23.  Defendants also advertised membership in sham trading groups such as RedliteGreenLite, BTC ("RLGLBTC"), relating to bitcoin, and RedliteGreenLite, LTC ("RLGLLTC"), relating to litecoin.  Trial Exs. 1, 70 at 4, 6; 162; Trial Tr. 173:09-20.  As part of Defendants' scheme to defraud, these memberships were held out by Defendants as offering expert entry-and-exit-price guidance for day trading of certain virtual currencies.  Trial Exs. 1; 70 at 4, 6; Trial Tr. 173:09- 20, 257:13-18.  The solicitations promised services for 12 or more months in exchange for an up-front fee.  *See, e.g.,* Trial Ex. 1 (referring to "2 Year" membership); Ex. 44 (referring to "Annual Fee"); Trial Tr. 257:22-258:12 (referring to "lifetime membership" for guidance and training).  Customers did not receive a year's worth of annual membership.  Instead, McDonnell ceased all communications with customers around June or July 2017.  *E.g.*, Trial Tr. 174:20-24, 239:20-240:01.  As an example of the execution of Defendants' scheme to defraud,

119

Dimovski testified that McDonnell gave him entry advice for a specific trade concerning Titcoin, but McDonnell then failed to give any exit signal; this ultimately resulted in Dimovski incurring significant trading losses.  Trial Tr. 163:20-165:14.

211.    In connection with the scheme to defraud, Defendants made misrepresentations and omissions in solicitations concerning trading virtual currencies on behalf of customers.  For example, McDonnell falsely claimed a virtual currency trading track record and an ongoing record of exceptional trading performance. *E.g.*, Trial Ex. 14, 161.  These claims were false: rather than trading over $50 million in BTC for an established group, Trial Ex. 14, or earning 73 BTC in a single day, Tr. Ex. 161, McDonnell was simply misappropriating customer funds and issuing false reports to them, *see, e.g.*, Trial Tr. 278:22-280:04.  McDonnell also made false and misleading claims about his experience and expertise with virtual currency, including in the development and promotion of new virtual currencies.  Trial Tr. 160:05-161:02.  Under oath, McDonnell stated that he did not recall being involved in the development of any such currencies.  Trial Ex. 84 (June 5 dep.) at 86:19-87:14.  McDonnell also falsely promised customers rapidly profitable in-and-out virtual currency investments. *E.g.*, Trial Ex. 6 (promising 300 percent returns in less than three days and stating "1 BTC in should produce 3 BTC out"); Trial Ex. 8 at 2 (promising 2 to 300 percent profit on 76 Litecoin each day of trading); Trial Ex. 167 (promising to make 0.5 to 2 bitcoin daily for a customer).  These solicitations were false; in fact McDonnell never accomplished such trading results for customers; he misappropriated the funds.  *E.g.*, Trial Tr. 70:20-25, 106:02-07; 229:05-230:13; Trial Exs. 51, 77, 79, 82, 83.  Defendants represented to Taylor that Defendants would purchase virtual currencies on his behalf, hold the virtual currencies in escrow, and trade them on Taylor's behalf.  Trial Tr. 213:9-21, 218:14-20, 221:12-20.  In

reality, Defendants misappropriated Taylor's funds and never returned them in connection with Defendants' scheme to defraud. *See, e.g.*, Trial Tr. 232:07-18, 278:22-280:04.

212.     In connection with their scheme to defraud, Defendants misrepresented to CabbageTech's managed trading customers the value of their investments and the profitability of trades. For example, Defendants sent Taylor multiple emails showing the value of Taylor's account, including one showing that the account balance had grown to $176,703.34 from an original investment of about $25,000. Trial Tr. 221:22-222:23; Trial Ex. 49.  Defendants sent another customer an email on June 17, 2018 stating that the customer's account balance was up to 676 Litecoin, when at the same time McDonnell had been looting the Bittrex cdmmerchant account and had begun transferring litecoins to the account opened in his wife's name. *See* Trial Ex. 82 at 4; Trial Tr. 357:22-367:12. Defendants made false account information, including account balances, available to CabbageTech customers through the CabbageTech website.  Trial Tr. 223:4-225:17; Trial Ex. 50.

213.     In connection with their scheme to defraud, Defendants made repeated misrepresentations concerning the availability of customer funds for withdrawal and in connection with withdrawal requests.  For example, Defendants falsely represented to Taylor that he could withdraw funds at any time, Trial Tr. 228:18-229:4, but when Taylor requested to withdraw $25,000, McDonnell gave Taylor a litany of false excuses and misrepresentations, including that Taylor's check was on the secretary's desk, that the refund would be sent by Fedex, and that funds would be repaid in bitcoin deposited into a Coin Base account, Trial Tr. 229:5-230:20; Tr. Ex. 51.  Defendants omitted to tell Taylor that his funds had been misappropriated; Taylor never received any of his money or virtual currency back.

Trial Tr. 236:19-23.  Defendants falsely represented to multiple CabbageTech customers that the company's website had been hacked and shut down to cover up the fact that CabbageTech customer funds had been misappropriated, used by McDonnell for personal expenses almost immediately after depositing his customers' checks or secreted in an account in his wife's name.  Trial Ex. 52; Trial Tr. 237:14-239:4.

214.    In order to conceal their fraudulent scheme, Defendants omitted to disclose their misappropriation of CabbageTech customer funds or that they would not return customer funds.

215.    Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the Act and Regulation 180.1(a).  *See CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (default judgment) (defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1) by misappropriating funds and making misrepresentations and omissions); *cf., e.g., CFTC v. Van Beuningen*, No. 1:16-cv-978, 2016 WL 9454431, at *4 (N.D. Ga. Mar. 29, 2016) (noting that, as with Rule 10b-5, misappropriation of funds violates Regulation 180.1); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 422 (D. Md. 2005) (defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 by misappropriating investor funds for his personal benefit).

216.    Defendants misappropriated all of the funds obtained from customers as part of their scheme to defraud.  McDonnell often withdrew customer funds deposited into the CabbageTech TD Bank Account through ATMs soon after receipt.  *See* Trial Ex. 139; Trial Tr. 394:18-22, 395:5-11.  McDonnell also used customer funds deposited into the TD Bank account to pay his rent.  Trial Tr. 279:21-280:04.  Defendants misappropriated customer funds sent to the Bittrex cdmmerchant account.

217.    On June 17, 18, and 19, 2017—at the same time that customer demands for refunds were

mounting—McDonnell improperly transferred more than 660 litecoin from the Bittrex

cdmmerchant account to the Bittrex cryptoclown account.  Trial Exs. 90-91, 95-96, 150-152;

Trial Tr. 133:17-136:23, 357:22-367:12.  No customer received funds or virtual currency

back.  Trial Tr. 71:03-15, 109:03-109:12, 236:19-23; *see also* Trial Ex. 83.  The only

exception was a small amount of virtual currency given to Brewell that was not intended as a

return on investment.  *See* Trial Tr. 65:6-66:5.  Defendants' misappropriation violates 7

U.S.C § 9(1) and 17 C.F.R. § 180.1. *See, e.g., CFTC v. Weinberg*, 287 F. Supp. 2d 1100,

1106 (C.D. Cal. 2003) (misappropriation of funds earmarked for trading constituted "willful

and blatant fraudulent activity that clearly violates" the Act) (quotation marks and citations

omitted)).

218.    Defendants' misrepresentations and omissions were material.

219.    A statement of fact is material "if a reasonable investor would consider it important in

deciding whether to make an investment." *S. Tr. Metals*, 2018 WL 3384266, at *8 (citing *R.J.

Fitzgerald*, 310 F.3d at 1328-29). Any fact that enables investors to assess the risk inherent in

their investment and the likelihood of profit is material. *See, e.g., In re Commodities Int'l

Corp.*, CFTC No. 83-43, 1997 WL 11543, at *8–9 (Jan. 14, 1997). "[M]isrepresentations

concerning profit and risk go to the heart of a customer's investment decision and are

therefore material as a matter of law." *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d

482, 500–01 (S.D.N.Y. 2004) (quoting *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F.

Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*,

278 F.3d 319 (4th Cir. 2002)).

220.    Each of Defendants' numerous misrepresentations are individually and collectively

material.  A reasonable investor would consider each important in deciding whether to invest,

remain invested, or make additional investments with CabbageTech and McDonnell in the

purchase or sale of virtual currencies, or to seek advice on trading from Defendants.  For

example, the Defendants' misrepresentations concerning CabbageTech's business are

material: a reasonable investor would find it important to know if the firm he had entrusted

his funds to was only a one-man boiler room in Staten Island that did not have a prestigious

Wall Street address, virtual currency expertise, or multiple employees. *See SEC v.*

*Constantin*, 939 F. Supp. 2d 288, 306-07 (S.D.N.Y. 2013) (in securities fraud action under

SEC Rule 10b-5, holding that defendants' numerous misleading representations, including

references to company divisions that did not exist and advertising office locations in

expensive metropolitan areas where firm did not have offices, were individually and

collectively material).

221.    Defendants' misrepresentations in solicitations to customers to purchase trading advice

are material: a reasonable customer would consider it important to know if he would not

receive the advice he believed he was purchasing.

222.    Defendants' misrepresentations in solicitations to trade virtual currency on the

customer's behalf are material: a reasonable investor would want to know if his funds would

not be used for trading virtual currencies as promised. Defendants' misrepresentations

concerning the value of CabbageTech customers' investments or the profitability of trading

are material: a reasonable customer would consider it important to know if his investments

were not profitable because of Defendants' misappropriation or would not be used for virtual

currency trading as promised. *See Constantin*, 939 F. Supp. 2d at 307 (finding account

124

statements setting forth fictitious account values material); *CFTC v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) (finding false account statements depicting trading profits material because they impacted investor's decisions to invest, remain invested, or make additional investments); *CFTC v. Rolando*, 589 F. Supp. 2d at 170 ("a reasonable investor would want to know that his account statements were false"). Defendants' misrepresentations and omissions concerning their customers' ability to withdraw funds are material: a reasonable investor would consider it important to know if he would be unable to withdraw his funds on demand. Defendants' omissions and failure to disclose their misappropriation is material: a reasonable customer or investor would want to know if his funds were misappropriated. *Cf. SEC v. Gallard*, No. 95-CIV-3099(HB), 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("[T]here is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist ... and that the money paid for those securities would be misappropriated."). In sum, Defendants' numerous misrepresentations concerned facts that were important to investors, went to the heart of their investment decisions, and were material.

223. Defendants acted with scienter. They were aware that their reliance and execution of the scheme was fraudulent and illegal.

224. Under Regulation 180.1, the Commission must show that Defendants' conduct was intentional or reckless. 17 C.F.R. § 180.1; *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015). This standard is met if a defendant "intended to defraud manipulate, or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328; *see also Kraft*, 153 F. Supp. 3d at 1015. The Commission can establish recklessness by showing that the conduct

"departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. v. CFTC*, 676 F.2d 1, 6-7 (1st Cir. 1982); *see also R.J. Fitzgerald*, 310 F.3d at 1328 (holding that scienter is met when a defendant's conduct "involves highly unreasonable omissions or misrepresentations that . . . present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it" (ellipses and brackets in original)). Scienter was proven.

225.   Defendants' conduct in making material misrepresentations and omissions and misappropriating customer funds was intentional or, at a minimum, reckless.  For example, Defendants intentionally, or with reckless disregard to their truth, made representations concerning CabbageTech's size, location, and number of employees were false.  McDonnell himself owned and controlled CabbageTech and knew that he operated it by himself from his home basement in Staten Island.  *See* Trial Ex. 84 (June 5 dep.) at 144:10-145:12.

226.   When Defendants solicited customers, they intentionally, or with reckless disregard to their truth, made false representations concerning the trading advice subscriptions. Defendants' statements were false when made: customers were promised one or more years, or even a lifetime, of advice services shortly before McDonnell abruptly closed the enterprise.  *E.g.*, Trial Ex. 133 (showing Slack group creation on May 14, 2017 and deletion on June 15, 2017).

227.   When Defendants solicited customers to provide funds for virtual currency trading on the customers' behalf, they intentionally, or with reckless disregard to their truth, made exaggerated representations and promises of profits that were known by them to be false when made.

228.    Defendants never intended to provide the promised trading signals and advice, or to trade

on behalf of customers, as evidenced by the immediate misappropriation of customer funds.

For example, McDonnell deposited one cashier's check for investments from Taylor, and the

next day wrote a check in a similar amount to pay his rent.  Trial Exs. 138, 139; Trial Tr.

455:01-09; *see also* Trial Ex. 171, 172.

229.    The intentional nature of Defendants' conduct is evidenced and proven beyond a

reasonable doubt by the blatant disregard of customers' complaints and their refusal to return

investors' funds. When customers asked to withdraw their investments and purported gains,

McDonnell would offer a series of false excuses for delays in repayment. *See, e.g.*, Trial Ex.

51, 77.) Taylor sent repeated emails asking for his funds to be returned and made phone calls

that went unanswered.  Trial Tr. 231:6-8; 239:25-240:01; Trial Ex. 51.  Other customers

asked for withdrawals that were never honored.  Trial Tr. 70:20-25; Trial Ex. 27, 82, 83.

Instead, Defendants cut off communications with customers who asked for their money.

Trial Tr. 174:12-19, 239:20-240:1.  Except for the one minor gratuitous payment, no

customer ever received money or virtual currency from Defendants.  Trial Tr. 71:03-15,

109:03-109:12, 236:19-23.  At deposition and under oath, McDonnell falsely stated that he

"d[idn't] recall" any CabbageTech customer ever requesting a refund, Trial Ex. 84 (June 5

dep.) at 254:17-20, or complaining about anything.  Trial Ex. 85 (June 19 dep.) at 50:3-

51:15.  McDonnell also falsely stated that he did not recall Brewell ever asking him for any

money or virtual currency back, *id.* at 48:19-49:3, did not recall ever communicating with

Anthony Dimovski, *id.* at 52:16-53:5, and did not recall any customer named Junor Taylor,

or ever emailing Taylor, speaking with Taylor on the telephone, or sending or receiving

anything to or from Taylor via Federal Express, *id.* at 58:13-61:7.

230.    Defendants' fraud was in connection with contracts of sale of a commodity in interstate and foreign commerce.

231.    The "in connection with" requirement of Section 6(c)(1) of the Act and Regulation 180.1(a) is construed broadly.  It is satisfied where the contract of sale of a commodity is in interstate commerce and the fraud are not independent events.  *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding that Section 10(b) of the Exchange Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal citation omitted)); *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41398, 41405 (July 14, 2011) (consistent with *Zandford*, "[t]he Commission interprets the words 'in connection with' broadly, not technically or restrictively"); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (concluding that the "in connection with" requirement, broadly read pursuant to *Zandford*, can be met even in cases involving "completely fictitious" securities transactions).

232.    Defendants' fraudulent acts, including making material misrepresentations and omissions and misappropriating customer funds and virtual currencies, were in connection with, and contemporaneous with, contracts of sale of virtual currencies such as Bitcoin and Litecoin, each a commodity in interstate commerce.  *McDonnell*, 287 F. Supp. 3d at 228.

233.    CabbageTech is liable for the acts of its agent McDonnell.  McDonnell is responsible for the acts of its agent, Cabbagetech.

234.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, impose strict liability on a principal for acts and omissions by its agent who acts within the scope of their employment or office. Pursuant to these provisions, "it does not matter if the

128

principal participated in or even knew about the agent's acts; he is strictly liable for them."
*Stotler & Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir. 1988); *see also Guttman v. CFTC*, 197
F.3d 33, 39-40 (2d Cir. 1999). That an agent's actions are illegal does not automatically place
those acts outside of his scope of employment. *See, e.g., Guttman*, 197 F.3d at 39-40
(upholding Commission's finding of principal-agent liability under Section 2(a)(1)(B) of the
Act, where agent engaged in trading that was both within scope of employment, and illegal);
*CFTC v. Byrnes*, 58 F. Supp. 3d 319, 323-30 (S.D.N.Y. 2014) (company may be liable under
Section 2(a)(1)(B) of the Act for agents' violations of the Act within scope of employment,
including any acts intended to serve any purpose of the employer).

235.    The well-pled allegations in the Complaint and the overwhelming preponderance of the
evidence at trial establish that McDonnell's violations of 7 U.S.C § 9(1) and 17 C.F.R. §
180.1 occurred within the course and scope of his work for CabbageTech. Accordingly,
CabbageTech is liable for McDonnell's violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17
C.F.R. § 1.2.  Similarly, McDonnell is liable for Cabbagetech's illegal activities.

236.    McDonnell is liable as a controlling person for his own and Cabbagetech's fraudulent
acts.

237.    Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), an individual who possesses, directly
or indirectly, the power to direct or cause the direction of the management and policies of an
entity may be liable as a controlling person of that entity, provided that the individual either
knowingly induces, directly or indirectly, the violative acts, or fails to act in good faith.  To
establish controlling person liability under 7 U.S.C. § 13c(b), the Commission must show (1)
control and (2) lack of good faith or knowing inducement of the acts constituting the
violation.  *Int'l Fin. Servs.*, 323 F. Supp. 2d at 504–05 (quoting *CFTC v. Baragosh*, 278 F.3d

319, 330 (4th Cir. 2002)).  The statute is construed liberally; even indirect means of discipline

or influence, short of actual direction, is sufficient to find liability as a controlling person.

*Monieson v. CFTC*, 996 F.2d 852, 859-60 (7th Cir. 1993). Proof of recklessness will

demonstrate that the controlling person acted in bad faith.  *Id.* at 860. To establish "knowing

inducement," the Commission must show that "the controlling person had actual or

constructive knowledge of the core activities that constitute the violation at issue and allowed

them to continue." *In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *7 (Jan. 12, 1988).

McDonnell and Cabbagetech were controlling persons who had actual knowledge of the

scheme to defraud and actions executing that scheme.

238.    McDonnell exercised general control over CabbageTech.  He also controlled the specific

activities that are the basis for CabbageTech's violations of the Act and Regulations.  For

example, McDonnell was the sole owner and operator of the business, controlled the content

on the CabbageTech website and related social media, and controlled the accounts at PayPal,

TD Bank, and Bittrex, where customer funds and virtual currencies were deposited and then

misappropriated.  *E.g.*, Trial Exs. 63 at 3, 84 (June 5 dep.) at 122:8-10, 125:11-126:5,

141:21-23, 142:14-19; Trial Exs. 88-91, 93-96 (showing Bittrex identity information).

McDonnell was responsible for developing and disseminating the false and misleading

information about CabbageTech to customers through solicitation materials. Trial Ex. 84

(June 5 dep.) at 142:8-13, 141:24-142:7 (research reports), 38:8-38:16, 40:7-22, 43:14- 44:15

(emails).  McDonnell controlled the various telephone numbers used to communicate with

CabbageTech customers, *see* Trial Exs. 42, 98, 102 (telephone subscriber information)) and

solicited customers by telephone *E.g.*, Trial Tr. 96:25-97:11, 99:02-99:20 (Newman), 202:19-

203:11 (Taylor).  McDonnell not only exercised general control over CabbageTech, he also

controlled and undertook its specific activities that constitute CabbageTech's violations of the Act and Regulations.  *See Int'l Fin. Servs.*, 323 F. Supp. 2d at 505.

239.    McDonnell knowingly induced, directly or indirectly, the conduct constituting violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1.  He failed to act in good faith, as evidenced by his making of relevant fraudulent misstatements and omissions to CabbageTech customers and his personal execution of the fraudulent scheme and misappropriation of customer funds. *See, e.g.*, Trial Ex. 84 (June 5 dep.) at 67:19-21; Trial Tr. 279:21-280:04.  McDonnell's failure to act in good faith is evidenced by his blatant disregard of customers' complaints, his lies to them, and his refusal to return investors' funds.  *E.g.*, Trial Exs. 82, 83, 122; Trial Tr. 174:12-19, 237:14-240:01, 308:06-309:25.  McDonnell is liable for CabbageTech's violations of 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 to the same extent as CabbageTech itself is pursuant to 7 U.S.C. § 13c(b).

240.    Judgment by default against CabbageTech has been properly granted.

241.    Rule 55 of the Federal Rules of Civil Procedure authorizes a default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  As to corporate defendants, "[i]t is settled law that a corporation may not appear in a lawsuit against it except through an attorney, and that, where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it."  *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 192 (2d Cir. 2006) (quoting *SEC v. Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975)).

242.    CabbageTech has failed to answer or otherwise defend this action, and this court has already found CabbageTech in default.  ECF No. 40.  The well-pled allegations in the Complaint, and the present findings of fact, establish that CabbageTech is liable for fraud by

misrepresentations, omissions, and misappropriation, in violation of 7 U.S.C § 9(1) and 17

C.F.R. § 180.1. Accordingly, final judgment by default against CabbageTech should be

entered pursuant to Rule 55 of the Federal Rules of Civil Procedure.  It has already been

entered.  *See* ECF No. 40; ECF No. 164.

IV.   Relief

    A.  Permanent Injunction

243.   The court's authority to grant the injunctive relief requested is set forth in Section 6c(a)

of the Act, 7 U.S.C. § 13a-1(a). The statutory injunctive relief contemplated in Section 6c of

the Act is remedial in nature.  It is designed to prevent injury to the public and to deter future

illegal conduct. "The Commission, like the SEC in the securities area, is the 'statutory

guardian' entrusted with the enforcement of the congressional scheme for safeguarding the

public interest in commodity futures markets." *CFTC v. British Am. Commodity Options

Corp.*, 560 F.2d 135, 142 (2d Cir. 1977)). Unlike private litigants seeking injunctions, the

Commission does not need to show irreparable injury or the inadequacy of other remedies

when seeking an injunction. *Id.*, at 141-42; *cf. SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.

1998) (noting same exception applies in actions by SEC); *SEC v. Unifund SAL*, 910 F.2d

1028, 1035-36 (2d Cir. 1990) (explaining the public interest inherent in such actions).  It has

shown irreparable injury to Defendants' customers and has shown danger of such damage to

the community in the future unless Defendants are now restrained.

244.   The Commission is entitled to injunctive relief under Section 6c of the Act upon a

showing that "there is a likelihood that, unless enjoined, the violations will continue." *See

CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986); *SEC v. Credit

Bancorp, Ltd.*, 738 F. Supp. 2d 376, 390 (S.D.N.Y. 2010) ("An enforcement action

requesting a permanent injunction must only show a 'reasonable likelihood of future violations.'") (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).  Unless an injunction is granted, there is a likelihood of future violations by Defendants.

245.    In determining whether a "reasonable likelihood" of future continuing violations exists, courts generally consider the egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the Defendants' recognition of the wrongfulness of the conduct; and the likelihood that the Defendants' customary business activities will present opportunities for future violations. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972); *see also SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978). "[T]the ultimate test ... is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (citation omitted). A "district court may properly infer a likelihood of future violations from the defendant's past unlawful conduct."  *CFTC v. Am. Bd. of Trade*, 803 F.2d at 1251; *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) (holding that such an injunction is particularly within the court's discretion where a violation was "founded on systematic wrongdoing, rather than an isolated occurrence").

246.    Defendants engaged in a recurrent, systematic process of egregious intentional violations of the Act: Defendants defrauded investors about the nature of the advice and managed trading services offered and then misappropriated the investors' assets for McDonnell's personal purposes.  Given the systematic nature of the past conduct, the high degree of scienter involved, McDonnell's failure to accept responsibility, and a lack of any constraints on future misconduct, there is a reasonable likelihood that Defendants will engage in future

like  violations.  A permanent injunction is warranted including, among other things, permanent bans on trading virtual currency, controlling trading accounts for other persons, soliciting or accepting funds from any person for trading in commodity interests, or applying for or claiming exemption from registration with the Commission or engaging in any activity requiring such registration or exempt from registration pursuant to Commission Regulation.

247.    The final injunction shall prevent McDonnell from dealing in assets that he legally owns himself.  The defendant has shown that he is susceptible to the inducement of fraud involving virtual currencies; he cannot be trusted to operate only on his own behalf in a lawful and honest way. *See*, *supra*, at ⁋ 22.

B.  Restitution

248.    Restitution may be granted pursuant to the court's statutory authority under Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A).  With the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), the CEA was amended to specifically allow the Commission to seek "restitution to persons who have sustained losses proximately caused by [a] violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(A).  The addition of this language provided by statute clarified the method to calculate restitution.

249.    Where a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution. *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986) (per curiam) (where there existed systematic and pervasive fraud, dispensing with the general rule that in calculating disgorgement a party must distinguish between the legally and illegally derived profits).

134

250.     The appropriate calculation of restitution in cases of pervasive fraud under the CEA

includes all customer losses even where only a subset of those customers testified at trial.

*See, e.g., Hunter Wise*, 21 F. Supp. 3d at 1352 (determining in connection with violations of

Section 6(c) of the Act and Rule 180.1 that "[t]he systematic and pervasive nature of [the

defendant's] fraud necessitates restitution not only for the retail customers who testified to

the losses they sustained due to [the defendant's] scheme, but for all of [defendant's]

customers as well.").

251.     Where there are consistent material misstatements or omissions in the context of a

fraudulent scheme, the court can assume reliance of the Defendants' customers on

Defendants' fraud even though they did not testify.  *See Affiliated Ute Citizens v. United

States*, 406 U.S. 128, 131 (1972) (determining that in cases "involving primarily a failure to

disclose, positive proof of reliance is not a prerequisite to recovery.").  The records show

money obtained and misappropriated from them by Defendants.  Where customer funds are

obtained under false pretenses, the appropriate calculation of restitution includes all

customers who are reasonably found to have relied on such misstatements. *See CFTC v.

Paramount Mgmt., LLC*, No. 13 CIV 4436-CM, 2013 WL 5586216, at *8 (S.D.N.Y. Sept. 9,

2013) (consent order) (where customer funds intended for forex trading were

misappropriated, finding "that it is not necessary that the Commission prove customers relied

on the misrepresentations and omissions of [defendants] for purposes of calculating customer

restitution because reliance is presumed").

252.     The Commission has properly assumed reliance by customers who testified and who did

not testify based on the testimony and documents showing a fraudulent mode of operation as

to each of Defendants' clients.

135

253.     The testimony and evidence presented at trial established that Defendants—from January

to July 2017—engaged in a systemic and pervasive scheme to mislead customers and

misappropriate their funds.  There can be no more fundamental omission than the

Defendants' failure to disclose that they had no intent to provide the services promised, but

rather, that they were executing a fraudulent scheme to misappropriate customer assets and

intended to continue to do so.  *See CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at

*5 (S.D. Fla. May 17, 2013), 2013 WL 2158428, at *5 ("On the whole, however, this case is

most accurately described as an omissions case. The heart of the fraud was the Defendants'

failure to tell pool participants of the Defendants' scheme to misappropriate the pool

participants' funds . . . .").  Accordingly, this court orders restitution in the full amount of

customer losses from funds transferred by customers to the Defendants from February to

June 2017 for the purchase and sale of virtual currencies and the trading services they did not

receive.

254.     It has not been shown by a preponderance of the evidence that the transfers made by

Charles Mills to McDonnell between February 2015 to November 2016 were part of

McDonnell's fraudulent scheme.  The amount of restitution sought was accordingly reduced

by $164,700.00.

255.     In total, from February to June 2017, Defendants wrongfully received $292,693.54

from victims with the plan to misappropriate all these funds.  *See* Trial Ex. 180.  The award

of restitution is reduced by $2,264.25, the value of the virtual currency transfer made by

McDonnell to Brewell in May 2017.

256.     Restitution in the total amount of $290,429.29 is appropriate in this matter, and is

granted.

257.    NFA should and is appointed as post-judgment monitor under the terms of final judgment and decree referenced in this memorandum.

258.    Payment and distribution of restitution shall take priority over all other payments, including payment of the civil monetary penalty.  *See* Trial Tr. 456:14–16 (Commission asserting that its "orders typically direct payment first in restitution before any payment of the civil monetary penalty").

    C.  Civil Monetary Penalties

259.    Under Section 6c(d)(1)(A) of the Act, the court may impose "on any person found to have committed any violation a civil penalty in the amount of not more than the greater of" $177,501 per violation (as adjusted for inflation pursuant to statute) or triple the monetary gain to the person for each violation.  *See* 7 U.S.C. § 13a-1(d)(1)(A) (setting forth the basic statutory amount or triple the monetary gain); Regulation §§ 143.8(a) and (b)(1), 17 C.F.R. § 143.8(a) and (b)(1) (implementing statutory requirement to adjust maximum amount of penalties for inflation pursuant to 28 U.S.C. § 2461 note (Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (as amended))).

260.    "The court should consider a variety of factors in assessing a civil monetary penalty, and has broad discretion in fashioning an appropriate remedy that is 'rationally related to the offense charged or the need for deterrence.'" *CFTC v. Yorkshire Grp., Inc.,* No. 13- cv5323, 2016 WL 8256380, at *6 (E.D.N.Y. Aug. 19, 2016) (quoting *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008)), *report and recommendation adopted by*, 2016 WL 5942310, at *3 (E.D.N.Y. Oct. 12, 2016).  "Accordingly, the court should focus on the gravity of the misconduct, considering such factors as (1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) respondent's state of mind; (3) the consequences flowing

137

from the violative conduct; and (4) respondent's post-violation conduct." *Id.* (internal quotation marks omitted). Conduct that violates the core provisions of the Act, such as customer fraud, is considered serious. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995).

261. In light of the core relationship of the anti-fraud regulations to the purpose of the Act, the egregiousness of Defendants' intentional conduct to misappropriate customer and investor funds, the length of time over which Defendants engaged in the wrongful trading activity, and McDonnell's failure to accept any responsibility or attempt to ameliorate the wrongful conduct following the court's findings of victim credibility, the court imposes a civil monetary penalty of triple the monetary gain for the fraudulent behavior of Defendants in violation of Section 6(c)(1) of the Act and Regulation 180.1.

262. Defendants' gain is the amount fraudulently raised from customers $290,429.29.

263. Triple the monetary gain is $871,287.87. The court imposes a civil monetary penalty of $871,287.87, plus post-judgment interest as prescribed by statute, jointly and severally against Patrick K. McDonnell and CabbageTech, Corp. d/b/a Coin Drop Markets.

V. Conclusion

264. This Court finds in favor of the Commission and against Defendants on Count I of the Complaint. Injunctive relief, restitution, and civil monetary penalties relief are appropriate based on the findings and conclusions in this order.

265. A final judgment and order of permanent injunction including the specific terms of the permanent injunction, restitution, and civil monetary penalties is set out in a Final Judgment and Order of Permanent Injunction, Restitution, and Civil Monetary Penalties against Defendants Patrick K. McDonnell and Cabbagetech, Corp. d/b/a Coin Drop Markets pursuant

to Federal Rules of Civil Procedure 58 and 55(b)(2), and equity and common law and applicable administrative law, Section 6c of the Act, 7 U.S.C. § 13a-1, after a full bench trial.

266.    The final judgment and order of injunction shall be furnished by the Commission to the Defendants by certified mail at Defendants last known address within five days of filing by the court.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 23, 2018
       Brooklyn, New York

139